Video Software Dealers Association et al v. Schwarzenegger et al Doc. 5

GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR., SBN 132099
H. MARK LYON, SBN 162061
ETHAN D. DETTMER, SBN 196046
1881 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 849-5300
Facsimile: (650) 849-5333

JENNER & BLOCK LLP
PAUL M. SMITH (*pro hac vice* application pending)
KATHERINE A. FALLOW (*pro hac vice* application pending)
AMY L. TENNEY (*pro hac vice* application pending)
601 13th Street, N.W., Suite 1200
Washington, D.C. 20005
Telephone: (202) 639-6000
Facsimile: (202) 639-6066

Attorneys for Plaintiffs
VIDEO SOFTWARE DEALERS ASSOCIATION
and ENTERTAINMENT SOFTWARE ASSOCIATION

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

VIDEO SOFTWARE DEALERS ASSOCIATION and ENTERTAINMENT SOFTWARE ASSOCIATION,

Plaintiffs,

vs.

ARNOLD SCHWARZENEGGER, in his official capacity as Governor of the State of California; BILL LOCKYER, in his official capacity as Attorney General of the State of California; GEORGE KENNEDY, in his official capacity as Santa Clara County District Attorney, RICHARD DOYLE, in his official capacity as City Attorney for the City of San Jose, and ANN MILLER RAVEL, in her official capacity as County Counsel for the County of Santa Clara,

Defendants.

CASE NO. C 05-4188 RMW (RS)

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR A PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Notice of Motion and Motion for a Preliminary Injunction;
Memorandum of Points and Authorities in Support Thereof Case No. C 05-4188 RMW (RS)

Dockets.Justia.com

**NOTICE OF MOTION AND MOTION**

TO ALL DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on December 2, 2005, at 9:00 a.m., or as soon thereafter as this matter may be heard, in Courtroom 6 of this Court, located at 280 South First Street, San Jose, California 95113, plaintiffs Video Software Dealers Association ("VSDA") and Entertainment Software Association ("ESA") will, and hereby do, respectfully move for a preliminary injunction preventing Defendants and their officers, employees, and representatives from enforcing Chapter 638, Statutes of 2005 (Cal. 2005) (hereinafter, the "Act").

VSDA and ESA (collectively "Plaintiffs") move for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 on the following grounds:

1. The Act was signed into law on October 7, 2005, and is due to take effect on January 1, 2006. The Act places criminal penalties on the sale or rental of "violent" video games to individuals under age 18 and imposes other burdens on the expression of video game retailers and manufacturers.

2. Plaintiffs are associations of companies that create, publish, manufacture, import, distribute, sell, and/or rent video games. On October 17, 2005, Plaintiffs filed a three-count Complaint seeking to invalidate the Act under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. As set forth in the Complaint, the Act is unlawful because it violates Plaintiffs' constitutionally guaranteed rights to freedom of expression and equal protection, and because it is unconstitutionally vague.

3. Plaintiffs are entitled to a preliminary injunction because they are likely to succeed on the merits of their constitutional challenge to the Act, and because the equities weigh strongly against enforcement of the Act. Similar efforts to regulate video games based on their expressive content have been struck down by every court that has considered this issue, including the Seventh and Eighth Circuits, and a District Court in the Ninth Circuit. *See American Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 579-80 (7th Cir. 2001); *Interactive Digital Software Ass'n v. St. Louis*

*County*, 329 F.3d 954, 957 (8th Cir. 2003); *Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180, 1184-85 (W.D. Wash. 2004).

4. The Act is subject to strict scrutiny because it imposes content-based restrictions on expression protected by the First Amendment. The Act's restrictions on "violent" video games fail strict scrutiny, because they are unsupported by a compelling state interest that is materially advanced by narrowly tailored means. In addition, the Act is unconstitutionally vague, and the Act unconstitutionally compels expression through burdensome and unnecessary labeling requirements.

5. The equities weigh strongly in favor of an injunction. Plaintiffs and their members will suffer irreparable harm if the Act is allowed to go into effect, because the loss of First Amendment freedoms, for any amount of time, constitutes irreparable injury. The First Amendment rights of members of the public will be similarly impaired.

This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the declarations submitted herewith, detailing the Act's chilling effect on protected expression, copies of sample video games that might be impermissibly censored under the Act, videos of sample representative game play of those games, the Court's papers and files in this case, the arguments of counsel, and any other matters the Court may consider.

For each of these reasons, Plaintiffs request that this Court enter a preliminary injunction enjoining all Defendants to this action, and their officers, employees, and representatives, from enforcing, or directing the enforcement of Chapter 638, Statutes of 2005 (Cal. 2005), until resolution of this action or further order of this Court.

ii

Notice of Motion and Motion for a Preliminary Injunction;
Memorandum of Points and Authorities in Support Thereof

Case No. C 05-4188 RMW (RS)

**TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ..... i

TABLE OF CONTENTS ..... iiii

TABLE OF AUTHORITIES ..... ivi

INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 3

A. The Nature Of Video Games ..... 3

B. The Video Game Industry's Well-Established Voluntary Rating System. ..... 3

C. The Challenged Statute. ..... 4

*1. The "Violent" Video Game Ban.* ..... 4

*2. The Act's Labeling Restrictions.* ..... 5

ARGUMENT ..... 6

I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS, GIVEN THE ACT'S SWEEPING CONTENT-BASED INVASION OF FIRST AMENDMENT RIGHTS AND UNCONSTITUTIONAL VAGUENESS ..... 6

A. Video Games Constitute Expression Protected By The First Amendment. ..... 6

B. The Act's "Violent" Video Game Restrictions Fail The Brandenburg Standard. ..... 7

C. The Act's "Violent" Video Game Restrictions Fail Strict Scrutiny. ..... 10

*1. The State Has No Legitimate, Much Less Compelling, Interest In Controlling Minors' Thoughts Or Feelings.* ..... 10

*2. The Act Does Not Materially Advance The State's Interests And Is Not Narrowly Tailored.* ..... 12

C. The Act's Labeling Provisions Are Unconstitutional. ..... 14

D. The Act Is Unconstitutionally Vague ..... 15

II. THE EQUITIES STRONGLY SUPPORT AN INJUNCTION ..... 18

CONCLUSION ..... 19

## TABLE OF AUTHORITIES

### CASES

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996) .......... 13

*American Amusement Machine Ass'n v. Kendrick*, 244 F.3d 572 (7th Cir. 2001) .......... i, 1, 2, 6, 7, 8, 9, 11, 12, 13

