GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR., SBN 132099
H. MARK LYON, SBN 162061
ETHAN D. DETTMER, SBN 196046
1881 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 849-5300
Facsimile: (650) 849-5333

JENNER & BLOCK LLP
PAUL M. SMITH (*pro hac vice* application pending)
KATHERINE A. FALLOW (*pro hac vice* application pending)
AMY L. TENNEY (*pro hac vice* application pending)
601 13th Street, N.W., Suite 1200
Washington, D.C. 20005
Telephone: (202) 639-6000
Facsimile: (202) 639-6066

Attorneys for Plaintiffs
VIDEO SOFTWARE DEALERS ASSOCIATION
and ENTERTAINMENT SOFTWARE ASSOCIATION

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIDEO SOFTWARE DEALERS ASSOCIATION and ENTERTAINMENT SOFTWARE ASSOCIATION,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, in his official capacity as Governor of the State of California; BILL LOCKYER, in his official capacity as Attorney General of the State of California; GEORGE KENNEDY, in his official capacity as Santa Clara County District Attorney, RICHARD DOYLE, in his official capacity as City Attorney for the City of San Jose, and ANN MILLER RAVEL, in her official capacity as County Counsel for the County of Santa Clara,<br><br>Defendants. | CASE NO. C 05 4188<br><br>DECLARATION OF CROSSAN R. ANDERSEN<br>IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIDEO SOFTWARE DEALERS ASSOCIATION and ENTERTAINMENT SOFTWARE ASSOCIATION,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, in his official capacity as Governor of the State of California; BILL LOCKYER, in his official capacity as Attorney General of the State of California; GEORGE KENNEDY, in his official capacity as Santa Clara County District Attorney, RICHARD DOYLE, in his official capacity as City Attorney for the City of San Jose, and ANN MILLER RAVEL, in her official capacity as County Counsel for the County of Santa Clara,<br><br>Defendants. | C.A. 05-4188 |

## DECLARATION OF CROSSAN R. ANDERSEN

Pursuant to 28 U.S.C. § 1746, I, Crossan R. Andersen, under penalty of perjury state as follows:

1. I am employed as President of the Video Software Dealers Association (hereafter, "VSDA" or "the Association") and have been so employed since January 1999. I previously served VSDA as its Senior Vice President and General Counsel and began my employment with VSDA in 1995. VSDA's principal offices are located in Los Angeles, California, where I reside.

1

2. I am admitted to practice in the State of California. I have previously served as a Trial Attorney for the United States Department of Justice, Antitrust Division (1971-1980), and as an Assistant United States Attorney for the Central District of California (1980-1988). From 1988 to 1995, I was employed as counsel to the Motion Picture Association of America.

3. The VSDA was established in 1981 as a not-for-profit trade association for the home entertainment industry. The Association represents more than 1,000 companies throughout the United States, Canada, and other nations. Its members operate thousands of retail outlets in the United States that sell and/or rent DVDs, VHS cassettes, and console video games. VSDA's membership comprises the full spectrum of movie video and video game retailers (from single-store retailers to large chains), video and video game distributors, the home video divisions of major and independent motion picture studios, and other related businesses that constitute and support the home video entertainment industry. Membership of the Association includes more than 1,250 retailers and retail stores that sell or rent console video games within the State of California, many of which are within the Northern District of California. These VSDA members would have standing in this matter to seek judicial relief in their own right.

4. As President of VSDA, I am called upon to represent VSDA and the distribution and retailing of home entertainment, including console video games and other packaged video products. This regularly includes representation in consumer and trade media, at conventions and other trade events and before federal and state governments and international trade organizations. I have personal knowledge of the facts stated in this declaration.

5. In my capacity as President of VSDA, I have remained informed concerning the issues and process concerning the recently enacted Chapter 638, Statutes of 2005 (the "Act"), which is

due to take effect on January 1, 2006. The Act imposes civil penalties on retailers, distributors, and manufacturers of video games, including many of VSDA's members, for selling or renting to persons under age 18 what the Act defines as "violent video games." The Act defines "violent" video games are those "in which the range of options available to a player includes killing, maiming, dismembering, or sexually assaulting an image of a human being," if the actions fall within one of two descriptions: either the game must "appeal to a deviant or morbid interest of minors" or it must enable "the player to virtually inflict serious injury upon images of human beings or characters with substantially human characteristics in a manner which is especially heinous, cruel or depraved in that it involves torture or serious physical abuse to the victim." Act, § 1746. Violation of the Act subjects the offender to a $1,000 fine. Act, § 1746.3.

