GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR., SBN 132099
H. MARK LYON, SBN 162061
ETHAN D. DETTMER, SBN 196046
1881 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 849-5300
Facsimile: (650) 849-5333

JENNER & BLOCK LLP
PAUL M. SMITH (*pro hac vice* application pending)
KATHERINE A. FALLOW (*pro hac vice* application pending)
AMY L. TENNEY (*pro hac vice* application pending)
601 13th Street, N.W., Suite 1200
Washington, D.C. 20005
Telephone: (202) 639-6000
Facsimile: (202) 639-6066

Attorneys for Plaintiffs
VIDEO SOFTWARE DEALERS ASSOCIATION
and ENTERTAINMENT SOFTWARE ASSOCIATION

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIDEO SOFTWARE DEALERS ASSOCIATION and ENTERTAINMENT SOFTWARE ASSOCIATION, <br><br> Plaintiffs, <br><br> v. <br><br> ARNOLD SCHWARZENEGGER, in his official capacity as Governor of the State of California; BILL LOCKYER, in his official capacity as Attorney General of the State of California; GEORGE KENNEDY, in his official capacity as Santa Clara County District Attorney, RICHARD DOYLE, in his official capacity as City Attorney for the City of San Jose, and ANN MILLER RAVEL, in her official capacity as County Counsel for the County of Santa Clara, <br><br> Defendants. | CASE NO. C 05 4188 <br><br> DECLARATION OF DOUGLAS LOWENSTEIN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

# DECLARATION OF DOUGLAS LOWENSTEIN

Pursuant to 28 U.S.C. § 1746, I, Douglas Lowenstein, under penalty of perjury state as follows:

1. I am currently employed as President of the Entertainment Software Association ("ESA"). I have been the President of the ESA (formerly known as the Interactive Digital Software Association) since June of 1994.

2. The ESA is the only U.S. trade association exclusively dedicated to serve and promote the business and public affairs interests of companies that publish entertainment software used for video game consoles (such as Nintendo GameCube, Microsoft Xbox, and Sony Playstation 2), personal computers, wireless, and the Internet. One such interest that the ESA promotes is these companies' right to publish and distribute works of expression that are protected under the First Amendment to the United States Constitution and similar provisions of the constitutions of the various States. The ESA's membership includes a number of entities that distribute and/or supply video games and related software to owners and operators of sales and rental outlets within the State of California. Twenty of ESA's members have facilities in California, accounting for nearly 10,000 employees.

3. As a result of my duties as President of the ESA, I have personal knowledge of the facts stated in this declaration.

**The ESRB Rating System**

4. The Entertainment Software Rating Board ("ESRB") is a self-regulatory body established by the ESA to independently rate the content of entertainment software for all platforms.

5. In 1994, the ESRB created a rating system for computer and video games. In a September 2000 report, the Federal Trade Commission ("FTC") called the ESRB rating

system the "most comprehensive" of industry-wide media rating systems. See http://www.ftc.gov/reports/violence/vioreport.pdf ("FTC Report") at 37. Senator Joe Lieberman has called the ESRB system a model for other entertainment industries to follow.

6. The ESRB rating system was created as part of the industry's commitment to empower parents and other consumers to make informed decisions based on the general content and nature of games that they may buy, rent, or play. The rating system was designed to provide credible, reliable, and easily understood information about games to consumers. Like the movie rating system, the ESRB rating system is entirely voluntary; neither the ESA nor the ESRB requires video game publishers to submit their games to the ESRB for review, even though nearly all such publishers do so. The ESA is not, and has never been, involved directly or indirectly in the issuance of ratings by the ESRB, or in the ESRB's interpretations of its own rating guidelines. The ESRB is funded in part by fees that it charges companies, which submit products to the ESRB for ratings.

7. The purpose of the ESRB rating system is to give parents and consumers information about the content of interactive entertainment software products so that they can make informed purchase and rental decisions. For any given game, the rating system offers both: (i) an actual rating in one of six categories for age appropriateness of content; and (ii) short descriptive phrases called "content descriptors" that give additional information about a game's content. A copy of the ESRB's rating system, including both the rating categories and the glossary of content descriptors, is attached as Exhibit A.

