EXHIBIT 1

Dockets.Justia.com

SENATE JUDICIARY COMMITTEE
Senator Joseph L. Dunn, Chair
2005-2006 Regular Session


AB 1179                                                    A
Assembly Member  Yee                                       B
As Amended September 2, 2005
Hearing Date:  September 8, 1005                            1
Civil Code                                                 1
AMT/MM:cjt                                                 7
                                                           9


PURSUANT TO RULE 29.10


SUBJECT


Violent Video Games:   Sales to Minors


DESCRIPTION

This bill would prohibit the sale or rental of violent
video games to minors under 18 years old, and would require
that such games be clearly labeled before being imported
into or distributed in California.  Violators of either
provision would be subject to liability for up to $1,000.
Sales clerks would be exempt from liability, so long as
they did not hold a management position or an ownership
interest in the retail business.  A minor's parents,
grandparents, aunts, uncles, and legal guardians would also
be exempt from the terms of the bill.  It would be an
affirmative defense to liability for unlawfully selling a
violent video game to establish reasonable reliance on
evidence that a purchaser or renter was not a minor, or to
establish that a manufacturer failed to label a violent
video game as required under the bill.

The bill would offer two alternate definitions of "violent
video game."  The first definition would mirror the
language used to define "obscene" speech.  The second
definition would mirror federal statutes and jury
instructions that relate to aggravating factors that
warrant death penalty convictions.

BACKGROUND

(more)


AB 1179 (Yee)
Page 2




This bill follows a line of attempts in this and other
states to limit the sale and rental of "violent video
games" to minors.  Proponents have argued that these
attempts are supported by numerous scientific studies which

indicate that minors who play violent video games may be more likely to act aggressively than other minors and may suffer other negative emotional and psychological effects.

Last year the Legislature passed AB 1793 (Yee), Chapter 630, Statutes of 2004, requiring video game retailers to post signs notifying customers of a current industry rating system that may be used to identify age-appropriate video games, and requiring retailers to make information explaining the rating system available on request.  Another bill, AB 1792 (Yee, 2004), which would have prohibited the sale or rental of "violent video games" to minors under age 18, failed in the Assembly Arts, Entertainment, Sports, Tourism, and Internet Media Committee.

Other states have successfully enacted statutes in recent years to restrict minors' access to violent video games.  However, those statutes were found unconstitutional on First Amendment and/or vagueness grounds.  [See, e.g., Interactive Digital Software Assoc. v. St. Louis County ( IDSA ) (8th Cir. 2003) 329 F.3d 954; American Amusement Machine Assoc. v. Kendrick  (7th Cir. 2001) 244 F.3d 572; Video Software Dealers Assoc. v. Maleng  (D.C. Wash. 2004) 325 F. Supp. 2d 1185.]  The author notes that an Illinois statute was recently signed into law that restricts the sale of violent video games to minors.

This year, AB 450 (Yee) was introduced in a renewed attempt to prohibit the sale or rental of "violent video games" to minors.  It was amended in the Assembly Judiciary Committee to address some of the constitutional issues raised in recent court decisions.  The bill passed the Assembly Judiciary Committee, but failed its first hearing in the Assembly Arts, Entertainment, Sports, Tourism, and Internet Media Committee.  Although the bill passed on its second vote in that committee, it has not been brought to a vote on the Assembly Floor.

On September 2, 2005, the last day for amending bills without a rule waiver, the author gutted and amended AB

□

AB 1179 (Yee)
Page 3

1179 (Yee) to insert language largely identical to the text of AB 450.  The primary difference between the bills is that AB 1179 would prohibit the sale or rental of "violent video games" to minors under 18 years old, while AB 450 would have prohibited the sale or rental of violent video games to minors under 17 years old.

                         CHANGES TO EXISTING LAW

 Existing law  , the U.S. Constitution, provides that "Congress shall make no law ? abridging the freedom of speech." [U.S. Const. Amend. 1.]

 Existing law  , the California Constitution, provides that "A law may not restrain or abridge liberty of speech or press." [Cal. Const. Art. 1  2.]

Existing law requires video game retailers to post signs in prominent areas of a retail establishment to provide information about a video game rating system or to notify customers that a rating system is available to aid in the selection of video games.  The law also requires retailers to make information explaining the rating system available on request.  [Bus. & Prof. Code  20650.]

