1   BILL LOCKYER
    Attorney General of the State of California
2   LOUIS R. MAURO
    Senior Assistant Attorney General
3   CHRISTOPHER E. KRUEGER
    Supervising Deputy Attorney General
4   SUSAN K. LEACH
    Deputy Attorney General
5   ZACKERY P. MORAZZINI, State Bar No. 204237
    Deputy Attorney General
6     1300 I Street, Suite 125
      P.O. Box 944255
7     Sacramento, CA 94244-2550
      Telephone:  (916) 445-8226
8     Fax:  (916) 324-5567
      Email:  Zackery.Morazzini@doj.ca.gov
9
    Attorneys for Defendants
10  Governor Arnold Schwarzenegger and
    Attorney General Bill Lockyer
11

12              IN THE UNITED STATES DISTRICT COURT

13            FOR THE NORTHERN DISTRICT OF CALIFORNIA

14                      SAN JOSE DIVISION

15

16  VIDEO SOFTWARE DEALERS and          Case No. C 05 4188 RMW RS
    ENTERTAINMENT SOFTWARE
17  ASSOCIATION,                        **STATE DEFENDANTS'
                                        MEMORANDUM OF POINTS AND
18                       Plaintiffs,    AUTHORITIES IN OPPOSITION TO
                                        PLAINTIFFS' MOTION FOR
19          vs.                         PRELIMINARY INJUNCTION**

20  ARNOLD SCHWARZENEGGER, in his
    official capacity as Governor of the State of   Date:        December 2, 2005
21  California; BILL LOCKYER, in his official        Time:        9:00 a.m.
    capacity as Attorney General of the State of    Courtroom:   6
22  California; GEORGE KENNEDY, in his
    official capacity as Santa Clara County         The Honorable Ronald M. Whyte
23  District Attorney, RICHARD DOYLE, in his
    official capacity as City Attorney for the City
24  of San Jose, and ANN MILLER RAVEL, in
    her official capacity as County Counsel for
25  the County of Santa Clara,

26                       Defendants.

27

28

**INTRODUCTION**

Across the Nation, states and municipalities are attempting to respond to the public outrage over the extremely violent video games that more and more minors have ready access to and are able to purchase without parental knowledge. The State of California, after considering extensive research demonstrating the harmful effects violent interactive video games have on minors, joined the fight to protect their well-being. Instead of rushing through the legislative process, the California Legislature took its time, reviewed the relevant studies, considered the recent opinions of courts on these matters, and crafted a concise, narrowly-tailored law that balances the rights of adults and the welfare of minors. The resulting law, Chapter 638 of the Statutes of 2005 (the "Act"), received bipartisan support and was passed by an overwhelming majority. The Legislature received voluminous support for the Act from medical professionals, state and local governmental entities, children's organizations, constitutional law scholars, and citizens.

Set to take effect on January 1, 2006, the Act imposes civil penalties on any person who sells or rents a "violent video game," as defined, to a minor under the age of 18 unless it is sold or rented to a minor's parent, grandparent, aunt, uncle, or legal guardian. The Legislature determined that, notwithstanding the purported efforts of the video game industry to self-regulate minors' access to extremely violent video games that even the industry concedes are inappropriate for minors, only through threat of civil penalty backed by a state-wide law would it be possible to achieve the goal of protecting minors from the harmful effects of such games.

The Act is so carefully crafted that the only video games covered are those that appeal to the deviant or morbid interest of minors, are deemed to be patently offensive to minors by community standards, and lack any serious literary, artistic, political, or scientific value for minors, or those that are especially heinous, cruel, or depraved. This an exceedingly narrow category of violent video games.

The constitutionality of the Act appears to present matters of first impression for the Court. But the Act uses defining terms that, time after time, have withstood constitutional scrutiny. Existing precedent fully supports the State's efforts to protect the health and welfare of minors. Just as the technology of video games improves at exponential rates, so does the body of research

1.

1   demonstrating the truly harmful effects these violent interactive games have on minors.  Given this

2   substantial research, the Act survives all levels of judicial scrutiny.  Therefore, because plaintiffs,

3   the Video Software Dealers Association and the Entertainment Software Association (collectively

4   "Plaintiffs") are not likely to prevail on the merits of their challenges to the Act, their Motion for

5   Preliminary Injunction should be denied.

6   **STATEMENT OF ISSUES TO BE DECIDED AND RELEVANT FACTS**

7   This Court must decide whether Plaintiffs are likely to prevail on their claim that the Act is

8   facially unconstitutional.  In opposing Plaintiffs motion, the State Defendants[1] argue, (1) assuming

9   that some covered games contain protected speech, the Act should be reviewed under the variable

10  obscenity standard set forth by the Supreme Court in *Ginsberg v. State of New York*, 390 U.S. 629,

11  638 (1968); (2) the Act is supported by such extensive scientific and social research that it survives

12  even the most rigorous level of strict scrutiny; (3) the Act's labeling requirements are constitutional;

13  and (4) the Act is not impermissibly vague.[2]

14  The relevant facts are as follows.  Assembly Member Leland Yee, Ph.D, introduced

15  Assembly Bill 450 on February 15, 2005.  RJN, Ex. 7.  Later during the same legislative session,

16  Assembly Bill 1179 was gutted and amended, and replaced with the language of Assembly Bill

17  450.[3]  AB 1179 was passed by the Assembly on September 8, 2005, with a vote of 66 ayes, 7 noes,

18  and was passed by the Senate that same day with a vote of  22 ayes, 9 noes.  RJN, Ex. 5, p. 1;

19  Exhibit 3, p.1.  The Governor signed the bill into law on October 7, 2005.  RJN, Ex. 6, p.1.  The Act

20  takes effect on January 1, 2006.  Cal. Const., Art. IV, § 8(c)(2).

21

22

23
24  1.  "State Defendants" hereafter refers to defendants Governor Arnold Schwarzenegger and Attorney General Bill Lockyer.

25  2.  State Defendants will assume, for purposes of this motion only, that games covered by the Act
26  may contain some protected speech, but reserve the right to present the argument that video games do not constitute speech for First Amendment purposes at a later time.

27  3.  RJN, Ex. 1, p. 2, ("On September 2, 2005, the last day for amending bills without a rule
28  waiver, the author gutted and amended AB 1179 (Yee) to insert the language largely identical to the text of AB 450.").

**STATE DEFENDANTS' OPPOSITION TO**                    **Case No.  C 05 4188 RMW RS**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1

**ARGUMENT**

2      In the Ninth Circuit, a party seeking a preliminary injunction must meet one of two tests.

3   Under the first, the moving party must demonstrate that:  "(1) the [moving party] will suffer

4   irreparable injury if injunctive relief is not granted, (2) the [moving party] will probably prevail on

5   the merits, (3) in balancing the equities, the [non-moving party] will not be harmed more than [the

6   moving party] is helped by the injunction, and (4) granting the injunction is in the public interest."

7   *Stanley v. University of Southern California*, 13 F.3d 1313, 1319 (9th Cir. 1994).  In the alternative,

8   the moving party demonstrate "either a combination of probable success on the merits and the

9   possibility of irreparable injury or that serious questions are raised and the balance of hardships tips

10  sharply in his favor."  *Ibid*.

11     A plaintiff's evidentiary burden in seeking a provisional remedy in advance of trial is more

12  rigorous, in particular, when the plaintiff seeks to enjoin governmental action taken in the public

13  interest pursuant to statutory provisions.  See *Thomas v. County of Los Angeles*, 978 F.2d 504, 508

14  (9th Cir. 1992).  And in the context of a facial challenge, Plaintiffs "confront 'a heavy burden' in

15  advancing their claim . . . .  Facial invalidation 'is, manifestly, strong medicine' that 'has been

16  employed by the Court sparingly and only as a last resort.'"  *National Endowment for the Arts v.*

17  *Finley*, 524 U.S. 569, 580 (1998) (internal citations omitted).  Indeed, "[t]o prevail, respondents

18  must demonstrate a substantial risk that application of the provision will lead to the suppression of

19  speech."  *National Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998).   U n d e r  a n y

20  standard, and especially under the more rigorous evidentiary standard applicable here, Plaintiffs'

21  motion must be denied.

