1  GIBSON, DUNN & CRUTCHER LLP
   THEODORE J. BOUTROUS, JR., SBN 132099
2  H. MARK LYON, SBN 162061
   ETHAN D. DETTMER, SBN 196046
3  1881 Page Mill Road
   Palo Alto, California 94304
4  Telephone: (650) 849-5300
   Facsimile: (650) 849-5333
5
   JENNER & BLOCK LLP
6  PAUL M. SMITH (*pro hac vice* application pending)
   KATHERINE A. FALLOW (*pro hac vice* application pending)
7  AMY L. TENNEY (*pro hac vice* application pending)
   601 13th Street, N.W., Suite 1200
8  Washington, D.C. 20005
   Telephone: (202) 639-6000
9  Facsimile: (202) 639-6066

10 Attorneys for Plaintiffs
   VIDEO SOFTWARE DEALERS ASSOCIATION
11 and ENTERTAINMENT SOFTWARE ASSOCIATION

12

13                   UNITED STATES DISTRICT COURT

14              FOR THE NORTHERN DISTRICT OF CALIFORNIA

15

16 VIDEO SOFTWARE DEALERS
   ASSOCIATION and ENTERTAINMENT           CASE NO. C 05-4188 RMW (RS)
   SOFTWARE ASSOCIATION,
17                                         PLAINTIFFS' REPLY MEMORANDUM
                                           IN SUPPORT OF MOTION FOR A
18           Plaintiffs,                   PRELIMINARY INJUNCTION

19           vs.

20

21 ARNOLD SCHWARZENEGGER, in his official
   capacity as Governor of the State of California;
22 BILL LOCKYER, in his official capacity as
   Attorney General of the State of California;
23 GEORGE KENNEDY, in his official capacity as
   Santa Clara County District Attorney, RICHARD
24 DOYLE, in his official capacity as City Attorney
   for the City of San Jose, and ANN MILLER
25 RAVEL, in her official capacity as County
   Counsel for the County of Santa Clara,

26           Defendants.

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

INTRODUCTION ........................................................................................................................ 1

I. THE ACT'S CONTENT-BASED RESTRICTIONS DO NOT REGULATE OBSCENITY AND THUS ARE SUBJECT TO STRICT SCRUTINY. ................................................................................................................ 2

II. THE STATE HAS FAILED TO SHOW THAT THE ACT SURVIVES STRICT SCRUTINY. ............................................................................................. 4

    A. The State Has Not Shown That It Has a Compelling Interest in Restricting Protected Speech. ............................................................................. 5

        1. The State's Interest In Controlling "Feelings" and "Thoughts" Is Not Legitimate, Let Alone Compelling. ....................... 5

        2. The State's Evidence of "Harm" Is Insufficient on its Face. ............................................................................................................ 6

    B. The State Has Not Satisfied the Other Demands of Strict Scrutiny. ........................................................................................................... 9

        1. The Act's Singling Out of Video Games Fails to Advance the State's Purported Interests and Exacerbates the Statute's Constitutional Failings. ...................................................... 9

        2. The Act Is Not Narrowly Tailored. ..................................................... 10

III. THE ACT'S LABELING PROVISIONS ARE UNCONSTITUTIONAL. ........................................................................................ 12

IV. THE ACT IS UNCONSTITUTIONALLY VAGUE. ................................................. 13

V. PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION. ............................................................................................................ 14

CONCLUSION ........................................................................................................................... 15

# TABLE OF AUTHORITIES

## CASES

*American Amusement Machine Ass'n v. Kendrick*, 244 F.3d 572 (7th Cir. 2001) ............................................................................................ 2, 3, 4, 6, 7, 10, 15

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) .................................................. 6

*Brandenberg v. Ohio*, 395 U.S. 444 (1969) ...................................................................... 5

*Cohen v. California*, 403 U.S. 15 (1971) .......................................................................... 3

*Elrod v. Burns*, 427 U.S. 347 (1976) .............................................................................. 15

*Entertainment Software Ass'n v. Granholm*, Case No. 05-CV-73634, 2005 WL 3008584 (E.D. Mich. Nov. 9, 2005) ............................................................ 1, 2, 4, 7, 9, 14, 15

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975) ................................................ 2, 3

*Florida Star v. B.J.F.*, 491 U.S. 524 (1989) .................................................................... 10

*Ginsberg v. New York*, 390 U.S. 629 (1968) .................................................................. 2, 4

*Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954 (8th Cir. 2003)  3, 4, 6, 7, 15

*James v. Meow Media, Inc.*, 300 F.3d 683 (6th Cir. 2002) ............................................... 3

*McConnell v. Federal Election Commission*, 540 U.S. 93 (2003) ................................. 2, 6

*Miller v. California*, 413 U.S. 15 (1973) .......................................................................... 3

*NAACP v. Button*, 371 U.S. 415 (1963) .......................................................................... 13

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ................................................................ 4

*Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988) ............. 12

*Sable Communications of California, Inc. v. FCC*, 492 U.S. 115 (1989) ....................... 12

*Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994) ...................................... 4

*United States v. Jones*, 132 F.3d 232 (5th Cir. 1998), *aff'd*, 527 U.S. 373 (1999) ........ 14

*United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000) ........... 4, 10, 12

*Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180 (W.D. Wash. 2004) ............................................................................................. 3, 4, 7, 8, 13, 14, 15

*Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988) ............................................ 15

*Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626
    (1985) .................................................................................................................... 12, 13

**STATUTES**

Cal. Bus. & Prof. Code § 20650 ........................................................................................... 11

Chapter 638, Statute of 2005 (Cal. 2005) ........................................................................... 1, 4

