# EXHIBIT 1

Dockets.Justia.com

2005 WL 3008584                                                                                        Page 1
Slip Copy, 2005 WL 3008584 (E.D.Mich.)
**(Cite as: 2005 WL 3008584)**

Only the Westlaw citation is currently available.

United States District Court,E.D. Michigan, Southern
Division.
ENTERTAINMENT SOFTWARE ASSOCIATION,
Video Software Dealers Association, and Michigan
Retailers Association, Plaintiffs,
v.
Jennifer GRANHOLM, in her official capacity as
Governor of the State of Michigan; Michael A. Cox,
in his official capacity as Attorney General for the
State of Michigan, et al., and Kym L. Worthy, in her
official capacity as Wayne County Prosecuting
Attorney, Defendants.
**No. 05-CV-73634.**

Nov. 9, 2005.

ORDER GRANTING PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

STEEH, J.
**\*1** This case questions the constitutionality of
Michigan 2005 Public Act 108 ("P.A. 108" or "the
Act"), which was signed into law by Gov. Granholm
on September 14, 2005, and is to go into effect on
December 1, 2005. The Act is designed to prohibit
the dissemination, exhibiting, or display of certain
sexually explicit and ultra-violent explicit video
games to minors without the consent of their parents
or guardians, and provides civil and criminal
penalties against those who violate the Act. For
purposes of this action, plaintiffs are not contesting
the constitutionality of Part I of the Act relating to
sexually explicit video games. The focus is on Part II,
which relates to ultra-violent explicit video games.
Oral argument was held on October 31, 2005. For the
reasons stated below, plaintiffs' motion for
preliminary injunction preventing defendants and
their officers, employees and representatives from
enforcing Part II of the Act is GRANTED.

FACTUAL BACKGROUND

Plaintiffs Entertainment Software Association
("ESA"), Video Software Dealers Association
("VSDA"), and Michigan Retailers Association
("MRA") are associations of companies that create,
publish, distribute, sell, and/or rent video games.

The Act makes it a state civil infraction for a person

to "knowingly disseminate to a minor an ultra-violent
explicit video game that is harmful to minors." Act,
pt. II, § 17. A person who violates this provision is
liable for a civil fine ranging from $5,000 to $40,000,
depending on the number of violations. *Id.* The Act
also provides misdemeanor criminal penalties of up
to 93 days in prison, a fine of $25,000, or both, for
store managers who permit a minor to "play or view
the playing" of a prohibited video game. *Id.* § 20.
"Ultra-violent explicit video games" under the Act
are those that "continually and repetitively depict[ ]
extreme and loathsome violence." *Id.* § 16(l).
"Extreme and loathsome violence" is defined as "real
or simulated graphic depictions of physical injuries or
physical violence against parties who realistically
appear to be human beings, including actions causing
death, inflicting cruelty, dismemberment,
decapitation, maiming, disfigurement, or other
mutilation of body parts, murder, criminal sexual
conduct, or torture." *Id.* § 16(g). An "ultra-violent
explicit video game" is "harmful to minors" under
the Act if it has all the following characteristics:
(I) Considered as a whole, appeals to the morbid
interest in asocial, aggressive behavior of minors as
determined by contemporary local community
standards.
(ii) Is patently offensive to contemporary local
community standards of adults as to what is suitable
for minors.
(iii) Considered as a whole, lacks serious literary,
artistic, political, education, or scientific value for
minors.

*Id.* § 16(h).

The Act's stated purposes for its restrictions on
"ultra-violent explicit" video games are:
"safeguarding both the physical and psychological
well-being of minors," "preventing violent,
aggressive and asocial behavior from manifesting
itself in minors," and "directly and substantially
alleviating the real-life harms perpetrated by minors
who play ultra-violent explicit video games." Act, pt.
II, § 15(e), (f), (g). The Act finds that "minors who
play ultra-violent explicit video games are
consistently more likely to exhibit violent, asocial, or
aggressive behavior and have feelings of aggression"
and that "the effects of media violence on minors 'are
measurable and long-lasting." ' *Id.* § § 15(a), (b).

**\*2** Plaintiffs make the following allegations in their
complaint, as well as in their motion for preliminary
injunction: (I) the Act violates freedom of speech
under the First Amendment, because video games are
fully protected speech; (ii) the Act violates the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3008584                                                                Page 2
Slip Copy, 2005 WL 3008584 (E.D.Mich.)
**(Cite as: 2005 WL 3008584)**

Fourteenth Amendment's Equal Protection Clause, because the Act restricts video games, but not other forms of media violence; (iii) the Act is unconstitutionally vague in that it fails to provide a standard to distinguish video games which are covered under the Act; and (iv) the Legislature's reliance of the industry's rating system is an unconstitutional delegation of powers by the Michigan legislature.

### STANDARD FOR PRELIMINARY INJUNCTION

The decision of whether or not to issue a preliminary injunction lies within the discretion of the district court. _CSX Transp., Inc. v. Tennessee State Bd. of Equalization,_ 964 F.2d 548, 552 (6th Cir.1992). In determining whether to grant or deny an injunction, the district court is required to consider four factors:
1. whether the movant is likely to prevail on the merits;
2. whether the movant would suffer an irreparable injury if the court does not grant a preliminary injunction;
3. whether a preliminary injunction would cause substantial harm to others; and
4. whether a preliminary injunction would be in the public interest.

_G & V Lounge v. Michigan Liquor Control Comm'n,_ 23 F.3d 1071, 1076 (6th Cir.1994) (citing _International Longshoreman's Ass'n v. Norfolk S. Corp.,_ 927 F.2d 900, 903 (6th Cir.1991), cert. denied, 502 U.S. 813 (1991).

The primary purpose of a preliminary injunction is to maintain the status quo until a decision on the merits can be made. _University of Texas v. Camenisch,_ 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981). The court is to be flexible in its consideration, and the four factors are not individual prerequisites to be met, but are viewed as a whole, with each leg of the test balanced against and among the others. _In re DeLorean Motor Co.,_ 755 F.2d 1223, 1229 (6th Cir.1985).

### ANALYSIS

#### 1. Likelihood of Success on Merits

The Sixth Circuit has held that video games constitute expression protected by the First Amendment. _James v. Meow Media,_ 300 F.3d 683 (6th Cir.2002) (video games can be constitutionally protected free speech in the context of a negligence action in which plaintiff sought to attach tort liability to communicative aspects of defendant's video games). Furthermore, depictions of violence are entitled to full constitutional protection. See, _American Amusement Machine Ass'n (AAMA) v. Kendrick,_ 244 F.3d 572, 575-76 (7th Cir.2001).

