BILL LOCKYER
Attorney General of the State of California
LOUIS R. MAURO
Senior Assistant Attorney General
CHRISTOPHER E. KRUEGER
Supervising Deputy Attorney General
SUSAN K. LEACH
Deputy Attorney General
ZACKERY P. MORAZZINI, State Bar No. 204237
Deputy Attorney General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone:  (916) 445-8226
  Fax:  (916) 324-5567
  Email:  Zackery.Morazzini@doj.ca.gov

Attorneys for Defendants Governor Arnold
Schwarzenegger and Attorney General Bill Lockyer

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| VIDEO SOFTWARE DEALERS ASSOCIATION and ENTERTAINMENT SOFTWARE ASSOCIATION, <br><br> Plaintiffs, <br><br> v. <br><br> ARNOLD SCHWARZENEGGER, in his official capacity as Governor of the State of California; BILL LOCKYER, in his official capacity as Attorney General of the State of California; GEORGE KENNEDY, in his official capacity as Santa Clara County District Attorney, RICHARD DOYLE, in his official capacity as City Attorney for the City of San Jose, and ANN MILLER RAVEL, in her official capacity as County Counsel for the County of Santa Clara, <br><br> Defendants. | C 05-4188 RMW RS <br><br> **GOVERNOR AND ATTORNEY GENERAL'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Hearing:  May 12, 2006 <br> Time:  9:00 a.m. <br> Courtroom:  6 <br> Judge:  The Honorable Ronald M. <br>           Whyte |

Governor & Attorney General's MSJ     *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
                                       C 05 4188 RMW RS

Dockets.Justia.com

1     TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2     PLEASE TAKE NOTICE that on May 12, 2006, at 9:00 a.m., in courtroom 6 of the above-

3 referenced Court located at 280 South 1st Street, San Jose, California, defendants Governor

4 Arnold Schwarzenegger and Attorney General Bill Lockyer will and hereby do move this Court

5 for entry of summary judgment on each and every cause of action set forth in plaintiffs'

6 complaint in this action pursuant to Rule 56(b) of the Federal Rules of Civil Procedure and L.R.

7 56-1.  The motion will be based upon this Notice of Motion and Motion, the Memorandum of

8 Points and Authorities filed in support thereof, all supporting papers and pleadings filed and on

9 file herein, and the oral arguments which the Court may hear in this matter.

10     Summary Judgment on all causes of action in the defendants favor is appropriate because

11 there are no genuine issues of material facts in dispute and, as a matter of law, each and every

12 aspect of the act at issue survives judicial scrutiny.

13           **INTRODUCTION**

14     This motion is likely to turn on whether the Court determines that the evidence the

15 Legislature considered in passing Assembly Bill 1179, California Civil Code section 1746 -

16 1746.5 ("the Act") is substantial.  Through this motion, Governor Arnold Schwarzenegger and

17 Attorney General Bill Lockyer ("the State") will demonstrate that they are entitled to summary

18 judgment because the evidence in the legislative record is more than enough to show that the

19 Legislature drew reasonable inferences based upon substantial evidence in passing the Act.  Not

20 only does the evidence provide sufficient grounds for the Legislature to reasonably infer that

21 playing the violent video games covered by the Act can cause harm to children, it is the best

22 possible evidence the Legislature can obtain without performing unwarranted, unethical, and

23 possibly illegal experiments on children.  The substantial evidence standard does not require the

24 State to force children to play video games that are so violent they are patently offensive to

25 prevailing standards in the community and a reasonable person would find they appeal to a

26 deviant or morbid interest of children in order to determine that such games are harmful.

27     Responsible social science uses field experiments, cross-sectional correlation studies,

28 longitudinal studies, and meta-analyses combining the results of other studies to form

Governor & Attorney General's MSJ    *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
C 05 4188 RMW RS

1

conclusions regarding causation.  These methodologies are standard operating procedure in social sciences such as child psychology and child psychiatry.  And in reviewing the results of leading professionals applying these methodologies – the same results reviewed by the Legislature – leading medical associations such as the American Academy of Pediatrics, the American Psychological Association, the California Psychiatric Association, and the California Psychological Association and have come to a clear consensus - violent video games cause harm to children.

The Act does not shield children from the games, but simply ensures that parents and not store clerks make the important decision as to whether a child should be allowed to play this exceedingly narrow category of video games.  The State should be applauded in this just effort.

### STATEMENT OF FACTS AND ISSUES TO BE DECIDED

The State asks this Court to decide whether, as a matter of law, the Act is constitutional based upon the evidence considered by the Legislature and contained in the legislative record. Specifically, the State asks this Court to decide, as a matter of law: (1) whether the Legislature's determination that helping parents combat children's automatic aggressiveness, increased aggressive thoughts and behavior, antisocial behavior, desensitization to violence, and poor school performance due to playing video games covered by the Act represents a compelling state interest; (2) whether the Legislature's determination was based upon substantial evidence; (3) whether the Act is narrowly tailored; (4) whether the Act is unconstitutionally vague; and (5) whether the Act's labeling requirements are constitutional.  The State requests that this Court grant summary judgment in its favor on Plaintiffs' causes of action for declaratory and injunctive relief, and lift the preliminary injunction entered on December 21, 2005, because the Act is constitutional and therefore survives Plaintiffs' challenges brought under the First and Fourteenth Amendments and the Equal Protection Clause.

The relevant facts are as follows.  Assembly Member Leland Yee, Ph.D, introduced

Governor & Attorney General's MSJ          *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
C 05 4188 RMW RS

2

1  Assembly Bill 450 on February 15, 2005.[1/]   Later during the same legislative session, Assembly

2  Bill 1179 was gutted and amended, and replaced with the language of Assembly Bill 450.[2/]   AB

3  1179 was passed by the Assembly on September 8, 2005, with a vote of 66 ayes, 7 noes, and was

4  passed by the Senate that same day with a vote of 22 ayes, 9 noes.  RJN, Ex. 5, p. 1; Ex. 3, p.1.

5  The Governor signed the bill into law on October 7, 2005.  RJN, Ex. 6, p.1.  The Act was set to

6  take effect on January 1, 2006 (Cal. Const., Art. IV, § 8(c)(2)), but on December 21, 2005, after

7  motion by Plaintiffs, briefing and oral argument, this Court issued a preliminary injunction,

8  enjoining defendants from enforcing the Act until further order of this Court.

9       Before passing the Act, the Legislature reviewed considerable evidence regarding the

10  negative effects violent video games have on children.  RJN, Appendices A-E.  The Legislature

11  also considered the positions taken on the issue by leading medical associations, each supporting

12  the conclusion that violent video games are harmful to children.  Appendix A, pp. A081-085.

13  The Legislative record contains dozens of studies and reports regard the negative effects violent

14  video games have on children.

15                          **STANDARD OF REVIEW**

16       Summary judgment is appropriate if the record, read in the light most favorable to the

17  non-moving party, demonstrates no genuine issue of material fact and that the moving party is

18  entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

19  Material facts are those necessary to the proof or defense of a claim, and are determined by

20  reference to the substantive law.  See *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

21       At the summary judgment stage the question before the court is whether there are genuine

22  issues for trial, or whether the matter can be decided as a matter of law.  *Ibid.*  Upon a showing

23  that there is no genuine issue of material fact as to a particular claim, the court may grant

24

---

25       1. See State's Request For Judicial Notice in Support of Motion for Summary Judgment
26  ("RJN"), Ex. 7, filed concurrently herewith and incorporated herein by this reference.

27       2. RJN, Ex. 1, p. 2, ("On September 2, 2005, the last day for amending bills without a rule
    waiver, the author gutted and amended AB 1179 (Yee) to insert the language largely identical to the
28  text of AB 450.").

