EXHIBIT 1

```
                    SENATE JUDICIARY COMMITTEE
                    Senator Joseph L. Dunn, Chair
                       2005-2006 Regular Session


     AB 1179                                                    A
     Assembly Member  Yee                                       B
     As Amended September 2, 2005
     Hearing Date:  September 8, 1005                           1
     Civil Code                                                 1
     AMT/MM:cjt                                                 7
                                                                9
```

PURSUANT TO RULE 29.10

SUBJECT

Violent Video Games:   Sales to Minors

DESCRIPTION

This bill would prohibit the sale or rental of violent video games to minors under 18 years old, and would require that such games be clearly labeled before being imported into or distributed in California.  Violators of either provision would be subject to liability for up to $1,000. Sales clerks would be exempt from liability, so long as they did not hold a management position or an ownership interest in the retail business.  A minor's parents, grandparents, aunts, uncles, and legal guardians would also be exempt from the terms of the bill.  It would be an affirmative defense to liability for unlawfully selling a violent video game to establish reasonable reliance on evidence that a purchaser or renter was not a minor, or to establish that a manufacturer failed to label a violent video game as required under the bill.

The bill would offer two alternate definitions of "violent video game."  The first definition would mirror the language used to define "obscene" speech.  The second definition would mirror federal statutes and jury instructions that relate to aggravating factors that warrant death penalty convictions.

BACKGROUND

(more)

☐

AB 1179 (Yee)
Page 2

This bill follows a line of attempts in this and other states to limit the sale and rental of "violent video games" to minors.  Proponents have argued that these attempts are supported by numerous scientific studies which

indicate that minors who play violent video games may be more likely to act aggressively than other minors and may suffer other negative emotional and psychological effects.

Last year the Legislature passed AB 1793 (Yee), Chapter 630, Statutes of 2004, requiring video game retailers to post signs notifying customers of a current industry rating system that may be used to identify age-appropriate video games, and requiring retailers to make information explaining the rating system available on request. Another bill, AB 1792 (Yee, 2004), which would have prohibited the sale or rental of "violent video games" to minors under age 18, failed in the Assembly Arts, Entertainment, Sports, Tourism, and Internet Media Committee.

Other states have successfully enacted statutes in recent years to restrict minors' access to violent video games. However, those statutes were found unconstitutional on First Amendment and/or vagueness grounds. [See, e.g., Interactive Digital Software Assoc. v. St. Louis County ( IDSA ) (8th Cir. 2003) 329 F.3d 954; American Amusement Machine Assoc. v. Kendrick (7th Cir. 2001) 244 F.3d 572; Video Software Dealers Assoc. v. Maleng (D.C. Wash. 2004) 325 F. Supp. 2d 1185.] The author notes that an Illinois statute was recently signed into law that restricts the sale of violent video games to minors.

This year, AB 450 (Yee) was introduced in a renewed attempt to prohibit the sale or rental of "violent video games" to minors. It was amended in the Assembly Judiciary Committee to address some of the constitutional issues raised in recent court decisions. The bill passed the Assembly Judiciary Committee, but failed its first hearing in the Assembly Arts, Entertainment, Sports, Tourism, and Internet Media Committee. Although the bill passed on its second vote in that committee, it has not been brought to a vote on the Assembly Floor.

On September 2, 2005, the last day for amending bills without a rule waiver, the author gutted and amended AB

AB 1179 (Yee)
Page 3

1179 (Yee) to insert language largely identical to the text of AB 450. The primary difference between the bills is that AB 1179 would prohibit the sale or rental of "violent video games" to minors under 18 years old, while AB 450 would have prohibited the sale or rental of violent video games to minors under 17 years old.

                    CHANGES TO EXISTING LAW

 Existing law  , the U.S. Constitution, provides that "Congress shall make no law ? abridging the freedom of speech." [U.S. Const. Amend. 1.]

 Existing law  , the California Constitution, provides that "A law may not restrain or abridge liberty of speech or press." [Cal. Const. Art. 1  2.]

