GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR., SBN 132099
H. MARK LYON, SBN 162061
ETHAN D. DETTMER, SBN 196046
1881 Page Mill Road
Palo Alto, California  94304
Telephone: (650) 849-5300
Facsimile: (650) 849-5333

JENNER & BLOCK LLP
PAUL M. SMITH
KATHERINE A. FALLOW
MATTHEW S. HELLMAN
601 13th Street, N.W., Suite 1200
Washington, D.C. 20005
Telephone:  (202) 639-6000
Facsimile:  (202) 639-6066

Attorneys for Plaintiffs
VIDEO SOFTWARE DEALERS ASSOCIATION
and ENTERTAINMENT SOFTWARE ASSOCIATION

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIDEO SOFTWARE DEALERS ASSOCIATION and ENTERTAINMENT SOFTWARE ASSOCIATION,<br><br>Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, in his official capacity as Governor of the State of California; BILL LOCKYER, in his official capacity as Attorney General of the State of California; GEORGE KENNEDY, in his official capacity as Santa Clara County District Attorney, RICHARD DOYLE, in his official capacity as City Attorney for the City of San Jose,  and ANN MILLER RAVEL, in her official capacity as County Counsel for the County of Santa Clara,<br><br>Defendants. | CASE NO. C 05-4188 RMW (RS)<br><br>PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF<br><br>Date:    May 12, 2006<br>Time:   9:00 a.m.<br>Dept:   6 |

Notice of Motion and Motion for a Preliminary Injunction;
Memorandum of Points and Authorities in Support Thereof          Case No. C 05-4188 RMW (RS)

Dockets.Justia.com

1

## **NOTICE OF MOTION AND MOTION**

2   TO ALL DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

3         PLEASE TAKE NOTICE that on May 12, 2006, at 9:00 a.m., or as soon thereafter as this

4   matter may be heard, in Courtroom 6 of this Court, located at 280 South First Street, San Jose,

5   California  95113, plaintiffs Video Software Dealers Association ("VSDA") and Entertainment

6   Software Association ("ESA") will, and hereby do, respectfully move for summary judgment to

7   permanently enjoin Defendants and their officers, employees, and representatives from enforcing Cal.

8   Civil Code § 1746 (2005)  (hereinafter, the "Act").

9         VSDA and ESA (collectively "Plaintiffs") move for a preliminary injunction pursuant to

10  Federal Rule of Civil Procedure 56 on the following grounds:

11        1.      This Court has already entered a preliminary injunction enjoining Defendants ("the

12  State") from enforcing the Act.  *See Video Software Dealers Ass'n v. Schwarzenegger*, 401 F. Supp.

13  2d 1034 (N.D. Cal. 2005).   The Court recognized that the Act imposes a content-based ban on

14  expression that is protected by the First Amendment. *Id.* at 1044.  The Court further held that the

15  Act's restrictions on minors' access to such expression was subject to strict scrutiny, preliminarily

16  concluding that Defendants were unlikely to meet their burden under that stringent level of review.

17  *Id.* at 1044-46.  As the Court noted, courts have enjoined every attempt to regulate "violent" video

18  games.

19        2.      The State cannot meet its burden under strict scrutiny.  To begin, the Act serves no

20  compelling purpose.  Moreover, the State cannot show that it has acted on the basis of substantial

21  evidence.  To the contrary, no court has ever credited the evidence that the State relies upon.  Indeed,

22  that evidence is so one-sided and riddled with caveats that it cannot possibly support the interests

23  claimed by the State.

24        3.      The Act does not materially advance its stated goals because the State has singled out

25  a subset of video games for regulation, despite the fact that a wide range of media contain

26  comparable violent expression.  The Act is also not narrowly tailored to achieve its purported goals

27  because, *inter alia*, its vague terms will create a chilling effect and because the State has not

28  considered less speech-restrictive alternatives, such as voluntary industry guidelines.

i

Notice of Motion and Motion for Summary Judgment;
Memorandum of Points and Authorities in Support Thereof                     Case No. C 05-4188 RMW (RS)

1        5.    The Act's mandatory labeling requirement compels video game manufacturers,

2    distributors, and retailers to channel the State's message that minors should not access them – even if

3    manufacturers and retailers vigorously disagree with this proposition.  The labeling requirement is

4    thus subject to, and defeated by, strict scrutiny.

5        6.    The Act's terms are unconstitutionally vague.  Although this Court preliminarily

6    concluded that some of the Act's terms were adequately definite, the record demonstrates that the

7    Act's definition of "violent" video games does not provide sufficient notice of which games will be

8    covered, and therefore is impermissibly vague.

9        This Motion is based on this Notice of Motion and Motion, the attached Memorandum of

10   Points and Authorities, the expert declarations submitted herewith detailing the lack of substantial

11   evidence supporting the Act, the accompanying transcripts of expert testimony, the Court's papers

12   and files in this case, the arguments of counsel, and any other matters the Court may consider.  For

13   each of these reasons, Plaintiffs request that this Court grant summary judgment in their favor and

14   enjoin all Defendants to this action, and their officers, employees, and representatives, from

15   enforcing, or directing the enforcement of the Act.

16

17

18

19

20

21

22

23

24

25

26

27

28

Notice of Motion and Motion for Summary Judgment;
Memorandum of Points and Authorities in Support Thereof      Case No. C 05-4188 RMW (RS)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iv

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

ARGUMENT ...................................................................................................................... 4

    I.        STANDARD OF REVIEW. ...................................................................... 4

    II.      THE ACT CANNOT SURVIVE STRICT SCRUTINY AND THEREFORE
            VIOLATES THE FIRST AMENDMENT. ............................................... 4

          A.  The Act Does Not Satisfy The *Brandenburg* Standard.......................... 5

          B.  The First Amendment Forbids The State From Censoring Speech In Order To
              Control Minors' Thoughts Or Feelings.................................................. 7

          C.  The Legislative Record Is Devoid Of "Substantial Evidence" Supporting The
              Act's Restrictions On Speech. .......................................................... 10

          D.  The Act Does Not Advance The State's Interests And Is Not
              Narrowly Tailored.............................................................................. 14

    III.     THE ACT'S LABELING PROVISIONS ARE UNCONSTITUTIONAL. ............... 18

    IV.    THE ACT IS UNCONSTITUTIONALLY VAGUE.................................................. 20

CONCLUSION .................................................................................................................. 23

# TABLE OF AUTHORITIES

## CASES

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996) ............................................. 17

*American Amusement Machine Association v. Kendrick*, 244 F.3d 572
(7th Cir. 2001).......................................................................................... 1,3, 9, 11, 15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....................................................... 4

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002)............................................ 6, 8, 9, 17

*Boos v. Barry*, 485 U.S. 312 (1988).................................................................................... 8

*Brandenburg v. Ohio*, 395 U.S. 444 (1969)........................................................................ 5

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................................. 4

*Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188 (9th Cir. 1989)................................... 6

