1  BILL LOCKYER
   Attorney General of the State of California
2  LOUIS R. MAURO
   Senior Assistant Attorney General
3  CHRISTOPHER E. KRUEGER
   Supervising Deputy Attorney General
4  SUSAN K. LEACH
   Deputy Attorney General
5  ZACKERY P. MORAZZINI, State Bar No. 204237
   Deputy Attorney General
6   1300 I Street, Suite 125
    P.O. Box 944255
7   Sacramento, CA 94244-2550
    Telephone:  (916) 445-8226
8  Fax:  (916) 324-5567
    Email:  Zackery.Morazzini@doj.ca.gov
9
   Attorneys for Defendants Governor Arnold
10 Schwarzenegger and Attorney General Bill Lockyer

11

12              IN THE UNITED STATES DISTRICT COURT

13           FOR THE NORTHERN DISTRICT OF CALIFORNIA

14                     SAN JOSE DIVISION

15
16  **VIDEO SOFTWARE DEALERS ASSOCIATION**        C 05 4188 RMW RS
    **and ENTERTAINMENT SOFTWARE**
16  **ASSOCIATION,**
                                                  **GOVERNOR AND**
17                                                **ATTORNEY GENERAL'S**
                                    Plaintiffs,   **OPPOSITION TO**
18                                                **PLAINTIFFS' MOTION FOR**
                                                  **SUMMARY JUDGMENT**
19         v.
                                                  Hearing:  May 12, 2006
20  **ARNOLD SCHWARZENEGGER, in his official**    Time:  9:00 a.m.
    **capacity as Governor of the State of California;**   Courtroom:  6
    **BILL LOCKYER, in his official capacity as**  The Honorable Ronald M. Whyte,
21  **Attorney General of the State of California; et al.,**  District Judge

22                                   Defendants.

23

24

25

26

27

28

Dockets.Justia.com

1    Defendants, Governor Arnold Schwarzenegger and Attorney General Bill Lockyer

2  (collectively "the State"), respectfully submit the following in opposition to Plaintiffs' Motion

3  for Summary Judgment ("Motion").

4                                    **INTRODUCTION**

5    Unsurprisingly, Plaintiffs' Motion attempts to cast the State in a spurious light, arguing that

6  the State is simply seeking to control the thoughts of children.  Plaintiffs essentially claim that

7  there is no permissible means through which California can exercise its police power to limit

8  purchases by children, without parental approval, of the most graphically violent and heinous

9  video games.  By definition, these games appeal to an abnormally unwholesome, grisly,

10 gruesome interest in children that is well beyond the accepted norm of society.  According to

11 Plaintiffs, helping parents keep their children from playing these patently offensive video games

12 is an "illegitimate" goal.

13    But who is harmed when the State acts to help parents prevent their children from playing

14 these games without their knowledge?  Certainly not the children.  But ironically, it is the

15 children's First Amendment rights that Plaintiffs purport to be protecting through this litigation.

16    Plaintiffs ask this Court to essentially ignore the volumes of social science supporting

17 Assembly Bill 1179, California Civil Code section 1746 -1746.5 ("the Act").  Tellingly,

18 Plaintiffs cite this Court to no peer-reviews publications or other established research that proves

19 playing violent video games does not harm children.  Instead, Plaintiffs simply argue that this

20 Court should fall in line with a few non-binding decisions of other courts in other states that

21 reviewed different statutes and different research.  The State respectfully requests that this Court

22 find the Act constitutional, after reviewing all of the evidence contained in the legislative record

23 and according the Legislature the deference to which it is entitled, because the Act is supported

24 by substantial evidence.

25 ///

26 ///

27 ///

28 ///

State's Opposition to MSJ                    *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
C 05 4188 RMW RS

1

1

**ARGUMENT**

2

**I.**

3
4

**THE ACT SURVIVES STRICT SCRUTINY BECAUSE IT IS
SUPPORTED BY SUBSTANTIAL EVIDENCE.**

5
6

**A.   The Substantial Evidence Standard Does Not Demand Absolute Certainty,
Especially When The State Acts To Protect Children.**

7            The substantial evidence standard does not require the State to prove beyond a reasonable

8    doubt that the video games covered by the Act can be harmful to the developing minds and

9    personalities of children.  Absolute certainty is not the standard and is not required.  The

10   substantial evidence standard leaves room for reasonable minds to differ.  It is the job of the

11   legislative and executive branches to consider the extensive evidence presented and make the

12   final determination.  And upon reviewing this final determination, the Supreme Court has made

13   it clear that the substantial evidence standard "is not a license to reweigh the evidence *de novo*,

14   or to replace [the legislature's] factual predictions with our own.  Rather, it is to assure that, in

15   formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial

16   evidence." *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 666 (1994) (plurality

17   opinion) (*Turner I*).

18           As the State argues through its own motion for summary judgment[1], the Legislature "is not

19   obligated, when enacting its statutes, to make a record of the type that an administrative agency

20   or court does to accommodate judicial review." *Ibid.*  "Even in the realm of First Amendment

21   questions where [the legislature] must base its conclusions upon substantial evidence, deference

22   must be accorded to its findings as to the harm to be avoided and to the remedial measures

23   adopted for that end, lest we infringe on traditional legislative authority to make predictive

24   judgments when enacting [statewide] regulatory policy." *Turner Broadcasting System, Inc. v.*

25   *F.C.C.*, 520 U.S. 180, 196 (1997) (*Turner II*).

26   *///*

27

28
     1.  *See* State's Mot. Summ. J., § I. B. 2, on file herein.

State's Opposition to MSJ          *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
C 05 4188 RMW RS

2

1    The Supreme Court recognizes that absolute certainty on the part of a legislative body

2  cannot always be achieved.  Thus, "[t]he quantum of empirical evidence needed to satisfy

3  heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and

4  plausibility of the justification raised."  *Nixon v. Shrink Missouri Government PAC*, 528 U.S.

5  377, 391 (2000).  Courts therefore "must accord substantial deference to the predictive

6  judgments" of legislative bodies because "[s]ound policymaking often requires legislators to

7  forecast future events and to anticipate the likely impact of these events based on deductions and

8  inferences for which complete empirical support may be unavailable."  *Turner I*,  512 U.S. at

9  665-666.

