1   GIBSON, DUNN & CRUTCHER LLP
    THEODORE J. BOUTROUS, JR., SBN 132099
2   H. MARK LYON, SBN 162061
    ETHAN D. DETTMER, SBN 196046
3   1881 Page Mill Road
    Palo Alto, California  94304
4   Telephone: (650) 849-5300
    Facsimile: (650) 849-5333
5
    JENNER & BLOCK LLP
6   PAUL M. SMITH (admitted *pro hac vice*)
    KATHERINE A. FALLOW (admitted *pro hac vice*)
7   MATTHEW S. HELLMAN (admitted *pro hac vice*)
    601 13th Street, N.W., Suite 1200
8   Washington, D.C. 20005
    Telephone:  (202) 639-6000
9   Facsimile:  (202) 639-6066

10  Attorneys for Plaintiffs
    VIDEO SOFTWARE DEALERS ASSOCIATION
11  and ENTERTAINMENT SOFTWARE ASSOCIATION

12

13                  UNITED STATES DISTRICT COURT

14          FOR THE NORTHERN DISTRICT OF CALIFORNIA

15

16  VIDEO SOFTWARE DEALERS
    ASSOCIATION and ENTERTAINMENT          CASE NO. C 05-4188 RMW (RS)
    SOFTWARE ASSOCIATION,
17                                          REPLY IN SUPPORT OF PLAINTIFFS'
                                            MOTION FOR SUMMARY JUDGMENT
18         Plaintiffs,

19              vs.

20

21  ARNOLD SCHWARZENEGGER, in his official
    capacity as Governor of the State of California;
    BILL LOCKYER, in his official capacity as
22  Attorney General of the State of California;
    GEORGE KENNEDY, in his official capacity as
23  Santa Clara County District Attorney, RICHARD
    DOYLE, in his official capacity as City Attorney
24  for the City of San Jose,  and ANN MILLER
    RAVEL, in her official capacity as County
25  Counsel for the County of Santa Clara,

26         Defendants.

27

28

Reply in Support of Plaintiffs'
Motion for Summary Judgment                              Case No. C 05-4188 RMW (RS)

Dockets.Justia.com

1

**TABLE OF CONTENTS**

2

Page

3

INTRODUCTION ......................................................................................................................... 1

4

    I.      THE ACT FAILS STRICT SCRUTINY. ....................................................................... 1

5

           A.      The State Has Not Shown That Even A Legitimate Interest

6
                     Underlies the Act. .................................................................................... 1

7

           B.      No Substantial Evidence Supports The Act. ...................................................... 5

8

           C.      The Act Does Not Materially Advance Its Aims, Is Not

9
                     Narrowly Tailored, And Ignores Less Restrictive Alternatives........................ 8

    II.     THE ACT'S LABELING PROVISIONS ARE

10
          UNCONSTITUTIONAL ........................................................................................ 10

11

    III.    THE ACT IS UNCONSTITUTIONALLY VAGUE................................................... 10

12

CONCLUSION ........................................................................................................................... 12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

1

## TABLE OF AUTHORITIES

2

3
Page(s)

### CASES

4

5
*Am. Amusement Mach. Ass'n v. Kendrick*,
  244 F.3d 572 (7th Cir. 2001)................................................................................................. 1, 8

6

7
*American Booksellers Ass'n, Inc. v. Hudnut*,
  771 F.2d 323 (7th Cir. 1985), *aff'd*, 475 U.S. 1001 (1986) ........................................... 3, 4

8
*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002)................................................................................................ 2, 3, 6

9

10
*Boos v. Barry*,
  485 U.S. 312 (1988)........................................................................................................ 4

11
*Bose Corp. v. Consumers Union of U.S., Inc.*,
  466 U.S. 485 (1984) ...................................................................................................... 6

12

13
*Brandenburg v. Ohio*,
  395 U.S. 444 (1969)........................................................................................................ 2

14

15
*Dworkin v. Hustler Magazine Inc.*,
  867 F.2d 1188 (9th Cir. 1989)........................................................................................ 2

16
*Entertainment Software Ass'n v. Blagojevich*,
  404 F. Supp. 2d 1051 (N.D. Ill. 2005) .................................................................. passim

17

18
*Entertainment Software Ass'n v. Granholm*,
  No. 05-73634, --- F. Supp. 2d ---, 2006 WL 901711 (E.D. Mich. Mar. 31, 2006)................... passim

19

20
*Erznoznik v. City of Jacksonville*,
  422 U.S. 205 (1975)........................................................................................................ 5

21

22
*Florida Star v. BJF*,
  491 U.S. 524 (1989)........................................................................................................ 9

