In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 06-1012, 06-1048 & 06-1161

ENTERTAINMENT SOFTWARE ASSOCIATION, et al.,

*Plaintiffs-Appellees,*

*v.*

ROD R. BLAGOJEVICH., GOVERNOR, et al.,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 4265—**Matthew F. Kennelly**, *Judge.*

ARGUED JUNE 5, 2006—DECIDED NOVEMBER 27, 2006

Before BAUER, ROVNER, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* In this appeal, we must determine whether the State of Illinois has gone too far in its attempt to protect minors from the allegedly dangerous impact of certain video games. The plaintiffs, associations representing video game manufacturers and retailers, successfully challenged the constitutionality of the Illinois Sexually Explicit Video Game Law in the district court. The State now appeals the district court's imposition of a permanent injunction against enforcement of the law. Primarily because we conclude that the Sexually Explicit Video Game Law is not sufficiently narrowly tailored, we affirm the judgment of the district court.

## I. BACKGROUND

On July 25, 2005, the State of Illinois enacted Public Act 94-0315. The Act is comprised primarily of the Violent Video Game Law ("VVGL") and the Sexually Explicit Video Game Law ("SEVGL"). The SEVGL requires video game retailers to place a four square-inch label with the numerals "18" on any "sexually explicit" video game. *See* 720 ILCS § 5/12B-25(a). It also requires them to place a sign in their stores explaining the video game rating system and to provide customers with brochures about the video game rating system. *See* 720 ILCS §§ 5/12B-30(a), 35(a). Most significantly, the SEVGL criminalizes the sale or rental of sexually explicit video games to minors. *See* 720 ILCS § 5/12B-15. The statute imposes criminal penalties on any "person who sells, rents, or permits to be sold or rented, any sexually explicit video game to any minor . . . ." *Id.*

The SEVGL defines "sexually explicit" video games as:

> [T]hose that the average person, applying contemporary community standards would find, with respect to minors, is designed to appeal or pander to the prurient interest and depict or represent in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act or a lewd exhibition of the genitals or post-pubescent female breast.

720 ILCS 5/12B-10(e).

The day after enactment, the plaintiffs filed suit in the United States District Court for the Northern District of Illinois, facially challenging the constitutionality of both the VVGL and the SEVGL. The plaintiffs are associations representing video game manufacturers and retailers. The defendants are the Governor of Illinois, the Illinois Attorney General, and the State's Attorney for Cook County (collec-

tively, "the State").[1] The plaintiffs are all participants in the video game industry's ratings system—the Entertainment Software Rating Board ("ESRB"), which rates games on the basis of the maturity/age for which the game is appropriate.[2] At the outset of the litigation the plaintiffs moved for a preliminary injunction and the defendants moved to dismiss. The motion to dismiss was denied. The district court stayed consideration of the motion for a preliminary injunction and held a three-day trial. Relevant to the SEVGL, during the trial, the State introduced screen shots from three games: (1) *Grand Theft Auto: San Andreas*, (2) *Leisure Suit Larry: Magna Cum Laude*, and (3) *The Guy Game: Uncut and Uncensored*. Parts of these games feature various images that the State alleges are covered by the law, ranging from digital drawings of exposed breasts to digital animations of sex acts. The plaintiffs introduced the game *God of War*, a game which takes place in ancient Greece and roughly tracks Homeric themes, as evidence of a benign game which was unconstitutionally criminalized by the law. In *God of War*, a single scene depicts two bare-chested women in Ancient Greece. The plaintiffs allege that the scene featuring the bare-chested women is critical to the game as it marks the point at which the character rejects the temptations of the physical realm to focus on his mission.

---

[1] Although the defendants have filed separate briefs, their arguments are identical except where noted.

[2] The ratings include EC (early child), E (everyone), E10+ (for those over age ten), T (teen), M (mature—for those over 17), and AO (adults only). Under the ESRB video games are also labeled with content descriptors such as "strong sexual content." The SEVGL includes an affirmative defense for retailers charged with violation of the prohibition against selling to minors that bars prosecution unless the rating of the game was M or AO.

