1

2

3

4                               **E-FILED on**     8/6/07

5

6

7

8             IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                  SAN JOSE DIVISION

11

| | |
|---|---|
| 12 VIDEO SOFTWARE DEALERS ASSOCIATION, and ENTERTAINMENT 13 SOFTWARE ASSOCIATION, | No. C-05-04188 RMW |
| 14        Plaintiffs, | |
| 15     v. | ORDER ON CROSS-MOTIONS FOR |
| 16 ARNOLD SCHWARZENEGGER, in his official capacity as Governor of the State of 17 California; BILL LOCKYER, in his official capacity as Attorney General of the State of 18 California; GEORGE KENNEDY, in his official capacity as Santa Clara County District 19 Attorney; RICHARD DOYLE, in his official capacity as City Attorney for the City of San 20 Jose; and ANN MILLER RAVEL, in her official capacity as County Counsel for the 21 County of Santa Clara, | SUMMARY JUDGMENT [Re Docket Nos. 70, 72, 74 and 90] |
| 22        Defendants. | |
| 23 | |

24       Plaintiffs move for summary judgment declaring that California Civil Code §§ 1746-1746.5

25 ("the Act"), requiring that certain violent video games be labeled and prohibiting the rental or sale of

26 those games to minors, is unconstitutional and that its enforcement be permanently enjoined.

27 Defendants move for summary judgment declaring that the Act is constitutional. For the reasons

28 given below, the court grants the plaintiffs' motion and permanently enjoins enforcement of the Act.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT—No. C-05-04188 RMW

1  Defendants' motion is denied.

2  ## I. BACKGROUND

3      The plaintiffs are the Video Software Dealers Association ("VSDA") and the Entertainment

4  Software Association ("ESA"), two groups who describe themselves as associations of companies in

5  the video game industry.  The defendants are California Governor Arnold Schwarzenegger,

6  California Attorney General Bill Lockyer, Santa Clara County District Attorney George Kennedy,

7  Santa Clara County Counsel Ann Ravel, and San José City Attorney Richard Doyle.  Governor

8  Schwarzenegger and Attorney General Lockyer ("State defendants") are the only defendants to file

9  opposition to plaintiffs' summary judgment motion.  Therefore, the other defendants are apparently

10  willing to accept and be bound by the outcome of the motions.

11      On October 7, 2005, Governor Schwarzenegger signed into law Assembly Bill 1179, which

12  was to take effect on January 1, 2006, as new Cal. Civ. Code §§ 1746-1746.5.  The Act restricts the

13  sale and rental of certain violent video games to minors.  *Id.* § 1746.1(a).  The Act contains a two-

14  part definition of a "violent video game":

15  (d)(1)  "Violent video game" means a video game in which the range of options
available to a player includes killing, maiming, dismembering, or sexually assaulting
16  an image of a human being, if those acts are depicted in the game in a manner that
does either of the following:

17
18      (A)  Comes within all of the following descriptions:

19          (i)  A reasonable person, considering the game as a whole, would find
appeals to a deviant or morbid interest of minors.

20          (ii)  It is patently offensive to prevailing standards in the community
as to what is suitable for minors.

21
22          (iii)  It causes the game, as a whole, to lack serious literary, artistic,
political, or scientific value for minors.

23      (B)  Enables the player to virtually inflict serious injury upon images of
human beings or characters with substantially human characteristics in a
24  manner which is especially heinous, cruel, or depraved in that it involves
torture or serious physical abuse to the victim.

25  (2)  For purposes of this subdivision, the following definitions apply:

26      (A)  "Cruel" means that the player intends to virtually inflict a high degree of
27  pain by torture or serious physical abuse of the victim in addition to killing the
victim.

28      (B)  "Depraved" means that the player relishes the virtual killing or shows

indifference to the suffering of the victim, as evidenced by torture or serious physical abuse of the victim.

(C) "Heinous" means shockingly atrocious. For the killing depicted in a video game to be heinous, it must involve additional acts of torture or serious physical abuse of the victim as set apart from other killings.

(D) "Serious physical abuse" means a significant or considerable amount of injury or damage to the victim's body which involves a substantial risk of death, unconsciousness, extreme physical pain, substantial disfigurement, or substantial impairment of the function of a bodily member, organ, or mental faculty. Serious physical abuse, unlike torture, does not require that the victim be conscious of the abuse at the time it is inflicted. However, the player must specifically intend the abuse apart from the killing.

(E) "Torture" includes mental as well as physical abuse of the victim. In either case, the virtual victim must be conscious of the abuse at the time it is inflicted; and the player must specifically intend to virtually inflict severe mental or physical pain or suffering upon the victim, apart from killing the victim.

