# EXHIBIT  A

Dockets.Justia.com

1   GIBSON, DUNN & CRUTCHER LLP
    THEODORE J. BOUTROUS, JR., SBN 132099
2   H. MARK LYON, SBN 162061
    ETHAN D. DETTMER, SBN 196046
3   1881 Page Mill Road
    Palo Alto, California  94304
4   Telephone: (650) 849-5300
    Facsimile: (650) 849-5333
5
    JENNER & BLOCK LLP
6   PAUL M. SMITH (*pro hac vice* application pending)
    KATHERINE A. FALLOW (*pro hac vice* application pending)
7   AMY L. TENNEY (*pro hac vice* application pending)
    601 13th Street, N.W., Suite 1200
8   Washington, D.C. 20005
    Telephone:  (202) 639-6000
9   Facsimile:  (202) 639-6066

10  Attorneys for Plaintiffs
    VIDEO SOFTWARE DEALERS ASSOCIATION
11  and ENTERTAINMENT SOFTWARE ASSOCIATION

12

13                  UNITED STATES DISTRICT COURT

14           FOR THE NORTHERN DISTRICT OF CALIFORNIA

15

16  VIDEO SOFTWARE DEALERS                 CASE NO. C 05-4188 RMW (RS)
    ASSOCIATION and ENTERTAINMENT
17  SOFTWARE ASSOCIATION,
                                           PLAINTIFFS' NOTICE OF MOTION
18          Plaintiffs,                    AND MOTION FOR A PRELIMINARY
                                           INJUNCTION; MEMORANDUM OF
19          vs.                            POINTS AND AUTHORITIES IN
                                           SUPPORT THEREOF
20
    ARNOLD SCHWARZENEGGER, in his official
21  capacity as Governor of the State of California;
    BILL LOCKYER, in his official capacity as
22  Attorney General of the State of California;
    GEORGE KENNEDY, in his official capacity as
23  Santa Clara County District Attorney, RICHARD
    DOYLE, in his official capacity as City Attorney
24  for the City of San Jose,  and ANN MILLER
    RAVEL, in her official capacity as County
25  Counsel for the County of Santa Clara,

26          Defendants.

27

28

---

# NOTICE OF MOTION AND MOTION

TO ALL DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on December 2, 2005, at 9:00 a.m., or as soon thereafter as this matter may be heard, in Courtroom 6 of this Court, located at 280 South First Street, San Jose, California 95113, plaintiffs Video Software Dealers Association ("VSDA") and Entertainment Software Association ("ESA") will, and hereby do, respectfully move for a preliminary injunction preventing Defendants and their officers, employees, and representatives from enforcing Chapter 638, Statutes of 2005 (Cal. 2005) (hereinafter, the "Act").

VSDA and ESA (collectively "Plaintiffs") move for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 on the following grounds:

1.      The Act was signed into law on October 7, 2005, and is due to take effect on January 1, 2006. The Act places criminal penalties on the sale or rental of "violent" video games to individuals under age 18 and imposes other burdens on the expression of video game retailers and manufacturers.

2.      Plaintiffs are associations of companies that create, publish, manufacture, import, distribute, sell, and/or rent video games. On October 17, 2005, Plaintiffs filed a three-count Complaint seeking to invalidate the Act under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. As set forth in the Complaint, the Act is unlawful because it violates Plaintiffs' constitutionally guaranteed rights to freedom of expression and equal protection, and because it is unconstitutionally vague.

3.      Plaintiffs are entitled to a preliminary injunction because they are likely to succeed on the merits of their constitutional challenge to the Act, and because the equities weigh strongly against enforcement of the Act. Similar efforts to regulate video games based on their expressive content have been struck down by every court that has considered this issue, including the Seventh and Eighth Circuits, and a District Court in the Ninth Circuit. *See American Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 579-80 (7th Cir. 2001); *Interactive Digital Software Ass'n v. St. Louis*

i

1   *County*, 329 F.3d 954, 957 (8th Cir. 2003); *Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d

2   1180, 1184-85 (W.D. Wash. 2004).

3        4.    The Act is subject to strict scrutiny because it imposes content-based restrictions on

4   expression protected by the First Amendment. The Act's restrictions on "violent" video games fail

5   strict scrutiny, because they are unsupported by a compelling state interest that is materially advanced

6   by narrowly tailored means. In addition, the Act is unconstitutionally vague, and the Act

7   unconstitutionally compels expression through burdensome and unnecessary labeling requirements.

8        5.    The equities weigh strongly in favor of an injunction. Plaintiffs and their members

9   will suffer irreparable harm if the Act is allowed to go into effect, because the loss of First

10  Amendment freedoms, for any amount of time, constitutes irreparable injury. The First Amendment

11  rights of members of the public will be similarly impaired.

12       This Motion is based on this Notice of Motion and Motion, the attached Memorandum of

13  Points and Authorities, the declarations submitted herewith, detailing the Act's chilling effect on

14  protected expression, copies of sample video games that might be impermissibly censored under the

15  Act, videos of sample representative game play of those games, the Court's papers and files in this

16  case, the arguments of counsel, and any other matters the Court may consider.

