1   parents. *See* Lowenstein Decl. ¶ 20-23.  Moreover, the State only recently enacted a law requiring

2   retailers to post signs indicating the availability of a video game rating system. *See* Cal. Bus. & Prof.

3   Code § 20650; *see also* Andersen Decl. ¶ 15.  Despite this enactment of a less restrictive alternative,

4   the State chose not to allow the signage law to have its intended effect, but instead passed the much

5   more restrictive Act.

6       **C.     The Act's Labeling Provisions Are Unconstitutional.**

7           The Act's provisions requiring labeling of "violent" video games – under the threat of

8   substantial fines – unconstitutionally compel speech of video game manufacturers, distributors, and

9   retailers.  The Supreme Court has long recognized that "[j]ust as the First Amendment may prevent

10  the government from prohibiting speech, the Amendment may prevent the government from

11  compelling individuals to express certain views." *United States v. United Foods, Inc.*, 533 U.S. 405,

12  410 (2001).  Because compelled messages alter the content of what the compelled party would

13  otherwise express, they are considered content-based regulation under the First Amendment and

14  require strict scrutiny. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988).

15  This protection extends not only to political or ideological speech, *see Pacific Gas & Electric Co. v.*

16  *Public Utilities Commission of California*, 475 U.S. 1 (1986) ("PG&E"), but to *all* statements,

17  whether of fact or opinion, *see Riley*, 487 U.S. at 797-98.

18          The Act's requirement that manufacturers, distributors and importers place a large "18" label

19  on all "violent" video games compels video game manufacturers, distributors, and retailers to channel

20  the State's message that minors are not entitled to access them  — even if manufacturers and retailers

21  disagree with this proposition. *See* Lowenstein Decl. ¶ 13-14; Andersen Decl. ¶ 17.  The labeling

22  requirement — like the sale and rental restrictions — is inconsistent with the voluntary rating system

23  used by Plaintiffs.[7]  The "18" label, which imparts no substantive information (other than a

24  _____

25  [7]   At a fundamental level, the "18" label conflicts with the ESRB rating system because it
          suggests that certain games are categorically inappropriate for individuals under 18, whereas
26        the ESRB ratings are intended only as a guide to parents and consumers. *See* Andersen Decl.
          ¶¶ 12-14.  The "18" label also conflicts with the specific classifications of the ESRB system.
27        For example, the "18" label may be required for certain games classified as "E 10+" or "T" by
          the ESRB, *see* Price Decl. ¶ 7, even though the ESRB system indicates that such games may
28        be suitable for ages 10 and up.  Similarly, games rated "M" by the ESRB may be suitable for

[Footnote continued on next page]

14

Dockets.Justia.com

1  stigmatizing message), is contrary to and may physically obscure the detailed information concerning

2  the ESRB rating and content descriptors on the game packaging. *See* Andersen Decl. ¶ 12;

3  Lowenstein Decl. ¶ 15. The conflict between the labels mandated by the Act and the existing labels

4  used by Plaintiffs' members will be inherently confusing to parents and other consumers who are the

5  intended beneficiaries of the information conveyed by the voluntary rating system. In all cases, the

6  label represents a message that video game retailers have not chosen for themselves. "Such forced

7  association with potentially hostile views burdens" their expression and "risks forcing [them] to

8  speak where [they] would prefer to remain silent." *PG&E*, 475 U.S. at 18.

9        Not only would the labeling provision unconstitutionally burden the expression of video game

10  retailers, creators, and manufacturers, but it would also create a substantial chilling effect on First

11  Amendment rights. For example, the Act appears to place the burden of labeling on individual video

12  game manufacturers, distributors, and importers, each of whom must decide which games fit within

13  the Act's vague terms. Some, in an abundance of caution and out of fear of substantial penalties, may

14  label a far wider range of games than even those arguably covered by the Act. *See* Andersen Decl.

15  ¶¶ 7-11; Lowenstein Decl. ¶¶ 16-18; Price Decl. ¶¶ 7-9. Such a framework fails as a matter of

16  constitutional law.

17        **D.    The Act Is Unconstitutionally Vague**

18        The Act is unconstitutional on an independent ground: vagueness. Because many of the Act's

19  key terms are impermissibly vague and place the burden of compliance on game retailers, the Act

20  will restrict a far broader range of expression than even the State claims it is seeking to regulate. The

21  Constitution demands that statutes be set forth with "sufficient definiteness that ordinary people can

22  understand what conduct is prohibited." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Such

23  precision is essential to "give the person of ordinary intelligence a reasonable opportunity to know

24  what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108

25

26  [Footnote continued from previous page]
      ages 17 and up, but the "18" label prohibits 17-year-olds from buying or renting such games.

