# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

ENTERTAINMENT SOFTWARE
ASSOCIATION, VIDEO SOFTWARE
DEALERS ASSOCIATION, and
MICHIGAN RETAILERS
ASSOCIATION,

        Plaintiffs,

vs.

JENNIFER M. GRANHOLM, in her
official capacity as Governor of the State
of Michigan; MICHAEL A. COX, in his
official capacity as Attorney General of
the State of Michigan; and KYM L.
WORTHY in her official capacity as
Wayne County Prosecuting Attorney,

        Defendants.
_____/

Case No: 05-73634

Hon. George Caram Steeh

Magistrate Judge Steven D. Pepe

**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

BODMAN LLP
By:   Dennis J. Levasseur (P39778)
       Alicia J. Blumenfeld (P67511)
100 Renaissance Center, 34th Floor
Detroit, Michigan 48243
Telephone: (313) 259-7777
Fax: (313) 393-7579

    and

JENNER & BLOCK LLP
By:   Paul M. Smith
       Katherine A. Fallow
       Kathleen R. Hartnett
       Amy L. Tenney
601 Thirteenth Street, N.W., Suite 1200
Washington, DC 20005
Telephone: (202) 639-6000
Fax: (202) 639-6066
Attorneys for Plaintiffs
_____/

September 26, 2005

## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs Entertainment Software Association, Video Software Dealers Association, and Michigan Retailers Association (collectively, "Plaintiffs") respectfully move for a preliminary injunction preventing Defendants and their officers, employees, and representatives from enforcing 2005 Public Act 108 (Mich. 2005) (hereinafter, the "Act").

In support of this Motion, Plaintiffs state as follows:

1. The Act was signed into law on September 14, 2005, and is due to take effect on December 1, 2005. The Act places civil and criminal penalties on the sale, rental and viewing of "ultra-violent explicit video games" to individuals under age 17 and imposes other burdens on the expression of consumers, video game retailers, and video game creators.

2. Plaintiffs are associations of companies that create, publish, distribute, sell, and/or rent video games. On September 21, 2005, Plaintiffs filed a five-count Complaint seeking to invalidate the Act under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. As set forth in each count of the Complaint, the Act is unlawful because it violates Plaintiffs' constitutionally guaranteed rights to freedom of expression, equal protection, and due process, and because it is unconstitutionally vague.

3. Plaintiffs are entitled to a preliminary injunction because they are likely to succeed on the merits of their constitutional challenge to the Act, and because the equities weigh strongly against enforcement of the Act. Similar attempts to place legal burdens on "violent" video games have been invalidated on First Amendment grounds by *every* federal court to have reached the question. *See James v. Meow Media, Inc.*, 300 F.3d 683, 696 (6th Cir. 2002) (attempted tort liability); *Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954,

957 (8th Cir. 2003) ("*IDSA*") (ban on "violent" games"); *American Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 579 (7th Cir. 2001) (Posner, J.) ("*AAMA*"); *Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180, 1184-85 (W.D. Wash. 2004) ("*VSDA*") (same); *Sanders v. Acclaim Entm't, Inc.*, 188 F. Supp. 2d 1264, 1279 (D. Colo. 2002) (attempted tort liability); *Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167, 181 (D. Conn. 2002) (same).

4. The Act, which restricts speech in order to prevent "real-life" violent acts, cannot meet the standards of *Brandenburg v. Ohio*, 395 U.S. 444 (1969). *See James*, 300 F.3d at 698. The State cannot show that video games, which are played safely by millions, are "directed at," and "likely to," produced "imminent" violence or lawless action. The Act's restrictions on "ultra-violent explicit video games" also fail strict scrutiny, because they are unsupported by a compelling state interest that is materially advanced by narrowly tailored means. In addition, the Act is unconstitutionally vague and fails to provide guidance on the types of types of speech and actions it prohibits.

5. The equities weigh strongly in favor of an injunction. Plaintiffs and their members will suffer irreparable harm if the Act is allowed to go into effect, because the loss of First Amendment freedoms, for any amount of time, constitutes irreparable injury. The First Amendment rights of members of the public will be similarly impaired.

6. In support of this Motion, Plaintiffs are submitting a memorandum of law, declarations detailing the Act's chilling effect on protected expression, and copies of sample video games that might be impermissibly censored under the Act.

