Video Software Dealers Association et al v. Schwarzenegger et al — Doc. 123 Att. 5
Case 5:05-cv-04188-RMW   Document 123-6   Filed 09/28/2007   Page 1 of 20
Case 2:05-cv-73634-GCS-SDP   Document 9   Filed 09/26/2005   Page 20 of 30

Scalia, JJ.) (striking ban on picketing near embassies where purpose was to protect the emotions of those who reacted to the picket signs' message); *Texas v. Johnson*, 491 U.S. at 408-09 (interest in protecting bystanders from feeling offended or angry is not sufficient to justify ban on expression). An effort by the State to censor speech in order to promote citizens' "well-being" amounts to nothing more than improper thought control. As the Supreme Court has noted, "First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end." *Free Speech Coalition*, 535 U.S. at 253.

Like adults, minors have a First Amendment right to be free from content-based governmental regulation of the speech they utter or receive. *See, e.g., McConnell v. Federal Election Comm'n*, 540 U.S. 93, 231 (2003) ("Minors enjoy the protection of the First Amendment"); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 (1975); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506-07, 511 (1969). The government does not have a generalized power to limit minors' exposure to creative works based on a belief that they may be psychologically harmful. Such works "may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952).[3] Thus, the State simply may not restrict protected expression merely because it dislikes the way that expression shapes individuals' thoughts and attitudes.

The Act nevertheless cloaks its speech restrictions in "harmful to minors" language, in an effort to exploit the narrow subset of sexually explicit speech that the Supreme Court has held the government may regulate consistent with the First Amendment. *See, e.g., Ginsberg v. New*

---

[3] As Judge Posner has explained, there is a serious "danger of allowing government to control the access of children to information and opinion," as "[p]eople are unlikely to become well-functioning, independent-minded adults and responsible citizens if they are raised in an intellectual bubble." *AAMA*, 244 F.3d at 577.

11

*York*, 390 U.S. 629, 636-43 (1968) (permitting relaxed "harmful to minors" regulation of certain explicit sexual expression). But the "harmful to minors" category of speech is limited to sexual materials and has no application to the "violent" material that the State seeks to regulate here. Indeed, the Sixth Circuit – along with other courts – has expressly "decline[d] to extend [its] obscenity jurisprudence to violent, instead of sexually explicit, material." *James*, 300 F.3d at 698; *see also IDSA*, 329 F.3d at 958 ("[D]epictions of violence cannot fall within the legal definition of obscenity for either minors or adults."); *AAMA*, 244 F.3d at 578-79 (concerns underlying *Ginsberg* do not apply with respect to "violent" video games); *VSDA*, 325 F. Supp. 2d at 1185 (explaining that *Ginsberg* is limited to sexually explicit expression); *cf. Miller v. California*, 413 U.S. 15, 24 (1973) ("[W]e now confine the permissible scope of [regulation of obscene materials] to works which depict or describe sexual conduct.").

        2.    **The Act Does Not Materially Advance The State's Interests And Is Not Narrowly Tailored.**

Even assuming that the State's justifications for the Act were not facially illegitimate and unsupported by evidence, the Act would still fail First Amendment scrutiny. First, the State would have to demonstrate that the Act's restrictions actually and materially address the alleged government interests. *See, e.g., Turner*, 512 U.S. at 664-65; *VSDA*, 325 F. Supp. 2d at 1189. Here, the fact that the State has singled out video games — even though a wide range of media make comparable violent expression available to minors — is strong evidence that the Act fails to advance the State's interests. *See, e.g., Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989) (the "facial underinclusiveness" of a regulation undermines the claim that the regulation serves its alleged interests); *VSDA*, 325 F. Supp. 2d at 1189 (explaining that "the Act is too narrow in that it will have no effect on the many other channels through which violent representations are

12

presented to children").[4] "Violent" video games "are a tiny fraction of the media violence to which modern American children are exposed." *AAMA*, 244 F.3d at 579. But the Act leaves these other media unaffected. Under the Act, for example, a minor could be legally barred from buying or renting an "M"-rated video game containing "violent" content, but that same minor could legally buy or rent the movie and book on which the video game was based. *See, e.g.*, Price Decl. ¶¶ 4 (noting that the "M"-rated game *Tom Clancy's Rainbow Six 3* is based on writer Tom Clancy's highly successful novels).

