book on which the video game was based. *Blagojevich*, 404 F. Supp. 2d at 1075 ("In fact, the underinclusiveness of this statute—given that violent images appear more accessible to unaccompanied minors in other media—indicates that regulating violent video games is not really intended to serve the proffered purpose."); *see also* Price Decl. ¶¶ 4, 8, 18, 37 (noting similarities between M-rated games and many films and books).

The Act fails strict scrutiny for the additional reason that the Legislature ignored the availability of less restrictive means of furthering its purported interests. The narrow tailoring requirement requires the State to prove that "a plausible, less restrictive alternative" to banning such games "will be ineffective to achieve its goals." *Playboy*, 529 U.S. at 816. The State cannot make such a showing where such alternative exists, including encouraging awareness of the voluntary ESRB video game rating system (which provides guidance to parents and other consumers), and the availability of parental controls that allow each household to determine which games their children can play.[4] *See Playboy*, 529 U.S. at 824 ("A court should not assume a plausible, less restrictive alternative would be ineffective; and a court should not presume parents, given full information, will fail to act."); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507-08 (1996) (plurality) (striking down ban on advertising alcohol prices because of less

---

[4] For example, all three of the next-generation game consoles manufactured by Microsoft, Nintendo, and Sony will include parental controls allowing parents to limit a child's access to games based on the games' ESRB rating, an option that Microsoft's latest console already offers. *See* Lowenstein Decl. ¶ 22; The Associated Press, *Sony to hand parents video game controls*, Int'l Herald Trib., Nov. 28, 2005, available at http://www.iht.com/articles/2005/11/28/business/sony.php. This technology is similar to the voluntary filtering and blocking technologies that the Supreme Court identified as less restrictive alternatives to prohibitions on speech.

restrictive alternatives, such as an "educational campaign" or "counterspeech"); *Ashcroft v. ACLU*, 542 U.S. 656, 671-72 (2004) (noting that rapid technological developments may create alternatives displacing the rationale for imposing speech restrictions). The State cannot meet its burden of demonstrating the absence of less restrictive alternatives where it declined Plaintiffs' offer to work with it to help educate consumers about the ESRB system, and instead proceeded to adopt the Act's restrictive measures. *See* Lowenstein Decl. ¶¶ 19-24; Andersen Decl. ¶ 15; *see also Granholm*, 2006 WL 901711, at *7 (state failed to carry its burden of demonstrating absence of less restrictive alternatives).

      C.    **The Act Impermissibly Incorporates the Voluntary Rating System Into a Punitive Censorship Scheme.**

The Act is also unconstitutional for the independent reason that it impermissibly predicates liability on the determination by the ESRB that a particular game is rated M or AO. As discussed above, ESRB ratings are intended to give consumers and parents advance information about content to enable them to for themselves determine age appropriateness and to make informed purchase and rental decisions. They were never intended to be the basis of legal sanction for game purchasers. The Act therefore is no different from the many laws that were passed in an attempt to give legal force to the film ratings imposed by the Motion Picture Association of America. In case after case those laws were struck down as an unconstitutional delegation of power to a private authority. *E.g., Swope v. Lubbers*, 560 F. Supp. 1328, 1334 (W.D. Mich. 1983) (rejecting a state institution's effort to prohibit the showing of "X"-rated movies on campus, stating that "it is well-established that the Motion Picture ratings may not be used as a standard for a

determination of constitutional status"); *Engdahl v. City of Kenosha*, 317 F. Supp. 1133 (E.D. Wis. 1970); *Motion Picture Ass'n of Am. v. Specter*, 315 F. Supp. 824 (E.D. Pa. 1970); *Borger ex rel. Borger v. Bisciglia*, 888 F. Supp. 97, 100 (E.D. Wis. 1995); *State v. Watkins*, 191 S.E.2d 135, 143-44 (S.C. 1972) (unconstitutional delegation for legislation to exempt from obscenity law films rated by MPAA), *vacated and remanded on other grounds*, 413 U.S. 905 (1973); *Potter v. State*, 509 P.2d 933, 935-36 (Okla. Crim. App. 1973) (same). The State cannot vest the power to decide what is legal and what is not in a private body not accountable to the public in any way. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70-71 (1963) (striking down state law requiring publishers to submit literature to review board for a determination as to whether is obscene). ESRB's voluntary ratings are useful for consumers and parents, but the government may not co-opt them and put the imprimatur of the State upon them.

