# EXHIBIT D

FILED
U.S. DIST. COURT
MIDDLE DIST. OF LA.

2006 JUN 16 PM 1:29

SIGN____ by DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

ENTERTAINMENT SOFTWARE
ASSOCIATION AND ENTERTAINMENT
MERCHANTS ASSOCIATION,

Plaintiffs,

vs.

CHARLES C. FOTI, JR., in his official
capacity as Attorney General of the State of
Louisiana; and DOUG MOREAU, in his
official capacity on behalf of himself as
District Attorney for the Parish of East
Baton Rouge, and on behalf of a class of
similarly situated individuals in their official
capacities.

Defendants.

CIVIL ACTION NO. 06-431-JJB CN

SECTION " "

MAGISTRATE

### MEMORANDUM IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER

#### INTRODUCTION

Plaintiffs Entertainment Software Association ("ESA") and Entertainment Merchants Association ("EMA") submit this memorandum in support of their application, pursuant to Federal Rule of Civil Procedure 65(b) and Local Rule 65.1 for a temporary restraining order preventing Defendants and their officers, employees, and representatives from enforcing La. R.S. 14:91.14 (hereinafter, the "Act"). The Act was signed into law and became effective on June 15, 2006.

Plaintiffs are entitled to a temporary restraining order under controlling legal principles. Louisiana's sweeping legislation imposes severe criminal penalties, including imprisonment and fines, on the sale, lease or rental of "violent" video games to



individuals under age 18. Such content discrimination violates the "bedrock principle underlying the First Amendment . . . that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

Plaintiffs are likely to succeed on their constitutional claims. In fact, every previous government attempt to restrict "violent" video games has been struck down as violating the First Amendment. *See Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954, 957 (8th Cir. 2003) ("*IDSA*"); *American Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 579-80 (7th Cir.), *cert. denied*, 534 U.S. 994 (2001) ("*AAMA*"); *Entertainment Software Association v. Granholm*, No. 05-73634, 2006 WL 901711, ___ F. Supp. 2d ___ (March 31, 2006, E.D. Mich.) ("*Granholm*"); *Video Software Dealers Ass'n v. Schwarzenegger*, 401 F. Supp. 2d 1034 (N.D. Cal. 2005) ("*Schwarzenegger*"); *Entertainment Software Ass'n v. Blagojevich*, 404 F. Supp. 2d 1051 (N.D. Ill. 2005) ("*Blagojevich*"); *Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180, 1184-85 (W.D. Wash. 2004) ("*Maleng*"); *see also James v. Meow Media, Inc.*, 300 F.3d 683, 696 (6th Cir. 2002) ("*James*") (rejecting attempts to impose tort liability on "violent" video games as inconsistent with the First Amendment); *Sanders v. Acclaim Entm't, Inc.*, 188 F. Supp. 2d 1264, 1279 (D. Colo. 2002) (same); *Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167, 181 (D. Conn. 2002) (same).

Not only are Plaintiffs likely to prevail on their claims, but the equities also weigh strongly in favor of a temporary restraining order. *See, e.g., AAMA*, 244 F.3d at 580. It is well established that "the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury," which justifies the grant of injunctive relief.

*Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)); *see also Ingebretson v. Jackson Public Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996); *Wexler v. City of New Orleans*, 267 F. Supp. 2d 559, 568 (E.D. La. 2003); *Jabr v. Rapides Parish Sch. Bd.*, 171 F. Supp. 2d 653, 666 (W.D. La. 2001). Plaintiffs will undoubtedly suffer irreparable harm if the Act is allowed to go into effect. The First Amendment rights of members of the public—whose rights are also at stake in this facial challenge—will be similarly impaired. Accordingly, the Act should be immediately enjoined.

## BACKGROUND

A.  **First Amendment Protection for Video Game Expression.**

Plaintiffs are associations of companies that create, publish, distribute, sell, and/or rent console and computer video games (hereinafter "video games"). Compl. ¶¶ 9-10. The Act, if allowed to go into effect, will result in censorship and limit the distribution of some of these creative works, based solely upon their expressive content. *Id.* ¶ 12. In this facial challenge, Plaintiffs also assert the rights of willing listeners. *Id.* ¶ 13.

