harm' includes depictions of death, dismemberment, amputation, decapitation, maiming, disfigurement, mutilation of body parts, or rape." *Id.*

The Act's "violent" video game ban claims to serve five purposes: "assisting parents in protecting their minor children from violent video games," "preventing violent, aggressive, and asocial behavior," "preventing psychological harm to minors who play violent video games," "eliminating any societal factors that may inhibit the physiological and neurological development of its youth," and "facilitating the maturation of Illinois' children into law-abiding, productive adults." Act § 12A-5(d)-(h). Furthermore, the Act purports to make "findings" that "minors who play violent video games are more likely to: (1) [e]xhibit violent, asocial, or aggressive behavior[,] (2) [e]xperience feelings of aggression[, and] (3) [e]xperience a reduction of activity in the frontal lobes of the brain which is responsible for controlling behavior." *Id.* § 12A-5(a).

### 2. The "Sexually Explicit" Video Game Ban.

The Act also imposes a criminal punishment of up to $1,000 on "[a] person who sells, rents, or permits to be sold or rented, any sexually explicit video game" to an individual under age 18. Act § 12B-15. The Act's definition of "sexually explicit" video games[3] borrows to some degree from recognized constitutional standards for the regulation of "harmful to minors" sexual speech, but omits the critical third prong of the constitutional standard — that such games lack serious literary, artistic, political, or scientific value. *Id.* § 12B-10(e). Notably, the Act contains a separate "harmful to minors" section that appears to meet the constitutional standard,

---

[3] "Sexually explicit" video games are defined by the Act as "those that the average person, applying contemporary community standards would find, with respect to minors, is designed to appeal or pander to the prurient interest and depict or represent in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act or a lewd exhibition of the genitals or post-pubescent female breast." Act § 12B-10(e).

but which applies to *all* media, not just to video games. *See id.* § 11-21. The Act's only purported "finding" related to "sexually explicit" video games is the bare assertion that such games are "inappropriate for minors." *Id.* § 12B-5.

### 3. The Act's Labeling, Signage, And Check-Out Restrictions.

In addition to imposing substantial penalties on persons who sell or rent "violent" or "sexually explicit" video games to minors, the Act imposes numerous additional burdens on speech. For example, the Act requires, under threat of criminal punishment of up to $1,000, that those who sell or rent "violent" or "sexually explicit" games "via electronic scanner" must program the scanner "to prompt sales clerks to check identification before the sale or rental transaction is completed." Act §§ 12A-15(b); 12B-15(b). And, under threat of the same criminal penalty, the Act bars the sale or rental -- to minors and adults — of any "violent" or "sexually explicit" game "through a self-scanning checkout mechanism." *Id.* §§ 12A-15(c); 12B-15(c).

The Act also unlawfully compels a variety of speech on the part of the "video game retailer," defined as *any* "person who sells or rents video games to the public." Act §§ 12A-10(a), 12B-10(a). *First*, retailers "shall label all violent video games" and "all sexually explicit video games" (as defined above) "with a solid white '18.'" *Id.* §§ 12A-25; 12B-25. The Act further specifies that the "18" label must be outlined in black, must be at least 2 inches by 2 inches large, and must be placed on the face of the video game package. *Id. Second*, the Act requires retailers to erect signs of specific appearance, dimension, and lettering, notifying customers of the ESRB rating system. *Id.* § 12B-30. These signs must be "prominently posted in, or within 5 feet of" a variety of locations throughout an establishment, including "the area in which games are displayed for sale or rental, at the information desk if one exists, and at the point of purchase." *Id. Third*, a retailer "shall make available upon request a brochure to

6

customers" explaining the ESRB system. *Id.* § 12B-35. Violation of any of these provisions is punishable by a fine of $500 for each of the first three violations, and $1,000 for every subsequent violation. *See id.* §§ 12A-25, 12B-25, 12B-30, 12B-35. Notably, these detailed signage and brochure requirements apply regardless whether retailers already voluntarily post similarly designed signs and provide such brochures — as a great majority do.

## ARGUMENT

"A party seeking to obtain a preliminary injunction must demonstrate: (1) its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted." *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). Once these conditions are met — as they are here — a court proceeds to balance "the irreparable harm that the nonmoving party will suffer if preliminary relief is granted" with "the irreparable harm the moving party will suffer if relief is denied," along with the public interest. *Id.* "This balancing involves a sliding scale analysis: the greater [a movant's] chances of success on the merits, the less strong a showing it must make that the balance of harm is in its favor." *FoodComm Int'l. v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003).

Plaintiffs easily satisfy this standard. Indeed, the Seventh Circuit has already ordered a preliminary injunction based on a challenge to a materially identical ban on "violent" video games. *See AAMA*, 244 F.3d at 580 (noting a "strong likelihood of ultimate victory," that plaintiffs "will suffer irreparable harm if the ordinance is permitted to go into effect," and "the entirely conjectural nature of the benefits of the ordinance to the people of Indianapolis").

