*Ginsberg* do not apply with respect to "violent" video games. *See, e.g., AAMA*, 244 F.3d at 578-79.

To the extent that the State's "harm" justification is anything more than a repackaging of the "preventing real-world violence" rationale, the State's alleged interest in restricting access to expression based on its content and a consumer's reaction to that content amounts to nothing more than thought control. As the Supreme Court has noted, "First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end." *Free Speech Coalition*, 535 U.S. at 253. The government simply does not have a generalized power to limit minors' exposure to creative works based on a belief that they will be psychologically harmful. Such works "may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952). But with the exception of a narrow subset of sexually explicit speech (which meets the three-prong standard set by the Supreme Court), the State simply may not restrict protected expression merely because it dislikes the way that expression shapes individuals' thoughts and attitudes—or neuron firing patterns[6]—or because it fears that the speech prevents the listener from becoming a sufficiently "productive" citizen. Act § 12A-5(h).[7]

---

[6] The Act's unsupported "finding" concerning "frontal lobe activity," and its correlated alleged "interest" in protecting minors' neurological development, *see* Act § 12A-5(a)(3) & (g), represent nothing more than a transparent attempt to repackage in the language of neuroscience the same psychological harm rationale that the Seventh Circuit clearly rejected in *AAMA*. The State's attempt to censor protected expression is no more constitutional for the change in terminology.

[7] The Act also asserts a goal of "assisting parents," Act § 12A-5(d), but contains no defense for sales or rentals made to minors who have parental permission to purchase or rent a "violent" or "sexually explicit" game. *See id.* §§ 12A-20, 12B-20; *cf.* Andersen Decl. ¶ 23 (noting that many retailers maintain member databases indicating whether their adult customers

13

### 3. The Act Does Not Materially Advance The State's Interests And Is Not Narrowly Tailored.

Even assuming that the State's justifications for the Act were not facially illegitimate and unsupported by evidence, the Act would still fail First Amendment scrutiny. First, the State would have to demonstrate that the Act's restrictions actually and materially address the alleged government interests. *See, e.g., Turner*, 512 U.S. at 664-65; *VSDA*, 325 F. Supp. 2d at 1189. Here, the fact that the State has singled out video games — even though a wide range of media make comparable violent expression available to minors — is strong evidence that the Act fails to advance the State's interests. *See, e.g., Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989) (the "facial underinclusiveness" of a regulation undermines the claim that the regulation serves its alleged interests); *VSDA*, 325 F. Supp. 2d at 1189 (explaining that "the Act is too narrow in that it will have no effect on the many other channels through which violent representations are presented to children").[8] As the Seventh Circuit observed in *AAMA*, "violent" video games "are a tiny fraction of the media violence to which modern American children are exposed." 244 F.3d at 579. But the Act leaves these other media unaffected. Under the Act, for example, a minor

---

have authorized the rental and sale of "M" rated games to their children). This suggests that the State is interested not in assisting parents in determining what is best for their children, but in imposing the State's own view of "appropriate" content on children and parents alike. In any event, the State may not suppress First Amendment rights in the name of helping parents to protect minors from the imagined harms of "violent" expression. *See, e.g., AAMA*, 244 F.3d at 577 (explaining that "the right of parents to enlist the aid of the state to shield their children from ideas of which the parents disapprove cannot be plenary," because children have their own rights under the First Amendment); *IDSA*, 329 F.3d at 960 (rejecting an asserted state interest in "assisting parents" as non-compelling, and explaining that "the government cannot silence protected speech by wrapping itself in the cloak of parental authority").

[8] Such differential regulation of comparable expression invokes the specter of impermissible viewpoint discrimination. *See, e.g., Playboy*, 529 U.S. at 812 ("Laws designed or intended to suppress or restrict the expression of specific speakers contradict basic First Amendment principles." (striking down a regulation that targeted "adult" cable channels, but permitted similar expression by other speakers)); *Turner*, 512 U.S. at 659 ("Regulations that discriminate among media, or among different speakers within a single medium, often present serious First Amendment concerns.").

