sign dimensions and locations — which are unrelated to any compelling state interest and certainly do not satisfy the exacting scrutiny required of compelled speech. *See, e.g., Riley*, 487 U.S. at 795. Moreover, there is simply no need for these criminal prohibitions, because video game retailers, like the rest of the video game industry and the ESRB itself, are already voluntarily committed to educating the public about the ESRB ratings system, and most if not all retailers already inform consumers with signs and brochures describing the ratings system. *See* Andersen Decl. ¶¶ 13, 18; Lowenstein Decl. ¶ 11. It is a fundamental First Amendment principle that the state may not coerce a speaker to deliver a message simply because that speaker may be willing to deliver the same message voluntarily. *See, e.g., West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624, 632 (1943).

*Third*, in addition to unconstitutionally compelling speech, the Act saddles video game retailers with unreasonable administrative burdens — under threat of criminal penalty — that are designed to (and will) impair and chill protected expression. For example, the Act requires all retailers who sell "violent" or "sexually explicit" games "via electronic scanner" to program such scanners "to prompt sales clerks to check identification before the sale or rental [of a controlled game] is completed." Act §§ 12A-15(b), 12B-15(b). Although many larger retailers voluntarily use such prompts for "M"-rated video games, the Act's requirements impose a new, unique, and costly burden on retailers. *See* Andersen Decl. ¶ 14. In addition, the Act forbids stores from permitting the use of "self-scanning checkout mechanism[s]" for the purchase or rental of "violent" or "sexually explicit" games — to minors *and* adults alike. Act §§ 12A-15(c), 12B-15(c). This restriction would impose a serious burden on adults' protected speech, *see* Andersen Decl. ¶ 15, whose rights the state does not contest. These provisions impose burdens on retailers

20

based on the content of the expression being sold, and thus violate the First Amendment for the reasons detailed above. *See supra* Sections I.B-I.C.

### E.   The Act Is Unconstitutionally Vague

The Act is unconstitutional on an independent ground: vagueness. Because several of the Act's key terms are impermissibly vague and place the burden of compliance on game retailers, the Act will restrict a far broader range of expression than even the State claims it is seeking to regulate. The Constitution demands that statutes be set forth with "sufficient definiteness that ordinary people can understand what conduct is prohibited." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Such precision is essential to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). In particular, exacting precision is required of restrictions in the context of protected expression. *See Reno*, 521 U.S. at 871-72 (explaining that the vagueness of a "content-based regulation of speech," particularly one imposing criminal penalties, "raises special First Amendment concerns because of its obvious chilling effect on free speech"); *NAACP v. Button*, 371 U.S. 415, 433 (1963).

Several key terms in the Act either are inherently vague or are defined in such a way as to fail to provide fair notice. For instance, the Act's "violent" video game prohibition targets "human-on-human" violence committed by "the player." Act § 12A-10(e). But "human" is a term particularly ill-suited to a medium that relies extensively on animated, extra-terrestrial, and fantastic forms and characters — which may be depicted as having only some "human" characteristics, or which may be "human" at some times and not others. For example, in *God of War*, the player assumes the role of Kratos, a Spartan commander in Ancient Greece who "dies" at various points in the game, but continues battling various gods and other entities; eventually,

the player learns that Kratos is actually the son of Zeus. *See* Price Decl. ¶¶ 25-32. Because Kratos is the son of a god, and thus able to keep battling while "dead," would he be considered "human" within the meaning of the statute? Would the "human" label apply to the gods that he battles? Similarly, in *Resident Evil IV*, part of a popular series of video games that have inspired feature films, the vast majority of enemies in the game are zombies and mutants with human characteristics. *See id.* ¶¶ 11-17. Would zombies and mutants be viewed as "human" within the meaning of the Act? And, in *Jade Empire*, which takes the player's character on an adventure through a mythical Chinese kingdom, both the player's character and the enemy forces possess magical abilities and transform into non-humanoid creatures. *See id.* ¶¶ 18-24. Does this game contain "human-on-human" violence as defined by the Act? These are only representative examples of the great confusion that will be generated by the Act's vague terms. Can a part-animal or part-alien creature be "human"? Are "the living dead conjured back to life by voodoo," *AAMA*, 244 F.3d at 577, human? And even if the player's on-screen character is not human, will the State deem her acts to constitute "human-on-human violence" merely because the actual player is?

