# EXHIBIT  F

Dockets.Justia.com

_____ FILED _____ ENTERED
_____ LODGED_____ RECEIVED

JUN .. 5 2003    DJ

AT SEATTLE
CLERK U S DISTRICT COURT
BY          WESTERN DISTRICT OF WASHINGTON
                                    DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

VIDEO SOFTWARE DEALERS
ASSOCIATION, INTERACTIVE DIGITAL
SOFTWARE ASSOCIATION,
WASHINGTON RETAIL ASSOCIATION,
INTERACTIVE ENTERTAINMENT
MERCHANTS ASSOCIATION,
INTERNATIONAL GAME DEVELOPERS
ASSOCIATION, and HOLLYWOOD
ENTERTAINMENT CORPORATION,

Plaintiffs,

v

NORM MALENG, in his official capacity as
King County Prosecuting Attorney, GARY
LOCKE, in his official capacity as Governor of
the State of Washington, and CHRISTINE O
GREGOIRE, in her official capacity as Attorney
General of the State of Washington,

Defendants

NO **CV03 1245**

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

NOTE ON MOTION CALENDAR
June 27, 2003

ORAL ARGUMENT REQUESTED

CV 03-01245 #00000002

## I.    INTRODUCTION

Plaintiffs Video Software Dealers Association ("VSDA"), Interactive Digital

Software Association ("IDSA"), Washington Retail Association ("WRA"), Interactive

Entertainment Merchants Association ("IEMA"), International Game Developers Association

("IGDA"), and Hollywood Entertainment Corporation, move this Court, pursuant to Federal

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (NO  ) - 1
[41632-0001/SL031550 241]

**ORIGINAL**

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
Phone  (206) 583-8888
Fax  (206) 583-8500

Rule of Civil Procedure 65, for an order preliminarily enjoining Defendants and their officers, employees, and representatives from enforcing H B 1009, 58th Leg , Reg Sess (Wash 2003) (hereinafter, the "Act")  The Act was signed into law on May 20, 2003, and is due to take effect on July 27, 2003  This motion is based on the argument herein, the attached declarations, and the complaint and other records in this case  A proposed order accompanies this motion

Washington's unprecedented legislation forbids the sale or rental of certain "violent" computer and video games ("video games") to individuals under age 17 based on the content and viewpoint of those games  The Act defines "violent" games to include only those games with scenes of violence depicting harm to "public law enforcement officers," and only when the player's character is depicted causing the harm  Such explicit content and viewpoint discrimination violates the "bedrock principle underlying the First Amendment      that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable " Texas v Johnson, 491 U S 397, 414 (1989)  That rule is especially salient where, as here, the government is expressly censoring speech for the purpose of fostering greater "respect" for one category of government officials  The Constitution forbids restricting speech in an attempt to control what individuals think of their government and its officials  Ashcroft v Free Speech Coalition, 122 S Ct 1389, 1403 (2002) ("First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end ")

This Court should enjoin the Act  Plaintiffs present a compelling case of likely success on the merits of their constitutional challenge  Indeed, similar attempts to regulate "violent" computer and video games, as well as "violent" speech in other entertainment media, have been deemed invalid by every federal court to have reached the question

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (NO  ) - 2
[41632-0001/SL031550 241]

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington  98101-3099
Phone  (206) 583-8888
Fax  (206) 583-8500

Moreover, Plaintiffs will suffer irreparable harm if the Act is allowed to go into effect As the Ninth Circuit has recognized, the loss of First Amendment freedoms – for any amount of time – constitutes irreparable injury The Act's direct prohibition and its chilling effects will immediately affect the First Amendment rights of game creators, distributors, retailers, and players – all of whose rights are at stake in this facial challenge

## II.    FACTUAL BACKGROUND

### A.    The Nature of Video Games

Plaintiffs are companies or associations of companies that create, publish, distribute, sell, and/or rent computer and video games  (Compl ¶¶ 12-20 ) Many Plaintiffs and their members do business in Washington, including in King County, and fear prosecution or loss of audiences in King County  They bring this action because the Act threatens to censor distribution of some of Plaintiffs' creative works, based solely upon their expressive content and viewpoint  In this facial challenge, Plaintiffs also assert the rights of willing listeners