*American Booksellers Ass'n v. Hudnut*, 771 F.2d 323 (7th Cir. 1985), *aff'd*, 475 U.S. 1001 (1986) .......... 9-10

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) .......... 8, 11

*Association of National Advertisers v. Lundgren*, 44 F.3d 726 (9th Cir. 1994) .......... 10

*Boos v. Barry*, 485 U.S. 312 (1988) .......... 11

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) .......... 8

*Brown v. California Department of Transportation*, 321 F.3d 1217 (9th Cir. 2003) .......... 18

*Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188 (9th Cir. 1989) .......... 8, 9

*Eclipse Enterprises, Inc. v. Gulotta*, 134 F.3d 63 (2d Cir. 1997) .......... 7

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975) .......... 11

*Florida Star v. B.J.F.*, 491 U.S. 524 (1989) .......... 12

*Ginsberg v. New York*, 390 U.S. 629 (1968) .......... 12

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) .......... 15-16

*Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954 (8th Cir. 2003) .......... i-ii, 1, 6, 7, 8, 10, 12

*James v. Meow Media, Inc.*, 300 F.3d 683 (6th Cir. 2002) .......... 2, 7, 8, 9, 12

*Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952) .......... 11

*Kolender v. Lawson*, 461 U.S. 352 (1983) .......... 15

*Leidholdt v. L.F.P. Inc*, 860 F.2d 890 (9th Cir. 1988) .......... 8

*McConnell v. Federal Election Commission*, 540 U.S. 93 (2003) .......... 11

*Miller v. California*, 413 U.S. 15 (1973) .......... 12

*NAACP v. Button*, 371 U.S. 415 (1963) .......... 16

*National People's Action v. Village of Wilmette*, 914 F.2d 1008 (7th Cir. 1990) .......... 18

*Ohio ex rel. Celebrezze v. Nuclear Regulatory Commission*, 812 F.2d 288 (6th Cir. 1987) .......... 18

*Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1 (1986) .......... 14, 15

*Perez-Funez v. District Director, INS*, 611 F. Supp. 990 (C.D. Cal. 1984) .......... 18

*Podolsky v. First Healthcare Corp*., 50 Cal.App.4th 632 (Cal. Ct. App. 1996) .......... 2

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) .......... 10

*Reno v. ACLU*, 521 U.S. 844 (1997) .......... 16

*Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988) .......... 14

*S.O.C., Inc. v. County of Clark*, 152 F.3d 1136 (9th Cir. 1998) .......... 2, 6, 18

*Sammartano v. First Judicial District Court*, 303 F.3d 959 (9th Cir. 2002) .......... 6, 18, 19

*Sanders v. Acclaim Entertainment, Inc.*, 188 F. Supp. 2d 1264 (D. Colo. 2002) .......... 2, 7

*Simon & Schuster, Inc. v. Members of the New York State Crime Victims Board*, 502 U.S. 105 (1991) .......... 10

*Texas v. Johnson*, 491 U.S. 397 (1989) .......... 1, 11

*Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969) .......... 11

*Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994) .......... 10, 12, 13

*United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000) .......... 10, 13

*United States v. United Foods, Inc.*, 533 U.S. 405 (2001) .......... 14

*Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180 (W.D. Wash. 2004) .......... ii, 1, 2, 6, 7, 8, 9, 10, 12, 13, 18

*Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167 (D. Conn. 2002) .......... 2, 7

*Winters v. New York*, 333 U.S. 507 (1948) .......... 7

## STATUTES

Cal. Bus. & Prof. Code § 20650 .................... 14, 15

## LEGISLATIVE MATERIAL

Chapter 638, Statutes of 2005 (Cal. 2005) .................... 4, 5, 6, 7, 11, 12, 16

**INTRODUCTION**

Plaintiffs Entertainment Software Association ("ESA") and Video Software Dealers Association ("VSDA") submit this memorandum in support of their motion, pursuant to Federal Rule of Civil Procedure 65, for a preliminary injunction preventing Defendants and their officers, employees, and representatives from enforcing Chapter 638, Statutes of 2005 (Cal. 2005) (hereinafter, the "Act"). The Act was signed into law on October 7, 2005, and is due to take effect on January 1, 2006.

Plaintiffs are entitled to a preliminary injunction under controlling legal principles. Plaintiffs are likely to succeed on their claim that the Act is unconstitutional. California's sweeping legislation places substantial penalties on the sale or rental of "violent" video games to individuals under age 18 and imposes additional burdens on the expression on those who make, distribute, and sell or rent video games. Such content discrimination violates the "bedrock principle underlying the First Amendment . . . that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

If allowed to go into effect, the Act would impose an unprecedented – and unconstitutional – scheme of censorship on fully protected speech, one that singles out expression in video games from all other media that may contain depictions of "violence." Indeed, the Act may well restrict the sale of "T"-rated video games based on popular movies – such as the *James Bond* franchise, and video games based on Governor Schwarzenegger's blockbuster *Terminator* trilogy.

Not only would the Act restrict the sale or rental of "violent" video games based on the content of those games, but it also would require any video game manufacturer, distributor or importer who distributes video games in California – essentially *every* video game maker – to determine whether the games meet the statutory definition of "violent," and if so, to place a large sticker on the game packaging that obscures other important information.

Every previous attempt to restrict video games based on their content has been struck down as violating the First Amendment. *See Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954 (8th Cir. 2003) ("*IDSA*"); *American Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572 (7th Cir. 2001) (Posner, J.) ("*AAMA*"); *Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180 (W.D.

Wash. 2004) ("*VSDA*"); *cf. James v. Meow Media, Inc.*, 300 F.3d 683, 696 (6th Cir. 2002) (refusing to permit tort liability for video games on First Amendment grounds); *Sanders v. Acclaim Entm't, Inc.*, 188 F. Supp. 2d 1264, 1279 (D. Colo. 2002) (same); *Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167, 181 (D. Conn. 2002) (same). Like its predecessors in other jurisdictions, the Act cannot withstand the strict constitutional scrutiny triggered by its content-based burdens on protected speech.

The Act is also impossibly – and unconstitutionally – vague. In defining which games are subject to restriction, the Act attempts to squeeze its prohibitions into the three-prong test for the narrow sexually explicit "harmful to minors" category of speech – which has *never* been extended to "violent" speech, and which has no meaning as applied to depictions of violence – and also seeks to import language from sentencing guidelines governing when the *death penalty* should be imposed. This latter framework is unprecedented in the speech context, and is so hopelessly vague that the Act should be struck down on vagueness grounds alone. *See VSDA*, 325 F. Supp. 2d at 1191 (invalidating Washington state law restricting "violent" video games on the independent ground of unconstitutional vagueness).