6. The Act also requires that "[e]ach violent video game that is imported into or distributed in California for retail sale shall be labeled with a solid white '18' outlined in black. The '18' shall have dimensions of no less than 2 inches by 2 inches" and must be placed on the face of the video game package. Act, § 1746.2. Failure to label a "violent" video game subjects a manufacturer or distributor to a $1,000 penalty. Act, § 1746.3.

7. The Act will have place significant burdens on VSDA's members based on the content of the video game expression that they make available. Because of its serious penalties and vague terms, the Act will also have a significant chilling effect on the expression of VSDA's members.

8. The Act's labeling requirements appear to apply to anyone who "distributes" video games in California. In light of the breadth of the Act, the Act may be read to apply not only to manufacturers, distributors and importers, but also to retailers. Under the Act, VSDA's

3

distributor and importer members must review their present offerings and attempt to determine which video game titles might come within the coverage of the Act's definition of "violent" video games. Moreover, they must make guesses about the content of video games not yet released but which, by custom and trade practice, are ordered in advance of the release of the game. Retailers may also be subjected to liability if they sell so-called "violent" video games acquired by means other than through manufacturers, importers, or distributors. For example, many VSDA members sell, rent and trade games that they acquire from customers through game trading and others acquire games for sale through returns (that may have labels removed or could have originally been sold at out-of-state outlets and thus would not have been labeled). In addition, retailers currently have substantial stocks of games in inventory and out on rental. These categories of games may not be labeled as required by the Act, and the State may take the view that retailers must determine whether the games may be sold to minors under the Act.

9. While the VSDA and its affected members can try to guess which video games might be covered by the Act, it is impossible for VSDA's members to determine with any degree of certainty whether any number of the titles they distribute are covered by the Act's definition of "violent" video games because, in the context of virtual depictions featured in most games, the language used in the act to define "violent" is vague and without definite meaning.

10. For example, a game is defined in the Act as "violent" if it includes the ability to "virtually inflict serious injury upon images of human beings or characters with substantially human characteristics." Act, § 1746. In a medium in which all depictions are computer generated and animated, even the meaning of "substantially human characteristics" as that term is used in the Act's definition of "violent" is without definite meaning. Combatants, including the

player's fictional character and the opponent, in many games are more or less mythological, often possessed with "powers" not possessed by humans. There is no reasonable way for VSDA and its members to determine whether a depiction in a computer game involves violence against characters with "substantially human characteristics," particularly given that many video games include animated, extra-terrestrial, and fantasized "human" forms with superhuman powers.

11. The Act's definition of "violent" video games contains other inherently vague terms, too numerous to list in full here. By way of example, the Act would require video game manufacturers, distributors and importers to discern the mental processes of the virtual "victims," which by their nature have no mental processes. The Act's definition of "serious physical abuse" apparently would require VSDA's members to determine whether a "victim" in a video game experiences "pain," and to what degree. *See* Act, § 1746(d)(2)(D). They would also be required to assess the level of "consciousness" of a "virtual victim." *See id.* § 1746(d)(2)(E). Moreover, the law would require inquiry by VDSA's members into the mental state of the *player* of the video game: for example, whether the player "intends to virtually inflict a high degree of pain"; whether the "player relishes the virtual killing or shows indifference to the suffering of the victim"; and whether the player "specifically intend[s] the abuse." *See id.*, §§ 1746(2)(A),(B),(D). It will be impossible for VSDA's members to discern how potential game players will react to video games. VSDA's members will be unable to apply these vague terms in attempting to comply with the Act.

12. The Act's labeling requirements would also force VSDA's members to disseminate video games in a manner that is inconsistent with current practices. At present, video game publishers use the entirety of a video game's limited packaging to convey information about

5

the content of the game – including the game's ESRB rating and content descriptors. The labels imposed by the Act – which are quite large relative to the total size of game packaging – will obscure and eliminate important product information, marketing and operational messages which appear on the game's label or packaging. These messages represent important speech for retailers and convey information and messages about the product which retailers would not willingly eliminate from the games, but for the sanctions imposed by the Act.