8. Under the ESRB system, games designated "EC" (Early Childhood) contain content that may be suitable for users age 3 and older, games designated "E" (Everyone) contain content that may be suitable for users age 6 and older, games designated "E10+"

(Everyone Ten and Older) contain content that may be suitable for users age 10 and older, games designated "T" (Teen) contain content that may be suitable for users age 13 and older, games designated "M" (Mature) contain content that may be suitable for users age 17 and older, and games designated "AO" (Adults Only) contain content that the ESRB suggests should only be played by users 18 and older.

9. The ESRB rating system is dynamic, and is responsive to changes in the marketplace and to feedback from parents and customers. For example, the ESRB recently amended its rating system to add the new "E10+" rating, after consultations with academics and child development experts.

10. The ESRB also assists video game publishers and retailers in educating parents and other consumers about video games. Among other things, the ESRB makes available to video game publishers standardized graphics for video game packaging, including the trademarked ESRB rating symbols and content descriptors, as well as labels alerting consumers to "check the ratings." These ESRB-distributed labeling templates are widely used by video game publishers. ESRB has created designs and specifications for these materials based on its years of experience, and these materials reflect both the need to fully and accurately inform consumers about the rating system and the specific presentation needs of publishers. These standardized materials, as used and adapted by video game publishers and retailers, represent the video game industry's collective message of how best to inform and describe the ESRB system to parents and other customers. The value of these materials as an educational tool for parents is particularly important, as the FTC has found that parents are involved in 83% of video game purchases for minors. See FTC Report at 42.

**The California Statute**

11. In my capacity as President of the ESA, I have remained informed about the issues and processes concerning the recently enacted Chapter 638, Statutes of 2005 (Ca. 2005) (the "Act"), which was enacted into law on October 7, 2005. The Act is due to take effect on January 1, 2006.

12. The Act seeks to censor expression in the video game medium because of the perceived effect of this expression on minors under the age of 18. Specifically, the Act makes illegal, and imposes penalties for, the rental or sale of "violent" video games to those under the age of 18. "Violent" video games are defined as those "in which the range of options available to a player includes killing, maiming, dismembering, or sexually assaulting an image of a human being" if the actions fall "within one of two descriptions": either the game must "appeal to a deviant or morbid interest of minors" or it must enable "the player to virtually inflict serious injury upon images of human beings or characters with substantially human characteristics in a manner which is especially heinous, cruel or depraved in that it involves torture or serious physical abuse to the victim." Act, § 1746. Violation of the Act subjects the offender to a $1,000 fine. Act, § 1746.3.

13. Some of the content displayed by the video games created, published, distributed, and/or made available to the public by the ESA's members may be deemed by law enforcement officials in the State of California to meet the statutory definitions of "violent" video games. Should the Act take effect, some retail establishments will likely sell or rent fewer copies of certain games because those games can no longer be sold or rented to minors under the Act, while other retailers may choose not to stock some games altogether – for adults or children – for fear of being subjected to the penalty for selling games that may be deemed covered by the Act to individuals under age 18. In either case, because retailers will

restrict the sale of ESA members' products in light of the Act, the Act will prevent the expression of ESA members from reaching a wide range of willing recipients.

14. The Act also requires that "[e]ach violent video game that is imported into or distributed in California for retail sale shall be labeled with a solid white '18' outlined in black. The '18' shall have dimensions of no less than 2 inches by 2 inches" and must be placed on the face of the video game package." Act, § 1746.2. Failure to label a "violent" video game subjects a manufacturer or distributor to a $1,000 penalty. Act, § 1746.3.

15. The Act's labeling requirement will place significant burdens on ESA members and the sales of their products, and will result in consumer confusion. As video game publishers, ESA members use ESRB ratings and content descriptors, and the corresponding artwork, on their game packaging to inform customers about the rating system. A large black and white label that says only "18" would fail to provide the information contained in the existing rating system, and as a result will be confusing to customers. Moreover, the large "18" label may obstruct important information on the game packaging itself, including information about the game's ESRB rating and other legal information. Instead of educating consumers about the content of the game – as the ESRB ratings already do – the labels mandated by the Act will primarily serve to stigmatize ESA members' games.