Existing law prohibits the sale, lease, rental, or provision of any video game intended for use by any person under 18 years old, which contains any commercial advertisement, brand names, trademarks, or copyrighted slogans of alcoholic beverages or tobacco products in the design, presentation, packaging or advertisement of the video game.  [Penal Code  308.5.]

This bill would make a legislative finding that exposing minors to depictions of violence in video games makes minors more likely to experience feelings of aggression, to experience a reduction of activity in the frontal lobes of the brain, and to exhibit violent antisocial or aggressive behavior.  It would also make a finding that even minors who do not commit acts of violence suffer psychological harm from prolonged exposure to violent video games.

This bill would make a legislative finding that the state has a compelling interest in preventing violent, aggressive, and antisocial behavior, and in preventing

AB 1179 (Yee)
Page 4

psychological or neurological harm to minors who play violent video games.

This bill would prohibit the sale or rental of violent video games to minors who are under 18 years of age.  This prohibition would not apply when a minor's parent, grandparent, aunt, uncle, or legal guardian rented or sold a violent video game to the minor.  It would also be an affirmative defense to establish: (1) that a defendant or his or her employee or agent reasonably relied upon evidence that a purchaser or renter was not a minor; or (2) that a manufacturer failed to label a violent video game as required under the bill.

This bill would define "violent video game" as a video game in which the range of options available to a player includes killing, maiming, dismembering, or sexually assaulting an image of a human being, if those acts are depicted in the game in a manner that does either of the following:

   a)   Comes within all of the following descriptions:

      i)   A reasonable person, considering the game as a whole, would find [it] appeals to a deviant or morbid interest in minors;

      ii)   It is patently offensive to prevailing standards in the community as to what is suitable to

minors;

    iii)   It causes the game, as a whole, to lack serious
        literary, artistic, political, or scientific value
        for minors.

  b)   Enables a player to virtually inflict serious
    injury upon human beings or characters with
    substantially human characteristics in a manner which
    is especially, heinous, cruel, or depraved in that it
    involves torture or serious physical abuse to the
    victim.

 This bill  would define the terms "heinous," "cruel,"
"depraved," "torture," and "serious physical abuse," and
would list pertinent factors to consider in determining

☐

AB 1179 (Yee)
Page 5

whether violence is especially heinous, cruel, or depraved.

 This bill  would provide that violent video games which are
imported into or distributed in California for retail sale
shall be labeled on the front face of the package, as
specified.

 This bill  would make a person who violates any provision of
the bill subject to liability for up to $1,000, with the
exception that a person who is employed solely in the
capacity of a salesclerk or other similar position, and who
does not hold an ownership interest or a management
position in the business, may not be held liable.

 This bill  would provide that a violation may be prosecuted
by any city attorney, county counsel, or district attorney,
and that a violation may be reported to the city attorney,
county counsel, or district attorney by an adult acting on
behalf of a minor to whom a violent video game was sold or
rented.

 This bill  would state that its provisions are severable.

                      COMMENT

 1.Stated need for the bill

  The author contends that this bill is a necessary
  response to the potential negative impacts that violent
  video games may have on minors under 18 years old.  The
  author states:

    Since teens are wiring the circuits for self
    control, responsibility and relationships they
    will carry with them into adulthood, they are
    more impressionable than we thought.  Active
    participation by youth in playing violent video
    games has a greater impact than watching
    television.  Youth choose actions where they are
    rewarded for causing violence to another
    character.  Repetition greatly increases learning

and also causes youth to identify with the
aggressor in the game.  Dozens of studies on
violent video games, including an analysis of 54
independent samples with 4,262 participants, show

☐

AB 1179 (Yee)
Page 6

five major effects: playing violent games leads
to increased physiological arousal, increased
aggressive thoughts, increased aggressive
feelings, increased aggressive behaviors, and
decreased pro-social or helping behaviors.  ?
These studies include experimental studies (that
show playing violent video games actually causes
increases in aggression), correlational studies
(where long-term relations between game play and
real-world aggression can be shown), and
longitudinal studies (where changes in children's
aggressive behaviors can be demonstrated).
Furthermore, students who played more violent
video games had greater involvement in physical
fights ?, became desensitized to violence, and
developed pro-violence attitudes and increased
tolerance of violence ?  The American Academy of
Pediatrics Policy Statement on Media Violence
stated that playing violent video games accounts
for a 13% to 22% increase in adolescents' violent
behavior.  When considering the negative impact
violent video games have on youth, the evidence
is strong:  playing violent video games has more
effect on increased youth aggression than
second-hand smoke has on causing cancer, or lead
exposure links to decreased IQ?