22  **I.    BECAUSE THE ACT APPLIES ONLY TO VIOLENT VIDEO GAMES
        DETERMINED TO BE HARMFUL TO MINORS, THE ACT IS SUBJECT TO**
23      **REVIEW UNDER THE VARIABLE OBSCENITY STANDARD SET FORTH IN**
        ***GINSBERG v. STATE OF NEW YORK.***
24

25      **A.    The First Amendment Rights of Minors Are Narrower than Those of Adults
              Given the Government's Constitutional Authority to Protect Minors from**
26            **Harm.**

27      States may properly exercise their police power to make necessary differentiations in the law

28  between adults and minors.  States are constitutionally allowed to prohibit minors from smoking,

3.

1   drinking, and driving.  States constitutionally prohibit minors from marrying and voting.  The law

2   recognizes that minors are not possessed of mental faculties equivalent to adults.  Just this year, the

3   Supreme Court recognized the importance of these difference when it held that the Constitution

4   prohibits states from executing minors.  In *Roper v. Simmons*, the Supreme Court recognized three

5   important differences, supported by existing science, between adults and minors under eighteen:

6       First, as any parent knows and as the scientific and sociological studies respondent
        and his amici cite tend to confirm, "[a] lack of maturity and an underdeveloped sense
7       of responsibility are found in youth more often than in adults and are more
        understandable among the young.  These qualities often result in impetuous and
8       ill-considered actions and decisions."  *Johnson*, *supra*, at 367, 113 S.Ct. 2658; see
        also *Eddings*, *supra*, at 115-116, 102 S.Ct. 869 ("Even the normal 16-year-old
9       customarily lacks the maturity of an adult").  It has been noted that "adolescents are
        overrepresented statistically in virtually every category of reckless behavior." Arnett,
10      Reckless Behavior in Adolescence: A Developmental Perspective, 12 Developmental
        Review 339 (1992).   In recognition of the comparative immaturity and
11      irresponsibility of juveniles, almost every State prohibits those under 18 years of age
        from voting, serving on juries, or marrying without parental consent.  [¶]

12
        The second area of difference is that juveniles are more vulnerable or susceptible to
13      negative influences and outside pressures, including peer pressure . . . .  This is
        explained in part by the prevailing circumstance that juveniles have less control, or
14      less experience with control, over their own environment.  See Steinberg & Scott,
        Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished
15      Responsibility, and the Juvenile Death Penalty, 58 Am. Psychologist 1009, 1014
        (2003).  [¶]
16
        The third broad difference is that the character of a juvenile is not as well formed as
17      that of an adult.  The personality traits of juveniles are more transitory, less fixed.
        See generally E. Erikson, Identity: Youth and Crisis (1968).
18

19  *Roper v. Simmons*, __ U.S. __, 125 S.Ct. 1183, 1195 (2005).  The Supreme Court based its findings

20  on social science, recognizing that the susceptibility of minors to mental harm from external

21  influences, well beyond that of adults, justifies differentiations in treatment in the eyes of the law.

22      That the differentiations impact First Amendment freedoms does render the state action per

23  se invalid.  "[E]ven where there is an invasion of protected freedoms 'the power of the state to

24  control the conduct of children reaches beyond the scope of its authority over adults . . . .'"

25  *Ginsberg v. State of New York*, 390 U.S. 629, 638 (1968), quoting *Prince v. Commonwealth of*

26  *Massachusetts*, 321 U.S. 158, 170 (1944).  The Supreme Court has firmly established that "the

27  States validly may limit the freedom of children to choose for themselves in the making of

28  important, affirmative choices with potentially serious consequences.  These rulings have been

4.

**STATE DEFENDANTS' OPPOSITION TO**                              **Case No.  C 05 4188 RMW RS**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1  grounded in the recognition that, during the formative years of childhood and adolescence, minors

2  often lack the experience, perspective, and judgment to recognize and avoid choices that could be

3  detrimental to them." *Bellotti v. Baird*, 443 U.S. 622, 635 (1979).   In furtherance of this bedrock

4  principle, the Supreme Court has "sustained legislation aimed at protecting the physical and

5  emotional well-being of youth even when the laws have operated in the sensitive area of

6  constitutionally protected rights." *New York v. Ferber*, 458 U.S. 747, 757 (1982).   Indeed, the

7  Supreme Court has "held that a statute prohibiting use of a child to distribute literature on the street

8  was valid notwithstanding the statute's effect on a First Amendment activity." *Ibid*.  Legal

9  differentiations are often necessary to protect minors, even from expressive materials:  "It is well

10  settled that a State or municipality can adopt more stringent controls on communicative materials

11  available to youths than on those available to adults." *Erznoznik v. City of Jacksonville*, 422 U.S.

12  205, 212 (1975).

13      That states may legislate to protect minors from harmful external influences is firmly

14  established by precedent.   In *Ginsberg v. State of New York*, a store owner was convicted of

15  violating a New York statute prohibiting the sale to minors material the legislature found to be

16  "harmful to minors."  390 U.S. at 631.  The statute at issue was directed at material containing

17  simple "nudity" as well as sexual depictions –  "girlie" magazines. *Id*. at 645-47.  The statute

18  defined the term "harmful to minors" as a description or representation, "in whatever form, of

19  nudity, sexual conduct, sexual excitement, or sadomasochistic abuse, when it:  (i) predominantly

20  appeals to the prurient, shameful or morbid interest of minors, and (ii) is patently offensive to

21  prevailing standards in the adult community as a whole with respect to what is suitable material for

22  minors, and (iii) is utterly without redeeming social importance for minors." *Id.* at 646.

23      Although there was no question that the New York law would not survive judicial scrutiny

24  had it applied to adults, the Supreme Court upheld the law under the "variable obscenity" or

25  "obscene as to minors" standard. *Id*. at 639-46.  This standard recognizes a state's power to define

26  obscenity (material receiving no First Amendment protection) in a variable manner – using one

27  definition applicable to adults and a more broad definition applicable only to minors.  The Court

28  cited with approval the reasoning of the New York Court of Appeals:

5.

> "(M)aterial which is protected for distribution to adults is not necessarily
> constitutionally protected from restriction upon its dissemination to children.  In
> other words, the concept of obscenity or of unprotected matter may vary according
> to the group to whom the questionable material is directed or from whom it is
> quarantined.  Because of the State's exigent interest in preventing distribution to
> children of objectionable material, it can exercise its power to protect the health,
> safety, welfare and morals of its community by barring the distribution to children
> of books recognized to be suitable for adults."

*Ginsberg*, 390 U.S. at 636, quoting  *Bookcase, Inc. v. Broderick*, 18 N.Y.2d 71, 75 (1966).

In the instant case, the State of California has properly differentiated between minors and adults with respect to the purchasing of extremely violent video games that the Legislature determined to be harmful to minors.  The Act, which applies only to minors, should be reviewed with this constitutionally permissible distinction in mind.

**B.**    **The Act Properly Incorporates a Variable Obscenity Standard to Limit Minors'
Access to Extremely Violent Material Found to Be Harmful to Minors.**

Consider a hypothetical video game where the player, using interactive controls, causes a female character in the game to fully disrobe.  The player is then able to control the nude female character in a host of different ways, causing the character to engage in intercourse, for example. Under *Ginsberg*, a state could flatly prohibit minors from legally purchasing such a game.  390 U.S. at 631, 645-47 (upholding law prohibiting representations or descriptions of "nudity" in "whatever form").

Now consider a video game where the player, using interactive controls, is rewarded or advances for causing his character to take out a shovel and bash the head of an image of a human being, appearing to beg for her life, until the head severs from the body and blood gushes from the neck.  The player is then allowed to continue bashing the image of the human corpse, knocking the decapitated body about the screen with a shovel.  Or a video game where the player can cause his character to wound an image of a human being with a rifle by shooting out a kneecap, pour gasoline on the wounded character, and then set the character on fire while the character appears to be alive. See, e.g., Ex. A to Morazzini Decl., "Video Game Violence Sampler."  Such a video game would lead a reasonable person to consider that the game as a whole appeals to a deviant or morbid interest of minors.  Act, Civil Code, § 1746(d)(1)(A).  The video game is so violent that it would be patently

STATE DEFENDANTS' OPPOSITION TO                          Case No.  C 05 4188 RMW RS
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1   offensive to prevailing community standards as to what is suitable for minors, and, considered as

2   a whole, it lacks any serious literary, artistic, political, or scientific value for minors. *Ibid*. The

3   video game is so extremely violent that a state legislature presented substantial evidence that when

4   minors play the video game it causes them to exhibit violent antisocial or aggressive behavior, a

5   reduction of activity in the frontal lobes of the brain, and psychological harm. Act, § 1.