**LEGISLATIVE MATERIALS**

Cal. Sen. Judiciary Comm. Report, AB 1179 (2005) .............................................. 3, 8, 14

**MISCELLANEOUS**

Craig A. Anderson, *et al.*, *Violent Video Games: Specific Effects of Violent Content on
    Aggressive Thoughts and Behavior*, 36 ADVANCES IN EXPERIMENTAL SOC. PSYCHOL. 199
    (2004) .......................................................................................................................... 8

Entertainment Software Ass'n, *Essential Facts About the Computer and Video Game Industry*
    (2005), *available at* http://www.theesa.com/files/2005EssentialFacts.pdf ............................ 11

FTC, *Marketing Violent Entertainment to Children* (Sept. 2000), *available at*
    http://www.ftc.gov/reports/violence/ vioreport.pdf ................................................................ 11

FTC, *Report to Congress:  Marketing Violent Entertainment to Children* (July 2004) ............... 11

National Institute on Media and the Family, *Mediawise Video Game Report Card* (2004) ........ 11

Press Release, Indiana Univ. School of Medicine, *Self-Control May Be Affected By Violent
    Media Exposure*, May 26, 2005, *available at* http://medicine.indiana.edu/
    news_releases/viewRelease.php4?art=339&print=true ........................................................ 9

# INTRODUCTION

Plaintiffs' opening brief demonstrated that they are entitled to a preliminary injunction barring the enforcement of content-based restrictions on "violent" video games found in AB 1179 (the "Act"). If the Act is allowed to go into effect on January 1, 2006, it will impose civil sanctions against game retailers and designers for selling, renting, or failing to label expression fully protected by the First Amendment, and will cause a vast chilling of legitimate free expression. This irreparable harm, combined with Plaintiffs' likelihood of success on their challenge to the Act, warrants a preliminary injunction.

The State's[1] opposition is meritless. Critically, the State concedes that the Act is not intended to prevent violence, and thus has not attempted to show that it satisfies the *Brandenburg* standard. State Defs. Mem. at 8. As a result, the State has abandoned any defense of the Act's stated interest in "preventing violent, aggressive, and antisocial behavior." Act § 1(c).

The State attempts to avoid strict scrutiny by asking the Court to take the unprecedented step of treating depictions of violence as obscenity – a category that has *never* been applied outside the realm of sexual speech. That argument flies in the face of basic First Amendment doctrine and must be rejected. Contrary to the State's contentions, the Act imposes content-based restrictions on fully protected speech and therefore triggers strict scrutiny.

The State cannot satisfy strict scrutiny because the remaining purpose – "preventing psychological and neurological harm to minors who play violent video games," Act § 1(c) – amounts to state-imposed thought control, and is not a legitimate state interest, let alone a compelling one. And in any case, the State cannot demonstrate that video games actually cause any psychological or neurological harm to minors. For the same reasons, the Act's labeling requirements fail as well. Finally, the State fails to meaningfully respond to Plaintiffs' argument that the Act's terms are unconstitutionally vague and will, if enforced, lead to the chilling of protected speech.

For these reasons, the United States District Court for the Eastern District of Michigan recently preliminarily enjoined enforcement of a similar law – agreeing with all previous cases concerning attempted restrictions on "violent" games. *See* Order Granting Plaintiffs' Motion for Preliminary Injunction, *Entertainment Software Ass'n v. Granholm*, Case No. 05-CV-73634, 2005 WL 3008584 (E.D. Mich. Nov. 9, 2005) (attached hereto as Ex. 1 to plaintiffs' Request for Judicial Notice ("RJN")). In holding that Plaintiffs were likely to prevail on their constitutional claims, the

---

[1] Unless otherwise noted, Plaintiffs will use the "State" to refer to both the State and County Defendants because the parties' arguments are substantially the same.

court rejected essentially the same arguments and evidence offered by the State here. Notably, the court held that the same research relied upon here is insufficient to show a compelling state interest at the preliminary injunction stage. *Id.* at *3. As in the Michigan case, Plaintiffs are likely to prevail on their constitutional claims and will suffer irreparable harm if the Act is permitted to go into effect. Therefore, Plaintiffs respectfully ask that this Court preliminarily enjoin the Act before its January 1, 2006 effective date.

## I. THE ACT'S CONTENT-BASED RESTRICTIONS DO NOT REGULATE OBSCENITY AND THUS ARE SUBJECT TO STRICT SCRUTINY.

As Plaintiffs' opening brief demonstrated, the Act is subject to strict scrutiny because it imposes content-based restrictions on "violent" video games. The State tries to escape this straightforward First Amendment conclusion—one reached by every court to have considered similar restrictions—by inventing an entirely new category of unprotected speech. The State's novel approach, which treats violent content as unprotected *obscenity* when viewed by minors, State Defs. Mem. at 3-11,[2] is as flawed as it is novel. As the Supreme Court has expressly held, obscene speech, whether for adults or for minors, is limited to speech with a sexual component. The court should reject the State's bold attempt to expand the obscenity doctrine beyond its well-established borders.

First Amendment limitations on governmental action are in general "no less applicable when [the] government seeks to control the flow of information to minors." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-214 (1975); *see McConnell v. Federal Election Comm'n*, 540 U.S. 93, 231 (2003) ("Minors enjoy the protection of the First Amendment."). As the Seventh Circuit explained, preserving children's First Amendment rights is "not merely a matter of pressing the First Amendment to a dryly logical extreme. . . . People are unlikely to become well-functioning, independent-minded adults, and responsible citizens if they are raised in an intellectual bubble." *American Amusement Machine Ass'n v. Kendrick*, 244 F.3d 572, 576-77 (7th Cir. 2001) ("*AAMA*").