The Act regulates video games based on their content, specifically those games that depict "extreme and loathsome violence." Therefore, the Act is subject to review under the strict scrutiny standard. A content-based restriction on speech is presumptively invalid, so defendants have the burden of demonstrating that the Act is necessary to serve a compelling state interest and that it is narrowly tailored to achieve that end. See, _IDSA v. St. Louis County,_ 329 F.3d 954, 958 (8th Cir.2003).

#### a. _Compelling State Interest_

**\*3** The Michigan Legislature considered evidence regarding the negative effects of violent video games on the brain function and behavior of minors. For example, the Michigan Legislature looked at studies by Dr. William Kronenberger which indicate that exposure to media violence is related to poorer executive functioning in adolescents. Dr. Kronenberger's team concluded that both video game and television media violence exposure are related to aggression in adolescents. However, this research did not evaluate the independent effect of violent video games, and thus provides no support for the Act's singling out of video games from other media. More recent research by the Kronenberger team on the relation between media violence exposure and brain activation as measured by functional magnetic resonance imaging (fMRI) allegedly suggests that media violence exposure may be associated with alterations in brain functioning. However, these findings are called into question by plaintiff's expert. (Declaration of Dr. Howard C. Nusbaum).

The Michigan Legislature also considered social science evidence regarding a relationship between video game violence and aggressive feelings and behavior, relying largely on the work of Dr. Craig Anderson. (Defendant's Appendix 10A-10FFF). Dr. Anderson's work has been rejected as a basis for restricting expression by other courts considering similar laws. Citing Dr. Anderson's work, the Seventh Circuit held that the "studies do not support

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3008584
Slip Copy, 2005 WL 3008584 (E.D.Mich.)
(Cite as: 2005 WL 3008584)

the ordinance," for two reasons. First, the studies did not show that "video games have ever caused anyone to commit a violent act ... or have caused the average level of violence to increase anywhere." *AAMA,* 244 F.3d at 578-79. Second, they do not show "that violent video games are any more harmful to the consumer or to the public safety than violent movies or other violent, but passive, entertainments." *Id.* at 579. In addition, many experts disagree with the claims asserted by Dr. Anderson and others. See, e.g., Declaration of Jeffrey H. Goldstein.

A cursory review of the research relied upon by the state shows that it is unlikely that the State can demonstrate a compelling interest in preventing a perceived "harm."

### b. *Narrowly Tailored*

Even assuming defendants could demonstrate a compelling state interest, there are defects which prevent them from satisfying the other demand of strict scrutiny, that the Act be narrowly tailored to achieve its legitimate purpose. The State suggests the Act is narrowly tailored because it does not ban adult speech. However, the Act will likely have a chilling effect on adults' expression, as well as expression that is fully protected as to minors. The response to the Act's threat of criminal penalties will likely be responded to by self-censoring by game creators, distributors and retailers, including ultimately pulling "T" and "M"-rated games off store shelves altogether.

There is a serious problem in determining which games are prohibited to be sold or displayed to minors under the Act. Without wholesale, indiscriminate refusals to sell video games to minors by store operators it appears impossible to protect sellers from prosecution. Store clerks cannot rely on the industry's voluntary rating system, other than potentially to invoke one of the affirmative defenses provided in the Act. Nor is it reasonable to expect store clerks to play each level of each game to determine if it falls within the Act's definition of ultra-violent explicit. Indeed, very few experienced video players can successfully reach the highest levels of many games in order to view their content. At oral argument, when asked by the court how a retailer could avoid criminal penalties under the Act, the attorney for the State suggested that a video retailer could call plaintiff's attorney to determine if a particular video game has ultra-violent explicit content. This is all but a direct concession that a

retailer cannot reasonably, economically, or easily make a determination whether the content of a particular video game is prohibited under the Act as to minors.

**\*4** This court concludes that defendants are not likely to succeed on the merits.

### 2. Irreparable Injury

The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Connection Distrib. Co. v. Reno,* 154 F.3d 281, 288 (6th Cir.1998). The harm stems from the fact that people will be deterred from exercising their rights in the future. *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Authority ("SORTA"),* 163 F.3d 341, 363 (6th Cir.1998).

### 3. Harm to Others / Public Interest

Considerations of the public interest and the relative harm to others resulting from the entry of a preliminary injunction in this case are subsumed in the court's consideration of the likelihood of success on the merits. First, the State has been unable to demonstrate the perceived harm it seeks to protect against. Second, there is an obvious risk of harm with enforcement of the Act, including the prosecution of individuals for selling offending video games. In addition, there is the obvious harm that results from stifling free speech. A consideration of these factors weighs in favor of granting a preliminary injunction.

### CONCLUSION

For the reasons stated above, plaintiffs have demonstrated that the Act is unlikely to survive strict scrutiny, and that irreparable harm follows from the loss of First Amendment freedoms. The court therefore GRANTS plaintiffs' motion for preliminary injunction, and enjoins enforcement of Part II of Michigan 2005 Public Act 108.

E.D.Mich.,2005.
Entertainment Software Ass'n v. Granholm
Slip Copy, 2005 WL 3008584 (E.D.Mich.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2

BILL ANALYSIS

SENATE JUDICIARY COMMITTEE
Senator Joseph L. Dunn, Chair
2005-2006 Regular Session

| | |
|---|---|
| AB 1179 | A |
| Assembly Member  Yee | B |
| As Amended September 2, 2005 | |
| Hearing Date:  September 8, 1005 | 1 |
| Civil Code | 1 |
| AMT/MM:cjt | 7 |
| | 9 |

PURSUANT TO RULE 29.10

SUBJECT

Violent Video Games:  Sales to Minors

DESCRIPTION

This bill would prohibit the sale or rental of violent video games to minors under 18 years old, and would require that such games be clearly labeled before being imported into or distributed in California.  Violators of either provision would be subject to liability for up to $1,000.  Sales clerks would be exempt from liability, so long as they did not hold a management position or an ownership interest in the retail business.  A minor's parents, grandparents, aunts, uncles, and legal guardians would also be exempt from the terms of the bill.  It would be an affirmative defense to liability for unlawfully selling a violent video game to establish reasonable reliance on evidence that a purchaser or renter was not a minor, or to establish that a manufacturer failed to label a violent video game as required under the bill.