Governor & Attorney General's MSJ     *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
C 05 4188 RMW RS

3

1   summary judgment in the party's favor "upon all or any part thereof."  *Wang Laboratories, Inc.*

2   *v. Mitsubishi Electronics, America, Inc.*, 860 F. Supp. 1448, 1450 (C.D.Cal. 1993); *Robi v. Five*

3   *Platters, Inc.*, 918 F.2d 1439, 1441 (9th Cir. 1990).

4                                    **ARGUMENT**

5                                        **I.**

6   **BECAUSE PLAINTIFFS' FIRST AMENDMENT CHALLENGE TO THE ACT**
    **FAILS AS A MATTER OF LAW, SUMMARY JUDGMENT SHOULD BE**
7   **ENTERED IN FAVOR OF THE STATE.**

8        The Act survives strict scrutiny because the State has a compelling interest in preventing

9   harm to minors, and the Act is narrowly tailored to serve this interest.  *Sable Communications of*

10  *Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989).[3/]

11  **A.   The State Has A Compelling Interest In Helping Parents Protect Children From**
         **Automatic Aggressiveness, Increased Aggressive Thoughts And Behavior, Antisocial**
12       **Behavior, Desensitization To Violence, And Poor School Performance.**

13       The United States Supreme Court has firmly established that safeguarding the physical

14  and psychological well-being of children is a compelling state interest.  *Sable Communications*

15  *of California, Inc. v. F.C.C.*, 492 U.S. at 126 ("This interest extends to shielding minors from the

16  influence of literature that is not obscene by adult standards.").  "A democratic society rests, for

17  its continuance, upon the healthy, well-rounded growth of young people into full maturity as

18  citizens."  *Prince v. Massachusetts*, 321 U.S. 158, 168 (1944).  The State's interest is not limited

19  to helping parents protect the developing minds of children from exposure to obscene material,

20  but includes simple nudity (*Ginsberg v. New York*, 390 U.S. 629, 645-47 (1968)) and even

21  "filthy words."  *F.C.C. v. Pacifica Foundation*, 438 U.S. 726, 741-44 (1978).  The Supreme

22  Court recognizes that parents, not society, are entitled to choose the appropriate material for their

23  individual children to view or hear.  *Ibid*.  And parents are entitled to the assistance of state laws

24  in this battle.

25       These established principles are grounded in the recognition that "during the formative

26

27       3.  The State does not concede that strict scrutiny applies to the Act, but will not re-litigate
    here the issue that this Court decided in its ruling on Plaintiffs' motion for preliminary injunction,
28  which the State preserves for potential appellate proceedings.

Governor & Attorney General's MSJ     *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
                                                      C 05 4188 RMW RS

                                          4

1    years of childhood and adolescence, minors often lack the experience, perspective, and judgment

2    to recognize and avoid choices that could be detrimental to them." *Bellotti v. Baird*, 443 U.S.

3    622, 635 (1979). To assist parents in this regard, the Supreme Court has affirmed that

4    "constitutional interpretation has consistently recognized that the parents' claim to authority in

5    their own household to direct the rearing of their children is basic in the structure of our society .

6    . . . [P]arents and others, teachers for example, who have this primary responsibility for

7    children's well-being are entitled to the support of laws designed to aid discharge of that

8    responsibility." *Ginsberg*, *supra*, 390 U.S. at 639. Existing precedent recognizes that parents,

9    not society, bear the primary obligation of determining what is, and what is not, appropriate

10    material to for their children.

11        The State has a compelling interest in assisting parents in their fight to limit children's

12    exposure to material that can cause automatic aggressiveness, increased aggressive thoughts and

13    behavior, antisocial behavior, desensitization to violence, and poor school performance.

14    Preventing these specific harms to children is of the utmost importance. The developing minds

15    of children are extremely vulnerable to negative external influences such as violent video games.

16    The Supreme Court recently explained the social science behind this important fact.

17        First, as any parent knows and as the scientific and sociological studies respondent
    and his amici cite tend to confirm, "[a] lack of maturity and an underdeveloped sense

18        of responsibility are found in youth more often than in adults and are more
    understandable among the young. These qualities often result in impetuous and

19        ill-considered actions and decisions." *Johnson*, *supra*, at 367, 113 S.Ct. 2658; see
    also *Eddings*, *supra*, at 115-116, 102 S.Ct. 869 ("Even the normal 16-year-old

20        customarily lacks the maturity of an adult"). It has been noted that "adolescents are
    overrepresented statistically in virtually every category of reckless behavior." Arnett,

21        *Reckless Behavior in Adolescence*: A Developmental Perspective, 12 Developmental
    Review 339 (1992). [¶]

22
        The second area of difference is that juveniles are more vulnerable or susceptible to

23        negative influences and outside pressures, including peer pressure . . . . This is
    explained in part by the prevailing circumstance that juveniles have less control, or

24        less experience with control, over their own environment. See Steinberg & Scott,
    *Less Guilty by Reason of Adolescence*: Developmental Immaturity, Diminished

25        Responsibility, and the Juvenile Death Penalty, 58 Am. Psychologist 1009, 1014
    (2003). [¶]

26
        The third broad difference is that the character of a juvenile is not as well formed as

27        that of an adult. The personality traits of juveniles are more transitory, less fixed.
    See generally E. Erikson, *Identity*: Youth and Crisis (1968).

28

Governor & Attorney General's MSJ        *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
C 05 4188 RMW RS

5

1  *Roper v. Simmons*, 543 U.S. 551, 569 (2005). The Supreme Court based its findings on social

2  science, recognizing that the susceptibility of minors to mental harm from external influences,

3  well beyond that of adults, justifies different treatment in the eyes of the law.

4      And a state's compelling interest is not limited to helping parents prevent their children

5  from unwanted exposure to obscene material.  In *FCC v. Pacifica Foundation*, *supra*, 438 U.S.

6  726, the Supreme Court upheld a formal declaratory order by the F.C.C. holding that a radio

7  station "'could have been the subject of administrative sanctions'" for its broadcasting of George

8  Carlin's "Filthy Words" monologue.  *Id*., at p. 730.  The F.C.C. had determined that the language

9  used in the monologue, though not obscene, was "indecent" pursuant to a federal statute.  *Id*., at

10  p. 729.  The Court expressly rejected the argument that a broadcast must be obscene in order to

11  be restricted under any circumstances, finding that the broadcast could be restricted because

12  "[t]hese words offend for the same reasons that obscenity offends," as the F.C.C. found that the

13  words used "debase and brutalize humans." *Id*., at p. 746 & n. 23.  Emphasizing that material

14  need not be obscene in order to be regulated as to children, the Court opined, "We simply hold

15  that when the Commission finds that a pig has entered the parlor, the exercise of its regulatory

16  power does not depend on proof that the pig is obscene."  *Id*., at pp. 750-51.

17      Notably, in his concurring opinion, Justice Powell observed that the "Court has recognized

18  society's right to 'adopt more stringent controls on communicative materials available to youths

19  than on those available to adults.'"  *Id*., at p. 757 (J. Powell, concurring) (internal citation

20  omitted).  Justice Powell explained:

> 21  This recognition stems in large part from the fact that 'a child . . . is not possessed
> of that full capacity for individual choice which is the presupposition of First
> 22  Amendment guarantees.' . . . .  Thus, children may not be able to protect themselves
> from speech which, although shocking to most adults, generally may be avoided by
> 23  the unwilling through the exercise of choice.  At the same time, such speech may
> have a deeper and more lasting negative effect on a child than on an adult.  For these
> 24  reasons, *society may prevent the general dissemination of such speech to children,*
> *leaving to parents the decision as to what speech of this kind their children shall*
> 25  *hear and repeat . . . .*"

26  *Id*., at pp. 757-58 (internal citations omitted; emphasis added).