Existing law requires video game retailers to post signs in prominent areas of a retail establishment to provide information about a video game rating system or to notify customers that a rating system is available to aid in the selection of video games. The law also requires retailers to make information explaining the rating system available on request. [Bus. & Prof. Code 20650.]

Existing law prohibits the sale, lease, rental, or provision of any video game intended for use by any person under 18 years old, which contains any commercial advertisement, brand names, trademarks, or copyrighted slogans of alcoholic beverages or tobacco products in the design, presentation, packaging or advertisement of the video game. [Penal Code 308.5.]

This bill would make a legislative finding that exposing minors to depictions of violence in video games makes minors more likely to experience feelings of aggression, to experience a reduction of activity in the frontal lobes of the brain, and to exhibit violent antisocial or aggressive behavior. It would also make a finding that even minors who do not commit acts of violence suffer psychological harm from prolonged exposure to violent video games.

This bill would make a legislative finding that the state has a compelling interest in preventing violent, aggressive, and antisocial behavior, and in preventing

AB 1179 (Yee)
Page 4

psychological or neurological harm to minors who play violent video games.

This bill would prohibit the sale or rental of violent video games to minors who are under 18 years of age. This prohibition would not apply when a minor's parent, grandparent, aunt, uncle, or legal guardian rented or sold a violent video game to the minor. It would also be an affirmative defense to establish: (1) that a defendant or his or her employee or agent reasonably relied upon evidence that a purchaser or renter was not a minor; or (2) that a manufacturer failed to label a violent video game as required under the bill.

This bill would define "violent video game" as a video game in which the range of options available to a player includes killing, maiming, dismembering, or sexually assaulting an image of a human being, if those acts are depicted in the game in a manner that does either of the following:

  a)  Comes within all of the following descriptions:

    i)  A reasonable person, considering the game as a whole, would find [it] appeals to a deviant or morbid interest in minors;

    ii) It is patently offensive to prevailing standards in the community as to what is suitable to

>   minors;
>
>   iii) It causes the game, as a whole, to lack serious literary, artistic, political, or scientific value for minors.
>
>   b) Enables a player to virtually inflict serious injury upon human beings or characters with substantially human characteristics in a manner which is especially, heinous, cruel, or depraved in that it involves torture or serious physical abuse to the victim.
>
>   This bill  would define the terms "heinous," "cruel," "depraved," "torture," and "serious physical abuse," and would list pertinent factors to consider in determining

AB 1179 (Yee)
Page 5

>   whether violence is especially heinous, cruel, or depraved.
>
>   This bill  would provide that violent video games which are imported into or distributed in California for retail sale shall be labeled on the front face of the package, as specified.
>
>   This bill  would make a person who violates any provision of the bill subject to liability for up to $1,000, with the exception that a person who is employed solely in the capacity of a salesclerk or other similar position, and who does not hold an ownership interest or a management position in the business, may not be held liable.
>
>   This bill  would provide that a violation may be prosecuted by any city attorney, county counsel, or district attorney, and that a violation may be reported to the city attorney, county counsel, or district attorney by an adult acting on behalf of a minor to whom a violent video game was sold or rented.
>
>   This bill  would state that its provisions are severable.
>
>                          COMMENT
>
>   1. Stated need for the bill
>
>      The author contends that this bill is a necessary response to the potential negative impacts that violent video games may have on minors under 18 years old.  The author states:
>
>         Since teens are wiring the circuits for self control, responsibility and relationships they will carry with them into adulthood, they are more impressionable than we thought.  Active participation by youth in playing violent video games has a greater impact than watching television.  Youth choose actions where they are rewarded for causing violence to another character.  Repetition greatly increases learning

and also causes youth to identify with the aggressor in the game. Dozens of studies on violent video games, including an analysis of 54 independent samples with 4,262 participants, show