*Entertainment Software Association v. Blagojevich*, 404 F. Supp. 2d 1051 (N.D. Ill.
2005) ............................................ 1, 3, 5, 7, 8, 9, 10, 11, 12, 13, 14, 15, 17, 18, 19, 21

*Entertainment Software Association v. Granholm*, 404 F. Supp. 2d 978 (E.D. Mich.
2005) ................................................................................................... 2, 13, 14, 22

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975)...................................................... 9

*Florida Star v. B.J.F.*, 491 U.S. 524 (1989)..................................................................... 15

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)........................................................... 20

*Interactive Digital Software Association v. St. Louis County*, 329 F.3d 954 (8th Cir.
2003) .................................................................................................... 1, 3, 12, 13

*James v. Meow Media*, 300 F.3d 683 (6th Cir.2002)........................................................... 7

*Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952) ......................................................... 8

*Kolender v. Lawson*, 461 U.S. 352 (1983)....................................................................... 20

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ............... 5

*McConnell v. Federal Election Commission*, 540 U.S. 93 (2003)....................................... 9

*NAACP v. Button*, 371 U.S. 415 (1963)............................................................................ 20

iv

*Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1
(1986) ........................................................................................................ 18, 19

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ...................................... 5, 14, 15

*Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997) ........................ 20

*Riley v. National Federation of the Blind of N.C., Inc.*, 487 U.S. 781 (1988) .......... 18, 19

*Texas v. Johnson,* 491 U.S. 397 (1989) ............................................................ 8

*United States v. Playboy Entertainment Group*, 529 U.S. 803 (2000) ................... 4, 15, 17

*United States v. United Foods, Inc.*, 533 U.S. 405 (2001) ................................. 18

*Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180, 1186-88 (W.D.
Wash. 2004) .............................................................................. 2, 3, 7, 12, 22

*Video Software Dealers Association v. Schwarzenegger*, 401 F. Supp. 2d 1034 (N.D.
Cal. 2005).............................................................. 1, 3, 6, 9, 10, 19, 20, 22

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) ................................. 17

## STATUTES

Cal. Civ. Code § 1746 ......................................................................*passim*

Cal. Bus. & Prof. Code § 20650 .................................................................... 17

## MISCELLANEOUS

Associated Press, *Sony to hand parents video game controls*, Int'l Herald Trib.,
Nov. 28, 2005, available at http://www.iht.com/articles/2005/11/28/business/
sony.php ........................................................................................................ 17

FTC, Report to Congress: Marketing Violent Entertainment to Children, (July 2004).... 17

Press Release, Indiana Univ. School of Medicine, *Self-Control May Be Affected By Violent
Media Exposure*, May 26, 2005, *available at* http://medicine.indiana.edu/news_releases/
viewRelease.php4?art=339&print=true ................................................................ 13

**MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiffs Video Software Dealers Association ("VSDA") and Entertainment Software Association ("ESA") submit this memorandum in support of their motion, pursuant to Federal Rule of Civil Procedure 56, for summary judgment invalidating Cal. Civil Code § 1746 (2005) (hereinafter, the "Act"), as an unconstitutional abridgement of speech under the First and Fourteenth Amendments, and as unconstitutionally vague under the Fourteenth Amendment.[1]

**INTRODUCTION**

This Court has already granted Plaintiffs a preliminary injunction enjoining enforcement of the Act by Defendants (the "State"). *See Video Software Dealers Ass'n v. Schwarzenegger*, 401 F. Supp. 2d 1034 (N.D. Cal. 2005). The Court recognized that the Act imposes a content-based ban on expression that is protected by the First Amendment. *Id.* at 1044. The Court further held that the Act's restrictions on minors' access to such expression was subject to strict scrutiny, preliminarily concluding that Defendants were unlikely to meet their burden under that stringent level of review. *Id.* at 1044-46. As the Court noted, courts have enjoined every attempt to regulate "violent" video games. *See Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954, 960 (8th Cir. 2003) ("*IDSA*"); *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 580 (7th Cir. 2001) ("*Kendrick*"); *Entertainment Software Ass'n v. Blagojevich*, 404 F. Supp. 2d 1051, 1082 (N.D. Ill. 2005) ("*Blagojevich*"); *Entertainment Software Ass'n v. Granholm*, 404 F. Supp. 2d 978, 983 (E.D. Mich. 2005) ("*Granholm*"); *Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180, 1186-88 (W.D. Wash. 2004) ("*VSDA*").

Based on the record before the Court, and in light of this overwhelming precedent, Plaintiffs now seek summary judgment on their constitutional challenge to the Act. The Act is defended on

---

[1] Plaintiffs at this time do not move for summary judgment on their equal protection claim.

1

Notice of Motion and Motion for Summary Judgment;
Memorandum of Points and Authorities in Support Thereof                    Case No. C 05-4188 RMW (RS)

essentially two grounds: controlling minors' *behavior* or controlling minors' *thoughts*, all through the restriction of their access to speech. Neither comes close to satisfying strict scrutiny. To the extent the State seeks to justify the Act as a means to prevent minors from acting aggressively, the law triggers – and fails to meet – the *Brandenburg* standard. To the extent the State defends the Act as a way to curb "psychological" or "emotional" harm to minors, that rationale is nothing more than impermissible thought control. Nor have Defendants come close to demonstrating that the Act is narrowly tailored or that other less restrictive alternatives are unavailable.

The current record establishes the Act's constitutional infirmities, and no evidence the State can offer will suggest that a trial might lead to another outcome. Indeed, Defendants agree that this case can be decided on summary judgment based on the record before the Court. Further factual development will not make the Act's content-based regulation or labeling requirements more legitimate or more well-founded. Nor will it make the Act's unconstitutionally vague terms more comprehensible. Because the law is clear and the material facts are not in dispute, Plaintiffs respectfully ask the Court to grant summary judgment in their favor and permanently enjoin the Act.

## BACKGROUND

Plaintiffs are associations of companies that create, publish, distribute, sell and/or rent video games. Andersen Decl. ¶ 3 (attached as Exh. 1 to Mem. in Support of Plaintiffs' Mot. Prelim. Inj.); Lowenstein Decl. ¶ 2 (attached as Exh. 3 to Mem. In Support of Plaintiffs' Mot. Prelim. Inj.). In this facial challenge, Plaintiffs also assert the rights of willing listeners. Compl. ¶ 7.

In granting a preliminary injunction, this Court has already stated that "video games . . . are . . . protected by the First Amendment," *Schwarzenegger*, 401 F. Supp. 2d at 1044, a conclusion that has been universally adopted by other courts. *Kendrick*, 244 F.3d at 577-78; *IDSA*, 329 F.3d at 957; *Blagojevich*, 404 F. Supp. 2d at 1072; *VSDA*, 325 F. Supp. 2d at 1184-85. Video games are a modern form of artistic expression. Like film and television programs, video games tell stories and entertain

audiences through the use of complex pictures, sounds, and text. *See* Price Decl. ¶¶ 3-4 (attached as Exh. 2 to Mem. in Support of Plaintiffs' Mot. Prelim. Inj.).