10    In the context of regulations seeking to protect children, such as the Act, the Legislature's

11  predictive judgments of harm and remedial measures are entitled to this Court's deference.  This

12  is especially true because, absent intrusive medical experimentation on children, 100% bullet-

13  proof, concrete, definitive evidence may never be available to the State.  But this is entirely

14  permissible because the law recognizes that social science is not the same as hard science.

15  Responsible social sciences such as child psychology and psychiatry must use field experiments,

16  observation, cross-sectional correlation studies, longitudinal studies, and meta-analyses

17  combining the results of other studies to form theories and conclusions regarding causation.

18  Children can be observed and surveyed regarding the video games they play, observed

19  interacting with other children and teachers, and their school performance can be reviewed.

20  Correlations can then be discerned and professional opinions and conclusions formed regarding

21  the impact that playing violent video games has on children.  From those conclusions, social

22  science can also draw conclusions regarding the impact that playing extremely violent video

23  games, those covered by the Act, can have on children.  Of course, not all children are the same

24  and not all children will suffer the same deleterious effects of playing the games covered by the

25  Act.  And not all smokers will get lung cancer, while some who never have smoked will.  This

26  certainly does not mean that smoking is not harmful – it is widely accepted that first and second-

27  hand smoke can lead to lung cancer despite the absence of direct causation.  The absence of

28  direct causation also certainly does not mean that a state has no compelling interest in protecting

State's Opposition to MSJ                    *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
C 05 4188 RMW RS

3

1    its citizens from the harm.

2          Absent intrusive, unethical, and possibly illegal experimentation on children, social science

3    may never be able to discover a single environmental variable that causes automatic aggression,

4    increased aggressive behavior, antisocial behavior, desensitization to violence, and poor school

5    performance in children.  But such is not demanded by the First Amendment.  All that is required

6    is that the legislative body consider the available evidence, and draw reasonable inferences from

7    the evidence considered.  *Turner I*, *supra*, 512 U.S. at 666.  Again, the Supreme Court

8    recognizes that "[s]ound policymaking often requires legislators to forecast future events and to

9    anticipate the likely impact of these events based on deductions and inferences for which

10   complete empirical support may be unavailable."  *Ibid.*  Once the legislative body does so, courts

11   "must accord substantial deference to the predictive judgments" of the legislative body.  *Ibid*.

**B.   It Was Not Unreasonable For The Legislature To Infer That The Video**
12   **Games Covered By The Act Can Be Harmful To Children That Play Them.**

13

14         Contrary to what Plaintiffs would have this Court believe, the Legislature carefully

15   considered and weighed the evidence, both pro and con, before passing the Act.  The Legislature

16   considered the best available evidence in passing the Act, and nothing cited to the Court by

17   Plaintiffs disproves the research the Legislature relied upon.  The legislative record contains

18   hundreds of pages of peer-reviewed articles, studies, reports, and correspondence from leading

19   social scientists and medical associations analyzing the impact of media violence, and

20   specifically violent video games, on minors and young adults.  Articles by Dr. Craig A.

21   Anderson, Ph.D.[2], along with *many other* respected psychologists, psychiatrists, sociologists,

22   and scholars explain the methodologies used and results obtained in researching the impact of

23   video game violence on children.  The legislative record contains no less than twenty-three

24   published articles authored by respected social scientists explaining the negative impacts playing

25

26

---

27         2.   Dr. Anderson is a Distinguished Professor and Chair of the Iowa State University
     Department of Psychology.  See http://www.psychology.iastate.edu/faculty/caa/.  He has been
28   publishing articles on the effects of violent video games on minors since 2000.

State's Opposition to MSJ                    *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
                                                                    C 05 4188 RMW RS

4

1    violent video games has on children.[3]  The research shows that problems with automatic

2    aggressiveness, increased aggressive thoughts and behavior, antisocial behavior, desensitization,

3    poor school performance, and reduced activity in the frontal lobes of the brain can occur when

4    children play violent video games.

5        Tellingly, Plaintiffs cite this Court to no peer-reviewed publications that disprove the

6    Legislature's conclusion that playing violent video games causes harm to children.  In fact,

7    Plaintiffs' expert, Professor Dimitri Williams, previously testified that "most experts would

8    agree that we have established covariation" showing that with people who play more violent

9    video games, some tend to exhibit greater aggression.  Pls.' Ex. B to Fallow Dec., 130:4-14

10   (Nov. 14, 2005 trial transcripts from *E.S.A. v. Blagojevich*, Williams' direct).  Professor

11   Williams even admitted that his position is "not that these games do not lead to [increased

12   aggression], only that [he has not] professionally been convinced of that yet."  *Id*., 175:2-25.

13   Notably, Professor Williams testified that he is familiar with the work of Dr. Craig Anderson and

14   "absolutely" considers him to be "an expert" in his field.  *Id*., 199:23-25; 200:1-3.  Professor

15   Williams himself admitted that Dr. Anderson's General Aggression Model is "the most cited

16   theory in [the] literature" in the field.  *Id*., 200:4-13.

17       As explained in the State's separate motion for summary judgement[4], in 2004 (nearly four

18   years after Judge Posner's opinion in *American Amusement Machine Ass'n v. Kendrick*, 244 F.3d

19   572 (2001)), Dr. Anderson reported that an "updated meta-analysis reveals that exposure to

20   violent video games is significantly linked to increases in aggressive behaviour, aggressive

21   cognition, aggressive affect, and cardiovascular arousal, and to decreases in helping behaviour."[5]

22   Dr. Anderson explained that "[e]xperimental studies reveal this linkage to be causal.

23

24       3.   *See* State's Request for Judicial Notice ("RJN") filed with the State's Motion for
     Summary Judgment; Appendix A, p. A014, "Violent Video Game Bibliography."  Appendices A -

25   E are presently on file with the Court through manual lodging and were previously served on all
     parties.

26

27       4.   *See* State's Mot. Summ. J., § I. B. 1.