23
*Ginsberg v. New York*,
  390 U.S. 629 (1968)........................................................................................................ 4

24

25
*Interactive Digital Software Ass'n v. St. Louis County*,
  329 F.3d 954 (8th Cir. 2003)....................................................................................... 1, 4

26
*James v. Meow Media*,
  300 F.3d 683 (6th Cir. 2002)......................................................................................... 2

27

28
*McConnell v. Federal Election Comm'n*,
  540 U.S. 93 (2003)......................................................................................................... 5

ii

Reply in Support of Plaintiffs'
Motion for Summary Judgment                              Case No. C 05-4188 RMW (RS)

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

*Pacific Gas & Electric Co. v. Public Utilities Commission of California*,
  475 U.S. 1 (1986)..............................................................................................................10

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992)............................................................................................................5

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
  487 U.S. 781 (1988)..........................................................................................................10

*Stanley v. Georgia*,
  394 U.S. 557 (1969)............................................................................................................3

*Texas v. Johnson*,
  491 U.S. 397 (1989)............................................................................................................4

*Turner Broadcasting System, Inc. v. FCC*,
  520 U.S. 180 (1997)............................................................................................................5

*United States v. Jones*,
  132 F.3d 232 (5th Cir. 1998), *aff'd*, 527 U.S. 373 (1999) ...............................................11

*United States v. Playboy Entertainment Group, Inc.*,
  529 U.S. 803 (2000).......................................................................................................5, 9

*Video Software Dealers Ass'n v. Maleng*,
  325 F. Supp. 2d 1180 (W.D. Wash. 2004)......................................................................1, 7

*Video Software Dealers Ass'n v. Schwarzenegger*,
  401 F. Supp. 2d 1034 (N.D. Cal. 2005) ..........................................................................4, 7

*Warsoldier v. Woodford*,
  418 F.3d 989 (9th Cir. 2005)..............................................................................................9

*Zauderer v. Office of Disciplinary Counsel*,
  471 U.S. 626 (1985)..........................................................................................................10

**STATUTES**

Cal. Civ. Code § 1746(d)(2)(D) .............................................................................................11

**OTHER AUTHORITIES**

FTC, Report to Congress: Marketing Violent Entertainment to Children (July 2004), available at
  http://www.ftc.gov/05/2004/07/040708 kidsviolencerpt.pdf................................................9

iii

1    Plaintiffs Video Software Dealers Association and Entertainment Software Association

2  ("Plaintiffs") respectfully submit this reply in support of their motion seeking summary judgment to

3  enjoin Cal. Civil Code § 1746 (2005) (the "Act").

4

5                                          **INTRODUCTION**

6    The State's defense of the Act turns the First Amendment on its head.  Under the First

7  Amendment, the government may not restrict protected speech in order to prevent violence or to

8  influence behavior except upon the most stringent showing of need.  Yet the State claims this

9  authority relying on a body of evidence that has been rejected as unpersuasive by every court to have

10  looked at it.  Moreover, in blatant disregard of the requirements of strict scrutiny and its presumption

11  of unconstitutionality, the State claims that this Court must accept, without question, the Legislature's

12  selective interpretation of a one-sided subset of social science research.  No aspect of the State's

13  argument can be squared with First Amendment doctrine, as every other court has concluded.

14  *Entertainment Software Ass'n v. Blagojevich*, 404 F. Supp. 2d 1051 (N.D. Ill. 2005) ("*Blagojevich*");

15  *Entertainment Software Ass'n v. Granholm*, No. 05-73634, --- F. Supp. 2d ---, 2006 WL 901711

16  (E.D. Mich. Mar. 31, 2006), ("*Granholm*"); *Interactive Digital Software Ass'n v. St. Louis County*,

17  329 F.3d 954 (8th Cir. 2003) ("*IDSA*"); *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572 (7th

18  Cir. 2001) ("*AAMA*"); *Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180 (W.D. Wash.

19  2004).  At bottom, the State seeks to do precisely what the First Amendment prohibits: to restrict

20  unpopular speech on unsubstantiated grounds.  The State has failed to carry its burden and Plaintiffs

21  are therefore entitled to summary judgment in their favor.

22  **I.    THE ACT FAILS STRICT SCRUTINY.**

23       **A.    The State Has Not Shown That Even A Legitimate Interest Underlies the Act.**

24    The State's opposition brief skips over strict scrutiny's threshold requirement:  that the State

25  act on the basis of a compelling interest.  If the interest is not compelling, no amount of evidence can

26  save the Act.  That is precisely the case here, because the State has failed to point to even a *legitimate*

27  interest that underlies the Act.  That failure by itself is enough to grant Plaintiffs summary judgment.