At the conclusion of the trial, Judge Kennelly applied strict scrutiny to the statutes and found for the plaintiffs, concluding that both the VVGL and the SEVGL were unconstitutional.[3] Specifically, the court concluded that the SEVGL was not narrowly tailored and that the SEVGL's brochure, labeling and signage provisions constituted "compelled speech" in violation of the First Amendment. The court also found that sovereign immunity did not bar suit against the Attorney General in this case.[4] The State now appeals only the district court's rulings pertaining to the SEVGL.

## II.  DISCUSSION

### A.  Standard of Review

We review *de novo* the district court's legal determinations that the Attorney General is not entitled to dismissal on the basis of sovereign immunity and that the SEVGL is unconstitutional. *See Anderson v. Milwaukee County*, 433 F.3d 975, 978 (7th Cir. 2006); *Nelson v. La Crosse County Dist. Atty.*, 301 F.3d 820, 825 (7th Cir. 2002). We defer to the district court's factual findings after a full bench trial unless they are clearly erroneous. *See Gaffney v. Riverboat Servs. of Ind.*, 451 F.3d 424, 447 (7th Cir. 2006).

---

[3] Although the State argues that the trial implicated only the VVGL, it seems plain to us that the trial implicated both the VVGL and the SEVGL.

[4] The district court also rejected the argument of the State's Attorney of Cook County, appellant Richard A. Devine, that he was immune from suit. It appears that the State's Attorney has now abandoned this argument as his brief only adopts the arguments of Governor Rod Blagojevich's brief.

## B.  Sovereign Immunity

The Attorney General challenges the district court's ruling that she is not immune from suit pursuant to the Eleventh Amendment of the United States Constitution. The Supreme Court has authorized suits against state officials in their official capacities when plaintiffs seek to enjoin allegedly unconstitutional statutes. *See Ex parte Young*, 209 U.S. 123, 157 (1908). The Court held in *Ex parte Young* that:

> In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party.

*Id.* The Attorney General argues that the plaintiffs have only established a "general connection" between her duties and powers and the SEVGL but not the specific connection necessary to overcome sovereign immunity. She argues that her primary duties do not involve the prosecution of ordinary criminal cases (as a prosecution under the SEVGL would be), but only in criminal appeals.

We are unconvinced by this argument. The Attorney General concedes that she has the power to enforce the SEVGL; the power is simply concurrent with that of the State's Attorney. This satisfies the "some connection" requirement of *Ex parte Young*. *See In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 373 (2d Cir. 2005) ("Under *Ex parte Young*, the state officer against whom a suit is brought must have some connection with the enforcement of the act . . . . [i]t is not necessary that the officer's enforcement duties be noted in the act.") (internal quotation

marks and citation omitted); *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919-20 (9th Cir. 2004) ("some connection" requirement satisfied where Attorney General had concurrent power with county prosecutors to enforce abortion-related parental notification statute); *cf. Citizens for Equal Protection v. Bruning*, 455 F.3d 859, 864 (8th Cir. 2006) (no Eleventh Amendment immunity where the Attorney General had "some connection" to enforcement of Nebraska Constitution Amendment that prohibited same sex marriage).

The Attorney General's reliance on our decision in *Sherman v. Community Consolidated School District 21 of Wheeling Township*[5] is misplaced. In *Sherman,* we concluded that the Attorney General was immune from suit in a challenge to an Illinois statute which required recitation of the Pledge of Allegiance. *See id.* at 441. But the statute in *Sherman* had no enforcement provisions or penalty clauses. *Id.* Involvement of the Attorney General was highly improbable because he had no authority to prosecute the plaintiff under the statute. That is not the situation in this case.

Moreover, the Supreme Court has instructed us that, "[i]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997)) (brackets omitted). Such an inquiry leads us to the conclusion that the Attorney General is not immune. We therefore affirm the district court's sovereign immunity ruling.