(3) Pertinent factors in determining whether a killing depicted in a video game is especially heinous, cruel, or depraved include infliction of gratuitous violence upon the victim beyond that necessary to commit the killing, needless mutilation of the victim's body, and helplessness of the victim.

*Id.* § 1746(d).

The court preliminarily enjoined the defendants from enforcing the Act. *Video Software Dealers Ass'n v. Schwarzenegger*, 401 F. Supp. 2d 1034 (2005).

In their motion for summary judgment, the plaintiffs claim the Act is unconstitutional and specifically assert that: (1) video games are a form of expression protected by the First Amendment of the U.S. Constitution, even for minors, (2) the Act's definition of "violent video game" is unconstitutionally vague, and (3) the labeling provisions of the Act run afoul of the First Amendment. The defendants counter that the Act is narrowly tailored to further a compelling state interest and that it is neither impermissibly vague nor violative of the First Amendment.

California is not the first state to attempt to limit minors' access to violent video games. While the Ninth Circuit has yet to consider a state legislature's ability to implement such a regulation, the Seventh and Eighth Circuits have found that specific ordinances on the subject unconstitutional in violation of the First Amendment. *See Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572 (7th Cir. 2001); *Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954 (8th Cir. 2003). Several district courts have also struck down or preliminarily enjoined enforcement

1   of such ordinances. *See Entertainment Software Ass'n. v. Foti*, 451 F. Supp. 2d 823 (M.D. La.

2   2006); *Entertainment Software Ass'n. v. Hatch*, 443 F. Supp. 2d 1065 (D. Minn. 2006);

3   *Entertainment Software Ass'n v. Granholm*, 426 F. Supp. 2d 646 (E.D. Mich. 2006); *Entertainment

4   Software Ass'n v. Blagojevich*, 404 F. Supp. 2d 1051 (E.D. Ill. 2005)[1]; and *Video Software Dealers

5   Ass'n v. Maleng*, 325 F. Supp. 2d 1180 (W.D. Wash. 2004).

6                       **II. MOTION TO STRIKE FILINGS OF AMICUS CURIAE**

7          The court granted Common Sense Media leave to "file an amicus brief in connection with

8   any motion for summary judgment by the plaintiffs." Docket no. 67. This is technically what

9   Common Sense has done. *See* docket no. 78. However, Common Sense's brief is merely a summary

10  of the declarations of six purported experts also submitted by Common Sense. Docket nos. 82-87.

11  Common Sense also filed what it describes as "an updated 10-minute montage of representative

12  scenes from several 'ultra violent' video games." Docket nos. 78 at 2; 79, Ex. A.

13         Plaintiffs move to strike the filings of Common Sense as improper under the terms on which

14  this court granted Common Sense leave to participate. The parties reported that there were "no

15  material factual disputes" and that "this case may properly be resolved on summary judgment," Joint

16  Case Mgmt. Statement (docket no. 68) ¶ 2, and the action has been structured with this in mind.

17  Common Sense is not a party to this action, and as such, generally lacks the rights of a party. *See

18  Miller-Wohl Co. v. Comm'r of Labor & Indus.*, 694 F.2d 203, 204 (9th Cir. 1982). As plaintiffs

19  point out, were Common Sense a party, its proffered expert testimony would have been subject to

20  standard discovery procedures, such as Fed. R. Civ. P. 26(a)(2). For these reasons, the court strikes

21  the expert testimony proffered by Common Sense.

22                        **III. CONSTITUTIONALITY OF THE ACT**

23      **A. Protection of Speech—The First Amendment**

24         Both sides move for summary judgment on the issue of whether the Act's restrictions on

25

26  [1] The permanent injunction issued by the district court in *Blagojevich* enjoined enforcement of a law
    criminalizing the sale or rental of sexually explicit video games to minors as well as the enforcement
27  of the statute criminalizing the sale or rental of violent video games to minors. The State only
    appealed the injunction with respect to the enforcement of the law on sexually explicit videos. The
28  issuance of the injunction was affirmed. *Entertainment Software Ass'n v. Blagojevich*, 469 F.3d 641
    (7th Cir. 2006).

minors' access to violent video games covered by the Act are permissible under the First Amendment. The Supreme Court has "long recognized that each medium of expression presents special First Amendment problems." *FCC v. Pacifica Found.*, 438 U.S. 726, 748 (1978).[2] The Act regulates video games, which, even though mere entertainment, are nonetheless protected by the First Amendment. *See Interactive Digital*, 329 F.3d at 957-58.