17       For each of these reasons, Plaintiffs request that this Court enter a preliminary injunction

18  enjoining all Defendants to this action, and their officers, employees, and representatives, from

19  enforcing, or directing the enforcement of Chapter 638, Statutes of 2005 (Cal. 2005), until resolution

20  of this action or further order of this Court.

ii

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ........................................................................................... i

TABLE OF CONTENTS ........................................................................................................... iiii

TABLE OF AUTHORITIES ........................................................................................................ ivi

INTRODUCTION ........................................................................................................................ 1

FACTUAL BACKGROUND ......................................................................................................... 3

    A.    The Nature Of Video Games................................................................................ 3

    B.    The Video Game Industry's Well-Established Voluntary Rating
        System. ................................................................................................................ 3

    C.    The Challenged Statute. ...................................................................................... 4

        1.    *The "Violent" Video Game Ban.* ........................................................... 4

        2.    *The Act's Labeling Restrictions.* ........................................................... 5

ARGUMENT .............................................................................................................................. 6

I.       PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF
        THEIR CLAIMS, GIVEN THE ACT'S SWEEPING CONTENT-
        BASED INVASION OF FIRST AMENDMENT RIGHTS AND
        UNCONSTITUTIONAL VAGUENESS.......................................................... 6

    A.    Video Games Constitute Expression Protected By The First
        Amendment. ........................................................................................................ 6

    B.    The Act's "Violent" Video Game Restrictions Fail The
        Brandenburg Standard......................................................................................... 7

    C.    The Act's "Violent" Video Game Restrictions Fail Strict
        Scrutiny. ............................................................................................................ 10

        1.    *The State Has No Legitimate, Much Less Compelling,*
            *Interest In Controlling Minors' Thoughts Or Feelings.* ...................... 10

        2.    *The Act Does Not Materially Advance The State's*
            *Interests And Is Not Narrowly Tailored.*............................................. 12

    C.    The Act's Labeling Provisions Are Unconstitutional. ..................................... 14

    D.    The Act Is Unconstitutionally Vague.............................................................. 15

II.      THE EQUITIES STRONGLY SUPPORT AN INJUNCTION.................................. 18

CONCLUSION ........................................................................................................................ 19

iii

1

## TABLE OF AUTHORITIES

2

### CASES

3

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996) ........................................................ 13

4

*American Amusement Machine Ass'n v. Kendrick*, 244 F.3d 572 (7th Cir.

5
   2001) ..................................................................................... i, 1, 2, 6, 7, 8, 9, 11, 12, 13

6

*American Booksellers Ass'n v. Hudnut*, 771 F.2d 323 (7th Cir. 1985), *aff'd*, 475 U.S. 1001

7
   (1986) ................................................................................................................... 9-10

8

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002)....................................................... 8, 11

9

*Association of National Advertisers v. Lundgren*, 44 F.3d 726 (9th Cir. 1994) .......................... 10

10

*Boos v. Barry*, 485 U.S. 312 (1988)....................................................................................... 11

11

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) .............................................................................. 8

12

*Brown v. California Department of Transportation*, 321 F.3d 1217 (9th Cir. 2003) ................... 18

13

*Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188 (9th Cir. 1989) ............................................ 8, 9

14

*Eclipse Enterprises, Inc. v. Gulotta*, 134 F.3d 63 (2d Cir. 1997) .................................................. 7

15

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975)................................................................ 11

16

*Florida Star v. B.J.F.*, 491 U.S. 524 (1989).............................................................................. 12

17

*Ginsberg v. New York*, 390 U.S. 629 (1968)............................................................................. 12

18

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)................................................................. 15-16

19

*Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954 (8th Cir.

20
   2003) ...............................................................................i-ii, 1, 6, 7, 8, 10, 12

21

*James v. Meow Media, Inc.*, 300 F.3d 683 (6th Cir. 2002)......................................... 2, 7, 8, 9, 12

22

*Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952) .................................................................. 11

23

*Kolender v. Lawson*, 461 U.S. 352 (1983)................................................................................... 15

24

*Leidholdt v. L.F.P. Inc*, 860 F.2d 890 (9th Cir. 1988) ...................................................................... 8

25

*McConnell v. Federal Election Commission*, 540 U.S. 93 (2003)............................................... 11

26

*Miller v. California*, 413 U.S. 15 (1973) .................................................................................. 12

27

28

iv

*NAACP v. Button*, 371 U.S. 415 (1963).......................................................................................... 16

*National People's Action v. Village of Wilmette*, 914 F.2d 1008 (7th Cir. 1990)......................... 18

*Ohio ex rel. Celebrezze v. Nuclear Regulatory Commission*, 812 F.2d 288 (6th Cir. 1987)........ 18

*Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1
    (1986)..................................................................................................................................... 14, 15

*Perez-Funez v. District Director, INS*, 611 F. Supp. 990 (C.D. Cal. 1984) ................................. 18

*Podolsky v. First Healthcare Corp.*, 50 Cal.App.4th 632 (Cal. Ct. App. 1996)............................. 2

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ........................................................................... 10

*Reno v. ACLU*, 521 U.S. 844 (1997)............................................................................................. 16

*Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988)............. 14

*S.O.C., Inc. v. County of Clark*, 152 F.3d 1136 (9th Cir. 1998) ............................................ 2, 6, 18

*Sammartano v. First Judicial District Court*, 303 F.3d 959 (9th Cir. 2002) ..................... 6, 18, 19

*Sanders v. Acclaim Entertainment, Inc.*, 188 F. Supp. 2d 1264 (D. Colo. 2002) ....................... 2, 7

*Simon & Schuster, Inc. v. Members of the New York State Crime Victims Board*, 502 U.S. 105
    (1991) ......................................................................................................................................... 10

*Texas v. Johnson*, 491 U.S. 397 (1989) .................................................................................... 1, 11

*Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969) ................ 11

*Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994) ..................................... 10, 12, 13