27      Furthermore, the "18" label conflicts with the California law that requires retailers to post
        signs about video game rating systems. *See* Cal. Bus. & Prof. Code § 20650; *see also*

28      Andersen Decl. ¶ 15.

15

1 | (1972). In particular, exacting precision is required of restrictions in the context of protected

2 | expression. *See Reno v. ACLU*, 521 U.S. 844, 871-72 (1997) (explaining that a vagueness "content-

3 | based regulation" of speech "raises special First Amendment concerns because of its obvious chilling

4 | effect on free speech"); *NAACP v. Button*, 371 U.S. 415, 433 (1963).

5 |         The Act is rife with terms that are inherently vague or are defined in such a way as to fail to

6 | provide fair notice. For example, the Act prohibits games which depict violence against "an image of

7 | a human being," and/or "characters with substantially human characteristics." Act §§ 1746(d)(1),

8 | (d)(1)(B). Those terms are particularly ill-suited for a medium that relies extensively on animated,

9 | extra-terrestrial, and fantastic forms and characters — which may be depicted as having only some

10 | "human" characteristics, or which may be "human" at some times and not others. For example, in

11 | *God of War*, the player assumes the role of Kratos, a Spartan commander in Ancient Greece who

12 | "dies" at various points in the game, but continues battling various gods and other entities;

13 | eventually, the player learns that Kratos is actually the son of Zeus. *See* Price Decl. ¶¶ 46-54.

14 | Because Kratos is the son of a god, and thus able to keep battling while "dead," would he be

15 | considered to have "substantially human characteristics" within the meaning of the statute? Would

16 | the gods that he battles fall within the Act's restrictions? Similarly, in *Resident Evil IV*, part of a

17 | popular series of video games that have inspired feature films, the vast majority of enemies in the

18 | game are zombies and mutants with human characteristics. *See id.* ¶¶ 30-37. Would zombies and

19 | mutants be viewed as having "substantially human characteristics" within the meaning of the Act?

20 | And, in *Jade Empire*, which takes the player's character on an adventure through a mythical Chinese

21 | kingdom, both the player's character and the enemy forces possess magical abilities and transform

22 | into non-humanoid creatures. *See id.* ¶¶ 38-45. Does this game contain violence "against an image

23 | of a human being" as defined by the Act? Can a part-animal or part-alien creature be "human"?

24 |         The Act is plagued with numerous other vague terms. For example, the Act would restrict the

25 | distribution of, and require the labeling of, video games that appeal to the "deviant or morbid interest

26 | of minors." What does that term mean in the context of depictions of violence in video games? Price

27 | Decl. ¶ 9; Lowenstein Decl. ¶ 17. Likewise, the Act defines "cruel" as "that the player intends to

28 | *virtually inflict* a high degree of pain by torture or serious physical abuse of the victim in addition to

16

1  killing the victim." Act, § 1746(d)(2)(A). How can a player "virtually inflict" physical or mental

2  pain? Price Decl. ¶¶ 13, 15. In defining depictions that may be considered "heinous" under the Act,

3  the Act refers to the "consciousness" of the "virtual victim." Act, § 1746(d)(2)(C). But how can a

4  "virtual victim" be "conscious" of anything? At what point does a computerized image experience a

5  "high degree of pain"? *See* Andersen Decl. ¶ 11; Price Decl. ¶¶ 12, 16. Similarly, the Act defines

6  "depraved" as "that the player relishes the virtual killing or shows indifference to the suffering of the

7  victim, as evidenced by torture or serious physical abuse of the victim." Act, § 1746(d)(2)(B). It

8  would be simply impossible for video game manufacturers and distributors to determine the "intent"

9  of every possible player of a particular video game. Price Decl. ¶ 15; Lowenstein Decl. ¶ 19;

10 Andersen Decl. ¶ 11. These terms – which are only representative examples of the Act's confusing

11 terms – have no clear meaning, especially in the context of video games. Not only are the terms

12 themselves vague, but the Act itself does not even purport to make the definition of "violent video

13 games" exclusive. Instead, the Act generally uses the word "includes" to modify the specific

14 examples of behavior covered by the definition. The open-ended definition does not confine the range

15 of depictions that trigger the "violent video game" label. Persons of ordinary intelligence are thus

16 forced to guess at the meaning and scope of the Act.

17     The ambiguous nature of the Act's definitions, coupled with the likelihood that they will be

18 interpreted inconsistently, will result in many games rated by the ESRB as potentially suitable for

19 teenagers and children being considered "violent video games" subject to the Act's restrictions.

20 Therefore, the Act's definitions may be held to cover many "T"-rated video games presently

21 available for commercial sale or rental to individuals under eighteen years of age, such as the *James

22 Bond* games, *Terminator 3: The Redemption*, *Minority Report*, and *Medal of Honor: Frontline*. *See*

23 Price Decl. ¶ 19.

24     Game creators, distributors, manufacturers, and retailers will respond to the uncertainty in the

25 Act, and the penalties the Act imposes, by either self-censoring or otherwise restricting access to *any*

26 potentially offending video game title. *See, e.g.*, Lowenstein Decl. ¶ 18; Andersen Decl. ¶¶ 7-11, 17;

27 Price Decl. ¶¶ 18-20. As the federal district court in Washington stated, in striking down a similar

28 video game ban as unconstitutionally vague, "[n]ot only is a conscientious retail clerk (and her

17

1  employer) likely to withhold from minors all games that could possibly fall within the broad scope of

2  the Act, but authors and game designers will likely 'steer far wider of the unlawful zone . . . than if

3  the boundaries of the forbidden area were clearly marked.'" *VSDA*, 325 F. Supp. 2d at 1191 (quoting

4  *Grayned*, 408 U.S. at 109 (alteration in original)). Such understandable, self-protective behavior will

5  deprive access to such expression not just to minors, but to adult customers as well — whose right to

6  access "violent" video games could not be questioned by the State.