7. Pursuant to E.D. Mich. LR 7.1, Plaintiffs' counsel sought concurrence in the relief requested in this motion. Concurrence was denied.

WHEREFORE, Plaintiffs request that this Court enter a preliminary injunction enjoining all Defendants to this action, and their officers, employees, and representatives, from enforcing, or directing the enforcement of 2005 Public Act 108 (Mich. 2005) until resolution of this action or further order of this Court.

Respectfully Submitted,

BODMAN LLP

/s/ Alicia J. Blumenfeld
By:   Dennis J. Levasseur (P39778)
      Alicia J. Blumenfeld (P67511)
100 Renaissance Center, 34th Floor
Detroit, Michigan 48243
Telephone: (313) 259-7777
Fax: (313) 393-7579
dlevasseur@bodmanllp.com
ablumenfeld@bodmanllp.com

JENNER & BLOCK LLP
By:   Paul M. Smith
      Katherine A. Fallow
      Kathleen R. Hartnett
      Amy L. Tenney
601 Thirteenth Street, N.W., Suite 1200
Washington, D.C. 20005
Telephone: (202) 639-6000
Fax: (202) 639-6066

September 26, 2005

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ENTERTAINMENT SOFTWARE ASSOCIATION, VIDEO SOFTWARE DEALERS ASSOCIATION, and MICHIGAN RETAILERS ASSOCIATION,<br><br>        Plaintiffs,<br><br>vs.<br><br>JENNIFER M. GRANHOLM, in her official capacity as Governor of the State of Michigan; MICHAEL A. COX, in his official capacity as Attorney General of the State of Michigan; and KYM L. WORTHY in her official capacity as Wayne County Prosecuting Attorney,<br><br>        Defendants. | Case No: 05-73634<br><br>Hon. George Caram Steeh<br><br>Magistrate Judge Steven D. Pepe |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

BODMAN LLP
By:   Dennis J. Levasseur (P39778)
        Alicia J. Blumenfeld (P67511)
100 Renaissance Center, 34th Floor
Detroit, Michigan 48243
Telephone: (313) 259-7777
Fax: (313) 393-7579
    and
JENNER & BLOCK LLP
By:   Paul M. Smith
        Katherine A. Fallow
        Kathleen R. Hartnett
        Amy L. Tenney
601 Thirteenth Street, N.W., Suite 1200
Washington, DC 20005
Telephone: (202) 639-6000
Fax: (202) 639-6066
Attorneys for Plaintiffs

September 26, 2005

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND .................................................................................................. 2

   A. The Nature Of Video Games. ........................................................................................ 2

   B. The Video Game Industry's Well-Established Voluntary Rating System ..................... 3

   C. The Challenged Statute. ................................................................................................. 4

       1. The "Violent" Video Game Ban. ............................................................................. 4

ARGUMENT ........................................................................................................................... 5

I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS, GIVEN THE ACT'S SWEEPING CONTENT-BASED INVASION OF FIRST AMENDMENT RIGHTS AND UNCONSTITUTIONAL VAGUENESS. ............................. 6

   A. Video Games Depicting Violence Are Fully Protected By The First Amendment. ..... 6

   B. The Act's "Violent" Video Game Restrictions Fail The *Brandenburg* Standard ........ 7

   C. The Act's Content-Based Restrictions Fail Strict Scrutiny. .......................................... 9

       1. The State Has No Legitimate, Much Less Compelling, Interest In Controlling Minors' Thoughts Or Feelings. ........................................................................... 10

       2. The Act Does Not Materially Advance The State's Interests And Is Not Narrowly Tailored. ............................................................................................... 12

       3. The Affirmative Defenses Do Not Cure The Act's Constitutional Infirmities ..... 14

   D. The Act Is Unconstitutionally Vague. ......................................................................... 16

II. THE EQUITIES STRONGLY SUPPORT AN INJUNCTION. ...................................... 19

CONCLUSION ...................................................................................................................... 20

# TABLE OF AUTHORITIES

## CASES

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996) .................................................... 13

*American Amusement Machine Ass'n v. Kendrick*, 244 F.3d 572 (7th Cir. 2001) .................................................................................. 1, 2, 5, 6, 8, 9, 11, 12, 13, 18