Moreover, the Act fails strict scrutiny because it is not narrowly tailored. The narrow tailoring requirement requires the State to prove that "a plausible, less restrictive alternative" to banning such games "will be ineffective to achieve its goals." *Playboy*, 529 U.S. at 816. The State cannot make such a showing here, where such alternative exists, including encouraging awareness of the voluntary ESRB video game rating system, which provides guidance to parents and other consumers. *See generally* Lowenstein Decl.; *Playboy*, 529 U.S. at 824 ("A court should not assume a plausible, less restrictive alternative would be ineffective; and a court should not presume parents, given full information, will fail to act."); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507-08 (1996) (plurality op.) (striking down ban on advertising alcohol prices because of less restrictive alternatives, such as an "educational campaign" or "counterspeech"). The State cannot meet its burden of demonstrating the absence of less restrictive alternatives where it declined Plaintiffs' offer to work with it to help educate

---

[4] Such differential regulation of comparable expression invokes the specter of impermissible viewpoint discrimination. *See, e.g., Playboy*, 529 U.S. at 812 ("Laws designed or intended to suppress or restrict the expression of specific speakers contradict basic First Amendment principles." (striking down a regulation that targeted "adult" cable channels, but permitted similar expression by other speakers)); *Turner*, 512 U.S. at 659 ("Regulations that discriminate among media, or among different speakers within a single medium, often present serious First Amendment concerns.").

13

consumers about the well-established and comprehensive ESRB system, and instead proceeded to adopt the Act's restrictive measures. *See* Lowenstein Decl. ¶¶ 15-16.

Even under a somewhat lower standard of scrutiny, the Act would not survive review. As explained in detail below, *infra* § I.D, the language employed by the Act to identify the censored games is hopelessly – and unconstitutionally – vague. Likewise, the restrictions on minors' access to "ultra-violent explicit" video games, which rests on vague and overbroad terms, would result in an overly broad and impermissible suppression of *adults'* access to protected speech. *See Reno v. ACLU*, 521 U.S. 844, 874 (1997). For example, the Act's restrictions on store game displays likely will mean that some retailers will decide not to offer an opportunity for customers to test out games in the store, or to show game footage on monitors in the store. Andersen Decl. ¶ 17-18. Similarly, retailers may decide not to stock any games with violent content potentially covered by the Act, because of the difficulty of determining which games may be sold or rented to minors. *Id.* ¶ 7-14. As a result, Plaintiffs' speech will not reach willing recipients, including adults. The broad suppression of speech created by the Act would require its invalidation even if there were some legal basis for applying some less strict level of First Amendment scrutiny, which there is not.

   **3.**  **The Affirmative Defenses Do Not Cure The Act's Constitutional Infirmities.**

The Act contains certain "affirmative defenses" that purportedly curtail the Act's reach. As explained below, however, the affirmative defenses exacerbate, rather than cure, the Act's flaws.

Some of the "affirmative defenses" provide no real defense at all. For example, one provision affords a "good faith" defense to a person who "disseminates" a covered video game to a minor, if the minor shows identification indicating that he or she is over 17, and the person

14

disseminating the game "complies with a rating system established by the pertinent entertainment industry that does not conflict with this part." Act, pt. II, § 23. The ESRB rating system, however, recommends that "T"-rated video games may be appropriate for individuals over thirteen years of age, even though a "T"-rated game may contain violence that falls within the Act's broad restrictions. Therefore, a person who sold a "T"-rated game that fell within the Act's definition to a minor over 13 would be liable under the Act – despite the fact that such a sale would be wholly consistent with the ESRB rating system. *See* Andersen Decl. ¶ 19. The affirmative defense therefore is essentially meaningless, other than for its narrow application to minors showing they are at least 17 years old and are therefore able to purchase "M"-rated games.[5]