### D. The Act's Signage Provision Unconstitutionally Compels Speech.

The Act's signage provision unconstitutionally compels video game retailers to post signs that express views contrary to their own position. The Act requires video game retailers to post a sign "in a location that is clearly visible to consumers. The sign must display the following language in 30-point font or larger: 'A person under the age of 17 is prohibited from renting or purchasing a video game rated AO or M. Violators may be subject to a $25 penalty.'" Minn. Stat. § 325I.07(3). The Supreme Court has long recognized that "[j]ust as the First Amendment may prevent the government from prohibiting speech, the Amendment may prevent the government from compelling individuals to express certain views." *United States v. United Foods, Inc.*, 533 U.S. 405,

410 (2001) (citations omitted). Because compelled messages alter the content of what the compelled party would otherwise express, and in this case impose a message with which Plaintiffs strongly disagree, they are considered content-based regulation under the First Amendment and require strict scrutiny. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). This protection extends not only to political or ideological speech, *see Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1 (1986) ("*PG&E*"), but to *all* statements, whether of fact or opinion. *See Riley*, 487 U.S. at 797-98.

For the same reasons that the Act's penalty provisions fail strict scrutiny, its signage provision must be invalidated. Indeed, if the Court were to invalidate the ban on minors' access to games rated M and AO, no rational, much less compelling, basis would remain for requiring retailers to post the signs. The required signs do not even purport to convey purely factual or noncontroversial information – "it tells parents and children nothing about the actual content of the games, and it creates the appearance that minors under [17] are prohibited from playing such games." *Blagojevich*, 404 F. Supp. 2d at 1081. At its core, the signage requirement compels video game retailers to channel the State's stigmatizing message that minors should not access the labeled games – even if retailers disagree with this proposition. Retailers may also disagree with the sign's implication that it is acceptable for minors who *are* 17 to play AO-rated games, which is contrary to the ESRB system. *See* Andersen Decl. ¶ 11. "Such forced association with potentially hostile views burdens . . ." their expression and "risks forcing [them] to speak

17

where [they] would prefer to remain silent," in violation of the First Amendment. *PG&E*, 475 U.S. at 18. This is plainly unconstitutional.

## II. THE EQUITIES STRONGLY SUPPORT AN INJUNCTION.

Not only have Plaintiffs demonstrated a virtually certain likelihood of success on the merits, but the other prerequisites to injunctive relief are easily met here. Plaintiffs, their members, and willing listeners will all suffer irreparable harm if the Act's burdens on protected expression go into effect. As the Eighth Circuit has made clear, the "'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Iowa Right to Life Comm.*, 187 F.3d at 970 (quoting *Elrod*, 427 U.S. at 373 (plurality)). In the First Amendment context, the irreparable injury "stems from the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if these rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future." *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 363 (6th Cir. 1998) (internal quotation marks omitted). Thus, no adequate remedy at law exists for Plaintiff's claims.

Finally, the balance of equities (including the public interest) weighs heavily in favor of an injunction. The public interest would be harmed if the Act were allowed to go into effect. *See Iowa Right to Life Comm.*, 187 F.3d at 970. The enforcement of the Act will affect not only Plaintiffs, but also countless video game creators, retailers, and consumers throughout Minnesota and beyond, all of whom will suffer infringements on their constitutional right to produce and view the expression contained in the wide array

18

of video games implicated here. By contrast, "there can be no irreparable harm to a [government] when it is prevented from enforcing an unconstitutional statute because 'it is always in the public interest to protect First Amendment liberties.'" *Joelner*, 378 F.3d at 620 (citation omitted).

Indeed, it is difficult to see how the State could be harmed when the Legislature proceeded to enact a plainly unconstitutional law, fully aware of the Act's constitutional infirmities. *See* Lowenstein Decl. ¶ 24. The equities compel an injunction here.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant a temporary and/or preliminary injunction that prevents the Act from going into effect until a final judgment on Plaintiffs' constitutional challenge (including any appeal) has been entered.

Dated:   June 13, 2006.

-and-

Paul M. Smith
Katherine A. Fallow
Matthew S. Hellman
JENNER & BLOCK LLP
601 13th Street, NW, Suite 1200
Washington, DC  20005
Telephone:  (202) 639-6000
Facsimile:  (202) 639-6066

s/Jennifer A. Kitchak
James E. Dorsey (#137893)
Jennifer A. Kitchak (#317056)
FREDRIKSON & BYRON, P.A.
200 South Sixth Street, Suite 4000
Minneapolis, Minnesota 55402
Telephone: (612) 492-7000
Facsimile: (612) 492-7077

ATTORNEYS FOR PLAINTIFFS
ENTERTAINMENT SOFTWARE
ASSOCIATION and ENTERTAINMENT
MERCHANTS ASSOCIATION

4042596_1.DOC

19