Video games are a modern form of artistic expression. Like motion pictures and television programs, video games tell stories and entertain audiences through the use of complex pictures, sounds, and text. These games often contain storylines and character development as richly detailed as (and sometimes based on) books and movies. Like great literature, these games often involve themes such as good versus evil, triumph over adversity, struggle against corrupt powers, and quest for adventure. The courts are unanimous in holding that the content of video games is fully protected by the First Amendment. *See IDSA*, 329 F.3d at 958; *AAMA*, 244 F.3d at 577-78; *James*, 300 F.3d 683 at 695-96; *Granholm*, 2006 WL 901711 at *3; *Schwarzenegger*, 401 F. Supp. 2d at

1044; *Blagojevich*, 404 F. Supp. 2d at 1056; *Maleng*, 325 F. Supp. 2d at 1184-85.

**B.     The Challenged Statute.**

The Act makes it a crime to sell, lease or rent a prohibited "interactive video or computer game" to a minor. Act, § 91.14(A). A person who violates this Act "shall be fined not less than one hundred dollars nor more than two thousand dollars or imprisoned, with or without hard labor, for not more than one year, or both." *Id.* § 91.14(B)(3). A minor is defined as a person under 18 years of age. *Id.* "Interactive video or computer game" means "an object or device that stores recorded data or instructions, receives data or instructions generated by a person who uses it and by processing the data or instructions, creates an interactive game capable of being played or viewed on or through a computer, gaming system, console, or other technology." *Id.* § 91.14(B)(1).

The video games proscribed by the Act are those that meet all of the following criteria:

> (1) The average person, applying contemporary community standards, would find that the video or computer game, taken as a whole, appeals to the minor's morbid interest in violence.
>
> (2) The game depicts violence in a manner patently offensive to prevailing standards in the adult community with respect to what is suitable for minors.
>
> (3) The game, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

Act, § 91.14(A)

The Act's stated purposes for its restrictions on "violent" video games are: "that children are the most precious resource of this state and they are worthy of special protection from their government" and that the State has an interest in protecting minors from "physical, psychological, and financial harm." Act, § 1(a).

-4-

# ARGUMENT

## I. PLAINTIFFS ARE ENTITLED TO A TEMPORARY RESTRAINING ORDER ENJOINING THE DEFENDANTS FROM IRREPARABLY VIOLATING THEIR CONSTITUTIONAL RIGHTS.

A temporary restraining order ("TRO") is appropriate where, as here: (1) the movant has a substantial likelihood of success on the merits; (2) the movant faces a substantial threat of irreparable harm without the TRO; (3) the threatened injury outweighs the threatened harm to the defendant; and (4) the TRO would not undermine the public interest. *See Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997); *McWaters v. FEMA*, 408 F. Supp. 2d 221, 228 (E.D. La. 2006). "[T]he Fifth Circuit employs a sliding scale involving the balancing the hardships associated with the issuance or denial of a [TRO] with the degree of likelihood of success on the merits." *McWaters*, 408 F. Supp. 2d at 228. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," justifying the grant of injunctive relief. *Deerfield*, 661 F.2d at 338 (citing *Elrod*, 427 U.S. at 373); *see also Wexler*, 267 F. Supp. 2d at 568; *Jabr*, 171 F. Supp. 2d at 666.