7

I. **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS, GIVEN THE ACT'S SWEEPING CONTENT-BASED INVASION OF FIRST AMENDMENT RIGHTS AND UNCONSTITUTIONAL VAGUENESS.**

A. **Video Games Constitute Expression Protected By The First Amendment.**

The Seventh Circuit has unequivocally held — consistent with other federal courts — that video games constitute expression protected by the First Amendment. *See AAMA*, 244 F.3d at 577-78; *accord, e.g., IDSA*, 329 F.3d at 957 (noting that "[t]he mere fact" that video games "appear in a novel medium is of no legal consequence"); *VSDA*, 325 F. Supp. 2d at 1184-85 (such games "are expressive and qualify for the protections of the First Amendment"). Indeed, video games convey "age-old themes of literature," messages, and ideologies, "just as books and movies do." *AAMA*, 244 F.3d at 577-78. Moreover, the Act's content-based restrictions themselves demonstrate that the targeted games constitute protected expression, because "it is the nature and effect of the message being communicated by these video games which prompted the state to act in this sphere." *VSDA*, 325 F. Supp. 2d at 1184.

B. **The Act's "Violent" Video Game Restrictions Fail Strict Scrutiny And Violate The First Amendment.**

1. **Because The Act Regulates Expression Based On Content, It Must Survive Strict Scrutiny.**

The Act restricts access to expression based on its "violent" content, and thus is subject to the most exacting First Amendment scrutiny. Such content-based regulation of expression is "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). "It is rare that a regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 818 (2000).

As the Seventh Circuit has made clear, this rule is no different where "violent" video games are at issue, because depictions of violence — including those in video games — are fully protected under the First Amendment. *AAMA*, 244 F.3d at 575-76 (likening the "violence" in

8

video games to "violence" in works of "[c]lassic literature and art," which "are saturated with graphic scenes of violence, whether narrated or pictorial," and concluding that "[t]he notion of forbidding not violence itself, but pictures of violence, is a novelty"); *accord, e.g., IDSA*, 329 F.3d at 958 (strict scrutiny applies to content-based restrictions on "violent" video games); *VSDA*, 325 F. Supp. 2d at 1186 (same); *cf., e.g., Eclipse Enters., Inc. v. Gulotta*, 134 F.3d 63, 66 (2d Cir. 1997) (declining to "expand the[] narrow categories of [unprotected] speech to include depictions of violence" in trading cards). Indeed, in the context of "violent" magazines, the Supreme Court has made clear that violent expression is "as much entitled to the protection of free speech as the best of literature." *Winters v. New York*, 333 U.S. 507, 510 (1948).

Nor is heightened scrutiny inapplicable because the Act targets *minors'* access to protected expression. Like adults, minors have a First Amendment right to be free from content-based governmental regulation of the speech they utter or receive. *See, e.g., McConnell v. Federal Election Comm'n*, 540 U.S. 93, 231 (2003) ("Minors enjoy the protection of the First Amendment"); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 (1975); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506-07, 511 (1969); *AAMA*, 244 F.3d at 576 ("Children have First Amendment rights."). As the Seventh Circuit has explained, there is a serious "danger of allowing government to control the access of children to information and opinion," as "[p]eople are unlikely to become well-functioning, independent-minded adults and responsible citizens if they are raised in an intellectual bubble." *AAMA*, 244 F.3d at 577.

Thus, like all content-based regulations of speech, the Act must withstand strict scrutiny. Under this standard, the State must (1) articulate a compelling state interest; (2) prove that the Act actually serves that interest and is "necessary" to do so; and (3) show that the Act is narrowly tailored to serve that interest. *R.A.V.*, 505 U.S. at 395; *Turner Broad. Sys., Inc. v. FCC*,

512 U.S. 622, 664-65 (1994); *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991); *AAMA*, 244 F.3d at 576 ("The grounds must be compelling and not merely plausible."). The legislature's judgments are not to be accepted without question; rather, the legislature must have "drawn reasonable inferences based on substantial evidence." *Turner*, 512 U.S. at 666; *see, e.g.*, *VSDA*, 325 F. Supp. 2d at 1187-88. Moreover, the state "must do more than simply 'posit the existence of the disease sought to be cured.' It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner*, 512 U.S. at 664; *see AAMA*, 244 F.3d at 576-79 (assessing the government's claimed interests and alleged supporting evidence).

### 2. The State Does Not Have A Compelling Interest In Restricting Access To The Targeted "Violent" Games.

The Act's stated goals essentially boil down to two purported State interests for its restrictions on "violent" games: (1) preventing "violent, aggressive, and asocial behavior," Act § 12A-5(e); and (2) preventing psychological or other developmental harms to minors allegedly resulting from playing "violent" video games, *id.* Act § 12A-5(f)-(h). Neither approaches a constitutionally sufficient rationale for the Act.