14

could be legally barred from buying or renting an "M" rated video game containing "violent" content, but that same minor could legally buy or rent the movie and book on which the video game was based. *See, e.g.*, Price Decl. ¶¶ 4, 39 (noting that the M-rated game *Tom Clancy's Rainbow Six 3* is based on writer Tom Clancy's highly successful novels).[9]

Moreover, the Act fails strict scrutiny because it is not narrowly tailored. The narrow tailoring requirement requires the State to prove that "a plausible, less restrictive alternative" to banning such games "will be ineffective to achieve its goals." *Playboy*, 529 U.S. at 816. The State cannot make such a showing here, where such an alternative exists: encouraging awareness of the voluntary ESRB video game rating system, which provides guidance to parents and other consumers. *See generally* Lowenstein Decl.; *Playboy*, 529 U.S. at 824 ("A court should not assume a plausible, less restrictive alternative would be ineffective; and a court should not presume parents, given full information, will fail to act."); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507-08 (1996) (plurality op.) (striking down ban on advertising alcohol prices because of less restrictive alternatives, such as an "educational campaign" or "counterspeech"). The State, in fact, rejected Plaintiffs' offer to work with it to help educate consumers about the well-established and comprehensive ESRB system. *See* Lowenstein Decl. ¶ 22-23.[10]

---

[9] The Seventh Circuit has explained why the State's alleged interest in facilitating the development of Illinois' youth will actually be *disserved* by restricting minors' access to violent images. As the court explained in *AAMA*, "shield[ing] children right up to the age of 18 from exposure to violent descriptions and images would not only be quixotic, but deforming; it would leave them unequipped to cope with the world as we know it." 244 F.3d at 577.

[10] The Act's lack of narrow tailoring is not cured by the Act's apparent defenses, the meaning and scope of which are unclear. There are four "affirmative defenses" to liability under the Act: (1) that the defendant who sold or rented the game was a "family member" of the minor customer; (2) that the defendant reasonably relied upon an "official or apparently official document" presented by the customer stating that the customer was 18 or older; (3) for the video

15

### C. The Act's "Sexually Explicit" Video Game Restrictions Fail Strict Scrutiny And Violate The First Amendment.

The Act's special restrictions on the sale or rental of "sexually explicit" video games are squarely foreclosed by Supreme Court precedent. In *Ginsberg v. New York*, 390 U.S. 629, 636-43 (1968), the Supreme Court carved out a narrow "harmful to minors" exception to the general rule that non-obscene sexual expression may not be restricted without satisfying the strictest Constitutional scrutiny. Under *Ginsberg* and *Miller v. California*, 413 U.S. 15 (1973), the government may restrict minors' access to sexually explicit material only if that material (1) predominantly appeals to minors' prurient, shameful or morbid interest in sex; (2) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and (3) lacks serious literary, artistic, political, or scientific value as to minors. *See Miller*, 413 U.S. at 24-25; *Ginsberg*, 390 U.S. at 633, 636-43. A purported "harmful to minors" statute that does not contain all of these elements will not be sustained under *Ginsberg* and *Miller*. *See Reno v. ACLU*, 521 U.S. 844, 864-66 (1997).

Here, under the Act's definition of "sexually explicit" video games, *see* Act § 12B-10(c), video games with serious literary, artistic, political or scientific value could be censored. For example, the Act may be read to restrict *God of War*, a video game in which the player's

---

game retailer, if the retail sales clerk had "complete knowledge" that the customer was a minor and "specific intent" to sell or rent to that minor; and (4) that the video game at issue "was pre-packaged and rated EC, E, E10+ or T" by the ESRB." Act §§ 12A-20, 12B-20. The Act separately states that a "retail sales clerk" shall not be found liable unless the clerk had "complete knowledge" that the customer was a minor and "specific intent" to sell or rent to that minor. *Id.* §§ 12A-15(d), 12B-15(d). These purported defenses include vague and confusing terms, such as "retail sales clerk," "complete knowledge," and "pre-packaged," which will only enhance the Act's chilling of speech. *See* Andersen Decl. ¶ 16. These defenses also illegitimately incorporate the voluntary ESRB rating system as the basis for legal sanctions, and fail to cover the common situation where a parent authorizes a child to buy or rent M-rated games, *see id.* ¶ 23. But, at the most fundamental level, these defenses do not cure the Act's First Amendment problem because they permit criminal punishment for the sale or rental to minors of fully protected expression.

16

character navigates a sophisticated plot through ancient Greece, but which shows female characters with their breasts exposed, along with a pivotal scene suggesting that sexual conduct is taking place between the main character and these women. *See* Price Decl. ¶ 33. Allowing such games with serious artistic and literary value to be restricted would broaden the government's power to regulate expression far beyond the narrow contours of *Miller* and *Ginsberg*. Thus, in *Reno v. ACLU*, the Supreme Court refused to sustain a regulation of sexual speech as to minors that, like the Act, "importantly, omit[ted] any requirement that the 'patently offensive' material covered by [the statute] lack serious literary, artistic, political, or scientific value." 521 U.S. at 865.