Moreover, the Act only covers "depictions of or simulations of" violence — terms with no logical boundary in a medium in which all images are obviously computer-generated and thus inherently unrealistic. The Seventh Circuit observed that video games are populated by "cartoon characters, that is animated drawings[,]" and that "[n]o one would mistake them for photographs of real people." *Id.* at 579. Similar confusion will be spawned by the Act's use of other vague terms — such as the various, non-exclusive categories of "serious physical harm," Act § 12A-

22

10(e) — that become all the more ambiguous and unclear when applied to the inherently unrealistic video game medium.[13]

Stores and store clerks will be subject to steep liability if they wrongly guess about what games the Act covers. Game creators, distributors, and retailers will respond to the uncertainty in the Act, and the penalties the Act imposes, by either self-censoring or otherwise restricting access to *any* potentially offending video game title, or, conceivably, by pulling "M" games off the shelves altogether. *See, e.g.*, Lowenstein Decl. ¶ 15; Andersen Decl. ¶¶ 9-11, 17; Price Decl. ¶¶ 9-10. As the federal district court in Washington stated, in striking down a Washington State "violent" video game ban as unconstitutionally vague, "[n]ot only is a conscientious retail clerk (and her employer) likely to withhold from minors all games that could possibly fall within the broad scope of the Act, but authors and game designers will likely 'steer far wider of the unlawful zone . . . than if the boundaries of the forbidden area were clearly marked.'" *VSDA*, 325 F. Supp. 2d at 1191 (quoting *Grayned*, 408 U.S. at 109). Such understandable, self-protective behavior will deprive access to such expression not just to minors, but to adult customers as well — whose right to access "violent" and "sexually explicit" video games could not be questioned by the State.

## II. THE EQUITIES STRONGLY SUPPORT AN INJUNCTION.

Not only have Plaintiffs demonstrated a virtually certain likelihood of success on the merits, but the other prerequisites to injunctive relief are easily met here. Plaintiffs, their members, and willing listeners will all suffer irreparable harm if the Act's restriction of protected

---

[13] The Act's definition of "sexually explicit" video games also fails for vagueness. As the Supreme Court explained in *Reno*, the "serious value" requirement, which the Act's "sexually explicit" definition lacks, "critically limits the uncertain sweep of the obscenity definition." 521 U.S. at 873 (ruling that a federal obscenity statute lacking the required elements was unconstitutionally vague).

23

expression goes into effect. As the Seventh Circuit has made clear, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Brownsburg Area Patrons Affecting Change v. Baldwin*, 137 F.3d 503, 507 (7th Cir. 1998) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)). And no adequate remedy at law exists for Plaintiff's claims. *See, e.g.*, *National People's Action v. Village of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990) ("[I]njunctions are especially appropriate in the context of first amendment violations because of the inadequacy of money damages.").

Finally, the balance of equities (including the public interest) weighs heavily in favor of an injunction. As the Seventh Circuit recently observed, "there can be no irreparable harm to a [government] when it is prevented from enforcing an unconstitutional statute because 'it is always in the public interest to protect First Amendment liberties.'" *Joelner v. Village of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004) (quoting *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)); *see also O'Brien v. Town of Caledonia*, 748 F.2d 403, 408 (7th Cir. 1984) (recognizing that "the public has a strong interest in the vindication of an individual's constitutional rights," as well as "an interest in encouraging the free flow of information and ideas," particularly "when the situation involves the punishing of a person who has contributed to that flow of information"). The enforcement of the Act will not only affect Plaintiffs, but will affect countless video game creators, retailers, and consumers throughout Illinois and beyond, all of whom will suffer infringements on their constitutional right to produce and view the expression contained in the wide array of video games implicated here. As in *AAMA*, the equities compel an injunction here. *See* 244 F.3d at 580.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant a preliminary injunction.

*[signature]*

Paul M. Smith
Katherine A. Fallow
Kathleen R. Hartnett
JENNER & BLOCK LLP
601 13th Street, N.W., Suite 1200
Washington, DC 20005
Phone: (202) 639-6000
Fax: (202) 639-6066

David P. Sanders (ARDC # 2452359)
Wade A. Thomson (ARDC # 6282174)
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611-7603
Phone: (312) 222-9350
Fax: (312) 537-0484

Attorneys for Plaintiffs