Computer and video games are a modern form of artistic expression  Like movies and television, as well as other forms of expression, these games tell stories and entertain audiences through the use of complex pictures and sounds, and sometimes through text (Fries Decl ¶ 10 )  Indeed, these games often contain storylines and character development comparable to those of books and movies  A plot develops and dialogue among characters takes place as the story of the game unfolds, often in response to actions taken by the player (Fries Decl ¶ 13 )  Like great literature, these games frequently involve themes such as good versus evil, triumph over adversity, struggle against corrupt powers, and quest for adventure (Fries Decl ¶ 11 )  For example, in *Resident Evil II*, the player tries to save a city from a virus – created by the sinister Umbrella corporation – that turns people into zombies  (Fries Decl ¶¶ 65-69 )  In *Medal of Honor  Frontline*, the player fights as an American soldier fighting to help liberate Europe from Hitler's control  (Fries Decl ¶¶ 23, 47-56 )

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, Washington  98101-3099
Phone   (206) 583-8888
Fax   (206) 583-8500

In addition to frequently involving intricate storylines, computer and video games also feature the artwork of some of the best graphic artists (Fries Decl ¶ 14 ) The typical game contains many different animated or computer-generated illustrations (Fries Decl ¶ 14 ) At various points in the story, game play may also include movie-like clips – sometimes actual clips from movies related to the game – which advance the storyline or the character's development (Fries Decl ¶ 14 ) Computer and video games also contain music, much of it original, which enhances the artistic expression of the game just as movie soundtracks do (Fries Decl ¶ 14 ) For instance, *Medal of Honor· Frontline* features over 70 minutes of original orchestral music by composer Michael Giacchino, and in *Grand Theft Auto  Vice City*, the player can listen to a variety of radio stations while driving or flying through Vice City (Fries Decl ¶¶ 39, 53 )

Computer and video games engage the imagination of viewers and place them into a world of fantasy  Many games allow the game player to become an active participant in shaping the unfolding narrative (Fries Decl ¶¶ 12-13 ) For example, *Tom Clancy's Splinter Cell* permits a player assuming the role of a National Security Agency operative, while searching for lost agents in the Former Soviet Republic of Georgia, to make a variety of choices that affect how the storyline unfolds and that highlight the complexities of a lawless political climate (Fries Decl ¶¶ 41-46 ) Even games that do not center on a complex narrative use graphic and sound elements to create an experience for the game player that provokes curiosity and evokes a sense of mood (Fries Decl ¶ 16 ) Moreover, these games, while designed to entertain, can also inform  For example, *Age of Empires II  The Age of Kings*, which enables a player to lead a variety of historical civilizations, informs players about the 1000 years of history between the fall of Rome and the Middle Ages (Fries Decl ¶¶ 17, 83-88 )

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (NO  ) - 4
[41632-0001/SL031550 241]

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
Phone  (206) 583-8888
Fax  (206) 583-8500

Not only are computer and video games themselves expression, but the creative process of developing these games resembles that of other forms of expression protected under the First Amendment, such as movies, books, and music  (Fries Decl ¶ 16 ) Increasingly, computer and video games are being recognized for their aesthetics and complexity  art museums mount exhibits on computer and video games as art, prominent art schools and universities offer courses and degree programs in game design, awards programs recognize computer and video game artists who excel in their craft, and academic conferences and scholarship are devoted to exploring the expression in computer and video games (Fries Decl ¶¶ 18-21 )

As with other literature, computer and video game storylines often include law enforcement officers of various kinds  Such personnel range from uniformed police officers (from Chief Wiggums in *The Simpson's Roadrage* to the futuristic officers in *Minority Report  Everybody Runs*), to intelligence officers (such as James Bond and his allies and enemies in the CIA and the KGB), to ancient guards (such as the Romans in *Age of Empires*), and military "police" (such as the Gestapo in France in *Medal of Honor Frontline*)  As with other literature, sometimes these officers are the "good guys", sometimes they are the "bad guys", sometimes there are some of each, and sometimes the line between "good" and "bad" is difficult to define and changes as the plot and characters develop  For example, in *Minority Report. Everybody Runs* (based on the movie, *Minority Report*), the player assumes the role of the head of a special police squad in Washington, D C in the year 2054  Because the player's character is framed, he must then battle these same police (who are mistakenly pursuing him) if he is to clear his name and save the world from nefarious forces  (Fries Decl ¶¶ 25, 28-33 )

Computer and video games include all of the expressive elements of movies and television, with the additional element that the player participates in the expression, often

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (NO  ) - 5
[41632-0001/SL031550 241]

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
Phone  (206) 583-8888
Fax  (206) 583-8500

shaping the course of the plot and its outcome   These games thus possess a creative capacity

that can even surpass that of the more traditional entertainment media   (Fries Decl ¶ 22 )