The equities also weigh strongly in favor of an injunction. *See, e.g.*, *AAMA*, 244 F.3d at 580. Plaintiffs and their members will suffer irreparable harm if the Act is allowed to go into effect, because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *S.O.C., Inc. v. County of Clark*, 152 F.3d 1136, 1148 (9th Cir. 1998) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)). The First Amendment rights of members of the public — whose rights are also at stake in this facial challenge — will be similarly impaired. Accordingly, the Act must be enjoined.[1]

---

[1] In addition, absent injunctive and declaratory relief, Plaintiffs' members might be subjected to a multitude of lawsuits under Cal. Bus. & Prof. Code § 17200, which has been interpreted to grant a broad private right of action to individuals harmed by an entity's alleged failure to comply with a state statute. See, e.g., *Podolsky v. First Healthcare Corp.*, 50 Cal.App.4th 632, 647 (Cal. Ct. App. 1996). The Act's inherently vague terms would mean that Plaintiffs' members could be subject to suit based on a wide and contradictory range of legal theories about what games are covered by the Act. The potential for numerous civil lawsuits only serves to underscore the need for immediate injunctive relief.

## FACTUAL BACKGROUND

### A. The Nature Of Video Games.

Plaintiffs are associations of companies that create, publish, manufacture, distribute, import, sell, and/or rent video games. Compl. ¶¶ 11-12. They bring this action because, if allowed to go into effect, the Act will censor distribution of some of Plaintiffs' creative works, based solely upon their expressive content. *Id.* ¶ 14. In this facial challenge, Plaintiffs also assert the rights of willing listeners. *Id.* ¶ 15.

Video games are a modern form of artistic expression. Like motion pictures and television programs, video games tell stories and entertain audiences through the use of complex pictures, sounds, and text. *See* Price Decl. ¶¶ 4-5.[2] Video games feature the artwork of leading graphic artists, as well as music — much of it original — that enhances the game's artistic expression in the same way as movie soundtracks. *Id.* These games often contain storylines and character development as richly detailed as (and sometimes based on) books and movies. *Id.* ¶¶ 4-5, 61. Like great literature, these games frequently involve familiar themes such as good versus evil, triumph over adversity, struggle against corrupt powers, and quest for adventure. *Id.* ¶¶ 4, 23-66.

### B. The Video Game Industry's Well-Established Voluntary Rating System.

Like other popular media, such as motion pictures and music, the video game industry has adopted a voluntary and widely used rating system for video games. *See* Lowenstein Decl. ¶¶ 4-10. That system — which the FTC has called the "most comprehensive" of industry-wide media rating systems — is implemented by the Entertainment Software Rating Board ("ESRB"), a self-regulatory body that assigns independent ratings and descriptions for video game content. *Id.* ¶¶ 4-5. The ESRB system includes not only letter ratings (EC, E, E10+, T, M, and AO), but also numerous

---

[2] In support of their Motion, Plaintiffs are submitting the Declaration of Ted Price ("Price Decl."), President and CEO of Insomniac Games, Inc.; Declaration of Crossan R. Andersen ("Andersen Decl."), President of Plaintiff VSDA; and Declaration of Douglas Lowenstein ("Lowenstein Decl."), President of Plaintiff ESA. Plaintiffs are also submitting copies of video games that may be deemed to be covered by the Act's restrictions, along with taped recordings of representative play of those games. The declarations and supporting materials are being submitted as a separate appendix to the memorandum in support of Plaintiffs' Motion.

3

Notice of Motion and Motion for a Preliminary Injunction;
Memorandum of Points and Authorities in Support Thereof Case No. C 05-4188 RMW (RS)

"content descriptors," descriptive phrases that give consumers and parents additional information about a game's contents. *Id.* ¶¶ 7-8. The purpose of the ESRB system is to provide easily understood information about games to consumers and parents — not to dictate what is ultimately appropriate for individuals of different ages. *Id.* ¶ 6. Like the movie rating system, the ESRB system is entirely voluntary; nonetheless, nearly all video game publishers submit their games for rating. *Id.* Similarly, video game retailers throughout the nation are part of a widespread and voluntary effort to educate consumers about the ESRB system and to require parental consent for the sale of "M" games to individuals under age 17. *See* Andersen Decl. ¶ 18.

**C. The Challenged Statute.**

***1. The "Violent" Video Game Ban.***

The Act imposes a civil penalty of up to $1,000 on any person who "sell[s] or rent[s] a video game that has been labeled as a violent video game to a minor." Act, § 1746.1(a). "Violent" video games are defined by the Act as those "in which the range of options available to a player includes killing, maiming, dismembering, or sexually assaulting an image of a human being," if the actions depicted meet one of two sets of criteria. Act, § 1746(d)(1). Under the first set of criteria, the violence depicted in the game must "appeal to a deviant or morbid interest of minors," be "patently offensive to prevailing standards in the community as to what is suitable for minors," and "cause[] the game, as a whole, to lack serious literary, artistic, political, or scientific value for minors." *Id.* § 1746(d)(1)(A). Under the second provision, a game will be restricted if the actions depicted enable "the player to virtually inflict serious injury upon images of human beings or characters with substantially human characteristics in a manner which is especially heinous, cruel or depraved in that it involves torture or serious physical abuse to the victim." *Id.* § 1746(d)(1)(B). Those terms are further defined as follows:

> (A) "Cruel" means that the player intends to virtually inflict a high degree of pain by torture or serious physical abuse of the victim in addition to killing the victim.
>
> (B) "Depraved" means that the player relishes the virtual killing or shows indifference to the suffering of the victim, as evidenced by torture or serious physical abuse of the victim.