13. VSDA has long supported widespread use of the ESRB rating system, encouraging all retailers to use it (by voluntarily choosing to not rent or sell AO-rated games to minors at all, and to provide minors with M-rated games only with parental consent), and to prominently display consumer information concerning the ESRB rating system in their stores. VSDA and its members have together invested thousands of dollars developing awareness of the ESRB rating system and seeking its acceptance by consumers as a useful guide, attempting to give it the same level of public awareness and acceptance as is enjoyed by the familiar Motion Picture Association of America's ratings for movies.

14. The Act compels retailers to speak in a manner inconsistent with the fundamental message they seek to advance. For example, video retailers displaying a T-rated video game are conveying to consumers that, according to the ESRB's definitions, the game has "content that may be suitable for ages 13 and older." Notwithstanding this, the Act would also require T-rated games meeting the definition of "violent" to be labeled with an "18" – indicating that such games are suitable only for adults, and will not be sold or rented to those ages 13-17. These two messages are fundamentally at odds with each other, and retailers are thus concerned about the confusion this will cause their customers. To reduce the strong

likelihood of confusion between the conflicting established rating system and the requirements of the Act, retailers will be forced to disregard the voluntary ESRB system.

15. Existing California law, Chapter 630, Statutes of 2004 (Ca. 2004) Section 2630, requires retailers in California to promote with signage "a video game rating system or notifying consumers that a rating system is available to aid in the selection of a game." Cal. Bus. & Prof. Code § 20650. In addition, retailers are required to "make available to consumers, upon request, information that explains *the* video game rating system." *Id.* (emphasis added). Among video game retailers in California, in practice the ESRB is *the* rating system which receives signage and about which information is provided under this law. The ESRB ratings system and its individual ratings conflict with the labeling required by the Act. Thus, retailers are required by California law to provide information concerning voluntary advisory ratings standards which are fundamentally at odds with the message conveyed by the "18" label. Retailers themselves will be confused by what message may be lawfully conveyed to consumers inasmuch as they will be required to enforce the "18" restriction and concurrently provide information about the ESRB ratings which advise that some "18" labeled games are suitable for ages 13-17.

16. Moreover, an "18" label is a symbol commonly used to communicate that certain materials are sexually explicit and intended only for adult audiences (*e.g.*, "Must be 18 to Enter," "No One Under 18 Admitted"). VSDA members in California are concerned that requiring an "18" on all games covered by the Act will create such stigma that M-rated, T-rated, or even lower rated games carrying the "18" label will no longer be perceived as products which simply contain material some parents might find unsuitable for their children (like R-rated or PG-13-rated movies) and instead be treated as though they were sexually explicit adult

products – even pornography. Indeed, some adult consumers, wary of being seen carrying an "18" product to the checkout counter, will be chilled in their efforts to acquire it. Additionally, VSDA's members may be chilled by simply choosing not to sell products labeled with an "18" in order to avoid the stigmatizing effects of those labels.

17. As described above, the Act's vague definitions will lead to varying conclusions as to which games are prohibited by the Act. But a retailer that receives "18"-labeled video games from a manufacturer or distributor has no discretion to re-classify the games as non-violent. Even if a retailer disagrees with an assessment that a video game is prohibited under the Act, a retailer may not lawfully sell an already labeled game to a minor and such a sale would subject the retailer to a $1,000 penalty. Act, §§ 1746.1, 1746.3.

18. As a rule, many video retailers in California who rent video games do so under contractual agreements they enter into with their adult customers. Under these agreements, the adult customer may designate other family members, including their children, as authorized by the parent to rent movies or games using the parent's account. Many of these contracts allow the parent to designate, for each child authorized to rent, what ratings limitations, if any, the parent chooses to place on the products rented or purchased by the child. This Act burdens retailers and their customers (who are consenting parents under these agreements) by obligating the retailer to disregard the parent's wishes and instead restrict their children to the "18" rating imposed by the state.

19. Not only will the Act have a burdensome and chilling effect on the expression of VSDA's members, but by virtue of its interaction with other provisions of California law, it may also subject VSDA's members to a number of private civil suits based on alleged violations of the Act. Cal. Bus. & Prof. Code § 17200 has been interpreted to give a broad right of action

8

based on harms incurred as a result of a violation of a state law like the Act. If the Act is permitted to go into effect, it may subject VSDA's members to civil suits based on a wide – and conflicting – range of interpretations of the Act. The significant difficulties interpreting the Act's vague definitions, discussed herein, will only be exacerbated by the serious burdens (including possible broad financial liability) imposed on VSDA's members by such lawsuits.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on October 18, 2005.

Crossan R. Andersen