16. Furthermore, the Act's labeling requirement applies to any game that qualifies under the Act's definition of "violent" video game, even if the game has received an ESRB rating of "EC," "E," E10+," and "T." In other words, the Act requires an "18" label to be placed on any game showing "violence" within the meaning of the Act, including many "T" and "E10+" games, even though the ESRB system would recommend that these games are suitable for young people. Thus, the Act's labeling provision is likely to have a stigmatizing

5

and chilling effect not only on "AO" and "M" games, but on other games as well, because some retailers may refuse to stock any game they deem "violent," out of concern that games with the "18" label will trigger scrutiny from law enforcement officials. Likewise, the Act's lack of clear guidance – and threat of substantial penalties – will cause manufacturers and publishers to steer far clear of the Act's prohibitions by labeling "18" any game that might conceivably be considered "violent" under the Act, even if under the ESRB system, some of the prohibited games would be recommended as being suitable for kids over 10 (for "E10+ games) or for teens 13 and older (for "T" games).

17.     The Act will require ESA's members to review every video game they manufacture for distribution in California (essentially all of their games) to attempt to determine which video game titles must be labeled under the Act's definition of "violent video games." The Act's complicated and vague terms will make this task nearly impossible. For example, under the Act those who make and distribute video games must determine if a video game "appeals to a deviant or morbid interest of minors," "is patently offensive to prevailing standards in the community as to what is suitable for minors." These determinations are wholly subjective, and there are no standards available to guide manufacturers and distributors about what is considered "suitable" for minors. Likewise, it will be impossible for manufacturers to determine which video games contain content that some law enforcement official in California might consider "especially heinous, cruel, or depraved."

18.     There are no standards to guide these assessments (which make no sense in the context of video games), and as a result video game manufacturers and distributors will reach widely different conclusions about what games need to be labeled under the Act. It is likely

that many video game manufacturers and publishers will take the most conservative view of the Act's prohibitions – for fear of violating the Act – and as a result a broad range of our members' expression will be impermissibly censored.

19.     Applying the Act's definition of "violent" video games will be particularly difficult, if not impossible, given the nature of video games. For example, a game is defined in the Act as "violent" if it includes the ability to "virtually inflict serious injury upon images of human beings or characters with substantially human characteristics." Act, § 1746. In a medium characterized by animation and fantasy, the meaning of the term "substantially human characteristics" is far from clear. Many video game characters are more or less mythological, often possessed with "powers" not possessed by humans. Likewise, determining whether a video game shows scenes of "mental abuse" of a "virtual victim," and ascertaining the "intent" of the individual video game player would be impossible. Because every person plays a video game differently, how would manufacturers and distributors determine the "intent" of the player? Moreover, video games often contain more than 50 hours of game play, much of which is non-linear or accessible only to advanced game players. Thus, unlike a movie, which can be viewed in its entirety by a retailer or distributor, most video games are not susceptible of such review.

### The Existence of Less Restrictive Alternatives

20.     Anticipating the Act's impact on the ESA members' First Amendment rights, the ESA attempted to work with the Legislature and the Governor prior to the passage of the Act to implement less speech-restrictive, constitutional means of achieving the Legislature's goals.

21.     To this end, on May 3, 2005, Gail Markels, representing the ESA, testified about the Act's constitutional flaws before the Assembly Entertainment, Sports, Tourism, and Internet Media Committee. Ms. Markels also explained that the ESRB ratings system provides a reliable, independent guide for parents and consumers to determine whether they find particular video games suitable for children. Educating parents and the public about the ESRB rating system would be an alternative means of achieving the Legislature's goals, for, as the FTC has found, parents are involved in 83% of video game purchases for minors. See FTC Report at 42. In addition, Ms. Markels explained that the use of technological solutions that allow parents to restrict access based on ratings offered another less restrictive alternative to the Act. In addition, other representatives of the ESA testified about the same topics before the Assembly and Senate Judiciary Committees.

22.     Through meetings, letters, and telephone calls, the ESA and its members communicated a similar message to Governor Schwarzenegger. We explained why the Act was unconstitutional, and we explained at length the comprehensive operation of the ESRB ratings system. We offered to work with the Governor and other State officials to help educate consumers about the ESRB ratings system as a less speech-restrictive alternative to the Act.

23.     Both the Legislature and the Governor rejected these offers to work together with the ESA and members of the video game industry, and refused to consider less speech-restrictive alternatives to the Act's absolute prohibitions. Although informed of the Act's constitutional failings, the Legislature and the Governor nonetheless chose to enact the Act into law, rather than to explore less speech-restrictive means of achieving their goal of preventing certain computer and video games from being viewed by minors.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on October 17, 2005.

Douglas Lowenstein