The author acknowledges that the entertainment industry
has undertaken self-regulatory measures to prevent minors
under 17 years old from renting or buying games that are
"M-rated," e.g., that contain mature content which may
include mature sexual themes, more intense violence,
and/or strong language.  But the author argues that
self-regulation has been unsuccessful, as discussed in
Comment 3 below.

2. First Amendment concerns

The First Amendment right to free speech must be a chief
consideration if the bill's restrictions would limit the
distribution of materials that are "protected speech."
The First Amendment does not prohibit every restriction
on protected speech, but it requires that restrictions be
carefully weighed and limited.  Appropriate questions
here are therefore whether "violent video games" are

☐

AB 1179 (Yee)
Page 7

protected speech and, if so, whether the bill is
appropriately tailored to limit access to that speech.

   a)    Whether violent video games are "protected speech"

   Video games have been found to be "protected speech"
   in several recent court decisions, one court
   explaining that games are protected because they
   "contain stories, imagery, ageold themes of
   literature, and messages, even an ideology, just as
   books and movies do."  [ IDSA , 329 F.3d 954 (internal
   quotations omitted); see also  Kendrick  , 244 F.3d 572.]


   The author notes that some speech which is considered
   "protected" for adults may be deemed unworthy of
   protection for children in certain cases.  [See
   Ginsberg v. New York  (1968) 390 U.S. 629.]  But this
   distinction has only been made in narrow circumstances
   where the question was whether the speech was
   "obscene."  Obscenity is one of the few categories of
   speech which has historically been unprotected under
   the First Amendment.  [See  Miller v. California  (1973)
   413 U.S. 15.]  In  Ginsberg  the Supreme Court held that
   children's access to certain pornographic magazines
   could be restricted without any violation of the First
   Amendment, even though those magazines were not
   "obscene" according to adult standards, because the
   magazines could properly be deemed obscene according
   to community standards for children.  [ Ginsberg  , 413
   U.S. at 636.]

   The obscenity standard that was tailored to
   child-specific standards in  Ginsberg  could not be
   equally applied here.  This is because several federal
   courts have held that materials which do not contain
   "depictions or descriptions of sexual conduct" may not
   be treated as obscenity, even when those materials
   contain objectionable violence.  [ IDSA  , 329 F.3d at
   959;  Maleng  , 325 F.Supp. 2d at 1185.]   As the  Maleng
   court explains:

      Sexually-explicit materials were originally
      excluded from the protections of the First
      Amendment because the prevention and punishment

☐

AB 1179 (Yee)
Page 8


      of lewd speech has very little, if any, impact
      on the free expression of ideas and government
      regulation of the sexually obscene has never
      been thought to raise constitutional problems.
      ?  The same cannot be said for depictions of
      violence: such depictions have been used in
      literature, art, and the media to convey
      important messages throughout our history, and
      there is no indication that such expressions
      have ever been excluded from the protections of

the First Amendment or subject to government
regulation.

A limited application of the Ginsberg case to speech
regarding sexual conduct is consistent with the
Supreme Court's statement in Erznoznik v. Jacksonville
that:

> speech that is neither obscene as to youths nor
> subject to some other legitimate proscription
> cannot be suppressed solely to protect the
> young from ideas or images that a legislative
> body thinks unsuitable for them.  In most
> circumstances, the values protected by the
> First Amendment are no less applicable when the
> government seeks to control the flow of
> information to minors.  [ 422 U.S. 205, 213-14
> (1975).]

Under the reasoning offered in the above cases, the
speech that would be restricted under this bill would
not be deemed obscene, even for minors, and would
therefore be considered "protected speech."

Nevertheless, one of the two definitions offered in AB
1179 for "violent video games" directly follows the
Ginsberg obscenity standard, and applies the terms of
the obscenity definition to video games where certain
violent acts may be committed by a game character.  It
is questionable whether this definition is appropriate
under existing law.  Neither the IDSA or the Maleng
decision is binding in California, but those decisions
and the precedent upon which they rely may be
persuasive to a California court.