6       Would the First Amendment tie the hands of states, prohibiting them from limiting minors'

7   access to such video games by merely requiring parental consent before a minor may purchase such

8   a game? Plaintiffs essentially argue 'Yes,' that although states may constitutionally limit minors'

9   access to simple depictions of nudity, the First Amendment strictly prohibits states from limiting

10  minors' access to such extremely violent video games. But such an interpretation of the First

11  Amendment cannot represent what was intended by our founding fathers.

12      To the contrary. That states may legislate to protect minors from harm is firmly established.

13  In *Ginsberg*, the Supreme Court upheld a statute based on its finding that it "was rational for the

14  legislature to find that the minors' exposure" to material containing nudity "might be harmful." 390

15  U.S. at 639. The Court explained that "constitutional interpretation has consistently recognized that

16  the parents' claim to authority in their own household to direct the rearing of their children is basic

17  in the structure of our society . . . . The legislature could properly conclude that parents and others,

18  teachers for example, who have this primary responsibility for children's well-being are entitled to

19  the support of laws designed to aid discharge of that responsibility" 390 U.S. at 639.

20      The Supreme Court recognized that states must be allowed to adjust the definition of

21  constitutionally unprotected material for minors to existing social realities in order to protect minors

22  from harm, notwithstanding that such definitions cannot constitutionally apply to adults:

23          We do not regard New York's regulation in defining obscenity on the basis of its
            appeal to minors under 17 as involving an invasion of such minors' constitutionally
24          protected freedoms. Rather [the statute] simply adjusts the definition of obscenity 'to
            social realities by permitting the appeal of this type of material to be assessed in term
25          of the sexual interests . . . ' of such minors . . . . That the State has power to make
            that adjustment seems clear, for we have recognized that even where there is an
26          invasion of protected freedoms 'the power of the state to control the conduct of
            children reaches beyond the scope of its authority over adults . . . .'

27

28  390 U.S. at 638 (internal citations omitted).

**STATE DEFENDANTS' OPPOSITION TO**                    **Case No.  C 05 4188 RMW RS**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1    The "harmful to minors" standard need not be limited to material that contains depictions

2  of nudity or sex.  The Supreme Court has never suggested that the special interest in sparing youth

3  from the harmful effects of communicative material is limited sexual material.  If the violent

4  material sought to be restricted is limited to that which is found to be harmful to minors, the

5  *Ginsberg* standard naturally applies.  Such a conclusion logically follows, especially given the

6  Supreme Court's recent recognition of the special vulnerability and susceptibility of minors to

7  external influences.  See *Roper v. Simmons*, 125 S.Ct. at 1190.

8    Judge Posner, writing for the Seventh Circuit Court of Appeals, recognized as much.  In

9  *American Amusement Machine Ass'n v. Kendrick,* 244 F.3d 572, 576-77 (7th Cir. 2001), a case

10  relied upon by Plaintiffs, the court in fact applied the *Ginsberg* standard to an ordinance designed

11  to restrict minors' access to violent video games. *Ibid.*  However, the court simply found that the city

12  failed to produce sufficient evidence to justify the governmental interest asserted, stating:

13      The Court in *Ginsberg* was satisfied that New York had sufficient grounds for
        thinking that representations of nudity that would not constitute obscenity if the
14      consumers were adults were harmful to children.  We must consider whether the City
        of Indianapolis has equivalent grounds for thinking that violent video games cause
15      harm either to the game players or (the point the City stresses) the public at large.

16  *Id*. at 576.  The court reviewed the evidence submitted by the city to support its purported

17  compelling interest in protecting the general public, but simply found the city's evidence of harm

18  to the public unsupported.  *Id*. at 578-79.  The importance of *Kendrick* is that the Seventh Circuit

19  applied the *Ginsberg* standard to the ordinance at issue – directed at violent material – but held the

20  ordinance invalid due to the city's failure to adequately support its asserted governmental interest.

21  As Judge Posner bluntly opined, "Common sense says that the City's claim of harm to its citizens

22  from these games is implausible, at best wildly speculative."  *Id*. at 579.  Importantly, the interest

23  the city sought to further in *Kendrick* was different than the interest California seeks to further here.

24  The ordinance at issue in *Kendrick* sought to prevent violence against law enforcement officers, thus

25  requiring the city to prove that playing video games is likely to incite imminent lawless.

26  *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).  Here, the Act seeks to protect minors from the

27  harmful effect of the video games.  *Brandenburg* is thus not applicable.

28  / / /

8.

1    More recently, the United States District Court for the Western District of Washington

2    recognized that a narrowly drawn law aimed at limiting minors' access to violent video games could

3    pass constitutional scrutiny, even one directed only at violent material. *Video Software Dealers*

4    *Ass'n v. Maleng*, 325 F. Supp. 2d 1180 (W.D. Wash. 2004). In *Maleng*, the court struck down a

5    statute prohibiting the sale of video games to minors that allowed the player to kill or injure

6    characters depicting "public law enforcement officers." *Id.* at 1189-90. However, the court

7    recognized that it is possible to draft such a law in a manner that would pass constitutional muster

8    if it were limited to "violent images, such as torture or bondage, that appeal to the prurient interest

9    of minors." *Id.* at 1190. Moreover, the court outlined what it considered to be key factors in a

10   constitutionally permissible violent video game regulation:

11        – does the regulation cover only the type of depraved or extreme acts of violence
          that violate community norms and prompted the legislature to act?

12        – does the regulation prohibit depictions of extreme violence against all innocent
          victims, regardless of their viewpoint or status? and

13        – do the social scientific studies support the legislative findings at issue?

14   *Id.* at 1190. The *Maleng* court recognized that a law could be drafted, if supported by the evidence,

15   in a manner that covers only that violent material which is found to meet the prevailing definition

16   of obscenity and is harmful to minors.

17        In the instant case, the Act does just that. It limits minors' access only to the most extremely

18   violent video games that the Legislature determined cause harm. The Act incorporates the Supreme

19   Court's definition of obscenity, varied to the audience of minors, to ensure that only material that

20   appeals to the deviant or morbid interest of minors is covered by the law. And the Act is completely

21   viewpoint neutral – all extreme violence is covered. When a law, supported by substantial evidence,

22   is crafted in such a manner that the only material regulated is that which is found to be obscene as

23   to minors, it should be reviewed under the *Ginsberg* standard, regardless of whether it is limited to

24   nudity or sex-based material. When legislating to protect minors, it is proper to include extremely

25   violent, harmful material in a variable definition of obscenity. The Legislature properly found that

26   exposure to extremely violent video games is no less harmful to minors than exposure to nudity or

27   sex-related material.

28   / / /

**STATE DEFENDANTS' OPPOSITION TO**                    **Case No.  C 05 4188 RMW RS**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1    **II.    THE ACT SURVIVES SCRUTINY UNDER THE *GINSBERG* VARIABLE
2    OBSCENITY STANDARD.**

3        The California Legislature has defined the obscenity of the violent video games on the basis

4    of their appeal to minors.  The Act varies the definition of obscenity, applicable only to minors, to

5    include extremely violent images in video games.  The Act defines the term "violent video game"

6    in part as follows:

7        (1) "Violent video game" means a video game in which the range of options
        available to a player includes killing, maiming, dismembering, or sexually assaulting
8        an image of a human being, if those acts are depicted in the game in a manner that
        does either of the following:
9        (A) Comes within all of the following descriptions:
        (i) A reasonable person, considering the game as a whole, would find appeals to a
10        deviant or morbid interest of minors.
        (ii) It is patently offensive to prevailing standards in the community as to what is
11        suitable for minors.
        (iii) It causes the game, as a whole, to lack serious literary, artistic, political, or
12        scientific value for minors.