The Supreme Court has recognized a narrow exception to this basic principle for certain sexual material that is deemed obscene for minors. *See, e.g.*, *Ginsberg*, 390 U.S. 629, 649-50 (1968).

---

[2] Putting aside its radical legal theory, the State's argument also rests on a misreading of the Act. Although the State repeatedly insists that the Act is just like the approved statute in *Ginsberg* (other than the fact that it regulates violence as opposed to sex), *e.g.*, State Defs. Mem. at 9, the Act contains two separate tests for liability, only one of which attempts to track the *Ginsberg* obscene for minors standard. The second standard—whether the violence depicted in a video game is "especially heinous, cruel or depraved"—does not track the traditional obscenity test. Thus, there can be no doubt that the second test is subject to strict scrutiny (and for the reasons discussed herein, the first test must also satisfy strict scrutiny).

But other than obscenity, the State can point to no category of content that is given First Amendment protection for adults but not minors. Indeed, the obscenity exception to full First Amendment protection has never been extended to speech that lacks a sexual component. *E.g.*, *Cohen v. California*, 403 U.S. 15, 20 (1971) ("Whatever else may be necessary to give rise to the States' broader power to prohibit obscene expression, such expression must be, in some significant way, erotic."); *Erznoznik*, 422 U.S. at 213, n.10 (same); *Miller v. California*, 413 U.S. 15, 24 (1973) ("[W]e now confine the permissible scope of [obscenity] regulation to works which depict or describe sexual conduct.").

The State's radical position has not been upheld by any federal court. *See Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954, 958 (8th Cir. 2003) ("*IDSA*") ("Simply put, depictions of violence cannot fall within the legal definition of obscenity for either minors or adults."); *AAMA*, 244 F.3d at 575-76 ("The notion of forbidding . . . pictures of violence . . . is a novelty, whereas concern with pictures of graphic sexual conduct is the essence of the traditional concern with obscenity."); *Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180, 1185 (W.D. Wash. 2004) ("*VSDA*") ("In addition to the fact that the Supreme Court has expressly limited 'obscenity' to include only sexually-explicit materials, the historical justifications for the obscenity exception simply do not apply to depictions of violence."); *see also James v. Meow Media, Inc.*, 300 F.3d 683, 698 (6th Cir. 2002) ("declin[ing] to extend . . . obscenity jurisprudence to violent, instead of sexually explicit, material" in a case involving tort liability for violent video game manufacturers). Indeed, the California Legislature's Senate Judiciary Committee had no difficulty understanding this point in considering the Act, noting that "[t]he obscenity standard that was tailored to child-specific standards in *Ginsberg* could not be equally applied here." Cal. Sen. Judiciary Comm. Report, AB 1179, at 7 (2005) (RJN Ex. 2) (citing *IDSA* and *VSDA*).

The State ignores this body of law and its own legislative analysis, and, even more puzzlingly, suggests that the decisions in *AAMA* and *VSDA support* its argument that the Act should be reviewed under a more lenient standard. State Defs. Mem. at 8-9. But in both of those cases the courts *rejected* attempts to analogize violence to obscenity, and struck down restrictions on video game expression as failing to meet strict constitutional scrutiny. *AAMA*, 244 F.3d at 577 (distinguishing images of violence from obscenity, and invalidating law regulating violent video games: "To shield children right up to the age of 18 from exposure to violent descriptions and images would not only be

3

quixotic, but deforming; it would leave them unequipped to cope with the world as we know it");[3] *VSDA*, 325 F. Supp. 2d at 1185 (rejecting the State's argument that regulation of violent imagery was the equivalent of obscenity regulation, stating "No court has accepted such an argument, probably because existing case law does not support it").

In the end, the State cannot create a new category of unprotected speech to save the Act from strict scrutiny. The Act censors violent imagery, not sexual material, and thus it reaches protected material and not obscenity (as to minors or adults). The case law could not be clearer in limiting obscenity's reduced protections to sexual material, whether viewed by minors or adults. The State errs in asking this court to reach a result so plainly foreclosed by precedent.

## II.     THE STATE HAS FAILED TO SHOW THAT THE ACT SURVIVES STRICT SCRUTINY.

Because strict scrutiny applies, the Act is "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). The State thus bears the burden of proving that the Act is necessary to serve a legitimate compelling state interest and is narrowly tailored to achieve that end. *See, e.g., United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 818 (2000); *AAMA*, 244 F.3d at 576 (the justifications "must be compelling and not merely plausible").

The State has not met its burden. As *all* courts reaching the question have concluded, regulations like those in the Act cannot survive strict scrutiny. *Granholm*, 2005 WL 3008584 at *4 (RJN Ex. 1); *AAMA*, 244 F.3d at 580; *IDSA*, 329 F.3d at 960; *VSDA*, 325 F. Supp. 2d at 1186-88. The State has provided no constitutionally legitimate justification for restricting fully protected expression–let alone the specific subset of video games targeted by the Act. And, far from drawing "reasonable inferences based on substantial evidence," *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 666 (1994), the Legislature looked at a one-sided subset of scientific research, and even that biased research does not support the Legislature's sweeping claims about the harm caused by "violent" video games.

---

[3] *AAMA* concluded that the government may not restrict violent speech for children absent "compelling and not merely plausible" grounds. 244 F.3d at 576. This conclusion flatly contradicts the State's assertion that the court "in fact applied the *Ginsberg* standard." State Defs. Mem. at 8. Had the Seventh Circuit thought violent speech equivalent to obscenity under *Ginsberg*, only a plausible ground for regulation would have been necessary. *See Ginsberg*, 390 U.S. at 644.