The bill would offer two alternate definitions of "violent video game."  The first definition would mirror the language used to define "obscene" speech.  The second definition would mirror federal statutes and jury instructions that relate to aggravating factors that warrant death penalty convictions.

BACKGROUND

(more)

AB 1179 (Yee)
Page 2


This bill follows a line of attempts in this and other
states to limit the sale and rental of "violent video
games" to minors.  Proponents have argued that these
attempts are supported by numerous scientific studies which
indicate that minors who play violent video games may be
more likely to act aggressively than other minors and may
suffer other negative emotional and psychological effects.

Last year the Legislature passed AB 1793 (Yee), Chapter
630, Statutes of 2004, requiring video game retailers to
post signs notifying customers of a current industry rating
system that may be used to identify age-appropriate video
games, and requiring retailers to make information
explaining the rating system available on request.  Another
bill, AB 1792 (Yee, 2004), which would have prohibited the
sale or rental of "violent video games" to minors under age
18, failed in the Assembly Arts, Entertainment, Sports,
Tourism, and Internet Media Committee.

Other states have successfully enacted statutes in recent
years to restrict minors' access to violent video games.
However, those statutes were found unconstitutional on
First Amendment and/or vagueness grounds.  [See, e.g.,
Interactive Digital Software Assoc. v. St. Louis County
( IDSA ) (8th Cir. 2003) 329 F.3d 954; American Amusement
Machine Assoc. v. Kendrick (7th Cir. 2001) 244 F.3d 572;
Video Software Dealers Assoc. v. Maleng (D.C. Wash. 2004)
325 F. Supp. 2d 1185.]  The author notes that an Illinois
statute was recently signed into law that restricts the
sale of violent video games to minors.

This year, AB 450 (Yee) was introduced in a renewed attempt
to prohibit the sale or rental of "violent video games" to
minors.  It was amended in the Assembly Judiciary Committee
to address some of the constitutional issues raised in
recent court decisions.  The bill passed the Assembly
Judiciary Committee, but failed its first hearing in the
Assembly Arts, Entertainment, Sports, Tourism, and Internet
Media Committee.  Although the bill passed on its second
vote in that committee, it has not been brought to a vote
on the Assembly Floor.

On September 2, 2005, the last day for amending bills
without a rule waiver, the author gutted and amended AB

2

AB 1179 (Yee)
Page 3


1179 (Yee) to insert language largely identical to the text
of AB 450.  The primary difference between the bills is
that AB 1179 would prohibit the sale or rental of "violent
video games" to minors under 18 years old, while AB 450
would have prohibited the sale or rental of violent video
games to minors under 17 years old.

CHANGES TO EXISTING LAW

 Existing law , the U.S. Constitution, provides that
"Congress shall make no law ? abridging the freedom of
speech."  [U.S. Const. Amend. 1.]

 Existing law , the California Constitution, provides that "A
law may not restrain or abridge liberty of speech or
press."  [Cal. Const. Art. 1  2.]

Existing law  requires video game retailers to post signs in
prominent areas of a retail establishment to provide
information about a video game rating system or to notify
customers that a rating system is available to aid in the
selection of video games.  The law also requires retailers
to make information explaining the rating system available
on request.  [Bus. & Prof. Code  20650.]

Existing law  prohibits the sale, lease, rental, or
provision of any video game intended for use by any person
under 18 years old, which contains any commercial
advertisement, brand names, trademarks, or copyrighted
slogans of alcoholic beverages or tobacco products in the
design, presentation, packaging or advertisement of the
video game.  [Penal Code  308.5.]

 This bill  would make a legislative finding that exposing
minors to depictions of violence in video games makes
minors more likely to experience feelings of aggression, to
experience a reduction of activity in the frontal lobes of
the brain, and to exhibit violent antisocial or aggressive
behavior.  It would also make a finding that even minors
who do not commit acts of violence suffer psychological
harm from prolonged exposure to violent video games.

 This bill  would make a legislative finding that the state
has a compelling interest in preventing violent,
aggressive, and antisocial behavior, and in preventing

3

AB 1179 (Yee)
Page 4

psychological or neurological harm to minors who play
violent video games.

 This bill  would prohibit the sale or rental of violent
video games to minors who are under 18 years of age.  This
prohibition would not apply when a minor's parent,
grandparent, aunt, uncle, or legal guardian rented or sold
a violent video game to the minor.  It would also be an
affirmative defense to establish: (1) that a defendant or
his or her employee or agent reasonably relied upon
evidence that a purchaser or renter was not a minor; or (2)
that a manufacturer failed to label a violent video game as
required under the bill.

 This bill  would define "violent video game" as a video game
in which the range of options available to a player
includes killing, maiming, dismembering, or sexually
assaulting an image of a human being, if those acts are
depicted in the game in a manner that does  either  of the
following:

     a)   Comes within all of the following descriptions:

        i)    A reasonable person, considering the game as a
              whole, would find [it] appeals to a deviant or
              morbid interest in minors;

        ii)    It is patently offensive to prevailing
               standards in the community as to what is suitable to
               minors;

        iii)   It causes the game, as a whole, to lack serious
               literary, artistic, political, or scientific value
               for minors.

     b)    Enables a player to virtually inflict serious
           injury upon human beings or characters with
           substantially human characteristics in a manner which
           is especially, heinous, cruel, or depraved in that it
           involves torture or serious physical abuse to the
           victim.

 This bill  would define the terms "heinous," "cruel,"
"depraved," "torture," and "serious physical abuse," and
would list pertinent factors to consider in determining

4

AB 1179 (Yee)
Page 5

whether violence is especially heinous, cruel, or depraved.

 This bill  would provide that violent video games which are
imported into or distributed in California for retail sale
shall be labeled on the front face of the package, as
specified.

 This bill  would make a person who violates any provision of
the bill subject to liability for up to $1,000, with the
exception that a person who is employed solely in the
capacity of a salesclerk or other similar position, and who
does not hold an ownership interest or a management
position in the business, may not be held liable.

 This bill  would provide that a violation may be prosecuted
by any city attorney, county counsel, or district attorney,
and that a violation may be reported to the city attorney,
county counsel, or district attorney by an adult acting on
behalf of a minor to whom a violent video game was sold or
rented.