27      Given the extreme vulnerability of children to negative external influences, as a matter of

28  law, the State has a compelling interest in helping parents limit children's exposure to material

Governor & Attorney General's MSJ        *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*

1    that can cause automatic aggressiveness, increased aggressive thoughts and behavior, antisocial

2    behavior, desensitization to violence, and poor school performance.

3    **B.    The Act Is Supported By Substantial Evidence And, In Fact, The Best Possible**
        **Evidence The State Can Obtain Without Performing Unwarranted, Unethical, And**
        **Possibly Illegal Experiments On Children.**

4

5        **1.    The Evidence Considered By The Legislature Is Substantial And Reflects The**
              **Prevailing View Of The Healthcare Community.**

6

7        The Legislative record is flush with peer-reviewed articles, studies, reports, and

8    correspondence from leading social scientists and medical associations analyzing the impact of

9    media violence, and specifically violent video games, on minors and young adults.  Articles by

10   Dr. Craig A. Anderson, Ph.D.[4], along with many other respected psychologists, psychiatrists and

11   scholars, explain the methodologies used and results obtained in researching the impact of video

12   game violence on children.  The legislative record contains no less than twenty-three published

13   articles authored by Dr. Anderson and other social scientists explaining the negative impacts

14   playing violent video games has on minors.[5]

15       For example, in 2004 (nearly  four years after Judge Posner's opinion in *American*

16   *Amusement Machine Ass'n v. Kendrick*, 244 F.3d 572 (2001)), Dr. Anderson reported that an

17   "updated meta-analysis reveals that exposure to violent video games is significantly linked to

18   increases in aggressive behaviour, aggressive cognition, aggressive affect, and cardiovascular

19   arousal, and to decreases in helping behaviour."[6]  Dr. Anderson explained that "[e]xperimental

20   studies reveal this linkage to be causal.  Correlational studies reveal a linkage to serious,

21   real-world types of aggression.  Methodologically weaker studies yielded smaller effect sizes

22   than methodologically stronger studies, suggesting that previous meta-analytic studies of violent

23

24       4.   Dr. Anderson is a Distinguished Professor and Chair of the Iowa State University
     Department of Psychology.  See http://www.psychology.iastate.edu/faculty/caa/.  He has been
25   publishing articles on the effects of violent video games on minors since 2000.

26       5. RJN, Appendix A, p. A014, "Violent Video Game Bibliography."  Appendices A - E are
     presently on file with the Court through manual lodging and were previously served on all parties.
27

28       6.  Appendix C, p. C091, Anderson, *An Update on the Effects of Playing Violent Video*
     *Games*, Journal of Adolescence, 24 (2004) 113-122.

Governor & Attorney General's MSJ        *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
                                          C 05 4188 RMW RS

7

video games underestimate the true magnitude of observed deleterious effects on behaviour, cognition, and affect."  Appendix C, p. C091.

The Legislature was presented with strong evidence demonstrating the causal relationship between violent video games and the harm caused to minors.  One such article, a comprehensive meta-study, or statistical practice of combining the results of a number of studies that address a set of related research hypotheses, concluded that "[t]hough the number of studies investigating the impact of violent video games is small relative to the number of television and film studies, there are sufficient studies with sufficient consistency (as shown by the meta-analysis results) to draw some conclusions . . . . The experimental studies demonstrate that in the short term, violent video games cause increases in aggressive thoughts, affect, and behaviour; increases in physiological arousal; and decreases in helpful behaviour."[7/]

In another study where 607 eighth and ninth grade students from four schools were analyzed, research demonstrated that "[a]dolescents who expose themselves to greater amounts of video game violence were more hostile, reported getting into arguments with teachers more frequently, were more likely to be involved in physical fights, and performed more poorly in school."[8/]

The legislative record contains further research showing that playing violent video games increases "automatic aggressiveness," even in adults.  In a study conducted using 121 college students, the results showed "[w]hile most video game enthusiasts insist that the games they play have no effect on them, their exposure to scenes of virtual violence may influence them automatically and unintentionally."[9/]  The study concluded that "[d]espite the misleading debate

---

7.  Appendix A, p. A100, Anderson, et al., *The Influence of Media Violence on Youth*, Psychological Science in the Public Interest, Vol. 4, No. 3, pp. 91-93 (December 2003).

8.  Appendix B, p. B028, provided in full in Appendix D, p. D001, Gentile, et al., *The Effects of Violent Video Game Habits on Adolescent Hostility, Aggressive Behaviors, and School Performance*, Journal of Adolescence 27 (2004) 5-22, p. 5.

9.  Appendix B, p. B064, provided in full at Appendix D, p. D019, Uhlmann & Swanson, *Exposure to Violent Video Games Increases Automatic Aggressiveness*, Journal of Adolescence, 27 (2004) 41-52, p. 48.

Governor & Attorney General's MSJ    *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
C 05 4188 RMW RS

8

in the news media over whether exposure to violent television, movies and video games leads to an increase in aggressive behavior, the empirical evidence that it does so has become overwhelming." Appendix D, pp. D027-28.

The legislative record also contains research demonstrating that violent video games can lead to desensitization to violence in minors.[10] Desensitization is "the attenuation or elimination of cognitive, emotional, and ultimately, behavioral responses to a stimulus [violence]." Appendix E, p. E03. The article reported specific findings that, as between violent video games, movies, televisions, and Internet content, "[r]egression analyses indicated that only exposure to video game violence was associated with (lower) empathy." Appendix E, p. E001 (internal citations omitted). Empathy is "the capacity to perceive and to experience the state of another [and] is critical to the process of moral evaluation." Appendix E, p. E004. Evidence in the legislative record plainly demonstrates a "[r]elationship[] between lower empathy and social maladjustment and aggression in youth . . . ." *Ibid*.

Other research in the legislative record demonstrates the impact violent video games have on brain activity. One such study, conducted over a two-year period and reported by the Indiana University School of Medicine, concluded that "[t]here appears to be a difference in the way the brain responds depending upon the amount of past violent media exposure through video games, movies and television."[11] For minors previously diagnosed with disruptive behavior disorders (DBD), the research demonstrated "less brain activity in the frontal lobe while the youths with DBD watch violent video games." The frontal lobe "is the area of the brain responsible for decision-making and behavior control, as well as attention and a variety of other cognitive functions." Brain function was also altered in non-DBD youth. Appendix A, p. A127.

///

---

10. Request for Judicial Notice, Ex. 2, Senate Rules Committee analysis of AB 1179, pp. 4-5; "Violent Video Game Bibliography," Appendix A, A014; Appendix E, p. E001, Funk, et al., *Violence Exposure in Real-Life, Video Games, Television, Movies, and the Internet: Is There Desensitization?*, Journal of Adolescence 27 (2004) 23-39.

11. Appendix A, p. A127, *Aggressive Youths, Violent Video Games Trigger Unusual Brain Activity*, Indiana University School of Medicine, December 2, 2002.

Governor & Attorney General's MSJ       *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
C 05 4188 RMW RS

9

The evidence regarding the negative impacts playing violent video games have on children is bolstered by the unanimous position taken by multiple professional medical associations. By correspondence dated April 15, 2005, the American Academy of Pediatrics informed the Legislature that "early studies on video games indicate that the effects of child-initiated virtual violence may be even more profound than those of passive media, such as televisions . . . . The time has passed for contemplating and discussing whether violence in video games and other media are harmful to our children. Action is needed." Appendix A, p. A085. The California Psychiatric Association informed the Legislature as follows:

> We believe that your legislation will provide a significant step towards decreasing child and adolescent aggression and violence. We believe it could also result in fewer child and adolescent behavioral, aggression and violence problems in homes, schools and communities. Were your bill to become law we would also expect to see a lessening of not only aggression, but symptoms of anxiety, depression, agitation and social isolation for many young people already predisposed to behavioral problems or with Severely Emotionally Disturbed diagnoses, or with Severe Persistent Mental Illness.