AB 1179 (Yee)
Page 6

five major effects: playing violent games leads to increased physiological arousal, increased aggressive thoughts, increased aggressive feelings, increased aggressive behaviors, and decreased pro-social or helping behaviors. ? These studies include experimental studies (that show playing violent video games actually causes increases in aggression), correlational studies (where long-term relations between game play and real-world aggression can be shown), and longitudinal studies (where changes in children's aggressive behaviors can be demonstrated). Furthermore, students who played more violent video games had greater involvement in physical fights ?, became desensitized to violence, and developed pro-violence attitudes and increased tolerance of violence ? The American Academy of Pediatrics Policy Statement on Media Violence stated that playing violent video games accounts for a 13% to 22% increase in adolescents' violent behavior. When considering the negative impact violent video games have on youth, the evidence is strong: playing violent video games has more effect on increased youth aggression than second-hand smoke has on causing cancer, or lead exposure links to decreased IQ?

The author acknowledges that the entertainment industry has undertaken self-regulatory measures to prevent minors under 17 years old from renting or buying games that are "M-rated," e.g., that contain mature content which may include mature sexual themes, more intense violence, and/or strong language. But the author argues that self-regulation has been unsuccessful, as discussed in Comment 3 below.

2. First Amendment concerns

The First Amendment right to free speech must be a chief consideration if the bill's restrictions would limit the distribution of materials that are "protected speech." The First Amendment does not prohibit every restriction on protected speech, but it requires that restrictions be carefully weighed and limited. Appropriate questions here are therefore whether "violent video games" are

AB 1179 (Yee)
Page 7

protected speech and, if so, whether the bill is appropriately tailored to limit access to that speech.

a) Whether violent video games are "protected speech"

Video games have been found to be "protected speech" in several recent court decisions, one court explaining that games are protected because they "contain stories, imagery, ageold themes of literature, and messages, even an ideology, just as books and movies do." [ IDSA , 329 F.3d 954 (internal quotations omitted); see also Kendrick , 244 F.3d 572.]

The author notes that some speech which is considered "protected" for adults may be deemed unworthy of protection for children in certain cases. [See Ginsberg v. New York (1968) 390 U.S. 629.] But this distinction has only been made in narrow circumstances where the question was whether the speech was "obscene." Obscenity is one of the few categories of speech which has historically been unprotected under the First Amendment. [See Miller v. California (1973) 413 U.S. 15.] In Ginsberg the Supreme Court held that children's access to certain pornographic magazines could be restricted without any violation of the First Amendment, even though those magazines were not "obscene" according to adult standards, because the magazines could properly be deemed obscene according to community standards for children. [ Ginsberg , 413 U.S. at 636.]

The obscenity standard that was tailored to child-specific standards in Ginsberg could not be equally applied here. This is because several federal courts have held that materials which do not contain "depictions or descriptions of sexual conduct" may not be treated as obscenity, even when those materials contain objectionable violence. [ IDSA , 329 F.3d at 959; Maleng , 325 F.Supp. 2d at 1185.] As the Maleng court explains:

   Sexually-explicit materials were originally excluded from the protections of the First Amendment because the prevention and punishment

☐

AB 1179 (Yee)
Page 8

   of lewd speech has very little, if any, impact on the free expression of ideas and government regulation of the sexually obscene has never been thought to raise constitutional problems. ? The same cannot be said for depictions of violence: such depictions have been used in literature, art, and the media to convey important messages throughout our history, and there is no indication that such expressions have ever been excluded from the protections of

the First Amendment or subject to government regulation.

A limited application of the Ginsberg case to speech regarding sexual conduct is consistent with the Supreme Court's statement in Erznoznik v. Jacksonville that:

> speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them. In most circumstances, the values protected by the First Amendment are no less applicable when the government seeks to control the flow of information to minors. [ 422 U.S. 205, 213-14 (1975).]

Under the reasoning offered in the above cases, the speech that would be restricted under this bill would not be deemed obscene, even for minors, and would therefore be considered "protected speech."

Nevertheless, one of the two definitions offered in AB 1179 for "violent video games" directly follows the Ginsberg obscenity standard, and applies the terms of the obscenity definition to video games where certain violent acts may be committed by a game character. It is questionable whether this definition is appropriate under existing law. Neither the IDSA or the Maleng decision is binding in California, but those decisions and the precedent upon which they rely may be persuasive to a California court.