The Act imposes a civil penalty of up to $1,000 on any person who "sell[s] or rent[s] a video game that has been labeled as a violent video game to a minor." Act, § 1746.1(a). "Violent" video games are defined by the Act as those "in which the range of options available to a player includes killing, maiming, dismembering, or sexually assaulting an image of a human being," if the actions depicted meet one of two sets of criteria. Act, § 1746(d)(1). Under the first set of criteria, the violence depicted in the game must "appeal to a deviant or morbid interest of minors," be "patently offensive to prevailing standards in the community as to what is suitable for minors," and "cause[] the game, as a whole, to lack serious literary, artistic, political, or scientific value for minors." *Id.* § 1746(d)(1)(A). Under the second provision, a game will be restricted if the actions depicted enable "the player to virtually inflict serious injury upon images of human beings or characters with substantially human characteristics in a manner which is especially heinous, cruel or depraved in that it involves torture or serious physical abuse to the victim." *Id.* § 1746(d)(1)(B).

The Act's "violent" video game ban purportedly serves two purposes: "preventing violent, aggressive, and antisocial behavior" and "preventing psychological or neurological harm to minors who play violent video games." *Id.* § 1(c). Furthermore, the Act purports to make "findings" that "[e]xposing minors to depictions of violence in video games" makes them "more likely to experience feelings of aggression, to experience a reduction of activity in the frontal lobes of the brain, and to exhibit violent antisocial or aggressive behavior," and that "[e]ven minors who do not commit acts of violence suffer psychological harm from prolonged exposure to violent video games." *Id.* §§ 1(a),(b).

In addition to imposing substantial penalties on persons who sell or rent "violent" video games to minors, the Act imposes an additional, content-based burden on speech that is unsupported

3

by a compelling state interest.  The Act provides that "[e]ach violent video game that is imported into or distributed in California for retail sale shall be labeled with a solid white '18' outlined in black. The '18' shall have dimensions of no less than 2 inches by 2 inches" and must be placed on the face of the video game package.  Act, § 1746.2.  Failure to label a "violent" video game subjects a manufacturer, distributor or importer to a $1,000 penalty.  Act, § 1746.3.

Plaintiffs filed their complaint on October 17, 2005, alleging that the Act is unconstitutional under the First and Fourteenth Amendments to the United States Constitution.  On October 19, 2005, Plaintiffs filed a motion seeking to preliminarily enjoin the Act, which was scheduled to take effect on January 1, 2006.  This Court entered an order granting the preliminary injunction on December 23, 2005.

## ARGUMENT

### I.  STANDARD OF REVIEW.

The State has the burden of proof at trial to establish that the Act passes First Amendment scrutiny.  *See, e.g.*, *United States v. Playboy Entm't Group*, 529 U.S. 803, 816-17 (2000).  Thus, to survive Plaintiffs' summary judgment motion, the State must come forward with sufficient evidence to create a genuine issue of material fact on each and every "element essential to [its] case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material only if it might affect the outcome of the case under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The State thus must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The State cannot meet its burden because there is no genuine dispute of fact with respect to any element of the State's case, much less all of them.

### II.    THE ACT CANNOT SURVIVE STRICT SCRUTINY AND THEREFORE VIOLATES THE FIRST AMENDMENT.

Because the Act imposes a content-based restriction on protected expression, it is subject to

4

strict scrutiny, as this Court has already held. *Schwarzenegger*, 401 F. Supp. 2d at 1044-45.[2]  As a result, the Act is "presumptively invalid," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992), and must be struck down unless Defendants can satisfy the stringent requirements of strict scrutiny. Plaintiffs are entitled to summary judgment because the Act fails every stage of the strict scrutiny analysis.  Strict scrutiny requires the State to demonstrate that the Act "is necessary to further a compelling state interest." *Id*. at 403 (internal citation omitted).  In making this showing, the State cannot just simply "'posit the existence of the disease sought to be cured.'"  *Blagojevich* 404 F. Supp. 2d at 1072 (quoting *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 664-65 (1994)).  Instead, it must point to "substantial evidence" supporting its claim.  *Id*.  Because the State's goals are illegitimate and not supported by substantial evidence, summary judgment is warranted.  *Infra*, §§ II.A; II.B; II.C.  Strict scrutiny also requires the State to demonstrate that the Act is narrowly tailored and materially advances its interests.  The record is clear that the Act fails these aspects of strict scrutiny, as well.  *Infra*, §  II.D.

### A.  The Act Does Not Satisfy The *Brandenburg* Standard.

As noted, the Act posits two purported state interests:  first, in "preventing violent, aggressive, and antisocial behavior" among minors; and second, "preventing psychological or neurological harm to minors who play violent video games."  *Id*. § 1(c).  To the extent the Defendants seek to defend the Act on the first rationale – preventing violent or aggressive behavior, the Act must satisfy the

---

[2] The State has maintained in the past that it need not satisfy strict scrutiny under a novel new "harmful to minors" doctrine for "violent" expression.  State Opp. to Prelim. Inj. at 6-10.  This Court has already rejected that argument, *Schwarzenegger*, 401 F. Supp. at 1044-45.  Moreover, courts have consistently refused to expand a doctrine that has always been limited to sexual obscenity into the realm of violence.  *See IDSA*, 329 F.3d at 958 ("Simply put, depictions of violence cannot fall within the legal definition of obscenity for either minors or adults."); *Kendrick*, 244 F.3d at 575-76 ("The notion of forbidding . . . pictures of violence . . . is a novelty, whereas concern with pictures of graphic sexual conduct is the essence of the traditional concern with obscenity."); *VSDA*, 325 F. Supp. 2d at 1185; *see also James*, 300 F.3d at 698 ("declin[ing] to extend . . . obscenity jurisprudence to violent, instead of sexually explicit, material" in a case involving tort liability for violent video game manufacturers).  There is no basis for this Court to depart from this settled line of jurisprudence.

5

stringent standards established by the Supreme Court in *Brandenburg v. Ohio*, 395 U.S. 444 (1969). *See Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1199 (9th Cir. 1989) (efforts to restrict speech based on its "tendency to cause others to engage in undesirable acts" must meet the *Brandenburg* test). Under *Brandenburg*, the government must prove that the targeted expression "is *directed* to inciting or producing the imminent lawless action and is *likely* to incite or produce such action." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002) (quoting *Brandenburg*, 395 U.S. at 447) (emphasis added). The State cannot, and has not even purported to make, this showing.