28       5.   Appendix C, p. C091, Anderson, *An Update on the Effects of Playing Violent Video
     Games*, Journal of Adolescence, 24 (2004) 113-122.

State's Opposition to MSJ            *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
C 05 4188 RMW RS

5

1   Correlational studies reveal a linkage to serious, real-world types of aggression.

2   Methodologically weaker studies yielded smaller effect sizes than methodologically stronger

3   studies, suggesting that previous meta-analytic studies of violent video games underestimate the

4   true magnitude of observed deleterious effects on behaviour, cognition, and affect."  Appendix

5   C, p. C091.

6       The Legislature was presented with strong evidence demonstrating the causal relationship

7   between violent video games and the harm caused to children.  One such article, a

8   comprehensive meta-study, or statistical practice of combining the results of a number of studies

9   that address a set of related research hypotheses, concluded that "[t]hough the number of studies

10  investigating the impact of violent video games is small relative to the number of television and

11  film studies, there are sufficient studies with sufficient consistency (as shown by the

12  meta-analysis results) to draw some conclusions . . . .  The experimental studies demonstrate that

13  in the short term, violent video games cause increases in aggressive thoughts, affect, and

14  behaviour; increases in physiological arousal; and decreases in helpful behaviour."[6]

15      In another study where 607 eighth and ninth grade students from four schools were

16  analyzed, research demonstrated that "[a]dolescents who expose themselves to greater amounts

17  of video game violence were more hostile, reported getting into arguments with teachers more

18  frequently, were more likely to be involved in physical fights, and performed more poorly in

19  school."[7]

20      The legislative record contains further research showing that playing violent video

21  games increases automatic aggressiveness, even in adults.  In a study conducted using 121

22  college students, the results showed "[w]hile most video game enthusiasts insist that the games

23  they play have no effect on them, their exposure to scenes of virtual violence may influence them

24

---

25      6.  Appendix A, p. A100, Anderson, et al., *The Influence of Media Violence on Youth*,
26  Psychological Science in the Public Interest, Vol. 4, No. 3, pp. 91-93 (December 2003).

27      7.  Appendix B, p. B028, provided in full in Appendix D, p. D001, Gentile, et al., *The Effects
28  of Violent Video Game Habits on Adolescent Hostility, Aggressive Behaviors, and School
    Performance*, Journal of Adolescence 27 (2004) 5-22, p. 5.

State's Opposition to MSJ          *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
C 05 4188 RMW RS

6

1  automatically and unintentionally."[8/]  The study concluded that "[d]espite the misleading debate

2  in the news media over whether exposure to violent television, movies and video games leads to

3  an increase in aggressive behavior, the empirical evidence that it does so has become

4  overwhelming."  Appendix D, pp. D027-28.

5      The legislative record also contains research demonstrating that violent video games can

6  lead to desensitization to violence in minors.[9/]  Desensitization is "the attenuation or elimination

7  of cognitive, emotional, and ultimately, behavioral responses to a stimulus [violence]."

8  Appendix E, p. E03.  The article reported specific findings that, as between violent video games,

9  movies, televisions, and Internet content, "[r]egression analyses indicated that only exposure to

10 video game violence was associated with (lower) empathy."  Appendix E, p. E001 (internal

11 citations omitted).  Empathy is "the capacity to perceive and to experience the state of another

12 [and] is critical to the process of moral evaluation."  Appendix E, p. E004.  Evidence in the

13 legislative record plainly demonstrates a "[r]elationship[] between lower empathy and social

14 maladjustment and aggression in youth . . . ."  *Ibid.*

15     Other research in the legislative record demonstrates the impact violent video games have

16 on brain activity.  One such study, conducted over a two-year period by Dr. Kronenberger  and

17 reported by the Indiana University School of Medicine, concluded that "[t]here appears to be a

18 difference in the way the brain responds depending upon the amount of past violent media

19 exposure through video games, movies and television."[10/]  For minors previously diagnosed with

20 disruptive behavior disorders (DBD), the research demonstrated "less brain activity in the frontal

---

8.  Appendix B, p. B064, provided in full at Appendix D, p. D019, Uhlmann & Swanson, *Exposure to Violent Video Games Increases Automatic Aggressiveness*, Journal of Adolescence, 27 (2004) 41-52, p. 48.

9.  Request for Judicial Notice, Ex. 2, Senate Rules Committee analysis of AB 1179, pp. 4-5; "Violent Video Game Bibliography," Appendix A, A014; Appendix E, p. E001, Funk, et al., *Violence Exposure in Real-Life, Video Games, Television, Movies, and the Internet: Is There Desensitization?*, Journal of Adolescence 27 (2004) 23-39.

10.  Appendix A, p. A127, *Aggressive Youths, Violent Video Games Trigger Unusual Brain Activity*, Indiana University School of Medicine, December 2, 2002.

State's Opposition to MSJ                    *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
                                                                                        C 05 4188 RMW RS

7

1   lobe while the youths with DBD watch violent video games." The frontal lobe "is the area of the

2   brain responsible for decision-making and behavior control, as well as attention and a variety of

3   other cognitive functions." Brain function was also altered in non-DBD youth. Appendix A, p.

4   A127.

5        Plaintiffs argue that none of the research considered by the Legislature is persuasive but,

6   again, cite this Court to nothing that disproves the research or conclusions. Indeed, Plaintiffs'

7   witness, Dr. Howard C. Nusbaum, previously testified in Illinois that his professional opinion

8   could be "summed up by saying that [he doesn't] believe that the [brain activity research]

9   conclusions are supported by the research, but [he doesn't] have any contradictory research or

10  findings that can unequivocally say that Dr. Kronenberger's results are wrong." Pls.' Ex. A to

11  Fallow Dec., 409:1-7 (Nov. 15, 2005 trial transcripts from *E.S.A. v. Blagojevich*, Nusbaum

12  cross).

13       The evidence regarding the negative impacts playing violent video games has on children is

14  fully supported by the unanimous position taken by multiple professional medical associations.