28

1

Reply in Support of Plaintiffs'
Motion for Summary Judgment                                        Case No. C 05-4188 RMW (RS)

1        The Act cannot be sustained as a means to prevent minors from behaving aggressively.  That

2   purported interest amounts to the same thing as saying that the targeted speech carries too much risk

3   of causing recipients to be violent.  The State's continued disavowal of an interest in preventing

4   minors from engaging in violence is belied by its repeated assertions that the research shows that

5   "violent" video games cause minors to act more aggressively.  *See* State Opp. at 5-7 (referring to

6   purported findings of increased "aggressive behavior," "aggressive thoughts," "automatic

7   aggressiveness," "hostil[ity]," and "linkage to serious, real-world types of aggression."); *see also*

8   Pls.' Opp. at 3-4 (cataloging references to increased aggression in the State's opening brief).  But

9   Plaintiffs have already pointed out that curbing aggression or violence by recipients is a categorically

10  illegitimate basis for restricting expression, unless the State can demonstrate that video games are

11  "directed to inciting or producing the imminent lawless action and [are] likely to incite or produce

12  such action."  *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002) (quoting *Brandenburg v.*

13  *Ohio*, 395 U.S. 444, 447 (1969)); *see also Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1199

14  (9th Cir. 1989) (efforts to restrict pornography based on its "tendency to cause others to engage in

15  undesirable acts" must meet the *Brandenburg* test).

16       The State has not even attempted to show that video games are either intended or likely to

17  cause imminent violence.  Thus, to the extent the Act is premised on violence-prevention grounds, it

18  should meet the same fate as every other attempt to regulate violent video games on this basis.  *See*

19  *Blagojevich*, 404 F. Supp. 2d at 1073 (finding that Illinois had come "nowhere near" to satisfying

20  *Brandenburg*); *Granholm*, 2006 WL 901711, at *4 (striking down Michigan statute because "video

21  game producers do not intend for the consumers to commit violent actions" and because the State has

22  failed to prove that video games have ever caused anyone to commit a violent act, let alone present a

23  danger of imminent violence); *James v. Meow Media*, 300 F.3d 683, 698 (6th Cir. 2002) ("[The]

24  glacial process of personality development [that violent video games allegedly affect] is far from the

25  temporal imminence that we have required to satisfy the *Brandenburg* test.").

26       The State attempts to evade *Brandenburg* by arguing that the Act is concerned not with the

27  harm to others caused by increased aggression, but the harm minors themselves suffer by becoming

28  more aggressive.  But *Brandenburg* would be meaningless if the government could always recast its

2

1  concern with aggression as a concern for the well-being of the aggressor.  The State cites no authority

2  for its attempted end-run around this fundamental First Amendment doctrine.  To the contrary,

3  *Brandenburg* has consistently been applied to protect speech claimed to have an adverse effect upon

4  listeners.  *E.g.*, *American Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323, 328-30 (7th Cir. 1985),

5  *aff'd*, 475 U.S. 1001 (1986) (assuming that pornography has a deleterious effect on those exposed to

6  it but striking down anti-pornography law under *Brandenburg* because there had been no showing

7  that such materials were likely to lead to imminent violence).  Thus, as numerous other courts have

8  found, *Brandenburg* is the relevant standard to evaluate the State's claim, and there is no question

9  that the State has fallen short of meeting that standard.

10  The State's attempt to frame its interest as one of protecting against other psychological or

11  developmental harms to minors themselves is unsupported and not even a legitimate interest, let

12  alone a compelling one adequate to survive strict scrutiny.  As discussed *infra*, the State has not

13  provided substantial evidence showing that "violent" video games have a deleterious effect on

14  children, but even assuming that some connection could be shown, it is not the State's place to pick

15  and choose the expression children are exposed to in an effort to shape their thoughts or personalities.

16  As *Blagojevich* put it, "[i]f controlling access to allegedly 'dangerous' speech is important in

17  promoting the positive psychological development of children, in our society that role is properly

18  accorded to parents and families, not the State."  *Blagojevich*, 404 F. Supp. 2d at 1075.

19  The notion that protected speech can be restricted because it affects personality is utterly

20  foreign to the First Amendment.  "The government 'cannot constitutionally premise legislation on the

21  desirability of controlling a person's private thoughts.'"  *Free Speech Coalition*, 535 U.S. at 253,

22  (quoting *Stanley v. Georgia*, 394 U.S. 557, 566 (1969)).  Yet that is exactly the rationale the State

23  advances for the Act.  State Opp. at 5-7 (describing findings purporting to show "desensitization,"

24  "decreases in helping behaviour," "lower empathy," and "antisocial behavior").  If "[t]he mere

25  tendency of speech to encourage *unlawful* acts is not a sufficient reason for banning it," *Free Speech

26  Coalition*, 535 U.S. at 253 (emphasis added), how can the State claim a compelling interest in

27  restricting speech to promote "empathy"?