---

[5]  980 F.2d 437 (7th Cir. 1992).

## C. Constitutionality of the SEVGL's Sale and Rental Provisions

The plaintiffs argue that the sale and rental provisions of the SEVGL facially violate the First and Fourteenth Amendments of the United States Constitution. As the State concedes, the SEVGL is a content-based restriction on speech, and we must employ strict scrutiny in assessing its constitutionality.[6] *See United States v. Playboy Entm't. Group*, 529 U.S. 803, 813 (2000); *FCC v. Pacifica*, 438 U.S. 726, 751 (1978). To survive strict scrutiny, the SEVGL "must be narrowly tailored to promote a compelling Government interest." *Playboy*, 529 U.S. at 811. Generally, "a statute is narrowly tailored only if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *See Ward v. Rock Against Racism,* 491 U.S. 781, 804 (1989) (quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)) (internal quotation marks omitted). Put another way, a statute is not narrowly tailored if "a less restrictive alternative would serve the Government's purpose." *See Playboy*, 529 U.S. at 813. We must assure that the State does not "burn the house to roast the pig." *See Butler v. Michigan*, 352 U.S. 380, 383 (1957) (Frankfurter, J.).

Here, the State's identified purpose is "shielding children from indecent sexual material and in assisting parents in protecting their children from that material." Governor's Br. at 16. We need not spend time determining whether this is a compelling interest; it clearly is.[7] *See Ashcroft v. ACLU*,

---

[6] In the district court the State argued that rational basis scrutiny was applicable, but it has abandoned this argument on appeal.

[7] The plaintiffs' compelling interest argument seems to conflate the narrow tailoring and compelling interest inquiries. Their brief argues that "to withstand strict scrutiny, the State must demon-
(continued...)

542 U.S. 656, 675 (2004) ("To be sure, our cases have recognized a compelling interest in protecting minors from exposure to sexually explicit materials."); *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989) ("We have recognized that there is a compelling interest in protecting the physical and psychological well-being of minors."). The burden is on the State to demonstrate that the SEVGL is narrowly tailored to achieving this purpose. *See Weinberg v. City of Chicago*, 310 F.3d 1029, 1038 (7th Cir. 2002). One line from the Governor's brief encapsulates the State's narrow tailoring argument: "The SEVGL is narrowly tailored because its effect is perfectly drawn to impact only the subject group—minors—while leaving fully intact the First Amendment rights of adults."

We think it important first to reaffirm our observation in *American Amusement Machine Association v. Kendrick*,[8] 244 F.3d 572, 576 (7th Cir. 2001)*,* that "[c]hildren have First Amendment Rights." The implication of this observation is that our narrow tailoring inquiry must be broader than the question of whether adults will be affected by the challenged legislation. The Constitution also requires us to ask whether legislation unduly burdens the First Amendment rights of minors. And for good reason — as we observed in *AAMA*, history has shown the dangers of giving too much censorship power to the State over materials intended for young persons. *See AAMA*, 244 F.3d at 577 ("The murderous fanaticism displayed by young German soldiers in World War II, alumni of the Hitler Jugend, illustrates the danger

---

[7]  (...continued)

strate that it has a compelling interest in attaching criminal penalties to video game expression that has such serious value for minors." The State has articulated its purpose in enacting the statute—our compelling interest inquiry would focus on whether that articulated purpose is "compelling," but this question has already been answered in the affirmative by the Supreme Court.

[8]  Hereinafter, *"AAMA."*

of allowing government to control the access of children to information and opinion."); *see also Cinecom Theaters Midwest States v. City of Ft. Wayne*, 473 F.2d 1297, 1302 (7th Cir. 1973) ("[A] city may not, consonant with the First Amendment, go beyond the limitations inherent in the concept of variable obscenity in regulating the dissemination to juveniles of 'objectionable' material.").