The freedom of speech protected by the First Amendment is "the indispensable condition[] of nearly every other form of freedom." *Palko v. Connecticut*, 302 U.S. 319, 327 (1937). Children "are entitled to a significant measure of First Amendment protection." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212 (1975). "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them. In most circumstances, the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors. " *Id.* at 213 (footnoted omitted).

However, "[t]he freedom of speech has its limits; it does not embrace certain categories of speech, including defamation, incitement, obscenity, and pornography produced with real children." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245-46 (2002). As the Court has noted,

> The First Amendment rights of minors are not co-extensive with those of adults. A State may permissibly determine that, at least in some precisely delineated areas, a child—like someone in a captive audience—is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees. In assessing whether a minor has the requisite capacity for individual choice the age of the minor is a significant factor.

*Erznoznik*, 422 U.S. at 214 n.11 (internal quotation marks, citations, and brackets omitted). The question here is whether the Act is directed at expression that falls within an exception to First Amendment protection.

"Content-based regulations are presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). A state may normally limit expression based on content only (1) "to promote a

---

[2] Several decades ago, the Supreme Court "recognized that some believe motion pictures possess a greater capacity for evil, particularly among the youth of a community, than other modes of expression." *Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676, 690 (1968) (internal quotation marks omitted). Defendants make similar arguments about video games. *See*, *e.g.*, docket no. 70 at 14-15.

1   compelling interest," and (2) if the state "chooses the least restrictive means" (3) "to further the

2   articulated interest."  *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989).

3         **B.  Protection of Speech Under *Brandenburg***

4         The plaintiffs argue that the Act should be analyzed under *Brandenburg v. Ohio*, 395 U.S.

5   444 (1969) (*per curiam*).  The defendants disagree and rely on *Ginsburg v. New York*, 390 U.S. 629

6   (1968).

7         When passing the Act, the California Legislature made the following findings justifying the

8   need for the Act:

9         (a)  Exposing minors to depictions of violence in video games, including sexual and
      heinous violence, makes those minors more likely to experience feelings of
10        aggression, to experience a reduction of activity in the frontal lobes of the brain, and
      to exhibit violent antisocial or aggressive behavior.

11
      (b)  Even minors who do not commit acts of violence suffer psychological harm from
12        prolonged exposure to violent video games.

13        (c)  The state has a compelling interest in preventing violent, aggressive, and
      antisocial behavior, and in preventing psychological or neurological harm to minors
14        who play violent video games.

15  2005 Cal. Legis. Serv. Ch. 638 (A.B. 1179) (West) § 1.  In *Brandenburg*, the Court held that the

16  First Amendment does "not permit a State to forbid or proscribe advocacy of the use of force or of

17  law violation except where such advocacy is directed to inciting or producing imminent lawless

18  action and is likely to incite or produce such action."  395 U.S. at 447.  Neither the legislative

19  findings nor the evidence submitted by defendants suggest that the expression in violent video

20  games is directed to inciting or producing imminent lawless action.  This alone means that the Act is

21  unconstitutional if *Brandenburg* sets forth the governing standard.  *See* 395 U.S. at 447; *Granholm*,

22  426 F. Supp. 2d at 652; *Blagojevich*, 404 F. Supp. 2d at 1073.  In addition, neither the legislative

23  findings nor the evidence shows that playing violent video games immediately or necessarily results

24  in real-world violence.  *Granholm*, 426 F.Supp. 2d at 652; *Blagojevich*, 404 F. Supp. 2d at 1073.

25  Defendants argue that there is an increased statistical probability that minors exposed to violent

26  video games will engage in violent behavior.  *See, e.g.*, docket no. 70 at 12-13.  This is not sufficient

27  under the requirement from *Brandenburg* that the suppressed expression be likely to produce

28  "imminent lawless action."  It is immaterial under the *Brandenburg* standard that violent video

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT—No. C-05-04188 RMW

1    games may, as defendants assert, promote violence (or "aggressive behavior") in a more indirect

2    way.  *See Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1199 (9th Cir. 1989) (declining to

3    create exception to First Amendment protection for non-obscene pornography, even though

4    plaintiffs argued such pornography caused harm).  Expression is not outside the protections of the

5    First Amendment "simply because it is base and malignant."  *Id.*  "[S]peech may not be suppressed

6    simply because it is offensive." *Id.*

7        **C.  State's Protection of Minors and Their Free Speech Rights**

8        Defendants submit that *Brandenburg* does not apply to the Act.  *See*, *e.g.*, docket no. 77 at

9    14-15.  In defending the Act, the State relies on the goals of preventing "automatic aggression,

10    increased aggressive behavior, [and] antisocial behavior" by minors.  Docket nos. 70 at 5 and 7, 77

11    at 4, 5 ("automatic aggressiveness, increased aggressive thoughts and behavior, antisocial

12    behavior"); *see* docket no. 70 at 11 ("automatic aggressiveness,  increased aggressive thoughts and

13    behavior, antisocial behavior").  The defendants argue that neither the Supreme Court nor the Ninth

14    Circuit has ever held or even suggested that the *Brandenburg* standard limits restrictions on speech

15    targeting and affecting only minors.