*United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000) ........................... 10, 13

*United States v. United Foods, Inc.*, 533 U.S. 405 (2001)............................................................ 14

*Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180 (W.D. Wash.
    2004) ....................................................................................... ii, 1, 2, 6, 7, 8, 9, 10, 12, 13, 18

*Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167 (D. Conn. 2002) .................................... 2, 7

*Winters v. New York*, 333 U.S. 507 (1948) .................................................................................... 7

Notice of Motion and Motion for a Preliminary Injunction;
Memorandum of Points and Authorities in Support Thereof                     Case No. C 05-4188 RMW (RS)

**STATUTES**

Cal. Bus. & Prof. Code § 20650 ............................................................................................ 14, 15

**LEGISLATIVE MATERIAL**

Chapter 638, Statutes of 2005 (Cal. 2005)........................................................ 4, 5, 6, 7, 11, 12, 16

vi

# INTRODUCTION

Plaintiffs Entertainment Software Association ("ESA") and Video Software Dealers Association ("VSDA") submit this memorandum in support of their motion, pursuant to Federal Rule of Civil Procedure 65, for a preliminary injunction preventing Defendants and their officers, employees, and representatives from enforcing Chapter 638, Statutes of 2005 (Cal. 2005) (hereinafter, the "Act"). The Act was signed into law on October 7, 2005, and is due to take effect on January 1, 2006.

Plaintiffs are entitled to a preliminary injunction under controlling legal principles. Plaintiffs are likely to succeed on their claim that the Act is unconstitutional. California's sweeping legislation places substantial penalties on the sale or rental of "violent" video games to individuals under age 18 and imposes additional burdens on the expression on those who make, distribute, and sell or rent video games. Such content discrimination violates the "bedrock principle underlying the First Amendment . . . that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

If allowed to go into effect, the Act would impose an unprecedented – and unconstitutional – scheme of censorship on fully protected speech, one that singles out expression in video games from all other media that may contain depictions of "violence." Indeed, the Act may well restrict the sale of "T"-rated video games based on popular movies – such as the *James Bond* franchise, and video games based on Governor Schwarzenegger's blockbuster *Terminator* trilogy.

Not only would the Act restrict the sale or rental of "violent" video games based on the content of those games, but it also would require any video game manufacturer, distributor or importer who distributes video games in California – essentially *every* video game maker – to determine whether the games meet the statutory definition of "violent," and if so, to place a large sticker on the game packaging that obscures other important information.

Every previous attempt to restrict video games based on their content has been struck down as violating the First Amendment. *See Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954 (8th Cir. 2003) ("*IDSA*"); *American Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572 (7th Cir. 2001) (Posner, J.) ("*AAMA*"); *Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180 (W.D.

1

1    Wash. 2004) ("*VSDA*"); *cf. James v. Meow Media, Inc.*, 300 F.3d 683, 696 (6th Cir. 2002) (refusing

2    to permit tort liability for video games on First Amendment grounds); *Sanders v. Acclaim Entm't,*

3    *Inc.*, 188 F. Supp. 2d 1264, 1279 (D. Colo. 2002) (same); *Wilson v. Midway Games, Inc.*, 198 F.

4    Supp. 2d 167, 181 (D. Conn. 2002) (same). Like its predecessors in other jurisdictions, the Act

5    cannot withstand the strict constitutional scrutiny triggered by its content-based burdens on protected

6    speech.

7        The Act is also impossibly – and unconstitutionally – vague. In defining which games are

8    subject to restriction, the Act attempts to squeeze its prohibitions into the three-prong test for the

9    narrow sexually explicit "harmful to minors" category of speech – which has *never* been extended to

10    "violent" speech, and which has no meaning as applied to depictions of violence – and also seeks to

11    import language from sentencing guidelines governing when the *death penalty* should be imposed.

12    This latter framework is unprecedented in the speech context, and is so hopelessly vague that the Act

13    should be struck down on vagueness grounds alone. *See VSDA*, 325 F. Supp. 2d at 1191 (invalidating

14    Washington state law restricting "violent" video games on the independent ground of

15    unconstitutional vagueness).

16        The equities also weigh strongly in favor of an injunction. *See, e.g., AAMA,* 244 F.3d at 580.

17    Plaintiffs and their members will suffer irreparable harm if the Act is allowed to go into effect,

18    because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably

19    constitutes irreparable injury." *S.O.C., Inc. v. County of Clark,* 152 F.3d 1136, 1148 (9th Cir. 1998)

20    (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)). The First Amendment rights of

21    members of the public — whose rights are also at stake in this facial challenge — will be similarly

22    impaired. Accordingly, the Act must be enjoined.[1]

23

24    _____

[1]    In addition, absent injunctive and declaratory relief, Plaintiffs' members might be subjected to
25    a multitude of lawsuits under Cal. Bus. & Prof. Code § 17200, which has been interpreted to
     grant a broad private right of action to individuals harmed by an entity's alleged failure to
26    comply with a state statute. See, e.g., *Podolsky v. First Healthcare Corp.*, 50 Cal.App.4th
     632, 647 (Cal. Ct. App. 1996). The Act's inherently vague terms would mean that Plaintiffs'
27    members could be subject to suit based on a wide and contradictory range of legal theories
     about what games are covered by the Act. The potential for numerous civil lawsuits only
28    serves to underscore the need for immediate injunctive relief.