7  ## II.    THE EQUITIES STRONGLY SUPPORT AN INJUNCTION.

8          Not only have Plaintiffs demonstrated a virtually certain likelihood of success on the merits,

9  but the other prerequisites to injunctive relief are easily met here. Plaintiffs, their members, and

10  willing listeners will all suffer irreparable harm if the Act's restriction of protected expression goes

11  into effect. As the Ninth Circuit has unequivocally held, "[t]he loss of First Amendment freedoms,

12  for even minimal periods of time, unquestionably constitutes irreparable injury." *S.O.C., Inc.*, 152

13  F.3d at 1148 (quoting *Elrod*, 427 U.S. at 373 (plurality)). And no adequate remedy at law exists for

14  Plaintiff's claims. *See Perez-Funez v. District Director, INS*, 611 F. Supp. 990, 1003 (C.D. Cal.

15  1984) (collecting cases); *see also Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n*, 812 F.2d

16  288, 290 (6th Cir. 1987) (injunctive relief is appropriate where "legal remedies prove inadequate.");

17  *National People's Action v. Village of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990) ("[I]njunctions

18  are especially appropriate in the context of first amendment violations because of the inadequacy of

19  money damages.").

20          Furthermore, "a party seeking preliminary injunctive relief in a First Amendment context can

21  establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a

22  colorable First Amendment claim." *Sammartano*, 303 F.3d at 973 (quotation marks omitted). As the

23  Ninth Circuit has explained, "when the harm claimed is a serious infringement on core expressive

24  freedoms, a plaintiff is entitled to an injunction even on a lesser showing meritoriousness." *Id.* at

25  974. Because Plaintiffs "have not only stated a colorable First Amendment claim, but one that is

26  likely to prevail[,] they have thus established the potential for irreparable injury" entitling them to a

27  preliminary injunction. *Brown v. California Dep't of Transp.*, 321 F.3d 1217, 1225 (9th Cir. 2003).

28

18

1    Finally, the balance of equities (including the public interest) weighs heavily in favor of an

2    injunction. Not only will Plaintiffs suffer immediate and irreparable harm to their First Amendment

3    freedoms, but the public will suffer similarly. "Courts considering requests for preliminary

4    injunctions have consistently recognized the significant public interest in upholding First Amendment

5    principles," *Sammartano*, 303 F.3d at 974, because First Amendment questions quite often have a

6    substantial impact on non-parties to a case. As in *Sammartano*, the State's enforcement of an

7    unconstitutional statute will not simply impact Plaintiffs, but will affect countless video game

8    creators, publishers, manufacturers, distributors, importers, retailers, and consumers through the State

9    of California and beyond, all of whom will suffer infringements on their First Amendment rights to

10   produce and view the expression contained in a wide array of video games. The equities compel an

11   injunction here.

### CONCLUSION

13   For the foregoing reasons, Plaintiffs respectfully request that this Court grant a preliminary

14   injunction.

15                                 Respectfully submitted.

16   DATED: October 19, 2005

17                                 GIBSON, DUNN & CRUTCHER LLP
                                   THEODORE J. BOUTROUS, JR.
18                                 H. MARK LYON
                                   ETHAN D. DETTMER
19

20

21                                 By:_____/s/ H. Mark Lyon_____
                                                     H. Mark Lyon
22

23                                 JENNER & BLOCK LLP
                                   PAUL M. SMITH
24                                 KATHERINE A. FALLOW
                                   AMY L. TENNEY
25                                 601 13th Street, N.W., Suite 1200
                                   Washington, D.C. 20005
26                                 Telephone: (202) 639-6000
                                   Facsimile: (202) 639-6066
27
                                   Attorneys for Plaintiffs
28                                 VIDEO SOFTWARE DEALERS ASSOCIATION
                                   and ENTERTAINMENT SOFTWARE ASSOCIATION

                                            19

1  GIBSON, DUNN & CRUTCHER LLP
   THEODORE J. BOUTROUS, JR., SBN 132099
2  H. MARK LYON, SBN 162061
   ETHAN D. DETTMER, SBN 196046
3  1881 Page Mill Road
   Palo Alto, California 94304
4  Telephone: (650) 849-5300
   Facsimile: (650) 849-5333
5
   JENNER & BLOCK LLP
6  PAUL M. SMITH
   KATHERINE A. FALLOW
7  MATTHEW S. HELLMAN
   601 13th Street, N.W., Suite 1200
8  Washington, D.C. 20005
   Telephone: (202) 639-6000
9  Facsimile: (202) 639-6066