*American Booksellers Ass'n v. Hudnut*, 771 F.2d 323 (7th Cir. 1985), *aff'd*, 475 U.S. 1001 (1986) ............................................................................................................ 9

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) .................................................... 7, 8, 11

*Boos v. Barry*, 485 U.S. 312 (1988) ............................................................................... 10-11

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) .................................................................... 7

*Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942) .................................................... 8

*Connection Distributing Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998) .................................. 2, 5, 19

*Dixie Fuel Co. v. Commissioner of Social Security*, 171 F.3d 1052 (6th Cir. 1999) ................ 5

*Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188 (9th Cir. 1989) .................................. 9

*Eclipse Enterprises, Inc. v. Gulotta*, 134 F.3d 63 (2d Cir. 1997) .................................... 6

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975) .................................................. 11

*Florida Star v. B.J.F.*, 491 U.S. 524 (1989) .................................................................... 12

*Ginsberg v. New York*, 390 U.S. 629 (1968) .................................................................. 11-12

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ....................................................... 16

*Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954 (8th Cir. 2003) ............................................................................................... 1, 2, 5, 6, 8, 9, 12

*James v. Meow Media, Inc.*, 300 F.3d 683 (6th Cir. 2002) ........................................... 1, 6, 7, 8, 9, 12

*Joelner v. Village of Washington Park*, 378 F.3d 613 (7th Cir. 2004) ............................. 20

*Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952) .................................................... 11

*Kolender v. Lawson*, 461 U.S. 352 (1983) ..................................................................... 16

*McConnell v. Federal Election Commission*, 540 U.S. 93 (2003) ................................................. 11

*Miller v. California*, 413 U.S. 15 (1973) ............................................................................................ 12

*NAACP v. Button*, 371 U.S. 415 (1963) ............................................................................................ 16

*National People's Action v. Village of Wilmette*, 914 F.2d 1008 (7th Cir. 1990) ......................... 19

*Ohio ex rel. Celebrezze v. Nuclear Regulatory Commission*, 812 F.2d 288 (6th Cir. 1987) ......... 19

*Potter v. State*, 509 P.2d 933 (Okla. Crim. App. 1973) ................................................................... 15

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ......................................................................... 9, 10

*Reno v. ACLU*, 521 U.S. 844 (1997) ............................................................................................ 14, 16

*Sanders v. Acclaim Entertainment, Inc.*, 188 F. Supp. 2d 1264 (D. Colo. 2002) ......................... 1-2

*Simon & Schuster, Inc. v. Members of the New York State Crime Victims Board*, 502 U.S. 105 (1991) ........................................................................................................................... 10

*State v. Watkins*, 191 S.E.2d 135 (S.C. 1972), *vacated and remanded on other grounds*, 413 U.S. 905 (1973) .................................................................................................................... 15

*Texas v. Johnson*, 491 U.S. 397 (1989) .................................................................................... 1, 8, 11

*Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969) ................ 11

*Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994) ..................................... 10, 12, 13

*United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Authority*, 163 F.3d 341 (6th Cir. 1998) ................................................................... 19

*United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000) ............................ 10, 13

*Video Software Dealers Ass'n v. Webster*, 773 F. Supp. 1275 (W.D. Mo. 1991), *aff'd*, 968 F.2d 684 (8th Cir. 1992) .................................................................................................. 18

*Video Software Dealers Ass'n v. Webster*, 968 F.2d 684 (8th Cir. 1992) .................................... 17

*Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180 (W.D. Wash. 2004) ........................................................................................... 1, 2, 5, 6, 8, 9, 10, 12, 13, 18

*Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167 (D. Conn. 2002) ............................................ 2

*Winters v. New York*, 333 U.S. 507 (1948).................................................................................7

## INTRODUCTION

Plaintiffs Entertainment Software Association ("ESA"), Video Software Dealers Association ("VSDA"), and Michigan Retailers Association ("MRA") submit this memorandum in support of their motion, pursuant to Federal Rule of Civil Procedure 65, for a preliminary injunction preventing Defendants and their officers, employees, and representatives from enforcing 2005 Public Act 108 (Mich. 2005) (hereinafter, the "Act"). The Act was signed into law on September 14, 2005, and is due to take effect on December 1, 2005.