Likewise, the "store manager" defense would provide only minimal benefit. A store manager may assert an affirmative defense to the Act's restrictions on the dissemination or display of covered games if, at the time of the alleged violation, a) the business had a policy requiring employees to comply with the relevant rating system, b) trained its employees to follow the policy, and c) enforced the policy. Act, pt. II, § 23(2). But compliance with these requirements, even if it benefited the manager, would not absolve store *clerks* from liability. Thus, a manager relying on the § 23(2) affirmative defense would shift the exposure of liability from store managers to store clerks.

Further, the affirmative defense provisions, like much of the Act, contain numerous vague terms that fail to give the reasonable manager and clerk sufficient notice about what types

---

[5] In any event, to the extent the Act seeks to incorporate the ESRB rating system into its scheme for restricting speech, it constitutes an unconstitutional delegation to a private third party. *See, e.g., State v. Watkins*, 191 S.E.2d 135, 143-44 (S.C. 1972), *vacated and remanded on other grounds*, 413 U.S. 905 (1973); *Potter v. State*, 509 P.2d 933, 935-36 (Okla. Crim. App. 1973).

of behavior are required. By the use of vague and confusing terms, the affirmative defenses will only enhance the Act's chilling of speech. *See* Andersen Decl. ¶ 16, 19. But, at the most fundamental level, these defenses do not cure the Act's First Amendment problem because they permit criminal and civil punishment for the dissemination of fully protected expression.

### D.  The Act Is Unconstitutionally Vague.

The Act is unconstitutional on an independent ground: vagueness. Because several of the Act's key terms are impermissibly vague and place the burden of compliance on game retailers, the Act will restrict a far broader range of expression than even the State claims it is seeking to regulate. The Constitution demands that statutes be set forth with "sufficient definiteness that ordinary people can understand what conduct is prohibited." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Such precision is essential to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). In particular, exacting precision is required of restrictions in the context of protected expression. *See Reno*, 521 U.S. at 871-72 (explaining that the vagueness of a "content-based regulation of speech," particularly one imposing criminal penalties, "raises special First Amendment concerns because of its obvious chilling effect on free speech"); *NAACP v. Button*, 371 U.S. 415, 433 (1963).

Several key terms in the Act either are inherently vague or are defined in such a way as to fail to provide fair notice. To begin with, the Act's prohibition targets violence "against parties who realistically appear to be human beings." Act, pt. II, § 16(g). But "human beings" is a term particularly ill-suited to a medium that relies extensively on animated, extra-terrestrial, and fantastic forms and characters — which may be depicted as having only some "human" characteristics, or which may be "human" at some times and not others. For example, in *Resident Evil IV*, part of a popular series of video games that have inspired feature films, the vast

16

majority of enemies in the game are zombies and mutants with human characteristics. *See* Price Decl. ¶¶ 26-32. Would zombies and mutants be viewed as "human" within the meaning of the Act? Similarly, in *Jade Empire*, which takes the player's character on an adventure through a mythical Chinese kingdom, both the player's character and the enemy forces possess magical abilities and transform into non-humanoid creatures. *See id.* ¶¶ 33-40; *id.* ¶¶ 41-49. Does this game contain characters that "realistically appear to be human beings" as defined by the Act? Do part-animal or part-alien creatures "realistically appear to be human beings"?