Plaintiffs easily satisfy this standard. Indeed, other courts have already entered preliminary and permanent injunctions in challenges to materially identical bans on distribution of "violent" video games. *See IDSA*, 329 F.3d at 960 (reversing district court's refusal to enjoin ban on "violent" video games); *AAMA*, 244 F.3d at 580 (noting a "strong likelihood of ultimate victory," irreparable harm to the plaintiffs if the law were allowed to go into effect, and "the entirely conjectural nature of the benefits of the ordinance to the people of Indianapolis"); *Granholm*, 2006 WL 901711 at *8 (ordering permanent injunction after earlier preliminary injunction); *Schwarzenegger*, 401 F. Supp. 2d 1034 (N.D. Cal. 2005) (preliminary injunction); *Blagojevich*, 404 F. Supp. 2d 1051

(N.D. Ill. 2005) (permanent injunction); *Maleng*, 325 F. Supp. 2d at 1191 (permanent injunction following preliminary injunction).

## II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS, GIVEN THE ACT'S SWEEPING CONTENT-BASED INVASION OF FIRST AMENDMENT RIGHTS AND UNCONSTITUTIONAL VAGUENESS.

### A. Video Games Depicting Violence Are Fully Protected By The First Amendment.

The courts have unequivocally held that video games constitute expression protected by the First Amendment. *IDSA*, 329 F.3d at 958 (video games "'are as much entitled to the protection of free speech as the best of literature'") (quoting *Winters v. New York*, 333 U.S. 507, 510 (1948)); *AAMA*, 244 F.3d at 577-78; *Granholm*, 2006 WL 901711 at *3 ("video games contain creative, expressive free speech, inseparable from their interactive functional elements, and are therefore protected by the First Amendment"); *Blagojevich*, 404 F. Supp. 2d at 1056 (video games are "one of the newest and most popular forms of artistic expression" and are "considered protected expression under the First Amendment"); *Maleng*, 325 F. Supp. 2d at 1184-85 (video games "are expressive and qualify for the protections of the First Amendment"). *see also James*, 300 F.3d at 695-96 (First Amendment protects the communicative aspects of video games). Indeed, video games convey "age-old themes of literature," messages, and ideologies, "just as books and movies do." *AAMA*, 244 F.3d at 577-78. Moreover, the Act's content-based restrictions themselves demonstrate that the targeted games constitute protected expression, because "it is the nature and effect of the message being communicated by these video games which prompted the state to act in this sphere." *Maleng*, 325 F. Supp. 2d at 1184.

That the Act restricts depictions of violence makes no difference as a matter of

First Amendment scrutiny. Depictions of violence are entitled to full constitutional protection. *See IDSA*, 329 F.3d at 958 (strict scrutiny applies to content-based restrictions on "violent" video games); *AAMA*, 244 F.3d at 575-76 ("The notion of forbidding not violence itself, but pictures of violence, is a novelty"); *Maleng*, 325 F. Supp. 2d at 1186 (same); *Eclipse Enters., Inc. v. Gulotta*, 134 F.3d 63, 66 (2d Cir. 1997) (declining to "expand the[] narrow categories of [unprotected] speech to include depictions of violence" in trading cards). Indeed, in the context of "violent" magazines, the Supreme Court has stated that violent expression is "as much entitled to the protection of free speech as the best of literature." *Winters*, 333 U.S. at 510.

B. **The Act's Content-Based Restrictions Fail Strict Scrutiny.**

Because the Act restricts protected expression based on its content, it is subject to the most exacting First Amendment scrutiny. *See IDSA*, 329 F.3d at 958 ("Because the ordinance regulates video games based on their content . . . we review it according to a strict scrutiny standard."); *Granholm*, 2006 WL 901711 at *4; *Schwarzenegger*, 401 F. Supp. 2d at 1045; *Blagojevich*, 404 F. Supp. 2d at 1072; *Maleng*, 325 F. Supp. 2d at 1186. Such content-based regulation of expression is "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). "It is rare that a regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 818 (2000).

Under the strict scrutiny standard, the State must (1) articulate a compelling state interest; (2) prove that the Act actually serves that interest and is "necessary" to do so; and (3) show that the Act is narrowly tailored to serve that interest. *R.A.V.*, 505 U.S. at 395; *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664-65 (1994); *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991). The

-7-

legislature's judgments are not to be accepted without question; rather, the legislature must have "drawn reasonable inferences based on substantial evidence." *Turner*, 512 U.S. at 666; *see also, e.g.*, *VSDA*, 325 F. Supp. 2d at 1187-88. Moreover, the State "must do more than simply 'posit the existence of the disease sought to be cured.' It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner*, 512 U.S. at 664 (citation omitted). The State cannot satisfy its burden of establishing any of the prongs of the strict scrutiny standard.