#### a. Preventing "Real-World" Violence.

With respect to the "preventing real-world violence" rationale, the State must meet the stringent demands of *Brandenburg v. Ohio*, 395 U.S. 444 (1969). *See, e.g.*, *James*, 300 F.3d at 698 ("In protecting against the propensity of expression to cause violence, states may only regulate that speech" which meets the *Brandenburg* standard). Under *Brandenburg*, the government may regulate expression based on a concern that it will cause unlawful or violent behavior *only* if the government can prove that such expression "'is *directed to* inciting or producing *imminent* lawless action and is *likely* to incite or produce such action.'" *Ashcroft v.*

10

*Free Speech Coalition*, 535 U.S. 234, 253 (2002) (quoting *Brandenburg*, 395 U.S. at 447) (emphasis added). As the Supreme Court has explained, "the mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Id.* Thus, the government may not punish speakers based solely on a prediction or suspicion that their words will tend, in the aggregate, to encourage undesired behavior.

Here, the Act regulates speech ostensibly based on the General Assembly's conclusory "findings" that "minors who play violent video games are more likely to: (1) [e]xhibit violent, asocial, or aggressive behavior [and] (2) [e]xperience feelings of aggression." Act § 12A-5(a). But even assuming that such findings were based on any reliable evidence,[4] the State would fail to meet the *Brandenburg* standard based on such aggregate effects. The General Assembly could not and did not find that games played safely every day by millions are "likely" to produce "imminent" violence. Nor are such games, designed for entertainment, "directed" to inciting violence. *See, e.g., James*, 300 F.3d at 698.

Partly for these legal reasons, the Seventh Circuit in *AAMA* rejected the government's argument that a "violent" video game ban was justified because video games "incite youthful players to breaches of the peace." 244 F.3d at 575; *see also, e.g., James*, 300 F.3d at 698 (holding that the "glacial process of personality development" allegedly affected by "violent" video games "is far from the temporal imminence that we have required to satisfy the

---

[4] The Act cites no support for its cursory conclusions about the effects of "violent" games on minors' real-world violent behavior. And there is no such support. As every court considering the issue has concluded, the research fails to establish any causal link between exposure to such games and subsequent harm to anyone. *See IDSA*, 329 F.3d at 959 (finding law lacking "the 'substantial supporting evidence' of harm that is required before an ordinance that threatens protected speech can be upheld"); *AAMA*, 244 F.3d at 578-79 (scientific studies "do not support" the regulation of "violent" video games, because these studies "do not find that video games have ever caused anyone to commit a violent act"); *VSDA*, 325 F. Supp. 2d at 1188 (finding that "the current state of the research cannot support the . . . Act because there has been no showing that exposure to video games . . . is likely to lead to actual violence").

11

*Brandenburg* test"). In addition, the Seventh Circuit examined the "studies" submitted by the government and concluded that there was no evidence that "video games have ever caused anyone to commit a violent act, as opposed to feeling aggressive, or have caused the average level of violence to increase anywhere." 244 F.3d at 578-79.[5]

### b. Preventing Psychological Or Developmental Harm.

The State's second asserted interest — preventing various "harms" to minors — is no more constitutionally sufficient than the first. Indeed, the Seventh Circuit already considered and rejected this argument in *AAMA*: "Common sense says that the [State's] claim of harm to its citizens from these games is implausible, at best wildly speculative." *AAMA*, 244 F.3d at 579.

As an initial matter, the requirements of strict scrutiny are not relaxed simply based on a generalized allegation of "harm" to minors. The only "minors" exception to the rule of strict scrutiny concerns the "harmful to minors" regulation of certain sexually explicit materials, which has no application to the "violent" material that the State seeks to regulate here. *See, e.g., Ginsberg v. New York*, 390 U.S. 629, 636-43 (1968) (permitting relaxed "harmful to minors" regulation of certain explicit sexual expression); *IDSA*, 329 F.3d at 959 (noting that "*Ginsberg* did not involve protected speech like the speech at issue in this case" (internal parentheses omitted)); *VSDA*, 325 F. Supp. 2d at 1185 (explaining that *Ginsberg* is limited to sexually explicit expression). Indeed, the Seventh Circuit has made clear that the concerns underlying

---

[5] In an analogous context — where it was claimed that non-obscene pornography may be regulated because it may increase the infliction of violence on women — the Seventh Circuit concluded that, even if such allegations were true, protected speech could not be restricted where the dangers were not immediate. "All of these unhappy effects," the court observed, "depend on mental intermediation." *American Booksellers Ass'n v. Hudnut*, 771 F.2d 323, 329-30 (7th Cir. 1985), *aff'd*, 475 U.S. 1001 (1986). That the allegedly harmful expression might one day lead to action was not enough — "this simply demonstrates the power of . . . speech." *Id.*

12