Indeed, the Act itself contains a separate, and apparently proper, "[h]armful to minors" section, Act § 11-21, which, unlike the Act's "sexually explicit" provisions, does not single out video games from other media for regulation. Any legitimate interest that the State has in shielding minors from "harmful to minors" sexual material is fully served by this general "harmful to minors" provision, which Plaintiffs do not challenge.[11]

### D. The Act's Labeling, Signage, And Check-Out Provisions Are Unconstitutional.

Several other provisions of the Act — those requiring labeling, signage, and brochures, under the threat of criminal penalty — unconstitutionally compel speech of video game retailers. The Supreme Court has long recognized that "[j]ust as the First Amendment may prevent the

---

[11] Because the special restriction on sexually explicit video games goes beyond the narrow contours of *Ginsberg*, it is subject to strict scrutiny as a content-based burden on expression. The restriction plainly fails strict scrutiny because the Assembly's purported reason for regulating this material — the bald assertion that it is "inappropriate for minors" — is patently insufficient to demonstrate a compelling state interest. The criminal restriction also fails the narrow tailoring requirement, because it lacks the third prong of the *Ginsberg/Miller* test for material that is harmful to minors, and as a result will cover a wide range of constitutionally protected speech. *See Reno*, 521 U.S. at 873.

17

government from prohibiting speech, the Amendment may prevent the government from compelling individuals to express certain views." *United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001). Because compelled messages alter the content of what the compelled party would otherwise express, they are considered content-based regulation under the First Amendment and require strict scrutiny. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). This protection extends not only to political or ideological speech, *see Pacific Gas & Electric Co. v. Public Utility of California*, 475 U.S. 1 (1986) ("*PG&E*"), but to *all* statements, whether of fact or opinion, *see Riley*, 487 U.S. at 797-98.

*First*, the Act's requirement that retailers place a large "18" label on all "violent" and "sexually explicit" video games compels video game retailers to channel the State's message that minors are not entitled to access the labeled games — even if retailers disagree with this proposition. *See* Andersen Decl. ¶ 18. The labeling requirement — like the sale and rental restrictions — is inconsistent with the voluntary rating system used by Plaintiffs.[12] The "18" label, which imparts no substantive information (other than a stigmatizing message), is contrary to and may physically obscure the detailed information concerning the ESRB rating and content descriptors on the game packaging. *See* Andersen Decl. ¶ 12; Lowenstein Decl. ¶ 17. The conflict between the labels mandated by the Act and the existing labels used by Plaintiffs will be inherently confusing to parents and other consumers who are the intended beneficiaries of the

---

[12] At a fundamental level, the "18" label conflicts with the ESRB rating system because it suggests that certain games (including games rated T or lower by the ESRB) are categorically inappropriate for individuals under 18, whereas the ESRB ratings are intended only as a guide to parents and consumers. *See* Andersen Decl. ¶¶ 18-22. The "18" label also conflicts with the specific classifications of the ESRB system. For example, the "18" label may be required for certain games classified as "E 10+" or "T" by the ESRB, *see* Price Decl. ¶ 9, even though the ESRB system indicates that such games may be suitable for ages 10 and up. Similarly, games rated "M" by the ESRB may be suitable for ages 17 and up, but the "18" label suggests that 17-year-olds may not buy or rent such games.

information conveyed by the voluntary rating system. In all cases, the label represents a message that video game retailers have not chosen for themselves. "Such forced association with potentially hostile views burdens" their expression and "risks forcing [them] to speak where [they] would prefer to remain silent." *PG&E*, 475 U.S. at 18.

Not only would the labeling provision unconstitutionally burden the expression of video game retailers, creators, and manufacturers, but it would create a substantial chilling effect on First Amendment rights. For example, the Act places the burden of labeling on individual video game retailers, each of whom will be left to his own devices to determine which games fit within the Act's vague terms. Some retailers, in an abundance of caution — and out of fear of criminal penalty — may label a far wider range of games than even those arguably covered by the Act. *See* Andersen Decl. ¶¶ 9-11; Lowenstein Decl. ¶¶ 16-18; Price Decl. ¶¶ 8-10. Moreover, the Act provides no affirmative defense to the labeling requirement for EC, E, E10+, or T-rated games. Retailers thus must label *all* games that they believe arguably fall within the Act's definitions of "violent" or "sexually explicit," even if the rental or sale of such games ultimately would be subject to the affirmative defense. Therefore, the Act permits the irrational and chilling result of criminalizing a retailer's failure to *label* "violent" or "sexually explicit" games with ratings of EC, E, E10+, or T, even though those games may be *sold* or *rented* due to the EC, E, E10+, or T affirmative defense. Such a framework fails — as a matter of both constitutional law and common sense.

*Second*, the Act's signage and brochure requirements impermissibly coerce video game retailers, under threat of criminal penalty, to convey messages that they already convey voluntarily, but to do so in a highly regimented manner that infringes upon their expression and business operations. *See* Andersen Decl. ¶ 13. The Act imposes detailed demands — such as

19