**B.     The Challenged Statute**

The Washington Legislature passed House Bill No 1009 in late April, and Governor

Locke signed the Act into law on May 20, 2003   The Act is unprecedented, restricting the

distribution of video games based solely on their expressive content and allegedly anti-law

enforcement viewpoint   Specifically, the Act makes illegal the rental or sale of "violent"

computer and video games to those under age 17   It defines "violent" games as only those

containing "realistic or photographic-like depictions of aggressive conflict in which the player

kills, injures, or otherwise causes physical harm to a human form in the game who is depicted,

by dress or other recognizable symbols, as a public law enforcement officer "  Act § 2   The

Act leaves other key terms undefined   For example, it does not explain the meaning of such

ambiguous terms as "realistic or photographic-like    depictions," "physical harm," "human

form," and "public law enforcement officer "  Although the Act makes a violation of this

prohibition a "civil infraction," Act § 2, it places the prohibition within Washington's criminal

code, see Ch 9 91 RCW (Misc Crimes)   The Act provides that a violation of its terms

"shall" be punished by a "maximum penalty and default amount" of $500   Act § 3

The Act claims to serve two purposes   "curb[ing] hostile and antisocial behavior in

Washington's youth," and "foster[ing] respect for public law enforcement officers "  Act § 1

With regard to the first of these purposes, the Act purports to find that "there has been an

increase in studies showing a correlation between exposure to violent video and computer

games and various forms of hostile and antisocial behavior," Act § 3, but cites no evidentiary

support for this claim   The Act's justification for the second purpose is even more sparse,

stating only that "some video and computer games focus on violence specifically against

public law enforcement officers such as police and fire fighters," without any evidence

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, Washington  98101-3099
Phone   (206) 583-8888
Fax   (206) 583-8500

whatsoever that "violent" games involving law enforcement officers pose any particular risk Id. Finally, the Act gives no indication that other means of regulating minors' access to "violent" games – ones less invasive of First Amendment freedoms than the Act's prohibition, such as educating consumers about the video game rating system – were considered and rejected by the Legislature

### III.    ARGUMENT

A plaintiff is entitled to a preliminary injunction upon showing "either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) that serious questions are raised and the balance of hardships tips in its favor." Sammartano v First Judicial Dist. Court, 303 F 3d 959, 965 (9th Cir 2002) (quotation omitted)  These "two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases " Id. (quotation omitted) Finally, "where the public interest is involved, the district court must also examine whether the public interest favors the plaintiff " Id. (quotation omitted)

Plaintiffs easily satisfy these standards  They have a strong case on the merits and face irreparable harm  Accordingly, an injunction is warranted

**A.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AND FOURTEENTH AMENDMENT CLAIMS, GIVEN THE ACT'S UNPRECEDENTED CONTENT- AND VIEWPOINT-BASED INVASION OF FIRST AMENDMENT RIGHTS AND ITS VAGUE TERMS.**

   **1.    Computer and Video Games Constitute Expression Protected By The First Amendment.**

Computer and video games clearly constitute protected expression  See, e g, American Amusement Mach Ass'n v Kendrick, 244 F 3d 572, 577-78 (7th Cir ) ("AAMA") (describing in detail video games' expressive qualities, including their ability to convey "age-old themes of literature," messages, and ideologies, "just as books and movies do"), cert

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
Phone  (206) 583-8888
Fax  (206) 583-8500

denied, 534 U S 994 (2001)    In most instances, they are aptly described as an interactive

form of story-telling  See, e g , Sony Computer Entm't Am , Inc v Bleem, LLC, 214 F 3d

1022, 1028 (9th Cir 2000) (describing these games as "involv[ing] plots that can be

controlled interactively by the player and may elapse over several hours"), Micro Star v

Formgen Inc , 154 F 3d 1107, 1109 (9th Cir 1998) (same, with respect to the "immensely

popular" video game "Duke Nukem 3D," in which "the player assumes the personality and

point of view of the title character" and "explore[s] a futuristic city infested with evil aliens

and other hazards")

　　　　The computer and video game medium is as expressive as film, music, and fine arts,

each of which is unquestionably entitled to full First Amendment protection  See Hurley v

Irish-American Gay, Lesbian & Bisexual Group of Boston, 515 U S  557, 569 (1995) (First

Amendment "unquestionably" protects "painting of Jackson Pollock, music of Arnold

Schoenberg, or Jabberwocky verse of Lewis Carroll"), Schad v  Borough of Mount Ephraim,