> (C) "Heinous" means shockingly atrocious. For the killing depicted in a video game to be heinous, it must involve additional acts of torture or serious physical abuse of the victim as set apart from other killings.
>
> (D) "Serious physical abuse" means a significant or considerable amount of injury or damage to the victim's body which involves a substantial risk of death, unconsciousness, extreme physical pain, substantial disfigurement, or substantial impairment of the function of a bodily member, organ, or mental faculty. Serious physical abuse, unlike torture, does not require that the victim be conscious of the abuse at the time it is inflicted. However, the player must specifically intend the abuse apart from the killing.
>
> (E) "Torture" includes mental as well as physical abuse of the victim. In either case, the virtual victim must be conscious of the abuse at the time it is inflicted; and the player must specifically intend to virtually inflict severe mental or physical pain or suffering upon the victim, apart from killing the victim.
>
> (3) Pertinent factors in determining whether a killing depicted in a video game is especially heinous, cruel, or depraved include infliction of gratuitous violence upon the victim beyond that necessary to commit the killing, needless mutilation of the victim's body, and helplessness of the victim.

*Id.* §§ 1746(d)(2), (3).

The Act's "violent" video game ban purportedly serves two purposes: "preventing violent, aggressive, and antisocial behavior" and "preventing psychological or neurological harm to minors who play violent video games." *Id.* § 1(c). Furthermore, the Act purports to make "findings" that "[e]xposing minors to depictions of violence in video games" makes them "more likely to experience feelings of aggression, to experience a reduction of activity in the frontal lobes of the brain, and to exhibit violent antisocial or aggressive behavior," and that "[e]ven minors who do not commit acts of violence suffer psychological harm from prolonged exposure to violent video games." *Id.* §§ 1(a),(b).

**2. *The Act's Labeling Restrictions.***

In addition to imposing substantial penalties on persons who sell or rent "violent" video games to minors, the Act imposes an additional, content-based burden on speech that is unsupported by a compelling state interest. The Act provides that "[e]ach violent video game that is imported into

or distributed in California for retail sale shall be labeled with a solid white '18' outlined in black. The '18' shall have dimensions of no less than 2 inches by 2 inches" and must be placed on the face of the video game package. Act, § 1746.2. Failure to label a "violent" video game subjects a manufacturer, distributor or importer to a $1,000 penalty. Act, § 1746.3.

**ARGUMENT**

A plaintiff is entitled to a preliminary injunction upon showing "either (1) a combination of probable success on the merits and the possibility of irreparable harm; or (2) that serious questions are raised and the balance of hardships tips on its favor." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 965 (9th Cir. 2002) (quotation marks omitted). These "two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Id.* (quotation marks omitted). "[W]hen the harm claimed is a serious infringement on core expressive freedoms, a plaintiff is entitled to an injunction even on a lesser showing meritoriousness." *Id.* at 974.

Here, the First Amendment injuries worked by the Act unquestionably constitute irreparable harm supporting an injunction. *See S.O.C., Inc.*, 152 F.3d at 1148. Indeed, every previous attempt to restrict the distribution of "violent" video games has been enjoined on First Amendment grounds. *See AAMA*, 244 F.3d at 580 (affirming district court's grant of a preliminary injunction, noting a "strong likelihood of ultimate victory," irreparable harm to the plaintiffs if the law were allowed to go into effect, and "the entirely conjectural nature of the benefits of the ordinance to the people of Indianapolis"); *IDSA*, 329 F.3d at 960 (reversing district court's refusal to enjoin ban on "violent" video games); *VSDA*, 325 F. Supp. 2d at 1191 (ordering permanent injunction against statewide restriction on "violent" video games, following preliminary injunction).

**I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS, GIVEN THE ACT'S SWEEPING CONTENT-BASED INVASION OF FIRST AMENDMENT RIGHTS AND UNCONSTITUTIONAL VAGUENESS.**

**A. Video Games Constitute Expression Protected By The First Amendment.**

Several circuit and district courts – including the Sixth, Seventh, and Eighth Circuits, and the United States District Court for the Western District of Washington – have unequivocally held that the First Amendment protects the expression in video games. *See AAMA*, 244 F.3d at 577-78; *IDSA*,

329 F.3d at 957 (noting that "[t]he mere fact" that video games "appear in a novel medium is of no legal consequence"); *VSDA*, 325 F. Supp. 2d at 1184-85 (such games "are expressive and qualify for the protections of the First Amendment"); *James*, 300 F.3d at 696 (confirming that the First Amendment protects the communicative aspect of video games, and rejecting attempts to impose tort liability on "violent" video games); *Sanders*, 188 F. Supp. 2d at 1279 (same); *Wilson*, 198 F Supp. 2d at 181 (same). Indeed, modern video games involve "intricate" story lines, "detailed artwork," "original scores," and an evolving narrative. *VSDA*, 325 F. Supp. 2d at 1184; *see also AAMA*, 244 F.3d at 577-78 (noting that video games convey "age-old themes of literature," messages, and ideologies, "just as books and movies do"). Moreover, the Act's content-based restrictions themselves demonstrate that the targeted games constitute protected expression, because "it is the nature and effect of the message being communicated by these video games which prompted the state to act in this sphere." *VSDA*, 325 F. Supp. 2d at 1184.

That the Act restricts depictions of violence makes no difference as a matter of First Amendment scrutiny. Depictions of violence are entitled to full constitutional protection. *See AAMA*, 244 F.3d at 575-76 ("The notion of forbidding not violence itself, but pictures of violence, is a novelty."); *IDSA*, 329 F.3d at 958 (strict scrutiny applies to content-based restrictions on "violent" video games); *VSDA*, 325 F. Supp. 2d at 1186 (same); *Eclipse Enters., Inc. v. Gulotta*, 134 F.3d 63, 66 (2d Cir. 1997) (declining to "expand the[] narrow categories of [unprotected] speech to include depictions of violence" in trading cards). Indeed, in the context of "violent" magazines, characterized by the state as collections of "bloodshed" and "crime," the Supreme Court has stated that violent expression is "as much entitled to the protection of free speech as the best of literature." *Winters v. New York*, 333 U.S. 507, 510 (1948).

**B. The Act's "Violent" Video Game Restrictions Fail The Brandenburg Standard.**

The Act restricts video games based on the Legislature's belief that video games can lead to violence. *See* Act § 1(c), (c) (finding that exposure to violent video games causes minors to "exhibit violent[,] antisocial[,] or aggressive behavior," and asserting that the State has a "compelling interest in preventing violent, aggressive, and antisocial behavior"). As a result, to survive constitutional

scrutiny, the Act must meet the stringent standards of *Brandenburg v. Ohio*, 395 U.S. 444 (1969). *See, e.g.*, *James*, 300 F.3d at 698 ("In protecting against the propensity of expression to cause violence, states may only regulate that speech" which meets the *Brandenburg* standard); *see also Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1199 (9th Cir. 1989) (efforts to restrict speech based on its "tendency to cause others to engage in undesirable acts" must meet the *Brandenburg* test); *cf. Leidholdt v. L.F.P. Inc*, 860 F.2d 890, 894 (9th Cir. 1988) (speech not actionable simply because it is "[b]ase and malignant") (quotation marks omitted).