AB 1179 (Yee)
Page 9

SHOULD AB 1179'S DEFINITION THAT MIRRORS THE OBSCENITY
DOCTRINE BE RETAINED, DESPITE CASES HOLDING THAT
"OBSCENITY" RELATES ONLY TO SEXUAL CONDUCT?

    b)    Whether the proposed restrictions are necessary and
          narrowly tailored to serve a compelling state interest

When speech is deemed "protected speech," any
restrictions on its content must be "necessary to
serve a compelling state interest," and "narrowly
tailored" to achieve that interest.  [ Republican Party
of Minn. v. White (2002) 536 U.S. 765, 774-75.]  This
standard has been applied by courts considering
similar violent video game restrictions for minors.
[See IDSA , 329 F.3d at 958; Maleng , 325 F.Supp.2d at
1186.]

Courts have repeatedly recognized that a state has a
legitimate and compelling state interest in
safeguarding both the physical and psychological
well-being of minors.  [ Sable Comm., Inc. v. FCC

(1989) 492 U.S. 115.]  The appropriate questions are
therefore whether the bill's proposed restrictions on
the sale and rental of violent video games are (1)
necessary and (2) narrowly tailored to achieve the
stated interest of safeguarding minors.

i.    Whether the proposed restrictions are necessary

The author argues there is clear evidence that
violent video games increase children's aggressive
behaviors, thoughts, and attitudes, and that they
jeopardize children's psychological health by
decreasing emotional empathy and pro-social helping
behaviors.

Opponents note that the courts which have evaluated
similar statutes found the restrictions proposed in
those measures to be unsupported by scientific
evidence.  The court in Kendrick noted that there
was no demonstrated causal connection between the
playing of violent video games and any violent acts,
and found there was no evidence that the interactive
character of the games -- rather than images which

AB 1179 (Yee)
Page 10

might be equally evident in movies or other
unrestricted materials -- that caused the negative
impacts.  [244 F.3d at 578-79.]  In IDSA , the court
discounted a study which indicated only that "more
aggressive thoughts are reported and there is
frequently more aggressive behavior" after minors
played violent video games, when there was no
further evidence of actual psychological damage.
[329 F.3d at 958-59.]

The author asserts that the studies relied upon here
demonstrate both a causal connection to acts of
violence and actual psychological damage.  In
contrast, opponents assert that the studies relied
upon are largely the same as the studies rejected by
the courts, without any new primary or experimental
research.  Opponents also argue that the
restrictions are not "necessary" because any impact
on a child caused by video game violence will be
very small in comparison to other factors that may
contribute to aggression, including real-world
interactions and exposure to other types of media
violence. It is unclear whether the evidence upon
which this bill is based would support a finding
that the proposed statutory restriction is
necessary.

DOES THE EVIDENCE SUPPORT A LEGISLATIVE FINDING THAT
THE PROPOSED RESTRICTIONS ARE NECESSARY?

ii.    Whether the proposed restrictions are
narrowly tailored

In support of a finding that the proposed

restrictions are narrowly tailored to achieve the
stated interest, the author notes that the
definition of "violent video game" (actually one of
two definitions, the first being the obscenity
definition discussed in Comment 2(a)) is limited to
violence that is "heinous, atrocious, and cruel,"
and is perpetrated against a game character that is
human or has "human-like characteristics."

Although these limitations would undeniably narrow
the statute's scope, it is not clear that the

AB 1179 (Yee)
Page 11

narrowing effect would effectuate the stated purpose
of the statute.  The statute is designed to address
studies which indicate that playing violent video
games may have undesirable physical and mental
effects on minors.  But it is not evident that these
studies identify "heinous, atrocious, and cruel"
violence as causing the significant negative effects
that the bill attempts to address.

The author contends that the "heinous, atrocious,
                                    and cruel" limitation is offered
_Maleng_ court's statement that the speech
restrictions imposed by that statute were overly
broad because the definition of "violent video
games" was "expansive and d[id] not attempt to
regulate the dissemination of video games on the
basis of the extremity of the violence portrayed."
[325 F.Supp.2d at 1190.]  However, the _Maleng_ court
was evaluating its statute based on experts'
testimony asserting "that 'ultra-violent' video
games cause aggression and must be regulated in
order to further the state's compelling interests."
[ _Id._ at 1189.]  Here, the studies used to justify
the state's compelling interests do not apparently
relate to "ultra-violent" video games or video games
that feature "heinous, atrocious, and cruel"
violence.  It is unclear what types of "violent"
video games were used in the studies referenced by
the author, and the author's comments sometimes
treat the violent video games discussed in the
studies as interchangeable with the M-rated games
which are currently subject to industry
self-regulation.