13    Act, Civil Code, § 1746(d).  The Act provides a secondary definition as follows, but only one need

14    be met for purposes of the Act.  *Id.* (d)(1)(B).

15        "To sustain state power to exclude material defined as obscene by [the statute] requires only

16    that we be able to say that it was not irrational for the legislature to find that exposure to material

17    condemned by the statute is harmful to minors."  *Ginsberg*, 390 U.S. at 641.  Although the *Ginsberg*

18    Court held that it was "doubtful" that the New York legislature's finding that "girlie" magazines

19    were harmful to minors was based upon "accepted scientific facts," it also recognized that courts

20    cannot "demand of legislatures 'scientifically certain criteria of legislation.'"  *Id.* at 642 [internal

21    citation omitted].  Thus, the Court held, "[w]e therefore cannot say that [the statute], in defining the

22    obscenity of material on the basis of its appeal to minors under 17, has no rational relation to the

23    objective of safeguarding such minors from harm."  *Id.* at 643.  Thus, just as in *Ginsberg*, the Act's

24    scope is limited to material which, by definition, is obscene as to minors.  The Act's definition

25    matches the Supreme Court's existing precedent of obscenity as to minors -- constitutionally

26    unprotected material – while incorporating extreme violence. See *Miller v. California*, 413 U.S. 15,

27    24 (1973).

28    / / /

**STATE DEFENDANTS' OPPOSITION TO**                    **Case No.  C 05 4188 RMW RS**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1    The Legislature expressly found that the material covered by the Act is harmful to minors.

2    Act, § 1.  And the Legislature presented substantial evidence supporting its findings.  See Section

3    III (B) (i-iii), below.  Certainly, this Court can find that "it was not irrational for the legislature to

4    find that exposure to material condemned by the statute is harmful to minors."  *Ginsberg*, 390 U.S.

5    at 642.

6    **III.    EVEN IF THE ACT WERE SUBJECT TO STRICT SCRUTINY, IT SURVIVES**
         **JUDICIAL REVIEW.**

7

8    Assuming, *arguendo*, that the Act is subject to strict scrutiny under the First Amendment,

9    it survives judicial review because it is narrowly tailored to serve a compelling state interest.

10   *Republican Party of Minnesota v. White*, 536 U.S. 765, 774-75 (2002).

11   **A.    Protecting Minors from Harm Is Unquestionably a Compelling State Interest.**

12   Plaintiffs are not likely to succeed on their claim that the state has presented no legitimate

13   interest to support the Act.  Plaintiffs boldly claim that the Act represents the Legislature's attempt

14   to "control [] the thoughts or feelings of minors."    Pltfs.' Mem. P & A Supp. Mot. Prelim. Inj.

15   10:25-28.  Plaintiffs' position is disingenuous, at best, especially considering that the video game

16   industry itself rates video games based upon their violent content and suitability for minors.  In fact,

17   the industry has two distinct ratings, M for Mature and AO for Adult Only, that express their own

18   view that the games with these ratings are not suitable for minors.  Lowenstein Decl. ¶ 9.

19   Here, the Legislature clearly expressed the state interest sought to be served by the Act –

20   protecting minors from harm: "The state has a compelling interest in preventing violent, aggressive,

21   and antisocial behavior, and in preventing psychological or neurological harm to minors who play

22   violent video games."  Act, § 1(c).

23   The Supreme Court has consistently held that protecting minors from harm is a compelling

24   state interest.  It has held that "[i]t is evident beyond the need for elaboration that a State's interest

25   in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.'"  *New York*

26   *v. Ferber*, 458 U.S. 747, 756-757 (1982) (internal citation omitted).  Thus, the Supreme Court has

27   "sustained legislation aimed at protecting the physical and emotional well-being of youth even when

28   the laws have operated in the sensitive area of constitutionally protected rights."  *Ibid*.  (internal

11.

1  citation omitted).  It is beyond question that the Legislature's interest in protecting minors from

2  harm is compelling for purposes of judicial review.

3      **B.    The Legislature's Determination That the Material Covered by the Act Is Harmful to Minors Is Based upon Substantial Evidence.**

4

5      The Supreme Court has explained that "Congress is not obligated, when enacting its statutes,

6  to make a record of the type that an administrative agency or court does to accommodate judicial

7  review."  *Id*. at 666.  Indeed, "[t]he quantum of empirical evidence needed to satisfy heightened

8  judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of

9  the justification raised."  *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 391 (2000).  The

10  "Legislature must have drawn reasonable inferences based on substantial evidence.'"  *Ibid*., quoting

11  *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 666 (1994) (plurality opinion).

12      In determining whether the Legislature drew reasonable inferences based upon substantial

13  evidence, the Supreme Court in *Turner*, *supra*, held that courts "must accord substantial deference

14  to the predictive judgments" of legislative bodies.  *Turner Broadcasting System, Inc. v. F.C.C.*, 512

15  U.S. at 665-666.  The Court recognized that "[s]ound policymaking often requires legislators to

16  forecast future events and to anticipate the likely impact of these events based on deductions and

17  inferences for which complete empirical support may be unavailable."  *Ibid*.

18      The legislative record of the Act includes and cites to dozens of relevant studies, articles, and

19  reports supporting the finding that playing violent interactive video games can be harmful to

20  minors.[4/]  The Legislature also considered the Senate Judiciary Committee's analysis of the Act for

21  the September 8, 2005 hearing, which recites the following as justification for the bill[5/]:

22      Dozens of studies on violent video games, including an analysis of 54 independent
       samples with 4,262 participants, show five major effects:  playing violent video

23

24  ───────────────────────────

25      4.  Assembly Bill 1179 (Yee) was a "gut and amend" of Assembly Bill 450 (Yee) in essentially
    identical language.  See to Request for Judicial Notice, Ex. 1, pp. 2-3.  The Legislature was provided with
    multiple bibliographies, including a "Violent Video Game Bibliography" citing dozens of relevant

26  studies.  Appendix A, p. A014.

27      5.  Evidence consisting of legislative hearings and floor debate is admissible to demonstrate the
    motive of the legislature in enacting the law.  *Las Vegas Nightlife, Inc. v. Clark County, Nev.*, 38 F.3d

28  1100, 1102 (9th Cir. 1994).

**STATE DEFENDANTS' OPPOSITION TO**                    **Case No.  C 05 4188 RMW RS**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1    games leads to increased physiological arousal, increased aggressive thoughts,
     increased aggressive feelings, increased aggressive behaviors, and decreased pro-
2    social or helping behaviors.  These studies include experimental studies (that show
     playing violent video games actually causes increases in aggression), correlation
3    studies (where long-term relations between game play and real-world aggression can
     be shown), and longitudinal studies (where changes in children's aggressive
4    behaviors can be demonstrated) . . . .  The American Academy of Pediatrics Policy
     Statement on Media Violence stated that playing violent video games accounts for
5    a 13% to 22% increase in adolescent's violent behavior.  When considering the
     negative impact violent video games have on youth, the evidence is strong:
6    playingviolent video games has more effect on increased youth aggression than
     second-hand smoke has on causing cancer, or lead exposure links to decreased IQ.

7

8    RJN, Ex 1, pp. 5-6.

9        The quantum of empirical evidence considered by the Legislature supports its determination

10   that playing the violent video games covered by the Act poses a special risk of harm to minors.

11           **i.    Playing Violent Interactive Video Games Leads to Antisocial or
                     Aggressive Feelings or Behavior, Adversely Impacts School
12                   Performance, and Lessens Brain Activity in the Frontal Lobes of
                     Minors.**
13

14       The Legislature's findings were based in large part by the research conducted and reported

15   by Dr. Craig A. Anderson, Ph.D.[6], much of which is contained in the legislative record. See

16   Appendix A, p. A014, "Violent Video Game Bibliography."  The Legislature was referred to no less

17   than twenty-three published articles authored by Dr. Anderson and his colleagues addressing the

18   negative impacts playing violent video games has on minors.  *Ibid.*

19        In 2004, Dr. Anderson reported that an "updated meta-analysis reveals that exposure to

20   violent video games is significantly linked to increases in aggressive behaviour, aggressive

21   cognition, aggressive affect, and cardiovascular arousal, and to decreases in helping behaviour."[7]

22   Moreover, "Experimental studies reveal this linkage to be causal.  Correlational studies reveal a

23   linkage to serious, real-world types of aggression.  Methodologically weaker studies yielded smaller

24

25       6.  Dr. Anderson is a Distinguished Professor and Chair of the Iowa State University Department
26   of Psychology.  http://www.psychology.iastate.edu/faculty/caa/.  He has been publishing articles on the
     effects of violent video games on minors since 2000.
27
         7.  See Appendix C, p. C091, Anderson, *An Update on the Effects of Playing Violent Video
28   Games*, Journal of Adolescence, 24 (2004) 113-122.