4

### A. The State Has Not Shown That It Has a Compelling Interest in Restricting Protected Speech.

#### 1. The State's Interest In Controlling "Feelings" and "Thoughts" Is Not Legitimate, Let Alone Compelling.

Given the State's concession that the Act does not attempt to prevent violence, State Defs. Mem. at 16, 20-21,[4] its only remaining defense is that the prohibited content causes "psychological or neurological harm to minors who play violent video games." *Id.* at 20. But the State's "harm" argument is really nothing more than a recasting of the foreclosed justification of preventing real-world violence, as the "harm" about which the State is concerned is the potential for the games to make minors behave more *aggressively*. For example, the State argues that the Legislature relied on studies purporting to show that exposure to "violent" video games leads to "'increases in aggressive behaviour, aggressive cognition, aggressive effect, and cardiovascular arousal, and to decreases in helping behaviour.'" *Id.* at 13 (quoting Craig A. Anderson, *An Update on the Effects of Playing Violent Video Games*, J. of Adolescence, 24 (2003) 113-122). Because that argument is predicated on an assumption that such impacts on the brain will lead to real-life *aggression* – a justification that the State has acknowledged will not support the Act, *see* State Defs. Mem. at 21 – the "harm" argument cannot provide a sufficient basis for restricting protected speech.

To the extent the State's "harm" rationale is anything other than a repackaged claim that "violent" video games will lead to real-world violence, it amounts to impermissible thought control – *i.e.*, a claim that the State can censor content that it thinks will contribute to disfavored attitudes or philosophies. *See, e.g.*, State Defs. Mem at 15 (noting study that video games may lead to decreased empathy).[5] Such an attempt to control individuals' thoughts, feelings, or viewpoints – or prevent

---

[4] This concession is of critical importance, because to the extent the State seeks to regulate expression for its alleged relationship to real-world violence, it must satisfy the stringent standard of *Brandenberg v. Ohio*, 395 U.S. 444 (1969), which requires proof that exposure to "violent" video games is likely to incite *imminent* real-world violence, *id.* at 447. By not even attempting to show that scientific research supports what *Brandenberg* requires, the State essentially acknowledges that the Legislature had no basis for finding that minors who play violent video games are more likely "to exhibit violent antisocial or aggressive behavior." Act § 1(a).

[5] The State's contention that Plaintiffs' constitutional claims must fail because "the video game industry itself rates video games based upon their violent content and suitability for minors," State Defs. Mem. at 11, reflects a profound misunderstanding of both the First Amendment and the ESRB rating system. Unlike the Act, which attempts to control minors' thoughts and personalities via government-imposed penalties, the voluntary ESRB system merely gives "parents and consumers information about the content of interactive entertainment software products so that they can make informed purchase and rental decisions." Lowenstein Decl. ¶ 7.

them from an anticipated "psychological" reaction to protected expression – is precisely the kind of government action that the First Amendment prohibits. *See, e.g.*, *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002). As explained above, minors generally enjoy the same First Amendment rights as adults to be free from content-based governmental regulation of the speech they utter or receive, *see, e.g.*, *McConnell*, 540 U.S. at 231. As *IDSA* put it, "[n]owhere in *Ginsberg* (or any other case . . .) does the Supreme Court suggest that the government's role in helping parents to be the guardians of their children's well-being is an unbridled license to governments to regulate what minors read and view." 329 F.3d at 959-960.

Notably, none of the State's "harm" arguments is specific to video games, let alone the particular category of "violent" games covered by the Act. Although the State's brief (and cited materials) *speculate* as to why "violent" video games may be more harmful than other "violent" content, they have failed to substantiate those claims with any meaningful research. Indeed, under the State's rationale, the kind of evidence on which it relies would justify government regulation of nearly any violent expression – for adults and children alike – in movies, music, television or art. In fact, at a recent evidentiary hearing in the Northern District of Illinois, Dr. Craig Anderson – the expert on which the State here relies – testified that *merely viewing a photograph of a gun*, without more, could cause the same alleged "effects" as playing "violent" games or viewing "violent" television programs. *See, e.g.*, 11/14/05 Tr. at 221 (RJN Ex. 3) (claiming similar effects from "simply seeing a photo of a gun – a handgun, a rifle, whatever"); 11/15/05 Tr. at 328 (RJN Ex. 4) (stating that "a very large number" of stimuli would have the same alleged impacts of "violent" video games, and agreeing that his focus on video games "is largely a matter of choice rather than some suggestion that they're different from the large number of other things that could have exactly the same effect"). The Court should firmly reject the radical notion on which the State's "harm" rationale is based, which cannot be squared with the First Amendment, and the logical conclusion of which would permit the regulation of a vast quantity of fully protected speech. *See, e.g.*, *AAMA*, 244 F.3d at 578-79.