 This bill  would state that its provisions are severable.

                          COMMENT

 1.Stated need for the bill

   The author contends that this bill is a necessary
   response to the potential negative impacts that violent
   video games may have on minors under 18 years old.  The
   author states:

     Since teens are wiring the circuits for self
     control, responsibility and relationships they
     will carry with them into adulthood, they are
     more impressionable than we thought.  Active
     participation by youth in playing violent video
     games has a greater impact than watching
     television.  Youth choose actions where they are
     rewarded for causing violence to another
     character.  Repetition greatly increases learning
     and also causes youth to identify with the
     aggressor in the game.  Dozens of studies on
     violent video games, including an analysis of 54
     independent samples with 4,262 participants, show

5

AB 1179 (Yee)
Page 6

       five major effects: playing violent games leads
       to increased physiological arousal, increased
       aggressive thoughts, increased aggressive
       feelings, increased aggressive behaviors, and
       decreased pro-social or helping behaviors.  ?
       These studies include experimental studies (that
       show playing violent video games actually causes
       increases in aggression), correlational studies
       (where long-term relations between game play and
       real-world aggression can be shown), and
       longitudinal studies (where changes in children's
       aggressive behaviors can be demonstrated).
       Furthermore, students who played more violent
       video games had greater involvement in physical
       fights ?, became desensitized to violence, and
       developed pro-violence attitudes and increased
       tolerance of violence ?  The American Academy of
       Pediatrics Policy Statement on Media Violence
       stated that playing violent video games accounts
       for a 13% to 22% increase in adolescents' violent
       behavior.  When considering the negative impact
       violent video games have on youth, the evidence
       is strong:  playing violent video games has more
       effect on increased youth aggression than
       second-hand smoke has on causing cancer, or lead
       exposure links to decreased IQ?

The author acknowledges that the entertainment industry
has undertaken self-regulatory measures to prevent minors
under 17 years old from renting or buying games that are
"M-rated," e.g., that contain mature content which may
include mature sexual themes, more intense violence,
and/or strong language.  But the author argues that
self-regulation has been unsuccessful, as discussed in
Comment 3 below.

 2.First Amendment concerns

The First Amendment right to free speech must be a chief
consideration if the bill's restrictions would limit the
distribution of materials that are "protected speech."
The First Amendment does not prohibit every restriction
on protected speech, but it requires that restrictions be
carefully weighed and limited.  Appropriate questions
here are therefore whether "violent video games" are

AB 1179 (Yee)
Page 7

protected speech and, if so, whether the bill is
appropriately tailored to limit access to that speech.

   a)    Whether violent video games are "protected speech"

   Video games have been found to be "protected speech"
   in several recent court decisions, one court
   explaining that games are protected because they
   "contain stories, imagery, ageold themes of
   literature, and messages, even an ideology, just as
   books and movies do."  [  IDSA  , 329 F.3d 954 (internal
   quotations omitted); see also  Kendrick  , 244 F.3d 572.]

   The author notes that some speech which is considered
   "protected" for adults may be deemed unworthy of
   protection for children in certain cases.  [See
    Ginsberg v. New York  (1968) 390 U.S. 629.]  But this
   distinction has only been made in narrow circumstances
   where the question was whether the speech was
   "obscene."  Obscenity is one of the few categories of
   speech which has historically been unprotected under
   the First Amendment.  [See  Miller v. California  (1973)
   413 U.S. 15.]  In  Ginsberg  the Supreme Court held that
   children's access to certain pornographic magazines
   could be restricted without any violation of the First
   Amendment, even though those magazines were not
   "obscene" according to adult standards, because the
   magazines could properly be deemed obscene according
   to community standards for children.  [  Ginsberg  , 413
   U.S. at 636.]

   The obscenity standard that was tailored to
   child-specific standards in  Ginsberg  could not be
   equally applied here.  This is because several federal
   courts have held that materials which do not contain
   "depictions or descriptions of sexual conduct" may not
   be treated as obscenity, even when those materials
   contain objectionable violence. [  IDSA  , 329 F.3d at
   959;  Maleng  , 325 F.Supp. 2d at 1185.]  As the  Maleng
   court explains:

      Sexually-explicit materials were originally
      excluded from the protections of the First
      Amendment because the prevention and punishment

7

AB 1179 (Yee)
Page 8

of lewd speech has very little, if any, impact
on the free expression of ideas and government
regulation of the sexually obscene has never
been thought to raise constitutional problems.
?  The same cannot be said for depictions of
violence: such depictions have been used in
literature, art, and the media to convey
important messages throughout our history, and
there is no indication that such expressions
have ever been excluded from the protections of
the First Amendment or subject to government
regulation.

A limited application of the  Ginsberg  case to speech
regarding sexual conduct is consistent with the
Supreme Court's statement in  Erznoznik v. Jacksonville
that:

speech that is neither obscene as to youths nor
subject to some other legitimate proscription
cannot be suppressed solely to protect the
young from ideas or images that a legislative
body thinks unsuitable for them.  In most
circumstances, the values protected by the
First Amendment are no less applicable when the
government seeks to control the flow of
information to minors.  [  422 U.S. 205, 213-14
(1975).]

Under the reasoning offered in the above cases, the
speech that would be restricted under this bill would
not be deemed obscene, even for minors, and would
therefore be considered "protected speech."

Nevertheless, one of the two definitions offered in AB
1179 for "violent video games" directly follows the
Ginsberg  obscenity standard, and applies the terms of
the obscenity definition to video games where certain
violent acts may be committed by a game character.  It
is questionable whether this definition is appropriate
under existing law.  Neither the  IDSA  or the  Maleng
decision is binding in California, but those decisions
and the precedent upon which they rely may be
persuasive to a California court.

8

AB 1179 (Yee)
Page 9


SHOULD AB 1179'S DEFINITION THAT MIRRORS THE OBSCENITY
DOCTRINE BE RETAINED, DESPITE CASES HOLDING THAT
"OBSCENITY" RELATES ONLY TO SEXUAL CONDUCT?

b)    Whether the proposed restrictions are necessary and
narrowly tailored to serve a compelling state interest

When speech is deemed "protected speech," any
restrictions on its content must be "necessary to
serve a compelling state interest," and "narrowly
tailored" to achieve that interest.  [ Republican Party
of Minn. v. White  (2002) 536 U.S. 765, 774-75.]  This
standard has been applied by courts considering
similar violent video game restrictions for minors.
[See  IDSA  , 329 F.3d at 958;  Maleng  , 325 F.Supp.2d at
1186.]