Appendix A, p. A082-084.

The evidence considered by the Legislature is truly substantial. Indeed, the United States District Court for the Western District of Washington recently reviewed similar research and came to the same conclusion as the California Legislature. In *Video Software Dealers Ass'n v. Maleng*, the court expressly found that existing evidence and expert opinions supported the finding that "the depictions of violence with which we are constantly bombarded in movies, television, computer games, interactive videos games, etc., have some immediate and measurable effect on the level of aggression experienced by some viewers and that *the unique characteristics of video games, such as their interactive qualities, the first-person identification aspect, and the repetitive nature of the action, makes video games potentially more harmful to the psychological well-being of minors than other forms of media*." 325 F. Supp. 2d 1180, 1188 (W.D. Wash. 2004) (emphasis added).

In *Maleng*, the court struck down the video game ordinance not because existing research did not support the state's finding that violent video games cause harm to minors, but because the court found that "there has been no showing that exposure to video games that 'trivialize

Governor & Attorney General's MSJ       *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
C 05 4188 RMW RS

10

1 │ violence against law enforcement officers' is likely to lead to actual violence against such

2 │ officers." *Ibid*. The act at issue in *Maleng* did not seek to prevent harm to minors, it sought to

3 │ prevent minors from inflicting harm on law enforcement officers - an interest that is separate and

4 │ distinct from that sought to be advanced by California. *Id*. at p. 1186. In the instant case,

5 │ California is seeking to prevent harm to minors, not to prevent them from committing violent

6 │ acts.

7 │     True, other courts have considered older research and found it insufficient to support similar

8 │ legislation. Judge Posner, for example, writing for the panel in *American Amusement Machine*

9 │ *Ass'n v. Kendrick*, stated in dicta that "shield[ing] children right up to the age of 18 from

10 │ exposure to violent descriptions and images would not only be quixotic, but deforming; it would

11 │ leave them unequipped to cope with the world as we know it." 244 F.3d at p. 577 (2001). Judge

12 │ Posner's dicta has no application here for two reasons. First, the research relied upon in

13 │ *Kendrick* was from 2000 and prior (when Dr. Anderson first began publishing on the effects of

14 │ violent video games) – California has the benefit of over five years of additional research and

15 │ publications on the subject. And second, the Act does not "shield" children from anything. The

16 │ State is simply assisting parents in making the determination as to whether their children should

17 │ be allowed to play the video games covered by the Act. The Act does not prohibit children from

18 │ playing the covered video games. Rather, it simply takes that decision out of the hands of store

19 │ clerks and places it in the hands of parents where it should properly rest. Interestingly, Judge

20 │ Posner fails to explain how helping parents prevent their children from playing games that are so

21 │ violent that they appeal to a child's deviant or morbid interest can under any circumstances be

22 │ "deforming" or "leave them unequipped to cope with the world." Such dicta is entirely

23 │ unsupportable.

24 │     Automatic aggressiveness, increased aggressive thoughts and behavior, antisocial behavior,

25 │ desensitization, poor school performance, reduced activity in the frontal lobes of the brain – each

26 │ represents a distinct harm to the developing minds of children. And prevailing social science

27 │ points directly to violent video games as a major culprit. Presented with such substantial

28 │ evidence, the Legislature could not simply ignore the deleterious effects these video games are

Governor & Attorney General's MSJ      *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
C 05 4188 RMW RS

11

1  having on children.  The Legislature's finding that the video games covered by the Act cause

2  harm to children is supported by substantial evidence.

3      Nevertheless, if this Court considers it necessary for the State to more fully elaborate on the

4  present state of the research regarding the harmful effects violent video games have on children

5  prior to deciding the issues raised in the motions for summary judgment, the State respectfully

6  requests that the Court grant summary adjudication in favor of the State on the narrow tailoring,

7  vagueness, labeling, and Equal Protection issues raised herein, and deny summary judgment to

8  all parties.  The parties can then proceed to trial on the remaining issues.

9        **2.    The State Is Not Required To Perform Experiments On Children, Exposing
          Them To Video Games So Violent That They Are Patently Offensive and Appeal
10         To A Deviant or Morbid Interest In Children, In Order to Support The Act.**

11     Never before has a state been required to perform experiments on children in order to

12  justify legislation seeking to protect them from harm.  No responsible governing body would

13  even consider doing so.  The very premise of the idea is absurd – inflict harm on children just to

14  make sure that the children will be harmed.  But Plaintiffs have consistently taken the position

15  that the First Amendment prohibits the State from even finding a compelling interest in this case

16  absent such proof.  Their position is untenable, at best, and truly irresponsible.

17     It is beyond argument that the Supreme Court allows states to regulate children's exposure

18  to sexual material.  *Ginsberg*, *supra*, 390 U.S. 629.  But no court has ever required a state to

19  demonstrate a direct causal link between such exposure and the harm to be prevented, such as a

20  child becoming prematurely sexually active from viewing the material.  The law does not require

21  states to use children as guinea pigs, exposing them to material that prevailing social science has

22  found to cause harm, in order to justify legislation seeking to protect them from the harm.

23     Instead, the law recognizes that responsible social science must use field experiments,

24  cross-sectional correlation studies, longitudinal studies, and meta-analyses combining the results

25  of other studies to form conclusions regarding causation.  Indeed, entire scientific fields,( e.g.,

26  astronomy), are based on correlational data obtained through observation.  Children can be

27  observed and surveyed regarding the video games they play, observed interacting with other

28  children and teachers, their school performance can be reviewed, and correlations can be

Governor & Attorney General's MSJ        *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
                                                                          C 05 4188 RMW RS

12

1    obtained and professional opinions formed regarding the impact that playing violent video games

2    have on children.  From those conclusions, responsible social science can also form opinions and

3    draw conclusions regarding the impact that playing ultra-violent video games, those covered by

4    the Act, can have on children.  Of course, not all children are the same and not all children will

5    suffer the same deleterious effects of playing the games covered by the Act.  And not all smokers

6    will get lung cancer, while some who never have smoked will.  This certainly does not mean that

7    smoking is not harmful – it is widely accepted that first and second-hand smoke cause lung

8    cancer despite the absence of direct causation.  This absence of direct causation also certainly

9    does not mean that a state has no compelling interest in protecting its citizens from the harm.

10       Absent intrusive, unethical, and possibly illegal experimentation on children, social science

11   may never be able to discover a single environmental variable that causes automatic aggression,

12   increased aggressive behavior, antisocial behavior, desensitization to violence, and poor school

13   performance in children.  But such is not demanded by the First Amendment.  All that is required

14   is that the legislative body consider the available evidence, and draw reasonable inferences from

15   the evidence considered.  *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 666 (1994).

16   The Supreme Court recognizes that "[s]ound policymaking often requires legislators to forecast

17   future events and to anticipate the likely impact of these events based on deductions and

18   inferences for which complete empirical support may be unavailable."  *Ibid.*  Once the legislative

19   body does so, courts "must accord substantial deference to the predictive judgments" of the

20   legislative body.  *Ibid.*

21       The substantial evidence standard is not the equivalent of the clear and convincing standard,

22   or even the reasonable doubt standard.  Absolute certainty is not required.  This standard leaves

23   room for reasonable minds to differ.  It is the job of the legislative and executive branches to

24   consider the evidence presented and make the final determination.  Upon reviewing the final

25   determination, the Supreme Court has made it clear that the substantial evidence standard "is not

26   a license to reweigh the evidence *de novo*, or to replace [the legislature's] factual predictions

27   with our own.  Rather, it is to assure that, in formulating its judgments, [the legislature] has

28   drawn reasonable inferences based on substantial evidence."  *Turner Broadcasting System, Inc.*,

Governor & Attorney General's MSJ          *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
C 05 4188 RMW RS

13

1 | *supra*, 512 U.S. at p. 666.