AB 1179 (Yee)
Page 9

SHOULD AB 1179'S DEFINITION THAT MIRRORS THE OBSCENITY DOCTRINE BE RETAINED, DESPITE CASES HOLDING THAT "OBSCENITY" RELATES ONLY TO SEXUAL CONDUCT?

b) Whether the proposed restrictions are necessary and narrowly tailored to serve a compelling state interest

When speech is deemed "protected speech," any restrictions on its content must be "necessary to serve a compelling state interest," and "narrowly tailored" to achieve that interest. [ Republican Party of Minn. v. White (2002) 536 U.S. 765, 774-75.] This standard has been applied by courts considering similar violent video game restrictions for minors. [See IDSA , 329 F.3d at 958; Maleng , 325 F.Supp.2d at 1186.]

Courts have repeatedly recognized that a state has a legitimate and compelling state interest in safeguarding both the physical and psychological well-being of minors. [ Sable Comm., Inc. v. FCC

(1989) 492 U.S. 115.]  The appropriate questions are therefore whether the bill's proposed restrictions on the sale and rental of violent video games are (1) necessary and (2) narrowly tailored to achieve the stated interest of safeguarding minors.

   i.   Whether the proposed restrictions are necessary

The author argues there is clear evidence that violent video games increase children's aggressive behaviors, thoughts, and attitudes, and that they jeopardize children's psychological health by decreasing emotional empathy and pro-social helping behaviors.

Opponents note that the courts which have evaluated similar statutes found the restrictions proposed in those measures to be unsupported by scientific evidence.  The court in Kendrick noted that there was no demonstrated causal connection between the playing of violent video games and any violent acts, and found there was no evidence that the interactive character of the games -- rather than images which

AB 1179 (Yee)
Page 10

might be equally evident in movies or other unrestricted materials -- that caused the negative impacts.  [244 F.3d at 578-79.]  In IDSA , the court discounted a study which indicated only that "more aggressive thoughts are reported and there is frequently more aggressive behavior" after minors played violent video games, when there was no further evidence of actual psychological damage. [329 F.3d at 958-59.]

The author asserts that the studies relied upon here demonstrate both a causal connection to acts of violence and actual psychological damage.  In contrast, opponents assert that the studies relied upon are largely the same as the studies rejected by the courts, without any new primary or experimental research.  Opponents also argue that the restrictions are not "necessary" because any impact on a child caused by video game violence will be very small in comparison to other factors that may contribute to aggression, including real-world interactions and exposure to other types of media violence. It is unclear whether the evidence upon which this bill is based would support a finding that the proposed statutory restriction is necessary.

DOES THE EVIDENCE SUPPORT A LEGISLATIVE FINDING THAT THE PROPOSED RESTRICTIONS ARE NECESSARY?

   ii.   Whether the proposed restrictions are narrowly tailored

In support of a finding that the proposed

restrictions are narrowly tailored to achieve the stated interest, the author notes that the definition of "violent video game" (actually one of two definitions, the first being the obscenity definition discussed in Comment 2(a)) is limited to violence that is "heinous, atrocious, and cruel," and is perpetrated against a game character that is human or has "human-like characteristics."

Although these limitations would undeniably narrow the statute's scope, it is not clear that the

AB 1179 (Yee)
Page 11

narrowing effect would effectuate the stated purpose of the statute. The statute is designed to address studies which indicate that playing violent video games may have undesirable physical and mental effects on minors. But it is not evident that these studies identify "heinous, atrocious, and cruel" violence as causing the significant negative effects that the bill attempts to address.