In granting the preliminary injunction, this Court stated that "[t]he Act seems to be intended more to prevent harm to minors than preventing minors from engaging in real-world violence," and therefore did not apply the *Brandenburg* standard. *Schwarzenegger* 404 F. Supp. 2d. at 1045. Plaintiffs agree that if the Act is wholly unconcerned with preventing violence, and the State completely disavows any reliance on the "preventing real-world violence" rationale, *Brandenburg* may not apply. But the language of the Act and the Defendants' arguments before this Court suggest that a central focus of the Act is indeed the prevention of violence. The Act expressly states that one of its primary goals is to prevent minors from acting violently, *see* Act, § 1(a), § 1(b), and almost every piece of social science research offered by the State in support of the Act purports to demonstrate that "violent" video games cause minors to be more violent. *See* App. to State Opp. to Prelim Inj. at A014 (citing titles relied upon by the Legislature including, "Violent Video Games Increase Aggression and Violence," "Violent Video Games and Aggressive Thoughts, Feelings, and Behaviors," "Video Games and Aggressive Thoughts, Feelings, and Behavior in the Laboratory and in Life."). Thus, although the State has ostensibly disclaimed the goal of violence-prevention in favor of a "harm to minors" rationale, the evidence on which the State relies belie its denials. *Compare* State Opp. to Prelim. Inj. at 8 (*Brandenburg* is . . . not applicable) *with id*. at 13 (relying on supposed finding that "[c]orrelational studies reveal a linkage to serious, real-world types of

6

aggression") *and id.* at 14 (relying on supposed finding that "[a]dolescents who expose themselves to greater amount of video game violence were more hostile").

Therefore, to the extent the Defendants continue to rely on evidence supposedly linking video games to violence, *Brandenburg* applies. The State has no conceivable basis for arguing that it has satisfied the *Brandenburg* standard, and indeed, the State has not even tried to do so. There is no evidence in record that video games, which serve to entertain, are intended to cause violence. Nor is there a scintilla of evidence even suggesting that video games, played by millions daily, are likely to cause imminent violence. As *Blagojevich* put it when considering the same body of evidence relied upon by the State here: "Defendants have come nowhere near making the necessary showing in this case" to satisfy *Brandenburg*. *Blagojevich*, 404 F. Supp. at 1073; *see also VSDA*, 325 F. Supp. 2d 1180, 1185 n.3; *cf. James v. Meow Media*, 300 F.3d 683, 690 (6th Cir.2002) (applying *Brandenburg* where plaintiff sought to impose liability on video game maker in tort context). This is hardly surprising, given that the research the State relies upon is concerned with the "glacial process of personality development," rather than the "temporal imminen[ce] that we have required to satisfy the Brandenburg test." *James*, 300 F.3d at 698. For these reasons, the Act must be enjoined as an impermissible regulation of expression undertaken in the name of preventing violence.

### B. The First Amendment Forbids The State From Censoring Speech In Order To Control Minors' Thoughts Or Feelings.

Turning to the second proffered justification—preventing "psychological or neurological harm to minors who play violent video games"—the State faces two problems. First, as just discussed, the evidence on which the State relies is a collection of social science that is almost exclusively concerned with the prevention of actual aggression . The State cannot have it both ways. Either the State *is* attempting to prevent minors from behaving aggressively based on its belief that "violent" video game expression causes such behavior, in which case it must satisfy *Brandenburg*, or the State is *not* trying to achieve that purpose, in which case the "aggression" studies on which it primarily

7

relies are irrelevant and do not establish a compelling state interest.

Second, to the extent the State's purported "compelling" interest in protecting against "psychological and neurological harm" to minors is anything more than a repackaging of the "preventing real-life" violence rationale, it amounts to an entirely illegitimate effort to restrict access to expression based on consumers' anticipated "psychological" reaction to that content. Such a rationale is not a legitimate state interest, let alone a compelling one. *See Blagojevich*, 404 F. Supp. 2d at 1074 ([T]the State lacks the authority to ban protected speech on the ground that it affects the listener's or observer's thoughts and attitudes.").

The government "cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts." *Free Speech Coalition*, 535 U.S. at 253 (quoting *Stanley v. Georgia*, 394 U.S. 557, 566 (1969)). Whether the State describes its remaining interest as preventing "asocial" attitudes or fine-tuning minors' "psychology," the First Amendment generally does not allow the State to ban speech based on how listeners will react to it. *See Boos v. Barry*, 485 U.S. 312, 321 (1988) (O'Connor, J., joined by Stevens & Scalia, JJ.) (striking ban on picketing near embassies where purpose was to protect the emotions of those who reacted to the picket signs' message); *Texas v. Johnson*, 491 U.S. 397, 408-09 (1989) (interest in protecting bystanders from feeling offended or angry is not sufficient to justify ban on expression).

Expressive works like video games, film or literature certainly "may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952). But with the exception of speech that is intended and likely to incite imminent violence, the State has *no* legitimate interest in censoring protected speech simply because it believes that it could lead to disfavored attitudes on the part of the listener. To the contrary, "First Amendment freedoms are most in danger

8

when the government seeks to control thought or to justify its laws for that impermissible end." *Free Speech Coalition*, 535 U.S. at 253.

This analysis is unchanged by the fact that listeners at issue here are minors. First Amendment limitations on governmental action are in general "no less applicable when [the] government seeks to control the flow of information to minors." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975); *see Schwarzenegger*, 404 F. Supp. 2d at 1044 ("Children 'are entitled to a significant measure of First Amendment protection.'") (quoting *Erznoznik*, 422 U.S. at 212); *McConnell v. Federal Election Comm'n*, 540 U.S. 93, 231 (2003) ("Minors enjoy the protection of the First Amendment."); *Blagojevich*, 404 F. Supp. 2d at 1075 ("[Concerns about thought control] apply to minors just as they apply to adults."). As Judge Posner observed in *Kendrick*, preserving children's First Amendment rights is "not merely a matter of pressing the First Amendment to a dryly logical extreme. . . . People are unlikely to become well-functioning, independent-minded adults, and responsible citizens if they are raised in an intellectual bubble." *Kendrick*, 244 F.3d at 576-77. The State has no authority to censor material in order to achieve a desired effect in minors. "If controlling access to allegedly 'dangerous' speech is important in promoting the positive psychological development of children, in our society that role is properly accorded to parents and families, not the State." *Blagojevich*, 404 F. Supp. 2d at 1075.

As this Court has already noted, there are few limits on the theory of governmental authority espoused by the Defendants in their defense of the Act. During oral argument on Plaintiffs' motion for a preliminary injunction, the County Defendants suggested that the "harmful to minors" rationale would justify a censorship regime under which minors could be denied access to a broad range of books if the State could show that such books "harmed" children. But "[n]o court has previously endorsed such a limited view of minors' First Amendment rights." *Schwarzenegger*, 404 F. Supp. 2d at 1045. To the contrary, "[i]t is uncertain that even if a causal link exists between violent video

9

games and violent behavior" – and for the reasons described below, such a link has *not* been established – "the First Amendment allows a state to restrict access to violent video games, even for those under eighteen years of age."  *Id.*

### C.  The Legislative Record Is Devoid Of "Substantial Evidence" Supporting The Act's Restrictions On Speech.

Regardless of the purported interests advanced by the Defendants, the Act cannot withstand strict scrutiny because the State's evidence, on its face, does not demonstrate that "the California legislature made 'reasonable inferences based on substantial evidence.'"  *Schwarzenegger*, 401 F. Supp. 2d at 1045 (quoting *Turner*, 512 U.S. at 666.).  To the contrary, no court has ever credited the evidence that Defendants rely upon.[3]  *See Blagojevich*, 404 F. Supp. 2d at 1074-75 (holding, after considering social science research in depth, that state defendants had failed to prove a compelling state interest by "substantial evidence.").  Indeed, that evidence is so one-sided and riddled with caveats that it cannot possibly support the interests claimed by the State.