15  By correspondence dated April 15, 2005, the American Academy of Pediatrics informed the

16  Legislature that "early studies on video games indicate that the effects of child-initiated virtual

17  violence may be even more profound than those of passive media, such as televisions . . . . The

18  time has passed for contemplating and discussing whether violence in video games and other

19  media are harmful to our children. Action is needed." Appendix A, p. A085. The California

20  Psychiatric Association informed the Legislature as follows:

21          We believe that your legislation will provide a significant step towards decreasing
            child and adolescent aggression and violence. We believe it could also result in
22          fewer child and adolescent behavioral, aggression and violence problems in homes,
            schools and communities. Were your bill to become law we would also expect to see
23          a lessening of not only aggression, but symptoms of anxiety, depression, agitation
            and social isolation for many young people already predisposed to behavioral
24          problems or with Severely Emotionally Disturbed diagnoses, or with Severe
            Persistent Mental Illness.

25

26  Appendix A, p. A082-084.

27       The United States District Court for the Western District of Washington reviewed similar

28  research and came to the same conclusion as the California Legislature. In *Video Software*

State's Opposition to MSJ            *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
                                                                        C 05 4188 RMW RS

8

*Dealers Ass'n v. Maleng*, the court expressly found that existing evidence and expert opinions supported the finding that "the depictions of violence with which we are constantly bombarded in movies, television, computer games, interactive videos games, etc., have some immediate and measurable effect on the level of aggression experienced by some viewers and that *the unique characteristics of video games, such as their interactive qualities, the first-person identification aspect, and the repetitive nature of the action, makes video games potentially more harmful to the psychological well-being of minors than other forms of media*." 325 F. Supp. 2d 1180, 1188 (W.D. Wash. 2004) (emphasis added).

In *Maleng*, the court struck down the video game ordinance not because existing research did not support the state's finding that violent video games cause harm to minors, but because the court found that "there has been no showing that exposure to video games that 'trivialize violence against law enforcement officers' is likely to lead to actual violence against such officers." *Ibid*. The act at issue in *Maleng* did not seek to prevent harm to minors, it sought to prevent minors from inflicting harm on law enforcement officers - an interest that is separate and distinct from that sought to be advanced by California. *Id*. at p. 1186. In the instant case, California is seeking to prevent harm to minors, not to prevent them from committing violent acts.

Other courts have considered older research and found it insufficient to support similar legislation. Judge Posner, for example, writing for the panel in *American Amusement Machine Ass'n v. Kendrick*, stated in dicta that "shield[ing] children right up to the age of 18 from exposure to violent descriptions and images would not only be quixotic, but deforming; it would leave them unequipped to cope with the world as we know it." 244 F.3d at p. 577 (2001). Judge Posner's dicta has no application here for two reasons. First, the research relied upon in *Kendrick* was from 2000 and prior (when Dr. Anderson first began publishing on the effects of violent video games) – California has the benefit of over five years of additional research and publication on the subject. And second, the Act does not "shield" children from anything. The State is simply assisting parents in making the determination as to whether their children should be allowed to play the video games covered by the Act. The Act does not prohibit children from

playing the covered video games.  Rather, it simply takes that decision out of the hands of

children and store clerks, and places it in the hands of parents where it should properly rest.

Interestingly, Judge Posner fails to explain how helping parents prevent their children from

playing games that are so violent that they appeal to a child's deviant or morbid interest can

under any circumstances be "deforming" or "leave them unequipped to cope with the world."

Such dicta has no application to this case.

Automatic aggressiveness, increased aggressive thoughts and behavior, antisocial behavior,

desensitization, poor school performance, reduced activity in the frontal lobes of the brain – each

represents a distinct harm to the developing minds of children.  And prevailing social science

points directly to violent video games as a major culprit.  Presented with such substantial

evidence, the Legislature could not simply ignore the deleterious effects these video games are

having on children.  The Legislature's finding that the video games covered by the Act cause

harm to children is supported by substantial evidence, and nothing cited by Plaintiffs comes

close to disproving the finding.

Nevertheless, if this Court considers it necessary for the State to more fully elaborate on the

present state of the research regarding the harmful effects violent video games have on children

prior to deciding the issues raised in the parties' motions for summary judgment, the State

respectfully requests that the Court grant summary adjudication in favor of the State, as

requested in its separate motion, on the narrow tailoring, vagueness, labeling, and Equal

Protection issues raised therein, and deny summary judgment to all parties.  The parties can then

proceed to trial on the remaining issues.

**C.    The Act Is Narrowly Tailored.**

> **1.    The Act Applies Only to Video Games Given Their Unique Interactive
> Nature.**

As explained in the State's separate motion[11], video games are unique in their interactive

nature.  The player controls the characters in first-person, causing them to shoot, stab, beat,

---

11.  *See* State's Mot. Summ. J., § I. C. 1.

stomp, run over, or ignite the opponent.  Often this is the entire point of the game.  The American Academy of Pediatrics advised the Legislature that "early studies on video games indicate that the effects of child-initiated virtual violence may even be more profound than those of passive media, such as television."  Appendix A, p. A085.  The California Psychiatric Association mirrored these concerns when it advised the Legislature that violent content in "interactive media" have "more significantly severe negative impacts than those wrought by television, movies, or music."  Appendix A, p. A082.  The California Psychological Association informed the Legislature that the research "point[s] overwhelmingly to a causal connection between media violence and aggressive behavior in some children" and that "[t]he interactive nature of video games exacerbates this problem."  Appendix A, p. A081.  And according to the American Psychological Association, "violent video games may be more harmful than violent television and movies because they are interactive, very engrossing and require the player to identify with the aggressor . . . ."[12]

Plaintiffs likely would not dispute that video games, given their interactive nature, can be excellent mechanisms for teaching children a variety of subject matters.  The Legislature considered the research that supports this conclusion.[13]  But just as the interactive nature of video games makes them exemplary teachers, it is this interactive nature that also posses a special risk to minors when the games contain extreme violence.  Plaintiffs have cited this Court to no peer-reviewed research that would undermine this conclusion.

Focusing the Act on such interactive video games is the only means through which the Legislature could attempt to remedy the exacerbated harm caused thereby.  Although the Legislature was presented with evidence that extreme violence in other forms of media can also cause harm to minors, substantial evidence supports the determination that the interactive nature

---

12.  http://www.apa.org/releases/videogames.html.