28

3

Reply in Support of Plaintiffs'
Motion for Summary Judgment                                    Case No. C 05-4188 RMW (RS)

1    If the State's view were accepted, the notion of protected speech would have little meaning, as

2    such speech could always be regulated if it caused "undesirable" attitudes on the part of the listener.

3    Whether the State describes its remaining interest as preventing asocial attitudes, or fine-tuning

4    minors' sense of empathy, bedrock First Amendment principles forbid the State to ban speech based

5    on how listeners will react to it.  *See Boos v. Barry*, 485 U.S. 312, 321 (1988) (O'Connor, J., joined

6    by Stevens & Scalia, JJ.) (striking ban on picketing near embassies where purpose was to protect the

7    emotions of those who reacted to the picket signs' message); *Texas v. Johnson*, 491 U.S. 397, 408-

8    09 (1989) (interest in protecting bystanders from feeling offended or angry is not sufficient to justify

9    ban on flag-burning).  Indeed, under the government's view, the State could permissibly regulate "a

10   minor's access to games about embezzling [or] shoplifting" – or a whole host of books or films or

11   magazines – on this basis.  *Video Software Dealers Ass'n v. Schwarzenegger*, 401 F. Supp. 2d 1034,

12   1045 (N.D. Cal. 2005).  As this Court noted, "[n]o court has previously endorsed such a limited view

13   of minors' First Amendment right[s]."  *Id.*  Not all speech protected by the First Amendment is

14   pleasant or universally acclaimed, and some of it may trigger negative thoughts – such as anger,

15   despair, isolation, or envy – but that is not a permissible basis for regulation.  "Any other answer

16   leaves the government in control of all of the institutions of culture, the great censor and director of

17   which thoughts are good for us."  *Hudnut*, 771 F.2d at 330.

18   It is particularly telling that although the State indignantly insists that it has a compelling

19   interest in shaping minors' personalities by restricting protected speech, the State's opposition fails to

20   cite a *single* case in support of that supposedly self-evident proposition.  *Ginsberg v. New York*, 390

21   U.S. 629 (1968), is not apposite because that case is the exception that proves the rule:  although the

22   government may restrict certain obscene materials for minors without satisfying strict scrutiny, under

23   that "harmful to minors" doctrine, the narrow paternalistic role for government is limited to material

24   with sexual content.  *See IDSA*, 329 F.3d at 959-60 ("Nowhere in *Ginsberg* (or any other case that we

25   can find, for that matter) does the Supreme Court suggest that the government's role in helping

26   parents to be the guardians of their children's well-being is an unbridled license to governments to

27   regulate what minors read and view.").  In any other context, First Amendment limitations on

28   governmental action are in general "no less applicable when [the] government seeks to control the

4

1    flow of information to minors." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 (1975); *see*

2    *McConnell v. Federal Election Comm'n*, 540 U.S. 93, 231 (2003) ("Minors enjoy the protection of

3    the First Amendment.").

4          In sum, the State cannot meet the *Brandenburg* test for restricting speech to protect

5    aggression, and its claimed interest in protecting minors from some nebulous form of "psychological

6    harm" is simply not legitimate.  As a result, the State has not demonstrated even a legitimate interest,

7    and thus cannot satisfy strict scrutiny.  Even if the State could show that its "psychological harm"

8    interest were supported by substantial evidence – and, as discussed below, it cannot – such an interest

9    cannot be divorced from an illegitimate interest in controlling minors' thoughts and feelings.

10   Plaintiffs are entitled to summary judgment on this ground alone.

11          **B.    No Substantial Evidence Supports The Act.**

12         Even assuming there were a potentially legitimate interest here, the evidence relied upon by

13   the Legislature would be inadequate to sustain the Act.  The State essentially asks this Court to defer,

14   without question, to its reliance on a one-sided body of research concerning the so-called effects of

15   "violent" video games.  Putting aside that the State relies on a set of research that has been

16   consistently rejected by the courts as insufficient to support the type of speech restriction at issue

17   here, the State's argument is nothing more than an attempted end-run around strict scrutiny.  As the

18   Supreme Court has made clear, strict scrutiny means that the Act is presumptively unconstitutional.

19   *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).  It is the *State's* burden to put forward

20   substantial evidence and support the reasonable inferences it would draw from it.  The State is thus

21   wrong to claim that the Legislature's reading of the evidence (however truncated and biased) must be

22   given deference absent an affirmative showing by Plaintiffs.