In *AAMA*, we concluded that the plaintiffs were entitled to a preliminary injunction against a city ordinance that restricted minors' access to violent video games because the city had failed to demonstrate a compelling interest. *AAMA*, 244 F.3d at 575-76. Here, the inquiry is different because "violence and obscenity are distinct categories of objectionable depiction," subject to different constitutional inquiries. *Id.* at 574. But the central holding of *AAMA* is an important backdrop for this case. The State must recognize that the question of a statute's compliance with the First Amendment does not end once it is determined that the free speech rights of adults are unaffected.

None of the parties allege that the games affected by the SEVGL are "obscene," as that term is understood in the parlance of constitutional law; the State rather contends that the games are "indecent" and subject to appropriate legislation limiting their distribution to minors. As in *Playboy*, it is undisputed that the State has no power to limit the sale of the games in question to adults. *See Playboy*, 529 U.S. at 811. But the Supreme Court has determined that, "because of its strong and abiding interest in youth, a State may regulate the dissemination to juveniles of, and their access to, material objectionable as to them, but which a State clearly could not regulate as to adults." *Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676, 690 (1968). Thus, the State may regulate sexual material that is "indecent" with respect to minors, even if such material is not "obscene" under the Court's formulation for adults, if the State can demonstrate that the

regulation in question is narrowly tailored to serve a compelling government interest. *See Sable,* 492 U.S. at 126 ("The Government may, however, regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means.").

In *Ginsberg v. New York*, 390 U.S. 629, 632-33 (1968), the Court began to define the boundaries of the State's ability to regulate material intended for minors, as it upheld a New York statute that criminalized the sale of certain obscene materials to persons under the age of seventeen. The language of the statute upheld in *Ginsberg* made distribution criminal if the material "(i) predominantly appeal[ed] to the prurient, shameful or morbid interest of minors, and (ii) [wa]s patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors, and (iii) [wa]s utterly without redeeming social importance for minors." *Id.* The Court concluded that the protection of children's psychological health was a permissible basis for restricting minors' access to non-obscene, sexually-oriented material. *Id.* at 633.

Five years after *Ginsberg*, the Court revisited the question of the appropriate obscenity standard with regard to material for adults. The Court held that a state's ability to criminalize the distribution of obscene materials only extends to those which "taken as a whole, do not have serious literary, artistic, political, or scientific value." *See Miller v. California*, 413 U.S. 15, 24 (1973).[9] In so ruling,

---

[9]  The two other prongs of the *Miller* test for obscenity did not substantially alter the Court's prior jurisprudence, providing specifically that material was obscene if "the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest" and "the work depicts or describes, in a patently offensive way, sexual

(continued...)

the Court explicitly rejected and replaced the "utterly without redeeming social importance" formulation that had first been articulated in *Memoirs v. Massachusetts*, 383 U.S. 413 (1966). The *Memoirs* Court had articulated two other prongs to its definition of obscenity—material was obscene if "(a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; [and] (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters . . . ." *Id.* at 418. As is obvious, the statute upheld in *Ginsberg* succeeded by appropriating the exact language of *Memoirs* and appending the words "for minors" to each prong of the test. Seemingly implicit then in the *Miller* Court's amendment of the *Memoirs* test was that the test of "obscenity for minors," or indecency, was amended to include the requirement that the material regulated "taken as a whole, do[es] not have serious literary, artistic, political, or scientific value" for minors. *See Miller*, 413 U.S. at 24.

But the Court has not made it so clear—none of its subsequent decisions have explicitly stated that *Miller*'s amendment of the *Memoirs* test also affected *Ginsberg*. *See Pacifica*, 438 U.S. at 767 ("It is true that the obscenity standard the *Ginsberg* Court adopted for such materials was based on the then-applicable obscenity standard of *Roth* . . . and *Memoirs* . . . and that '[w]e have not had occasion to decide what effect *Miller* . . . will have on the *Ginsberg* formulation.'") (Brennan, J., dissenting) (quoting *Erznoznick, infra*); *Erznoznick v. City of Jacksonville*, 422 U.S. 205, 214 n. 10 (1975) ("In *Miller* . . . we abandoned the *Roth-Memoirs* test for judging obscenity with respect to adults. We have not had occasion to decide what effect

---

⁹ (...continued)
conduct specifically defined by the applicable state law." *See Miller*, 413 U.S. at 24 (internal citation and quotation marks omitted).