16        The Supreme Court has recognized that those still in their formative years must be

17    considered differently under the law.  *See Ginsberg v. New York*, 390 U.S. 629, 638-41 (1968); *see*

18    *also Roper v. Simmons,* 543 U.S. 551, 569-71 (2005).  The rationale underlying *Brandenburg*—that

19    in a society of free men, men must be free to make even foolish choices—does not apply

20    unequivocally to those still learning how to choose.  The defendants submit that the Act implements

21    a compelling state interest, that is to prevent minors from experiencing "feelings of aggression," "a

22    reduction of activity in the frontal lobes of the brain," and "psychological harm."  2005 Cal. Legis.

23    Serv. Ch. 638 (A.B. 1179) (West) § 1(a)-(b).  The Supreme Court has recognized that "there is a

24    compelling interest in protecting the physical and psychological well-being of minors."  *Sable*

25    *Communications of California, Inc. v.* F.C.C., 492 U.S. 115, 126 (1989).  However, to withstand

26    constitutional scrutiny, any regulation must be narrowly drawn to serve that interest without

27    unnecessarily interfering with First Amendment freedoms.  *Id.*  "Content-based regulations are

28    presumptively invalid."  *R.A.V.,* 505 U.S. at 382.

1    Plaintiffs claim that *Ginsberg* has only been used by prior courts to analyze restrictions on

2  sexual material and that any regulation of violent videos necessarily interferes with First

3  Amendment freedoms.  The Supreme Court has never expressly considered whether obscenity is a

4  unique category of expression and therefore the only subject matter that justifies limitation of the

5  First Amendment rights of minors, or whether—as California seeks to do here—*Ginsberg* may serve

6  as a template for other limitations on minors' access to other categories of expression, such as violent

7  videos.

8    Media violence was at issue in *Winters v. New York*, 333 U.S. 507 (1948).  In the decision

9  below, the New York Court of Appeals reasoned—as California does here—that violence can be

10 "indecent or obscene" in much the same way as sexual material can and, therefore, upheld the

11 defendant's conviction under a statute that prohibited distribution of publications "principally made

12 up of criminal news, police reports, or accounts of criminal deeds, or pictures, or stories of deeds of

13 bloodshed, lust or crime," *People v. Winters*, 294 N.Y. 545, 549-550, 553 (1945).  The statute

14 forbade all such publications, not just the distribution of them to minors.  *Id*. at 549.  The Supreme

15 Court, although "recogniz[ing] the importance of the exercise of a state's police power to minimize

16 all incentive to crime, particularly in the field of sanguinary or salacious publications with their

17 stimulation of juvenile delinquency," struck the statute down as unconstitutionally vague.  *Id*. at 518.

18 The Court, however, made clear that it was holding neither that a state "may not punish circulation

19 of objectionable printed matter, assuming that it is not protected by the principles of the First

20 Amendment" nor that states are "prevented by the requirements of specificity from carrying out their

21 duty of eliminating evils to which, in their judgment, such publications give rise." 333 U.S. at 510,

22 520.  *Winters* thus does not foreclose a state from regulating violent expression such as the violent

23 videos described in the Act and could be construed to imply that a narrowly-drawn regulation could

24 do so.

25    The desire to regulate the exposure of minors to senseless violent acts is understandable and,

26 perhaps, more important than regulating exposure to obscenity.  Many parents presumably hope that

27 their children, upon reaching an appropriate age, will enjoy healthy sexual relationships.  Only

28 certain narrow categories of sexual activity, such as rape and incest, are illegal.  Violence, on the

1  other hand, is generally illegal, and is allowed only in certain narrow circumstances, such as self-

2  defense and proper law enforcement activity.  Most parents hope that their children will grow up to

3  be non-violent.  If exposing minors to depictions of violence in video games makes them experience

4  feelings of aggression and exhibit violent antisocial or aggressive behavior, the state could have a

5  compelling interest in restricting minors' access to such material.