2

# FACTUAL BACKGROUND

## A.    The Nature Of Video Games.

Plaintiffs are associations of companies that create, publish, manufacture, distribute, import, sell, and/or rent video games. Compl. ¶¶ 11-12. They bring this action because, if allowed to go into effect, the Act will censor distribution of some of Plaintiffs' creative works, based solely upon their expressive content. *Id.* ¶ 14. In this facial challenge, Plaintiffs also assert the rights of willing listeners. *Id.* ¶ 15.

Video games are a modern form of artistic expression. Like motion pictures and television programs, video games tell stories and entertain audiences through the use of complex pictures, sounds, and text. *See* Price Decl. ¶¶ 4-5.[2] Video games feature the artwork of leading graphic artists, as well as music — much of it original — that enhances the game's artistic expression in the same way as movie soundtracks. *Id.* These games often contain storylines and character development as richly detailed as (and sometimes based on) books and movies. *Id.* ¶¶ 4-5, 61. Like great literature, these games frequently involve familiar themes such as good versus evil, triumph over adversity, struggle against corrupt powers, and quest for adventure. *Id.* ¶¶ 4, 23-66.

## B.    The Video Game Industry's Well-Established Voluntary Rating System.

Like other popular media, such as motion pictures and music, the video game industry has adopted a voluntary and widely used rating system for video games. *See* Lowenstein Decl. ¶¶ 4-10. That system — which the FTC has called the "most comprehensive" of industry-wide media rating systems — is implemented by the Entertainment Software Rating Board ("ESRB"), a self-regulatory body that assigns independent ratings and descriptions for video game content. *Id.* ¶¶ 4-5. The ESRB system includes not only letter ratings (EC, E, E10+, T, M, and AO), but also numerous

---

[2]    In support of their Motion, Plaintiffs are submitting the Declaration of Ted Price ("Price Decl."), President and CEO of Insomniac Games, Inc.; Declaration of Crossan R. Andersen ("Andersen Decl."), President of Plaintiff VSDA; and Declaration of Douglas Lowenstein ("Lowenstein Decl."), President of Plaintiff ESA. Plaintiffs are also submitting copies of video games that may be deemed to be covered by the Act's restrictions, along with taped recordings of representative play of those games. The declarations and supporting materials are being submitted as a separate appendix to the memorandum in support of Plaintiffs' Motion.

3

1  "content descriptors," descriptive phrases that give consumers and parents additional information

2  about a game's contents. *Id.* ¶¶ 7-8. The purpose of the ESRB system is to provide easily understood

3  information about games to consumers and parents — not to dictate what is ultimately appropriate for

4  individuals of different ages. *Id.* ¶ 6. Like the movie rating system, the ESRB system is entirely

5  voluntary; nonetheless, nearly all video game publishers submit their games for rating. *Id.* Similarly,

6  video game retailers throughout the nation are part of a widespread and voluntary effort to educate

7  consumers about the ESRB system and to require parental consent for the sale of "M" games to

8  individuals under age 17. *See* Andersen Decl. ¶ 18.

9  **C.   The Challenged Statute.**

10      *1.   The "Violent" Video Game Ban.*

11      The Act imposes a civil penalty of up to $1,000 on any person who "sell[s] or rent[s] a video

12  game that has been labeled as a violent video game to a minor." Act, § 1746.1(a). "Violent" video

13  games are defined by the Act as those "in which the range of options available to a player includes

14  killing, maiming, dismembering, or sexually assaulting an image of a human being," if the actions

15  depicted meet one of two sets of criteria. Act, § 1746(d)(1). Under the first set of criteria, the

16  violence depicted in the game must "appeal to a deviant or morbid interest of minors," be "patently

17  offensive to prevailing standards in the community as to what is suitable for minors," and "cause[]

18  the game, as a whole, to lack serious literary, artistic, political, or scientific value for minors." *Id.*

19  § 1746(d)(1)(A). Under the second provision, a game will be restricted if the actions depicted enable

20  "the player to virtually inflict serious injury upon images of human beings or characters with

21  substantially human characteristics in a manner which is especially heinous, cruel or depraved in that

22  it involves torture or serious physical abuse to the victim." *Id.* § 1746(d)(1)(B). Those terms are

23  further defined as follows:

24          (A)   "Cruel" means that the player intends to virtually inflict a high
              degree of pain by torture or serious physical abuse of the victim in
25          addition to killing the victim.

26          (B)   "Depraved" means that the player relishes the virtual killing or
              shows indifference to the suffering of the victim, as evidenced by
27          torture or serious physical abuse of the victim.

28

4

(C) "Heinous" means shockingly atrocious. For the killing depicted in a video game to be heinous, it must involve additional acts of torture or serious physical abuse of the victim as set apart from other killings.

(D) "Serious physical abuse" means a significant or considerable amount of injury or damage to the victim's body which involves a substantial risk of death, unconsciousness, extreme physical pain, substantial disfigurement, or substantial impairment of the function of a bodily member, organ, or mental faculty. Serious physical abuse, unlike torture, does not require that the victim be conscious of the abuse at the time it is inflicted. However, the player must specifically intend the abuse apart from the killing.

(E) "Torture" includes mental as well as physical abuse of the victim. In either case, the virtual victim must be conscious of the abuse at the time it is inflicted; and the player must specifically intend to virtually inflict severe mental or physical pain or suffering upon the victim, apart from killing the victim.

(3) Pertinent factors in determining whether a killing depicted in a video game is especially heinous, cruel, or depraved include infliction of gratuitous violence upon the victim beyond that necessary to commit the killing, needless mutilation of the victim's body, and helplessness of the victim.