10 Attorneys for Plaintiffs
   VIDEO SOFTWARE DEALERS ASSOCIATION
11 and ENTERTAINMENT SOFTWARE ASSOCIATION

12

13                    UNITED STATES DISTRICT COURT

14              FOR THE NORTHERN DISTRICT OF CALIFORNIA

15

16 VIDEO SOFTWARE DEALERS                CASE NO. C 05-4188 RMW (RS)
   ASSOCIATION and ENTERTAINMENT
17 SOFTWARE ASSOCIATION,                 PLAINTIFFS' NOTICE OF MOTION
                                         AND MOTION FOR SUMMARY
18              Plaintiffs,              JUDGMENT; MEMORANDUM OF POINTS
                                         AND AUTHORITIES IN
19      vs.                              SUPPORT THEREOF

20
   ARNOLD SCHWARZENEGGER, in his official  Date:  May 12, 2006
21 capacity as Governor of the State of California;  Time:  9:00 a.m.
   BILL LOCKYER, in his official capacity as    Dept:  6
22 Attorney General of the State of California;
   GEORGE KENNEDY, in his official capacity as
23 Santa Clara County District Attorney, RICHARD
   DOYLE, in his official capacity as City Attorney
24 for the City of San Jose, and ANN MILLER
   RAVEL, in her official capacity as County
25 Counsel for the County of Santa Clara,

26              Defendants.

27

28

---

## NOTICE OF MOTION AND MOTION

TO ALL DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 12, 2006, at 9:00 a.m., or as soon thereafter as this matter may be heard, in Courtroom 6 of this Court, located at 280 South First Street, San Jose, California 95113, plaintiffs Video Software Dealers Association ("VSDA") and Entertainment Software Association ("ESA") will, and hereby do, respectfully move for summary judgment to permanently enjoin Defendants and their officers, employees, and representatives from enforcing Cal. Civil Code § 1746 (2005) (hereinafter, the "Act").

VSDA and ESA (collectively "Plaintiffs") move for a preliminary injunction pursuant to Federal Rule of Civil Procedure 56 on the following grounds:

1. This Court has already entered a preliminary injunction enjoining Defendants ("the State") from enforcing the Act. *See Video Software Dealers Ass'n v. Schwarzenegger*, 401 F. Supp. 2d 1034 (N.D. Cal. 2005). The Court recognized that the Act imposes a content-based ban on expression that is protected by the First Amendment. *Id.* at 1044. The Court further held that the Act's restrictions on minors' access to such expression was subject to strict scrutiny, preliminarily concluding that Defendants were unlikely to meet their burden under that stringent level of review. *Id.* at 1044-46. As the Court noted, courts have enjoined every attempt to regulate "violent" video games.

2. The State cannot meet its burden under strict scrutiny. To begin, the Act serves no compelling purpose. Moreover, the State cannot show that it has acted on the basis of substantial evidence. To the contrary, no court has ever credited the evidence that the State relies upon. Indeed, that evidence is so one-sided and riddled with caveats that it cannot possibly support the interests claimed by the State.

3. The Act does not materially advance its stated goals because the State has singled out a subset of video games for regulation, despite the fact that a wide range of media contain comparable violent expression. The Act is also not narrowly tailored to achieve its purported goals because, *inter alia*, its vague terms will create a chilling effect and because the State has not considered less speech-restrictive alternatives, such as voluntary industry guidelines.

i

5.  The Act's mandatory labeling requirement compels video game manufacturers, distributors, and retailers to channel the State's message that minors should not access them – even if manufacturers and retailers vigorously disagree with this proposition. The labeling requirement is thus subject to, and defeated by, strict scrutiny.

6.  The Act's terms are unconstitutionally vague. Although this Court preliminarily concluded that some of the Act's terms were adequately definite, the record demonstrates that the Act's definition of "violent" video games does not provide sufficient notice of which games will be covered, and therefore is impermissibly vague.

This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the expert declarations submitted herewith detailing the lack of substantial evidence supporting the Act, the accompanying transcripts of expert testimony, the Court's papers and files in this case, the arguments of counsel, and any other matters the Court may consider. For each of these reasons, Plaintiffs request that this Court grant summary judgment in their favor and enjoin all Defendants to this action, and their officers, employees, and representatives, from enforcing, or directing the enforcement of the Act.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iv

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

ARGUMENT ....................................................................................................................... 4

I.     STANDARD OF REVIEW. ...................................................................................... 4

II.    THE ACT CANNOT SURVIVE STRICT SCRUTINY AND THEREFORE
       VIOLATES THE FIRST AMENDMENT. .................................................................. 4

       A.  The Act Does Not Satisfy The *Brandenburg* Standard........................................... 5

       B.  The First Amendment Forbids The State From Censoring Speech In Order To
           Control Minors' Thoughts Or Feelings.................................................................... 7