Plaintiffs are entitled to a preliminary injunction under controlling legal principles. Michigan's sweeping legislation places civil and criminal penalties on the dissemination or display of "ultra-violent explicit" video games to individuals under age 17, and imposes other burdens on the expression of consumers, video game retailers, and video game creators. Such content discrimination violates the "bedrock principle underlying the First Amendment . . . that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

The Act violates this "bedrock principle," and under controlling law Plaintiffs are likely to succeed on their constitutional claims. The Sixth Circuit – along with the Seventh and Eighth Circuits, and other federal district courts – has held that the First Amendment precludes attempts to impose legal burdens based on the expressive content of video games. *James v. Meow Media, Inc.*, 300 F.3d 683, 696 (6th Cir. 2002) (rejecting attempt to impose tort liability on makers of "violent" video games); *Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954, 957 (8th Cir. 2003) ("*IDSA*") (holding that video games are protected by the First Amendment, and striking ban on "violent video games"); *American Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 579 (7th Cir. 2001) (Posner, J.) ("*AAMA*") (same); *Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180, 1184-85 (W.D. Wash. 2004) ("*VSDA*") (same); *Sanders v.*

*Acclaim Entm't, Inc.*, 188 F. Supp. 2d 1264, 1279 (D. Colo. 2002) (rejecting attempted tort liability); *Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167, 181 (D. Conn. 2002) (same). Indeed, every previous government attempt to restrict the dissemination of "violent" video games has been invalidated on First Amendment grounds. *IDSA*, 329 F.3d at 957; *AAMA*, 244 F.3d at 579; *VSDA*, 325 F. Supp. 2d at 1184-85.

Not only are Plaintiffs likely to prevail on their claims, but the equities also weigh strongly in favor of an injunction. *See, e.g., AAMA*, 244 F.3d at 580. As the Sixth Circuit has recognized, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)). Plaintiffs will undoubtedly suffer irreparable harm if the Act is allowed to go into effect. The First Amendment rights of members of the public — whose rights are also at stake in this facial challenge — will be similarly impaired. Accordingly, the Act should be enjoined.

## FACTUAL BACKGROUND

### A.   The Nature Of Video Games.

Plaintiffs are associations of companies that create, publish, distribute, sell, and/or rent video games. Compl. ¶¶ 9-11. The Act, if allowed to go into effect, will result in censorship and limit the distribution of some of these creative works, based solely upon their expressive content. *Id.* ¶ 13. In this facial challenge, Plaintiffs also assert the rights of willing listeners. *Id.* ¶ 14.

Video games are a modern form of artistic expression. Like motion pictures and television programs, video games tell stories and entertain audiences through the use of complex

pictures, sounds, and text. *See* Price Decl. ¶¶ 3-4.[1] These games often contain storylines and character development as richly detailed as (and sometimes based on) books and movies. *Id.* ¶¶ 3-4, 20. Like great literature, these games often involve themes such as good versus evil, triumph over adversity, struggle against corrupt powers, and quest for adventure. *Id.* ¶¶ 4, 18-61.

B.  **The Video Game Industry's Well-Established Voluntary Rating System.**

Like other popular media, such as motion pictures, television, and music, the video game industry has adopted a voluntary and widely used rating system for video games. *See* Lowenstein Decl. ¶¶ 4-10. That system — which the FTC has called the "most comprehensive" of industry-wide media rating systems — is implemented by the Entertainment Software Rating Board ("ESRB"), a self-regulatory body that assigns independent ratings and descriptions for video game content. *Id.* ¶¶ 5-6. The purpose of the ESRB system is to provide easily understood information about games to consumers and parents — not to dictate what is ultimately appropriate for individuals of different ages. *Id.* ¶ 7. Like the movie rating system, the ESRB system is entirely voluntary; nonetheless, essentially all video game publishers submit their games for rating. *Id.* ¶ 6. Similarly, video game retailers throughout the nation are part of a widespread and voluntary effort to educate consumers about the ESRB system and to restrict the sale of "M" games to individuals under age 17. *See* Andersen Decl. ¶ 15.

---

[1] In support of their Motion, Plaintiffs are submitting the Declaration of Ted Price ("Price Decl."), President and CEO of Insomniac Games, Inc.; Declaration of Crossan R. Andersen ("Andersen Decl."), President of Plaintiff VSDA; and Declaration of Douglas Lowenstein ("Lowenstein Decl."), President of Plaintiff ESA. Plaintiffs are also submitting copies of video games that may be deemed to be covered by the Act's restrictions, along with taped recordings of representative play of those games. These materials are contained in a separate appendix.