Likewise, the definition of "ultra-violent explicit video game" is hopelessly vague. An "ultra-violent explicit video game" is defined as one that "continually and repetitively depicts extreme and loathsome violence." Act, pt. II, § 16(*l*). What is meant by "continually and repetitively"? Is there a threshold number of acts that establishes liability under the Act? What if the game permits each player to determine how much "violence" occurs in a game (as many do)? *See* Price Decl. ¶¶ 24, 32, 40, 49, 54, 61. If it is merely possible to engage in "continual and repetitive" "violence," will the game be censored for all? *Id.*

The Act's "harmful to minors" definition suffers from equally substantial vagueness problems. Even assuming that the harmful to minors standard could be expanded beyond the regulation of sexually explicit material (and it cannot), the Act fails to provide explanations of what constitutes a "morbid interest in asocial, aggressive behavior," "morbid interest in uncontrolled aggression against an individual," and "what is suitable for minors" with respect to depictions of violence. *See* Price Decl. ¶¶ 24, 32, 40, 49, 54, 61. As with the other provisions of the Act, the "harmful to minors" definition fails to give reasonable notice of what conduct is proscribed by the Act. *See Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690 (8th Cir. 1992) (affirming district court's conclusion that statute lacks requisite specificity because, *inter*

*alia*, term "morbid" was not defined); *see also Video Software Dealers Ass'n v. Webster*, 773 F. Supp. 1275, 1281 (W.D. Mo. 1991), *aff'd*, 968 F.2d 684, 689 (8th Cir. 1992); *cf. Winters*, 333 U.S. at 513, 518-19 (striking down as vague a statute prohibiting the distribution of tales of criminal deeds of bloodshed and lust "so massed as to become vehicles for inciting violent and depraved crimes against the person" and appealing "to that portion of the public who (as many recent records remind us) are disposed to take to vice for its own sake").[6]

Stores and store clerks will be subject to steep liability if they wrongly guess about what games the Act covers. Game creators, distributors, and retailers will respond to the uncertainty in the Act, and the penalties the Act imposes, by either self-censoring or otherwise restricting access to *any* potentially offending video game title, or, conceivably, by pulling a wide range of games off the shelves altogether. *See, e.g.*, Lowenstein Decl. ¶ 13-14; Andersen Decl. ¶¶ 12, 17-18, 20-21; Price Decl. ¶¶ 15. As the federal district court in Washington stated, in striking down a Washington State "violent" video game ban as unconstitutionally vague, "[n]ot only is a conscientious retail clerk (and her employer) likely to withhold from minors all games that could possibly fall within the broad scope of the Act, but authors and game designers will likely 'steer far wider of the unlawful zone . . . than if the boundaries of the forbidden area were clearly marked.'" *VSDA*, 325 F. Supp. 2d at 1191 (quoting *Grayned*, 408 U.S. at 109). Such understandable, self-protective behavior will deprive access to such expression not just to

---

[6] Moreover, the Act covers "real or simulated graphic depictions of" violence — terms with no logical boundary in a medium in which all images are obviously computer-generated and therefore unrealistic. Act, pt. II, § 16(g). The Seventh Circuit observed that video games are populated by "cartoon characters, that is animated drawings[,]" and that "[n]o one would mistake them for photographs of real people." *AAMA*, 244 F.3d at 579. Similar confusion will be spawned by the Act's use of other vague terms — such as the various, non-exclusive categories of "physical injuries or physical violence," Act, pt. II, § 16(g) — that become all the more ambiguous and unclear when applied to the inherently unrealistic video game medium.

18

minors, but to adult customers as well — whose right to access "violent" and "sexually explicit" video games could not be questioned by the State.

## II.   THE EQUITIES STRONGLY SUPPORT AN INJUNCTION.

Not only have Plaintiffs demonstrated a virtually certain likelihood of success on the merits, but the other prerequisites to injunctive relief are easily met here. Plaintiffs, their members, and willing listeners will all suffer irreparable harm if the Act's restriction of protected expression goes into effect. As the Sixth Circuit has made clear, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Connection Distrib. Co.*, 154 F.3d at 288 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)). In the First Amendment context, the irreparable injury "stems from the intangible nature or the benefits flowing from the exercise of those rights; and the fear that, if these rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future." *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Authority* ("SORTA"), 163 F.3d 341, 363 (6th Cir. 1998) (internal quotation marks omitted). Thus, no adequate remedy at law exists for Plaintiff's claims. *See, e.g., Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987) (injunctive relief is appropriate where "legal remedies prove inadequate."); *National People's Action v. Village of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990) ("[I]njunctions are especially appropriate in the context of first amendment violations because of the inadequacy of money damages.").