### C. The State Cannot Show a Legitimate and Compelling Interest In Restricting Access to Games with "Violent" Content.

The Act fails strict scrutiny because the State cannot point to any legitimate and compelling interest that would support the Act's restrictions on protected speech. The Act suggests that the restrictions on video games are justified by the State's interest in preventing "physical" and "psychological" harm to minors. *See* Act, § 1.[1] Neither of these purported interests satisfies the requirements of strict scrutiny.

As to the first purported interest, the State cannot meet the stringent standard for laws restricting speech in order to curb "violent" behavior. Any effort to justify the Act on the theory that disfavored content in video games will cause physical harm by inciting some players to act violently must meet the stringent standards of *Brandenburg v. Ohio*, 395 U.S. 444 (1969). *See Granholm*, 2006 WL 901711 at *4-5; *Blagojevich*, 404 F. Supp. 2d at 1073; *see also James*, 300 F.3d at 698 ("In protecting against the propensity of expression to cause violence, states may only regulate that speech" that meets the *Brandenburg* standard); *Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017, 1021-22 (5th Cir. 1987). Under *Brandenburg*, the government must prove that the targeted expression

"'is *directed to* inciting or producing *imminent* lawless action and is *likely* to incite or produce such action.'" *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002) (quoting *Brandenburg*, 395 U.S. at 447) (emphasis added); *Herceg*, 814 F.2d at 1022; *James*, 300 F.3d at 698; *see also Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1199-1200 & n.8 (9th Cir. 1989) (*American Booksellers Ass'n v. Hudnut*, 771 F.2d 323, 329-30 (7th Cir. 1985), *aff'd*, 475 U.S. 1001 (1986). As the Supreme Court has explained, "the mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Free Speech Coalition*, 535 U.S. at 253; *cf. Texas v. Johnson*, 491 U.S. at 408-09 ("fighting words" doctrine applies only to speech likely to provoke immediate breach of peace); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) (same). Thus, the government may not punish speakers based solely on a prediction or suspicion that their words will tend, in the aggregate, to encourage undesired behavior. The Act is devoid of any legislative finding or underlying evidence that the video games covered by the Act are directed to and likely to cause imminent violent action – nor could such a showing be made, as every court to have considered the issue has concluded.

The Act's second stated interest—in preventing "psychological harm" to minors—is equally flawed. That interest is nothing more than an interest in controlling minors' thoughts—a wholly impermissible reason for restricting protected speech. The First Amendment forbids governmental restrictions on speech based on the provocative or persuasive effect of that speech on its audience. *See Boos v. Barry*, 485 U.S. 312, 321 (1988) (O'Connor, J.,) (striking ban on picketing near embassies where purpose was to protect the emotions of those who reacted to the picket signs' message); *Texas v. Johnson*, 491 U.S. at 408-09 (interest in protecting bystanders from feeling offended or

angry is not sufficient to justify ban on expression). An effort by the State to censor speech in order to promote citizens' "well-being" amounts to nothing more than improper thought control. As the Supreme Court has noted, "First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end." *Free Speech Coalition*, 535 U.S. at 253.