452 U S  61, 65 (1981) (First Amendment protects expression in the form of

"[e]ntertainment, as well as political and ideological speech", "motion pictures, programs

broadcast by radio and television, and live entertainment, such as musical and dramatic works

fall within the First Amendment guarantee" (citations omitted))  Like those other media,

computer and video games "may affect public attitudes and behavior in a variety of ways,

ranging from direct espousal of a political or social doctrine to the subtle shaping of thought

which characterizes all artistic expression "  Joseph Burstyn, Inc v Wilson, 343 U S  495,

501 (1952) (recognizing that movies are protected expression)  The fact that video games

are a relatively new medium of expression makes them no less protected, as, for example, the

Eighth Circuit recognized in striking down attempted regulation of "violent" video games

See Interactive Digital Software Ass'n v St Louis County, No  02-3010, slip op  at 4 (8th

Cir June 3, 2003) ("IDSA") ("The mere fact [of] a novel medium is of no legal

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
Phone  (206) 583-8888
Fax  (206) 583-8500

consequence ")  Rather, as initially happened with movies and the Internet, video games' relative novelty heightens the risk of unconstitutional regulation  See Burstyn, 343 U S  at 502 (according motion pictures protected status and overruling earlier decision to the contrary), Reno v ACLU, 521 U S  844, 850, 870 (1997) (refusing to "qualif[y] the level of First Amendment scrutiny that should be applied" to the Internet, a "unique and wholly new medium" (quotation omitted))

Indeed, the statute at issue here singles out video games for suppression based on whether they contain a particular content  See Act § 2 (regulating video or computer games with "violent" content, defined to include only depictions of violence directed at "public law enforcement officers")  Moreover, according to the Act, these games are singled out for censorship because they are allegedly correlated with "various forms of hostile and antisocial behavior" and reduce "respect for public law enforcement officers "  Act § 1   It thus could not be clearer that Washington seeks to regulate a particular category of disfavored expression based on that expression's message and alleged impact on its viewers  See IDSA, slip op  at 4 (concluding that computer and video games receive First Amendment protection, and "find[ing] it telling that the County seeks to restrict access to these video games precisely because their content purportedly affects     thought or behavior")

Numerous courts have recognized that the depiction of "violence" – including in computer and video games – constitutes expression protected under the First Amendment For example, in a unanimous opinion by Judge Posner, the Seventh Circuit preliminarily enjoined as unconstitutional an Indianapolis ordinance purporting to regulate games with violent content  See AAMA, 244 F 3d at 577-79 (likening "violence" in video games to "violence" in other media), id  at 575-76 ("[t]he notion of forbidding not violence itself, but pictures of violence, is a novelty")  Similarly, the Sixth Circuit had "little difficulty in holding that the First Amendment protects video games" where the games are targeted based on their

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle  Washington 98101-3099
Phone  (206) 583-8888
Fax  (206) 583-8500

"communicative aspect " James v Meow Media, Inc , 300 F 3d 683, 695-96 (6th Cir 2002) (noting such games' "expressive content" and "communicative aspect"), cert denied, 123 S Ct 967 (2003)  The Eighth Circuit recently joined this consensus, finding "the pictures, graphic design, concept art, sounds, music, stories, and narrative present in video games" – including games containing "violence" – entitled to full First Amendment protection  IDSA, slip op at 4-5 (recognizing violent video games are "'as much entitled to the protection of free speech as the best of literature'") (quoting Winters v New York, 333 U S 507, 510 (1948) (violent magazines)), accord Eclipse Enters , Inc v Gulotta, 134 F 3d 63, 66-67 (2d Cir 1997) (violent trading cards), Sanders v Acclaim Entm't, Inc , 188 F Supp 2d 1264, 1279 (D Colo 2002) (according "full First Amendment protection" to video games), Wilson v Midway Games, Inc , 198 F Supp 2d 167, 181 (D Conn 2002) (same)

> 2.     **The Act Fails Strict Scrutiny And Violates The First Amendment.**
>
> >  a.     **Because The Act Regulates Expression Based on Content And Viewpoint, It Must Survive the Most Exacting First Amendment Scrutiny.**