Under *Brandenburg*, the government may regulate expression based on a concern that it will cause unlawful or violent behavior *only* if the government can prove that such expression "'is *directed to* inciting or producing *imminent* lawless action and is *likely* to incite or produce such action.'" *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002) (quoting *Brandenburg*, 395 U.S. at 447) (emphasis added). As the Supreme Court has explained, "[t]he mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Id*. Thus, the government may not punish speakers based solely on a prediction or suspicion that their words will tend, in the aggregate, to encourage undesired behavior.

Yet that is exactly what the Act purports to do. Here, the Act regulates speech ostensibly based on the Legislature's conclusory "findings" that "minors" who play violent video games are "more likely to . . . exhibit violent antisocial or aggressive behavior." Act, § 1(a). Even assuming that such findings were based on any reliable evidence, which they are not,[3] the State would fail to

[3] The Act's vague "legislative findings" ignores a substantial body of conflicting evidence about the purported effects of "violent" video games. Indeed, every court considering the issue has concluded that the research fails to establish any causal link between exposure to such games and subsequent harm to anyone. *See IDSA*, 329 F.3d at 959 (finding law lacking "the 'substantial supporting evidence' of harm that is required before an ordinance that threatens protected speech can be upheld"); *AAMA*, 244 F.3d at 578-79 (scientific studies "do not support" the regulation of "violent" video games, because these studies "do not find that video games have ever caused anyone to commit a violent act"); *VSDA*, 325 F. Supp. 2d at 1188 (finding that "the current state of the research cannot support the . . . Act because there has been no showing that exposure to video games . . . is likely to lead to actual violence"). But even accepting the Legislature's purported "findings" – that video games lead to "violent, asocial, or aggressive behavior" by minors – they would not demonstrate the level of "imminence" required by the *Brandenburg* standard. *See, e.g.*, *James*, 300 F.3d at 698; *cf. Dworkin*, 867 F.2d at 1199 n.8 ("At best, the scientific evidence concerning the causal relationship between pornographic materials and violent actions is ambiguous and

[Footnote continued on next page]

meet the *Brandenburg* standard based on such aggregate effects. *See Dworkin*, 867 F.2d at 1199. First, as the Sixth Circuit has observed, video games, designed for entertainment, are not "directed" to inciting violence. *See, e.g.*, *James*, 300 F.3d at 698 (video game makers do not "'intend' to produce violent actions by the consumers, as is required by the *Brandenburg* test"). Second, the purported basis for the Act – that long-term exposure to "violent" video games increases violent or aggressive behavior in some small percentage of at-risk persons – falls far short of establishing a risk of "imminent" violence. *Id.* (holding that the "glacial process of personality development" allegedly affected by "violent" video games "is far from the temporal imminence that we have required to satisfy the *Brandenburg* test"). Finally, there is absolutely no finding by the Legislature that video games, which are played safely every day by millions, are "likely" to produce "imminent" violence. *Id.* at 699; *see also AAMA*, 244 F.3d at 575.

Partly for these legal reasons, the Seventh Circuit in *AAMA* rejected the government's argument that a "violent" video game ban was justified because video games "incite youthful players to breaches of the peace." 244 F.3d at 575. Likewise, the District Court for the Western District of Washington observed that the "Supreme Court and the Ninth Circuit have expressly rejected the idea that the possibility of *future* harm can justify the regulation of speech." *VSDA*, 325 F. Supp. 2d at 1187 n.3 (emphasis added). And in an analogous context – the attempted regulation of non-obscene pornography based, among other things, on allegations that such materials may lead to the infliction of violence on women – the Ninth Circuit concluded that such regulation falls short of the *Brandenburg* requirements, and thus cannot survive First Amendment scrutiny. *Dworkin*, 867 F.2d at 1199-1200 & n.8 (explaining that the "equivocal evidence" of any "causal relationship between pornographic materials and violent actions" fails to show the likelihood of causing imminent unlawful action required under *Brandenburg*); *see also American Booksellers Ass'n v. Hudnut*, 771 F.2d 323, 329-30 (7th Cir. 1985) (regulation failed to satisfy *Brandenburg* because any violent

---

[Footnote continued from previous page]

unvalidated. Such equivocal evidence is insufficient to establish the 'clear and present danger' required in order for any of the exceptions to general first amendment principles to apply.").

"effects depend on mental intermediation"), *aff'd*, 475 U.S. 1001 (1986). As in *Dworkin*, the State cannot demonstrate that the Act meets the *Brandenburg* standards; accordingly, it must be enjoined.

**C. The Act's "Violent" Video Game Restrictions Fail Strict Scrutiny.**

To the extent that the Legislature articulated some purpose for the Act going beyond a supposed reduction in violent behavior, such additional justifications also fail constitutional scrutiny. Because the Act restricts access to expression based on its content, it is subject to the most exacting First Amendment scrutiny. *See IDSA*, 329 F.3d at 958 ("Because the ordinance regulates video games based on their content . . . we review it according to a strict scrutiny standard."); *VSDA*, 325 F. Supp. 2d at 1186. Such content-based regulation of expression is "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992); *see also VSDA*, 325 F. Supp. 2d at 1186. "It is rare that a regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 818 (2000).

Under the strict scrutiny standard, the State must (1) articulate a compelling state interest; (2) prove that the Act actually serves that interest and is "necessary" to do so; and (3) show that the Act is narrowly tailored to serve that interest. *R.A.V.*, 505 U.S. at 395; *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664-65 (1994); *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991); *Ass'n of Nat'l Advertisers v. Lundgren*, 44 F.3d 726, 739-40 (9th Cir. 1994). The Legislature's judgments are not to be accepted without question; rather, the Legislature must have "drawn reasonable inferences based on substantial evidence." *Turner*, 512 U.S. at 666; *see also, e.g.*, *VSDA*, 325 F. Supp. 2d at 1187-88. Moreover, the State "must do more than simply 'posit the existence of the disease sought to be cured.' It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner*, 512 U.S. at 664 (citation omitted). The State cannot satisfy its burden of establishing any of the prongs of the strict scrutiny standard.