Because there does not appear to be a direct
correlation between the proposed limitations and the
negative effects discussed in the studies relied
upon by the author, it is unclear that the proposed
definition of "violent video game" is narrowly
tailored to address the state's compelling
interests, rather than simply tailored for the sake
of a more "narrow" statute.

WOULD SOME OTHER STANDARD MORE EFFECTIVELY IMPOSE
LIMITATIONS NARROWLY TAILORED TO ADDRESS THE

Case 5:05-cv-04188-RMW     Document 24-2     Filed 11/10/2005     Page 11 of 19

☐

          AB 1179 (Yee)
          Page 12


               COMPELLING INTERESTS AT STAKE?

      3. Opponents contend industry self-regulation is a less
         restrictive alternative

                  Opponents argue that existing laws and regulations are
          further evidence that the bill's proposed restrictions
          are not "narrowly tailored" to address a compelling state
          interest, since those measures are "less restrictive
          alternatives" that may be used to address the same
          compelling state interests.  Specifically, opponents note
          that the Entertainment Software Rating Board (ESRB)
          already assesses and rates video games based on their
          content and age-appropriateness, and that members of the
          industry have voluntarily submitted to the restrictions
          of these ratings.  Opponents note that the ESRB's rating
          system has been praised by the Federal Trade Commission
          (FTC) as the most comprehensive rating system of the
          three entertainment industries.

          The ESRB rating system uses six age-based ratings and
          about 30 content descriptors to provide information about
          the content of the game.  The six age-based ratings are:
              EC or Early Childhood-suitable for ages 3 and older.
              Games contain no material that parents would find
              objectionable.

              E or Everyone-suitable for ages 6 and older.  Games
              may contain minimal cartoon, fantasy, or mild violence
              and/or infrequent use of mild language.

              E10+ or Everyone 10 and Older-suitable for ages 10 and
              older.  Games may contain more cartoon, fantasy or
              mild violence, mild language, and/or minimal
              suggestive themes.

              T or Teen-these games may be suitable for ages 13 and
              older.  Games may contain violence, suggestive themes,
              crude humor, minimal blood and/or infrequent use of
              strong language.

              M or Mature-suitable for ages 17 and older.  Games may
              contain mature sexual themes, more intense violence,
              and/or strong language.

☐

          AB 1179 (Yee)
          Page 13


              AO or Adults Only-suitable for adults only.  Games may
              include graphic descriptions of sex and/or violence.
              These products are not intended for persons under the

age of 18.

Each video game rated by the ESRB has the age-based
rating symbol printed on the front and back of the game
box, and the back of the box displays content descriptors
that may explain why the game received the rating it did.
 Examples of the content descriptors include "animated
blood," "comic mischief," "mild violence," "intense
violence," "strong language," "suggestive themes,"
"strong sexual content," "drug reference" and "use of
drugs."

The author acknowledges that the ESRB rating system is
currently in place, but argues that its implementation
has been unsatisfactory.

    Recent studies show that the voluntary rating and
    enforcement system implemented by self-regulatory
    associations or entertainment producers have had
    limited success on decreasing youth access to
    Mature (M) rated video games.  In a phone survey
    of clerks at forty-six stores in 12 states, only
    76% of respondents say they understand the
    ratings they are supposed to enforce and only
    half of the stores reported training employees in
    the use of the ratings ?  In many of the stores
    that have reported they have training, further
    questioning revealed the "training" only included
    installing cash register prompts.  Eight[y]-nine
    percent (89%) of stores surveyed said they now
    have policies restricting the sale of M-rated
    games to those under seventeen ?  Despite this,
    clerks still sell these video games to under-aged
    youth.  During 2004, the National Institute on
    Media and the Family had children between the
    ages of seven and fourteen attempt to purchase
    M-rated games in thirty-five stores.   Youth
    succeeded 34% of the time.  While the overall
    purchase rate was 34%, boys as young as seven
    were able to buy M-rated games 50% of the time.
    A nationwide undercover survey of stores
    completed by the Federal Trade Commission in 2003

☐

AB 1179 (Yee)
Page 14

    corroborated these findings.  In this study, 69%
    of unaccompanied 13 to 16-year-olds purchased
    M-rated games and only 24% of cashiers asked the
    youth's age.