**STATE DEFENDANTS' OPPOSITION TO**                    **Case No.  C 05 4188 RMW RS**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1  effect sizes than methodologically stronger studies, suggesting that previous meta-analytic studies
2  of violent video games underestimate the true magnitude of observed deleterious effects on
3  behaviour, cognition, and affect." *Ibid*.

4       The Legislature was presented with evidence demonstrating the causal relationship
5  between violent video games and the harm caused to minors. One such article, a comprehensive
6  meta-study or statistical practice of combining the results of a number of studies that address a set
7  of related research hypotheses, concluded that "Though the number of studies investigating the
8  impact of violent video games is small relative to the number of television and film studies, there
9  are sufficient studies with sufficient consistency (as shown by the mate-analysis results) to draw
10  some conclusions . . . . The experimental studies demonstrate that in the short term, violent video
11  games cause increases in aggressive thoughts, affect, and behaviour; increases in physiological
12  arousal; and decreases in helpful behaviour. [8/]

13       In another article where 607 eighth and ninth grade students from four schools were
14  analyzed, research demonstrated that "[a]dolescents who expose themselves to greater amounts of
15  video game violence were more hostile, reported getting into arguments with teachers more
16  frequently, were more likely to be involved in physical fights, and performed more poorly in
17  school."[9/]

18       The Legislature was presented with further research showing that playing violent video
19  games increases "automatic aggressiveness," even in adults. In a study conducted using 121 college
20  students, the results showed "[w]hile most video game enthusiasts insist that the games they play
21  have no effect on them, their exposure to scenes of virtual violence may influence them
22  automatically and unintentionally."[10/] The study concluded that "[d]espite the misleading debate in

23
---

24       8. Appendix A, p. A100, Anderson, et al., *The Influence of Media Violence on Youth*,
    Psychological Science in the Public Interest, Vol. 4, No. 3, pp. 91-93 (December 2003).

25
26       9. Appendix B, p. B028, provided in full in Appendix D, p. D001, Gentile, et al., *The Effects of
    Violent Video Game Habits on Adolescent Hostility, Aggressive Behaviors, and School Performance*,
    Journal of Adolescence 27 (2004) 5-22, p. 5.

27
28       10. Appendix B, p. B064, provided in full at Appendix D, p. D019, Uhlmann & Swanson,
    *Exposure to Violent Video Games Increases Automatic Aggressiveness*, Journal of Adolescence, 27

14.

1  the news media over whether exposure to violent television, movies and video games leads to an

2  increase in aggressive behavior, the empirical evidence that it does so has become overwhelming."

3  *Id*. at 49-50.

4        The Legislature was also presented with research demonstrating that violent video games can

5  lead to desensitization in minors.[11/]    Desensitization "means the attenuation or elimination of

6  cognitive, emotional, and ultimately, behavioral responses to a stimulus." *Id*. at 25.  One article

7  reported specific findings that, as between violent video games, movies, televisions, and Internet

8  content, "[r]egression analyses indicated that only exposure to video game violence was associated

9  with (lower) empathy." *Id*. at 23 (internal citations omitted).  Empathy is "the capacity to perceive

10 and to experience the state of another [and] is critical to the process of moral evaluation." *Id*. at 26.

11 Evidence demonstrates a "[r]elationship[] between lower empathy and social maladjustment and

12 aggression in youth . . . ." *Id*. (internal citation omitted).

13       Other research considered by the Legislature demonstrates the impact violent video games

14 have on brain activity.  One such study, conducted over a two year period and reported by the

15 Indiana University School of Medicine, concluded that "[t]here appears to be a difference in the way

16 the brain responds depending upon the amount of past violent media exposure through video games,

17 movies and television."[12/]    For minors previously diagnosed with disruptive behavior disorders

18 (DBD), the research demonstrated "less brain activity in the frontal lobe while the youths with DBD

19 watch violent video games."  *Ibid*.  The frontal lobe "is the area of the brain responsible for

20 decision-making and behavior control, as well as attention and a variety of other cognitive

21 functions." *Ibid*.  Brain function was also altered in non-DBD youth. *Ibid*.

22 / / /

23

24 (2004) 41-52, p. 48.

25       11.  Request for Judicial Notice, Ex. 2, Senate Rules Committee analysis of AB 1179, pp. 4-5;
   "Violent Video Game Bibliography," Appendix A, A014; Appendix E, p. E001, Funk, et al., *Violence*
26 *Exposure in Real-Life, Video Games, Television, Movies, and the Internet:  Is There Desensitization?*,
   Journal of Adolescence 27 (2004) 23-39.

27

28       12.  Appendix A, p. A127, *Aggressive Youths, Violent Video Games Trigger Unusual Brain*
   *Activity*, Indiana University School of Medicine, December 2, 2002.

15.

1    By correspondence dated April, 2005, the American Academy of Pediatrics informed the

2  Legislature that "early studies on video games indicate that the effects of child-initiated virtual

3  violence may be even more profound than those of passive media, such as televisions . . . .  The time

4  has passed for contemplating and discussing whether violence in video games and other media are

5  harmful to our children.  Action is needed."  See Appendix A, p. A085.

6    Indeed, the United States District Court for the Western District of Washington recently

7  came to the same conclusion as the Legislature.  In *Maleng*, a case relied upon by Plaintiffs, the

8  court expressly found that existing evidence and expert opinions supported the finding that "the

9  depictions of violence with which we are constantly bombarded in movies, television, computer

10  games, interactive videos games, etc., have some immediate and measurable effect on the level of

11  aggression experienced by some viewers and that *the unique characteristics of video games, such*

12  *as their interactive qualities, the first-person identification aspect, and the repetitive nature of the*

13  *action, makes video games potentially more harmful to the psychological well-being of minors than*

14  *other forms of media*.  325 F. Supp. 2d at 1188 (emphasis added).

15    In *Maleng*, the court struck down the video game ordinance not because existing research

16  did not support the harm violent video games cause to minors, but because the court found that "the

17  current state of the research cannot support the legislative determinations that underlie the Act

18  because there has been no showing that exposure to video games that 'trivialize violence against law

19  enforcement officers' is likely to lead to actual violence against such officers."  *Ibid*.

20    In the instant case, the Legislature is seeking to prevent harm to minors, not to prevent them

21  from committing violent acts.  Automatic aggressiveness, increased aggressive thoughts and

22  behavior, antisocial behavior, desensitization, poor school performance, reduced activity in the

23  frontal lobes of the brain – each causes distinct harm to the developing minds of minors.  And

24  prevailing social science points directly to violent video games as a major culprit.  Presented with

25  such substantial evidence, the Legislature could not simply ignore the deleterious effects extremely

26  violent video games are having on minors.  The Legislature's finding that extremely violent video

27  games covered by the Act cause harm to minors is supported by substantial evidence, Plaintiffs are

28  not likely to succeed on their claim that the Act does not address a compelling state interest.

16.

## C.    The Act Is Narrowly Tailored to Further the State's Interest.

Even under strict scrutiny, a content-based restrict on speech will survive judicial review if the legislature chose the least restrictive means available to further its compelling interest. *Sable Communications of California, Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989). Here, the Act is very narrowly tailored to protect the State's youth, as explained below.

### i.    The Act Applies Only to Video Games Given Their Unique Interactive Nature.

The Legislature had substantial evidence to determine that extremely violent video games, given their interactive nature requiring players to affirmatively cause characters to engage in extreme violence, pose a special risk of harm to minors beyond the passive viewing of television or movies.