### 2.     The State's Evidence of "Harm" Is Insufficient on its Face.

The State attempts to buttress its legislative findings that "violent" video games cause harm to minors by relying primarily on the research of Dr. Anderson and related researchers. State Defs. Mem. at 13-16. But the State fails to mention that *every* court that has considered Dr. Anderson's work has expressly rejected his research as a constitutionally sufficient rationale for restricting minors' free speech rights. Indeed, earlier this month, the United States District Court for the Eastern

District of Michigan concluded that Dr. Anderson's work does not provide a basis for restricting speech. *Granholm*, 2005 WL 3008584, at *3 (RJN Ex. 1). Noting experts who dispute Dr. Anderson's claims, the court held that Dr. Anderson's research does *not* show that video games: (1) "have ever caused anyone to commit a violent act"; (2) "have caused the average level of violence to increase anywhere"; or (3) "are any more harmful to the consumer or to public safety than violent movies or other violent, but passive entertainments." *Id.* (quoting *AAMA*, 244 F.3d at 578-79).[6] In light of the absence of a conclusive link between the supposed harm and the Act, the court found it "unlikely" that the State of Michigan could "demonstrate a compelling interest in preventing a perceived 'harm.'" *Id.*

Likewise, citing Dr. Anderson's research, the Seventh Circuit held that the "studies do not support the ordinance," even if they show that "violent" video games can cause individuals "to feel[] aggressive." *AAMA*, 244 F.3d at 578. The court noted that, as here, no research establishes that "violent" video games are more harmful than violence in other media. *Id.* at 578-79. The Eighth Circuit similarly rejected a materially indistinguishable "psychological harm" justification, holding that "[t]he County's conclusion that there is a strong likelihood that minors who play violent video games will suffer a deleterious effect on their psychological health is simply unsupported in the record," and expressly rejecting Dr. Anderson's research as "fall[ing] far short of a showing that video games are psychologically deleterious." *IDSA*, 329 F.3d at 958-59; *see also VSDA*, 325 F. Supp. 2d at 1188.

The State's cited research is essentially the same as what has been offered and rejected in previous cases. Contrary to the State's assertions, the evidence in this area is at best mixed, and many experts disagree with the strident claims asserted by Dr. Anderson and others. *See, e.g.*, Declaration of Jeffrey H. Goldstein (recently submitted to the Northern District of Illinois in a similar challenge to a state "violent" video games law) (RJN Ex. 5); Declaration of Dmitri Williams (same) (RJN Ex. 6). The research on which Dr. Anderson and others rely is wholly correlational, and thus does not support making causal claims about the "effects" of "violent" video games. Indeed, even Dr. Anderson concedes that "longitudinal research is badly needed" before strong causal claims can

---

[6] Dr. Anderson conceded all of these points, among others, in his recent court testimony. *See* 11/15/05 Tr. at 283 (RJN Ex. 4) (agreeing that "the vast majority of the kids . . . playing violent video games right now . . . are going to grow up and be just fine"); *id.* at 285-86 (agreeing that there is no evidence concerning how much, if at all, "violence would be reduced in the world if we were to, in fact, cut off people under 18 from buying games that are covered by the statute); *id.* at 279-80 (conceding that the "effect sizes" that he relies on are approximately the same for television and video game "violence").

be made about "violent" video games. Craig A. Anderson, *et al.*, *Violent Video Games: Specific Effects of Violent Content on Aggressive Thoughts and Behavior*, 36 ADVANCES IN EXPERIMENTAL SOC. PSYCHOL. 199, 244 (2004), *reproduced in* State Def. Exh B. at B061. In fact, the only published longitudinal study to date found *no* negative impact from a month-long exposure to a "violent" video game. *See* Williams Decl. ¶¶ 18-19; Goldstein Decl. ¶ 44.

Even accepting Dr. Anderson's conclusions as true – that "violent" games, like all "violent" media, have some diffuse and aggregate effect on aggression – those conclusions do not justify suppressing the video games singled out by the Act. *See, e.g.*, *VSDA*, 325 F. Supp. 2d at 1188 (rejecting regulation based on a claim that "prolonged exposure to violent entertainment media is one of the constellation of risk factors for aggressive or anti-social behavior"). Notably, in recent testimony before the District Court for the Northern District of Illinois in a similar lawsuit, Dr. Anderson admitted that the research shows that children are *not* more vulnerable than adults to the "effects" of violent video games. *See ESA v. Blagojevich*, C.A. No. 05-4265 (N.D. Ill.), 11/15/05 Tr. at 324-25 (RJN Ex. 4) ("In the video game literature, there's not a clear age vulnerability."). This admission undermines one of the Legislature's central claims, *i.e.*, that restrictions on speech are necessary to protect minors from developmental harm caused by "violent" video games. Moreover, as the California Senate Judiciary Committee recognized, none of the research relied upon by the Legislature is specific to the particular category of "violent" video games covered by the Act. *See* Sen. Jud. Comm. Analysis at 11 (RJN Ex. 2) (noting that the "studies used to justify the state's compelling interests do not apparently relate to 'ultra-violent' video games or video games that feature 'heinous, atrocious, and cruel' violence"). In fact, Dr. Anderson himself has testified that cartoon-like games are as harmful (if not more harmful) than more "realistic" games, and that there is no research support "for saying that games that single out humanlike victims ought to be treated differently from games that have alien victims." 11/15/05 Tr. at 327-28 (RJN Ex. 4).

The State's other cited studies also fail to support the Act's sweeping restrictions. The Gentile study, for example, concluded that adolescents exposed to media violence were more hostile and were prone, *inter alia*, to "arguments with teachers more frequently." State Defs. Mem. at 14. Even assuming *arguendo* the accuracy of the Gentile study results, this study is purely correlational, and does not support any conclusion that video games caused the teens' hostility (as opposed to the hypothesis that more hostile people seek out more violent games). The Uhlmann & Swanson study likewise has little bearing on whether minors suffer "harm" from playing "violent" video games because that study was conducted on *adults*. *Id*. at 14-15.