Courts have repeatedly recognized that a state has a
legitimate and compelling state interest in
safeguarding both the physical and psychological
well-being of minors.  [ Sable Comm., Inc. v. FCC
(1989) 492 U.S. 115.]  The appropriate questions are
therefore whether the bill's proposed restrictions on
the sale and rental of violent video games are (1)
necessary and (2) narrowly tailored to achieve the
stated interest of safeguarding minors.

i.    Whether the proposed restrictions are necessary

The author argues there is clear evidence that
violent video games increase children's aggressive
behaviors, thoughts, and attitudes, and that they
jeopardize children's psychological health by
decreasing emotional empathy and pro-social helping
behaviors.

Opponents note that the courts which have evaluated
similar statutes found the restrictions proposed in
those measures to be unsupported by scientific
evidence.  The court in  Kendrick  noted that there
was no demonstrated causal connection between the
playing of violent video games and any violent acts,
and found there was no evidence that the interactive
character of the games -- rather than images which

9

AB 1179 (Yee)
Page 10

might be equally evident in movies or other
unrestricted materials -- that caused the negative
impacts. [244 F.3d at 578-79.] In  IDSA  , the court
discounted a study which indicated only that "more
aggressive thoughts are reported and there is
frequently more aggressive behavior" after minors
played violent video games, when there was no
further evidence of actual psychological damage.
[329 F.3d at 958-59.]

The author asserts that the studies relied upon here
demonstrate both a causal connection to acts of
violence and actual psychological damage.  In
contrast, opponents assert that the studies relied
upon are largely the same as the studies rejected by
the courts, without any new primary or experimental
research.  Opponents also argue that the
restrictions are not "necessary" because any impact
on a child caused by video game violence will be
very small in comparison to other factors that may
contribute to aggression, including real-world
interactions and exposure to other types of media
violence. It is unclear whether the evidence upon
which this bill is based would support a finding
that the proposed statutory restriction is
necessary.

DOES THE EVIDENCE SUPPORT A LEGISLATIVE FINDING THAT
THE PROPOSED RESTRICTIONS ARE NECESSARY?

    ii.   Whether the proposed restrictions are
narrowly tailored

In support of a finding that the proposed
restrictions are narrowly tailored to achieve the
stated interest, the author notes that the
definition of "violent video game" (actually one of
two definitions, the first being the obscenity
definition discussed in Comment 2(a)) is limited to
violence that is "heinous, atrocious, and cruel,"
and is perpetrated against a game character that is
human or has "human-like characteristics."

Although these limitations would undeniably narrow
the statute's scope, it is not clear that the

AB 1179 (Yee)
Page 11

narrowing effect would effectuate the stated purpose
of the statute.  The statute is designed to address
studies which indicate that playing violent video
games may have undesirable physical and mental
effects on minors.  But it is not evident that these
studies identify "heinous, atrocious, and cruel"
violence as causing the significant negative effects   .
that the bill attempts to address.

The author contends that the "heinous, atrocious,
                                            and cruel"
limitation is offered in response to the
            Maleng  court's statement that the speech
restrictions imposed by that statute were overly
broad because the definition of "violent video
games" was "expansive and d[id] not attempt to
regulate the dissemination of video games on the
basis of the extremity of the violence portrayed."
[325 F.Supp.2d at 1190.]  However, the  Maleng  court
was evaluating its statute based on experts'
testimony asserting "that 'ultra-violent' video
games cause aggression and must be regulated in
order to further the state's compelling interests."
[  Id.  at 1189.]  Here, the studies used to justify
the state's compelling interests do not apparently
relate to "ultra-violent" video games or video games
that feature "heinous, atrocious, and cruel"
violence.  It is unclear what types of "violent"
video games were used in the studies referenced by
the author, and the author's comments sometimes
treat the violent video games discussed in the
studies as interchangeable with the M-rated games
which are currently subject to industry
self-regulation.

Because there does not appear to be a direct
correlation between the proposed limitations and the
negative effects discussed in the studies relied
upon by the author, it is unclear that the proposed
definition of "violent video game" is narrowly
tailored to address the state's compelling
interests, rather than simply tailored for the sake
of a more "narrow" statute.

WOULD SOME OTHER STANDARD MORE EFFECTIVELY IMPOSE
LIMITATIONS NARROWLY TAILORED TO ADDRESS THE

AB 1179 (Yee)
Page 12


COMPELLING INTERESTS AT STAKE?

3. Opponents contend industry self-regulation is a less
    restrictive alternative

Opponents argue that existing laws and regulations are
further evidence that the bill's proposed restrictions
are not "narrowly tailored" to address a compelling state
interest, since those measures are "less restrictive
alternatives" that may be used to address the same
compelling state interests.  Specifically, opponents note
that the Entertainment Software Rating Board (ESRB)
already assesses and rates video games based on their
content and age-appropriateness, and that members of the
industry have voluntarily submitted to the restrictions
of these ratings.  Opponents note that the ESRB's rating
system has been praised by the Federal Trade Commission
(FTC) as the most comprehensive rating system of the
three entertainment industries.

The ESRB rating system uses six age-based ratings and
about 30 content descriptors to provide information about
the content of the game.  The six age-based ratings are:
    EC or Early Childhood-suitable for ages 3 and older.
    Games contain no material that parents would find
    objectionable.

    E or Everyone-suitable for ages 6 and older.  Games
    may contain minimal cartoon, fantasy, or mild violence
    and/or infrequent use of mild language.

    E10+ or Everyone 10 and Older-suitable for ages 10 and
    older.  Games may contain more cartoon, fantasy or
    mild violence, mild language, and/or minimal
    suggestive themes.

    T or Teen-these games may be suitable for ages 13 and
    older.  Games may contain violence, suggestive themes,
    crude humor, minimal blood and/or infrequent use of
    strong language.

    M or Mature-suitable for ages 17 and older.  Games may
    contain mature sexual themes, more intense violence,
    and/or strong language.


12

AB 1179 (Yee)
Page 13

> AO or Adults Only-suitable for adults only.  Games may
> include graphic descriptions of sex and/or violence.
> These products are not intended for persons under the
> age of 18.