2 | In the instant case, the Legislature considered the very best evidence available regarding the

3 | harmful effects that playing ultra-violent video games have on children. As discussed above, the

4 | Legislature considered dozens of published studies and reports, and considered the unanimous

5 | position taken by the leading professional associations in the child development and medical

6 | fields. The Legislature's determination that assisting parents in combating the deleterious effects

7 | of playing the video games covered by the Act represents a compelling interest is supported by

8 | the prevailing view in the professional community. The Legislature was not required to demand

9 | laboratory experiments where children are forced to play such vile video games like *Postal II*,

10 | bashing women with a shovel until the head pops off and setting on fire images of humans that

11 | appear to be alive, begging for their life. The First Amendment does not demand such an

12 | absurdity. It cannot be said that, in siding with the prevailing view of the healthcare community

13 | and dozens of studies, the State's determination was not a reasonable inference based upon

14 | substantial evidence.

15 | **C.    The Act Is Narrowly Tailored To Advance The State's Compelling Interest.**

16 | The Act survives strict scrutiny because the State has chosen the least restrictive means to

17 | advance its compelling interest. *Sable Communication of Cal., Inc.*, *supra*, 492 U.S. at p. 126.

18 | **1.    The Act Applies Only to Video Games Given Their Unique Interactive Nature.**

19 | The Legislature had substantial evidence to determine that extremely violent video games,

20 | given their interactive nature requiring players to affirmatively cause characters to engage in

21 | extreme violence, pose a special risk of harm to children beyond the passive viewing of

22 | television or movies.

23 | Video games are uniquely interactive. The player controls the characters in first-person,

24 | causing them to shoot, stab, beat, stomp, run over, or ignite the opponent. Often this is the entire

25 | point of the game. The American Academy of Pediatrics advised the Legislature that "early

26 | studies on video games indicate that the effects of child-initiated virtual violence may even be

27 | more profound than those of passive media, such as television." Appendix A, p. A085. The

28 | California Psychiatric Association mirrored these concerns when it advised the Legislature that

Governor & Attorney General's MSJ          *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
C 05 4188 RMW RS

14

violent content in "interactive media" have "more significantly severe negative impacts than those wrought by television, movies, or music." Appendix A, p. A082. The California Psychological Association informed the Legislature that the research "point[s] overwhelmingly to a causal connection between media violence and aggressive behavior in some children" and that "[t]he interactive nature of video games exacerbates this problem." Appendix A, p. A081. And according to the American Psychological Association, "violent video games may be more harmful than violent television and movies because they are interactive, very engrossing and require the player to identify with the aggressor . . . ."[12]

Plaintiffs likely would not dispute that video games, given their interactive nature, can be excellent mechanisms for teaching minors a variety of subject matters. The Legislature considered the research that supports this conclusion.[13] But just as the interactive nature of video games makes them exemplary teachers, it is this interactive nature that also posses a special risk to minors when the games contain extreme violence.

Focusing the Act on such interactive video games is the only means through which the Legislature could attempt to remedy the exacerbated harm caused thereby. Although the Legislature was presented with evidence that extreme violence in other forms of media can also cause harm to minors, substantial evidence supports the determination that the interactive nature of video games poses a special risk. The Legislature was more than justified in focusing on this narrow medium of violent material.

**2. The Category of Video Games Covered By The Act Is Exceedingly Narrow.**

By definition, the Act covers only those games that, as a whole, a reasonable person would find appeal to a deviant or morbid interest of minors, are patently offensive by community standards as to what is suitable for minors, and lack serious literary, artistic, political, or

---

12. http://www.apa.org/releases/videogames.html.

13. Appendix B, p. B003, Gentile & Gentile, *Violent Video Games as Exemplary Teachers*, paper presented at Biennial Meeting of the Society for Research in Child Development, April 9, 2005 (concluding that playing violent video games leads to greater hostile attribution bias and increased aggressive behaviors -- "exemplary" teaching of aggression).

scientific value for minors.  Civil Code, § 1746(d)(1).  The Act provides an alternative definition

with precise terms that cover only the most "especially heinous" depictions of violence on a

substantially human character.  Video games meeting either definition, an exceedingly narrow

category of video games, contain little if any expression.

In contrast, the video game ordinance at issue in *Interactive Digital Software Association v.*

*St. Louis County*, 329 F.3d 954 (8th Cir. 2003), relied heavily upon by Plaintiffs, applied to all

"graphically violent video games," and was not narrowly drawn.  Because the Act at issue

covers only an exceedingly narrow category of violent video games, it is narrowly tailored.

### 3. The Act Does Not Restrict Adult Access to Any Video Games, and Does Not Prohibit Children From Playing the Games, Only Purchasing Them Without Adult Supervision.

The Act poses none of the problems raised in prior Supreme Court precedent where

Congress sought to regulate indecent speech as to minors, but also prohibited adult access to the

covered material.  See *United States v. Playboy Ent. Group*, 529 U.S. 803, 812-817 (2000)

(regulation of "signal bleeding" of indecent programing invalid because it also prohibited adult

access); *Sable Communications*, *supra*, 492 U.S. at 127 (ban on "dial-a-porn" to protect minors

struck down for prohibiting adult access to protected speech).  Here, the Act is specifically

limited to children.  Adult access to video games remains unimpeded.

And should parents or guardians desire children to have access to such games, they can

purchase the games for the child.  By containing this safe harbor, the Act hits only the

specifically desired target – children whose parents do not want them exposed to the extremely

violent video games.  Alternative avenues for children's access to the covered games are written

into the Act.  Thus, any burden placed on children is minimal.  They need only persuade their

parent or guardian to purchase these games for them.

### 4. No Less Restrictive Means Exists For Ensuring, Through Threat of Civil Penalty, That Children Only Have Access to Extremely Violent Video Games With Parental Knowledge.

The presence of industry self-regulation has limited relevance in this case.  The self-

imposed ratings described in detail by Plaintiffs simply do not carry the force of a state law, the

violation of which subjects the offender to civil penalty.  The Legislature considered substantial

Governor & Attorney General's MSJ    *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
C 05 4188 RMW RS

16

evidence demonstrating that the effectiveness of the video game industry's self-regulation is simply unacceptable.  The Senate Judiciary Committee analysis raised the issue, stating, "[t]he author acknowledges that the ESRB rating system is currently in place, but argues that its implementation has been unsatisfactory."  RJN, Exhibit 1, p. 13.  In fact, the Legislature considered that "[r]ecent studies show that the voluntary rating and enforcement system implemented by self-regulatory associations or entertainment producers have had limited success on decreasing youth access to Mature (M) rated video games."  RJN, Exhibit 1, pp. 13-14.  They were also made aware that "[d]uring 2004, the National Institute on Media and the Family had children between the ages of seven and fourteen attempt to purchase M-rated games in thirty-five stores.  Youth succeeded 34% of the time.  While the overall purchase rate was 34%, boys as young as seven were able to buy M-rated games 50% of the time."  RJN, Exhibit 1, pp. 13-14. The Legislature was also aware that "a nationwide undercover survey of stores completed by the Federal Trade Commission in 2003 corroborated these findings.  In this study, 69% of unaccompanied 13 to 16-year-olds purchased M-rated games and only 24% of cashiers asked the youth's age."  RJN, Exhibit 1, pp. 13-14.

The ineffectiveness of the industry's attempts to self-regulate comes as no surprise. According to a Federal Trade Commission ("FTC") report to Congress, cited to the Legislature in the Senate Judiciary Committee analysis, the industry specifically markets M-rated (Mature) games to minors.[14]  The FTC report states, "[a]ccording to industry data, nearly 40% of M-rated games purchased in 2002 were for children under 17."  Appendix E, p. E053.  Although Plaintiffs claim they have implemented new enforcement provisions, the FTC report concluded that "[t]he industry is actively enforcing those standards and penalizing those companies found to be in noncompliance. Yet those standards permit, and, in fact, industry members continue to place, advertisements in television and print media with substantial youth audiences."  Appendix E, p. E054.