The author contends that the "heinous, atrocious, and cruel" limitation is offered  Maleng  court's statement that the speech restrictions imposed by that statute were overly broad because the definition of "violent video games" was "expansive and d[id] not attempt to regulate the dissemination of video games on the basis of the extremity of the violence portrayed." [325 F.Supp.2d at 1190.] However, the  Maleng  court was evaluating its statute based on experts' testimony asserting "that 'ultra-violent' video games cause aggression and must be regulated in order to further the state's compelling interests." [ Id.  at 1189.] Here, the studies used to justify the state's compelling interests do not apparently relate to "ultra-violent" video games or video games that feature "heinous, atrocious, and cruel" violence. It is unclear what types of "violent" video games were used in the studies referenced by the author, and the author's comments sometimes treat the violent video games discussed in the studies as interchangeable with the M-rated games which are currently subject to industry self-regulation.

Because there does not appear to be a direct correlation between the proposed limitations and the negative effects discussed in the studies relied upon by the author, it is unclear that the proposed definition of "violent video game" is narrowly tailored to address the state's compelling interests, rather than simply tailored for the sake of a more "narrow" statute.

WOULD SOME OTHER STANDARD MORE EFFECTIVELY IMPOSE LIMITATIONS NARROWLY TAILORED TO ADDRESS THE

AB 1179 (Yee)
Page 12

COMPELLING INTERESTS AT STAKE?

3. Opponents contend industry self-regulation is a less restrictive alternative

Opponents argue that existing laws and regulations are further evidence that the bill's proposed restrictions are not "narrowly tailored" to address a compelling state interest, since those measures are "less restrictive alternatives" that may be used to address the same compelling state interests. Specifically, opponents note that the Entertainment Software Rating Board (ESRB) already assesses and rates video games based on their content and age-appropriateness, and that members of the industry have voluntarily submitted to the restrictions of these ratings. Opponents note that the ESRB's rating system has been praised by the Federal Trade Commission (FTC) as the most comprehensive rating system of the three entertainment industries.

The ESRB rating system uses six age-based ratings and about 30 content descriptors to provide information about the content of the game. The six age-based ratings are:
   EC or Early Childhood-suitable for ages 3 and older. Games contain no material that parents would find objectionable.

   E or Everyone-suitable for ages 6 and older. Games may contain minimal cartoon, fantasy, or mild violence and/or infrequent use of mild language.

   E10+ or Everyone 10 and Older-suitable for ages 10 and older. Games may contain more cartoon, fantasy or mild violence, mild language, and/or minimal suggestive themes.

   T or Teen-these games may be suitable for ages 13 and older. Games may contain violence, suggestive themes, crude humor, minimal blood and/or infrequent use of strong language.

   M or Mature-suitable for ages 17 and older. Games may contain mature sexual themes, more intense violence, and/or strong language.

AB 1179 (Yee)
Page 13

   AO or Adults Only-suitable for adults only. Games may include graphic descriptions of sex and/or violence. These products are not intended for persons under the

age of 18.

Each video game rated by the ESRB has the age-based rating symbol printed on the front and back of the game box, and the back of the box displays content descriptors that may explain why the game received the rating it did. Examples of the content descriptors include "animated blood," "comic mischief," "mild violence," "intense violence," "strong language," "suggestive themes," "strong sexual content," "drug reference" and "use of drugs."

The author acknowledges that the ESRB rating system is currently in place, but argues that its implementation has been unsatisfactory.

> Recent studies show that the voluntary rating and enforcement system implemented by self-regulatory associations or entertainment producers have had limited success on decreasing youth access to Mature (M) rated video games. In a phone survey of clerks at forty-six stores in 12 states, only 76% of respondents say they understand the ratings they are supposed to enforce and only half of the stores reported training employees in the use of the ratings ? In many of the stores that have reported they have training, further questioning revealed the "training" only included installing cash register prompts. Eight[y]-nine percent (89%) of stores surveyed said they now have policies restricting the sale of M-rated games to those under seventeen ? Despite this, clerks still sell these video games to under-aged youth. During 2004, the National Institute on Media and the Family had children between the ages of seven and fourteen attempt to purchase M-rated games in thirty-five stores. Youth succeeded 34% of the time. While the overall purchase rate was 34%, boys as young as seven were able to buy M-rated games 50% of the time. A nationwide undercover survey of stores completed by the Federal Trade Commission in 2003

AB 1179 (Yee)
Page 14

> corroborated these findings. In this study, 69% of unaccompanied 13 to 16-year-olds purchased M-rated games and only 24% of cashiers asked the youth's age.