As this Court has already noted, the evidence relied upon by the California Legislature in passing the Act consists almost exclusively of articles by Dr. Craig Anderson.  *Id.*  Even taken at face value, Dr. Anderson's work does not demonstrate either a substantial or a causal connection between "violent" video games and aggression.  As *Blagojevich* observed, Dr. Anderson has conceded that the supposed "effects" of exposure to "violent" video games, if any, are quite small.  *E.g.,* 404 F. Supp. 2d. at 1059 (Dr. Anderson admits that his study shows that violent video games have only an "incremental" effect on aggressive behavior.); *id.* at 1060 (Dr. Anderson found only slight differences in "noise blast" test results between those who were exposed to violent video games and those who were not).  Moreover, based on these limitations in Dr. Anderson's work, the court in *Blagojevich* concluded that

---

[3] Notably, the defendants in Illinois did not appeal any of the district court's factual findings or legal conclusions about that state's "violent" video games law.

> defendants have failed to present substantial evidence showing that
> playing violent video games causes minors to have aggressive feelings
> or engage in aggressive behavior. At most, researchers have been able
> to show a correlation between playing violent video games and a
> slightly increased level of aggressive thoughts and behavior. With these
> limited findings, it is impossible to know which way the causal
> relationship runs: it may be that aggressive children may also be
> attracted to violent video games.

> *Id.* at 1074.

Indeed, Dr. Anderson has admitted that "violent" video games do not cause immediate acts of extreme violence, and that "the vast majority of the kids . . . playing violent video games right now … are going to grow up and be just fine." Transcript of Testimony of Dr. Craig A. Anderson, *Blagojevich*, 11/15/05 Tr. at 283 ("Anderson Test.") (*see*, Declaration of Katherine A. Fallow ("Fallow Decl."), ¶ 2, Exh. A (Fallow Decl. attached hereto as Exh. 1). Even read charitably, this is light years from being a record of substantial evidence demonstrating a real harm or compelling state interest.

Moreover, although the Act posits that children are especially vulnerable to the supposed harm of "violent" video games, the record is devoid of evidence demonstrating that video games are any more "harmful" than other violent media. The Seventh Circuit specifically found in considering Dr. Anderson's research that there was no evidence that video games "are any more harmful to the consumer or to public safety than violent movies or other violent, but passive entertainments." *Kendrick*, 244 F.3d at 579. *Blagojevich* reached the same conclusion, finding that Dr. Anderson's research did not show that video games were more harmful than other media. *See Blagojevich*, 404 F. Supp. 2d at 1074 ("Dr. Anderson also has not provided evidence to show that the purported relationship between violent video game exposure and aggressive thoughts or behavior is any greater than with other types of media violence, such as television or movies, or other factors that contribute to aggression, such as poverty."). This conclusion was inescapable given that Dr. Anderson conceded in his *Blagojevich* testimony that the "effect sizes" for television and video game

11

"violence" are essentially the same. Anderson Test., 11/15/05 Tr. at 279-80. And Dr. Anderson's testimony revealed another lack of fit between the Act and its goals when he conceded that his research showed no difference in "vulnerability" to violent images as between adults and children. *Id.* at 324-25.[4]

Therefore, the legislative record does not provide "substantial evidence" for the State's claim that exposure to "violent" video games causes an increase in violent or aggressive behavior. The Defendants' evidence of "psychological" or "neurological" harm is even flimsier. The core concern of the State's social science evidence is demonstrating a link between video games and violence, rather than psychological or neurological harm. *See* Williams Decl. at ¶ 4 (attached hereto as Exh. 2) (noting that Dr. Anderson's work is "generally concerned" with whether video games create "violent adolescents") . Indeed, the studies cited in the State's "Violent Video Game Bibliography," State Opp. to Prelim. Inj., App. A at A14-18, skew almost entirely toward a concern with violence (and Anderson has authored or co-authored roughly half of the studies cited). And even those that purport to have a focus on psychological harm generally tie that harm to increased aggression. *E.g.*, Funk, et al., *Violence Exposure in Real-Life, Video Games, Televison, Movies, and the Internet: Is There Desensitization*? (noting that desensitization is associated with increased aggression) (reprinted in State Opp. to Prelim. Inj., App. E at E1-10).[5]

---

[4] Dr. Anderson further admitted that increases in "aggression" could be the result of a large number of stimuli, and he has not done the research to compare the relative effects of any of these other factors. Anderson Test. 11/15/05 Tr. at 328. Finally, just as the State has failed to consider the substantial body of research that contradicts the position it advocates, *infra* at 13, Dr. Anderson has ignored contrary evidence in reaching his conclusions about the so-called effects of exposure to "violent" video games. *Id.* at 335-36. This one-sided research cannot support the State's claimed interests in this case.

[5] Ultimately, every court to have considered the issue has rejected the psychological harm rationale as a basis for restricting video games. *See Blagojevich*, 404 F. Supp. 2d at 1074-75; *IDSA*, 329 F.3d at 959; *VSDA*, 325 F.Supp. 2d at 1188. The Eighth Circuit rejected a materially indistinguishable "psychological harm" justification, holding that "[t]he [government's] conclusion that there is a strong likelihood that minors who play violent video games will suffer a deleterious effect on their

[Footnote continued on next page]

The State's supposed interest in preventing minors from experiencing a "reduction of activity in the frontal lobes of the brain" is even less compelling. Act, § 1(a). The State has pointed to the research of Dr. William Kronenberger in support of its claimed interest in preventing a reduction in "frontal lobe" activity. As two other courts have already recognized, however, Dr. Kronenberger's research does not constitute "substantial evidence" supporting a restriction on speech. Critically, none of Dr. Kronenberger's "brain scan" studies – only one of which has been published – distinguish between the supposed effects of playing "violent" video games versus from watching "violent" television, and as a result nothing in his research supports singling out video games for censorship. *Granholm*, 404 F. Supp. 2d at 982; *see also* Testimony of William Kronenberger, 11/14/05 Tr. at 77 (*see*, Fallow Decl., ¶ 2, Exh. B) (conceding that his studies "did not analyze the effect of violent video games specifically") ("Kronenberger Test."). And, Dr. Kronenberger has repeatedly conceded that his research does not show that playing "violent" video games *causes* the brain patterns observed by his research team. *Blagojevich*, 404 F. Supp. 2d at 1074; Kronenberg Test., 11/14/05 Tr. at 77-78 (conceding that his findings are merely "correlational"); Press Release, Indiana Univ. School of Medicine, *Self-Control May Be Affected By Violent Media Exposure*, May 26, 2005, *available at* http://medicine.indiana.edu/news_releases/viewRelease.php4?art=339&print=true. At most, Dr. Kronenberger's research describes differences in brain patterns observed through MRI; he does not even claim to be able to predict the behaviors of those he observed. Kronenberg Test., 11/14/05 Tr. at 90; *see also Blagojevich*, 404 F. Supp. 2d at 1074 ("Decreased activity does not necessarily indicate diminished capacity; it can signify expertise or use of an alternative mental method of

---

[Footnote continued from previous page]
psychological health is simply unsupported in the record," and expressly rejecting Dr. Anderson's research as "fall[ing] far short of a showing that video games are psychologically deleterious." *IDSA*, 329 F.3d at 959.