13.  Appendix B, p. B003, Gentile & Gentile, *Violent Video Games as Exemplary Teachers*, paper presented at Biennial Meeting of the Society for Research in Child Development, April 9, 2005 (concluding that playing violent video games leads to greater hostile attribution bias and increased aggressive behaviors -- "exemplary" teaching of aggression).

of video games poses a special risk.  The Legislature was more than justified in focusing on this narrow medium of violent material.

### 2.    The Category of Video Games Covered By The Act Is Exceedingly Narrow.

By definition, the Act covers only those games that, as a whole, a reasonable person would find appeal to a deviant or morbid interest of minors, are patently offensive by community standards as to what is suitable for minors, and lack serious literary, artistic, political, or scientific value for minors.  Civil Code, § 1746(d)(1).  The Act provides an alternative definition with precise terms that cover only the most "especially heinous" depictions of violence on a substantially human character.  Only video games meeting either definition, an exceedingly narrow category of video games, are covered by the Act.

In contrast to the Act, the video game ordinance at issue in *Interactive Digital Software Association v. St. Louis County*, 329 F.3d 954 (8th Cir. 2003), relied heavily upon by Plaintiffs, applied to all "graphically violent video games," and was not narrowly drawn.  Because the Act at issue covers only an exceedingly narrow category of violent video games, more precisely defined than that considered by the Eighth Circuit, it is narrowly tailored to serve the State's compelling interest.

### 3.    The Act Does Not Restrict Adult Access to Any Video Games, and Does Not Prohibit Children From Playing the Games, Only Purchasing Them Without Adult Supervision.

The Act poses none of the problems at issue in prior Supreme Court cases where Congress sought to regulate indecent speech as to minors, but also prohibited adult access to the covered material.  See *United States v. Playboy Ent. Group*, 529 U.S. 803, 812-817 (2000) (regulation of "signal bleeding" of indecent programing invalid because it also prohibited adult access); *Sable Communications*, *supra*, 492 U.S. at 127 (ban on "dial-a-porn" to protect minors struck down for prohibiting adult access to protected speech).  Here, the Act is specifically limited to children. Adult access to all video games remains unimpeded.

And should parents or guardians desire children to have access to such games, they can purchase the games for the child.  By containing this safe harbor, the Act hits only the

State's Opposition to MSJ                    *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
C 05 4188 RMW RS

12

1  specifically desired target – children whose parents do not want them exposed to the extremely

2  violent video games.  Alternative avenues for children's access to the covered games are written

3  into the Act.  Thus, any burden placed on children is minimal.  They need only persuade their

4  parent or guardian to purchase these games for them.

5         **4.    No Less Restrictive Means Exists For Ensuring, Through Threat of Civil**
               **Penalty, That Children Only Have Access to Extremely Violent Video**

6                 **Games With Parental Knowledge.**

7        Plaintiffs argue that "the State has utterly ignored less speech-restrictive alternatives to

8  furthering its purported goals . . . ."  Pls.' Mot. Summ. J., 17:1-3.  But Plaintiffs provide this

9  Court with no evidence that any of their proposed alternatives would have the desired impact on

10  children's access to games covered by the Act.  The presence of industry self-regulation has

11  limited relevance in this case.  The self-imposed ratings described in detail by Plaintiffs simply

12  do not carry the force of a state law, the violation of which subjects the offender to civil penalty.

13  As explained in the State's separate motion[14], the Legislature considered substantial evidence

14  demonstrating that the effectiveness of the video game industry's self-regulation is simply

15  unacceptable.  The Senate Judiciary Committee analysis raised the issue, stating, "[t]he author

16  acknowledges that the ESRB rating system is currently in place, but argues that its

17  implementation has been unsatisfactory."  RJN, Exhibit 1, p. 13.  In fact, the Legislature

18  considered that "[r]ecent studies show that the voluntary rating and enforcement system

19  implemented by self-regulatory associations or entertainment producers have had limited success

20  on decreasing youth access to Mature (M) rated video games."  RJN, Exhibit 1, pp. 13-14.

21        The Legislature was also made aware that "[d]uring 2004, the National Institute on Media

22  and the Family had children between the ages of seven and fourteen attempt to purchase M-rated

23  games in thirty-five stores.  Youth succeeded 34% of the time.  While the overall purchase rate

24  was 34%, boys as young as seven were able to buy M-rated games 50% of the time."  RJN,

25  Exhibit 1, pp. 13-14.  The Legislature was also aware that "a nationwide undercover survey of

26  stores completed by the Federal Trade Commission in 2003 corroborated these findings.  In this

27

28        14.  *See* State's Mot. Summ. J., § I. C. 4.

State's Opposition to MSJ       *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
                                       C 05 4188 RMW RS

13

study, 69% of unaccompanied 13 to 16-year-olds purchased M-rated games and only 24% of cashiers asked the youth's age." *Ibid.*

The ineffectiveness of the industry's attempts to self-regulate comes as no surprise. According to a Federal Trade Commission ("FTC") report to Congress, cited to the Legislature in the Senate Judiciary Committee analysis, the industry specifically markets M-rated (Mature) games to minors.[15] The FTC report states, "[a]ccording to industry data, nearly 40% of M-rated games purchased in 2002 were for children under 17." Appendix E, p. E053. Although Plaintiffs claim they have implemented new enforcement provisions, the FTC report concluded that "[t]he industry is actively enforcing those standards and penalizing those companies found to be in noncompliance. Yet those standards permit, and, in fact, industry members continue to place, advertisements in television and print media with substantial youth audiences." Appendix E, p. E054.

The Legislature was not willing to simply maintain the status quo, hoping that purported industry efforts would eventually eliminate children's access to extremely violent video games. The Act is thus narrowly tailored to ensure that, through threat of civil penalty, only with parental knowledge will children have access to the most extremely violent video games. No less restrictive means of achieving this goal exists.

**D.    The *Brandenburg* Standard Does Not Apply To The Act.**

The purpose of the Act is to protect the well being of children. The Act states its purpose as "preventing violent, aggressive, and antisocial behavior, and in preventing psychological or neurological harm to minors who play violent video games." Stats. 2005, Ch. 638, § 1(c) (A.B. 1179). Plaintiffs argue that because the Act seeks in part to prevent children from behaving aggressively, the State must satisfy the *Brandenburg* standard. Pls.' Mot. Summ. J., 7:21-28; *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).