23         The State relies on *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997) for its

24   claim of deference.  Yet that case applied intermediate scrutiny, and thus to the extent it discussed a

25   greater level of deference to legislative judgments, those statements do not apply here.  Instead,

26   "[w]hen the Government seeks to restrict speech based on its content, the usual presumption of

27   constitutionality afforded congressional enactments *is reversed*," *United States v. Playboy*

28   *Entertainment Group, Inc.*, 529 U.S. 803, 817 (2000) (emphasis added), and the government cannot

5

1  rely on supposition or probability, but must show "a significantly stronger, more direct connection."

2  *Free Speech Coalition*, 535 U.S. at 253 (declining to uphold child pornography statute on basis of

3  government claim that the speech at issue would encourage child predators). *Cf. Bose Corp. v.*

4  *Consumers Union of U.S., Inc.*, 466 U.S. 485, 508 (1984) ("[Where] the question is one of alleged

5  trespass across the line between speech unconditionally guaranteed and speech which may

6  legitimately be regulated . . . the rule is that we examine for ourselves the statements in issue and the

7  circumstances under which they were made to see whether they are of a character which the

8  principles of the First Amendment . . . protect.") (internal quotation marks and citations omitted).

9       The State cannot claim that it has drawn "reasonable inferences based on substantial

10  evidence" when it is has looked only at a biased subset of the materials. *Blagojevich*, 404 F. Supp. 2d

11  at 1063.  There can be no confidence in the Legislature's reasonableness when it has ignored all the

12  evidence that undercuts its conclusions. *See id*.  The State suggests that no such evidence exists,

13  State Opp. at 5, but that is plainly incorrect, as demonstrated by the declarations submitted by

14  Plaintiffs' experts. *See* Goldstein Decl. ¶¶ 44-45 (Ex. 4 to Pls.' S.J. Mot.) (describing, among other

15  things, studies that "*offer no support for the hypothesis that children will report more aggressive*

16  *mood after playing violent video games*," and that found that "*mood was significantly more positive*

17  *after playing the violent game than after the paper-and-pencil game*") (emphasis in original); *id.* ¶¶

18  32-33 (collecting studies that found no adverse effects or correlations associated with video games);

19  Williams Decl. ¶¶ 18-19 (Ex. 2 to Pls.' S.J. Mot.) (reporting that the longest video game study to date

20  found that those who played "violent" game had no increase in aggressive thoughts or behaviors).

21  Contrary to the State's arguments, State Opp. at 3, Plaintiffs are not arguing that the State must

22  produce "100% bullet-proof" evidence in support of its claimed interest – but rather that it must make

23  *reasonable* inferences based on all available evidence.  Here, it is simply unreasonable for the

24  Legislature to rely upon only that biased subset of research that supports its goal of restricting speech.

25       Moreover, the evidence that the Legislature did consider is insufficient on its face to support

26  the Act.  As Plaintiffs have already explained, even taken at face value, the work of Dr. Anderson and

27  others does not demonstrate any causal long-term connection between "violent" video games and

28  aggression. Pls.' S.J. Mot. at 10-14.  Thus, the courts have rejected Dr. Anderson's work as

6

1   justification for governmental restraint on speech because it does not "establish a solid causal link

2   between violent video game exposure and aggressive thinking and behavior." 404 F. Supp. 2d at

3   1063; *see also Granholm*, 2006 WL 901711, at \*5 ("Dr. Anderson's studies have not provided any

4   evidence that the relationship between violent video games and aggressive behavior exists.").

5   Although the State makes a half-hearted attempt to highlight evidence beyond Dr. Anderson's

6   discredited body of work, it is no more successful there.  As Plaintiffs have already explained, Dr.

7   Kronenberger's mostly unpublished "frontal lobe" research is purely correlative – not causal – and

8   does not separate out the "effects" of video games from those of television; therefore, his research

9   cannot qualify as substantial evidence, as the courts in *Blagojevich* and *Granholm* have concluded.

10  *Blagojevich*, 404 F. Supp. 2d at 1065; *Granholm*, 2006 WL 901711, at \*5.  Similarly, correlative

11  studies about individuals who play video games and display "automatic aggressiveness,"

12  "hostil[ity]," State Opp. at 6, or reduced "empathy," *id.* at 7, are not substantial evidence because

13  they "have not eliminated the most obvious alternative explanation: aggressive individuals may

14  themselves be attracted to violent video games."[1] *Blagojevich*, 404 F. Supp. 2d at 1063.