*Miller* will have on the *Ginsberg* formulation."); *see also ACLU v. Ashcroft*, 322 F.3d 240, 246 (3d Cir. 2003) (explaining that the legislative history of the Child Online Protection Act reveals that the Act's "definition of the harmful to minors test constitutes an attempt to fuse the standards upheld by the Supreme Court in *Ginsberg* . . . and *Miller*") (internal quotation marks omitted), *aff'd*, 542 U.S. 656 (2004); *cf. Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 387 (1988) (declining to invalidate a Virginia statute that included a "harmful to minors" definition that was "a modification of the *Miller* definition of obscenity, adapted for juveniles" and certifying question of reach of statute to Virginia Supreme Court).

It ultimately does not matter. Either *Ginsberg* or *Miller* provides us with the third prong in an appropriate standard for what material can be regulated in the manner of the SEVGL. That is to say, somewhere between *Ginsberg* and *Miller* we arrive at the basement for constitutionality of a statute criminalizing the distribution of sexually oriented materials to minors. Inexplicably, the State of Illinois chose to ignore both *Ginsberg*'s and *Miller*'s third prongs in creating the SEVGL's definition of "sexually explicit." The State thereby simultaneously failed to narrowly tailor the statute and created a statute that is unconstitutionally overbroad. *See Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972) ("A clear and precise enactment may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct.").

The SEVGL's "sexually explicit" definition is evidently modeled after the first two prongs of the *Ginsberg/Miller* test, but includes neither the "utterly without redeeming social importance for minors" language of *Ginsberg* or the "taken as a whole, do not have serious literary, artistic, political, or scientific value" language of *Miller*. After *Miller*, a number of statutes have been found unconstitutional that included the *Miller* language or some hybrid of *Miller* and

*Ginsberg. See, e.g.*, *Ashcroft v. ACLU*, 542 U.S. 656, 662, 673 (2004) (finding federal statute that included language "taken as a whole, lacks serious literary, artistic, political, or scientific value for minors" insufficiently narrowly tailored because less restrictive alternatives were available); *see also Entm't Software Ass'n v. Granholm*, 404 F.Supp. 2d 978, 981 (E.D. Mich. 2005) (imposing preliminary injunction against statute that included language "[c]onsidered as a whole, lacks serious literary, artistic, political, education, or scientific value for minors" in its definition of implicated content because statute was unlikely to survive strict scrutiny). But we are aware of no criminal statutes that have been found to be narrowly tailored in this context that did not at least attempt to include some version of the third prong.[10] *Cf. Ashcroft*, 542 U.S. at 679 (Breyer, J., dissenting) (describing the words "lacks serious literary, artistic, political, or scientific value" as "critical terms").

_____

[10]  The State cites *Denver Area Educational Telecommunications Consortium v. FCC* as a case in which a regulation survived constitutional inquiry despite lacking the third *Miller* prong. 518 U.S. 727, 752 (1996). But the regulation upheld in *Denver Area* was not a penal statute; its function was simply to "permit a cable system operator to prohibit the broadcasting of 'programming' that the 'operator reasonably believes describes or depicts sexual or excretory activities or organs in a patently offensive manner.'" *Id.* at 732. Moreover, the portion of *Denver Area* that affirmed this particular provision did not command a majority. *See id.* at 752 (plurality opinion). The *Denver Area* majority opinion found that the "statute's second provision significantly differs from the first, for it does not simply permit, but rather requires, cable system operators to restrict speech." *Id.* at 753. The Court found this second, restrictive provision to be unconstitutional since it was not narrowly tailored to the recognized compelling interest of "protection of children." *Id.* at 755-56.