6        Nevertheless, cases subsequent to *Winters* have, without exception, held that the First

7  Amendment precludes restrictions on minors' access to violent videos, either on the theory that

8  *Ginsburg* rationale cannot be expanded beyond the subject matter of obscenity or that the nexus

9  between exposure to violent videos and feelings of aggression or antisocial behavior has not been

10  adequately shown.

11        In *Kendrick*, the Seventh Circuit reversed a district court's denial of a preliminary injunction

12  against enforcement of a city ordinance that required parents to accompany minors who wished to

13  play video games containing "graphic violence" predominately appealing to minors' morbid interest

14  in violence and lacking serious literary, artistic, political or scientific value.  244 F.3d at 573.  Judge

15  Richard Posner, writing for the panel, explained that video games depicting violence could not be

16  categorized as obscene.  *Id.* at 574-76.  The city's grounds for promulgating the ordinance had to "be

17  compelling and not merely plausible" and not a pretext for regulation in violation of a minors' First

18  Amendment rights.  *Id.* at 576.  Judge Posner expressed doubt that a government could have a

19  compelling interest in preventing minors from playing violent video games and that the City had

20  little data to compel a conclusion that the games covered by the ordinance increased aggressive

21  behavior in minors.  *Id.* at 578-79.  Among the evidence was some of the work of Craig Anderson,

22  Ph.D., a psychologist who has published on the effect of violent videos on minors and on whose

23  opinions the California legislature significantly relied in passing the Act.  *Id.* at 578.  A preliminary

24  injunction was issued because the ordinance's "conjectural" benefits were outweighed by the risk of

25  infringing on First Amendment rights.  *Id.* at 580.  The court did note, however, that "[i]f the games

26  used actors and simulated real death and mutilation convincingly, or if the games lacked any story

27  line and were merely animated shooting galleries . . . , a more narrowly drawn ordinance might

28  survive a constitutional challenge."  *Id.* at 579-80.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT—No. C-05-04188 RMW

1    In *Interactive Digital*, the Eighth Circuit reversed a district court and ordered a permanent

2    injunction against enforcement of a county ordinance that made it unlawful to "sell, rent, or make

3    available graphically violent video games to minors." 329 F.3d at 956. The court expressly held

4    that the ordinance should be analyzed using strict scrutiny, rejecting the County's suggestion to treat

5    the games as obscene and use the less stringent standard from *Ginsberg*. *Id*. at 958-60. The County

6    presented a psychologist who claimed that playing violent video games increased aggressive

7    thoughts and behavior, but the court found this testimony fell short of the required "substantial

8    supporting evidence" necessary to justify the ordinance. *Id*. at 958-59.

9    The court for the District of Minnesota in *Hatch* permanently enjoined enforcement of a

10   Minnesota statute that subjected a person under seventeen years of age to a civil penalty for

11   knowingly renting or selling a video game rated AO (adults only) or M (mature) by the

12   Entertainment Software Rating Board. 443 F. Supp 2d at 1068. The court found that the statute did

13   not pass strict scrutiny and that the data offered to support the statute was insufficient to demonstrate

14   a causal link between the playing of violent video games and some deleterious effect on minors. *Id.*

15   at 1069-1070. The court also found that even assuming a causal link, the statute was not narrowly

16   tailored. There was no showing that restricting video games alone would alleviate the state's

17   concern about minors, nor that video games, in the absence of other violent media, would cause

18   injury to children. *Id.* at 1070.

19   In *Foti,* a district court in the Middle District of Louisiana granted a preliminary injunction

20   barring enforcement of a statute criminalizing distribution of video and computer games that appeal

21   to minors' morbid interest in violence. 451 F. Supp. 2d at 837. The court found that the targeted

22   expression was protected under *Brandenburg* and that "the Statute cannot be defended on the

23   grounds that it is designed to protect minors from some form of 'psychological harm,' as that

24   amounts to nothing more than 'impermissible thought control.'" *Id.* at 831.

25   In *Granholm*, a district court in the Eastern District of Michigan permanently enjoined

26   enforcement of a statute prohibiting distribution of certain "ultra-violent explicit video games" to

27   minors. 426 F. Supp. 2d at 648. The court ruled that the statute under consideration, as a content-

28   based restriction on expression, could not pass strict scrutiny. *Id*. at 651-52. The court also found

1   that the evidence considered by the legislature, including studies by Dr. Anderson, was insufficient

2   to show that playing violent video games causes minors to have aggressive thoughts and behavior.

3   *Id*. at 652-53.  The court also found that the statute was not narrowly tailored and was likely to have

4   a chilling effect on adults' free expression because it would cause video game creators to steer clear

5   of the boundaries of the statutory definition.  *Id*. at 654-56.