*Id.* §§ 1746(d)(2), (3).

The Act's "violent" video game ban  purportedly serves two purposes: "preventing violent, aggressive, and antisocial behavior" and "preventing psychological or neurological harm to minors who play violent video games." *Id.* § 1(c). Furthermore, the Act purports to make "findings" that "[e]xposing minors to depictions of violence in video games" makes them "more likely to experience feelings of aggression, to experience a reduction of activity in the frontal lobes of the brain, and to exhibit violent antisocial or aggressive behavior," and that "[e]ven minors who do not commit acts of violence suffer psychological harm from prolonged exposure to violent video games." *Id.* §§ 1(a),(b).

## 2. *The Act's Labeling Restrictions.*

In addition to imposing substantial penalties on persons who sell or rent "violent" video games to minors, the Act imposes an additional, content-based burden on speech that is unsupported by a compelling state interest. The Act provides that "[e]ach violent video game that is imported into

5

1  or distributed in California for retail sale shall be labeled with a solid white '18' outlined in black.

2  The '18' shall have dimensions of no less than 2 inches by 2 inches" and must be placed on the face

3  of the video game package. Act, § 1746.2. Failure to label a "violent" video game subjects a

4  manufacturer, distributor or importer to a $1,000 penalty. Act, § 1746.3.

## ARGUMENT

6  A plaintiff is entitled to a preliminary injunction upon showing "either (1) a combination of

7  probable success on the merits and the possibility of irreparable harm; or (2) that serious questions

8  are raised and the balance of hardships tips in its favor." *Sammartano v. First Judicial Dist. Court*,

9  303 F.3d 959, 965 (9th Cir. 2002) (quotation marks omitted). These "two formulations represent two

10  points on a sliding scale in which the required degree of irreparable harm increases as the probability

11  of success decreases." *Id.* (quotation marks omitted). "[W]hen the harm claimed is a serious

12  infringement on core expressive freedoms, a plaintiff is entitled to an injunction even on a lesser

13  showing meritoriousness." *Id.* at 974.

14  Here, the First Amendment injuries worked by the Act unquestionably constitute irreparable

15  harm supporting an injunction. *See S.O.C., Inc.*, 152 F.3d at 1148. Indeed, every previous attempt to

16  restrict the distribution of "violent" video games has been enjoined on First Amendment grounds.

17  *See AAMA*, 244 F.3d at 580 (affirming district court's grant of a preliminary injunction, noting a

18  "strong likelihood of ultimate victory," irreparable harm to the plaintiffs if the law were allowed to go

19  into effect, and "the entirely conjectural nature of the benefits of the ordinance to the people of

20  Indianapolis"); *IDSA*, 329 F.3d at 960 (reversing district court's refusal to enjoin ban on "violent"

21  video games); *VSDA*, 325 F. Supp. 2d at 1191 (ordering permanent injunction against statewide

22  restriction on "violent" video games, following preliminary injunction).

23  **I.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR
24  CLAIMS, GIVEN THE ACT'S SWEEPING CONTENT-BASED INVASION
     OF FIRST AMENDMENT RIGHTS AND UNCONSTITUTIONAL VAGUENESS.**

25  **A.  Video Games Constitute Expression Protected By The First Amendment.**

26  Several circuit and district courts – including the Sixth, Seventh, and Eighth Circuits, and the

27  United States District Court for the Western District of Washington – have unequivocally held that

28  the First Amendment protects the expression in video games. *See AAMA*, 244 F.3d at 577-78; *IDSA*,

6

1    329 F.3d at 957 (noting that "[t]he mere fact" that video games "appear in a novel medium is of no

2    legal consequence"); *VSDA*, 325 F. Supp. 2d at 1184-85 (such games "are expressive and qualify for

3    the protections of the First Amendment"); *James*, 300 F.3d at 696 (confirming that the First

4    Amendment protects the communicative aspect of video games, and rejecting attempts to impose tort

5    liability on "violent" video games); *Sanders*, 188 F. Supp. 2d at 1279 (same); *Wilson*, 198 F Supp. 2d

6    at 181 (same). Indeed, modern video games involve "intricate" story lines, "detailed artwork,"

7    "original scores," and an evolving narrative. *VSDA*, 325 F. Supp. 2d at 1184; *see also AAMA*, 244

8    F.3d at 577-78 (noting that video games convey "age-old themes of literature," messages, and

9    ideologies, "just as books and movies do"). Moreover, the Act's content-based restrictions

10   themselves demonstrate that the targeted games constitute protected expression, because "it is the

11   nature and effect of the message being communicated by these video games which prompted the state

12   to act in this sphere." *VSDA*, 325 F. Supp. 2d at 1184.

13          That the Act restricts depictions of violence makes no difference as a matter of First

14   Amendment scrutiny. Depictions of violence are entitled to full constitutional protection. *See*

15   *AAMA*, 244 F.3d at 575-76 ("The notion of forbidding not violence itself, but pictures of violence, is

16   a novelty."); *IDSA*, 329 F.3d at 958 (strict scrutiny applies to content-based restrictions on "violent"

17   video games); *VSDA*, 325 F. Supp. 2d at 1186 (same); *Eclipse Enters., Inc. v. Gulotta*, 134 F.3d 63,

18   66 (2d Cir. 1997) (declining to "expand the[] narrow categories of [unprotected] speech to include

19   depictions of violence" in trading cards). Indeed, in the context of "violent" magazines, characterized

20   by the state as collections of "bloodshed" and "crime," the Supreme Court has stated that violent

21   expression is "as much entitled to the protection of free speech as the best of literature." *Winters v.*

22   *New York*, 333 U.S. 507, 510 (1948).