       C.  The Legislative Record Is Devoid Of "Substantial Evidence" Supporting The
           Act's Restrictions On Speech. ............................................................................. 10

       D.  The Act Does Not Advance The State's Interests And Is Not
           Narrowly Tailored............................................................................................... 14

III.   THE ACT'S LABELING PROVISIONS ARE UNCONSTITUTIONAL. ............... 18

IV.    THE ACT IS UNCONSTITUTIONALLY VAGUE................................................... 20

CONCLUSION.................................................................................................................. 23

iii

# TABLE OF AUTHORITIES

## CASES

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996) .............................................. 17

*American Amusement Machine Association v. Kendrick*, 244 F.3d 572
(7th Cir. 2001)................................................................................. 1,3, 9, 11, 15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................................ 4

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002) ............................................ 6, 8, 9, 17

*Boos v. Barry*, 485 U.S. 312 (1988)................................................................................... 8

*Brandenburg v. Ohio*, 395 U.S. 444 (1969)........................................................................ 5

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................... 4

*Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188 (9th Cir. 1989) .................................... 6

*Entertainment Software Association v. Blagojevich*, 404 F. Supp. 2d 1051 (N.D. Ill.
2005) ............................................... 1, 3, 5, 7, 8, 9, 10, 11, 12, 13, 14, 15, 17, 18, 19, 21

*Entertainment Software Association v. Granholm*, 404 F. Supp. 2d 978 (E.D. Mich.
2005) ............................................................................................... 2, 13, 14, 22

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975)...................................................... 9

*Florida Star v. B.J.F.*, 491 U.S. 524 (1989)...................................................................... 15

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)........................................................... 20

*Interactive Digital Software Association v. St. Louis County*, 329 F.3d 954 (8th Cir.
2003) ......................................................................................... 1, 3, 12, 13

*James v. Meow Media*, 300 F.3d 683 (6th Cir.2002)........................................................... 7

*Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952) ......................................................... 8

*Kolender v. Lawson*, 461 U.S. 352 (1983)........................................................................ 20

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ............... 5

*McConnell v. Federal Election Commission*, 540 U.S. 93 (2003)....................................... 9

*NAACP v. Button*, 371 U.S. 415 (1963)........................................................................... 20

*Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1
(1986) .................................................................................................................. 18, 19

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ........................................ 5, 14, 15

*Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997) ......................... 20

*Riley v. National Federation of the Blind of N.C., Inc.*, 487 U.S. 781 (1988) ........... 18, 19

*Texas v. Johnson,* 491 U.S. 397 (1989) ............................................................. 8

*United States v. Playboy Entertainment Group*, 529 U.S. 803 (2000) .................. 4, 15, 17

*United States v. United Foods, Inc.*, 533 U.S. 405 (2001) ................................. 18

*Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180, 1186-88 (W.D.
Wash. 2004) ................................................................................... 2, 3, 7, 12, 22

*Video Software Dealers Association v. Schwarzenegger*, 401 F. Supp. 2d 1034 (N.D.
Cal. 2005) ............................................................................. 1, 3, 6, 9, 10, 19, 20, 22

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) .................................. 17

## STATUTES

Cal. Civ. Code § 1746 ........................................................................... *passim*

Cal. Bus. & Prof. Code § 20650 .................................................................... 17

## MISCELLANEOUS

Associated Press, *Sony to hand parents video game controls*, INT'L HERALD TRIB.,
Nov. 28, 2005, available at http://www.iht.com/articles/2005/11/28/business/
sony.php ........................................................................................................... 17

FTC, Report to Congress: Marketing Violent Entertainment to Children, (July 2004).... 17

Press Release, Indiana Univ. School of Medicine, *Self-Control May Be Affected By Violent
Media Exposure*, May 26, 2005, *available at* http://medicine.indiana.edu/news_releases/
viewRelease.php4?art=339&print=true ........................................................ 13

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs Video Software Dealers Association ("VSDA") and Entertainment Software Association ("ESA") submit this memorandum in support of their motion, pursuant to Federal Rule of Civil Procedure 56, for summary judgment invalidating Cal. Civil Code § 1746 (2005) (hereinafter, the "Act"), as an unconstitutional abridgement of speech under the First and Fourteenth Amendments, and as unconstitutionally vague under the Fourteenth Amendment.[1]

### INTRODUCTION

This Court has already granted Plaintiffs a preliminary injunction enjoining enforcement of the Act by Defendants (the "State"). *See Video Software Dealers Ass'n v. Schwarzenegger*, 401 F. Supp. 2d 1034 (N.D. Cal. 2005). The Court recognized that the Act imposes a content-based ban on expression that is protected by the First Amendment. *Id.* at 1044. The Court further held that the Act's restrictions on minors' access to such expression was subject to strict scrutiny, preliminarily concluding that Defendants were unlikely to meet their burden under that stringent level of review. *Id.* at 1044-46. As the Court noted, courts have enjoined every attempt to regulate "violent" video games. *See Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954, 960 (8th Cir. 2003) ("*IDSA*"); *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 580 (7th Cir. 2001) ("*Kendrick*"); *Entertainment Software Ass'n v. Blagojevich*, 404 F. Supp. 2d 1051, 1082 (N.D. Ill. 2005) ("*Blagojevich*"); *Entertainment Software Ass'n v. Granholm*, 404 F. Supp. 2d 978, 983 (E.D. Mich. 2005) ("*Granholm*"); *Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180, 1186-88 (W.D. Wash. 2004) ("*VSDA*").