C.    The Challenged Statute.

   1.   The "Violent" Video Game Ban.

The Act makes it a state civil infraction for a person to "knowingly disseminate to a minor an ultra-violent explicit video game that is harmful to minors." Act, pt. II, § 17. A person who violates this provision is liable for a civil fine ranging from $5,000 to $40,000, depending on the number of violations. Id. The Act also provides misdemeanor criminal penalties of up to 93 days in prison, a fine of $25,000, or both, for store managers who permit a minor to "play or view the playing" of a prohibited video game. Id. § 20. "Ultra-violent explicit video games" under the Act are those that "continually and repetitively depict[] extreme and loathsome violence." Id. § 16(l). "Extreme and loathsome violence" is defined as "real or simulated graphic depictions of physical injuries or physical violence against parties who realistically appear to be human beings, including actions causing death, inflicting cruelty, dismemberment, decapitation, maiming, disfigurement, or other mutilation of body parts, murder, criminal sexual conduct, or torture." Id. § 16(g). An "ultra-violent explicit video game" is "harmful to minors" under the Act if it has all the following characteristics:

> (i) Considered as a whole, appeals to the morbid interest in asocial, aggressive behavior of minors as determined by contemporary local community standards.
>
> (ii) Is patently offensive to contemporary local community standards of adults as to what is suitable for minors.
>
> (iii) Considered as a whole, lacks serious literary, artistic, political, education, or scientific value for minors.

Id. § 16(h).

The Act stated purposes for its restrictions on "ultra-violent explicit" video games are: "safeguarding both the physical and psychological well-being of minors," "preventing violent, aggressive and asocial behavior from manifesting itself in minors," and "directly and

4

substantially alleviating the real-life harms perpetrated by minors who play ultra-violent explicit video games." Act, pt. II, §§ 15(e), (f), (g). The Act purports to make "findings" that "minors who play ultra-violent explicit video games are consistently more likely to exhibit violent, asocial, or aggressive behavior and have feelings of aggression" and that "the effects of media violence on minors 'are measurable and long-lasting.'" *Id.* §§ 15(a), (b).

## ARGUMENT

In determining whether to issue a preliminary injunction, "a district court considers four factors: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction upon the public interest." *Dixie Fuel Co. v. Commissioner of Soc. Sec.*, 171 F.3d 1052, 1059-60 (6th Cir. 1999). "None of these factors, standing alone, is a prerequisite to relief; rather, the court should balance them." *Connection Distrib. Co.*, 154 F.3d at 288 (quotation marks omitted). Because a First Amendment violation "unquestionably constitutes irreparable injury," the likelihood of success on the merits "often will be the determinative factor." *Id.*

Plaintiffs easily satisfy this standard. Indeed, other courts have already entered preliminary and permanent injunctions in challenges to materially identical bans on distribution of "violent" video games. *See AAMA*, 244 F.3d at 580 (noting a "strong likelihood of ultimate victory," irreparable harm to the plaintiffs if the law were allowed to go into effect, and "the entirely conjectural nature of the benefits of the ordinance to the people of Indianapolis"); *IDSA*, 329 F.3d at 960; *VSDA*, 325 F. Supp. 2d at 1191.

I.  **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS, GIVEN THE ACT'S SWEEPING CONTENT-BASED INVASION OF FIRST AMENDMENT RIGHTS AND UNCONSTITUTIONAL VAGUENESS.**

   A.  **Video Games Depicting Violence Are Fully Protected By The First Amendment.**

The Sixth Circuit, along with several other federal courts, has held that video games constitute expression protected by the First Amendment. *James*, 300 F.3d at 695-96; *AAMA*, 244 F.3d at 577-78 (explaining that the court had "little difficulty" concluding that the First Amendment protects the communicative aspects of video games); *IDSA*, 329 F.3d at 958 (video games "'are as much entitled to the protection of free speech as the best of literature'") (quoting *Winters v. New York*, 333 U.S. 507, 510 (1948)); *VSDA*, 325 F. Supp. 2d at 1184-85 (video games "are expressive and qualify for the protections of the First Amendment"). Indeed, video games convey "age-old themes of literature," messages, and ideologies, "just as books and movies do." *AAMA*, 244 F.3d at 577-78. Moreover, the Act's content-based restrictions themselves demonstrate that the targeted games constitute protected expression, because "it is the nature and effect of the message being communicated by these video games which prompted the state to act in this sphere." *VSDA*, 325 F. Supp. 2d at 1184; *see also James*, 300 F.3d at 695 (because plaintiffs were seeking to impose liability based on expressive aspects of video games, tort lawsuit raised "significant constitutional problems under the First Amendment.").