Finally, the balance of equities (including the public interest) weighs heavily in favor of an injunction. The public interest would be harmed if the Act were allowed to go into effect. *See SORTA*, 163 F.3d at 363 (holding that failure to enjoin the Government's suppression of advertisement in public fora "would harm the public's interests in protecting First Amendment

19

rights in order to allow the free flow of ideas"). The enforcement of the Act will not only affect Plaintiffs, but will affect countless video game creators, retailers, and consumers throughout Michigan and beyond, all of whom will suffer infringements on their constitutional right to produce and view the expression contained in the wide array of video games implicated here. By contrast, "there can be no irreparable harm to a [government] when it is prevented from enforcing an unconstitutional statute because 'it is always in the public interest to protect First Amendment liberties.'" *Joelner v. Village of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004) (quoting *Connection Distrib. Co*, 154 F.3d at 288). The equities compel an injunction here.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant a preliminary injunction.

Respectfully submitted,

ENTERTAINMENT SOFTWARE ASSOCIATION, VIDEO SOFTWARE DEALERS ASSOCIATION, and MICHIGAN RETAILERS ASSOCIATION

/s/Alicia J. Blumenfeld

Dennis J. Levasseur
Alicia J. Blumenfeld
**BODMAN LLP**
100 Renaissance Center
Detroit, MI 48243
Tel (313) 393-7596
Fax (313) 393-7579
dlevasseur@bodmanllp.com
ablumenfeld@bodmanllp.com

Paul M. Smith
Katherine A. Fallow
Kathleen R. Hartnett
Amy L. Tenney
**JENNER & BLOCK LLP**
601 Thirteenth Street, N.W.
Washington, DC 20005
Tel. (202) 639-6000
Fax (202) 639-6066

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

ENTERTAINMENT SOFTWARE
ASSOCIATION, VIDEO SOFTWARE
DEALERS ASSOCIATION, and MICHIGAN
RETAILERS ASSOCIATION,

        Plaintiffs,

vs.

JENNIFER M. GRANHOLM, in her official
capacity as Governor of the State of Michigan;
MICHAEL A. COX, in his official capacity as
Attorney General of the State of Michigan; and
KYM L. WORTHY in her official capacity as
Wayne County Prosecuting Attorney,

        Defendants.
_____/

Case No: 02:05-cv-73634

Hon. George Caram Steeh

Magistrate Judge Steven D. Pepe

## PROOF OF SERVICE

Kimberly Jarvis certifies that she is an employee of Bodman LLP, that on September 26, 2005 she caused to be served a copy of **Plaintiffs' Motion for a Preliminary Injunction, Memorandum in Support of Motion for a Preliminary Injunction, Appendix to Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction, Notice of Filing Exhibits in the Traditional Manner** and this Proof of Service upon the person(s) listed below via **Hand Delivery** upon:

Denise C. Barton, Esq.
Assistant Attorney General
Department of Attorney General
525 W. Ottawa Street, Floor 5
Lansing, Michigan 48909

Jeffrey Caminsky, Esq.
Timothy A. Baughman, Esq.
Assistant Prosecuting Attorney
Wayne County
1441 St. Antoine St., Room 1200
Detroit, Michigan 48226

I declare under penalty of perjury that the foregoing statement is true and correct to the best of my information, knowledge and belief.

                                                */s/ Kimberly Jarvis*
                                                Kimberly Jarvis

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

ENTERTAINMENT SOFTWARE
ASSOCIATION, VIDEO SOFTWARE
DEALERS ASSOCIATION, and MICHIGAN
RETAILERS ASSOCIATION,

        Plaintiffs,

vs.

JENNIFER M. GRANHOLM, in her official
capacity as Governor of the State of Michigan;
MICHAEL A. COX, in his official capacity as
Attorney General of the State of Michigan; and
KYM L. WORTHY in her official capacity as
Wayne County Prosecuting Attorney,

        Defendants.