Like adults, minors have a First Amendment right to be free from content-based governmental regulation of the speech they utter or receive. *See, e.g., McConnell v. Federal Election Comm'n*, 540 U.S. 93, 231 (2003) ("Minors enjoy the protection of the First Amendment"); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 (1975); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506-07, 511 (1969). The government does not have a generalized power to limit minors' exposure to creative works based on a belief that they may be psychologically harmful. *IDSA*, 329 F.3d at 959-960 ("[In no case] does the Supreme Court suggest that the government's role in helping parents to be the guardians of their children's well-being is an unbridled license to governments to regulate what minors read and view. . . . [T]he government cannot silence protected speech by wrapping itself in the cloak of parental authority."); *Blagojevich*, 404 F. Supp. 2d at 1076 (same). *Cf. AAMA*, 244 F.3d at 577 ("[There is] there is a serious "danger of allowing government to control the access of children to information and opinion," as "[p]eople are unlikely to become well-functioning, independent-minded adults and responsible citizens if they are raised in an intellectual bubble."). Thus, the State simply may not restrict video game expression merely because it dislikes the way that expression shapes individuals' thoughts and attitudes. *See Blagojevich*, 404 F. Supp. 2d at 1074 ("In this country, the State lacks the authority to

ban protected speech on the ground that it affects the listener's or observer's thoughts and attitudes.").

### D. The Act Does Not Materially Advance The State's Interests And Is Not Narrowly Tailored.

Even assuming that the State's justifications for the Act were not facially illegitimate and unsupported by evidence, the Act would still fail First Amendment scrutiny. First, the State would have to demonstrate that the Act's restrictions actually and materially address the alleged government interests. *See, e.g., Turner*, 512 U.S. at 664-65; *Maleng*, 325 F. Supp. 2d at 1189. Here, the fact that the State has singled out video games—even though a wide range of media make comparable violent expression available to minors—is strong evidence that the Act fails to advance the State's interests. *See, e.g., Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989) (the "facial underinclusiveness" of a regulation undermines the claim that the regulation serves its alleged interests).[2] "Violent" video games "are a tiny fraction of the media violence to which modern American children are exposed." *AAMA*, 244 F.3d at 579. But the Act leaves these other media unaffected. *See Blagojevich*, 404 F. Supp. 2d at 1075 ("In fact, the underinclusiveness of this statute—given that violent images appear more accessible to unaccompanied minors in other media—indicates that regulating violent video games is not really intended to serve the proffered purpose."); *Granholm*, 2006 WL 901711 at *6 (Not only does the Act not materially advance the State's stated interests, but it appears to discriminate against a disfavored "newcomer" in the world of entertainment media. Thus, "singling out" the video game industry does not advance the State's alleged goals and therefore does not fulfill the strict scrutiny requirement."). Under the Act, for example, a minor could be legally barred from buying or renting an "M"-rated video

-11-

game containing "violent" content, but that same minor could legally buy or rent the movie and book on which the video game was based.

Moreover, the Act fails strict scrutiny because it is not narrowly tailored. The narrow tailoring requirement requires the State to prove that "a plausible, less restrictive alternative" to banning such games "will be ineffective to achieve its goals." *Playboy*, 529 U.S. at 816. The State cannot make such a showing here, where such alternative exists, including encouraging awareness of the voluntary ESRB video game rating system (which provides guidance to parents and other consumers), and the availability of parental controls that allow each household to determine which games their children can play.[3] *See Playboy*, 529 U.S. at 824-25 ("A court should not assume a plausible, less restrictive alternative would be ineffective; and a court should not presume parents, given full information, will fail to act."); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507-08 (1996) (plurality op.) (striking down ban on advertising alcohol prices because of less restrictive alternatives, such as an "educational campaign" or "counterspeech"); *Ashcroft*, 542 U.S. at 671-72 (noting that rapid technological developments may create alternatives displacing the rationale for imposing speech restrictions). The State cannot meet its burden of demonstrating the absence of less restrictive alternatives where it declined Plaintiffs' offer to work with it to help educate consumers about the well-established and comprehensive ESRB system, and instead proceeded to adopt the Act's restrictive measures.