The Act restricts access to expression based on "violent" content, and thus requires exacting First Amendment scrutiny  See United States v Playboy Entm't Group, Inc , 529 U S 803, 811 (2000) (describing a situation in which the "overriding justification for the regulation is concern for the effect of the subject matter on young viewers" as "the essence of content-based regulation" requiring strict scrutiny)  Such content-based regulation of speech and expression is "presumptively invalid " R A V v City of St Paul, 505 U S 377, 382 (1992)  Indeed, "[i]t is rare that a regulation restricting speech because of its content will ever be permissible " Playboy, 529 U S at 818, see Texas v Johnson, 491 U S at 414  With respect to this strict standard, it matters not that the Act restricts speech to minors, because, like adults, minors have a First Amendment right to be free from content-based governmental regulation of the speech they utter or receive  See Erznoznik v City of Jacksonville, 422

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
Phone   (206) 583-8888
Fax   (206) 583-8500

U S 205, 213-14 (1975); Tinker v. Des Moines Indep Cmty Sch Dist, 393 U S 503, 506-07, 511 (1969)

In this case, however, the Act does not just regulate based on <u>content</u>  Even more perniciously, the Act regulates based on the <u>viewpoint</u> expressed by the games  It targets only those games that include depictions of violence aimed at depictions of "public law enforcement officers," and only when inflicted by the player's character  Act § 2  Because the Act restricts access only to those games exhibiting violence toward law enforcement officers – that is, toward the government – while allowing <u>all</u> other games depicting violence to be sold to minors, the Act discriminates against a particular, "anti-government" viewpoint  See <u>Sammartano</u>, 303 F 3d at 971 ("Our cases have recognized that, where the government is plainly motivated by the nature of the message rather than the limitations of the forum or a specific risk within that forum, it is regulating a viewpoint rather than a subject matter ")  Such singling out of a particular viewpoint for regulation – particularly an "anti-government" viewpoint – runs directly counter to the most central First Amendment precepts  See <u>Gerritsen v City of Los Angeles</u>, 994 F 2d 570, 578 (9th Cir 1993) (curtailing "controversial or anti-government" speech is an "impermissible" government interest)  As the Supreme Court has made plain, "[v]iewpoint discrimination is    an egregious form of content discrimination," and "[w]hen the government targets not subject matter, but particular views taken by a speaker on a subject, the violation of the First Amendment is all the more blatant " <u>Rosenberger v Rector and Visitors of Univ of Va</u>, 515 U S 819, 829 (1995)  Indeed, "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction " <u>Id</u>

To justify the Act under strict scrutiny, Defendants must (1) articulate a compelling state interest, (2) prove that the Act is "necessary" to serve that interest (i e, prove that the asserted harms are real and would actually be alleviated by the regulation), and (3) show that

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (NO ) - 11
[41632-0001/SL031550 241]

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
Phone  (206) 583-8888
Fax  (206) 583-8500

the Act is narrowly tailored to serve that interest  R A V , 505 U S  at 395, Turner Broad

Sys , Inc  v  FCC, 512 U S  622, 664-65 (1994), Simon & Schuster, Inc  v  Members of the

N Y  State Crime Victims Bd , 502 U S  105, 118 (1991)  The State cannot come close to

meeting these demanding requirements

> **b.    The State Does Not Have A Legitimate – Let Alone Compelling – Interest in Restricting Access To The Targeted Games.**

In the statute itself, the Legislature claimed to further two state interests  The first

was "curbing hostile and antisocial behavior" of minors supposedly caused by exposure to

games in which the player acts violently toward a law enforcement officer  The second was

"fostering respect for law enforcement officers "  Neither interest approaches a

constitutionally sufficient rationale  As to the former, extremely stringent standards apply to

government regulation of speech based on a concern that it will cause listeners to engage in

unlawful or "antisocial" behavior  A law justified in this way must meet the long-established

standards set forth in Brandenburg v  Ohio, 395 U S  444 (1969)  See James, 300 F 3d at

699 ("Federal courts, however, have generally demanded that all expression, advocacy or

not, meet the Brandenburg test before its regulation for its tendency to incite violence is

permitted ")  The Brandenburg test requires the government to prove that expression "'is

directed to inciting or producing imminent lawless action and is likely to incite or produce

such action '"  Free Speech Coalition, 122 S  Ct  at 1403 (quoting Brandenburg, 395 U S  at

447)  Thus, the government may not punish speakers based solely on a prediction or

suspicion that their words will tend, in the aggregate, to encourage undesired behavior

Indeed, it is a core First Amendment principle that "the mere tendency of speech to

encourage unlawful acts is not a sufficient reason for banning it "  Id  Here, the Act regulates

supposedly "violent" speech without coming close to meeting Brandenburg's dictates  See