***1. The State Has No Legitimate, Much Less Compelling, Interest In Controlling Minors' Thoughts Or Feelings.***

The Act includes a finding that exposure to "violent" video games makes minors "more likely to experience feelings of aggression" and posits a "compelling" state interest in protecting against

"psychological and neurological harm" to minors. Act §§ 1(a), (c). Even assuming that this justification is anything more than a repackaging of the "preventing real-life" violence rationale, it still amounts to an illegitimate effort to restrict access to expression based on consumers' anticipated "psychological" reaction to that content. The First Amendment forbids governmental restrictions on speech based on the provocative or persuasive effect of that speech on its audience. *See Boos v. Barry*, 485 U.S. 312, 321 (1988) (O'Connor, J., joined by Stevens & Scalia, JJ.) (striking ban on picketing near embassies where purpose was to protect the emotions of those who reacted to the picket signs' messages); *Texas v. Johnson*, 491 U.S. at 408-09 (interest in protecting bystanders from feeling offended or angry is not sufficient to justify ban on expression). An effort by the State to censor speech in order to promote citizens' "well-being" amounts to nothing more than improper thought control. As the Supreme Court has noted, "First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end." *Free Speech Coalition*, 535 U.S. at 253.

Like adults, minors have a First Amendment right to be free from content-based governmental regulation of the speech they utter or receive. *See, e.g.*, *McConnell v. Federal Election Comm'n*, 540 U.S. 93, 231 (2003) ("Minors enjoy the protection of the First Amendment"); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 (1975); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506-07, 511 (1969). The government does not have a generalized power to limit minors' exposure to creative works based on a belief that they may be psychologically harmful. Such works "may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952).[4] Thus, the State simply may not restrict protected expression merely because it dislikes the way it shapes individuals' thoughts and attitudes—or brain neuron firing patterns.[5]

---

[4] As Judge Posner has explained, there is a serious "danger of allowing government to control the access of children to information and opinion," as "[p]eople are unlikely to become well-functioning, independent-minded adults and responsible citizens if they are raised in an intellectual bubble." *AAMA*, 244 F.3d at 577.

[5] The Act's unsupported "finding" concerning the effect of video games on the "frontal lobes" of the brain and its correlated alleged "interest" in protecting minors from "neurological

[Footnote continued on next page]

The Act nevertheless partly cloaks its speech restrictions in "harmful to minors" language, Act § 1746(d)(1)(A), in an effort to exploit the narrow subset of sexually explicit speech that the Supreme Court has held the government may regulate consistent with the First Amendment. *See, e.g.*, *Ginsberg v. New York*, 390 U.S. 629, 636-43 (1968) (permitting relaxed "harmful to minors" regulation of certain explicit sexual expression). But the "harmful to minors" category of speech is limited to sexual materials and has no application to the "violent" material that the State seeks to regulate here. Indeed, courts have repeatedly rejected similar arguments that depictions of violence can be regulated under the "harmful to minors," or obscenity, exceptions to the protections of the First Amendment. *See IDSA*, 329 F.3d at 958 ("[D]epictions of violence cannot fall within the legal definition of obscenity for either minors or adults."); *AAMA*, 244 F.3d at 578-79 (concerns underlying *Ginsberg* do not apply with respect to "violent" video games); *VSDA*, 325 F. Supp. 2d at 1185 (explaining that *Ginsberg* is limited to sexually explicit expression); *James*, 300 F.3d at 698 ("declin[ing] to extend [its] obscenity jurisprudence to violent, instead of sexually explicit, material."); *cf. Miller v. California*, 413 U.S. 15, 24 (1973) ("[W]e now confine the permissible scope of [regulation of obscene materials] to works which depict or describe sexual conduct.").

#### ***2. The Act Does Not Materially Advance The State's Interests And Is Not Narrowly Tailored.***

Even assuming that the State's justifications for the Act were not facially illegitimate and unsupported by evidence, the Act would still fail First Amendment scrutiny. First, the State would have to demonstrate that the Act's restrictions actually and materially address the alleged government interests. *See, e.g.*, *Turner*, 512 U.S. at 664-65; *VSDA*, 325 F. Supp. 2d at 1189. Here, the fact that the State has singled out video games — even though a wide range of media make comparable violent expression available to minors — is strong evidence that the Act fails to advance the State's interests. *See, e.g.*, *Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989) (the "facial underinclusiveness"

---

[Footnote continued from previous page]
harm," *see* Act §§ 1(a), (c), represents nothing more than a transparent attempt to repackage in the language of neuroscience the same psychological harm rationale that other courts have already rejected. *See, e.g.*, *IDSA*, 329 F.3d at 958; *AAMA*, 244 F.3d at 579. The State's attempt to censor protected expression is no more constitutional for the change in terminology.

12

Notice of Motion and Motion for a Preliminary Injunction;
Memorandum of Points and Authorities in Support Thereof
Case No. C 05-4188 RMW (RS)

of a regulation undermines the claim that the regulation serves its alleged interests); *VSDA*, 325 F. Supp. 2d at 1189 (explaining that "the Act is too narrow in that it will have no effect on the many other channels through which violent representations are presented to children").[6] As the Seventh Circuit observed, "violent" video games "are a tiny fraction of the media violence to which modern American children are exposed." *AAMA*, 244 F.3d at 579. But the Act leaves these other media unaffected. Under the Act, for example, a minor could be legally barred from buying or renting a video game containing "violent" content, but that same minor could legally buy or rent the movie and book on which the video game was based. *See, e.g.*, Price Decl. ¶¶ 4, 61 (noting that the M-rated game *Tom Clancy's Rainbow Six 3* is based on writer Tom Clancy's highly successful novels, and that the Act may cover "T"-rated games such as the *Terminator* games).