Opponents respond that between 85% and 90% of retailers
have recently implemented programs to prevent the sale
and rental of M-rated games to minors.  They argue that
this new program will help to reduce improper sales of
M-rated games to minor, and note that recent studies
indicate sales of M-rated and AO-rated games to minors
were prevented 66% of the time this year, an improvement
from 45% the year before.

Opponents also argue that limitations on who can sell or

rent video games is not the only way to successfully
limit minors' access to M-rated games, since information
on the ESRB rating system is readily available to
parents.  In addition to the information included on the
box of each video game, last year's AB 1793 (Yee) created
a statutory requirement for video game retailers to
prominently post signs advising consumers about the
rating system, and to provide information explaining the
rating system upon request.  Opponents argue that making
this information available to parents will play a large
role in protecting minors from exposure to violent video
games, citing FTC statistics which indicate that parents
are involved in 8 out of 10 video game purchases or
rentals.

4.Whether the terms of the bill are unconstitutionally
  vague

Opponents argue that the terms of the bill fall short of
the level of clarity required by the First Amendment.
Under  Grayned v. City of Rockford  , a legislative
enactment must "give the person of ordinary intelligence
a reasonable opportunity to know what is prohibited, so
that he may act accordingly."  [408 U.S. 104, 108.]

Opponents challenge the bill's application to "characters
with substantially human characteristics," arguing that
this term could apply to aliens, talking beasts, robots,
cartoon-type characters, and a broad range of other video
game characters.  Opponents also challenge the language

AB 1179 (Yee)
Page 15

used to define "heinous, atrocious, and cruel" violence.
Those definitions require findings, for example, that
virtual victims were "conscious" of specified abuse or
that players had a specified intent or state of mind with
respect to a virtual killing.  Opponents argue that it is
unclear how a virtual character could be found to be
"conscious of abuse" or how it could be found that a
video game player "intends to virtually inflict a high
degree of pain" or "relishes the virtual killing or shows
indifference to the suffering of the [virtual] victim."
Determinations of consciousness and intent are clearly
appropriate in assessing the severity of violent acts
committed by (and against) real people.  But those terms
are more unwieldy and difficult to apply in the context
of virtual characters or players whose ultimate "intent"
is simply to progress through the levels of a computer
game.

The Assembly Judiciary Committee analysis noted that the
terms discussed above, which define "heinous, atrocious,
and cruel" conduct, survived a vagueness challenge in a
death penalty case.  [Citing  United States v. Jones  (5th
Cir. 1998) 132 F.3d 232.]  That holding may not resolve
the vagueness issues discussed above, however, because
those questions relate specifically to problems that stem
from the difficulty of applying those standards to
virtual characters in a video game setting.

In discussing vagueness issues for another violent video
game statute, the _Maleng_ court stated:

> The problem is not, as defendants suggest, that a
> retail clerk might be unaware of the contents of
> a particular game ?  The real problem is that the
> clerk might know everything there is to know
> about the game and yet not be able to determine
> whether it can be legally sold to a minor.  The
> effects of such vagueness are particularly
> troublesome where First Amendment rights are
> implicated.  Not only is a conscientious retail
> clerk (and her employer) likely to withhold from
> minors all games that could possibly fall within
> the broad scope of the Act, but authors and game
> designers will likely 'steer far wider of the
> unlawful zone ? than if the boundaries of the

□

AB 1179 (Yee)
Page 16

> forbidden area were clearly marked.'

[325 F.Supp.2d at 1191.]

These vagueness concerns may be further intensified by
the potentially broad scope of responsibility for
determining what video games are "violent" under the
bill.  AB 1179 would require every violent video game
that is imported into the state for retail sale to be
appropriately labeled, and would impose liability up to
$1,000 for violations of this requirement.  The author
indicates that the requirement is intended to put the
responsibility on manufacturers to determine what video
games are violent.  But it is possible that there would
also be situations where large retailers want to import
games from an out-of-state store to an in-state store for
retail purposes.  In such cases, it is unclear whether
the responsibility for labeling would fall on the
manufacturer (who may not have intended the game for sale
in California) or the retailer.  A wide variety of
entities might therefore be responsible for making the
difficult assessment of what video games are restricted
under the statute.