Video games are uniquely interactive. The player controls the characters in first-person, causing them to shoot, stab, beat, stomp, run over, or ignite the opponent. Often this is the entire point of the game. The American Academy of Pediatrics advised the Legislature that "early studies on video games indicate that the effects of child-initiated virtual violence may even be more profound than those of passive media, such as television." See Appendix A, p. A085. The California Psychiatric Association mirrored these concerns when it advised the Legislature that violent content in "interactive media" have "more significantly severe negative impacts than those wrought by television, movies, or music." See Appendix A, p. A082. The California Psychological Association informed the Legislature that the research "point[s] overwhelmingly to a causal connection between media violence and aggressive behavior in some children" and that "[t]he interactive nature of video games exacerbates this problem." See Appendix A, p. A081. And according to the American Psychological Association, "violent video games may be more harmful than violent television and movies because they are interactive, very engrossing and require the player to identify with the aggressor . . . ."[13/]

/ / /

---

13. http://www.apa.org/releases/videogames.html.

17.

1    Plaintiffs likely would not dispute that video games, given their interactive nature, can be

2    excellent mechanisms for teaching minors a variety of subject matters.  The Legislature considered

3    the research that supports this conclusion.[14/]  But just as the interactive nature of video games makes

4    them exemplary teachers, it is this interactive nature that also posses a special risk to minors when

5    the games contains extreme violence.

6    Focusing the Act on such interactive video games is the only means through which the

7    Legislature could attempt to remedy the exacerbated harm caused thereby.  Although the Legislature

8    was presented with evidence that extreme violence in other forms of media can also cause harm to

9    minors, substantial evidence supports the determination that the interactive nature of video games

10   poses a special risk.  The Legislature was more than justified in focusing on this narrow medium of

11   violent material.

12   ii.    **The Type of Video Games Covered By The Act Are   Exceedingly
          Narrow.**

13

14   By definition, the Act covers only those games that, as a whole, a reasonable person would

15   find appeal to a deviant or morbid interest of minors, are patently offensive by community standards

16   as to what is suitable for minors, and lack serious literary, artistic, political, or scientific value for

17   minors.  Act, Civil Code, § 1746(d)(1).  The Act provides an alternative definition with precise

18   terms that cover only the most "especially heinous" depictions of violence on a substantially human

19   character.  Video games meeting either definition, an exceedingly narrow category of video games,

20   contain little if any expression.  Certainly no expression worthy of protection as to minors.

21   In contrast, the video game ordinance at issue in *Interactive Digital Software Association v.*

22   *St. Louis County*, 329 F.3d 954 (8th Cir. 2003) relied heavily upon by Plaintiffs, applied to all

23   "graphically violent video games," and was not narrowly drawn.  *Ibid*.  Because the Act at issue

24   covers only an exceedingly narrow category of violent video games, it is narrowly tailored.

25

26

27   14.  Appendix B, p. B003, Gentile & Gentile, *Violent Video Games as Exemplary Teachers*,
     paper presented at Biennial Meeting of the Society for Research in Child Development, April 9, 2005
     (concluding that playing violent video games leads to greater hostile attribution bias and increased

28   aggressive behaviors -- "exemplary" teaching of aggression).

18.

**STATE DEFENDANTS' OPPOSITION TO**              **Case No.  C 05 4188 RMW RS**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1          **iii.    The Act Does Not Restrict Adult Access to Any Video Games, and Does
                     Not Prohibit Minors From Playing the Games, Only Purchasing Them
2                    Without Adult Supervision.**

3          The Act poses none of the problems raised in prior Supreme Court precedent where Congress

4  sought to regulate indecent speech as to minors, but also prohibited adult access to the covered

5  material.  See *United States v. Playboy Ent. Group*, 529 U.S. 803, 812-817 (2000) (regulation of

6  "signal bleeding" of indecent programing invalid because it also prohibited adult access); *Sable*

7  *Communications*, 492 U.S. at 127 (ban on "dial-a-porn" to protect minors struck down for

8  prohibiting adult access to protected speech).  Here, the Act is specifically limited to minors.  Adult

9  access to video games remains unimpeded.

10         And should parents or guardians desire minors to have access to such games, they can

11 purchase the games for the minors.  By containing this safe harbor, the Act hits only the specifically

12 desired target – minors whose parents do not want their child exposed to the extremely violent video

13 games.  Alternative avenues for minors' access to the covered games are written into the Act.  Thus,

14 any burden placed on minors is minimal.  They need only persuade their parent or guardian to

15 purchase these games for them.

16         **iv.    No Less Restrictive Means Exists For Ensuring, Through Threat of Civil
                    Penalty, That Minors Only Have Access to Extremely Violent Video
17                  Games With Parental Knowledge.**

18         The presence of industry self-regulation has little, if any, relevance in this case.  The self-

19 imposed ratings described in detail by Plaintiffs simply do not carry the force of a state law, the

20 violation of which subjects the offender to civil penalty.

21         The Legislature considered substantial evidence demonstrating that the effectiveness of the

22 video game industry's self-regulation is simply unacceptable.  The Senate Judiciary Committee

23 analysis raised the issue, stating, "[t]he author acknowledges that the ESRB rating system is

24 currently in place, but argues that its implementation has been unsatisfactory."  RJN, Exhibit 1, p.

25 13.  In fact, the Legislature considered that "[r]ecent studies show that the voluntary rating and

26 enforcement system implemented by self-regulatory associations or entertainment producers have

27 had limited success on decreasing youth access to Mature (M) rated video games."  *Id.* at pp. 13-14.

28 They were also made aware that "[d]uring 2004, the National Institute on Media and the Family had

19.

**STATE DEFENDANTS' OPPOSITION TO**                          **Case No.  C 05 4188 RMW RS**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1    children between the ages of seven and fourteen attempt to purchase M-rated games in thirty-five

2    stores.  Youth succeeded 34% of the time.  While the overall purchase rate was 34%, boys as young

3    as seven were able to buy M-rated games 50% of the time."  *Ibid.*  The Legislature was also aware

4    that "a nationwide undercover survey of stores completed by the Federal Trade Commission in 2003

5    corroborated these findings.  In this study, 69% of unaccompanied 13 to 16-year-olds purchased

6    M-rated games and only 24% of cashiers asked the youth's age."  *Ibid.*

7        The ineffectiveness of the industry's attempts to self-regulate comes as no surprise.

8    According to a Federal Trade Commission ("FTC") report to Congress, cited to the Legislature in

9    the Senate Judiciary Committee analysis, the industry specifically markets M-rated (Mature) games

10   to minors.[15/]  The FTC report states, "[a]ccording to industry data, nearly 40% of M-rated games

11   purchased in 2002 were for children under 17."  *Id.* at 27.  Although Plaintiffs claim they have

12   implemented new enforcement provisions, the FTC report concluded that "[t]he industry is actively

13   enforcing those standards and penalizing those companies found to be in noncompliance. Yet those

14   standards permit, and, in fact, industry members continue to place, advertisements in television and

15   print media with substantial youth audiences."  *Id.* at 28.

16       The Legislature was not willing to simply maintain the status quo, hoping that purported

17   industry efforts would eventually eliminate minors' access to extremely violent video games.  The

18   Act is thus narrowly tailored to ensure that, through threat of civil penalty, only with parental

19   knowledge will minors have access to the most extremely violent video games.  No less restrictive

20   means of achieving this goal exists.

21   **V.    THE BRANDENBURG STANDARD DOES NOT APPLY TO THE ACT.**

22       The purpose of this Act, as stated by the Legislature, is to protect minors.  The Act expresses

23   its purpose as "preventing violent, aggressive, and antisocial behavior, and in preventing

24   psychological or neurological harm to minors who play violent video games."  Act, § 1(c).  The

25   *Brandenburg* standard, however, applies only when a statute seeks to prohibit "advocacy of the use

26

27   _____

28       15.  Appendix E, p. E020, FTC July 2004 Report, at pp. 20-28; Request for Judicial Notice,
     Exhibt 1, pp. 13-14.

**STATE DEFENDANTS' OPPOSITION TO**                    **Case No.  C 05 4188 RMW RS**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1   of force or of law violation except where such advocacy is directed to inciting or producing

2   imminent lawless action and is likely to incite or produce such action." *See Brandenburg v. Ohio*,

3   395 U.S. 444, 447 (1969).  By contrast, the Act's prohibition is based on the Legislature's finding

4   that violent video games cause harm to minors, and is not aimed specifically at preventing minors

5   from committing immediate violent acts.  Thus, the *Brandenburg* standard is inapplicable.