The State's reliance on recent "brain activity" research to justify the Act is similarly unavailing. *See* State Defs. Mem. at 15. Indeed, the same body of research – consisting of a handful studies by Dr. William Kronenberger and his colleagues at Indiana University – was recently rejected by the district court in Michigan as insufficient to demonstrate a compelling state interest at the preliminary injunction stage. *Granholm*, 2005 WL 3008584, at *3 (RJN Ex. 1). The court noted that Dr. Kronenberger's research "did not evaluate the independent effect of violent video games, and thus provides no support for the Act's singling out of video games from other media." *Id.* And in the recent evidentiary hearing in Illinois, the United States District Court for the Northern District of Illinois noted that Dr. Kronenberger's research does not show *any* kind of harm to minors' brains. 11/16/05 Tr. at 486-88 (RJN Ex. 7) (citing the unrebutted testimony of Plaintiffs' expert Dr. Howard Nusbaum); Declaration of Dr. Howard C. Nusbaum (submitted in the Illinois case) (RJN Ex. 8); *Granholm*, 2005 WL 3008584, at *3 (RJN Ex. 1) (noting that Dr. Kronenberger's findings have been "called into question" by Dr. Nusbaum). Moreover, Dr. Kronenberger has admitted that his research is only correlational, and does not show whether minors with behavioral disorders seek out "violent" media, or whether some other variable is at work. Press Release, Indiana Univ. School of Medicine, *Self-Control May Be Affected By Violent Media Exposure*, May 26, 2005, *available at* http://medicine.indiana.edu/ news_releases/viewRelease.php4?art=339&print=true. This tenuous research ─ like the other research relied upon by the State ─ does not support the State's claims of harm, let alone a legitimate or compelling state interest.

**B.     The State Has Not Satisfied the Other Demands of Strict Scrutiny.**

**1.   The Act's Singling Out of Video Games Fails to Advance the State's Purported Interests and Exacerbates the Statute's Constitutional Failings.**

Not only has the State failed to prove a compelling state interest, but it has failed to demonstrate that the Act materially advances the purported compelling interests.[7] Recognizing that the Act's content-based regulation restricts only one form of speech, the State attempts to explain away this discrimination between types of speech by contending that the interactive nature of video games "pose[s] a special risk of harm to minors beyond the passive viewing" of other media. State Defs. Mem. at 17. The State, however, fails to point to *any* research supporting its position, relying

---

[7] The State's arguments are also internally inconsistent. The State contends that the Act is narrowly tailored because parents may buy the games for their children. State Defs. Mem. at 19. But if "violent" video games were truly as harmful as the State claims (which is not supported by the scientific evidence), then the Act would not materially advance the State's asserted interest, as minors could continue to access the games through their parents.

9

instead on amorphous policy statements by various professional associations. *See id.* Despite the State's assertions, experts with more specialized knowledge have acknowledged that such a conclusion is premature, given the lack of conclusive research. *See* Williams Decl. ¶¶ 34-36. And even Dr. Anderson has testified that the impact of violent video games is essentially *the same* as for other violent media. 11/15/05 Tr. at 278-79 (RJN Ex. 4).

The State has thus singled out a subset of video games for regulation, despite the fact that a wide range of media contain comparable violent expression. *See AAMA*, 244 F.3d at 579 (noting that "violent" video games "are a tiny fraction of the media violence to which modern American children are exposed"); *see also* Anderson Test., 11/15/05 Tr. at 279-80 (RJN Ex. 4) (conceding that the "effect sizes" are approximately the same for television and video game "violence"). No one could think that the Act materially advances its goals by preventing a 16-year-old from buying or renting the *Resident Evil IV* or *Tom Clancy's Rainbow Six 3* video games, *see* Price Decl. ¶¶ 11-17, 38-43, when it would be entirely lawful for that same teen to buy or rent *Resident Evil* and Tom Clancy movies, and to purchase Tom Clancy books. Such differential treatment of similarly situated media is strong evidence that the Act's true goal is to punish a disfavored speaker – not to advance the State's asserted interests. *See, e.g.*, *Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989).

### 2. The Act Is Not Narrowly Tailored.

The State argues that the Act is "narrowly tailored" because it applies to only a small subset of video games. State Defs. Mem. at 18. But the Act's inherently vague terms, discussed in more detail below, will have the effect of covering a broad swath of video games. The Act's restrictions therefore are far from narrow. And as the Senate Judiciary Committee observed in its analysis of the law, the lack of a proper "fit" between the Act's stated interests and the games it covers further undermines any legitimate claim of "narrow tailoring." Sen. Jud. Comm. Analysis at 11 ("Because there does not appear to be a direct correlation between the proposed limitations and the negative effects discussed in the studies relied upon by the [Act's] author, it is unclear that the proposed definition of 'violent video game' is narrowly tailored to address the state's compelling interests, rather than simply tailored for the sake of a more 'narrow' statute.").

In addition, the Act's restrictions are not narrowly tailored because the State has failed to establish that "a plausible, less restrictive alternative . . . will be ineffective to achieve its goals," *Playboy*, 529 U.S. at 816 ─ for example, educational efforts concerning the video game industry's self-regulatory Entertainment Software Rating Board ("ESRB") rating system, and the State's recently enacted law requiring the posting of signs containing information about that system. Cal.

Bus. & Prof. Code § 20650. In fact, the ESRB rating system is well respected and widely used. *See* Plaintiffs' Opening Mem. 3-4; Lowenstein Decl. ¶¶ 4-11. In its initial 2000 report surveying various media's rating systems, the Federal Trade Commission ("FTC") called the ESRB system the "most comprehensive of the three industry systems studied by the Commission," "widely used by industry members," and "revised repeatedly to address new challenges, developments, and concerns regarding the practices of its members." FTC, *Marketing Violent Entertainment to Children*, at 37 (Sept. 2000), *available at* http://www.ftc.gov/reports/violence/ vioreport.pdf ("2000 FTC Report").