Each video game rated by the ESRB has the age-based
rating symbol printed on the front and back of the game
box, and the back of the box displays content descriptors
that may explain why the game received the rating it did.
 Examples of the content descriptors include "animated
blood," "comic mischief," "mild violence," "intense
violence," "strong language," "suggestive themes,"
"strong sexual content," "drug reference" and "use of
drugs."

The author acknowledges that the ESRB rating system is
currently in place, but argues that its implementation
has been unsatisfactory.

> Recent studies show that the voluntary rating and
> enforcement system implemented by self-regulatory
> associations or entertainment producers have had
> limited success on decreasing youth access to
> Mature (M) rated video games.  In a phone survey
> of clerks at forty-six stores in 12 states, only
> 76% of respondents say they understand the
> ratings they are supposed to enforce and only
> half of the stores reported training employees in
> the use of the ratings ?  In many of the stores
> that have reported they have training, further
> questioning revealed the "training" only included
> installing cash register prompts.  Eight[y]-nine
> percent (89%) of stores surveyed said they now
> have policies restricting the sale of M-rated
> games to those under seventeen ?  Despite this,
> clerks still sell these video games to under-aged
> youth.  During 2004, the National Institute on
> Media and the Family had children between the
> ages of seven and fourteen attempt to purchase
> M-rated games in thirty-five stores.   Youth
> succeeded 34% of the time.  While the overall
> purchase rate was 34%, boys as young as seven
> were able to buy M-rated games 50% of the time.
> A nationwide undercover survey of stores
> completed by the Federal Trade Commission in 2003

13

AB 1179 (Yee)
Page 14

corroborated these findings.  In this study, 69%
of unaccompanied 13 to 16-year-olds purchased
M-rated games and only 24% of cashiers asked the
youth's age.

Opponents respond that between 85% and 90% of retailers
have recently implemented programs to prevent the sale
and rental of M-rated games to minors.  They argue that
this new program will help to reduce improper sales of
M-rated games to minor, and note that recent studies
indicate sales of M-rated and AO-rated games to minors
were prevented 66% of the time this year, an improvement
from 45% the year before.

Opponents also argue that limitations on who can sell or
rent video games is not the only way to successfully
limit minors' access to M-rated games, since information
on the ESRB rating system is readily available to
parents.  In addition to the information included on the
box of each video game, last year's AB 1793 (Yee) created
a statutory requirement for video game retailers to
prominently post signs advising consumers about the
rating system, and to provide information explaining the
rating system upon request.  Opponents argue that making
this information available to parents will play a large
role in protecting minors from exposure to violent video
games, citing FTC statistics which indicate that parents
are involved in 8 out of 10 video game purchases or
rentals.

4. Whether the terms of the bill are unconstitutionally
vague

Opponents argue that the terms of the bill fall short of
the level of clarity required by the First Amendment.
Under _Grayned v. City of Rockford_, a legislative
enactment must "give the person of ordinary intelligence
a reasonable opportunity to know what is prohibited, so
that he may act accordingly."  [408 U.S. 104, 108.]

Opponents challenge the bill's application to "characters
with substantially human characteristics," arguing that
this term could apply to aliens, talking beasts, robots,
cartoon-type characters, and a broad range of other video
game characters.  Opponents also challenge the language

14

AB 1179 (Yee)
Page 15

used to define "heinous, atrocious, and cruel" violence.
Those definitions require findings, for example, that
virtual victims were "conscious" of specified abuse or
that players had a specified intent or state of mind with
respect to a virtual killing.  Opponents argue that it is
unclear how a virtual character could be found to be
"conscious of abuse" or how it could be found that a
video game player "intends to virtually inflict a high
degree of pain" or "relishes the virtual killing or shows
indifference to the suffering of the [virtual] victim."
Determinations of consciousness and intent are clearly
appropriate in assessing the severity of violent acts
committed by (and against) real people.  But those terms
are more unwieldy and difficult to apply in the context
of virtual characters or players whose ultimate "intent"
is simply to progress through the levels of a computer
game.

The Assembly Judiciary Committee analysis noted that the
terms discussed above, which define "heinous, atrocious,
and cruel" conduct, survived a vagueness challenge in a
death penalty case.  [Citing  United States v. Jones  (5th
Cir. 1998) 132 F.3d 232.]  That holding may not resolve
the vagueness issues discussed above, however, because
those questions relate specifically to problems that stem
from the difficulty of applying those standards to
virtual characters in a video game setting.

In discussing vagueness issues for another violent video
game statute, the  Maleng  court stated:

    The problem is not, as defendants suggest, that a
    retail clerk might be unaware of the contents of
    a particular game ?  The real problem is that the
    clerk might know everything there is to know
    about the game and yet not be able to determine
    whether it can be legally sold to a minor.  The
    effects of such vagueness are particularly
    troublesome where First Amendment rights are
    implicated.  Not only is a conscientious retail
    clerk (and her employer) likely to withhold from
    minors all games that could possibly fall within
    the broad scope of the Act, but authors and game
    designers will likely 'steer far wider of the
    unlawful zone ? than if the boundaries of the

15

AB 1179 (Yee)
Page 16


        forbidden area were clearly marked.'

    [325 F.Supp.2d at 1191.]

    These vagueness concerns may be further intensified by
    the potentially broad scope of responsibility for
    determining what video games are "violent" under the
    bill.  AB 1179 would require every violent video game
    that is imported into the state for retail sale to be
    appropriately labeled, and would impose liability up to
    $1,000 for violations of this requirement.  The author
    indicates that the requirement is intended to put the
    responsibility on manufacturers to determine what video
    games are violent.  But it is possible that there would
    also be situations where large retailers want to import
    games from an out-of-state store to an in-state store for
    retail purposes.  In such cases, it is unclear whether
    the responsibility for labeling would fall on the
    manufacturer (who may not have intended the game for sale
    in California) or the retailer.  A wide variety of
    entities might therefore be responsible for making the
    difficult assessment of what video games are restricted
    under the statute.

    As discussed below in Comment 5, opponents indicate that
    the labeling required under this bill would not be
    implemented on a national scale.  Indeed, nation-wide
    labeling based on the AB 1179 standard would not be
    permitted to the extent that legislation in other states
    required labeling in accordance with different "violent
    video game" definitions.