---

14.  Appendix E, p. E020, FTC July 2004 Report, at pp. 20-28; Request for Judicial Notice, Exhibit 1, pp. 13-14.

Governor & Attorney General's MSJ          *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
C 05 4188 RMW RS

17

The Legislature was not willing to simply maintain the status quo, hoping that purported industry efforts would eventually eliminate children's access to extremely violent video games. The Act is thus narrowly tailored to ensure that, through threat of civil penalty, only with parental knowledge will children have access to the most extremely violent video games. No less restrictive means of achieving this goal exists.

## II.

### BECAUSE THE ACT'S DEFINITIONS ARE NOT IMPERMISSIBLY VAGUE, THE STATE IS ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW.

The Legislature carefully drafted the language of the Act to enable a person of ordinary intelligence to discern what violent video games may not be sold or rented to children. The Act's definition provides:

> (1) "Violent video game" means a video game in which the range of options available to a player includes killing, maiming, dismembering, or sexually assaulting an image of a human being, if those acts are depicted in the game in a manner that does either of the following:
> (A) Comes within all of the following descriptions:
> (i) A reasonable person, considering the game as a whole, would find appeals to a deviant or morbid interest of minors.
> (ii) It is patently offensive to prevailing standards in the community as to what is suitable for minors.
> (iii) It causes the game, as a whole, to lack serious literary, artistic, political, or scientific value for minors.

Civil Code, § 1746(d). The Act provides a secondary definition, but only one need be met for purposes of the Act.

A law is not unconstitutionally vague where it provides "a person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1979); *see also Daily v. Bond*, 623 F.2d 624, 626 (9th Cir. 1980) ( a statute is not unconstitutionally vague if it gives fair warning of the proscribed conduct). The key terms of the Act are defined with precision. An ordinary person, using common sense, is capable of determining which games fall into the "violent video game" category.

In reviewing a business regulation for facial vagueness, the principal inquiry is whether the

law affords fair warning of what is proscribed. *Village of Hoffman Estates v. The Flipside*, 455 U.S. 489 (1982) (finding in a pre-enforcement challenge of a law that prohibited the sale of certain drug paraphernalia that the statute contained some ambiguities, but holding that it was sufficiently clear to provide notice and was not impermissibly vague). In *Village of Hoffman Estates*, the Supreme Court recognized that "economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action . . . . The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.* at 498-99 (footnotes omitted). Here, the key terms are defined with precision such that a person of ordinary intelligence will understand the meaning and application.

A person of ordinary intelligence will easily be capable of playing a video game and determining if the level of violence available to the player meets a definition contained in the Act. Does the game allow a player to kill, maim, dismember, or sexually assault an image of a human being? Would a reasonable person, considering the game as a whole, find that it appeals to a deviant or morbid interest of minors? Is the game patently offensive to prevailing standards in the community as to what is suitable for minors? And does the violence cause the game, as a whole, to lack serious literary, artistic, political, or scientific value for minors? A person of ordinary intelligence can surely apply this straight forward test to any video game.

Moreover, as to the terms used in the secondary definition, including "heinous, cruel and depraved" and "serious physical abuse" and "torture," the Legislature used definitions that had already been deemed constitutional by courts in other contexts. The Supreme Court has found that any vagueness in the statutory definition of "heinous, cruel, and depraved" is cured by the limitation that the statutory definition of the offense involve torture or serious physical abuse. *See Walton v. Arizona*, 497 U.S. 639, 654-55 (1990) (overruled on other grounds) (upholding a death penalty statute that used these definitions); *United States v. Jones*, 132 F.3d 232, 249-50 (5th Cir. 1998) (finding that similar definitions for cruel, depraved, heinous, serious physical

Governor & Attorney General's MSJ        *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
C 05 4188 RMW RS

19

1 abuse and torture were not unconstitutionally vague and did not lead to an arbitrary imposition of

2 the death penalty).  In the Act, the definitions for "heinous," "cruel" and "depraved" include

3 qualifications requiring the act include torture or serious physical abuse of the victim.  It

4 therefore survives the vagueness challenge as the death penalty statute in *Walton* survived.  And

5 the definitions for "serious physical abuse" and "torture" are almost identical to definitions used

6 in a death penalty statute that survived a vagueness challenge in at least one Appellate Court.

7 *See United States v. Jones*, 132 F.3d at 250.

8     Additionally, the Act restricts only certain forms of violence against "an image of a human

9 being;" there are no restrictions on violence against non-humans.  The argument that the Act is

10 impermissibly vague because video games are a creative medium divorced from everyday reality

11 with non-human and animal-like characters is not persuasive.  However, a person of ordinary

12 intelligence can determine whether or not a video game depicts an "image of a human being."

13     To be sure, the video game industry already independently reviews and rates the level of

14 violence in video games for all platforms.[15/]   For more than ten years the ESRB has had a rating

15 system for computer and video games, and the rating system offers actual ratings for age

16 appropriateness of content and short descriptive phrases.  Lowenstein Decl., ¶ 7.  Under this

17 rating system, the ESRB rates certain games as "AO" (Adults Only), and games with this

18 designation contain content that the ESRB suggests should only be played by users 18 and older.

19 Lowenstein Decl., ¶ 8.  In making these determinations, the ESRB states that "AO" games "have

20 content that should only be played by persons 18 years and older.  Titles in this category may

21 include prolonged scenes of intense violence and/or graphic sexual content and nudity."

22 Lowenstein Decl., Exhibit A.  The ESRB defines "intense violence" as "graphic and realistic-

23 looking depictions of physical conflict.  May involve extreme and/or realistic blood, gore,

24 weapons, and depictions of human injury and death."  *Ibid*.  A distinction is made by the ESRB

25 between "intense violence" and "violence" which is defined as "scenes involving aggressive

26 conflict."  *Ibid*.  Thus, the industry is already reviewing and rating video games based on violent

27

28     15.  See Declaration of Douglas Lowenstein submitted in support of Plaintiffs' Motion for Preliminary Injunction, on file herein, at ¶ 4.

Governor & Attorney General's MSJ     *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
C 05 4188 RMW RS

20

1    content.  The requirements of the Act may require a similar process of reviewing and rating the

2    video games, based on the Act's own definitions and guidelines.

3         The definitions in this statute require common sense judgment.  The parameters of the

4    statute are sufficiently clear to give notice to an ordinary person applying the Act.  Mathematical

5    precision in definitional terms is not required to meet the constitutional standard and a certain

6    amount of flexibility in the statute is permissible.  *See Grayned*, 408 U.S. at 110-111.  "It will

7    always be true that the fertile legal 'imagination can conjure up hypothetical cases in which the

8    meaning of [disputed] terms will be in nice question.'" *Id.* at n. 15 (internal citations omitted).

9    Similar to the statue in *Grayned*, the terms used in this Act "delineates its reach in words of

10   common understanding." *Id*. at p. 112 (internal citation omitted).  Notwithstanding creative

11   hypotheticals, the terms used in this Act are ones with a common, straightforward understanding

12   and meaning.  Therefore, as a matter of law, the Act's definition of violent video game is not

13   impermissibly vague.