Opponents respond that between 85% and 90% of retailers have recently implemented programs to prevent the sale and rental of M-rated games to minors. They argue that this new program will help to reduce improper sales of M-rated games to minor, and note that recent studies indicate sales of M-rated and AO-rated games to minors were prevented 66% of the time this year, an improvement from 45% the year before.

Opponents also argue that limitations on who can sell or

rent video games is not the only way to successfully limit minors' access to M-rated games, since information on the ESRB rating system is readily available to parents. In addition to the information included on the box of each video game, last year's AB 1793 (Yee) created a statutory requirement for video game retailers to prominently post signs advising consumers about the rating system, and to provide information explaining the rating system upon request. Opponents argue that making this information available to parents will play a large role in protecting minors from exposure to violent video games, citing FTC statistics which indicate that parents are involved in 8 out of 10 video game purchases or rentals.

4. Whether the terms of the bill are unconstitutionally vague

Opponents argue that the terms of the bill fall short of the level of clarity required by the First Amendment. Under Grayned v. City of Rockford , a legislative enactment must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." [408 U.S. 104, 108.]

Opponents challenge the bill's application to "characters with substantially human characteristics," arguing that this term could apply to aliens, talking beasts, robots, cartoon-type characters, and a broad range of other video game characters. Opponents also challenge the language

AB 1179 (Yee)
Page 15

used to define "heinous, atrocious, and cruel" violence. Those definitions require findings, for example, that virtual victims were "conscious" of specified abuse or that players had a specified intent or state of mind with respect to a virtual killing. Opponents argue that it is unclear how a virtual character could be found to be "conscious of abuse" or how it could be found that a video game player "intends to virtually inflict a high degree of pain" or "relishes the virtual killing or shows indifference to the suffering of the [virtual] victim." Determinations of consciousness and intent are clearly appropriate in assessing the severity of violent acts committed by (and against) real people. But those terms are more unwieldy and difficult to apply in the context of virtual characters or players whose ultimate "intent" is simply to progress through the levels of a computer game.

The Assembly Judiciary Committee analysis noted that the terms discussed above, which define "heinous, atrocious, and cruel" conduct, survived a vagueness challenge in a death penalty case. [Citing United States v. Jones (5th Cir. 1998) 132 F.3d 232.] That holding may not resolve the vagueness issues discussed above, however, because those questions relate specifically to problems that stem from the difficulty of applying those standards to virtual characters in a video game setting.

In discussing vagueness issues for another violent video game statute, the Maleng court stated:

> The problem is not, as defendants suggest, that a retail clerk might be unaware of the contents of a particular game ? The real problem is that the clerk might know everything there is to know about the game and yet not be able to determine whether it can be legally sold to a minor. The effects of such vagueness are particularly troublesome where First Amendment rights are implicated. Not only is a conscientious retail clerk (and her employer) likely to withhold from minors all games that could possibly fall within the broad scope of the Act, but authors and game designers will likely 'steer far wider of the unlawful zone ? than if the boundaries of the

AB 1179 (Yee)
Page 16

> forbidden area were clearly marked.'

[325 F.Supp.2d at 1191.]

These vagueness concerns may be further intensified by the potentially broad scope of responsibility for determining what video games are "violent" under the bill. AB 1179 would require every violent video game that is imported into the state for retail sale to be appropriately labeled, and would impose liability up to $1,000 for violations of this requirement. The author indicates that the requirement is intended to put the responsibility on manufacturers to determine what video games are violent. But it is possible that there would also be situations where large retailers want to import games from an out-of-state store to an in-state store for retail purposes. In such cases, it is unclear whether the responsibility for labeling would fall on the manufacturer (who may not have intended the game for sale in California) or the retailer. A wide variety of entities might therefore be responsible for making the difficult assessment of what video games are restricted under the statute.