13

Notice of Motion and Motion for Summary Judgment;
Memorandum of Points and Authorities in Support Thereof          Case No. C 05-4188 RMW (RS)

achieving the same goal"); Nusbaum Decl. ¶¶ 17, 32 (attached hereto as Exh. 3).  For these reasons, *Blagojevich* found Dr. Kronenberger's research "unpersuasive" and far from the "substantial evidence" required for restricting speech. *Blagojevich*, 404 F. Supp. 2d at 1065; *see Granholm*, 404 F. Supp. 2d at 982.

Finally, the State's defense of the Act is fundamentally flawed for the additional reason that the "evidence" on which it relies is so one-sided and biased that it cannot support a reasonable inference that the Act's restrictions are necessary to prevent supposed harms from exposure to "violent" video games.  In relying almost exclusively on the work of Dr. Anderson and Dr. Kronenberger, the State wholly ignores a substantial body of literature either finding no effect of playing video games or finding a positive effect.  *See* Goldstein Decl. at ¶ 7 (attached hereto as Exh. 4) ("[The State has] ignor[ed] studies with null or inconsistent results"); Williams Decl. at ¶ 39 ("It appears that [the State has] only included the papers that they might interpret to support the law.").  As the court in *Blagojevich* concluded, the failure of the Illinois Legislature to consider "any of the evidence that showed no relationship or a negative relationship between violent video game play and increases in aggressive thoughts and behavior," along with its failure to take into account research that is critical of the work of Dr. Anderson and others, "further undermine defendants' claim that the legislature 'made reasonable inferences' from the scientific literature based on 'substantial evidence.'" *Blagojevich*, 404 F. Supp. 2d at 1063.  Likewise, here, because the State relied on only a biased subset of the available research and failed even to consider contrary data, it cannot demonstrate that the Act is supported by "substantial evidence."

### D.  The Act Does Not Advance The State's Interests And Is Not Narrowly Tailored.

Beyond its illegitimate and unsubstantiated goals, the Act fails to meet the other requirements of strict scrutiny.  In order to survive strict scrutiny, the State must show that the Act materially advances the State's purported goals, and that it does so in a narrowly tailored way.  *R.A.V.,* 505 U.S.

14

at 395.  The State cannot satisfy its burden on either count.

First, the Act does not materially advance its stated goals.  The State has singled out a subset of video games for regulation, despite the fact that a wide range of media contain comparable violent expression.  *See Kendrick*, 244 F.3d at 579 (noting that "violent" video games "are a tiny fraction of the media violence to which modern American children are exposed"); *Blagojevich*, 404 F. Supp. 2d at 1075 (finding no evidence demonstrating that video games are more harmful than any other media).  Indeed, the available evidence on the effects of exposure to violence in video games, particularly the evidence claiming "harm" to brain development rather than just a greater propensity for violence, fails to distinguish between exposure to violence in video games or in other media. Nusbaum Decl.  ¶¶ 17, 32.  And the Act cannot possibly materially advance its goals by preventing a 16-year-old from buying or renting the *Resident Evil IV* or *Tom Clancy's Rainbow Six 3* video games, *see* Price Decl. ¶¶ 30-37, 60-66, when the same teen may lawfully buy or rent *Resident Evil* and Tom Clancy movies, and purchase Tom Clancy books.

Such differential treatment of similarly situated media is strong evidence that the Act's true goal is to punish a disfavored speaker – not to advance the State's asserted interests.  *See, e.g.*, *Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989) (the "facial underinclusiveness" of a regulation undermines the claim that the regulation serves its alleged interests); *Blagojevich*, 404 F. Supp. 2d at 1075 ("[T]he underinclusiveness of this statute – given that violent images appear more accessible to unaccompanied minors in other media – indicates that regulating violent video games is not really intended to serve the proffered purpose [of giving parents the power to protect children from harmful images].")

Second, the Act is not narrowly tailored.  "Narrow tailoring" in the constitutional sense requires that regulation of speech be limited to what is necessary to achieve the legislature's end, and

15

that the State justify the rejection of less speech-restrictive alternatives, *see, e.g.*, *R.A.V.*, 505 U.S. at

395; *Playboy*, 529 U.S. at 813.  The State does not come close to meeting its burden in this regard.

The Act is not narrowly tailored to achieve its purported goals.  For one, there is no "fit"

between the general representations of violence prohibited by the Act – infliction of serious injury in

a "heinous, cruel or depraved manner" manner, for example – and the research allegedly

documenting harm to minors.  As the California Senate Judiciary Committee Report observed in its

analysis of the law's constitutionality, "[b]ecause there does not appear to be a direct correlation

between the proposed limitations and the negative effects discussed in the studies relied upon by the

[Act's] author, it is unclear that the proposed definition of 'violent video game' is narrowly tailored

to address the state's compelling interests, rather than simply tailored for the sake of a more 'narrow'

statute."  Sen. Jud. Comm. Analysis at 11 (attached as Exh. 2 to Reply in Support of Plaintiff's Mot.

Prelim. Inj.).

Further, the Act will almost certainly restrict access to games that should not be properly

considered "violent" video games under the Act.  Because the Act imposes penalties for incorrect

determinations of whether a game should be classified as a "violent video game," there is a

significant risk that games not falling within the Act's definition will be labeled as "violent," or

pulled off the shelves altogether to avoid any chance of liability.  Lowenstein Decl. ¶¶ 16-18;

Andersen Decl. ¶¶ 9-11, 17; Price Decl. ¶¶ 9-10.  Distributors will be required to review hundreds of

hours of game play to determine if even one scene meets the definition.  As a result, manufacturers

and retailers will inevitably be cautious and overinclusive in restricting access to games depicting

violence even if not regulated by the Act.  Due to this chilling effect, the Act will suppress a broad

swath of speech that is unrelated to the State's purported interests.