///

---

15.  Appendix E, p. E020, FTC July 2004 Report, at pp. 20-28; Request for Judicial Notice, Exhibit 1, pp. 13-14.

State's Opposition to MSJ                *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
C 05 4188 RMW RS

14

1    Plaintiffs argue that causing children to become more aggressive is not harmful to the

2   children themselves, only to those on the receiving end of the aggression.  Plaintiffs' argument is

3   facially absurd, and is simply an attempt to subject the Act to the *Brandenburg* standard.

4   Plaintiffs' attempt fails, as they cite this Court to no evidence showing that aggression is not

5   itself harmful to the developing minds and personalities of children.

6    As this Court previously recognized, the *Brandenburg* standard applies when a statute seeks

7   to prohibit "advocacy of the use of force or of law violation except where such advocacy is

8   directed to inciting or producing imminent lawless action and is likely to incite or produce such

9   action."  *See* Order Granting Pls.' Mot. Prelim. Inj., 11:11-16; *Brandenburg*, 395 U.S. at 447.

10  By contrast, the Act is intended to prevent harm to children, which is itself the increased

11  aggression and associated problems, and is not aimed at preventing children from violating the

12  law.  Thus, the *Brandenburg* standard is inapplicable.

13                                              **II.**

14           **THE ACT'S LABELING PROVISION IS CONSTITUTIONAL.**

15  **A.  The Labeling Provision Regulates Purely Commercial Speech.**

16    The State may constitutionally require commercial products to be labeled with specific

17  warnings or information.  Commercial speech is subject to lesser protection than other

18  constitutionally guaranteed expression.  *See, e.g.*, *Central Hudson Gas & Electric v. Public*

19  *Services Comm. of New York*, 447 U.S. 557, 562-63 (1980) ("commercial speech . . . [is]

20  expression related solely to economic interests of the speaker and its audience").   Additionally,

21  within the class of regulations affecting commercial speech, there are "material differences

22  between [purely factual and uncontroversial] disclosure requirements and outright prohibitions

23  on speech."  *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S.

24  626, 650 (1985).  Regulations that compel "purely factual and uncontroversial" commercial

25  speech are subject to more lenient review than regulations that restrict accurate commercial

26  speech and will be sustained if they are "reasonably related to the State's interest in preventing

27  deception of consumers." *Id.* at 651; *see also 44 Liquourmart, Inc. v. Rhode Island*, 517 U.S.

28  484, 501 (1996) (less exacting scrutiny is required where truthful, non-misleading commercial

1   speech is restricted).  In *Zauderer*, the Supreme Court recognized that the "appellant's

2   constitutionally protected interest in *not* providing any particular factual information in his

3   advertising is minimal."  471 U.S. at 651 (emphasis in original).  Similarly in this case, the Act

4   does not prohibit speech.  Rather, the Act requires that factual legal information be placed on the

5   cover of regulated video games.  This requirement is reasonable and has minimal impact on

6   plaintiffs' First Amendment Rights.

7       The "18" required by the Act conveys factual and accurate information to purchasers and

8   sellers of video games.  The "18" lets consumers and store clerks know that only individuals

9   over 18 may purchase the game.  This is factual and useful information for the consumer, as well

10  as the clerk selling the games.  Plaintiffs argue that this information "would demand a *false*

11  statement, if the other portions of the law are enjoined because the label would appear to

12  describe a legal restriction on sales where no such restriction exists."  *See* Plaintiffs' Summary

13  Judgment Br. at 18-19.  However, Plaintiffs fail to address the flip side of the argument; namely,

14  when the other portions of the law are upheld as valid, the "18" simply requires a true statement

15  regarding a legal restriction on sales of video games.  Moreover, the "18" label is the least

16  intrusive and easiest method to alert consumers and store clerks as to what games cannot legally

17  be sold to persons under 18.  Alternative methods of informing the public, such as separate lists

18  provided by distributors or information on the Internet, are more cumbersome, intrusive and

19  provide for a greater chance of inaccuracy and deception.  The labeling requirement in the Act is

20  reasonably related to the State's interest in alerting purchasers and sellers to the law, and is the

21  most efficient and effective method of doing so.

22  **B. The Labeling Provision of the Act Does Not Need to Meet Strict Scrutiny.**

23      The Act's labeling requirement does not compel speech and, therefore, strict scrutiny does

24  not apply.  *See* States' Mot. Summ. J., pp. 23-24.  Contrary to Plaintiffs' argument, this is not a

25  case where the "18" would force "'speakers to alter their speech to conform with an agenda that

26  they do not set.'"  Pls.' Mot. Summ. J., 19:14-15 (internal citation omitted).  The "18" is not an

27  agenda or an opinion, but rather a valid and accurate statement of the law that video games

28  covered by the Act cannot be sold to anyone under 18.  Furthermore, *Pacific Gas & Electric Co.*

State's Opposition to MSJ          *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
C 05 4188 RMW RS

16

1    and *Riley* are readily distinguishable and are not applicable to the facts of this case.

2         The Court in *Riley* and earlier cases clearly stated that speech seeking charitable

3    solicitations "have not been dealt with as purely commercial speech."  *Riley v. Nat'l Fed'n of the*

4    *Blind of N.C., Inc.*, 487 U.S. 781, 788 (1988).  There is nothing in this statute remotely

5    comparable to the statute in *Riley*.  This Act regulates violent video games and has nothing to do

6    with charitable solicitations.  Similarly lacking in persuasive force, the facts of *Pacific Gas &*

7    *Electric Co.*, do not help plaintiffs.  In *Pacific Gas & Electric Co.*, the Court found that the

8    California Public Utilities Commission may not require a privately owned utility company to

9    include in its billing envelopes speech of a *private third party* organization with which the utility

10   disagrees.  *Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1,

11   20 (1986).  Here, the plaintiffs may not like complying with the Act, but the label gives factual

12   information of the law – not a private third party message as in *Pacific Gas & Electric Co.*

13        Plaintiffs argue that the "18" label is not narrowly tailored to achieve the State's goals  and

14   argue that relying on the ESRB ratings would be less restrictive.  Pls.' Mot. Summ. J., 19:17-21.