15          Accordingly, the bibliography relied upon by the Legislature – much of which consists of

16  opinion articles, policy statements, and other non-scientific material, in addition to the flawed studies

17  discussed above – does not constitute "substantial evidence" sufficient to justify the Act's restrictions

18  on speech.  Nor may the Act be defended by reference to the "expert" declarations improperly

19  submitted by amicus Common Sense Media ("CSM").  Because CSM's filing runs afoul of the

20  proper role of amicus, this Court should strike its brief and the declarations in their entirety.  In any

21  event, CSM's declarations and brief give no support whatsoever to the State's argument.  As an

22  initial matter, they are entirely focused on demonstrating how video games allegedly increase

23  violence or affect minors' thoughts.  Yet as explained above, *see supra* § 1.A., these are not even

24

25

26  [1] The State's insistence that the *Maleng* decision supports its argument is grossly misplaced.  As this
    Court has already recognized, that decision "found that the State had not carried its burden of
    proving that games covered by the statute caused aggressive feelings or behavior."

27  *Schwarzenegger*, 401 F. Supp. 2d at 1043 (citing *Maleng*, 325 F. Supp. 2d at 1189).  As Plaintiffs
    have already pointed out, *Maleng* drew these conclusions generally, and not just with respect to

28  encouraging violence against law enforcement officers.  Pls. Opp. at 9, n.2.

7

1    *legitimate* bases for the State to act upon.  And even if they were legitimate, the cited studies are not

2    substantial evidence.  Many merely rehash the inadequate evidence already in the legislative record

3    or the same "meta-analyses" performed by Dr. Anderson and rejected by the courts.  Declaration of

4    Brad J. Bushman ("Bushman Decl.") ¶¶ 11-17; Declaration of Michael Ogden Rich ("Rich Decl.")

5    ¶ 6; Declaration of Cary P. Gross ("Gross Decl.") ¶ 4.  The rest present new studies that suffer from

6    exactly the same flaws as the studies that have been previously rejected.  For example, some rely on

7    television research to make sweeping – and unsubstantiated – causal claims about video games.  *See*

8    Gross Decl. ¶¶ 4-5; Declaration of Thomas N. Robinson ¶ 3; Rich Decl., Exh. C.  Still others

9    impermissibly rely on merely correlative or short term experimental data to draw long-term causal

10   conclusions.  *See* Declaration of Sonya Brady ¶ 5; Declaration of Ute Ritterfeld ¶ 3; Bushman Decl.

11   ¶¶ 9, 12.[2]  And at least one of the experts relies on an *uncompleted* study to make definitive

12   statements about the "effects" of video games.  Gross Decl.  In short, none of these studies is on point

13   or persuasive substantial evidence.  And, as with the Legislature's bibliography, missing from all the

14   declarations is an acknowledgement of contrary evidence.  Thus, even if this Court were to consider

15   CSM's filings (and it should not), they would not constitute substantial evidence upon which a

16   Legislature could reasonably draw inferences about the effect of violent video games on minors.

**C.    The Act Does Not Materially Advance Its Aims, Is Not Narrowly Tailored,
And Ignores Less Restrictive Alternatives.**

Plaintiffs are also entitled to summary judgment because the Act does not satisfy the other

elements of strict scrutiny.  The State continues to fail to explain how the Act can be said to

materially advance its goals when it blocks the purchase of say, a *Resident Evil* video game, but

allows the minor to rent a *Resident Evil* movie.  "Video games consist of 'a tiny fraction of the media

violence to which American children are exposed."  *Granholm*, 2006 WL 901711 at *6 (quoting

*AAMA*, 244 F.3d at 579).  "[T]he underinclusiveness of this statute—given that violent images appear

more accessible to unaccompanied minors in other media— indicates that regulating violent video

_____

[2] As Plaintiffs' expert Howard Nusbaum has already explained, the study described by Ute Ritterfeld
in his declaration used brain imaging techniques that could only show correlation at most, and
which are subject to a host of alternative explanations.  *See* Nusbaum Decl.  (Ex. 3 to Pls.' S.J.
Mot.).

8

Reply in Support of Plaintiffs'
Motion for Summary Judgment                                              Case No. C 05-4188 RMW (RS)

1  games is not really intended to serve the proffered purpose." *See Blagojevich*, 404 F. Supp. 2d at

2  1075; *Florida Star v. BJF*, 491 U.S. 524, 540-41 (1989).