Importantly, in failing to consider *Miller*, the drafters of the SEVGL also neglected to include a requirement that any work in question be considered "as a whole" in determining whether a defendant should be subject to criminal penalties. While the Court has yet to explicitly fuse *Miller* and *Ginsberg*, it seems clear to us that in so amending the adult test for obscenity, the Court also intended to require that the work be considered "as a whole" in the context of statutes applicable to juveniles. *See Miller*, 413 U.S. at 24. As Judge Kennelly correctly observed, this deficiency, combined with the SEVGL's lack of the third *Ginsberg/Miller* prong, makes likely the prospect of criminal prosecutions for the sale of games that are beyond the scope of the State's compelling interest—games that have "social importance for minors." *Cf. Reno v. ACLU*, 521 U.S. 844, 865-66 (1997).

The game *God of War*, discussed above and cited by the district court, is illustrative of this point. Because the SEVGL potentially criminalizes the sale of any game that features exposed breasts, without concern for the game considered in its entirety or for the game's social value for minors, distribution of *God of War* is potentially illegal, in spite of the fact that the game tracks the Homeric epics in content and theme. As we have suggested in the past, there is serious reason to believe that a statute sweeps too broadly when it prohibits a game that is essentially an interactive, digital version of the *Odyssey*. *Cf. AAM*, 244 F.3d at 577 ("No doubt the City would concede this point if the question were whether to forbid children to read without the presence of an adult the *Odyssey*, with its graphic descriptions of Odysseus's grinding out the eye of Polyphemus with a heated, sharpened stake. . ."). Similarly, it seems unlikely that a statute is narrowly tailored to achieving the stated compelling interest when it potentially criminalizes distribution of works featuring only brief flashes of nudity. *See Erznoznick*, 422 U.S. at 214 n. 10 ("It

is clear, however, that under any test of obscenity as to minors not all nudity would be proscribed. Rather, to be obscene 'such expression must be, in some significant way, erotic.'") (quoting *Cohen v. California*, 403 U.S. 15, 20 (1971)).

The possibility of such prosecution is far from illusory. Illinois has created a statute which allows prosecution in any of its counties solely on the basis of "contemporary community standards" with regard to the lasciviousness of any depiction of "post-pubescent female breasts." 720 ILCS 5/12B-10(e). While *Miller* reaffirmed the "contemporary community standards" test, the entire point of the *Miller* third prong is to free individuals from the possibility of prosecution solely on the basis of widely divergent local standards. *See Ashcroft*, 535 U.S. at 579 ("[T]he serious value requirement 'allows appellate courts to impose some limitations and regularity on the definition by setting, as a matter of law, a national floor for socially redeeming value'") (quoting *Reno*, 521 U.S. at 873). Indeed, in *Reno*, the Supreme Court concluded that a significant deficiency of the Communications Decency Act was its failure to include the third *Miller* prong. *See Reno*, 521 U.S. at 873 (finding the *Miller* third prong "particularly important because, unlike the 'patently offensive' and 'prurient interest' criteria, it is not judged by contemporary community standards").[11]

These deficiencies are sufficient for this court to conclude that the statute is not narrowly tailored and is overbroad. It is unnecessary for the State to ban access to material that has serious social value for minors to achieve its stated purpose.

---

[11] This portion of *Reno* addressed the ACLU's argument that the statute was unconstitutionally vague. The reasoning is equally applicable to the narrow tailoring analysis.

But even if we found no inherent problems in the SEVGL's "sexually explicit" definition, the statute could still not survive strict scrutiny because the plaintiffs have identified other less restrictive alternatives to the SEVGL. Most obviously, the State could have simply passed legislation increasing awareness among parents of the voluntary ESRB ratings system. *Cf. 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507 (1996) ("It is perfectly obvious that alternative forms of regulation that would not involve any restriction on speech would be more likely to achieve the State's goal of promoting temperance . . . . educational campaigns focused on the problems of excessive, or even moderate, drinking might prove to be more effective."); *Linmark Assocs., Inc. v. Willingboro Twp.*, 431 U.S. 85, 97 (1977) (suggesting that municipality, as an alternative to speech restrictions, "continue 'the process of education' it has already begun" through municipality-sponsored speech targeted at raising awareness of municipality's views on the local housing market).