6        In *Blagojevich*, a district court permanently enjoined enforcement of an Illinois statute

7   criminalizing the sale or rental of certain violent video games to minors.  404 F. Supp. 2d. at 1055.

8   The court interpreted *Kendrick* as applying strict scrutiny and found that the statute was "a

9   content-based regulation subject to the strictest scrutiny under the First Amendment."  *Id*. at 1072.

10  Among the justifications for the statute were "preventing violent, aggressive, and asocial behavior"

11  and "preventing psychological harm to minors."  *Id*.  The proffered evidence justifying the statute

12  included fourteen studies by Dr. Anderson.  *Id*. at 1058.  The court, after a trial, found Dr.

13  Anderson's studies unpersuasive, stating "that neither Dr. Anderson's testimony nor his research

14  establish a solid causal link between violent video game exposure and aggressive thinking and

15  behavior."  *Id*. at 1063.  The court was concerned that Dr. Anderson's research did not establish a

16  causal link between violent video games and violent behavior, did not assess the significance of any

17  link, and did not compare video games to other forms of media violence to which minors are

18  exposed.  *Id*. at 1063-67.

19       Finally, in *Maleng*, a district court in the Western District of Washington ruled on cross-

20  motions for summary judgment that a Washington state statute violated the First Amendment.  325

21  F. Supp. 2d at 1183, 1190.  The statute at issue forbade the distribution to minors of video games

22  involving violence against law enforcement personnel.  *Id*. at 1190.  The court found that the

23  obscenity standard from *Ginsberg* was inappropriate because the statute did not cover sexually

24  explicit material, and instead applied strict scrutiny.  *Id*. at 1185-86.  The court held that the State

25  had not carried its burden of proving that games covered by the statute caused aggressive feelings or

26  behavior.  *Id*. at 1189.  The court further ruled that the statute was "both over-inclusive and under-

27  inclusive" because the set of games covered by the statute did not reflect the harms the legislature

28  sought to alleviate; the statute was therefore not narrowly tailored.  *Id*.

1    Although none of the above cases holding violent video laws unconstitutional are Ninth

2  Circuit cases binding on this court, they nevertheless reflect a strong judicial antagonism toward

3  such laws that this court should not ignore.

### D.  Standard Applicable to the Act—Strict Scrutiny

#### 1.  The Legislature Has the Power to Enact Laws Restricting Expressions of Violence to Minors If the Law Passes Strict Scrutiny

Despite the suggestion in some of the cases discussed above that a law restricting expressions

of violence to minors is unconstitutional unless the restricted speech incites imminent lawlessness as

described in *Brandenburg*, the court believes that a state legislature has the power to enact laws that

restrict speech to protect the well-being of minors provided the laws pass strict scrutiny.  Although

the values protected by the First Amendment are generally no less applicable when government

seeks to control the flow of information to minors, the First Amendment rights of minors are not co-

extensive with those of adults.  *Ernoznik*, 422 U.S. at 213-14.  As noted in *Sable Communications*,

the Supreme Court has "recognized that there is a compelling interest in protecting the physical and

psychological well-being of minors."  492 U.S. at 126; *see also Nunez by Nunez v. City of San

Diego*, 114 F.3d 935, 946 (9th Cir. 1997) ("[T]he government may have a compelling interest in

protecting minors from certain things that it does not for adults.").

However, the Act is a content-based regulation and it is presumptively invalid.  *R.A.V.*, 505

U.S. at 382.  Therefore, to be constitutional, the Act must promote the compelling interest of

protecting the physical and psychological well-being of minors by the least restrictive means and the

means must actually further the articulated interest.  *Sable*, 492 U.S. at 126.

### 2.  The Act Promotes a Compelling Interest

The purpose of the Act is to prevent violent, aggressive and antisocial behavior by minors

who play violent video games and to prevent psychological and neurological harm to them.  *See

2005 Cal. Legis. Serv. Ch. 638 (A.B. 1179 § 1).  These purposes, except to the extent they intend to

merely control a minor's thoughts, are compelling interests.  The government clearly has a

compelling interest in protecting the physical and psychological well-being of minors.  *R.A.V.*, 505

U.S. at 382.  However, as the Supreme Court has noted

The government cannot constitutionally premise legislation on the desirability of

1

2
> controlling a person's private thoughts. First Amendment freedoms are most in
> danger when the government seeks to control thought or to justify its laws for that
> impermissible end. The right to think is the beginning of freedom, and speech must
> be protected from the government because speech is the beginning of thought.