23          **B.      The Act's "Violent" Video Game Restrictions Fail The Brandenburg
                       Standard.**

24

25          The Act restricts video games based on the Legislature's belief that video games can lead to

26   violence. *See* Act § 1(c), (c) (finding that exposure to violent video games causes minors to "exhibit

27   violent[,] antisocial[,] or aggressive behavior," and asserting that the State has a "compelling interest

     in preventing violent, aggressive, and antisocial behavior"). As a result, to survive constitutional

28

                                                         7

1   scrutiny, the Act must meet the stringent standards of *Brandenburg v. Ohio*, 395 U.S. 444 (1969).

2   *See, e.g., James*, 300 F.3d at 698 ("In protecting against the propensity of expression to cause

3   violence, states may only regulate that speech" which meets the *Brandenburg* standard); *see also*

4   *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1199 (9th Cir. 1989) (efforts to restrict speech

5   based on its "tendency to cause others to engage in undesirable acts" must meet the *Brandenburg*

6   test); *cf. Leidholdt v. L.F.P. Inc*, 860 F.2d 890, 894 (9th Cir. 1988) (speech not actionable simply

7   because it is "[b]ase and malignant") (quotation marks omitted).

8        Under *Brandenburg*, the government may regulate expression based on a concern that it will

9   cause unlawful or violent behavior *only* if the government can prove that such expression "'is

10   *directed to* inciting or producing *imminent* lawless action and is *likely* to incite or produce such

11   action.'" *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002) (quoting *Brandenburg*, 395

12   U.S. at 447) (emphasis added).  As the Supreme Court has explained, "[t]he mere tendency of speech

13   to encourage unlawful acts is not a sufficient reason for banning it."  *Id*.  Thus, the government may

14   not punish speakers based solely on a prediction or suspicion that their words will tend, in the

15   aggregate, to encourage undesired behavior.

16        Yet that is exactly what the Act purports to do.  Here, the Act regulates speech ostensibly

17   based on the Legislature's conclusory "findings" that "minors" who play violent video games are

18   "more likely to . . . exhibit violent antisocial or aggressive behavior."  Act, § 1(a).  Even assuming

19   that such findings were based on any reliable evidence, which they are not,[3] the State would fail to

---

21   [3]   The Act's vague "legislative findings" ignores a substantial body of conflicting evidence
       about the purported effects of "violent" video games.  Indeed, every court considering the
22   issue has concluded that the research fails to establish any causal link between exposure to
       such games and subsequent harm to anyone.  *See IDSA*, 329 F.3d at 959 (finding law lacking
23   "the 'substantial supporting evidence' of harm that is required before an ordinance that
       threatens protected speech can be upheld"); *AAMA*, 244 F.3d at 578-79 (scientific studies "do
24   not support" the regulation of "violent" video games, because these studies "do not find that
       video games have ever caused anyone to commit a violent act"); *VSDA*, 325 F. Supp. 2d at
25   1188 (finding that "the current state of the research cannot support the . . . Act because there
       has been no showing that exposure to video games . . . is likely to lead to actual violence").
26   But even accepting the Legislature's purported "findings" – that video games lead to "violent,
       asocial, or aggressive behavior" by minors – they would not demonstrate the level of
27   "imminence" required by the *Brandenburg* standard.  *See, e.g., James*, 300 F.3d at 698; *cf.
       Dworkin*, 867 F.2d at 1199 n.8 ("At best, the scientific evidence concerning the causal
28   relationship between pornographic materials and violent actions is ambiguous and
       [Footnote continued on next page]

8

1    meet the *Brandenburg* standard based on such aggregate effects. *See Dworkin*, 867 F.2d at 1199.

2    First, as the Sixth Circuit has observed, video games, designed for entertainment, are not "directed"

3    to inciting violence. *See, e.g., James*, 300 F.3d at 698 (video game makers do not "'intend' to

4    produce violent actions by the consumers, as is required by the *Brandenburg* test"). Second, the

5    purported basis for the Act – that long-term exposure to "violent" video games increases violent or

6    aggressive behavior in some small percentage of at-risk persons – falls far short of establishing a risk

7    of "imminent" violence. *Id.* (holding that the "glacial process of personality development" allegedly

8    affected by "violent" video games "is far from the temporal imminence that we have required to

9    satisfy the *Brandenburg* test"). Finally, there is absolutely no finding by the Legislature that video

10   games, which are played safely every day by millions, are "likely" to produce "imminent" violence.

11   *Id.* at 699; *see also AAMA*, 244 F.3d at 575.

12       Partly for these legal reasons, the Seventh Circuit in *AAMA* rejected the government's

13   argument that a "violent" video game ban was justified because video games "incite youthful players

14   to breaches of the peace." 244 F.3d at 575. Likewise, the District Court for the Western District of

15   Washington observed that the "Supreme Court and the Ninth Circuit have expressly rejected the idea

16   that the possibility of *future* harm can justify the regulation of speech." *VSDA*, 325 F. Supp. 2d at

17   1187 n.3 (emphasis added). And in an analogous context – the attempted regulation of non-obscene

18   pornography based, among other things, on allegations that such materials may lead to the infliction

19   of violence on women – the Ninth Circuit concluded that such regulation falls short of the

20   *Brandenburg* requirements, and thus cannot survive First Amendment scrutiny. *Dworkin*, 867 F.2d

21   at 1199-1200 & n.8 (explaining that the "equivocal evidence" of any "causal relationship between

22   pornographic materials and violent actions" fails to show the likelihood of causing imminent

23   unlawful action required under *Brandenburg*); *see also American Booksellers Ass'n v. Hudnut*, 771

24   F.2d 323, 329-30 (7th Cir. 1985) (regulation failed to satisfy *Brandenburg* because any violent

25

26

27   [Footnote continued from previous page]
         unvalidated. Such equivocal evidence is insufficient to establish the 'clear and present danger'
28       required in order for any of the exceptions to general first amendment principles to apply.").