Based on the record before the Court, and in light of this overwhelming precedent, Plaintiffs now seek summary judgment on their constitutional challenge to the Act. The Act is defended on

---

[1] Plaintiffs at this time do not move for summary judgment on their equal protection claim.

1

essentially two grounds: controlling minors' *behavior* or controlling minors' *thoughts*, all through

the restriction of their access to speech. Neither comes close to satisfying strict scrutiny. To the

extent the State seeks to justify the Act as a means to prevent minors from acting aggressively, the

law triggers – and fails to meet – the *Brandenburg* standard. To the extent the State defends the Act

as a way to curb "psychological" or "emotional" harm to minors, that rationale is nothing more than

impermissible thought control. Nor have Defendants come close to demonstrating that the Act is

narrowly tailored or that other less restrictive alternatives are unavailable.

The current record establishes the Act's constitutional infirmities, and no evidence the State

can offer will suggest that a trial might lead to another outcome. Indeed, Defendants agree that this

case can be decided on summary judgment based on the record before the Court. Further factual

development will not make the Act's content-based regulation or labeling requirements more

legitimate or more well-founded. Nor will it make the Act's unconstitutionally vague terms more

comprehensible. Because the law is clear and the material facts are not in dispute, Plaintiffs

respectfully ask the Court to grant summary judgment in their favor and permanently enjoin the Act.

## BACKGROUND

Plaintiffs are associations of companies that create, publish, distribute, sell and/or rent video

games. Andersen Decl. ¶ 3 (attached as Exh. 1 to Mem. in Support of Plaintiffs' Mot. Prelim. Inj.);

Lowenstein Decl. ¶ 2 (attached as Exh. 3 to Mem. In Support of Plaintiffs' Mot. Prelim. Inj.). In this

facial challenge, Plaintiffs also assert the rights of willing listeners. Compl. ¶ 7.

In granting a preliminary injunction, this Court has already stated that "video games . . . are . .

. protected by the First Amendment," *Schwarzenegger*, 401 F. Supp. 2d at 1044, a conclusion that has

been universally adopted by other courts. *Kendrick*, 244 F.3d at 577-78; *IDSA*, 329 F.3d at 957;

*Blagojevich*, 404 F. Supp. 2d at 1072; *VSDA*, 325 F. Supp. 2d at 1184-85. Video games are a modern

form of artistic expression. Like film and television programs, video games tell stories and entertain

2

audiences through the use of complex pictures, sounds, and text. *See* Price Decl. ¶¶ 3-4 (attached as Exh. 2 to Mem. in Support of Plaintiffs' Mot. Prelim. Inj.).

The Act imposes a civil penalty of up to $1,000 on any person who "sell[s] or rent[s] a video game that has been labeled as a violent video game to a minor." Act, § 1746.1(a). "Violent" video games are defined by the Act as those "in which the range of options available to a player includes killing, maiming, dismembering, or sexually assaulting an image of a human being," if the actions depicted meet one of two sets of criteria. Act, § 1746(d)(1). Under the first set of criteria, the violence depicted in the game must "appeal to a deviant or morbid interest of minors," be "patently offensive to prevailing standards in the community as to what is suitable for minors," and "cause[] the game, as a whole, to lack serious literary, artistic, political, or scientific value for minors." *Id.* § 1746(d)(1)(A). Under the second provision, a game will be restricted if the actions depicted enable "the player to virtually inflict serious injury upon images of human beings or characters with substantially human characteristics in a manner which is especially heinous, cruel or depraved in that it involves torture or serious physical abuse to the victim." *Id.* § 1746(d)(1)(B).

The Act's "violent" video game ban purportedly serves two purposes: "preventing violent, aggressive, and antisocial behavior" and "preventing psychological or neurological harm to minors who play violent video games." *Id.* § 1(c). Furthermore, the Act purports to make "findings" that "[e]xposing minors to depictions of violence in video games" makes them "more likely to experience feelings of aggression, to experience a reduction of activity in the frontal lobes of the brain, and to exhibit violent antisocial or aggressive behavior," and that "[e]ven minors who do not commit acts of violence suffer psychological harm from prolonged exposure to violent video games." *Id.* §§ 1(a),(b).