That the Act restricts depictions of violence makes no difference as a matter of First Amendment scrutiny. Depictions of violence are entitled to full constitutional protection. *See AAMA*, 244 F.3d at 575-76 ("The notion of forbidding not violence itself, but pictures of violence, is a novelty"); *IDSA*, 329 F.3d at 958 (strict scrutiny applies to content-based restrictions on "violent" video games); *VSDA*, 325 F. Supp. 2d at 1186 (same); *Eclipse Enters., Inc. v. Gulotta*, 134 F.3d 63, 66 (2d Cir. 1997) (declining to "expand the[] narrow categories of

[unprotected] speech to include depictions of violence" in trading cards). Indeed, in the context of "violent" magazines, characterized by the state as "massing" "bloodshed" and "crime," the Supreme Court has stated that violent expression is "as much entitled to the protection of free speech as the best of literature." *Winters v. New York*, 333 U.S. 507, 510 (1948).

### B. The Act's "Violent" Video Game Restrictions Fail The *Brandenburg* Standard.

The Act restricts video games based on the Legislature's belief that video games cause violence, and the Act's central purpose is to prevent the "real-life harms" supposedly caused by "violent" video games. *See* Act, pt. II, §§ 15(f), (g) (asserting that the State has a "legitimate and compelling interest in preventing violent, aggressive, and asocial behavior from manifesting itself in minors," and "substantially alleviating the real-life harms perpetrated by minors who play ultra-violent explicit video games."). In support of its restrictions, the Act cites unidentified studies "'point[ing] overwhelmingly to a causal connection between media violence and aggressive behavior in some children.'" *Id.* § 15(b); *see id.* § 15(a).

Any effort to justify the Act on the theory that disfavored content in video games will cause some players to act violently must meet the stringent standards of *Brandenburg v. Ohio*, 395 U.S. 444 (1969). *See James*, 300 F.3d at 698 ("In protecting against the propensity of expression to cause violence, states may only regulate that speech" that meets the *Brandenburg* standard). As the Sixth Circuit has explained, "[f]ederal courts . . . have generally demanded that all expression, advocacy or not, meet the *Brandenburg* test before its regulation for its tendency to incite violence is permitted." *Id.* at 699. Under *Brandenburg*, the government must prove that the targeted expression "'is *directed to* inciting or producing *imminent* lawless action and is *likely* to incite or produce such action.'" *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002) (quoting *Brandenburg*, 395 U.S. at 447) (emphasis added); *James*, 300 F.3d at 698. As the

7

Supreme Court has explained, "the mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Free Speech Coalition*, 535 U.S. at 253; *cf. Texas v. Johnson*, 491 U.S. at 408-09 ("fighting words" doctrine applies only to speech likely to provoke immediate breach of peace); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) (same). Thus, the government may not punish speakers based solely on a prediction or suspicion that their words will tend, in the aggregate, to encourage undesired behavior.

Yet that is exactly what the Act purports to do. It regulates speech ostensibly based on the Michigan Legislature's conclusory "findings" that "minors who play ultra-violent explicit video games are consistently more likely to exhibit violent, asocial, or aggressive behavior and have feelings of aggression." Act, pt. II, § 15(a). Even assuming that such findings were based on any reliable evidence,[2] which they are not, the State would fail to meet the *Brandenburg* standard based on such aggregate effects. First, as the Sixth Circuit has observed, video games, designed for entertainment, are not "directed" to inciting violence. *See, e.g., James*, 300 F.3d at 698 (video game makers do not "'intend' to produce violent actions by the consumers, as required by the *Brandenburg* test"). Second, the purported basis for the Act – that long-term exposure to "violent" video games increases violent or aggressive behavior in some small