Case No: 05-73634

Hon. George Caram Steeh

Magistrate Judge Steven D. Pepe

---

BODMAN LLP
By:   Dennis J. Levasseur (P39778)
       Alicia J. Blumenfeld (P67511)
100 Renaissance Center, 34th Floor
Detroit, Michigan 48243
Telephone: (313) 259-7777
Facsimile: (313) 393-7579

    and

JENNER & BLOCK LLP
By:   Paul M. Smith
       Katherine A. Fallow
       Kathleen R. Hartnett
       Amy L. Tenney
601 Thirteenth Street, N.W., Suite 1200
Washington, DC 20005
Telephone: (202) 639-6000
Facsimile: (202) 639-6066

MICHIGAN DEPARTMENT OF
ATTORNEY GENERAL
By:   Denise C. Barton (P41535)
P.O. Box 30736
Lansing, Michigan 48909
(517) 373-6434
Attorney for Defendants Governor
Jennifer A. Granholm and Attorney
General Michael A. Cox

---

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Detroit_665522_1

Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs Entertainment Software Association, Video Software Dealers Association, and Michigan Retailers Association (collectively, "Plaintiffs") respectfully move for summary judgment against Governor Granholm, Attorney General Cox, and Prosecuting Attorney Worthy, (collectively "Defendants") and ask that Bill No. 416 (Mich. 2005) (hereinafter, the "Act") be permanently enjoined.

In support of this Motion, Plaintiffs state as follows:

1.   The Act was signed into law on September 14, 2005, and was due to take effect on December 1, 2005. The Act places civil and criminal penalties on the sale, rental and viewing of "ultra-violent explicit video games" to individuals under age 17 and imposes other burdens on the expression of consumers, video game retailers, and video game creators.

2.   Plaintiffs are associations of companies that create, publish, distribute, sell, and/or rent video games. On September 21 2005, Plaintiffs filed a five-count Complaint seeking to invalidate the Act under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. As set forth in each count of the Complaint, the Act is unlawful because it violates Plaintiffs' constitutionally guaranteed rights to freedom of expression, equal protection, and due process, and because it is unconstitutionally vague.

3.   Plaintiffs also filed a motion for a preliminary injunction, which this Court granted on November 9, 2005. In that order, this Court concluded that Defendants "are not likely to succeed on the merits." This Court noted the weaknesses in the evidence Defendants presented, and recognized that the Seventh Circuit had already rejected such evidence as failing to demonstrate that video games are harmful to minors in *American Amusement Machine Ass'n*, 244 F.3d 572, 578-79 (7th Cir. 2002). This Court also emphasized the ambiguity of the Act's

terms and found that "there is a serious problem in determining which games are prohibited to be sold or displayed to minors under the Act."

4. Plaintiffs are now entitled to summary judgment. There is no genuine dispute of material fact here requiring further factual development. The Act imposes a content-based regulation on protected speech and is subject to strict scrutiny. Defendants cannot meet this standard. The Act cannot be justified by a concern with preventing aggressive or violent behavior in minors because there is no evidence suggesting the Act meets the standard of *Brandenburg v. Ohio*, 395 U.S. 444 (1969). Nor does the Defendant's alternative justification for the Act—protecting the psychological well-being of minors—pass constitutional muster. The State may not regulate protected speech because it affects listeners' attitudes, and there is no evidence in any case that video games are psychologically harmful.

5. In addition, the Act is unconstitutionally vague, as Defendants all but admitted at the hearing on Plaintiffs' motion for a preliminary injunction.

6. In support of this Motion, Plaintiffs are submitting a memorandum of law, explaining in more depth why summary judgment is warranted.

7. Pursuant to E.D. Mich. L.R. 7.1, counsel for Plaintiffs sought concurrence in this motion. Concurrence was not obtained.