E. **The Act Is Unconstitutionally Vague.**

The Act is unconstitutional on an independent ground: vagueness. Because several of the Act's key terms are impermissibly vague and place the burden of compliance on game retailers, the Act will restrict a far broader range of expression than

even the State claims it is seeking to regulate. The Constitution demands that statutes be set forth with "sufficient definiteness that ordinary people can understand what conduct is prohibited." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Such precision is essential to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). In particular, exacting precision is required of restrictions in the context of protected expression. *See Reno*, 521 U.S. at 871-72 (explaining that the vagueness of a "content-based regulation of speech," particularly one imposing criminal penalties, "raises special First Amendment concerns because of its obvious chilling effect on free speech"); *NAACP v. Button*, 371 U.S. 415, 433 (1963).

The Act's definition of a prohibited "violent" video game fails to give reasonable notice of what conduct is prohibited. The vague terms include, but are not limited to: "the minor's morbid interest in violence," depictions of violence that are "patently offensive to prevailing standards in the community as to what is suitable for minors," and games which lack "serious literary, artistic, political, or scientific value for minors." The State has apparently attempted to harness the standard for sexual obscenity in the context of violent video games, but the "'harmful to minors' standard for sexually explicit speech cannot be expanded to cover depictions of violence." *Granholm*, 2006 WL 901711 at *8. Instead, as *Granholm* held, such terms have no clear meaning in the context of violent video games. *Id*; *see also Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690 (8th Cir. 1992) (affirming district court's conclusion that statute lacks requisite specificity because, *inter alia*, term "morbid" was not defined); *cf. Winters*, 333 U.S. at 513, 518-19 (striking down as vague a statute prohibiting the distribution of tales of criminal deeds of

bloodshed and lust "so massed as to become vehicles for inciting violent and depraved crimes against the person" and appealing "to that portion of the public who (as many recent records remind us) are disposed to take to vice for its own sake"). Indeed, unlike the existing harmful to minors statute, which defines the sexual depictions that are subject to its provisions, the Act provides no definition for "violence."

Because of its vague terms, persons of ordinary intelligence are forced to guess at the meaning and scope of the Act. And because video games offer the player a wide range of possible game play of significant duration, retailers would be expected to review the entire possible course of play in a particular game to ensure that the game does not violate the Act. "The lack of precision among these definitions will subject [Louisiana] retailers to steep . . . criminal liability if they guess wrongly about what games the Act covers. Retailers will respond by either self censoring or otherwise restricting access to any potentially offending video game title." *Granholm*, 2006 WL 901711 at *8; *Blagojevich*, 404 F. Supp. 2d at 1077 ("[T]his [vague] this definition leaves video game creators, manufacturers, and retailers guessing about whether their speech is subject to criminal sanctions."); *Maleng*, 325 F. Supp. 2d at 1191 ("The problem is not . . . that a retail clerk may be unaware of the contents of a particular game. . . . The real problem is that the clerk might know everything there is to know about the game and yet not be able to determine whether it can be legally sold to a minor."). Such understandable, self-protective behavior will deprive access to such expression not just to minors, but to adult customers as well—who unquestionably have the right to access the video games covered by the Act.

II.     **THE EQUITIES STRONGLY SUPPORT A TEMPORARY INJUNCTION.**

Not only have Plaintiffs demonstrated a virtually certain likelihood of success on

the merits, but the other prerequisites to temporary injunctive relief are easily met here. Issuance of a temporary restraining order would plainly serve the public interest and would not harm Defendants' legitimate interests. Plaintiffs, their members, and willing listeners will all suffer irreparable harm if the Act's restriction of protected expression goes into effect. As the Supreme Court has made clear, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373; *see also Ingebretson*, 88 F.3d at 280; *Deerfield*, 661 F.2d at 338; *New Orleans Secular Humanist Ass'n, Inc. v. Bridges*, 2006 WL 1005008, *5 (E.D. La.); *Wexler*, 267 F. Supp. 2d at 568. In the First Amendment context, the irreparable injury "stems from the intangible nature or the benefits flowing from the exercise of those rights; and the fear that, if these rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future." *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Authority* ("*SORTA*"), 163 F.3d 341, 363 (6th Cir. 1998) (internal quotation marks omitted); *see also Howells v. City of New Orleans*, 2001 WL 823723, *2 (E.D. La.); (TRO granted); *Howell v. City of New Orleans*, 844 F. Supp. 292, 294 (E.D. La. 1994) (same). Thus, no adequate remedy at law exists for Plaintiff's claims. *See, e.g., Jabr*, 171 F. Supp. 2d at 666; *National People's Action v. Village of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990) ("[I]njunctions are especially appropriate in the context of first amendment violations because of the inadequacy of money damages.").