Brandenburg, 395 U S  at 447  Rather, the Act is ostensibly based on the Legislature's

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
Phone   (206) 583-8888
Fax   (206) 583-8500

conclusory "finding" of a "correlation between exposure to violent video and computer games and various forms of hostile and antisocial behavior " Act § 1   Even assuming that such a finding was based on any reliable evidence, the essence of the <u>Brandenburg</u> principle is that the government may <u>not</u> suppress content based on a "finding" that the speech – whether it be books advocating violent revolution, pamphlets expressing hate toward particular racial or ethnic groups, or works of imagination depicting violent actions – tend, in the aggregate, to increase the chances that some person, somewhere will act unlawfully   Rather, the content must be "likely" to produce "imminent" violence – a standard that can hardly be met by games played safely every day by millions   The bar to reliance on predictions of future antisocial behavior is particularly clear where, as here, the works at issue are not even "directed" to inciting lawlessness, as required by <u>Brandenburg</u>, because video game makers' primary purpose is to entertain   <u>See, e g</u>, <u>James</u>, 300 F 3d at 698 (video games makers do not "'intend' to produce violent action by the consumers")   Absent that element, the "incitement" exception to the First Amendment simply does not apply

Courts confronting statutes and lawsuits that, like the Act, seek to regulate computer and video games based on their "violent" content, agree that <u>Brandenburg</u>'s requirements cannot be met by alleging a link between such games and real life violence   For example, in <u>AAMA</u>, Judge Posner explained that, absent concrete proof by the government that particular video games have a literal effect of "incit[ing] youthful players to breaches of the peace," as required by Supreme Court precedent, such games may not be prohibited based on the mere assertion that violence may occur   <u>AAMA</u>, 244 F 3d at 575   He reasoned that "[c]lassic literature and art, and not merely today's popular culture, are saturated with graphic scenes of violence, whether narrated or pictorial," and that "[t]he notion of forbidding not violence itself, but pictures of violence, is a novelty," <u>id</u> at 575-76 – a novelty in plain tension with the Constitution's requirement that <u>actual</u> violence must be intended, likely, and

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington  98101-3099
Phone   (206) 583-8888
Fax   (206) 583-8500

imminent for speech to be restricted   Moreover, he refused to distinguish video games as "interactive," noting that "[a]ll literature     is interactive, the better it is, the more interactive," as it "draws the reader into the story, makes him identify with the characters, invites him to judge and quarrel with them, to experience their joys and sufferings as the reader's own "  Id  at 577, see IDSA, slip op  at 5 (noting that "some books, such as the pre-teen oriented 'Choose Your Own Nightmare' series     can be every bit as interactive as video games")

Similarly, in James the Sixth Circuit concluded that allegedly "violent" video games "fall[] well short" of the Brandenburg threshold  James, 300 F 3d at 698   As the Sixth Circuit incisively explained, the "glacial process of personality development" allegedly affected by "violent" video games "is far from the temporal imminence that we have required to satisfy the Brandenburg test "  Id , see Wilson, 198 F  Supp  2d at 182 (at worst, video games "'amount[] to nothing more than advocacy of illegal action at some indefinite future time,'" which is insufficient to satisfy Brandenburg (quoting Hess v  Indiana, 414 U S  105 (1973)), Sanders, 188 F  Supp  2d at 1279 (refusing to "dilute the Brandenburg test" by finding that "violent" video games meet that test)   In an analogous context – the attempted regulation of non-obscene pornography based, among other things, on allegations that such materials may lead to the infliction of violence on women – the Ninth Circuit has similarly concluded that such regulation falls short of the Brandenburg requirements, and thus fails to survive First Amendment scrutiny  Dworkin v  Hustler Magazine Inc , 867 F 2d 1188, 1199-1200 & n 8 (9th Cir  1989) (explaining that the "equivocal evidence" of any "causal relationship between pornographic materials and violent actions" fails to show the likelihood of causing imminent unlawful action required under Brandenburg), see also, e g , American Booksellers Ass'n v  Hudnut, 771 F 2d 323, 329-30 (7th Cir  1985) (regulation failed to

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (NO  ) - 14
[41632-0001/SL031550 241]

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
Phone   (206) 583-8888
Fax   (206) 583-8500

satisfy <u>Brandenburg</u> because any violent "effects depend on mental intermediation"), <u>aff'd</u>, 475 U S 1001 (1986)