Moreover, the Act fails strict scrutiny because it is not narrowly tailored. The narrow tailoring requirement requires the State to prove that "a plausible, less restrictive alternative" to banning such games "will be ineffective to achieve its goals." *Playboy*, 529 U.S. at 816. The State cannot make such a showing here, where several such alternatives exist, such as encouraging awareness of the voluntary ESRB video game rating system, which provides guidance to parents and other consumers, and implementing technological solutions that allow parents to restrict access based on ESRB ratings. *See generally* Lowenstein Decl.; *Playboy*, 529 U.S. at 824 ("A court should not assume a plausible, less restrictive alternative would be ineffective; and a court should not presume parents, given full information, will fail to act."); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507-08 (1996) (plurality op.) (striking down ban on advertising alcohol prices because of less restrictive alternatives, such as an "educational campaign" or "counterspeech"). The State, in fact, rejected Plaintiffs' offer to work with it to help educate consumers about the well-established and comprehensive ESRB system and to assist in implementing effective technological controls for

---

[6] Such differential regulation of comparable expression invokes the specter of impermissible viewpoint discrimination. *See, e.g., Playboy*, 529 U.S. at 812 (striking down a regulation that targeted "adult" cable channels, but permitted similar expression by other speakers, and holding that "[l]aws designed or intended to suppress or restrict the expression of specific speakers contradict basic First Amendment principles"); *Turner*, 512 U.S. at 659 ("Regulations that discriminate among media, or among different speakers within a single medium, often present serious First Amendment concerns.").

parents. *See* Lowenstein Decl. ¶ 20-23. Moreover, the State only recently enacted a law requiring retailers to post signs indicating the availability of a video game rating system. *See* Cal. Bus. & Prof. Code § 20650; *see also* Andersen Decl. ¶ 15. Despite this enactment of a less restrictive alternative, the State chose not to allow the signage law to have its intended effect, but instead passed the much more restrictive Act.

**C. The Act's Labeling Provisions Are Unconstitutional.**

The Act's provisions requiring labeling of "violent" video games – under the threat of substantial fines – unconstitutionally compel speech of video game manufacturers, distributors, and retailers. The Supreme Court has long recognized that "[j]ust as the First Amendment may prevent the government from prohibiting speech, the Amendment may prevent the government from compelling individuals to express certain views." *United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001). Because compelled messages alter the content of what the compelled party would otherwise express, they are considered content-based regulation under the First Amendment and require strict scrutiny. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). This protection extends not only to political or ideological speech, *see Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1 (1986) ("PG&E"), but to *all* statements, whether of fact or opinion, *see Riley*, 487 U.S. at 797-98.

The Act's requirement that manufacturers, distributors and importers place a large "18" label on all "violent" video games compels video game manufacturers, distributors, and retailers to channel the State's message that minors are not entitled to access them — even if manufacturers and retailers disagree with this proposition. *See* Lowenstein Decl. ¶ 13-14; Andersen Decl. ¶ 17. The labeling requirement — like the sale and rental restrictions — is inconsistent with the voluntary rating system used by Plaintiffs.[7] The "18" label, which imparts no substantive information (other than a

---

[7] At a fundamental level, the "18" label conflicts with the ESRB rating system because it suggests that certain games are categorically inappropriate for individuals under 18, whereas the ESRB ratings are intended only as a guide to parents and consumers. *See* Andersen Decl. ¶¶ 12-14. The "18" label also conflicts with the specific classifications of the ESRB system. For example, the "18" label may be required for certain games classified as "E 10+" or "T" by the ESRB, *see* Price Decl. ¶ 7, even though the ESRB system indicates that such games may be suitable for ages 10 and up. Similarly, games rated "M" by the ESRB may be suitable for

[Footnote continued on next page]

stigmatizing message), is contrary to and may physically obscure the detailed information concerning the ESRB rating and content descriptors on the game packaging. *See* Andersen Decl. ¶ 12; Lowenstein Decl. ¶ 15. The conflict between the labels mandated by the Act and the existing labels used by Plaintiffs' members will be inherently confusing to parents and other consumers who are the intended beneficiaries of the information conveyed by the voluntary rating system. In all cases, the label represents a message that video game retailers have not chosen for themselves. "Such forced association with potentially hostile views burdens" their expression and "risks forcing [them] to speak where [they] would prefer to remain silent." *PG&E*, 475 U.S. at 18.

Not only would the labeling provision unconstitutionally burden the expression of video game retailers, creators, and manufacturers, but it would also create a substantial chilling effect on First Amendment rights. For example, the Act appears to place the burden of labeling on individual video game manufacturers, distributors, and importers, each of whom must decide which games fit within the Act's vague terms. Some, in an abundance of caution and out of fear of substantial penalties, may label a far wider range of games than even those arguably covered by the Act. *See* Andersen Decl. ¶¶ 7-11; Lowenstein Decl. ¶¶ 16-18; Price Decl. ¶¶ 7-9. Such a framework fails as a matter of constitutional law.

**D. The Act Is Unconstitutionally Vague**

The Act is unconstitutional on an independent ground: vagueness. Because many of the Act's key terms are impermissibly vague and place the burden of compliance on game retailers, the Act will restrict a far broader range of expression than even the State claims it is seeking to regulate. The Constitution demands that statutes be set forth with "sufficient definiteness that ordinary people can understand what conduct is prohibited." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Such precision is essential to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108

---

[Footnote continued from previous page]
ages 17 and up, but the "18" label prohibits 17-year-olds from buying or renting such games. Furthermore, the "18" label conflicts with the California law that requires retailers to post signs about video game rating systems. *See* Cal. Bus. & Prof. Code § 20650; *see also* Andersen Decl. ¶ 15.

(1972). In particular, exacting precision is required of restrictions in the context of protected expression. *See Reno v. ACLU*, 521 U.S. 844, 871-72 (1997) (explaining that a vagueness "content-based regulation" of speech "raises special First Amendment concerns because of its obvious chilling effect on free speech"); *NAACP v. Button*, 371 U.S. 415, 433 (1963).

The Act is rife with terms that are inherently vague or are defined in such a way as to fail to provide fair notice. For example, the Act prohibits games which depict violence against "an image of a human being," and/or "characters with substantially human characteristics." Act §§ 1746(d)(1), (d)(1)(B). Those terms are particularly ill-suited for a medium that relies extensively on animated, extra-terrestrial, and fantastic forms and characters — which may be depicted as having only some "human" characteristics, or which may be "human" at some times and not others. For example, in *God of War*, the player assumes the role of Kratos, a Spartan commander in Ancient Greece who "dies" at various points in the game, but continues battling various gods and other entities; eventually, the player learns that Kratos is actually the son of Zeus. *See* Price Decl. ¶¶ 46-54. Because Kratos is the son of a god, and thus able to keep battling while "dead," would he be considered to have "substantially human characteristics" within the meaning of the statute? Would the gods that he battles fall within the Act's restrictions? Similarly, in *Resident Evil IV*, part of a popular series of video games that have inspired feature films, the vast majority of enemies in the game are zombies and mutants with human characteristics. *See id.* ¶¶ 30-37. Would zombies and mutants be viewed as having "substantially human characteristics" within the meaning of the Act? And, in *Jade Empire*, which takes the player's character on an adventure through a mythical Chinese kingdom, both the player's character and the enemy forces possess magical abilities and transform into non-humanoid creatures. *See id.* ¶¶ 38-45. Does this game contain violence "against an image of a human being" as defined by the Act? Can a part-animal or part-alien creature be "human"?