As discussed below in Comment 5, opponents indicate that
the labeling required under this bill would not be
implemented on a national scale.  Indeed, nation-wide
labeling based on the AB 1179 standard would not be
permitted to the extent that legislation in other states
required labeling in accordance with different "violent
video game" definitions.

ARE THE DEFINITIONS IN THE BILL TOO VAGUE TO PROVIDE A
REASONABLE OPPORTUNITY FOR MANUFACTURERS AND RETAILERS TO
DETERMINE WHAT GAMES ARE RESTRICTED?

    5.Opponents say the bill would be unreasonably burdensome
      to implement

The California Retailers Association (CRA) contends that
this bill's requirement of additional labeling would
place extreme and unreasonable burdens on retailers.  CRA
asserts that implementation problems would arise because
this labeling would have to be California-specific, while
the voluntary ESRB labeling system would continue to be

AB 1179 (Yee)
Page 17

applied nationwide.  Although the author argues that AB
1179's definitions may ultimately be integrated with the
ESRB rating criteria, it is unclear that any kind of
integration would be possible when Illinois has enacted
violent video game restrictions that rely on a different
definition.  In order to do state-specific labeling, the
CRA maintains that retailers would be required to change
their software programs to account for different labels
on identical games to be sent to different destinations,
and that new UPC (Universal Product Codes) would have to
be assigned to violent video games that would be sent to
California.

   6.Opponents note that government regulation has not proven
     necessary for other entertainment industries

     Opponents point out that other entertainment industries,
     such as the motion picture, recording, and publishing
     industries, are not subject to the sort of statutory
     restrictions this bill would impose on the video game
     industry.  Notably, the motion picture industry has been
     voluntarily self-regulated for approximately 40 years.
     Given the apparent success of other self-regulating
     industries, opponents to the bill argue that current
     self-regulating mechanisms for video games should be
     given an opportunity for similar success.

     Some opponents note an additional concern that the
     regulations proposed in the bill would set a precedent
     for imposing regulations on violent speech in other
     entertainment industries.  Indeed, some supporters of the
     bill readily agree that the bill's proposed regulations
     on violent video games should be expanded to movies,
     songs, and books which contain violent images or
     descriptions that could be harmful to children.  Given
     the broad scope of free speech interests associated with
     music, movies, books, and video games, opponents argue
     this bill could be the start of a journey down the
     slippery slope toward endangering important First
     Amendment rights.

   7.Opponents argue the bill could chill video gaming
     development

     Opponents maintain that the proposed regulation would

AB 1179 (Yee)

Page 18

subject video game developers to a chilling effect,
asserting that:

> Game creation is a massively complex mix of science
> and art.  From software engineers to script writers to
> animators to music composers, there is a great need
> for talented, creative and educated individuals that
> must work in unison to see a game become a reality.
> In step with the growing need for talent, universities
> and colleges-over 50 just in the state of
> California-are implementing game development courses
> and degree programs.

Opponents are concerned that the regulations proposed by
this bill would "stagnate this important cultural medium
and its future evolution."

8.Whether 17 or 18 is the appropriate age of minority

The restrictions proposed in AB 1179 would be applied to
minors under 18 years old, but the previous bill, AB 450,
would have applied to minors under 17 years old.
Opponents argue that the age of majority should be
returned to 17 years old, since restrictions currently
placed on movies and music both define 17 as the age of
majority.  Opponents also note that the industry's
self-imposed regulation of video games restricts M-rated
games to people 17 years old and older.

The author's staff indicates that the author selected 18
as the age of majority in this bill mainly for ease of
implementation purposes.  The author's staff notes that a
recently enacted Illinois statute would restrict access
to violent video games by minors under 18 years old, and
suggests that manufacturers may have an easier time
implementing various state statutes on a nationwide level
if they can use the same "18" label.  In practice,
however, interchangeable labels would only be of limited
use because the definition of violent video games in
Illinois is significantly different from the definition
proposed in this bill.

IF APPROVED, SHOULD THE RESTRICTION ON ACCESS FOR MINORS
BE SET AT 17 OR 18 YEARS OLD?