6   **VI.    THE ACT'S PRECISELY DEFINED TERMS ARE NOT IMPERMISSIBLY VAGUE**

7           The Legislature carefully drafted the language of the Act to enable a person of ordinary

8   intelligence to discern what types of violent video games could not be sold or rented to minors.   A

9   law is not unconstitutionally vague where it provides "a person of ordinary intelligence a reasonable

10  opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of*

11  *Rockford*, 408 U.S. 104, 109 (1979); *see also Daily v. Bond*, 623 F.2d 624, 626 (9th Cir. 1980)

12  (statute is not unconstitutionally vague if it gives fair warning of the proscribed conduct).  The Due

13  Process Clause, under which a vagueness challenge falls, does not present an "insurmountable

14  obstacle to legislation" by demanding mathematical precision of terms.  *U.S. v. Petrillo*, 322

15  U.S. 1, 7 (1947).

16          In reviewing a business regulation for facial vagueness, the principal inquiry is whether the

17  law affords fair warning of what is proscribed. *Village of Hoffman Estates v. The Flipside*, 455 U.S.

18  489 (1982).  In *Flipside*, the Supreme Court recognized that "economic regulation is subject to a less

19  strict vagueness test because its subject matter is often more narrow, and because businesses, which

20  face economic demands to plan behavior carefully, can be expected to consult relevant legislation

21  in advance of action . . . .  The Court has also expressed greater tolerance of enactments with civil

22  rather than criminal penalties because the consequences of imprecision are qualitatively less severe."

23  *Id.* at 498-99 (footnotes omitted).  Here, the key terms of the Act are defined with precision.  An

24  ordinary person, using common sense, is capable of determining which games meet the definition

25  of "violent video game."

26          Plaintiffs argue that the terms of the Act are vague and do not provide fair notice, but this

27  argument is contradicted by the fact that the ESRB already independently reviews and rates the

28  content of entertainment software.  Lowenstein Decl., ¶ 4.  For more than ten years, the ESRB has

21.

1    been rating computer and video games, and the rating system offers actual rating for age

2    appropriateness of content and short descriptive phrases. Lowenstein Decl. ¶ 7. Certain games

3    receive ratings of "AO" (Adults Only) and contain content that the ESRB suggests should only be

4    played by users 18 and older. Lowenstein Decl. ¶ 8. The ESRB states that "AO" games "have

5    content that should only be played by persons 18 years and older. Titles in this category may

6    include prolonged scenes of intense violence and/or graphic sexual content and nudity." Lowenstein

7    Decl. Exhibit A. The ESRB defines "intense violence" as "graphic and realistic-looking depictions

8    of physical conflict. May involve extreme and/or realistic blood, gore, weapons, and depictions of

9    human injury and death." A distinction is made by the ESRB between "intense violence" and

10   "violence" which is defined as "scenes involving aggressive conflict." Lowenstein Decl., Exh. A.

11            Plaintiffs question whether an ordinary person would be able to determine whether three

12   games, *God of War, Jade Empire* and *Resident Evil IV*, depict violence against an "image of a

13   human being." Plaintiffs fail to mention that the ESRB has already made a distinction between these

14   three games and the type of violence each contains. Although the three games are all rated "Mature"

15   (17+), the ESRB has given *Resident Evil IV* and *God of War*[16] content descriptors of "blood and

16   gore, intense violence, language" and *Jade Empire* received a "blood and gore, violence." The

17   "intense violence" descriptor for *Resident Evil IV* and *God of War* clearly state that this type of

18   violence includes realistic-looking physical conduct and realistic blood, gore and weapons, and

19   depictions of human injury and death. Therefore, the ESRB has determined that the violence in *God

20   of War* and *Resident Evil IV* is more realistic-looking than the violence in *Jade Empire*. This

21   undercuts Plaintiffs' assertion that the terms used in the Act are ill-suited for a medium that relies

22   on animation and fantastic forms and characters because the ESRB makes distinction between

23   realistic-looking physical conduct and merely "aggressive conduct." Thus, Plaintiffs' hypotheticals

24   are disingenuous; whether there is a depiction of violence against an "image of a human being"

25   and/or "characters with substantially human characteristics" is something an ordinary person,

26   especially the ESRB, can determine.

27

28            16. *God of War* has additional descriptors of "nudity, sexual themes, strong language."

22.

1    Additionally, Plaintiffs' argument that certain terms like "deviant or morbid interest of

2    minors," "cruel," "heinous," "depraved," are not adequately defined is not persuasive. The Supreme

3    Court has found that any vagueness in the statutory definition of "heinous, cruel, and depraved" is

4    cured by the limitation that the statutory definition of the offense involve torture or serious physical

5    abuse. *See Walton v. Arizona*, 497 U.S. 639, 654-55 (1990) (overruled on other grounds) (upholding

6    a death penalty statute that used these definitions); *United States v. Jones*, 132 F.3d 232, 249-50 (5th

7    Cir. 1998) (finding that similar definitions for cruel, depraved, heinous, serious physical abuse and

8    torture were not unconstitutionally vague and did not lead to an arbitrary imposition of the death

9    penalty). In this Act, the definitions for "heinous," "cruel" and "depraved" include qualifications

10   requiring the act include torture or serious physical abuse of the victim and therefore survive the

11   vagueness challenge as the death penalty statute in *Walton* survived. Moreover, the definitions for

12   "serious physical abuse" and "torture" are almost identical to definitions used in a death penalty

13   statute that survived a vagueness challenge in at least one Appellate Court. *See United States v.*

14   *Jones*, 132 F.3d at 250. Finally, Plaintiffs cannot argue that "deviant or morbid interest of minors"

15   is too vague because in *Ginsburg* a statute with essentially the same language survived a vagueness

16   challenge. 390 U.S. at 643-46 (upholding a statute with the language "predominantly appeals to

17   the prurient, shameful or morbid interest of minors"). Tellingly, Plaintiffs do not cite to a single

18   case to support their argument that any of the specific terms contained in the Act are

19   unconstitutionally vague.

20   Moreover, contrary to Plaintiffs' argument, the video game statute in *Maleng* is not similar

21   to the one at issue here. In *Maleng*, the Act in question regulated only speech that depicted violence

22   against law enforcement officers. *Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d at n.

23   2, (noting that "public law enforcement officers" was not clearly defined and there was a question

24   of whether a firefighter was a public law enforcement officer). The Act in this case defines violent

25   video game and does not specifically advocate against a certain type of violence -- the Act is

26   viewpoint neutral.

27   ///

28   ///

23.

**STATE DEFENDANTS' OPPOSITION TO**                    **Case No.  C 05 4188 RMW RS**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1    **VII.    THE ACT'S LABELING PROVISIONS ARE CONSTITUTIONAL.**

2    Because the Act survives all levels of judicial scrutiny, its labeling requirements survive as

3    well.[17/]    It is beyond question that the State may constitutionally require harmful commercial

4    products be labeled as such.  Plaintiffs arguments to the contrary are unsupported.

5    "For commercial speech [to be protected by the First Amendment], it at least must concern

6    lawful activity and not be misleading.  Next, we ask whether the asserted governmental interest is

7    substantial.  If both inquiries yield positive answers, we must determine whether the regulation

8    directly advances the governmental interest asserted, and whether it is not more extensive than

9    necessary to serve that interest."  *Central Hudson Gas & Electric v. Public Service Commission of*

10    *New York*, 447 U.S. 557, 566 (1980).  The requirement that "18" appear on the package is a method

11    to inform the public that certain video games cannot legally be sold to anyone under 18.  This

12    requirement does not prevent the video games from being displayed or sold to those over the age of

13    18, and directly advances the state's interest in protecting minors.

14    Plaintiffs' suggestion that the Act should be declared unconstitutional because the "18" label

15    conflicts with the voluntary ESRB rating system is not supported by fact or legal precedent.  *See*

16    Pltfs.' Mem. P & A Supp. Mot. Prelim. Inj., 14, n.7.  A voluntary rating scheme designed by a

17    business organization does not preempt a valid state law.  Nor is the Act inconsistent with Cal. Bus.