In dismissing reliance on the ESRB system, the State rests heavily on a 2004 FTC report. State Defs. Mem. at 20. But the State ignores the FTC's observation in that report that the video game industry has continually improved its practices, and is performing *better* than its peer retail industries ─ movies and music. FTC, *Report to Congress: Marketing Violent Entertainment to Children* at 28-29 (July 2004), *reproduced in* State Defs. Mem. App. E, E020, E046, E049-50. Moreover, the FTC has made the crucial observation that *parents are involved in 83% of video game purchases for minors*. 2000 FTC Report, at 42.[8] Indeed, the other report cited by the State showed that minors were *turned down* from purchasing M-rated games *66% of the time*. *See* National Institute on Media and the Family, *Mediawise Video Game Report Card* at 4 (2004) (cited in Defs. Request for Judicial Notice, Ex. 1 at 13). And, while some "M" games are quite popular, they do not dominate the industry; rather, 53% of all games sold in 2004 were rated "E," 30% were "T," and only 16% percent were "M." Entertainment Software Ass'n, *Essential Facts About the Computer and Video Game Industry*, at 4 (2005), *available at* http://www.theesa.com/files/2005EssentialFacts.pdf. Thus, far from establishing the crisis claimed by the State's brief, the actual facts show that the voluntary ESRB system is a less restrictive alternative, and that the video game industry is a leader in self-regulation.

Finally, the State suggests that the Act is narrowly tailored because the Act purportedly does not ban or burden adult speech. State Defs. Mem. at 19. Even assuming the relevance of that argument to the strict scrutiny analysis, it ignores a central premise of Plaintiffs' challenge: that the Act will have a significant chilling effect on adults' expression (as well as expression that is fully protected as to minors). As Plaintiffs have explained, game creators, distributors and retailers may respond to the Act's monetary sanctions by self-censoring or otherwise restricting access to *any*

---

[8] Recent research similarly indicates that "92% of the time parents are present at the time games are purchased or rented." Entertainment Software Ass'n, *Essential Facts About the Computer and Video Game Industry*, at 7 (2005), *available at* http://www.theesa.com/files/2005EssentialFacts.pdf.

11

potentially offending game, and, conceivably, by pulling "M" games off the shelves altogether. *See* Lowenstein Decl. ¶ 16; Andersen Decl. ¶¶ 9-11, 15, 17; Price Decl. ¶¶ 9-10.[9]

### III. THE ACT'S LABELING PROVISIONS ARE UNCONSTITUTIONAL.

As Plaintiffs' opening brief explained, the labeling provisions are also unconstitutional for many of the same reasons the Act's restrictions violation the First Amendment. The Act requires any entity that distributes video games in the State of California ─ essentially every video game manufacturer ─ to place a large "18" sticker on any game that meets the statutory definition of "violent." This imposes a content-based burden that triggers ─ and fails ─ strict scrutiny. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988).

The State's argument that the labeling restrictions are a valid regulation of commercial speech is meritless. As an initial matter, the commercial speech standard cited by the State is inapplicable. This case is not like advertising cases where the courts have upheld rules designed to guard against misleading commercial speech. To the contrary, the labeling requirement forces video game manufacturers, distributors, and retailers to channel the State's disapproving message about the content of certain video games. The Act's requirement that Plaintiffs' members convey a stigmatizing message with which they disagree is therefore subject to strict scrutiny. *See Riley*, 487 U.S. at 795 ("Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech. We therefore consider the Act as a content-based regulation of speech.").

Even if the commercial speech standard were applicable, the labeling provisions would still be invalid. To begin with, it is the State's burden to establish a substantial government interest or consumer deception supporting a compelled disclosure. *See Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 637, 651 (1985). But, as the above discussion of the State's purported evidence of "harm" to minors from violent video games demonstrates, the State has no substantial interest in requiring the "18" label based on any claim of "harm" from the game content. And the State has made no showing whatsoever of consumer deception; to the contrary, the ESRB system provides extensive and helpful information to consumers, which the State's "18" label will obstruct and confuse. Moreover, because of the Act's vagueness problems, compounded by the threat of civil

---

[9] The State is therefore wrong in arguing that narrow tailoring is present because this case is *unlike* prior cases striking down laws to shield minors from certain speech because they "also prohibited adult access to the covered material." State Defs. Mem. at 19. Because the Act will burden adult speech, and because less restrictive alternatives exist, the Act is *precisely* like the regulations invalidated in *Sable Communications of California, Inc. v. FCC*, 492 U.S. 115 (1989) and *United States v. Playboy Entertainment Group*, 529 U.S. 803 (2000), the cases on which the State relies.

sanctions, manufacturers and distributors likely will respond to the Act by labeling a broad swath of constitutionally protected expression. As a result, the labeling provisions will burden speech far more than is necessary to serve any purported State interest. *See Zauderer*, 471 U.S. at 651 ("unjustified or unduly burdensome disclosure requirements might offend the First Amendment by chilling protected commercial speech.").

## IV. THE ACT IS UNCONSTITUTIONALLY VAGUE.

Plaintiffs' opening brief demonstrated that because the Act's vague terms are susceptible of widely different interpretations by those who face liability under the Act, the Act will chill expression fully protected by the First Amendment.[10] The State's argument in response boils down to the contention that because the ESRB voluntarily rates its games according to its own terminology, it follows that the Act's entirely different definitions of illegal conduct are sufficiently clear, and hence constitutional. State Defs. Mem. at 21-24. This is a complete non-sequitur.

At the outset, it is beside the point that the ESRB voluntarily rates video games. Self-regulation does not require the precision demanded of legal regulation. Instead, the question is whether the Act's terms are sufficiently definite so that the government may impose sanctions on violators without fear of chilling legitimate expression.