    ARE THE DEFINITIONS IN THE BILL TOO VAGUE TO PROVIDE A
    REASONABLE OPPORTUNITY FOR MANUFACTURERS AND RETAILERS TO
    DETERMINE WHAT GAMES ARE RESTRICTED?

    5.Opponents say the bill would be unreasonably burdensome
      to implement

        The California Retailers Association (CRA) contends that
    this bill's requirement of additional labeling would
    place extreme and unreasonable burdens on retailers.  CRA
    asserts that implementation problems would arise because
    this labeling would have to be California-specific, while
    the voluntary ESRB labeling system would continue to be

AB 1179 (Yee)
Page 17

applied nationwide.  Although the author argues that AB
1179's definitions may ultimately be integrated with the
ESRB rating criteria, it is unclear that any kind of
integration would be possible when Illinois has enacted
violent video game restrictions that rely on a different
definition.  In order to do state-specific labeling, the
CRA maintains that retailers would be required to change
their software programs to account for different labels
on identical games to be sent to different destinations,
and that new UPC (Universal Product Codes) would have to
be assigned to violent video games that would be sent to
California.

6.Opponents note that government regulation has not proven
   necessary for other entertainment industries

Opponents point out that other entertainment industries,
such as the motion picture, recording, and publishing
industries, are not subject to the sort of statutory
restrictions this bill would impose on the video game
industry.  Notably, the motion picture industry has been
voluntarily self-regulated for approximately 40 years.
Given the apparent success of other self-regulating
industries, opponents to the bill argue that current
self-regulating mechanisms for video games should be
given an opportunity for similar success.

Some opponents note an additional concern that the
regulations proposed in the bill would set a precedent
for imposing regulations on violent speech in other
entertainment industries.  Indeed, some supporters of the
bill readily agree that the bill's proposed regulations
on violent video games should be expanded to movies,
songs, and books which contain violent images or
descriptions that could be harmful to children.  Given
the broad scope of free speech interests associated with
music, movies, books, and video games, opponents argue
this bill could be the start of a journey down the
slippery slope toward endangering important First
Amendment rights.

7.Opponents argue the bill could chill video gaming
   development

Opponents maintain that the proposed regulation would

17

AB 1179 (Yee)
Page 18

subject video game developers to a chilling effect,
asserting that:

> Game creation is a massively complex mix of science
> and art. From software engineers to script writers to
> animators to music composers, there is a great need
> for talented, creative and educated individuals that
> must work in unison to see a game become a reality.
> In step with the growing need for talent, universities
> and colleges-over 50 just in the state of
> California-are implementing game development courses
> and degree programs.

Opponents are concerned that the regulations proposed by
this bill would "stagnate this important cultural medium
and its future evolution."

8. Whether 17 or 18 is the appropriate age of minority

The restrictions proposed in AB 1179 would be applied to
minors under 18 years old, but the previous bill, AB 450,
would have applied to minors under 17 years old.
Opponents argue that the age of majority should be
returned to 17 years old, since restrictions currently
placed on movies and music both define 17 as the age of
majority. Opponents also note that the industry's
self-imposed regulation of video games restricts M-rated
games to people 17 years old and older.

The author's staff indicates that the author selected 18
as the age of majority in this bill mainly for ease of
implementation purposes. The author's staff notes that a
recently enacted Illinois statute would restrict access
to violent video games by minors under 18 years old, and
suggests that manufacturers may have an easier time
implementing various state statutes on a nationwide level
if they can use the same "18" label. In practice,
however, interchangeable labels would only be of limited
use because the definition of violent video games in
Illinois is significantly different from the definition
proposed in this bill.

IF APPROVED, SHOULD THE RESTRICTION ON ACCESS FOR MINORS
BE SET AT 17 OR 18 YEARS OLD?

AB 1179 (Yee)                    .
Page 19


9.Additional implementation issues

The author's staff acknowledges that certain logistical
concerns may remain to be resolved.  Specifically, his
staff acknowledges that it may be appropriate to delay
the effective date of the bill to allow for an evaluation
of what games should be restricted under the bill, and to
allow for the labeling of such games.  His staff also
acknowledges that it may be appropriate to "grandfather
in" the video game stock that is already held in
California retail outlets.  The grandfather clause
contemplated by the author may not address all situations
where grandfathering may be appropriate.  In particular,
it would not apparently protect secondary markets such as
Goodwill shops that resell preexisting stock from other
retail outlets, or that sell used games.

SHOULD PROVISIONS BE MADE TO DELAY THE EFFECTIVE DATE OF
THE BILL, AND TO GRANDFATHER IN EXISTING STOCK AND USED
GAMES THAT MIGHT BE RESOLD?

10.Committee options

Because this bill is a gut-and-amend bill that is being
heard under Senate Rule 29.10, it may not be amended in
committee.  It may be passed out of committee without
amendment, it may be sent to the Floor without
recommendation, or it may be held as a two-year bill.

Support:  Alliance for Children of San Mateo and Santa
          Clara Counties; California Alliance Against Domestic
          Violence; California Commission on the Status of
          Women; California State PTA; California Psychiatric
          Association; California Psychological Association;
          California State Conference of the National
          Association for the Advancement of Colored People;
          Capitol Resource Institute; City of Norwalk
          Department of Public Safety; Cruz Bustamante;
          dramaworks; Feather River College; Girl Scouts,
          Junior Leagues of California State Public Affairs
          Committee; Maidu Cultural and Development Group;
          Muir Trail Council; NAACP Legal Defense and
          Educational Fund, Inc.; Northern California Society
          of Public Health Education; Q Entertainment; Parents
          Television Council; Santa Clara County After School

AB 1179 (Yee)
Page 20

>    Collaborative; Plumas County Child Care and
>    Development Planning Council; Plumas Rural Services,
>    Inc. Domestic Violence Services; Portola CARES
>    Resource Center; Sierra Valley Even Start Family
>    Literacy Program; Stanislaus County Children's
>    Council; Support Network for Battered Women; Sutter
>    Lakeside Community Services; The Child-Responsible
>    Media Campaign; Women's Mountain Passages; 66
>    individuals

Opposition:  Activision; American Civil Liberties Union;
>    American Electronics Association; California
>    Broadcasters Association; California Chamber of
>    Commerce; California Retailers Association;
>    Electronic Arts; Entertainment Software
>    Association; Independent Film & Television
>    Alliance; Interactive Entertainment Merchants
>    Association; International Game Developers
>    Association; Motion Picture Association of
>    America, Inc.; National Association of Theatre
>    Owners of California/Nevada; Recording Industry
>    Association of America; The Media Coalition,
>    Inc.; TechNet; Video Software Dealers
>    Association; Wal-Mart; Eight Individuals

## HISTORY

Source:  California District of the American Academy of
>    Pediatrics; Common Sense Media; Girl Scout Councils
>    of California [co-sponsors]

Related Pending Legislation:  AB 450 (Yee), which contains
>    roughly the same terms as this bill
>    but limits sales and rentals to
>    people younger than 17, is on the
>    Assembly Floor.