14                                              **III.**

15   **BECAUSE THE ACT'S LABELING PROVISION IS CONSTITUTIONAL, THE**
     **STATE IS ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW.**
16

17   **A.    The Act's Labeling Requirement Regulates Purely Commercial Speech.**

18        The Act provides that each video game covered by the Act "that is imported into or

19   distributed into California for retail sale shall be labeled with a solid white '18 ' outlined in

20   black.  The '18' shall have dimensions of no less than 2 inches by 2 inches" and "shall be

21   displayed on the front face of the video game package." Civ. Code, §1746.2.  Plaintiffs' claim

22   that the this provision of the Act violates the First Amendment because it allegedly compels

23   them "to disseminate the government's message that minor's should be denied access to certain

24   video games . . . ." Compl., ¶ 57.  However, because the Act's labeling requirement expressly

25   impacts only the commercial speech aspect of the covered video games, it is subject to and

26   survives judicial scrutiny under *Zauderer v. Office of Disciplinary Counsel of The Supreme*

27   *Court of Ohio*, 471 U.S. 626 (1985), as a matter of law.

28        In *Zauderer*,  the Supreme Court upheld a requirement that attorneys advertising services on

Governor & Attorney General's MSJ         *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
                                                                            C 05 4188 RMW RS

21

contingent-fee basis disclose that clients will have to pay costs even if their lawsuits are unsuccessful. *Id.*, at pp. 652-53. The Court held that, in reviewing government mandated disclosure requirements of factual information in advertising, the "constitutionally protected interest in *not* providing any particular factual information in . . . advertising is minimal." *Id.*, at p. 651. The Court set forth the appropriate level of judicial review for such disclosure requirements on commercial speech: "we hold that an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *Ibid.* And when "the possibility of deception is . . . self-evident . . . we need not require the State to 'conduct a survey of the . . . public before it [may] determine that the [advertisement] had a tendency to mislead.'" *Id.*, at pp. 652-53 (internal citation omitted). This lesser standard of review is appropriate because "the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides . . . ." *Id.*, at p. 651.

By its plain language, the labeling provision of the Act applies only to covered video games that are "for retail sale" in California. Act, Civ. Code, §1746.2. The cover of a video game displayed for retail sale is the prime advertising space which easily communicates messages to potential consumers and retailer. "[A]dvertising pure and simple" constitutes commercial speech for purposes of First Amendment analysis. *Zauderer*, *supra*, 471 U.S. at p. 637. Because the Act's labeling provision impacts the purely commercial aspect regarding retail sales of the covered video games, they are subject to review under *Zauderer*.

The Act's labeling requirement serves the self-evidence purpose of communicating to consumers and store clerks that the video game cannot be legally purchased by anyone under 18 years of age. This requirement is necessary, in part, because of the misleading effect of the ratings included on the cover of video games by the industry itself. The cover of video games sold in California presently display the ESRB's independent, self-imposed rating from "E" for Everyone to "AO" for Adults Only. Lowenstein Decl., ¶¶ 4-8. Such ratings only reflect the industry's recommendation of the appropriate age group of the particular games and do not communicate any factual information regarding the legality of the sale of the game to children.

1   It is self-evident that individuals and store clerks could be deceived by the ESRB rating

2   appearing on the cover of a game subject to the Act's restrictions, believing that an "M" or "AO"

3   rating can legally be sold to children.  Absent the "18" label appearing on the cover of such

4   games, consumers and store clerks would have essentially no way of knowing whether or not a

5   child could legally purchase the game.  Thus, the labeling requirement is reasonably related to

6   the State's interest in preventing deception to consumers and retailers.

7   **B.    The Act Is Not Subject To Review As Compelled Speech.**

8        The labeling requirements of the Act do not compel speech and strict scrutiny does not

9   apply to this provision of the Act.  The facts of this case are not similar to  *Riley v. Nat'l Fed'n of*

10  *the Blind of N.C., Inc.* or *Pacific Gas & Electric Co. v. Public Utilities Commission of California*

11  where the Supreme Court struck down content-based regulations that compelled speech.  In

12  *Riley*, the Court struck down a law which regulated professional fundraisers and required the

13  fundraisers to disclose to potential donors the average percentage of gross receipts actually

14  turned over to charities during a certain period of time.  *Riley v. Nat'l Fed'n of the Blind of N.C.,*

15  *Inc.*, 487 U.S. 781, 784 (1988).  *Riley* and earlier precedent squarely held that charitable

16  solicitations involve a variety of core speech interests that are within the protection of the First

17  Amendment and "have not been dealt with as 'purely commercial speech.'"  *Id.* at 788.  The Act

18  does not regulate a charitable solicitation and is not comparable to the statute in *Riley*.  Instead,

19  the Act regulates pure commercial speech regarding the advertising of covered games for retail

20  sale.

21       Similarly, in *Pacific Gas & Electric Co.*, the Court found that the California Public Utilities

22  Commission may not require a privately owned utility company to include in its billing

23  envelopes speech of a private third party organization with which the utility disagrees.  475 U.S.

24  1, 20 (1986).  In *Pacific Gas & Electric Co.*, the Court expressly found that the information the

25  utility provides in its envelopes "extends well beyond speech that proposes a business

26  transaction . . . and includes the kind of discussion of 'matters of public concern' that the First

27  Amendment both fully protects and implicitly encourages."  *Id.*, at p. 9.

28       Here, in contrast, the "18" is a label required to be placed on the cover of the game to

Governor & Attorney General's MSJ          *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
                                            C 05 4188 RMW RS

23

1   communicate factual, legal information to consumers and retailers -- expressly related to a

2   proposed business transaction.  And the label is required by the state government, not a private

3   third party, to inform the public that a specific game cannot legally be sold to anyone under 18.[16/]

4   Under no circumstances can the labeling requirement of the Act be considered compelled speech

5   subject to strict scrutiny.  Therefore, the State is entitled to judgment as a matter of law on the

6   issue of the constitutionality of the Act's labeling requirement.

7                                            **IV.**

8             **THE ACT DOES NOT VIOLATE THE EQUAL PROTECTION CLAUSE.**

9             Plaintiffs' claim that the Act violates the Equal Protection Clause because it regulates only

10  the sale violent video games and not other forms of violent media is entirely without merit.

11  Compl., ¶¶ 63-66.  The State is entitled to summary judgment as a matter of law on this claim.

12            The Supreme Court "has long recognized that each medium of expression presents special

13  First Amendment problems."  *F.C.C. v. Pacifica Foundation*, 438 U.S. at 748.  The various

14  forms of  media are necessarily different than the others.  Indeed, the Court has frequently

15  upheld such differential treatment on the sound theory that a legislature may deal with one part

16  of a problem without addressing all of it.  *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 215

17  (1975); *Williamson v. Lee Optical of Oklahoma*, 348 U.S. 483, 488-489 (1955).  In *Williamson*,

18  the Supreme Court recognized that "[e]vils in the same field may be of different dimensions and

19  proportions, requiring different remedies.  Or so the legislature may think . . . .  Or the reform

20  may take one step at a time, addressing itself to the phase of the problem which seems most

21  acute to the legislative mind . . . .  The legislature may select one phase of one field and apply a

22  remedy there, neglecting the others."  *Williamson v. Lee Optical of Oklahoma*, *supra*, 348 U.S. at

23  489.

24            A legislative enactment that does not create a suspect classification or impinge upon a

25  fundamental right need only be show that it bears some rational relationship to a legitimate

26

27        16.  The Court specifically noted that the State has more leeway in determining appropriate
    information disclosure requirements for business corporations than do private third parties.  *Pacific Gas &*
28  *Electric Co.* 475 U.S. at 16 n. 12.

Governor & Attorney General's MSJ        *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
                                                                                            C 05 4188 RMW RS

24

government interest. *City of Dallas v. Stanglin*, 490 U.S. 19, 23-24 (1989) (upholding, under rational basis review, dance hall regulation limiting use to patrons between 14 and 18 years of age). In the instant case, the Act creates no suspect classification and does not implicate a fundamental right. The right to sell video games to children cannot be considered a fundamental right under any circumstances. Therefore, the Act is to be reviewed under rational basis.