As discussed below in Comment 5, opponents indicate that the labeling required under this bill would not be implemented on a national scale. Indeed, nation-wide labeling based on the AB 1179 standard would not be permitted to the extent that legislation in other states required labeling in accordance with different "violent video game" definitions.

ARE THE DEFINITIONS IN THE BILL TOO VAGUE TO PROVIDE A REASONABLE OPPORTUNITY FOR MANUFACTURERS AND RETAILERS TO DETERMINE WHAT GAMES ARE RESTRICTED?

5. Opponents say the bill would be unreasonably burdensome to implement

The California Retailers Association (CRA) contends that
this bill's requirement of additional labeling would
place extreme and unreasonable burdens on retailers.  CRA
asserts that implementation problems would arise because
this labeling would have to be California-specific, while
the voluntary ESRB labeling system would continue to be

AB 1179 (Yee)
Page 17

applied nationwide.  Although the author argues that AB
1179's definitions may ultimately be integrated with the
ESRB rating criteria, it is unclear that any kind of
integration would be possible when Illinois has enacted
violent video game restrictions that rely on a different
definition.  In order to do state-specific labeling, the
CRA maintains that retailers would be required to change
their software programs to account for different labels
on identical games to be sent to different destinations,
and that new UPC (Universal Product Codes) would have to
be assigned to violent video games that would be sent to
California.

6. Opponents note that government regulation has not proven
   necessary for other entertainment industries

   Opponents point out that other entertainment industries,
   such as the motion picture, recording, and publishing
   industries, are not subject to the sort of statutory
   restrictions this bill would impose on the video game
   industry.  Notably, the motion picture industry has been
   voluntarily self-regulated for approximately 40 years.
   Given the apparent success of other self-regulating
   industries, opponents to the bill argue that current
   self-regulating mechanisms for video games should be
   given an opportunity for similar success.

   Some opponents note an additional concern that the
   regulations proposed in the bill would set a precedent
   for imposing regulations on violent speech in other
   entertainment industries.  Indeed, some supporters of the
   bill readily agree that the bill's proposed regulations
   on violent video games should be expanded to movies,
   songs, and books which contain violent images or
   descriptions that could be harmful to children.  Given
   the broad scope of free speech interests associated with
   music, movies, books, and video games, opponents argue
   this bill could be the start of a journey down the
   slippery slope toward endangering important First
   Amendment rights.

7. Opponents argue the bill could chill video gaming
   development

   Opponents maintain that the proposed regulation would

AB 1179 (Yee)

Page 18

subject video game developers to a chilling effect, asserting that:

> Game creation is a massively complex mix of science and art. From software engineers to script writers to animators to music composers, there is a great need for talented, creative and educated individuals that must work in unison to see a game become a reality. In step with the growing need for talent, universities and colleges-over 50 just in the state of California-are implementing game development courses and degree programs.

Opponents are concerned that the regulations proposed by this bill would "stagnate this important cultural medium and its future evolution."

8. Whether 17 or 18 is the appropriate age of minority

The restrictions proposed in AB 1179 would be applied to minors under 18 years old, but the previous bill, AB 450, would have applied to minors under 17 years old. Opponents argue that the age of majority should be returned to 17 years old, since restrictions currently placed on movies and music both define 17 as the age of majority. Opponents also note that the industry's self-imposed regulation of video games restricts M-rated games to people 17 years old and older.

The author's staff indicates that the author selected 18 as the age of majority in this bill mainly for ease of implementation purposes. The author's staff notes that a recently enacted Illinois statute would restrict access to violent video games by minors under 18 years old, and suggests that manufacturers may have an easier time implementing various state statutes on a nationwide level if they can use the same "18" label. In practice, however, interchangeable labels would only be of limited use because the definition of violent video games in Illinois is significantly different from the definition proposed in this bill.

IF APPROVED, SHOULD THE RESTRICTION ON ACCESS FOR MINORS BE SET AT 17 OR 18 YEARS OLD?