16

1    Finally, the State has utterly ignored less speech-restrictive alternatives to furthering its

2    purported goals, including parental controls,[6] increased self-regulation, and increased awareness of

3    the industry's voluntary rating system.  The State cannot satisfy its burden here while ignoring such

4    obvious alternative methods of providing information regarding the content of games in order to

5    accomplish the Act's goals.  *See Playboy*, 529 U.S. at 824 ("[A] court should not presume parents,

6    given full information, will fail to act."); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507-08

7    (1996) (plurality op.) (striking down advertising ban because of less restrictive alternatives such as an

8    "educational campaigns" or "counter-speech").[7]  Moreover, the State only recently enacted a law

9    requiring retailers to post signs indicating the availability of a video game rating system, *see* Cal.

10   Bus. & Prof. Code § 20650; Andersen Decl. ¶ 15, but in fact rejected Plaintiffs' offer to work with it

11   to help further educate consumers about the ESRB system and to assist in implementing effective

12   technological controls for parents, even though the FTC has concluded that parents are involved in

13   83% of video game purchases for minors.  *See* Lowenstein Decl. ¶ 20-23; FTC, *Report to Congress:*

---

[6] Not only has the State not meet its burden of demonstrating that parents are currently unable to adequately supervise their children's game play, it wholly ignores recent technological developments that further enhance parents' ability to decide what games their children may play. For example, all three of the next-generation game consoles manufactured by Microsoft, Nintendo, and Sony will include parental controls allowing parents to limit a child's access to games based on the games' ESRB rating, an option that Microsoft's latest console already offers.  *See* Associated Press, *Sony to hand parents video game controls*, Int'l Herald Trib., Nov. 28, 2005, available at http://www.iht.com/articles/2005/11/28/business/sony.php.  This technology is similar to the voluntary filtering and blocking technologies that the Supreme Court identified as less restrictive alternatives to prohibitions on speech.  *See Ashcroft*, 542 U.S. at 668-69; *Playboy*, 529 U.S. at 824-25; *see also Ashcroft*, 542 U.S. at 671-72 (noting that rapid technological developments may create alternatives displacing the rationale for imposing speech restrictions).  In light of the increasing availability of parental-control technology for video games, the State may not wield the blunt instrument of censorship when more tailored – and wholly voluntary – means exist for addressing the supposed harm

[7] Indeed, the Federal Trade Commission has concluded that the video game industry is performing better in its efforts in its ratings efforts than its peer retail industries – music and movies – that are not subject to State restrictions involving violence.  FTC, *Report to Congress: Marketing Violent Entertainment to Children* at 28-29 (July 2004), *reproduced in* State Defs. Mem. App. E, E020, E046, E049-50 ("FTC Report"); *see also Blagojevich*, 404 F. Supp. 2d at 1075 (citing FTC report and noting that minors are more easily able to purchase other types of media rated for mature audiences than purchase M-rated video games).

17

*Marketing Violent Entertainment to Children* at 42 (July 2004), *reproduced in* State Defs. Mem. App. E, E020, E046, E049-50. The State has therefore failed to meet its burden to prove that a "plausible, less restrictive alternative . . . will be ineffective to achieve its goals." *Playboy*, 529 U.S. at 816.

## III.    THE ACT'S LABELING PROVISIONS ARE UNCONSTITUTIONAL.

The Act's provisions requiring labeling of "violent" video games with a large "18" – under the threat of substantial fines – cannot survive if the other challenged provisions are invalidated. The Supreme Court has long recognized that "[j]ust as the First Amendment may prevent the government from prohibiting speech, the Amendment may prevent the government from compelling individuals to express certain views." *United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001) (citations omitted). Because compelled messages alter the content of what the compelled party would otherwise express, and in this case impose a message with which Plaintiffs strongly disagree, they are considered content-based regulation under the First Amendment and require strict scrutiny.[8] *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). This protection extends not only to political or ideological speech, *see Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1 (1986) ("*PG&E*"), but to *all* statements, whether of fact or opinion, *see Riley*, 487 U.S. at 797-98.

If the other portions of the law are enjoined, the Act's requirement that manufacturers, distributors and importers place a large "18" label on all "violent" video games would demand a *false*

---

[8] For this and other reasons, the State's suggestion that the labeling restrictions are a valid regulation of commercial speech under *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) is meritless. *See id.* at 651 (noting that standard of review in that case applied when State compelled disclosure of "purely factual and uncontroversial information" designed to dissipate consumer confusion); *Blagojevich*, 404 F. Supp. 2d at 1081-82 (concluding that *Zauderer* does not apply to similar video game labeling requirements). Indeed, "[n]othing in *Zauderer* suggests . . . that the State is equally free to require [entities] to carry the messages of third parties, where the messages themselves are biased against or are expressly contrary to the [entity's] views." *PG&E*, 475 U.S. at 15 n.12. Even if the commercial speech standard were applicable, the labeling provisions would still be invalid.

18

statement, if the other portions of the law are enjoined because the label would appear to describe a legal restriction on sales where no such restriction exists. In any event, the mandatory label compels video game manufacturers, distributors, and retailers to channel the State's message that minors should not access certain video games – even if manufacturers and retailers vigorously disagree with this proposition. The label represents a message that video game retailers have not chosen for themselves. "Such forced association with potentially hostile views burdens" their expression and "risks forcing [them] to speak where [they] would prefer to remain silent." *PG&E*, 475 U.S. at 18.

The labeling requirement triggers – and fails – strict scrutiny. The required label does not even purport to convey purely factual or noncontroversial information – "it tells parents and children nothing about the actual content of the games, and it creates the appearance that minors under eighteen are prohibited from playing such games." *Blagojevich*, 404 F. Supp. 2d at 1081. Instead, it is designed to force manufacturers and distributors to convey a stigmatizing message, "forc[ing] speakers to alter their speech to conform with an agenda that they do not set." *PG&E*, 475 U.S. at 9. This is plainly unconstitutional.

Not only is the labeling requirement unduly burdensome, but it is also not narrowly tailored to achieve the State's purported goals. Notably, it ignores the less restrictive alternative of relying on the voluntary ESRB rating system, which fully allows consumers to make choices based on the content of the game. *See Riley*, 487 U.S. at 798-99 (law not narrowly tailored where potential donors could otherwise obtain information of which State sought to compel disclosure). As this court has already noted in the context of the labeling requirement, "[a] court should not assume a plausible, less restrictive alternative would be ineffective; and a court should not presume parents, given full information, will fail to act." *Schwarzenegger*, 401 F. Supp. 2d at 1047 (quoting *Playboy*, 529 U.S. at 824). Further, because the Act appears to place the burden of labeling on individual video game manufacturers, distributors, and importers, each of whom must decide which games fit within the

19

Act's terms, some may, out of an abundance of caution and fear of substantial penalties, label a far

wider range of games than even those arguably covered by the Act.  *See* Andersen Decl. ¶¶ 7-11;

Lowenstein Decl. ¶¶ 16-18; Price Decl. ¶¶ 7, 18-29.  The labeling requirement clearly infringes on

First Amendment rights.