15    But this circular argument fails to address the specific reason that the "18" is required -- the

16   "18" corresponds with the statute, as written, not as the plaintiffs wish it to be.  The "18" denotes

17   to purchasers and sellers that no one under 18 is allowed to purchase the video game.  Applying

18   the ESRB labels would be deceiving because the ESRB ratings and labels do not correspond to

19   the Act.

20        Moreover, plaintiffs' continued reliance on *Blagojevich* is unconvincing because

21   *Blagojevich* is not controlling law and the statutes involved in the two cases are not the same.

22   Specifically, the labeling provisions in the statute in the *Blagojevich* case required "video game

23   retailers – even those who do not sell violent or sexually explicit games – to post large signs in

24   multiple places" and video game retailers would be required to write, print and distribute

25   brochures explaining the ESRB rating system for any customer who requests the brochure.

26   *Entertainment Software Association v. Blagojevich* 404 F. Supp.2d 1051, 1082 n.12 (N.D. Ill.

27   2005).  Here, the California law only requires that an "18" be placed on the package of a video

28   game meeting the relevant definitions under the Act and there is no additional requirements of

State's Opposition to MSJ                    *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*

1    signage or brochures.  The California Act is more narrowly tailored than the law that was struck

2    down in *Blagojevich* and requires no extra signs or drafting of brochures.  The California Act

3    only requires that factual information be placed on video games meeting the Act's definitions.

4    Thus, plaintiffs' arguments that the labeling provision in this Act are unconstitutional are not

5    persuasive.  The labeling requirement is reasonably related to the State's interest in alerting

6    consumers and retailers to legal information, thus preventing their possible deception, and

7    survives judicial scrutiny.

8                                                **III.**

9                    **THE ACT'S PROVISIONS ARE NOT IMPERMISSIBLY VAGUE**.

10   Plaintiffs' arguments that certain terms in the Act are impermissibly vague is not supported

11   by fact or legal precedent.  Plaintiffs argue that the term "image of a human being" is vague in

12   the context of the video game medium, but this argument ignores the plain meaning of the

13   words.  Plaintiffs state that "video game characters that appear to be human beings may actually

14   be zombies, aliens, gods or some other fanciful creature, and might transform from humans to

15   other beings." *See* Pls.' Mot. Summ. J., pp. 20-23.  The Act's terms are precisely defined and

16   require only the application of common sense – if it is an "image of a human being" it falls

17   within the Act's proscriptions.  If the entity looks like a fanciful creature or an alien that is not an

18   image of a human being, the Act would not apply to that game.  Plaintiffs ignore the plain

19   meaning of the words when making their argument.[16]

20   Moreover, Plaintiffs completely ignore the fact that the video game industry already

21   voluntarily reviews and rates the level of violence in video games for all platforms.[17]  Under this

22   rating system, the ESRB makes distinctions between "Animated Blood" ("discolored and/or

23   unrealistic depictions of blood") and "Blood" ("depictions of blood").  *See* Lowenstein Decl.,

24

25       16.  Plaintiffs' reliance on *Blagojevich* is not helpful as the statute in that case did not have
     the same terms and definitions as used is this Act.  The two statutes regulate the same subject matter,
26   but the provisions of the Acts are different.  Most importantly, *Blagojevich* is not binding on this
     Court.
27
         17.  *See* Declaration of Douglas Lowenstein submitted in support of Plaintiffs' Motion for
28   Preliminary Injunction, on file, at ¶4.

Exhibit A.   Additionally, the ESRB is able to distinguish between "Cartoon Violence" ("violent actions involving cartoon-like situations and characters"); "Fantasy Violence" ("violent actions of a fantasy nature, involving human or non-human characters in situations easily distinguishable from real life") and "Intense Violence" ("Graphic and realistic-looking depictions of physical conflict.  May involve extreme an/or realistic blood, gore, weapons, and depictions of human injury and death.")  *Id.*  The ESRB is able to distinguish between fanciful blood and gore, and graphic and realistic-looking depictions of physical conflict.  The ESRB makes a distinction between realistic human injury and death, and violent actions of a fantasy nature easily distinguishable from real life.  Thus, although Plaintiffs argue that the industry could not possibly make distinctions between an alien and an image of a human being, the industry is already reviewing and rating video games based on those very same distinctions.

Similarly, Plaintiffs' argument that "serious physical abuse" is too vague is not convincing.  The ESRB's ratings already take into account levels of violence, as discussed in the State's Motion for Summary Judgment at pages 20-21.  Moreover, this particular term has been deemed constitutional in another context.  With some terms, including "serious physical abuse" and "torture," the Legislature used definitions that had already been deemed constitutional by Courts in other contexts.  *See Walton v. Arizona*, 497 U.S. 639, 654-55 (1990) (overruled on other grounds) (holding that any vagueness in the statutory definition of "heinous, cruel, and depraved" is cured by the limitation that the statutory definition of the offense involve torture or serious physical abuse and upholding a death penalty statute that used these definitions); *United States v. Jones*, 132 F.3d 232, 249-50 (5th Cir. 1998) (finding that similar definitions for cruel, depraved, heinous, serious physical abuse and torture were not unconstitutionally vague and did not lead to an arbitrary imposition of the death penalty).  In this Act, the definitions for "heinous," "cruel" and "depraved" include qualifications requiring the act include torture or serious physical abuse of the victim and therefore survive the vagueness challenge as the death penalty statute in *Walton* survived.  Moreover, the definitions for "serious physical abuse" and "torture" are almost identical to definitions used in a death penalty statute that survived a vagueness challenge in at least one Appellate Court.  *See United States v. Jones*, 132 F.3d at 250.

1    Plaintiffs' "fertile legal 'imagination can conjure up hypothetical cases in which the

2   meaning of [disputed] terms will be in nice question,'" but this exercise does not render the Act

3   unconstitutional. *Grayned v. City of Rockford*, 408 U.S. 104, 110-111 n.15 (1979).