3  Similar problems plague the State's narrow-tailoring arguments. Although the State claims

4  that the Act is narrowly tailored to the unique problem of interactive video games, it cites no studies

5  supporting its claim about the effects of "interactivity." And in any event, Dr. Anderson has testified

6  that the purported effects of exposure to "violent" television and video games are essentially the

7  same. Anderson Test., 11/15/05 Tr. at 278-80. The State also cannot argue that the Act is narrowly

8  tailored to reach only a well-defined subset of video games. Leaving aside the sweeping effect of the

9  Act's open-ended vague terminology, *infra*, the Act is not narrowly tailored because there is zero

10  evidence in the record demonstrating that the particular type of video game that the Act targets is a

11  type that is distinctively harmful to minors. This lack of fit is an independent basis to strike down the

12  Act.

13  Finally, the State's suggestion that Plaintiffs have failed to demonstrate the efficacy of less

14  speech-restrictive alternatives ignores the fundamental point that under strict scrutiny, the

15  *government* bears the burden of proving the absence of such alternatives. *E.g.*, *Playboy*, 529 U.S. at

16  816 ("When a plausible, less restrictive alternative is offered to a content-based speech restriction, it

17  is the Government's obligation to prove that the alternative will be ineffective to achieve its goals.");

18  *Warsoldier v. Woodford*, 418 F.3d 989, 999 (9th Cir. 2005) ("[The government] cannot meet its

19  burden to prove least restrictive means unless it demonstrates that it has actually considered and

20  rejected the efficacy of less restrictive measures before adopting the challenged practice."). The State

21  continues to overlook the fact that the video game industry does *better* than its media counterparts in

22  ensuring that unaccompanied minors are unable to buy age-inappropriate material. *Blagojevich*, 404

23  F. Supp. 2d. at 1075; FTC, Report to Congress: Marketing Violent Entertainment to Children at 20,

24  23-24 (July 2004), available at http://www.ftc.gov/05/2004/07/040708 kidsviolencerpt.pdf. And it

25  has not said a word about parental controls that will allow parents to limit which games the consoles

26  will play. Having failed to address these alternatives or to satisfy any other aspect of the narrow-

27  tailoring requirement, the State has failed to carry its burden. Plaintiffs are therefore entitled to

28  summary judgment.

9

1    **II.    THE ACT'S LABELING PROVISIONS ARE UNCONSTITUTIONAL**

2    Plaintiffs have already explained why the Act's labeling requirement compels speech in

3    violation of the First Amendment. Pls.' S.J. Mot. at 18-20 (citing *Riley v. National Federation of the*

4    *Blind of North Carolina, Inc.*, 487 U.S. 781 (1988) and *Pacific Gas & Electric Co. v. Public Utilities*

5    *Commission of California*, 475 U.S. 1 (1986)); Pls. S.J. Opp. at 17 (same). For the same reasons that

6    apply to the rest of the Act, the labeling requirement cannot survive strict scrutiny and is

7    unconstitutional. In its Opposition, the State does not even argue that the labeling provision could

8    survive strict scrutiny, nor does the State argue that the labeling provisions could be independently

9    justified if the rest of the Act is found unconstitutional. Indeed, the State all but concedes that the

10   "18" label would constitute a *false* statement if the Court strikes down (as it should) the other

11   provisions of the Act. State Opp. at 16.

12   Thus, the State's reliance on *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985)

13   is misplaced. *Zauderer* involved only the disclosure of "purely factual and uncontroversial

14   information" designed to alleviate "consumer confusion or deception." 471 U.S. at 651. Here, the

15   label "18" conveys a stigmatizing message that it is unlawful for minors to buy, or perhaps even play,

16   such games. *See Blagojevich*, 404 F. Supp. 2d at 1081 (noting that similar "18" label "creates the

17   appearance that minors under eighteen are prohibited from playing such games.").[3] But because the

18   State may not constitutionally impose such restrictions under the First Amendment, that message is

19   untrue and will only cause greater consumer confusion. The State's defense of the labeling

20   requirement is premised on the constitutionality of the rest of the Act, and thus the labeling

21   requirement must invalidated along with the rest of the Act.

22   **III.    THE ACT IS UNCONSTITUTIONALLY VAGUE.**

23   The State's arguments on vagueness are likewise meritless. The State remains unable to

24   specify what qualifies as an "image of a human being" in the context of video games. The best that

25   _____

26   [3] The State tries to distinguish the Act from the law in *Blagojevich* by pointing out that the Illinois
     law also imposed onerous signage display and brochure requirements. But that does not detract
27   from *Blagojevich*'s holding that the Illinois labeling requirement – which is nearly indistinguishable
     from the California provision – amounted to unconstitutional compelled speech. 404 F. Supp. 2d at
28   1081.