The Supreme Court has indicated that "[w]hen plaintiffs challenge a content-based speech restriction, the burden is on the Government to prove that the proposed alternatives will not be as effective as the challenged statute." *Ashcroft*, 542 U.S. at 665. The Government has not met this burden with regard to this proposal. The district court relied on evidence introduced at trial that, under the current voluntary ratings regime, parents are involved in eighty-three percent of video game purchases for minors. The State has not pointed to evidence to the contrary. If Illinois passed legislation which increased awareness of the ESRB system, perhaps through a wide media campaign, the already-high rate of parental involvement could only rise. Nothing in the record convinces us that this proposal would not be at least as effective as the proposed speech restrictions. In short, the SEVGL is overbroad, it is not narrowly tailored, and it

Nos. 06-1012, 06-1048 & 06-1161                    17

cannot survive strict scrutiny.[12]

## D. Constitutionality of the SEVGL's Labeling, Brochure and Signage Provisions

The State also appeals the district court's ruling that the SEVGL's labeling, brochure and signage provisions constitute compelled speech in violation of the First Amendment. As the Supreme Court recently observed, some of its "leading First Amendment precedents have established the principle that freedom of speech prohibits the government from telling people what they must say." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, ___ U.S. ___, 126 S. Ct. 1297 (2006) (citing *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) and *Wooley v. Maynard*, 430 U.S. 705, 717 (1977)). The Court has stated that where a statute "[m]andat[es] speech that a speaker would not otherwise make," that statute "necessarily alters the content of the speech." *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). Moreover, "speech does not lose its protection because of the corporate identity of the speaker." *See Pacific Gas and Elec. Co. v. Pub. Util. Comm'n*, 475 U.S. 1, 16 (1986) (plurality opinion).

However, the First Amendment's guarantee of freedom from "compelled speech" is not absolute. Particularly in the commercial arena, the Constitution permits the State to require speakers to express certain messages without their consent, the most prominent examples being warning and nutritional information labels. *See, e.g., Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 114-16 (2d Cir. 2001) (rejecting First Amendment challenge to state requirement that manufacturers include labeling warning consumers of

---

[12] The district court included a discussion of whether the SEVGL was unconstitutionally vague in its strict scrutiny discussion. We feel it unnecessary to reach the vagueness question in this appeal.

mercury content). The Court has allowed states to require the inclusion of "purely factual and uncontroversial information . . . . as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *See Zauderer v. Office of Disciplinary Counsel for Sup. Ct. of Ohio,* 471 U.S. 626, 651 (1985) (upholding State's requirement that attorney include in advertisements a disclosure that clients may be responsible for costs of litigation).

The question that we must answer is whether the SEVGL's labeling and signage requirements are compelled speech in violation of the Constitution or simply requirements of purely factual disclosures. The State argues that all of these provisions are like the mercury disclosure requirements in *Sorrell. See Sorrell*, 272 F.3d at 114. With regard to the "18" sticker requirement, this argument seems to be plainly unsound. The SEVGL requires that the "18" sticker be placed on games that meet the statute's definition of "sexually explicit." The State's definition of this term is far more opinion-based than the question of whether a particular chemical is within any given product. Even if one assumes that the State's definition of "sexually explicit" is precise, it is the State's definition—the video game manufacturer or retailer may have an entirely different definition of this term. Yet the requirement that the "18" sticker be attached to all games meeting the State's definition forces the game-seller to include this non-factual information in its message that is the game's packaging. The sticker ultimately communicates a subjective and highly controversial message—that the game's content is sexually explicit. This is unlike a surgeon general's warning of the carcinogenic properties of cigarettes, the analogy the State attempts to draw. For these reasons, we must apply strict scrutiny to the SEVGL's requirement that the "18" sticker be placed on all covered video games.