3

4
*Free Speech Coalition*, 535 U.S. at 253 (internal quotation marks and citation omitted). As noted by

5
Judge Posner in *Kendrick*,

6
> Violence has always been and remains a central interest of humankind and a
> recurrent, even obsessive theme of culture both high and low. It engages the interest
> of children from an early age, as anyone familiar with the classic fairy tales collected
> by Grimm, Andersen, and Perrault is aware. To shield children right up to the age of
> 18 from exposure to violent descriptions and images would not only be quixotic, but
> deforming; it would leave them unequipped to cope with the world as we know it.

7

8

9
244 F.3d at 577.

10
Although Judge Posner's comments emphasize the need to proceed carefully in restricting a

11
minor's exposure to violence, the Act nevertheless passes the first requirement of strict scrutiny as

12
the government has a compelling interest in protecting the physical and psychological well-being of

13
minors. The state can legitimately restrict speech if such a restriction is narrowly tailored and will

14
prevent or significantly decrease the likelihood of antisocial and aggressive behavior in minors—not

15
merely how a minor thinks of violence.

16
### 3.  The Act Does Not Choose the Least Restrictive Means

17
The cases cited in this opinion that either preliminarily or permanently barred enforcement of

18
similar laws found that the government had not established that the laws actually furthered their

19
articulated purposes or that the laws were narrowly tailored to accomplish those purposes. The

20
analyses in those cases often combine discussion of the two questions. In this court's analysis of the

21
Act, it will attempt to separate the questions and first discuss whether the defendants have

22
established that the Act addresses its goals by the least restrictive means and then discuss whether

23
defendants have shown a causal connection between the restrictions imposed by the Act and the

24
compelling interest sought to be addressed by the Act.

25
The Act contains two definitions of a "violent video game;" a game needs only satisfy one

26
definition to be covered. Cal. Civ. Code § 1746(d)(1). The second definition, contained in §

27
1746(d)(1)(B), has no exception for material with some redeeming value and is therefore too broad.

28
The definition could literally apply to some classic literature if put in the form of a video game. *See*

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT—No. C-05-04188 RMW

1   *Kendrick*, 244 F.3d at 577-78.  Therefore, subsection B is an unconstitutional restriction of First

2   Amendment rights.

3          The definition of "violent video game" in subsection A is drawn from the obscenity

4   definition approved in *Ginsberg.*  Therefore, there is some precedent for finding the definition

5   sufficiently narrow to meet constitutional standards.  However, despite the fact that "[i]n assessing

6   whether a minor has the requisite capacity for individual choice the age of the minor is a significant

7   factor," *Erznoznik*, 422 U.S. at 214 n.11 (internal quotation marks, citations, and brackets omitted),

8   the Act applies in the same way to all minors under the age of eighteen.  The studies cited by the

9   State do not demonstrate that exposure to violent video games of those nearing the age of majority

10  has the same deleterious effect on them as it does, for example, on those under age fourteen.  In light

11  of the fact that, upon turning eighteen, one can vote and fight in a war, a showing needs to be made

12  that an individual nearing the age of majority needs to be shielded from uncensored speech to the

13  same extent as an early adolescent.  *See Kendrick*, 244 F.3d at 577 ("People are unlikely to become

14  well-functioning, independent-minded adults and responsible citizens if they are raised in an

15  intellectual bubble.").

16         Although the court held in granting its preliminary injunction against enforcement of the Act

17  that it was not vague, *see Video Software Dealers Ass'n v. Schwarzenegger*, 401 F. Supp. 2d at 1040-

18  42, some terms such as "image of a human being" are broad and not sufficiently narrow.  "An image

19  of a human being" is not limited to what appears to be an actual living human being.  As observed in

20  *Kendrick*, if "the games used actors and simulated real death and mutilation convincingly . . . , a

21  more narrowly drawn statute might survive a constitutional challenge."  244 F.3d at 579-580.

22         The State has also not shown that the Act will accomplish its goal of protecting the physical

23  and psychological well-being of minors more effectively than the existing, narrower industry

24  standards.[3]  "When a plausible, less restrictive alternative is offered to a content-based speech

25  restriction, it is the Government's obligation to prove that the alternative will be ineffective to

26  achieve its goals."  *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 816 (2000).

27

28  _____

    [3]  The court is not suggesting that the ESRB standards should be adopted as law, but, rather,
    mentions those standards as ones that support the State's interest but do not involve State intrusions
    on First Amendment rights.

To pass the strict scrutiny test, therefore, the state must demonstrate that the industry labeling standards, either alone or combined with technological controls that enable parents to limit which games their children play, do not equally address the state's interest in protecting the physical and psychological well-being of children.  The State has not demonstrated that the Act is narrowly tailored to address its purpose.  Therefore, the Act cannot pass strict scrutiny.