9

1    "effects depend on mental intermediation"), *aff'd*, 475 U.S. 1001 (1986). As in *Dworkin*, the State

2    cannot demonstrate that the Act meets the *Brandenburg* standards; accordingly, it must be enjoined.

3          **C.**    **The Act's "Violent" Video Game Restrictions Fail Strict Scrutiny.**

4          To the extent that the Legislature articulated some purpose for the Act going beyond a

5    supposed reduction in violent behavior, such additional justifications also fail constitutional scrutiny.

6    Because the Act restricts access to expression based on its content, it is subject to the most exacting

7    First Amendment scrutiny. *See IDSA*, 329 F.3d at 958 ("Because the ordinance regulates video

8    games based on their content . . . we review it according to a strict scrutiny standard."); *VSDA*, 325 F.

9    Supp. 2d at 1186. Such content-based regulation of expression is "presumptively invalid." *R.A.V. v.

10   City of St. Paul*, 505 U.S. 377, 382 (1992); *see also VSDA*, 325 F. Supp. 2d at 1186. "It is rare that a

11   regulation restricting speech because of its content will ever be permissible." *United States v.

12   Playboy Entm't Group, Inc.*, 529 U.S. 803, 818 (2000).

13         Under the strict scrutiny standard, the State must (1) articulate a compelling state interest; (2)

14   prove that the Act actually serves that interest and is "necessary" to do so; and (3) show that the Act

15   is narrowly tailored to serve that interest. *R.A.V.*, 505 U.S. at 395; *Turner Broad. Sys., Inc. v. FCC*,

16   512 U.S. 622, 664-65 (1994); *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims

17   Bd.*, 502 U.S. 105, 118 (1991); *Ass'n of Nat'l Advertisers v. Lundgren*, 44 F.3d 726, 739-40 (9th Cir.

18   1994). The Legislature's judgments are not to be accepted without question; rather, the Legislature

19   must have "drawn reasonable inferences based on substantial evidence." *Turner*, 512 U.S. at 666; *see

20   also, e.g.*, *VSDA*, 325 F. Supp. 2d at 1187-88. Moreover, the State "must do more than simply 'posit

21   the existence of the disease sought to be cured.' It must demonstrate that the recited harms are real,

22   not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and

23   material way." *Turner*, 512 U.S. at 664 (citation omitted). The State cannot satisfy its burden of

24   establishing any of the prongs of the strict scrutiny standard.

25           *1.*    ***The State Has No Legitimate, Much Less Compelling, Interest In
26   Controlling Minors' Thoughts Or Feelings.***

27         The Act includes a finding that exposure to "violent" video games makes minors "more likely

28   to experience feelings of aggression" and posits a "compelling" state interest in protecting against

1    "psychological and neurological harm" to minors. Act §§ 1(a), (c). Even assuming that this

2    justification is anything more than a repackaging of the "preventing real-life" violence rationale, it

3    still amounts to an illegitimate effort to restrict access to expression based on consumers' anticipated

4    "psychological" reaction to that content. The First Amendment forbids governmental restrictions on

5    speech based on the provocative or persuasive effect of that speech on its audience. *See Boos v.*

6    *Barry*, 485 U.S. 312, 321 (1988) (O'Connor, J., joined by Stevens & Scalia, JJ.) (striking ban on

7    picketing near embassies where purpose was to protect the emotions of those who reacted to the

8    picket signs' messages); *Texas v. Johnson*, 491 U.S. at 408-09 (interest in protecting bystanders from

9    feeling offended or angry is not sufficient to justify ban on expression). An effort by the State to

10   censor speech in order to promote citizens' "well-being" amounts to nothing more than improper

11   thought control. As the Supreme Court has noted, "First Amendment freedoms are most in danger

12   when the government seeks to control thought or to justify its laws for that impermissible end." *Free*

13   *Speech Coalition*, 535 U.S. at 253.

14           Like adults, minors have a First Amendment right to be free from content-based governmental

15   regulation of the speech they utter or receive. *See, e.g., McConnell v. Federal Election Comm'n*, 540

16   U.S. 93, 231 (2003) ("Minors enjoy the protection of the First Amendment"); *Erznoznik v. City of*

17   *Jacksonville*, 422 U.S. 205, 213-14 (1975); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S.

18   503, 506-07, 511 (1969). The government does not have a generalized power to limit minors'

19   exposure to creative works based on a belief that they may be psychologically harmful. Such works

20   "may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a

21   political or social doctrine to the subtle shaping of thought." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S.

22   495, 501 (1952).[4] Thus, the State simply may not restrict protected expression merely because it

23   dislikes the way it shapes individuals' thoughts and attitudes—or brain neuron firing patterns.[5]

24   _____

25   [4]    As Judge Posner has explained, there is a serious "danger of allowing government to control
        the access of children to information and opinion," as "[p]eople are unlikely to become well-
26      functioning, independent-minded adults and responsible citizens if they are raised in an
        intellectual bubble." *AAMA*, 244 F.3d at 577.