In addition to imposing substantial penalties on persons who sell or rent "violent" video games to minors, the Act imposes an additional, content-based burden on speech that is unsupported

3

by a compelling state interest. The Act provides that "[e]ach violent video game that is imported into or distributed in California for retail sale shall be labeled with a solid white '18' outlined in black. The '18' shall have dimensions of no less than 2 inches by 2 inches" and must be placed on the face of the video game package. Act, § 1746.2. Failure to label a "violent" video game subjects a manufacturer, distributor or importer to a $1,000 penalty. Act, § 1746.3.

Plaintiffs filed their complaint on October 17, 2005, alleging that the Act is unconstitutional under the First and Fourteenth Amendments to the United States Constitution. On October 19, 2005, Plaintiffs filed a motion seeking to preliminarily enjoin the Act, which was scheduled to take effect on January 1, 2006. This Court entered an order granting the preliminary injunction on December 23, 2005.

**ARGUMENT**

**I. STANDARD OF REVIEW.**

The State has the burden of proof at trial to establish that the Act passes First Amendment scrutiny. *See, e.g.*, *United States v. Playboy Entm't Group*, 529 U.S. 803, 816-17 (2000). Thus, to survive Plaintiffs' summary judgment motion, the State must come forward with sufficient evidence to create a genuine issue of material fact on each and every "element essential to [its] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material only if it might affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The State thus must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The State cannot meet its burden because there is no genuine dispute of fact with respect to any element of the State's case, much less all of them.

**II. THE ACT CANNOT SURVIVE STRICT SCRUTINY AND THEREFORE VIOLATES THE FIRST AMENDMENT.**

Because the Act imposes a content-based restriction on protected expression, it is subject to

4

strict scrutiny, as this Court has already held. *Schwarzenegger*, 401 F. Supp. 2d at 1044-45.[2] As a

result, the Act is "presumptively invalid," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992), and

must be struck down unless Defendants can satisfy the stringent requirements of strict scrutiny.

Plaintiffs are entitled to summary judgment because the Act fails every stage of the strict scrutiny

analysis. Strict scrutiny requires the State to demonstrate that the Act "is necessary to further a

compelling state interest." *Id.* at 403 (internal citation omitted). In making this showing, the State

cannot just simply "'posit the existence of the disease sought to be cured.'" *Blagojevich* 404 F. Supp.

2d at 1072 (quoting *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 664-65 (1994)). Instead, it

must point to "substantial evidence" supporting its claim. *Id.* Because the State's goals are

illegitimate and not supported by substantial evidence, summary judgment is warranted. *Infra*, §§

II.A; II.B; II.C. Strict scrutiny also requires the State to demonstrate that the Act is narrowly tailored

and materially advances its interests. The record is clear that the Act fails these aspects of strict

scrutiny, as well. *Infra*, § II.D.

## A. The Act Does Not Satisfy The *Brandenburg* Standard.

As noted, the Act posits two purported state interests: first, in "preventing violent, aggressive,

and antisocial behavior" among minors; and second, "preventing psychological or neurological harm

to minors who play violent video games." *Id.* § 1(c). To the extent the Defendants seek to defend the

Act on the first rationale – preventing violent or aggressive behavior, the Act must satisfy the

---

[2] The State has maintained in the past that it need not satisfy strict scrutiny under a novel new "harmful to minors" doctrine for "violent" expression. State Opp. to Prelim. Inj. at 6-10. This Court has already rejected that argument, *Schwarzenegger*, 401 F. Supp. at 1044-45. Moreover, courts have consistently refused to expand a doctrine that has always been limited to sexual obscenity into the realm of violence. *See IDSA*, 329 F.3d at 958 ("Simply put, depictions of violence cannot fall within the legal definition of obscenity for either minors or adults."); *Kendrick*, 244 F.3d at 575-76 ("The notion of forbidding . . . pictures of violence . . . is a novelty, whereas concern with pictures of graphic sexual conduct is the essence of the traditional concern with obscenity."); *VSDA*, 325 F. Supp. 2d at 1185; *see also James*, 300 F.3d at 698 ("declin[ing] to extend . . . obscenity jurisprudence to violent, instead of sexually explicit, material" in a case involving tort liability for violent video game manufacturers). There is no basis for this Court to depart from this settled line of jurisprudence.

5

1   stringent standards established by the Supreme Court in *Brandenburg v. Ohio*, 395 U.S. 444 (1969).

2   *See Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1199 (9th Cir. 1989) (efforts to restrict speech

3
    based on its "tendency to cause others to engage in undesirable acts" must meet the *Brandenburg*
4
    test). Under *Brandenburg*, the government must prove that the targeted expression "is *directed* to
5
6   inciting or producing the imminent lawless action and is *likely* to incite or produce such action."

7   *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002) (quoting *Brandenburg*, 395 U.S. at 447)

8   (emphasis added).  The State cannot, and has not even purported to make, this showing.