---

[2] The Act's citation to "published research" as support for its cursory conclusions about the effects of "violent" games on minors' real-world violent behavior ignores a substantial body of conflicting evidence that contradicts those conclusions. Indeed, every court considering the issue has concluded that the research fails to establish any causal link between exposure to such games and subsequent harm to anyone. *See IDSA*, 329 F.3d at 959 (finding law lacking "the 'substantial supporting evidence' of harm that is required before an ordinance that threatens protected speech can be upheld"); *AAMA*, 244 F.3d at 578-79 (scientific studies "do not support" the regulation of "violent" video games, because these studies "do not find that video games have ever caused anyone to commit a violent act"); *VSDA*, 325 F. Supp. 2d at 1188 (finding that "the current state of the research cannot support the . . . Act because there has been no showing that exposure to video games . . . is likely to lead to actual violence"). But even accepting the Legislature's purported "findings" – that video games lead to "violent, asocial, or aggressive behavior" by minors – they would not demonstrate the level of "imminence" required by the *Brandenburg* standard. *See, e.g., James*, 300 F.3d at 698.

percentage of at-risk persons – falls far short establishing a risk of "imminent" violence. Considering a similar argument in *James*, the Sixth Circuit held that the "glacial process of personality development" allegedly affected by "violent" video games "is far from the temporal imminence that we have required to satisfy the *Brandenburg* test." *Id.* Finally, as in *James*, there is absolutely no finding by the Legislature that video games, which are played safely every day by millions, are "likely" to produce "imminent" violence. *Id.* at 699; *see also AAMA*, 244 F.3d at 575.

Therefore, because the Act fails to meet the strict standards of *Brandenburg*, it cannot be sustained under the First Amendment as a measure designed to reduce violent behavior in society. *James*, 300 F.3d at 698-99; *cf. Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1199-1200 & n.8 (9th Cir. 1989) (holding that the "causal relationship between pornographic materials and violent actions is ambiguous and unvalidated," and therefore does not establish a "clear and present danger" under First Amendment jurisprudence); *American Booksellers Ass'n v. Hudnut*, 771 F.2d 323, 329-30 (7th Cir. 1985), *aff'd*, 475 U.S. 1001 (1986) (speech that *might* increase violence toward women cannot be restricted where the dangers are not immediate).

C.   **The Act's Content-Based Restrictions Fail Strict Scrutiny.**

To the extent that the Legislature articulated some purpose for the Act going beyond a supposed reduction in violent behavior, such additional justifications also fail constitutional scrutiny. Because the Act restricts access to expression based on its content, it is subject to the most exacting First Amendment scrutiny. *See IDSA*, 329 F.3d at 958 ("Because the ordinance regulates video games based on their content . . . we review it according to a strict scrutiny standard."); *VSDA*, 325 F. Supp. 2d at 1186. Such content-based regulation of expression is "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). "It is rare that a

9

regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 818 (2000).

Under the strict scrutiny standard, the State must (1) articulate a compelling state interest; (2) prove that the Act actually serves that interest and is "necessary" to do so; and (3) show that the Act is narrowly tailored to serve that interest. *R.A.V.*, 505 U.S. at 395; *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664-65 (1994); *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991). The legislature's judgments are not to be accepted without question; rather, the legislature must have "drawn reasonable inferences based on substantial evidence." *Turner*, 512 U.S. at 666; *see also, e.g.*, *VSDA*, 325 F. Supp. 2d at 1187-88. Moreover, the State "must do more than simply 'posit the existence of the disease sought to be cured.' It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner*, 512 U.S. at 664 (citation omitted). The State cannot satisfy its burden of establishing any of the prongs of the strict scrutiny standard.

### 1. The State Has No Legitimate, Much Less Compelling, Interest In Controlling Minors' Thoughts Or Feelings.

The Act includes a finding that "violent" video games cause minors to "have feelings of aggression," and posits a "legitimate and compelling" state interest in protecting the "psychological well-being of minors." Act, pt. II, §§ 15(a), (e). Even assuming that this justification is anything more than a repackaging of the "preventing real-life" violence rationale, it still amounts to an illegitimate effort to restrict access to expression based on consumers' anticipated "psychological" reaction to that content. The First Amendment forbids governmental restrictions on speech based on the provocative or persuasive effect of that speech on its audience. *See Boos v. Barry*, 485 U.S. 312, 321 (1988) (O'Connor, J., joined by Stevens &