WHEREFORE, Plaintiffs request that this Court enter summary judgment against Defendants and permanently enjoin the Act as unconstitutional under the First and Fourteenth Amendments.

Respectfully submitted,

BODMAN LLP

By: /s/ Alicia J. Blumenfeld
    Dennis J. Levasseur (P39778)
    Alicia J. Blumenfeld (P67511)
100 Renaissance Center, 34th Floor
Detroit, Michigan 48243
Telephone: (313) 259-7777
Facsimile: (313) 259-7579
dlevasseur@bodmanllp.com
ablumenfeld@bodmanllp.com

and

JENNER & BLOCK LLP
By:   Paul M. Smith
     Katherine A. Fallow
     Kathleen R. Hartnett
     Amy L. Tenney
601 Thirteenth Street, N.W., Suite 1200
Washington, DC 20005
Telephone: (202) 639-6000
Facsimile: (202) 639-6066

December 23, 2005

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

ENTERTAINMENT SOFTWARE
ASSOCIATION, VIDEO SOFTWARE
DEALERS ASSOCIATION, and MICHIGAN
RETAILERS ASSOCIATION,

    Plaintiffs,

vs.

JENNIFER M. GRANHOLM, in her official
capacity as Governor of the State of Michigan;
MICHAEL A. COX, in his official capacity as
Attorney General of the State of Michigan; and
KYM L. WORTHY in her official capacity as
Wayne County Prosecuting Attorney,

    Defendants.

Case No: 05-73634

Hon. George Caram Steeh

Magistrate Judge Steven D. Pepe

_____/

BODMAN LLP
By:   Dennis J. Levasseur (P39778)
       Alicia J. Blumenfeld (P67511)
100 Renaissance Center, 34th Floor
Detroit, Michigan 48243
Telephone: (313) 259-7777
Facsimile: (313) 393-7579

    and

JENNER & BLOCK LLP
By:   Paul M. Smith
       Katherine A. Fallow
       Kathleen R. Hartnett
       Amy L. Tenney
601 Thirteenth Street, N.W., Suite 1200
Washington, DC 20005
Telephone: (202) 639-6000
Facsimile: (202) 639-6066

MICHIGAN DEPARTMENT OF
ATTORNEY GENERAL
By:   Denise C. Barton (P41535)
P.O. Box 30736
Lansing, Michigan 48909
(517) 373-6434
Attorney for Defendants Governor
Jennifer A. Granholm and Attorney
General Michael A. Cox

_____/

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

Detroit_665529_1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ....................................................................................................................... 3

ARGUMENT ............................................................................................................................. 5

I.  STANDARD OF REVIEW ............................................................................................ 5

II. THE ACT CANNOT SURVIVE STRICT SCRUTINY AND THEREFORE
    VIOLATES THE FIRST AMENDMENT ..................................................................... 6

    A. The Act Fails The *Brandenburg* Standard ............................................................ 7

    B. The Act Cannot Be Justified By The State's Purported Interest In Shaping The
       Psychological Development Of Minors. .............................................................. 11

    C. The Act Does Not Advance The State's Interests And Is Not Narrowly
       Tailored ................................................................................................................ 14

III. THE ACT IS UNCONSTITUTIONALLY VAGUE ..................................................... 16

CONCLUSION .......................................................................................................................... 20

# TABLE OF AUTHORITIES

### Cases

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996) ..................................................16

*American Amusement Machine Ass'n v. Kendrick*, 244 F.3d 572 (7th Cir. 2001) .....2, 6, 9, 13, 15

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) ..........................................7, 11, 12

*Banks v. Principi*, 386 F. Supp. 2d 921 (E.D. Mich. 2005) ...................................................5

*Boos v. Barry*, 485 U.S. 312 (1988) ..................................................................................12

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) ........................................................................7

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ....................................................................5

*Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942) ..........................................................7

*Entertainment Software Ass'n v. Blagojevich*, No. 05C4265, ___ F. Supp. 2d ___, 2005
    WL 344810 (N.D. Ill. Dec. 2, 2005) .................................................................... *passim*