Finally, the balance of equities (including the public interest) weighs heavily in favor of a temporary restraining order. The public interest would be harmed if the Act were allowed to go into effect. *See Wexler*, 267 F. Supp. 2d at 568-69 (holding that

"[t]he public interest is best served by enjoining the effect of any ordinance which limits potentially constitutionally protected expression until it can be conclusively determined that the ordinance withstands constitutional scrutiny."). The enforcement of the Act will not only affect Plaintiffs, but will affect countless video game creators, retailers, and consumers throughout Louisiana and beyond, all of whom will suffer infringements on their constitutional right to produce and view the expression contained in the wide array of video games implicated here. By contrast, "there can be no irreparable harm to a [government] when it is prevented from enforcing an unconstitutional statute because 'it is always in the public interest to protect First Amendment liberties.'" *Joelner v. Village of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004) (quoting *Connection Distrib. Co*, 154 F.3d at 288); *see also Ingebretson*, 88 F.3d at 280; *ACLU v. Foster*, 2002 WL 1733651, *2 (E.D. La.) ("The threatened injury to the plaintiffs in this matter far outweighs the threatened injury to the defendants because constitutional rights are at stake."). The equities compel a temporary restraining order here.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant a temporary restraining order, enjoining Defendants from enforcing the Act until the Court rules on the merits of Plaintiffs' constitutional claims.

Respectfully submitted,

_____
James A. Brown, T.A. (Bar #14101)
George Denegre, Jr. (Bar #8387)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, LA 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

Attorneys for Entertainment Software Association
and Entertainment Merchants Association

Of Counsel:

Paul M. Smith
Katherine A. Fallow
Matthew S. Hellman
JENNER & BLOCK LLP
601 13th Street, NW, Suite 1200
Washington, DC 20005
Telephone: (202) 639-6000
Facsimile: (202) 639-6066

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing pleading has been served upon Charles C. Foti, Jr., in his official capacity as Attorney General of the State of Louisiana and Doug Moreau, in his official capacity as District Attorney for the Parish of Baton Rouge, by facsimile and/or e-mail with PDF attachment this 11 day of June 2006.

_____

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ENTERTAINMENT SOFTWARE ASSOCIATION AND ENTERTAINMENT MERCHANTS ASSOCIATION,<br><br>Plaintiffs,<br><br>vs.<br><br>CHARLES C. FOTI, JR., in his official capacity as Attorney General of the State of Louisiana; and DOUG MOREAU, in his official capacity on behalf of himself as District Attorney for the Parish of East Baton Rouge, and on behalf of a class of similarly situated individuals in their official capacities,<br><br>Defendants. | CIVIL ACTION NO. 06-431-JJB-CN<br><br>SECTION "D"<br><br>Judge James J. Brady |

### MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I. INTRODUCTION

Plaintiffs Entertainment Software Association ("ESA") and Entertainment Merchants Association ("EMA") submit this memorandum in support of their motion, pursuant to Federal Rule of Civil Procedure 56, for summary judgment in their favor and entry of a declaratory judgment and a permanent injunction preventing enforcement of La. R.S. 14:91.14 (hereinafter, the "Act"). On June 16, 2006, the Court temporarily enjoined enforcement of the Act, and on August 24, 2006, the Court entered a preliminary injunction against Defendant District Attorney Doug Moreau enjoining enforcement of the Act. Plaintiffs now respectfully request that the Court grant summary judgment to Plaintiffs, and issue a declaratory judgment finding the Act unconstitutional and permanently enjoin enforcement of the Act.