As noted, the Legislature also attempts to justify censorship as necessary to "foster respect for public law enforcement officers " Act § 1  Indeed, Governor Locke recognized this as the goal of the Act, explaining that the Act "foster[s] an environment where young people respect those who uphold the law," and that the Act is needed to "reinforce this message " May 20, 2003 Press Release, <u>available at</u> http //access wa gov/news /2003/May/n2003420_5997 asp  But this "foster[ing] respect" rationale is illegitimate  The government cannot suppress speech because it communicates a message of "disrespect" for the government and its agents  To allow such a justification would all but eliminate the First Amendment as we know it  See <u>Sheehan v  Gregoire</u>, No  C02-1112C, slip  op  at 14 (W D Wash  May 22, 2003) (striking down a 2002 Washington Act prohibiting the distribution, with an "intent to harm or intimidate," information about law enforcement officers, and stating that "[t]hought-policing is <u>not</u> a compelling state interest recognized by the First Amendment")  As the Supreme Court has explained, "First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end " <u>Free Speech Coalition</u>, 122 S  Ct  at 1403

This principle has equal force when censorship is directed at minors  As Judge Posner explained in <u>AAMA</u>  "Now that eighteen-year-olds have the right to vote, it is obvious that they must be allowed the freedom to form their political views on the basis of uncensored speech <u>before</u> they turn eighteen, so that their minds are not a blank when they first exercise the franchise " 244 F 3d at 577  Imagine a law, for example, that forbade any "violent" television show that "fostered disrespect" for the President or Congress  Such a law would be intolerable under our constitutional system

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, Washington  98101-3099
Phone  (206) 583-8888
Fax  (206) 583-8500

c.    **Even Assuming That The State, In Theory, Could Have A Compelling Interest In Regulating "Violent" Speech, The Act Fails First Amendment Scrutiny Because It Does Not Identify Or Address A Real Problem And Is Not Narrowly Tailored.**

Even assuming that the State's justification based on a perceived linkage between violent content and antisocial behavior were not facially illegitimate, the Act would fail First Amendment scrutiny because it does not advance the State's purported interest    Nor is the Act narrowly tailored, as the State has bypassed other, less restrictive means of achieving its goal

To survive strict scrutiny, the government must first prove that an "actual problem" exists, and must do so with more than "anecdote and supposition " *Playboy*, 529 U S  at 823 Second, the Act's provisions must actually and materially address the alleged government interest  *See, e g , Florida Star v B J F ,* 491 U S  524, 540 (1989) (striking down statute that restricted dissemination by the mass media, but not by others, of rape victims' identities, and noting that "facial underinclusiveness" undermined the claim that the statute actually served its purported interests), *Turner Broad  Sys , Inc  v FCC,* 512 U S  622, 664-65 (1994) (even under intermediate scrutiny, speech regulation must advance "real" harm to "material degree")  Here, there is both insufficient evidence of a "real world" problem (the effects of "violent" games on minors), and a complete disconnect between the alleged problem and the Act's prohibition, which extends only to games depicting violence against one narrow category of "victim "

The existing research concerning "violent" video games fails to establish any link between exposure to such games (of <u>any</u> sort) and subsequent violent behavior against anyone  *See* <u>AAMA</u> 244 F 3d at 578-79 (existing scientific studies "do not support" the regulation of "violent" video games, because these studies "do not find that video games have

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
Phone  (206) 583-8888
Fax  (206) 583-8500

ever caused anyone to commit a violent act"), IDSA, slip op at 6 (determining that a county regulation of "violent" games because of the games' alleged effects on minors lacked "the 'substantial supporting evidence' of harm that is required before an ordinance that threatens protected speech can be upheld")  Indeed, Washington's own Department of Health conducted an expansive study in 2000, in response to a legislative request, and concluded that "the research evidence is not supportive of a major public concern that violent video games lead to real-life violence "  Wash  State Dep't of Health, Video Games and Real-Life Aggression  A Review of the Literature (May 2000)  Moreover, counsel know of no research suggesting that depictions of violence specifically against law enforcement officers cause real life violence

Furthermore, the Act and its legislative history make no attempt to explain how regulation of video games alone will serve the statute's purported interest  Depictions of violence – including violence against law enforcement officers – are found not only in video games, but in movies, books, magazines, music, and art, as well as on television and the Internet  See, e g , AAMA, 244 F 3d at 579 ("violent" video games "are a tiny fraction of the media violence to which modern American children are exposed," as well as "not very violent compared to what is available to children on television and in movie theaters today")  But these other media – as well as all video games depicting "violence" not directed at law enforcement officers – are all left unaffected by the Act  Under the Act, for example, a minor would be barred from buying or renting the *Minority Report* video game (because it is possible for a player to "harm" the futuristic officers wrongly pursuing him), but that same minor could legally rent and view the PG-13 rated *Minority Report* movie, which contains a similar plot and "violence" as the video game  Such differential regulation of comparable expression not only is problematic in principle, but it heightens concerns about whether the Act advances the purported interests at all  See, e g , Florida Star, 491 U S  at 540