The Act is plagued with numerous other vague terms. For example, the Act would restrict the distribution of, and require the labeling of, video games that appeal to the "deviant or morbid interest of minors." What does that term mean in the context of depictions of violence in video games? Price Decl. ¶ 9; Lowenstein Decl. ¶ 17. Likewise, the Act defines "cruel" as "that the player intends to *virtually inflict* a high degree of pain by torture or serious physical abuse of the victim in addition to

killing the victim." Act, § 1746(d)(2)(A). How can a player "virtually inflict" physical or mental pain? Price Decl. ¶¶ 13, 15. In defining depictions that may be considered "heinous" under the Act, the Act refers to the "consciousness" of the "virtual victim." Act, § 1746(d)(2)(C). But how can a "virtual victim" be "conscious" of anything? At what point does a computerized image experience a "high degree of pain"? *See* Andersen Decl. ¶ 11; Price Decl. ¶¶ 12, 16. Similarly, the Act defines "depraved" as "that the player relishes the virtual killing or shows indifference to the suffering of the victim, as evidenced by torture or serious physical abuse of the victim." Act, § 1746(d)(2)(B). It would be simply impossible for video game manufacturers and distributors to determine the "intent" of every possible player of a particular video game. Price Decl. ¶ 15; Lowenstein Decl. ¶ 19; Andersen Decl. ¶ 11. These terms – which are only representative examples of the Act's confusing terms – have no clear meaning, especially in the context of video games. Not only are the terms themselves vague, but the Act itself does not even purport to make the definition of "violent video games" exclusive. Instead, the Act generally uses the word "includes" to modify the specific examples of behavior covered by the definition. The open-ended definition does not confine the range of depictions that trigger the "violent video game" label. Persons of ordinary intelligence are thus forced to guess at the meaning and scope of the Act.

The ambiguous nature of the Act's definitions, coupled with the likelihood that they will be interpreted inconsistently, will result in many games rated by the ESRB as potentially suitable for teenagers and children being considered "violent video games" subject to the Act's restrictions. Therefore, the Act's definitions may be held to cover many "T"-rated video games presently available for commercial sale or rental to individuals under eighteen years of age, such as the *James Bond* games, *Terminator 3: The Redemption*, *Minority Report*, and *Medal of Honor: Frontline*. *See* Price Decl. ¶ 19.

Game creators, distributors, manufacturers, and retailers will respond to the uncertainty in the Act, and the penalties the Act imposes, by either self-censoring or otherwise restricting access to *any* potentially offending video game title. *See, e.g.*, Lowenstein Decl. ¶ 18; Andersen Decl. ¶¶ 7-11, 17; Price Decl. ¶¶ 18-20. As the federal district court in Washington stated, in striking down a similar video game ban as unconstitutionally vague, "[n]ot only is a conscientious retail clerk (and her

employer) likely to withhold from minors all games that could possibly fall within the broad scope of the Act, but authors and game designers will likely 'steer far wider of the unlawful zone . . . than if the boundaries of the forbidden area were clearly marked.'" *VSDA*, 325 F. Supp. 2d at 1191 (quoting *Grayned*, 408 U.S. at 109 (alteration in original)). Such understandable, self-protective behavior will deprive access to such expression not just to minors, but to adult customers as well — whose right to access "violent" video games could not be questioned by the State.

**II. THE EQUITIES STRONGLY SUPPORT AN INJUNCTION.**

Not only have Plaintiffs demonstrated a virtually certain likelihood of success on the merits, but the other prerequisites to injunctive relief are easily met here. Plaintiffs, their members, and willing listeners will all suffer irreparable harm if the Act's restriction of protected expression goes into effect. As the Ninth Circuit has unequivocally held, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *S.O.C., Inc.*, 152 F.3d at 1148 (quoting *Elrod*, 427 U.S. at 373 (plurality)). And no adequate remedy at law exists for Plaintiff's claims. *See Perez-Funez v. District Director, INS*, 611 F. Supp. 990, 1003 (C.D. Cal. 1984) (collecting cases); *see also Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987) (injunctive relief is appropriate where "legal remedies prove inadequate."); *National People's Action v. Village of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990) ("[I]njunctions are especially appropriate in the context of first amendment violations because of the inadequacy of money damages.").

Furthermore, "a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." *Sammartano*, 303 F.3d at 973 (quotation marks omitted). As the Ninth Circuit has explained, "when the harm claimed is a serious infringement on core expressive freedoms, a plaintiff is entitled to an injunction even on a lesser showing meritoriousness." *Id.* at 974. Because Plaintiffs "have not only stated a colorable First Amendment claim, but one that is likely to prevail[,] they have thus established the potential for irreparable injury" entitling them to a preliminary injunction. *Brown v. California Dep't of Transp.*, 321 F.3d 1217, 1225 (9th Cir. 2003).

Finally, the balance of equities (including the public interest) weighs heavily in favor of an injunction. Not only will Plaintiffs suffer immediate and irreparable harm to their First Amendment freedoms, but the public will suffer similarly. "Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles," *Sammartano*, 303 F.3d at 974, because First Amendment questions quite often have a substantial impact on non-parties to a case. As in *Sammartano*, the State's enforcement of an unconstitutional statute will not simply impact Plaintiffs, but will affect countless video game creators, publishers, manufacturers, distributors, importers, retailers, and consumers through the State of California and beyond, all of whom will suffer infringements on their First Amendment rights to produce and view the expression contained in a wide array of video games. The equities compel an injunction here.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court grant a preliminary injunction.

Respectfully submitted.

DATED: October 19, 2005

GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR.
H. MARK LYON
ETHAN D. DETTMER

By: /s/ H. Mark Lyon
H. Mark Lyon

JENNER & BLOCK LLP
PAUL M. SMITH
KATHERINE A. FALLOW
AMY L. TENNEY
601 13th Street, N.W., Suite 1200
Washington, D.C. 20005
Telephone: (202) 639-6000
Facsimile: (202) 639-6066

Attorneys for Plaintiffs
VIDEO SOFTWARE DEALERS ASSOCIATION
and ENTERTAINMENT SOFTWARE ASSOCIATION