AB 1179 (Yee)
Page 19

9.Additional implementation issues

The author's staff acknowledges that certain logistical
concerns may remain to be resolved.  Specifically, his
staff acknowledges that it may be appropriate to delay
the effective date of the bill to allow for an evaluation
of what games should be restricted under the bill, and to
allow for the labeling of such games.  His staff also

acknowledges that it may be appropriate to "grandfather
in" the video game stock that is already held in
California retail outlets.  The grandfather clause
contemplated by the author may not address all situations
where grandfathering may be appropriate.  In particular,
it would not apparently protect secondary markets such as
Goodwill shops that resell preexisting stock from other
retail outlets, or that sell used games.

SHOULD PROVISIONS BE MADE TO DELAY THE EFFECTIVE DATE OF
THE BILL, AND TO GRANDFATHER IN EXISTING STOCK AND USED
GAMES THAT MIGHT BE RESOLD?

 10.Committee options

Because this bill is a gut-and-amend bill that is being
heard under Senate Rule 29.10, it may not be amended in
committee.  It may be passed out of committee without
amendment, it may be sent to the Floor without
recommendation, or it may be held as a two-year bill.

Support:  Alliance for Children of San Mateo and Santa
          Clara Counties; California Alliance Against Domestic
          Violence; California Commission on the Status of
          Women; California State PTA; California Psychiatric
          Association; California Psychological Association;
          California State Conference of the National
          Association for the Advancement of Colored People;
          Capitol Resource Institute; City of Norwalk
          Department of Public Safety; Cruz Bustamante;
          dramaworks; Feather River College; Girl Scouts,
          Junior Leagues of California State Public Affairs
          Committee; Maidu Cultural and Development Group;
          Muir Trail Council; NAACP Legal Defense and
          Educational Fund, Inc.; Northern California Society
          of Public Health Education; Q Entertainment; Parents
          Television Council; Santa Clara County After School

□

          AB 1179 (Yee)
          Page 20


              Collaborative; Plumas County Child Care and
              Development Planning Council; Plumas Rural Services,
              Inc. Domestic Violence Services; Portola CARES
              Resource Center; Sierra Valley Even Start Family
              Literacy Program; Stanislaus County Children's
              Council; Support Network for Battered Women; Sutter
              Lakeside Community Services; The Child-Responsible
              Media Campaign; Women's Mountain Passages; 66
              individuals

Opposition:  Activision; American Civil Liberties Union;
             American Electronics Association; California
             Broadcasters Association; California Chamber of
             Commerce; California Retailers Association;
             Electronic Arts; Entertainment Software
             Association; Independent Film & Television
             Alliance; Interactive Entertainment Merchants
             Association; International Game Developers
             Association; Motion Picture Association of
             America, Inc.; National Association of Theatre

         Owners of California/Nevada; Recording Industry
         Association of America; The Media Coalition,
         Inc.; TechNet; Video Software Dealers
         Association; Wal-Mart; Eight Individuals

                        HISTORY

Source:  California District of the American Academy of
         Pediatrics; Common Sense Media; Girl Scout Councils
         of California [co-sponsors]

Related Pending Legislation:  AB 450 (Yee), which contains
                    roughly the same terms as this bill
                    but limits sales and rentals to
                    people younger than 17, is on the
                    Assembly Floor.

   Prior Legislation:  AB 1792 (Yee, 2004), which failed in
            the Assembly Committee on Arts,
            Entertainment, Sports, Tourism, and Internet
            Media, would have prohibited the sale,
            rental, or exhibition of violent video games
            to minors under 18 years old, defining
            "violent video games" as games that (1)
            appeal to a minor's morbid interest in

AB 1179 (Yee)
Page 21

            violence, (2) allow infliction of serious
            injuries on human-like characters in a way
            that is especially heinous, atrocious, or
            cruel, and (3) lack serious literary,
                                                artistic, political, or :
            minors.

            AB 1793 (Yee), Chapter 630, Statutes of 2004,
            requires video game retailers to post signs
            in prominent areas of the retail
            establishment to notify customers that a
            rating system is available to aid in the
            selection of video games, and to make
            information explaining the rating system
            available on request.

   Prior Vote:  Not relevant.  Bill was gutted and amended.

                   *************

Case 5:05-cv-04188-RMW    Document 24-2    Filed 11/10/2005    Page 19 of 19