18    & Prof. Code § 20650.  This Act requires that an "18" be placed on the front of a violent video

19    game; § 20650 requires that video game retailers post a sign within the retail establishment

20    informing consumers about a video game rating system.  The video game retailers may

21    simultaneously comply with § 20650 and the Act as there is nothing in § 20650 regarding what

22    should be affixed to the front of a video game package.

23    **VIII.    THE EQUITIES WEIGH SHARPLY IN FAVOR OF THE STATE.**

24    Should this Court enjoin a duly enacted law of the State, the State itself will suffer

25    irreparable injury.  "[I]t is clear that a state suffers irreparable injury whenever an enactment of its

26    people or their representatives is enjoined."  *Coalition for Economic Equity v. Wilson*, 122 F.3d 718,

27

28    17.  As discussed fully, above, the Act meets the test of strict scrutiny.

**STATE DEFENDANTS' OPPOSITION TO**                    **Case No.  C 05 4188 RMW RS**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

719 (9th Cir. 1997).  The equities tip sharply in favor of the State. The Legislature presented substantial evidence demonstrating that without the Act's restrictions going into effect, minors will continue to be able to purchase and play extremely violent video games, notwithstanding the industry's self-imposed regulations.  The compelling public interest in protecting minors from the harm inflicted by the video games covered by the Act outweighs any purported potential harm to Plaintiffs.

**CONCLUSION**

For all of the foregoing reasons, the State Defendants respectfully request that this Court deny,  in its entirety, Plaintiffs' motion for a preliminary injunction.

Dated:  November 10, 2005                    Respectfully submitted,

BILL LOCKYER
Attorney General of the State of California

LOUIS R. MAURO
Senior Assistant Attorney General

CHRISTOPHER E. KRUEGER
Supervising Deputy Attorney General

SUSAN K. LEACH
Deputy Attorney General

 /s/  **Zackery P. Morazzini**
ZACKERY P. MORAZZINI
Deputy Attorney General
Attorneys for Defendants

**STATE DEFENDANTS' OPPOSITION TO**                    **Case No.  C 05 4188 RMW RS**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION                                                                1

STATEMENT OF ISSUES TO BE DECIDED AND RELEVANT FACTS                        2

ARGUMENT                                                                    3

I.   BECAUSE THE ACT APPLIES ONLY TO VIOLENT VIDEO GAMES
     DETERMINED TO BE HARMFUL TO MINORS, THE ACT IS SUBJECT TO
     REVIEW UNDER THE VARIABLE OBSCENITY STANDARD SET FORTH IN
     *GINSBERG v. STATE OF NEW YORK*.                                       3

     A.   The First Amendment Rights of Minors Are Narrower than Those of Adults
          Given the Government's Constitutional Authority to Protect Minors from Harm. 3

     B.   The Act Properly Incorporates a Variable Obscenity Standard to Limit Minors'
          Access to Extremely Violent Material Found to Be Harmful to Minors.  6

II.  THE ACT SURVIVES SCRUTINY UNDER THE *GINSBERG* VARIABLE
     OBSCENITY STANDARD.                                                    10

III. EVEN IF THE ACT WERE SUBJECT TO STRICT SCRUTINY, IT SURVIVES
     JUDICIAL REVIEW.                                                       11

     B.   The Legislature's Determination That the Material Covered by the Act Is
          Harmful to Minors Is Based upon Substantial Evidence.             12

          i.    Playing Violent Interactive Video Games Leads to Antisocial or
                Aggressive Feelings or Behavior, Adversely Impacts School
                Performance, and Lessens Brain Activity in the Frontal Lobes of
                Minors.                                                     13

     C.   The Act Is Narrowly Tailored to Further the State's Interest.     16

          i.    The Act Applies Only to Video Games Given Their Unique Interactive
                Nature.                                                     17

          ii.   The Type of Video Games Covered By The Act Are  Exceedingly
                Narrow.                                                     18

          iii.  The Act Does Not Restrict Adult Access to Any Video Games, and Does
                Not Prohibit Minors From Playing the Games, Only Purchasing Them
                Without Adult Supervision.                                  18

          iv.   No Less Restrictive Means Exists For Ensuring, Through Threat of Civil
                Penalty, That Minors Only Have Access to Extremely Violent Video
                Games With Parental Knowledge.                             19

V.   THE BRANDENBURG STANDARD DOES NOT APPLY TO THE ACT.                    20

i.

1

VI.    THE ACT'S PRECISELY DEFINED TERMS ARE NOT IMPERMISSIBLY
        VAGUE                                                              21

VII.   THE ACT'S LABELING PROVISIONS ARE CONSTITUTIONAL.                   24

VIII.  THE EQUITIES WEIGH SHARPLY IN FAVOR OF THE STATE.                   24

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**STATE DEFENDANTS' OPPOSITION TO**                    **Case No.  C 05 4188 RMW RS**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1

# TABLE OF AUTHORITIES

2

**Page**

## CASES

3

American Amusement Machine Ass'n v. Kendrick,
    244 F.3d 572 (7th Cir. 2001)      8

4

Bellotti v. Baird,
    443 U.S. 622 (1979)      5

5

6

Bookcase, Inc. v. Broderick,
    18 N.Y.2d 71 (1966)      6

7

8

Brandenburg v. Ohio,
    395 U.S. 444 (1969)      8, 20

9

Central Hudson Gas & Electric v. Public Service Commission of New York,
    447 U.S. 557 (1980)      24

10

Coalition for Economic Equity v. Wilson,
    122 F.3d 718 (9th Cir. 1997)      24

11

12

Daily v. Bond,
    623 F.2d 624 (9th Cir. 1980)      21

13

Erznoznik v. City of Jacksonville,
    422 U.S. 205 (1975)      5

14

15

Ginsberg v. State of New York,
    390 U.S. 629 (1968)      passim

16

Grayned v. City of Rockford,
    408 U.S. 104 (1979)      21

17

18

Las Vegas Nightlife, Inc. v. Clark County, Nev.,
    38 F.3d 1100 (9th Cir. 1994)      12

19

20

Miller v. California,
    413 U.S. 15 (1973)      10

21

National Endowment for the Arts v. Finley,
    524 U.S. 569 (1998)      3

22

New York v. Ferber,
    458 U.S. 747 (1982)      5

23

24

New York v. Ferber,
    458 U.S. 747 (1982)      11

25

Nixon v. Shrink Missouri Government PAC,
    528 U.S. 377 (2000)      12

26

27

Prince v. Commonwealth of Massachusetts,
    321 U.S. 158 (1944)      4

28

*Republican Party of Minnesota v. White*,
    536 U.S. 765 (2002)                           11

*Roper v. Simmons*,
    __ U.S. __, 125 S.Ct. 1183 (2005)            4, 8

*Sable Communications of California, Inc. v. F.C.C.*,
    492 U.S. 115 (1989)                  17, 19

*Stanley v. University of Southern California*,
    13 F.3d 1313 (9th Cir. 1994)              3

*Thomas v. County of Los Angeles*,
    978 F.2d 504 (9th Cir. 1992)              3

*Turner Broadcasting System, Inc. v. F.C.C.*,
    512 U.S. 622 (1994)                  12

*U.S. v. Petrillo*,
    322 U.S. 1 (1947)                     21

*United States v. Jones*,
    132 F.3d 232 (5th Cir. 1998)              23

*United States v. Playboy Ent. Group*,
    529 U.S. 803 (2000)                  19

*Video Software Dealers Ass'n v. Maleng*,
    325 F. Supp. 2d 1180 (W.D. Wash. 2004)    9, 16, 23

*Village of Hoffman Estates v. The Flipside*,
    455 U.S. 489 (1982)                  21

*Walton v. Arizona*,
    497 U.S. 639 (1990)                  23

**STATUTES**

Business and Professions Code
    § 20650.                             24

Statutes of California
    Stats. 2005, ch. 638                *passim*

**CONSTITUTIONAL PROVISIONS**

California Constitution
    Article IV, § 8(c)(2)                  2

**OTHER AUTHORITY**

Assembly Bill 450                       12

Assembly Bill 1179                   12

**STATE DEFENDANTS' OPPOSITION TO**     **Case No.  C 05 4188 RMW RS**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

v.