At a more fundamental level, the State fails to come to grip with the fact that the Act's terms are indeed vague in the context of video game regulation. One level of vagueness stems from the Act's focus on violence to "characters with substantially human characteristics," a term found nowhere in the ESRB's own guidelines. In an area of expression in which mythological creatures, mutants, and humanoids are commonplace, Price Decl. ¶ 11, separating the "substantially human" from the insufficiently human amounts to an unconstitutional guessing game. For this reason, the court in *VSDA* had no trouble concluding that a Washington regulation was likely vague when, much like the Act here, it restricted video games containing "realistic" violence. As the Court put it: "Would a game built around The Simpsons or the Looney Tunes characters be 'realistic' enough to trigger the Act?" *VSDA*, 325 F. Supp. 2d at 1190. Answers to these questions are essentially unknowable to the game designers and merchants who will be forced to respond by curtailing legitimate speech. *See* Price Decl. ¶ 20.

---

[10] The State misstates the applicable standard for the vagueness inquiry. State Defs. Mem. at 21 (suggesting that the vagueness standard is less stringent in the case of "economic regulation"). The Act involves expression that is fully protected under the First Amendment, not "business regulation," and therefore the concerns about vagueness are heightened. *NAACP v. Button*, 371 U.S. 415, 432 (1963) ("[S]tandards of permissible statutory vagueness are strict in the area of free expression.").

13

Other terms in the Act are equally, if not more, vague. The Act restricts games that are "especially heinous, cruel or depraved," apparently incorporating a criminal death penalty standard. But even if these terms are sufficiently definite when applied to real humans, they are hopelessly enigmatic when applied to virtual humans and humanoids. Does one act "cruel[ly]" in attacking a demigod who enjoys immortality? Does one act "heinous[ly]" toward an image of a "normal" human, when that image reappears unharmed every time the player restarts the game? The law may impose extra punishment on those who commit real crimes against real humans in a flagrant manner precisely because our common human experience gives us a benchmark to judge those actions. *See United States v. Jones*, 132 F.3d 232, 250 (5th Cir. 1998) (upholding "heinous, cruel, and depraved" formulation in the death penalty context because it has a "common-sense core meaning that [a jury was] capable of understanding"). But what benchmark or "common-sense core meaning" can there be when "victims" of virtual violence have no consciousness of the "harm" inflicted on them? *Cf.* Sen. Jud. Comm. Analysis at 15 ("Determinations of consciousness and intent are clearly appropriate in assessing the severity of violent acts committed by (and against) real people. But those terms are more unwieldy and difficult to apply in the context of virtual characters or players whose ultimate 'intent' is simply to progress through the levels of a computer game.").

Ultimately, Defendants put forward no reason to think that the terms used in the Act are any more definite than the ones struck down in Washington, and most recently in Michigan. *See VSDA*, 325 F. Supp. 2d at 1191; *Granholm*, 2005 WL 3008584 at *3 (RJN Ex. 1).[11] For these reasons, "[n]ot only is a conscientious retail clerk (and her employer) likely to withhold from minors all games that could possibly fall within the broad scope of the Act, but . . . game designers will likely 'steer far wider of the unlawful zone . . . than if the boundaries of the forbidden area were clearly marked.'" *VSDA*, 325 F. Supp. 2d at 1191 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972)).

## V. PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION.

In addition to Plaintiffs' likelihood of success on the merits, the equities weigh heavily in favor of an injunction here. See Plaintiffs' Opening Mem. at 18-19. If the Act is permitted to go into effect, Plaintiffs' members and willing recipients of their expression will suffer irreparable harm, because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably

---

[11] Notably, despite its dismissive stance, the State does not say whether the games identified in Plaintiffs' preliminary injunction motion, and attached as exhibits thereto, would be covered under the Act. State Defs. Mem. at 22.

14
Reply in Support of Motion for a Preliminary Injunction                    Case No. C 05-4188 RMW (RS)

constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality).[12] Every court to have considered a similar statute has granted injunctive relief. *E.g.*, *Granholm*, *AAMA*, *ISDA*, *VSDA*. The same relief is warranted here.

## CONCLUSION

For the foregoing reasons, as well as those submitted in Plaintiffs' opening brief, Plaintiffs respectfully request that this Court grant a preliminary injunction.[13]

Respectfully submitted,

DATED: November 23, 2005

GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR.
H. MARK LYON
ETHAN D. DETTMER


By: _____/s/_____
         Ethan D. Dettmer

JENNER & BLOCK LLP
PAUL M. SMITH
KATHERINE A. FALLOW
AMY L. TENNEY
601 13th Street, N.W., Suite 1200
Washington, D.C. 20005
Telephone:  (202) 639-6000
Facsimile:  (202) 639-6066

Attorneys for Plaintiffs
VIDEO SOFTWARE DEALERS ASSOCIATION
and ENTERTAINMENT SOFTWARE ASSOCIATION

---

[12] The County Defendants argue that the motion for a preliminary injunction against them should be denied because they have not "threatened plaintiffs or anyone else with a civil prosecution as soon as the law goes into effect." County Def. Mem at 6.  This argument fails to recognize that under well-established precedent Plaintiffs may facially challenge the Act before it goes into effect; as courts have repeatedly recognized, the mere existence of the Act will burden Plaintiffs' First Amendment rights, and therefore Plaintiffs' claims are justiciable even prior to any threat of individual civil prosecution.  *See, e.g.*, *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988).

[13] If the Court denies the motion, Plaintiffs ask that it do so in time to allow them to file an appeal and motion for stay pending appeal before the Act's January 1, 2006 effective date.