Prior Legislation:  AB 1792 (Yee, 2004), which failed in
>    the Assembly Committee on Arts,
>    Entertainment, Sports, Tourism, and Internet
>    Media, would have prohibited the sale,
>    rental, or exhibition of violent video games
>    to minors under 18 years old, defining
>    "violent video games" as games that (1)
>    appeal to a minor's morbid interest in

20

AB 1179 (Yee)
Page 21

        violence, (2) allow infliction of serious
injuries on human-like characters in a way
that is especially heinous, atrocious, or
cruel, and (3) lack serious literary,
artistic, political, or scientific value for
minors.

        AB 1793 (Yee), Chapter 630, Statutes of 2004,
requires video game retailers to post signs
in prominent areas of the retail
establishment to notify customers that a
rating system is available to aid in the
selection of video games, and to make
information explaining the rating system
available on request.

Prior Vote:  Not relevant.  Bill was gutted and amended.

**************

**EXHIBIT 3**

```
                                                              1

 1                  IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3
       ENTERTAINMENT SOFTWARE          )
 4     ASSOCIATION, et al.,            )
                                       )
 5                    Plaintiffs,      )   No. 05 C 4265
                                       )
 6          v.                         )   Chicago, Illinois
                                       )   November 14, 2005
 7     ROD BLAGOJEVICH, et al.,        )   10:00 a.m.
                                       )
 8                    Defendants.      )

 9

10                     TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE MATTHEW F. KENNELLY
11
       APPEARANCES:
12
       For the Plaintiffs:   JENNER & BLOCK, LLC
13                           One IBM Plaza
                             330 North Wabash Avenue
14                           40th Floor
                             Chicago, IL   60611, by
15                           MS. KATHERINE A. FALLOW
                             MS. KATHLEEN R. HARTNETT
16                           MR. DAVID P. SANDERS

17                           JENNER & BLOCK, LLP
                             601 13th Street
18                           1200 South
                             Washington, D.C.   20005, by
19                           MR. PAUL M. SMITH

20
       For the Defendants:   FLETCHER, TOPOL, O'BRIEN & KASPER, P.C.
21                           222 North LaSalle Street
                             Suite 300
22                           Chicago, IL   60601, by
                             MR. MICHAEL J. KASPER
23

24

25
```

2

```
 1                    HOGAN MARREN, LTD.
                      180 North Wacker Drive
 2                    Suite 600
                      Chicago, IL   60606, by
 3                    MR. PATRICK E. DEADY
                      MS. LAURA C. LIU
 4
                      OFFICE OF THE ILLINOIS ATTORNEY GENERAL
 5                    100 West Randolph Street
                      13th Floor
 6                    Chicago, IL   60601, by
                      MR. ANDREW L. DRYJANSKI
 7                    MS. ELLECIA L. PARSELL-BURKE

 8                    COOK COUNTY STATE'S ATTORNEY
                      500 Richard J. Daley Center
 9                    Chicago, IL   60602, by
                      MR. STEPHEN L. GARCIA
10

11
     COURT REPORTER:  LAURA M. BRENNAN
12                    219 South Dearborn Street, Room 2102
                      Chicago, IL   60604
13                    (312) 427-4393

14

15

16

17

18

19

20

21

22

23

24

25
```

* * * * *

220

1  very quickly without much awareness or thought. Some take more

2  time and thought. The idea, though, is that as a result of

3  these processes, at some point some kind of thoughtful action

4  emerges or some kind of impulsive action emerges, which in turn

5  then, of course, influences in some sense the outcome of this

6  social encounter. But, of course, that's not the end of the

7  story because what happens -- I mean, if a child interprets

8  this bump as intentional and then responds aggressively in some

9  way, then that becomes a provocation that enters into sort of

10 the next part of this continuing interaction cycle.

11      So, the way that aggression or nonaggression sort of

12 occurs here is dependent on, again, person variables, as well

13 as what's going on in the immediate situation. And in a sense

14 we can think of each time one of these events occurs, it is in

15 some sense a learning trial where one can learn what are the

16 consequences of certain kinds of actions, attitudes, beliefs,

17 things like that.

18 BY MR. KASPER:

19 Q   And will you describe the concept of priming as it relates

20 to that?

21 A   Yes. Priming in this context refers to the case where

22 certain kinds of situational cues can increase the likelihood

23 or increase the accessibility of certain kinds of thoughts or

24 certain kinds of knowledge structures.

25      Not in a video context, but in a somewhat different

3

221

1  aggression context, there's research showing that simply seeing

2  a photo of a gun -- a handgun, a rifle, whatever -- primes

3  aggressive thoughts, that is, it increases the accessibility of

4  aggressive thoughts, and that priming itself can lead to an

5  increase in the likelihood that aggressive behavior will occur

6  sometime fairly shortly after the prime took place.

7  Q   Okay.  And how many of these episodes that you're talking

8  about does a person have every day?

9  A   Well, a lot of these kind of interactions take place very,

10  very quickly.  And so, it could easily be thousands, certainly

11  hundreds, sort of depending on how big a scale you want to

12  draw.

13  Q   And how does repeated exposure to media and video game

14  violence affect long term propensity for aggression?  I think

15  that requires us to move over here.

16          THE COURT:  Let me ask you this.  If using this other

17  chart is going to take more than a few minutes, I'd rather hold

18  it until tomorrow morning.

19          MR. KASPER:  This is probably a good place to stop.

20          THE COURT:  Let's hold it until tomorrow.

21          MR. KASPER:  Okay.

22          THE COURT:  Okay.  We'll be able to start at 9:45.

23  So, I'll see you then.

24          MR. SMITH:  Thank you, your Honor.

25          THE COURT:  This is Mr. Dryjanski.  She wasn't there

222

4