The Act's requirement that covered video games must be sold only to persons 18 or older plainly bears a rational relationship to the State's legitimate interest in protecting children from the harmful effects of playing the covered games. Moreover, even if the Act were subject to heightened judicial scrutiny under the Equal Protection Clause, it is constitutional for the same reasons set forth in section I, above. Therefore, as a matter of law, the Act does not violate Plaintiffs' right to equal protection of the laws.

## CONCLUSION

For all of the foregoing reasons, the State is entitled to entry of summary judgment in its favor on each and every cause of action alleged in the complaint.

Dated: March 30, 2006

Respectfully submitted,

BILL LOCKYER
Attorney General of the State of California

LOUIS R. MAURO
Senior Assistant Attorney General

CHRISTOPHER E. KRUEGER
Supervising Deputy Attorney General

SUSAN K. LEACH
Deputy Attorney General

 /s/ Zackery P. Morazzini
ZACKERY P. MORAZZINI
Deputy Attorney General
Attorneys for Defendants Governor Arnold Schwarzenegger and
Attorney General Bill Lockyer

Governor & Attorney General's MSJ      *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
C 05 4188 RMW RS

25

1

**TABLE OF CONTENTS**

2                                                                                      **Page**

3  INTRODUCTION                                                                          1

4  STATEMENT OF FACTS AND ISSUES TO BE DECIDED                                           2

5  STANDARD OF REVIEW                                                                    3

6  ARGUMENT                                                                              4

7  I.    BECAUSE PLAINTIFFS' FIRST AMENDMENT CHALLENGE TO THE
         ACT FAILS AS A MATTER OF LAW, SUMMARY JUDGMENT SHOULD
8        BE ENTERED IN FAVOR OF THE STATE.                                               4

9        A.   The State Has A Compelling Interest In Helping Parents Protect Children
              From Automatic Aggressiveness, Increased Aggressive Thoughts And
10            Behavior, Antisocial Behavior, Desensitization To Violence, And Poor School
              Performance.                                                               4

11
         B.   The Act Is Supported By Substantial Evidence And, In Fact, The Best
12            Possible Evidence The State Can Obtain Without Performing Unwarranted,
              Unethical, And Possibly Illegal Experiments On Children.                    7

13
              1.   The Evidence Considered By The Legislature Is Substantial And Reflects The
14                 Prevailing View Of The Healthcare Community.                           7

15            2.   The State Is Not Required To Perform Experiments On Children, Exposing
                   Them To Video Games So Violent That They Are Patently Offensive and
16                 Appeal To A Deviant or Morbid Interest In Children, In Order to Support The
                   Act.                                                                  12

17
         C.   The Act Is Narrowly Tailored To Advance The State's Compelling
18            Interest.                                                                  14

19            1.   The Act Applies Only to Video Games Given Their Unique Interactive
                   Nature.                                                               14

20
              2.   The Category of Video Games Covered By The Act Is Exceedingly
21                 Narrow.                                                               15

22            3.   The Act Does Not Restrict Adult Access to Any Video Games, and Does
                   Not Prohibit Children From Playing the Games, Only Purchasing Them
23                 Without Adult Supervision.                                            16

24            4.   No Less Restrictive Means Exists For Ensuring, Through Threat of Civil
                   Penalty, That Children Only Have Access to Extremely Violent Video
25                 Games With Parental Knowledge.                                        16

26

27

28

Governor & Attorney General's MSJ        *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
                                                                           C 05 4188 RMW RS

i

**TABLE OF CONTENTS  (continued)**

Page

II.      BECAUSE THE ACT'S DEFINITIONS ARE NOT IMPERMISSIBLY
         VAGUE, THE STATE IS ENTITLED TO SUMMARY JUDGMENT AS A
         MATTER OF LAW.                                                              18

III.     BECAUSE THE ACT'S LABELING PROVISION IS CONSTITUTIONAL,
         THE STATE IS ENTITLED TO SUMMARY JUDGMENT AS A MATTER
         OF LAW.                                                                     21

         A.    The Act's Labeling Requirement Regulates Purely Commercial
               Speech.                                                              21

         B.    The Act Is Not Subject To Review As Compelled Speech.                23

IV.      THE ACT DOES NOT VIOLATE THE EQUAL PROTECTION CLAUSE.                       24

CONCLUSION                                                                          25

Governor & Attorney General's MSJ        *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
                                         C 05 4188 RMW RS

ii

1

# TABLE OF AUTHORITIES

2

**Page**

3

**Cases**

4

*American Amusement Machine Ass'n v. Kendrick*
    244 F.3d 572 (2001) ............................................................ 7, 11

5

*Anderson v. Liberty Lobby*
    477 U.S. 242 (1986) ............................................................ 3

6

7

*Bellotti v. Baird*
    443 U.S. 622 (1979) ............................................................ 5

8

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986) ............................................................ 3

9

10

*City of Dallas v. Stanglin*
    490 U.S. 19 (1989) ............................................................ 24

11

*Daily v. Bond*
    623 F.2d 624 (9th Cir. 1980) ............................................................ 18

12

13

*Erznoznik v. City of Jacksonville*
    422 U.S. 205 (1975) ............................................................ 24

14

*F.C.C. v. Pacifica Foundation*
    438 U.S. 726 (1978) ............................................................ 4, 6, 24

15

16

*Ginsberg v. New York*
    390 U.S. 629 (1968) ............................................................ 4, 5, 12

17

*Grayned v. City of Rockford*
    408 U.S. 104 (1979) ............................................................ 18, 21

18

19

*Interactive Digital Software Association v. St. Louis County*
    329 F.3d 954 (8th Cir. 2003) ............................................................ 16

20

*Pacific Gas & Electric Co. v. Public Utilities Commission of California*
    745 U.S. 1 (1986) ............................................................ 23

21

22

*Prince v. Massachusetts*
    321 U.S. 158 (1944) ............................................................ 4

23

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*
    487 U.S. 781 (1988) ............................................................ 23

24

*Robi v. Five Platters, Inc.*
    918 F.2d 1439 (9th Cir. 1990) ............................................................ 4

25

26

*Roper v. Simmons*
    543 U.S. 551 (2005) ............................................................ 6

27

28

Governor & Attorney General's MSJ    *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
C 05 4188 RMW RS

iii

**TABLE OF AUTHORITIES  (continued)**

Page

*Sable Communications of Cal., Inc. v. F.C.C.*
    492 U.S. 115 (1989)      4, 14, 16

*Turner Broadcasting System, Inc. v. F.C.C.*
    512 U.S. 622 (1994)      13, 14

*United States v. Jones*
    132 F.3d 232 (5th Cir. 1998)      19, 20

*United States v. Playboy Ent. Group*
    529 U.S. 803 (2000)      16

*Video Software Dealers Ass'n v. Maleng*
    325 F. Supp. 2d  1180 (W.D. Wash. 2004)      10, 11

*Village of Hoffman Estates v. The Flipside*
    455 U.S. 489 (1982)      18, 19

*Wang Laboratories, Inc. v. Mitsubishi Electronics, America, Inc.*
    860 F. Supp. 1448  (C.D.Cal. 1993)      4

*Williamson v. Lee Optical of Oklahoma*
    348 U.S. 483 (1955)      24

*Zauderer v. Office of Disciplinary Counsel of The Supreme Court of Ohio*
    471 U.S. 626 (1985)      21, 22

**Constitutional Provisions**

California Constitution
    Art. IV, § 8(c)(2)      3

**California Statutes**

California Civil Code

    §§ 1746 -1746.5      1
    § 1746(d)      18
    § 1746(d)(1)      16
    § 1746.2.      21, 22

**Federal Statutes**

Federal Rules of Civil Procedure
    Rule 56(b)      1

Governor & Attorney General's MSJ    *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
C 05 4188 RMW RS

iv

**TABLE OF AUTHORITIES  (continued)**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Page**

**Court Rules**

      Local Rule 56-1        1

Governor & Attorney General's MSJ      *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
    C 05 4188 RMW RS

v