AB 1179 (Yee)
Page 19

9. Additional implementation issues

The author's staff acknowledges that certain logistical concerns may remain to be resolved. Specifically, his staff acknowledges that it may be appropriate to delay the effective date of the bill to allow for an evaluation of what games should be restricted under the bill, and to allow for the labeling of such games. His staff also

acknowledges that it may be appropriate to "grandfather in" the video game stock that is already held in California retail outlets. The grandfather clause contemplated by the author may not address all situations where grandfathering may be appropriate. In particular, it would not apparently protect secondary markets such as Goodwill shops that resell preexisting stock from other retail outlets, or that sell used games.

SHOULD PROVISIONS BE MADE TO DELAY THE EFFECTIVE DATE OF THE BILL, AND TO GRANDFATHER IN EXISTING STOCK AND USED GAMES THAT MIGHT BE RESOLD?

10. Committee options

Because this bill is a gut-and-amend bill that is being heard under Senate Rule 29.10, it may not be amended in committee. It may be passed out of committee without amendment, it may be sent to the Floor without recommendation, or it may be held as a two-year bill.

Support:  Alliance for Children of San Mateo and Santa Clara Counties; California Alliance Against Domestic Violence; California Commission on the Status of Women; California State PTA; California Psychiatric Association; California Psychological Association; California State Conference of the National Association for the Advancement of Colored People; Capitol Resource Institute; City of Norwalk Department of Public Safety; Cruz Bustamante; dramaworks; Feather River College; Girl Scouts, Junior Leagues of California State Public Affairs Committee; Maidu Cultural and Development Group; Muir Trail Council; NAACP Legal Defense and Educational Fund, Inc.; Northern California Society of Public Health Education; Q Entertainment; Parents Television Council; Santa Clara County After School

☐

AB 1179 (Yee)
Page 20

Collaborative; Plumas County Child Care and Development Planning Council; Plumas Rural Services, Inc. Domestic Violence Services; Portola CARES Resource Center; Sierra Valley Even Start Family Literacy Program; Stanislaus County Children's Council; Support Network for Battered Women; Sutter Lakeside Community Services; The Child-Responsible Media Campaign; Women's Mountain Passages; 66 individuals

Opposition:  Activision; American Civil Liberties Union; American Electronics Association; California Broadcasters Association; California Chamber of Commerce; California Retailers Association; Electronic Arts; Entertainment Software Association; Independent Film & Television Alliance; Interactive Entertainment Merchants Association; International Game Developers Association; Motion Picture Association of America, Inc.; National Association of Theatre

                Owners of California/Nevada; Recording Industry
                Association of America; The Media Coalition,
                Inc.; TechNet; Video Software Dealers
                Association; Wal-Mart; Eight Individuals

                            HISTORY

    Source:  California District of the American Academy of
             Pediatrics; Common Sense Media; Girl Scout Councils
             of California [co-sponsors]

    Related Pending Legislation:  AB 450 (Yee), which contains
                             roughly the same terms as this bill
                             but limits sales and rentals to
                             people younger than 17, is on the
                             Assembly Floor.

    Prior Legislation:  AB 1792 (Yee, 2004), which failed in
                  the Assembly Committee on Arts,
                  Entertainment, Sports, Tourism, and Internet
                  Media, would have prohibited the sale,
                  rental, or exhibition of violent video games
                  to minors under 18 years old, defining
                  "violent video games" as games that (1)
                  appeal to a minor's morbid interest in

AB 1179 (Yee)
Page 21

                  violence, (2) allow infliction of serious
                  injuries on human-like characters in a way
                  that is especially heinous, atrocious, or
                  cruel, and (3) lack serious literary,
                                                               artistic, political, or :
                  minors.

                  AB 1793 (Yee), Chapter 630, Statutes of 2004,
                  requires video game retailers to post signs
                  in prominent areas of the retail
                  establishment to notify customers that a
                  rating system is available to aid in the
                  selection of video games, and to make
                  information explaining the rating system
                  available on request.

    Prior Vote:  Not relevant.  Bill was gutted and amended.

                       *************