## IV.     THE ACT IS UNCONSTITUTIONALLY VAGUE.

The Constitution demands that statutes be set forth with "sufficient definiteness that ordinary

people can understand what conduct is prohibited."  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

Such precision is essential to "give the person of ordinary intelligence a reasonable opportunity to

know what is prohibited, so that he may act accordingly."  *Grayned v. City of Rockford*, 408 U.S.

104, 108 (1972).  In particular, exacting precision is required of restrictions in the context of

protected expression.  *See Reno v. American Civil Liberties Union*, 521 U.S. 844, 871-72 (1997)

(explaining that the vagueness of a "content-based regulation of speech," particularly one imposing

criminal penalties, "raises special First Amendment concerns because of its obvious chilling effect on

free speech"); *NAACP v. Button*, 371 U.S. 415, 433 (1963).  The Act fails to provide these basic

constitutional protections.

In its order granting their motion for a preliminary injunction, the Court concluded that

Plaintiffs were not likely to prevail on the argument that the Act is unconstitutionally vague.

*Schwarzenegger*, 401 F. Supp. 2d at 1040-1042.  Plaintiffs respectfully disagree with this preliminary

conclusion, and submit that the Act's terms are so inherently vague as to fail to give the ordinary

person "a reasonable opportunity" to know which video games might fall within the Act's

proscriptions.

For example, even accepting the Court's conclusion that the Act's definition of "violent"

video games turns on whether the game depicts "an image of a human being," and not "images of

human beings or characters with substantially human characteristics," *id.* at 1040-41, the term "an

20

image of a human being" itself is vague in the context of the video game medium.  As detailed in the

Declaration of Ted Price, video game characters that appear to be human beings may actually be

zombies, aliens, gods, or some other fanciful creature, and might transform from humans to other

beings and vice versa over the course of the game.  Price Decl. ¶¶ 10-11.  Examples of such

ambiguous characters abound in the games submitted by Plaintiffs, including *Resident Evil*, *Jade*

*Empire*, and *God of War*.  Price Decl. ¶¶ 30-44; Lowenstein Decl. ¶ 19.  Therefore, even if some

games contain characters that are readily identified as "human" – such as *Full Spectrum Warrior* –

other, more fantastical games make this exercise much more difficult, and are susceptible to varying

and subjective interpretations.  For these reasons, the court in *Blagojevich* held that the Illinois

statute, which applied to video games showing "human on human" violence, was unconstitutionally

vague.  *Blagojevich*, 404 F. Supp. 2d at 1077 ("As a mechanism for regulating a fanciful medium,

however, this definition [of "human-on-human violence"] leaves video game creators, manufacturers,

and retailers guessing about whether their speech is subject to criminal sanctions.").  Likewise, here it

is impossible to determine in advance whether a game depicting violence against part-human or

super-human characters would run afoul of the Act.[9]

        To give another example, one of the Act's two alternative definitions of a "violent" video

game relies on a term that is so vague and broad that it threatens to cover a wide range of video

_____

[9] As Plaintiffs argued in their preliminary injunction briefs, many of the other terms in the statute
have no clear meaning, not necessarily because those terms would not have a discernable meaning
in the context of actions taken in the real world, but because the terms cannot be so easily applied in
the context of the virtual world of video games.  For example, it is difficult if not impossible to measure whether a
"high degree of pain" is being inflicted to a character that may, for example, possess superhuman
characteristics, and at any rate is only an image on a video screen.  *See* Andersen Decl. ¶ 11; Price
Decl. ¶¶ 12, 16.  And how does a video game manufacturer determine if a character – much less a
player controlling a character in the game – shows "indifference to . . . suffering"?  Act,
§ 1746(d)(2)(A).  Indeed, it would be simply impossible for video game manufacturers and
distributors to determine the "intent" of every possible *player* of a particular video game, such as
whether a player will "specifically intend . . . abuse."  Act, § 1746(d)(2)(A); *see*; Lowenstein Decl.
¶ 19; Andersen Decl. ¶ 11; Price Decl. ¶ 15.  These are just a few illustrations of how the Act is
unconstitutionally vague.

21

games, including those with obvious literary and artistic merit and possibly games rated "T" and lower by the ESRB. The second prong of the Act's definition, § 1746(d)(1)(B), would cover games in which the "range of options available to a player" includes killing or seriously injuring another character in a way that involves "serious physical abuse." In the realm of often fantastical video games, the term "serious physical abuse" could possibly be held to apply to a wide range of martial arts fighting, sword fights, and battles with (super)human characters. As one example, in *Resident Evil 4*, the player encounters both zombie and human enemies and, for strategic reasons in the game (such as conserving ammunition), may wound them in a way that appears to cause unconsciousness, would inflict "serious physical pain" on a real person, or impairs a bodily member such as a leg. *Compare Act.* at § 1746(d)(1)(B)(2)(D). Similarly, players in *Jade Empire*, in the process of fighting enemies with swords, may wound characters in ways that may impair body parts or cause extreme "pain" to the enemy character. Plaintiffs do not believe that any of these games should fall under the Act, but the fact that they might, and that it is utterly unclear as to what games are covered, underscores the Act's constitutional failings, and the concomitant chilling effect that it creates. *See Granholm*, 404 F. Supp. 2d at 983 (noting that in light of a similarly vague statute that "without wholesale, indiscriminate refusals to sell video games to minors by store operators it appears impossible to protect sellers from prosecution").

In sum, even if the Court were to determine that the definitions could be applied in the context of some games (a determination with which Plaintiffs respectfully disagree), *see Schwarzenegger*, 401 F. Supp. 2d at 1042, the Act is vague as to how it applies to a broad range of current and future games. Indeed, as this Court has noted, even the *Defendants* cannot say which of the games submitted by the Plaintiffs would be covered by the Act. As a result, "[n]ot only is a conscientious retail clerk (and her employer) likely to withhold from minors all games that could possibly fall within the broad scope of the Act, but authors and game designers will likely 'steer far wider of the

22

unlawful zone . . . than if the boundaries of the forbidden area were clearly marked.'" *VSDA*, 325 F.

Supp. 2d at 1191 (quoting *Grayned*, 408 U.S. at 109 (alteration in original)).

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully ask this Court to grant summary judgment in

their favor and permanently enjoin the Act.

DATED:  March 31, 2006

> GIBSON, DUNN & CRUTCHER LLP
> THEODORE J. BOUTROUS, JR.
> H. MARK LYON
> ETHAN D. DETTMER
>
>
> By: /s/ H. Mark Lyon
>                    H. Mark Lyon
>
> JENNER & BLOCK LLP
> PAUL M. SMITH
> KATHERINE A. FALLOW
> MATTHEW S. HELLMAN
> 601 13th Street, N.W., Suite 1200
> Washington, D.C. 20005
> Telephone:  (202) 639-6000
> Facsimile:  (202) 639-6066
>
> Attorneys for Plaintiffs
> VIDEO SOFTWARE DEALERS ASSOCIATION
> and ENTERTAINMENT SOFTWARE ASSOCIATION

23