4   Mathematical precision is not required when a legislature drafts a statute and a certain amount of

5   flexibility is permissible. *Id.* at 110-111. The definitions in the Act require common sense

6   judgment and determinations that the video game industry is already making. Thus,

7   notwithstanding Plaintiffs' hypotheticals, the terms used in the Act are precisely defined and rely

8   on a common understanding and meaning to apply them. As a matter of law, the Act's

9   definitions of "violent video game" is not impermissibly vague.

10                                    **CONCLUSION**

11    The State's efforts to help parents protect children from the harmful effects of violent video

12   games is supported by substantial evidence and is narrowly tailored to serve a compelling state

13   interest. The terms used by the Legislature are sufficiently clear to allow a reasonable person to

14   understand what is required by the Act. And the Act's labeling requirement is a permissible

15   regulation of commercial speech. Therefore, for all of the foregoing reasons, the State

16   respectfully requests that Plaintiffs' Motion for Summary Judgment be denied in its entirety.

17          Dated: April 19, 2006

18                              Respectfully submitted,

19                              BILL LOCKYER
                                Attorney General of the State of California

20                              LOUIS R. MAURO
21                              Senior Assistant Attorney General

                                CHRISTOPHER E. KRUEGER
22                              Supervising Deputy Attorney General

23                              SUSAN K. LEACH

                                Deputy Attorney General
24

25                                /s/   Zackery P. Morazzini
                                ZACKERY P. MORAZZINI
26                              Deputy Attorney General
                                Attorneys for Defendants Governor Arnold Schwarzenegger and
27                              Attorney General Bill Lockyer

28

State's Opposition to MSJ            *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
                                                        C 05 4188 RMW RS

                                            20

1

**TABLE OF CONTENTS**

2
**Page**

3   INTRODUCTION                                                                    1

4   ARGUMENT

5
6   I.      THE ACT SURVIVES STRICT SCRUTINY BECAUSE IT IS SUPPORTED BY
            SUBSTANTIAL EVIDENCE.                                                    2

7           A.    The Substantial Evidence Standard Does Not Demand Absolute
                  Certainty, Especially When The State Acts To Protect Children.     2
8
            B.    It Was Not Unreasonable For The Legislature To Infer That The Video
9                 Games Covered By The Act Can Be Harmful To Children That Play
                  Them                                                              4
10
            C.    The Act Is Narrowly Tailored.                                     10
11
12                1.    The Act Applies Only to Video Games Given Their Unique
                        Interactive Nature.                                         10

13                2.    The Category of Video Games Covered By The Act Is Exceedingly
                        Narrow.                                                      12
14
15                3.    The Act Does Not Restrict Adult Access to Any Video Games,
                        and Does Not Prohibit Children From Playing the Games, Only
                        Purchasing Them Without Adult Supervision.                   12
16
17                4.    No Less Restrictive Means Exists For Ensuring, Through Threat
                        of Civil Penalty, That Children Only Have Access to Extremely
                        Violent Video Games With Parental Knowledge.                 13
18
            D.    The *Brandenburg* Standard Does Not Apply To The Act.             14
19
20  II.     THE ACT'S LABELING PROVISION IS CONSTITUTIONAL.                         15

            A.  The Labeling Provision Regulates Purely Commercial Speech.          15
21
            B.  The Labeling Provision of the Act Does Not Need to Meet Strict Scrutiny.  16
22
23  III.    THE ACT'S PROVISIONS ARE NOT IMPERMISSIBLY VAGUE.                       18

    CONCLUSION                                                                       20
24

25

26

27

28

State's Opposition to MSJ                    *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
                                             C 05 4188 RMW RS

1       **TABLE OF AUTHORITIES**

2                                                                                        **Page**

3    **Cases**

4

5    *44 Liquourmart, Inc. v. Rhode Island*
           517 U.S. 484 (1996)                                                               15

6    *American Amusement Machine Ass'n v. Kendrick*
           244 F.3d 572 (2001)                                                             5, 9

7

8    *Brandenburg v. Ohio*
           395 U.S. 444 (1969)                                                          14, 15

9    *Central Hudson Gas & Electric v. Public Services Comm. of New York*
           447 U.S. 557 (1980)                                                              15

10

11   *Entertainment Software Association v. Blagojevich*
           404 F. Supp.2d 1051, 1082 n.12 (N.D. Ill. 2005).                            17, 18

12   *Grayned v. City of Rockford*
           408 U.S. 104 (1979)                                                              20

13

14   *Interactive Digital Software Association v. St. Louis County*
           329 F.3d 954 (8th Cir. 2003)                                                     12

15   *Nixon v. Shrink Missouri Government PAC*
           528 U.S. 377 (2000)                                                               3

16

17   *Pacific Gas & Electric Co. v. Public Utilities Commission of California*
           475 U.S. 1 (1986)                                                            16, 17

18   *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
           487 U.S. 781 (1988)                                                              17

19

20   *Turner Broadcasting System, Inc. v. F.C.C.*,
           520 U.S. 180 (1997)                                                               2

21   *Turner Broadcasting System, Inc. v. F.C.C.*
           512 U.S. 622 (1994)                                                            2, 4

22

23   *United States v. Jones*
           132 F.3d 232 (5th Cir. 1998)                                                     19

24   *United States v. Playboy Ent. Group*
           529 U.S. 803 (2000)                                                              12

25

26   *Video Software Dealers Ass'n v. Maleng*
           325 F. Supp. 2d 1180 (W.D. Wash. 2004)                                        8, 9

27   *Walton v. Arizona*,
           497 U.S. 639 (1990)                                                              19

28

**TABLE OF AUTHORITIES  (continued)**

1                                                                                    **Page**

2    *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*
3         471 U.S. 626 (1985)                                                    15-16

4

5    **Statutes**

6

7    California Civil Code
          §§ 1746 -1746.5                                                              1
8    California Civil Code
9          § 1746(d)(1)                                                              12

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

State's Opposition to MSJ          *Video Software Dealers Association, et al. v. Arnold Schwarzenegger, et al.*
                                                            C 05 4188 RMW RS

iii