Reply in Support of Plaintiffs'
Motion for Summary Judgment                                    Case No. C 05-4188 RMW (RS)

1    the State can offer is the tautology that "[i]f the entity looks like a fanciful creature or an alien that is

2    not an image of a human being," then it is not an "image of a human being." State Opp. at 18. That

3    formulation does not help determine whether, for example, a zombie – a discolored or disfigured

4    humanoid that is not considered to be "alive" – "looks like a fanciful creature" or like a human being.

5    *See* Price Decl. ¶¶ 33-34, 36 (attached as Ex. 2 to Pls Mem. Sup. Prelim. Inj.) (describing *Resident*

6    *Evil 4*). Nor is it clear whether or why a character identified as a god in a storyline should be

7    described as an "image of a human being" when the god – a character that is by definition not a

8    human – appears in human form. Price Decl. ¶ 53 (describing *God of War*). These are just two

9    examples of the ambiguities created by the Act's restriction of a medium characterized by animation

10    and fantasy, and the State has failed to show how the Act can be applied in an objective and

11    predictable way.

12        Similarly unavailing is the State's argument that the term "serious physical abuse" is not

13    impermissibly vague because that term has been applied in the criminal sentencing context. In the

14    real world, the infliction of "serious physical abuse" may have a "common-sense core meaning" that

15    a jury may understand, *see United States v. Jones*, 132 F.3d 232, 250 (5th Cir. 1998), *aff'd*, 527 U.S.

16    373 (1999), but when a player inflicts violence on an "image of a human being" with superhuman

17    abilities, there is no common benchmark to decide whether the violence inflicts "extreme physical

18    pain" or a "substantial risk of death." Act, § 1746(d)(2)(D). Likewise, given that players have a

19    range of options when playing the game, there is no way for a retailer or distributor to predict in

20    advance the "intent" of a player – whether the player, for example, "intend[s] the abuse, apart from

21    the killing." *Id.*[4]

22        Finally, the State is wrong in suggesting that the Act may be upheld because the video game

23    voluntary rating system uses certain content descriptors in an attempt to provide parents and other

24    consumers with detailed information about games. *See* State Opp. at 18-19. Voluntary ESRB ratings

25

26

27    [4] Further, as explained in the Plaintiffs' Opposition to the State's Motion for Summary Judgment, at 16, it is also not clear when a game might appeal to a "deviant or morbid interest." Act, § 1746(d)(1)(A)(1). *See Granholm*, 2006 WL 901711, at *8 (finding similar language

28    unconstitutionally vague).

11

Reply in Support of Plaintiffs'
Motion for Summary Judgment                                      Case No. C 05-4188 RMW (RS)

1    do not have the force of law and while they may be written to be as informative as possible to

2    consumers, a retailer or distributor is not penalized by the State if it is unable to determine the

3    appropriate ESRB category in advance. Where the State seeks to restrict speech, the Constitution

4    requires a level of clarity and notice that is absent here.

5           These ambiguities in the Act's definitions are not hypothetical – Plaintiffs described the

6    difficulties of applying the Act to specific, existing games in their Motion for Summary Judgment, at

7    21-22. Given these problems, retailers and distributors will have no choice but to censor a wide

8    range of games that might fall into the Act's vague terms. For these reasons, the Act should be held

9    unconstitutional on vagueness grounds.

10                                         **CONCLUSION**

11          For the foregoing reasons, Plaintiffs respectfully ask this Court to deny summary judgment to

12   the State and grant summary judgment in their favor and permanently enjoin the Act.

13

14                                            Respectfully submitted.

15   DATED: April 28, 2006

16                                            GIBSON, DUNN & CRUTCHER LLP
                                              THEODORE J. BOUTROUS, JR.
17                                            H. MARK LYON
                                              ETHAN D. DETTMER
18

19

20                                            By:_____/s/_____
                                                      Theodore J. Boutrous, Jr.

21

22                                            JENNER & BLOCK LLP
                                              PAUL M. SMITH (admitted *pro hac vice*)
                                              KATHERINE A. FALLOW (admitted *pro hac vice*)
23                                            MATTHEW S. HELLMAN (admitted *pro hac vice*)
                                              601 13th Street, N.W., Suite 1200
24                                            Washington, D.C. 20005
                                              Telephone: (202) 639-6000
25                                            Facsimile: (202) 639-6066

26                                            Attorneys for Plaintiffs
                                              VIDEO SOFTWARE DEALERS ASSOCIATION
27                                            and ENTERTAINMENT SOFTWARE ASSOCIATION

28

                                                12