Applying strict scrutiny, we cannot say that the "18" sticker is narrowly tailored to the State's goal of ensuring

that parents are informed of the sexually explicit content in games. As we described above, the State has not demonstrated that it could not accomplish this goal with a broader educational campaign about the ESRB system. *Cf. Riley*, 487 U.S. at 800 (requirement that professional fundraisers disclose information about percentage of funds actually turned over to charity in the prior year was not narrowly tailored where "the State [could] itself publish the detailed financial disclosure forms it requires professional fundraisers to file"). Indeed, at four square inches, the "18" sticker *literally* fails to be narrowly tailored—the sticker covers a substantial portion of the box.[13] The State has failed to even explain why a smaller sticker would not suffice. Certainly we would not condone a health department's requirement that half of the space on a restaurant menu be consumed by the raw shellfish warning. Nor will we condone the State's unjustified requirement of the four square-inch "18" sticker.

Similarly, we must conclude that the SEVGL's signage and brochure requirements are unconstitutional. Careful consideration of what the signs and brochures are in fact communicating reveals that the message is neither purely factual nor uncontroversial. *See Zauderer*, 471 U.S. at 651. The signs and the brochures are intended to communicate that any video games in the store can be properly judged pursuant to the standards described in the ESRB ratings. Moreover, the signs communicate endorsement of ESRB, a non-governmental third party whose message may be in conflict with that of any particular retailer. Requiring a private party to give significant space to a third party whose message potentially conflicts with the plaintiff's was the very Government action the Supreme Court found to be unconstitutional in *Pacific Gas and Electric*. *See Pacific Gas*

---

[13] The face of a standard DVD box (the most common format for the games in question) is 7.5" by 5.5".

*and Elec.*, 475 U.S. at 13-17 (invalidating a requirement that utility company allow third party to include its newsletter in the plaintiff utility company's envelopes sent to customers containing utility bill and company newsletter); *see also Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.,* 515 U.S. 557, 566 (1995) (State could not compel St. Patrick's Day parade organizers to include gay and lesbian group in parade because of the potential conflict with the intended message of the protected expressive activity). This is quite a different situation than the Supreme Court's most recent compelled speech case, *Rumsfeld v. FAIR*, where the Court concluded that there was no expressive activity threatened by simply allowing the military equal recruiting access as other employers. *See FAIR*, 126 S. Ct. at 1309-10. Here, the retailers affected by the SEVGL have salespeople and their own information that communicate messages about the relative value of various games for buyers of different age groups. The State cannot force them to potentially compromise this message by inclusion of the ESRB ratings. The State is certainly entitled to communicate the good news about the ESRB to the public. Indeed, the plaintiffs' proposed alternative to the SEVGL, endorsed above, would involve a broad educational campaign directed at the public about the ESRB system. But the State goes too far in imposing criminal sanctions for any retailer's reticence at joining in communicating this message.

We also note that the signage requirement is victim to the same overreaching as the labeling requirement with regard to the size of the prescribed sign. The SEVGL requires all retailers to maintain three signs in the store —one within five feet of the games, one at any existing information desk, and one at the "point of purchase." *See* ILCS 720 § 5B-30. The signs must each have "dimensions of no less than 18 by 24 inches." *Id.* Many video game stores are as small as one room in an indoor mall. Little imagination is required to

Nos. 06-1012, 06-1048 & 06-1161                    21

envision the spacing debacle that could accompany a small retailer's attempt to fit three signs, each roughly the size of a large street sign, into such a space. We think that this deficiency reflects the narrow tailoring failure of the entire signage and brochure scheme, and we agree with the district court that it is unconstitutional.

### III.  CONCLUSION

The judgment of the district court is AFFIRMED.

A true Copy:

      Teste:

                     _____

                     *Clerk of the United States Court of Appeals for the Seventh Circuit*