#### 4.  State Has Not Shown That the Act Actually Furthers the Articulated Interest

The courts that have found similar laws unconstitutional have had before them much of the same evidence that is presently offered by the State.  None has been satisfied that a sufficient causal link has been established between the playing of violent video games and the physical and psychological well-being of children.  *See Kendrick,* 244 F.3d at 578-579; *Interactive Digital*, 329 F.3d at 958-959; *Hatch*, 443 F. Supp. 2d at 1070; *Granholm*, 426 F. Supp. 2d. at 652-53; *Blagojevich*, 404 F. Supp. 2d at 1073.  The State relies heavily on the work of Dr. Anderson, whose studies have been analyzed by most of the courts.  The State points out that the *Kendrick* court did not have before it Dr. Anderson "up-dated meta-analysis."  However, the court in *Hatch* did and reached the following conclusion:

> This Court's review of the article reveals it to be completely insufficient to demonstrate an empirical, causal link between video games and violence in minors. The article, itself, reports that the body of violent video game literature is not sufficiently large to conduct a detailed meta-analysis of a specific feature. The author notes "[t]here still is not a large enough body of samples in this domain for truly sensitive tests of potential age differences in susceptibility to violent video game effects."  Dr. Anderson also notes the lack of longitudinal studies as a "glaring empirical gap" in video game research. Even assuming the methodology employed by Dr. Anderson to be correct, Dr. Anderson's meta-analysis is far too slight to bear the weight of the State's argument.

443 F. Supp. 2d at 1069 (internal citations to Anderson article omitted).

Nevertheless, this court is not as doubtful as others courts have been as to the legislature's power to restrict the access of minors to violent video games or as skeptical of  Dr. Anderson's conclusions.  The legislature does have the power, despite *Brandenburg*, to enact legislation that limits a minor's First Amendment rights if the legislation can be shown to truly protects a minor's psychological and physical well-being and is narrowly drafted to pass strict scrutiny.  However, at this point, there has been no showing that violent video games as defined in the Act, *in the absence of other violent media*, cause injury to children.  In addition, the evidence does not establish that

1 | video games, because of their interactive nature or otherwise, are any more harmful than violent

2 | television, movies, internet sites or other speech-related exposures. Although some reputable

3 | professional individuals and organizations have expressed particular concern about the interactive

4 | nature of video games, there is no generally-accepted study that supports that concern. There has

5 | also been no detailed study to differentiate between the effects of violent videos on minors of

6 | different ages.

7 |      The court, although sympathetic to what the legislature sought to do by the Act, finds that the

8 | evidence does not establish the required nexus between the legislative concerns about the well-being

9 | of minors and the restrictions on speech required by the Act.

10 | **5. Labeling Requirement**

11 |      The Act requires video games that meet its definition of "violent" to be labeled, on the front

12 | of the package, with a white "18" outlined in black and at least two inches square. Cal. Civ.

13 | § 1746.2. The parties disagree as to whether the labeling requirement is commercial speech or

14 | compelled speech requiring the game creators and distributors to carry a message with which they

15 | disagree. In light of the conclusion that the Act is unconstitutional, the court does not reach this

16 | issue.

17 | **IV. ORDER**

18 |      For the foregoing reasons, the court permanently enjoins the defendants from enforcing Cal.

19 | Civ. Code §§ 1746-1746.5.

20 |

21 | DATED:_____8/6/07_____

22 | RONALD M. WHYTE
United States District Judge

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiffs:**

| | |
|---|---|
| Matthew Samuel Hellman | mhellman@jenner.com |
| Theodore J. Bounteous, Jr. | |
| Amy L. Tenner | |
| Ethan D. Dettmer | edettmer@gibsondunn.com |
| H. Mark Lyon | mlyon@gibsondunn.com |
| Jeffrey A Minnery | jminnery@gibsondunn.com |
| Katherine A. Fallow | |
| Paul M. Smith | |

**Counsel for Defendants:**

| | |
|---|---|
| Zackery P. Morazzini | zackery.morazzini@doj.ca.gov |
| Robert R. Fabela | CAO.Main@sanjoseca.gov |
| David Michael Rollo | david.rollo@cco.sccgov.org |
| Kathryn J. Zoglin | katie.zoglin@cco.sccgov.org |

**Counsel for Amicus Curiae:**

| | |
|---|---|
| Francine T. Radford | fradford@gmssr.com |
| Keith E. Johnson | kjohnson@gmssr.com |

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:**      8/6/07                          /s/ MAG
                                          **Chambers of Judge Whyte**

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT—No. C-05-04188 RMW

17