27   [5]    The Act's unsupported "finding" concerning the effect of video games on the "frontal lobes"
28      of the brain and its correlated alleged "interest" in protecting minors from "neurological

                                                                    [Footnote continued on next page]

                                                    11

1     The Act nevertheless partly cloaks its speech restrictions in "harmful to minors" language,

2  Act § 1746(d)(1)(A), in an effort to exploit the narrow subset of sexually explicit speech that the

3  Supreme Court has held the government may regulate consistent with the First Amendment. *See,*

4  *e.g., Ginsberg v. New York*, 390 U.S. 629, 636-43 (1968) (permitting relaxed "harmful to minors"

5  regulation of certain explicit sexual expression). But the "harmful to minors" category of speech is

6  limited to sexual materials and has no application to the "violent" material that the State seeks to

7  regulate here. Indeed, courts have repeatedly rejected similar arguments that depictions of violence

8  can be regulated under the "harmful to minors," or obscenity, exceptions to the protections of the

9  First Amendment. *See IDSA*, 329 F.3d at 958 ("[D]epictions of violence cannot fall within the legal

10  definition of obscenity for either minors or adults."); *AAMA*, 244 F.3d at 578-79 (concerns underlying

11  *Ginsberg* do not apply with respect to "violent" video games); *VSDA*, 325 F. Supp. 2d at 1185

12  (explaining that *Ginsberg* is limited to sexually explicit expression); *James*, 300 F.3d at 698

13  ("declin[ing] to extend [its] obscenity jurisprudence to violent, instead of sexually explicit,

14  material."); *cf. Miller v. California*, 413 U.S. 15, 24 (1973) ("[W]e now confine the permissible scope

15  of [regulation of obscene materials] to works which depict or describe sexual conduct.").

16        **2.    *The Act Does Not Materially Advance The State's Interests And Is***
17             ***Not Narrowly Tailored.***

18     Even assuming that the State's justifications for the Act were not facially illegitimate and

19  unsupported by evidence, the Act would still fail First Amendment scrutiny. First, the State would

20  have to demonstrate that the Act's restrictions actually and materially address the alleged government

21  interests. *See, e.g., Turner*, 512 U.S. at 664-65; *VSDA*, 325 F. Supp. 2d at 1189. Here, the fact that

22  the State has singled out video games — even though a wide range of media make comparable

23  violent expression available to minors — is strong evidence that the Act fails to advance the State's

24  interests. *See, e.g., Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989) (the "facial underinclusiveness"

25

26  [Footnote continued from previous page]
       harm," *see* Act §§ 1(a), (c), represents nothing more than a transparent attempt to repackage
27     in the language of neuroscience the same psychological harm rationale that other courts have
       already rejected. *See, e.g., IDSA*, 329 F.3d at 958; *AAMA*, 244 F.3d at 579. The State's
28     attempt to censor protected expression is no more constitutional for the change in
       terminology.

12

1  of a regulation undermines the claim that the regulation serves its alleged interests); *VSDA*, 325 F.

2  Supp. 2d at 1189 (explaining that "the Act is too narrow in that it will have no effect on the many

3  other channels through which violent representations are presented to children").[6] As the Seventh

4  Circuit observed, "violent" video games "are a tiny fraction of the media violence to which modern

5  American children are exposed." *AAMA*, 244 F.3d at 579. But the Act leaves these other media

6  unaffected. Under the Act, for example, a minor could be legally barred from buying or renting a

7  video game containing "violent" content, but that same minor could legally buy or rent the movie and

8  book on which the video game was based. *See, e.g.*, Price Decl. ¶¶ 4, 61 (noting that the M-rated

9  game *Tom Clancy's Rainbow Six 3* is based on writer Tom Clancy's highly successful novels, and

10  that the Act may cover "T"-rated games such as the *Terminator* games).

11       Moreover, the Act fails strict scrutiny because it is not narrowly tailored. The narrow

12  tailoring requirement requires the State to prove that "a plausible, less restrictive alternative" to

13  banning such games "will be ineffective to achieve its goals." *Playboy*, 529 U.S. at 816. The State

14  cannot make such a showing here, where several such alternatives exist, such as encouraging

15  awareness of the voluntary ESRB video game rating system, which provides guidance to parents and

16  other consumers, and implementing technological solutions that allow parents to restrict access based

17  on ESRB ratings. *See generally* Lowenstein Decl.; *Playboy*, 529 U.S. at 824 ("A court should not

18  assume a plausible, less restrictive alternative would be ineffective; and a court should not presume

19  parents, given full information, will fail to act."); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484,

20  507-08 (1996) (plurality op.) (striking down ban on advertising alcohol prices because of less

21  restrictive alternatives, such as an "educational campaign" or "counterspeech"). The State, in fact,

22  rejected Plaintiffs' offer to work with it to help educate consumers about the well-established and

23  comprehensive ESRB system and to assist in implementing effective technological controls for

---

25  [6]  Such differential regulation of comparable expression invokes the specter of impermissible

26  viewpoint discrimination. *See, e.g.*, *Playboy*, 529 U.S. at 812 (striking down a regulation that targeted "adult" cable channels, but permitted similar expression by other speakers, and

27  holding that "[l]aws designed or intended to suppress or restrict the expression of specific speakers contradict basic First Amendment principles"); *Turner*, 512 U.S. at 659

28  ("Regulations that discriminate among media, or among different speakers within a single medium, often present serious First Amendment concerns.").

13