9       In granting the preliminary injunction, this Court stated that "[t]he Act seems to be intended

10  more to prevent harm to minors than preventing minors from engaging in real-world violence," and

11  therefore did not apply the *Brandenburg* standard.  *Schwarzenegger* 404 F. Supp. 2d. at 1045.
12
    Plaintiffs agree that if the Act is wholly unconcerned with preventing violence, and the State
13
14  completely disavows any reliance on the "preventing real-world violence" rationale, *Brandenburg*

15  may not apply.  But the language of the Act and the Defendants' arguments before this Court suggest

16  that a central focus of the Act is indeed the prevention of violence.  The Act expressly states that one

17  of its primary goals is to prevent minors from acting violently, *see* Act, § 1(a), § 1(b), and almost

18  every piece of social science research offered by the State in support of the Act purports to
19
20  demonstrate that "violent" video games cause minors to be more violent.  *See* App. to State Opp. to

21  Prelim Inj. at A014 (citing titles relied upon by the Legislature including, "Violent Video Games

22  Increase Aggression and Violence," "Violent Video Games and Aggressive Thoughts, Feelings, and

23  Behaviors," "Video Games and Aggressive Thoughts, Feelings, and Behavior in the Laboratory and

24  in Life.").  Thus, although the State has ostensibly disclaimed the goal of violence-prevention in

25  favor of a "harm to minors" rationale, the evidence on which the State relies belie its denials.

26  *Compare* State Opp. to Prelim. Inj. at 8 (*Brandenburg* is . . . not applicable) *with id*. at 13 (relying on
27
28  supposed finding that "[c]orrelational studies reveal a linkage to serious, real-world types of

6

aggression") *and id.* at 14 (relying on supposed finding that "[a]dolescents who expose themselves to greater amount of video game violence were more hostile").

Therefore, to the extent the Defendants continue to rely on evidence supposedly linking video games to violence, *Brandenburg* applies. The State has no conceivable basis for arguing that it has satisfied the *Brandenburg* standard, and indeed, the State has not even tried to do so. There is no evidence in record that video games, which serve to entertain, are intended to cause violence. Nor is there a scintilla of evidence even suggesting that video games, played by millions daily, are likely to cause imminent violence. As *Blagojevich* put it when considering the same body of evidence relied upon by the State here: "Defendants have come nowhere near making the necessary showing in this case" to satisfy *Brandenburg*. *Blagojevich*, 404 F. Supp. at 1073; *see also VSDA*, 325 F. Supp. 2d 1180, 1185 n.3; *cf. James v. Meow Media*, 300 F.3d 683, 690 (6th Cir.2002) (applying *Brandenburg* where plaintiff sought to impose liability on video game maker in tort context). This is hardly surprising, given that the research the State relies upon is concerned with the "glacial process of personality development," rather than the "temporal imminen[ce] that we have required to satisfy the Brandenburg test." *James*, 300 F.3d at 698. For these reasons, the Act must be enjoined as an impermissible regulation of expression undertaken in the name of preventing violence.

## B. The First Amendment Forbids The State From Censoring Speech In Order To Control Minors' Thoughts Or Feelings.

Turning to the second proffered justification—preventing "psychological or neurological harm to minors who play violent video games"—the State faces two problems. First, as just discussed, the evidence on which the State relies is a collection of social science that is almost exclusively concerned with the prevention of actual aggression . The State cannot have it both ways. Either the State *is* attempting to prevent minors from behaving aggressively based on its belief that "violent" video game expression causes such behavior, in which case it must satisfy *Brandenburg*, or the State is *not* trying to achieve that purpose, in which case the "aggression" studies on which it primarily

7

relies are irrelevant and do not establish a compelling state interest.

Second, to the extent the State's purported "compelling" interest in protecting against "psychological and neurological harm" to minors is anything more than a repackaging of the "preventing real-life" violence rationale, it amounts to an entirely illegitimate effort to restrict access to expression based on consumers' anticipated "psychological" reaction to that content. Such a rationale is not a legitimate state interest, let alone a compelling one. *See Blagojevich*, 404 F. Supp. 2d at 1074 ([T]the State lacks the authority to ban protected speech on the ground that it affects the listener's or observer's thoughts and attitudes.").

The government "cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts." *Free Speech Coalition*, 535 U.S. at 253 (quoting *Stanley v. Georgia*, 394 U.S. 557, 566 (1969)). Whether the State describes its remaining interest as preventing "asocial" attitudes or fine-tuning minors' "psychology," the First Amendment generally does not allow the State to ban speech based on how listeners will react to it. *See Boos v. Barry*, 485 U.S. 312, 321 (1988) (O'Connor, J., joined by Stevens & Scalia, JJ.) (striking ban on picketing near embassies where purpose was to protect the emotions of those who reacted to the picket signs' message); *Texas v. Johnson*, 491 U.S. 397, 408-09 (1989) (interest in protecting bystanders from feeling offended or angry is not sufficient to justify ban on expression).

Expressive works like video games, film or literature certainly "may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952). But with the exception of speech that is intended and likely to incite imminent violence, the State has *no* legitimate interest in censoring protected speech simply because it believes that it could lead to disfavored attitudes on the part of the listener. To the contrary, "First Amendment freedoms are most in danger

8