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975) ......................................................12

*Florida Star v. B.J.F.*, 491 U.S. 524 (1989) ........................................................................15

*Ginsberg v. New York*, 390 U.S. 629 (1968) ......................................................................13

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ............................................................17

*Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954 (8th Cir. 2003) ...2, 6, 13, 14

*James v. Meow Media, Inc.*, 300 F.3d 683 (6th Cir. 2002) ..........................................3, 6, 7, 13

*Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952) ..........................................................12

*Kolender v. Lawson*, 461 U.S. 352 (1983) ........................................................................17

*McConnell v. Federal Election Commission*, 540 U.S. 93 (2003) ........................................12

*NAACP v. Button*, 371 U.S. 415 (1963) ............................................................................17

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ..........................................................6, 14, 15

*Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997) ............................................17

*Sable Communications of California, Inc. v. FCC*, 492 U.S.115 (1989) ...................................... 16

*Texas v. Johnson*, 491 U.S. 397 (1989) ........................................................................... 7, 12

*United States v. Playboy Entertainment Group*, 529 U.S. 803 (2000) ........................... 5, 15, 16

*Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180 (W.D. Wash. 2004) ............................................................................................................. 2, 6, 13, 14, 19

*Video Software Dealers v. Schwarzenegger*, No. 05-04188, ___ F. Supp. 2d ___ (N.D. Cal. Dec. 21, 2005) ................................................................................................. 1, 6, 8, 13

*Video Software Dealers Ass'n v. Webster*, 968 F.2d 684 (8th Cir. 1992) ............................... 18

*Video Software Dealers Ass'n v. Webster*, 773 F. Supp. 1275 (W.D. Mo. 1991), *aff'd*, 968 F.2d 684 (8th Cir. 1992) ........................................................................................ 19

### Statutes

2005 Mich. Legis. Serv. P.A. 108 ................................................................................ *passim*

### Other Authorities

Kronenberger, *et al.*, *Media Violence Exposure in Adolescents*, 31 AGGRESSIVE BEHAVIOR 213 (2005) ................................................................................................... 9

## INTRODUCTION

Plaintiffs Entertainment Software Association ("ESA"), Video Software Dealers Association ("VSDA"), and Michigan Retailers Association ("MRA") submit this memorandum in support of their motion, pursuant to Federal Rule of Civil Procedure 56, for summary judgment invalidating the 2005 Michigan Public Act 108 (Mich. 2005) (hereinafter, the "Act"), 2005 Mich. Legis. Serv. P.A. 108, as an unconstitutional abridgement of speech under the First and Fourteenth Amendments, and as unconstitutionally vague under the Fourteenth Amendment.[1]

This Court has already granted Plaintiffs a preliminary injunction enjoining enforcement of the Act by Defendants (the "State"). *See* Order Granting Plaintiffs' Mot. for Prelim. Inj., *Entertainment Software Ass'n v. Granholm*, No. 05-CV-73634, 2005 WL 3008584 (E.D. Mich. Nov. 9, 2005) ("PI Order"). As this Court recognized, the Act imposes a content-based ban on "violent" video games subject to strict scrutiny. *Id.* at *3. And as the Court also preliminarily recognized, the Act fails strict scrutiny. The justifications offered by the State are insufficient both on their face and because of a lack of evidence that the Act actually serves those purposes in a narrowly tailored way. Moreover, the Act's vagueness – which the State has all but conceded – provides an independent basis for the Court to rule in Plaintiffs' favor.

The current record establishes these constitutional infirmities, and no evidence the State can offer will suggest that a trial might lead to another outcome. This conclusion is consistent with that of all federal courts addressing similar attempts at regulating "violent" video games, including two decisions that were issued since this Court entered its preliminary injunction: *Entertainment Software Ass'n v. Blagojevich*, No. 05C4265, 2005 WL 344810 (N.D. Ill. Dec. 2,

---

[1] Plaintiffs at this time do not move for summary judgment on their equal protection and due process claims.