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (NO  ) - 17
[41632-0001/SL031550 241]

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington  98101-3099
Phone  (206) 583-8888
Fax  (206) 583-8500

Finally, even assuming that the Act serves a theoretically compelling interest and that the Act's prohibition actually advances that interest, the Act fails strict scrutiny because it is not narrowly tailored  See Playboy, 529 U S  at 815  As discussed in more detail below, the Act's prohibitions, though ostensibly limited to the narrow class of computer and video games depicting violence against law enforcement officers, are so vague that they could be read to cover a large subset of existing video games  See Reno v  ACLU, 521 U S  at 871-72 (vagueness "undermines the likelihood that the [Act] has been carefully tailored to the goal of protecting minors")  And, regardless of vagueness, the narrow tailoring requirement requires the State to prove that "a plausible, less restrictive alternative" to banning such games "will be ineffective to achieve its goals "  Playboy, 529 U S  at 816  The State cannot make such a showing here, where a plausible, much less restrictive means of regulating minors' access to "violent" video games exists  awareness-raising measures concerning the video game rating system, (Lowenstein Decl  ¶¶ 4-18 ), which provides guidance, to parents and others, similar to that of the well-known movie rating system  See Playboy, 529 U S  at 824 ("A court should not assume a plausible, less restrictive alternative would be ineffective, and a court should not presume parents, given full information, will fail to act "), 44 Liquormart, Inc  v  Rhode Island, 517 U S  484, 507-08 (1996) (plurality op ) (striking down ban on advertising alcohol prices because of less restrictive alternatives, such as an "educational campaign" or "counterspeech")  In any event, the State was required at least to have considered the efficacy of less restrictive alternatives, see Sable Communications of Cal , Inc  v  FCC, 492 U S  115, 129-30 (1989), but never did so  In fact, the State expressly rejected Plaintiffs' offer to work with the State to help educate consumers about the video game rating system, which not only provides age-based ratings, but also offers comprehensive "content descriptors" that signal content that may be of concern to parents and consumers  (Lowenstein Decl  ¶¶ 15-18 )

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (NO  ) - 18
[41632-0001/SL031550 241]

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington  98101-3099
Phone  (206) 583-8888
Fax  (206) 583-8500

In sum, the State cannot show that the Act serves any compelling government interest in a narrowly tailored manner  Rather, the Act impermissibly attempts "to protect the young from ideas or images that a legislative body thinks unsuitable for them " Erznoznik, 422 U S at 213-14  Accordingly, the Act fails strict scrutiny under the First Amendment

3.      **The Act Is Unconstitutionally Vague.**

The Act is unconstitutional on another, independent ground  vagueness  Because several of the Act's terms are impermissibly vague and place the burden of compliance on game retailers, the Act will restrict a far broader range of video games than even the State claims it is seeking to regulate  The Constitution demands that statutes be set forth with "sufficient definiteness that ordinary people can understand what conduct is prohibited " Kolender v  Lawson, 461 U S  352, 357 (1983)  Such precision is essential to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly " Grayned v  City of Rockford, 408 U S  104, 108 (1972)  Exacting precision is demanded of legislation imposing penalties where free speech rights are at issue See NAACP v  Button, 371 U S  415, 433 (1963) (noting dangers, "in the area of First Amendment freedoms," of "the existence of a penal statute susceptible of sweeping and improper application")  Finally, the fact that the government's stated purpose relates to children does not relax this exacting constitutional standard  See Interstate Circuit, Inc  v City of Dallas, 390 U S  676, 689 (1968)

Several key terms in the Act either are inherently vague or are defined in such a way as to fail to provide fair notice  For example, the core of the Act's prohibition concerns depictions of "public law enforcement officer[s] "  However, this term has no easily understood meaning in the context of video games, in which the action takes place in a wide variety of fictional and historical settings  For example, in a James Bond game, do the secret agents meet that definition?  What about military officers?  Military officers serving as civilian

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (NO  ) - 19
[41632-0001/SL031550 241]

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
Phone  (206) 583-8888
Fax  (206) 583-8500