law enforcement? Do "enemy" officers or security guards qualify? What if a villain in the game disguises himself as a police officer? What if the player's role in the game is that of a police officer, and the player accidentally "harms" his partner? And what is a "recognizable symbol" for a law enforcement officer? Would damage to a police car qualify even if no officer is visible?

The same sorts of interpretive problems plague the term "human form," a term ill-suited to a medium that relies extensively on extra-terrestrial or make-believe life forms and characters – creatures which may be depicted as having only some "human" characteristics. Is Superman a "human form"? Can a part-animal or part-alien creature be "human" in form?

Moreover, the Act only covers "realistic or photographic-like depictions" of violence – a term with no evident meaning in a medium in which all depictions are obviously computer-generated and thus inherently unrealistic. See AAMA, 244 F.3d at 579 (explaining that because video game characters "are cartoon characters, that is, animated drawings[,] [n]o one would mistake them for photographs of real people"). Because the term "realistic" must, in the context of the Act, mean something other than what it ordinarily means (otherwise, nothing would be covered), its meaning will not easily be discerned by a store owner or clerk. (Halpin Decl. ¶ 7.) Similarly, the Act covers depictions of "physical harm," a term entirely at odds with a non-physical medium in which all "action," including any depiction of "harm," is entirely imaginary. What would be "physical harm" in a medium that relies heavily on animation and computer imagery? Would a cartoon character hitting an officer with a frying pan be covered, when it is clear, moments later, that the officer has fully "recovered" from the "harm" inflicted?

The Act offers no clues as to how these terms are to be construed, leaving game retailers and others to guess, for example, whether a game involving a temporary injury to a two-legged alien disguised as a futuristic military officer is a "realistic   physical harm" to a

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (NO. ) - 20
[41632-0001/SL031550 241]

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
Phone (206) 583-8888
Fax (206) 583-8500

"human form" depicted as a "public law enforcement officer." (Halpin Decl. ¶¶ 6-7.) Because the Act's definition of "violence" raises more questions than it answers, and fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited," Grayned, 408 U.S. at 108, the Act is unconstitutionally vague. See Sheehan, slip op. at 17 (striking down "a statute that demands self-censorship" because of its vague prohibitions and thus "impermissibly sacrifices the public interest in the free exchange of speech and ideas").

Moreover, the legislative record, far from shedding light on how to interpret these terms, actually indicates the hope of the Act's proponents that the Act's terms will be confusing to the average person, will be interpreted more broadly than as provided, and will, accordingly, chill speech. See Hearing Before the House Juvenile Justice and Family Law Committee (Jan. 22, 2003) (statement of Representative Dickerson, the Act's primary sponsor) (stating that the Act's effect will be that "retailers will have to do what they say they're doing already and that is not allow any M-rated games to be sold to underage children," not just those games involving violence to law enforcement officers). Thus, not only will the Act's vague wording impermissibly cause Plaintiffs and others to "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked," Grayned, 408 U.S. at 109 (quotation omitted), but the Act's framers actually intended this forbidden effect.

Stores and store clerks will be subject to steep liability if they wrongly guess about what games the Act covers. Game creators, distributors, and retailers will respond to the uncertainty in the Act, and the penalties the Act imposes, by either self-censoring or otherwise restricting access to any potentially offending video game title. (Halpin Decl. ¶¶ 9-11, Fries Decl. ¶¶ 8-9.) Some range of games will not be made (or will be made differently) and some games will not be stocked at all. (Halpin Decl. ¶¶ 10-11, Fries Decl. ¶ 9.) Such

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (NO.) - 21
[41632-0001/SL031550 241]

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
Phone: (206) 583-8888
Fax: (206) 583-8500

understandable, self-protective behavior will deprive access to such expression not only to children, but to adult customers as well – whose right to enjoy "violent" video games is undisputed by the State. Taken together, the vague terms used in the Act itself and the Act's legislative history create an unwarranted chilling effect on protected speech and render the Act unconstitutionally vague.

### 4. The Act Is An Unconstitutional Prior Restraint.

The challenged provisions of the Act also constitute an unconstitutional prior restraint. It is blackletter law that prior restraints on expression are "the most serious and the least tolerable infringement on First Amendment rights," Nebraska Press Ass'n v. Stewart, 427 U.S. 539, 559 (1976), and thus are presumptively unconstitutional, see, e.g., Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 558-59 (1975). In determining whether a regulation is a prior restraint, courts look to "substance and not to mere matters of form, and . . . in accordance with familiar principles . . . statutes must be tested by [their] operation and effect." Near v. Minnesota, 283 U.S. 697, 708 (1931). The "operation and effect" of the Act render it a prior restraint on speech. The Act imposes stiff penalties for those who engage in covered expression. The Act is also vague, making it likely that authorities will enforce the Act on an *ad hoc* basis. In effect, computer and video game retailers will be restrained from selling a great number of video games – some ultimately covered by the statute, and some not – and the only way a retailer can be confident of avoiding prosecution for selling or renting a game is to consult with local authorities before doing so. Because a Ninth Circuit decision departs from these principles, see Free Speech Coalition v. Reno, 198 F.3d 1083, 1096-97 (9th Cir.), aff'd on other grounds, 122 S. Ct. 1389 (2002), Plaintiffs seek to preserve this claim and argument but rely primarily on the constitutional deficiencies identified above.

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (NO.) - 22
[41632-0001/SL031550 241]

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
Phone (206) 583-8888
Fax (206) 583-8500

B.  **PLAINTIFFS WILL SUFFER IMMEDIATE AND IRREPARABLE HARM, AND THE PUBLIC INTEREST WILL SUFFER, ABSENT A PRELIMINARY INJUNCTION AGAINST ENFORCEMENT OF THE ACT.**

Plaintiffs have demonstrated a very strong likelihood of success on the merits. The Act is an unprecedented attempt at viewpoint-specific regulation of protected expression, and courts across the country have determined that such restrictions on allegedly "violent" video games violate the First Amendment. Because of the strength of their merits case, Plaintiffs need only show "a possibility of irreparable harm," under the Ninth Circuit's well-settled standards. Sammartano, 303 F.3d at 965 (quotation omitted). But Plaintiffs have shown much more than a mere "possibility" of harm because it is established law that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." S.O.C., Inc. v. County of Clark, 152 F.3d 1136, 1148 (9th Cir. 1998) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)).

Furthermore, "a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." Sammartano, 303 F.3d at 973 (quotation omitted). As the Ninth Circuit has explained, "when the harm claimed is a serious infringement on core expressive freedoms, a plaintiff is entitled to an injunction even on a lesser showing of meritoriousness." Id. at 974. Because Plaintiffs "have not only stated a colorable First Amendment claim, but one that is likely to prevail[,] they have thus established the potential for irreparable injury" entitling them to a preliminary injunction. Brown v. California Dep't of Transp., 321 F.3d 1217, 1225 (9th Cir. 2003).

Not only will Plaintiffs suffer immediate and irreparable harm to their First Amendment freedoms, but the public will suffer similarly. "Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (NO.) - 23
[41632-0001/SL031550.241]

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
Phone: (206) 583-8888
Fax: (206) 583-8500

upholding First Amendment principles," Sammartano, 303 F 3d at 974, because First Amendment questions quite often have a substantial impact on non-parties to a case As in Sammartano, "[t]he ongoing enforcement of the potentially unconstitutional regulations," id at 974, will not simply affect Plaintiffs, but will affect countless video game creators, distributors, retailers, and consumers throughout Washington State, and even beyond, all of whom will suffer infringements on their First Amendment rights to produce and view the expression contained in a wide array of video games

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant a preliminary injunction

RESPECTFULLY SUBMITTED this 5th day of June, 2003

JENNER & BLOCK, LLC
Paul M Smith
Deanne E Maynard
Kathleen R Hartnett
601 Thirteenth Street, N W , Suite 1200
Washington, D C 20005
Phone (202) 639-6000
Fax (202) 639-6066

and

PERKINS COIE LLP

By _____
David J Burman, WSBA #10611
Signe H Brunstad, WSBA #30944

Attorneys for Plaintiffs

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (NO ) - 24
[41632-0001/SL031550 241]

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
Phone (206) 583-8888
Fax (206) 583-8500

THE HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| VIDEO SOFTWARE DEALERS ASSOCIATION et al., <br><br> Plaintiffs, <br><br> v. <br><br> NORM MALENG et al., <br><br> Defendants. | NO. C03-1245L <br><br> PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT <br><br> Note for Hearing: Friday, October 10, 2003 <br> Time of Hearing: 9:00 a.m. <br><br> Oral Argument Requested |

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. C03-1245L)
[41632-0001/SL032550.186]

# CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.  STATEMENT OF FACTS ................................................................................... 2

III. ARGUMENT ........................................................................................................ 4

    A.  SUMMARY JUDGMENT STANDARD ..................................................... 4

    B.  H.B. 1009 IS AN UNPRECEDENTED CONTENT- AND
        VIEWPOINT-BASED RESTRICTION OF EXPRESSION THAT
        VIOLATES THE FIRST AMENDMENT .................................................. 5

        1.  The State Does Not Have a Compelling Interest in Restricting
            Access to the Targeted Games. ............................................................. 7

            (a)  "Discouraging Criminal Violent Behavior" as a
                  Justification ................................................................................. 7

            (b)  The "Well-Being of Youth" as a Justification ......................... 12

        2.  Even If the State Has Articulated a Compelling Interest in
            Theory, H.B. 1009 Neither Advances Any Such Interest in a
            Direct and Material Way Nor Is Narrowly Tailored. ......................... 13

            (a)  H.B. 1009 Does Not Advance the State's Purported
                  Interests. .................................................................................... 14

            (b)  H.B. 1009 Is Not Narrowly Tailored. ...................................... 16

    C.  H.B. 1009 IS UNCONSTITUTIONALLY VAGUE ................................... 17

    D.  THE ACT IS AN UNLAWFUL PRIOR RESTRAINT. .............................. 20

IV.  CONCLUSION .................................................................................................. 21

# TABLE OF AUTHORITIES

## Cases

44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484 (1996) ................................................. 17

American Amusement Mach. Ass'n v. Kendrick, 244 F.3d 572 (7th Cir.),
   cert. denied, 534 U.S. 994 (2001) ............................................................................ passim

Ashcroft v. Free Speech Coalition, 122 S. Ct. 1389 (2002) ................................................... 7

Brandenburg v. Ohio, 395 U.S. 444 (1969) ................................................................... 7, 8, 9

Brother Records, Inc. v. Jardine, 318 F.3d 900 (9th Cir. 2003) .............................................. 4

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ........................................................................ 4

Columbia Pictures Indus., Inc. v. Professional Real Estate Investors, Inc., 944
   F.2d 1525 (9th Cir. 1991), aff'd, 508 U.S. 49 (1993) ......................................................... 5

Dworkin v. Hustler Magazine Inc., 867 F.2d 1188 (9th Cir. 1989) ........................................ 9

Erznoznik v. City of Jacksonville, 422 U.S. 205 (1975) ................................................. 12, 17

Florida Star v. B.J.F., 491 U.S. 524 (1989) ......................................................................... 14

Forsberg v. Pacific Northwest Bell Tel. Co., 840 F.2d 1409 (9th Cir. 1988) ........................ 5

Free Speech Coalition v. Reno, 198 F.3d 1083 (9th Cir.), aff'd on other
   grounds, 535 U.S. 234 (2002) ........................................................................................ 21

FTC v. Cyberspace.com, LLC, No. C00-1806L, 2002 WL 32060289 (W.D.
   Wash. July 10, 2002) ........................................................................................................ 5

FTC v. Gill, 265 F.3d 944 (9th Cir. 2001) .............................................................................. 5

Ginsberg v. New York, 390 U.S. 629 (1968) ....................................................................... 13

Grayned v. City of Rockford, 408 U.S. 104 (1972) ....................................................... 18, 19

Hess v. Indiana, 414 U.S. 105 (1973) ..................................................................................... 9

Interactive Digital Software Ass'n v. St. Louis County, 329 F.3d 954 (8th Cir. 2003) ............................................................................................................. passim

James v. Meow Media, Inc., 300 F.3d 683 (6th Cir. 2002), cert. denied, 123 S. Ct. 967 (2003) ............................................................................................. 5, 7, 9

Kolender v. Lawson, 461 U.S. 352 (1983) ................................................................. 18

NAACP v. Button, 371 U.S. 415 (1963) ..................................................................... 18

Near v. Minnesota ex rel. Olson, 283 U.S. 697 (1931) ............................................... 20

Nebraska Press Ass'n v. Stewart, 427 U.S. 539 (1976) ............................................... 20

Nelson v. Pima Community College, 83 F.3d 1075 (9th Cir. 1996) ............................. 5

R.A.V. v. City of St. Paul, 505 U.S. 377 (1992) .................................................. 1, 6, 16

Reno v. ACLU, 521 U.S. 844 (1997) .......................................................................... 16

Republican Party of Minnesota v. White, 536 U.S. 765 (2002) ............................ 14, 15

Sable Communications of Cal., Inc. v. FCC, 492 U.S. 115 (1989) .................. 13, 14, 17

Sanders v. Acclaim Entm't, Inc., 188 F. Supp. 2d 1264 (D. Colo. 2002) ....................... 9

Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd., 502 U.S. 105 (1991) ................................................................................................ 6

Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546 (1975) ................................. 20

Texas v. Johnson, 491 U.S. 397 (1989) ......................................................................... 1

Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622 (1994) ....................................... 6, 14, 15

Underwager v. Channel 9 Australia, 69 F.3d 361 (9th Cir. 1995) ................................ 4

United States v. Playboy Entm't Group, 529 U.S. 803 (2000) ............................. passim

Wilson v. Midway Games, Inc., 198 F. Supp. 2d 167 (D. Conn. 2002) ......................... 9

Winters v. New York, 333 U.S. 507 (1948) ................................................................. 13

**Statutes**

Ch. 9.91 RCW ........................................................................................................... 4

**Regulations and Rules**

Fed. R. Civ. P 56(a) ................................................................................................... 1

**Constitutional Provisions**

H.B. 1009, 58th Leg., Reg. Sess. (Wash. 2003) .............................................. passim

**Other Authorities**

Hearing Before the House Juvenile Justice and Family Law Committee (Jan. 22, 2003) (statement of Rep. Dickerson) ............................................................. 19

Hearing Before the Senate Committee on Children and Family Services and Corrections (Apr. 1, 2003) (statement of Rep. Dickerson) ................................ 19

Jonathan L. Freedman, Media Violence and Its Effect on Aggression: Assessing the Scientific Evidence (2002) ........................................................... 10

Kevin Durkin & Kate Aisbett, Computer Games and Australians Today (Office of Film and Literature Classification 1999) ............................................ 11

Plaintiffs hereby move for summary judgment pursuant to Fed. R. Civ. P. 56(a), based on all of the evidentiary materials placed before the Court in support of Plaintiffs' prior motion for a preliminary injunction. As we show, there is no need for a trial for the Court to hold that H.B. 1009, 58th Leg., Reg. Sess. (Wash. 2003) (hereinafter, "H.B. 1009" or "the Act") is facially unconstitutional.

## I. INTRODUCTION

The Court is familiar with Plaintiffs' challenge to H.B. 1009, and has already determined, in its July 10, 2003 Order Granting Plaintiffs' Motion for a Preliminary Injunction ("Injunction Order"), that H.B. 1009 raises serious constitutional questions. The Act forbids the sale or rental to persons under age 17 of computer and video games (hereinafter called "video games") containing depictions of scenes where the player's character may inflict harm on "public law enforcement officers." It thus constitutes a "presumptively invalid" content-based regulation, R.A.V. v. City of St. Paul, 505 U.S. 377, 382 (1992), and indeed was enacted for the express purpose of preventing disfavored messages from reaching young people. Such a law violates the "bedrock principle underlying the First Amendment . . . that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." Texas v. Johnson, 491 U.S. 397, 414 (1989).

The Act fails strict scrutiny: The justifications offered by the State are insufficient both on their face and because of a lack of evidence that the Act actually serves those purposes in a narrowly tailored way. Moreover, the Act's vagueness—which the State has all but conceded—provides an independent basis for the Court to rule in Plaintiffs' favor. The current record establishes these constitutional infirmities, and no evidence the State can offer will suggest that a trial might lead to another outcome. This conclusion is consistent

with that of all federal courts addressing similar attempts at regulating "violent" video games. See Interactive Digital Software Ass'n v. St. Louis County, 329 F.3d 954, 956-58 (8th Cir. 2003) ("IDSA") (M. Arnold, J.); American Amusement Mach. Ass'n v. Kendrick, 244 F.3d 572, 577-78 (7th Cir.), cert. denied, 534 U.S. 994 (2001). Because no evidence supports the Act's "seemingly arbitrary" prohibition, Injunction Order at 7, there is no genuine issue of material fact for trial, and Plaintiffs are entitled to summary judgment.

## II.　STATEMENT OF FACTS

Plaintiffs are companies or associations of companies that create, distribute, sell, and/or rent video games. Compl. ¶¶ 12-20.[1] They bring this action to assert their own First Amendment rights as well as those of their willing listeners. Id. ¶ 20. Because "plaintiffs have identified various injuries that they . . . will suffer as soon as the Act becomes effective," the Court has already held in its Injunction Order that Plaintiffs have standing to bring this facial challenge, Injunction Order at 2, and that they also "have standing to assert the First Amendment rights of their consumers, the minors who are deprived of access under the Act," id.

Because video games contain "story lines, detailed artwork, original scores, and a complex narrative which evolves," the Court has further held that they are "expressive and qualify as speech for purposes of the First Amendment." Id. at 4. We therefore will not recite here the extensive record evidence establishing that video games should receive the same level of First Amendment protection as books, movies and other expressive media.

---

[1] The name of one of the plaintiffs—the Interactive Digital Software Association, an association of developers and publishers of video games—has been changed to the Entertainment Software Association.

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. C03-1245L) - 2
[41632-0001/SL032550.186]

Video game storylines often include law enforcement officers of various kinds. Such personnel range from uniformed police officers (such as Chief Wiggum in The Simpsons' Roadrage and the futuristic officers in Minority Report: Everybody Runs), to intelligence officers (such as security operatives in Tom Clancy's Splinter Cell), to ancient guards (such as the Romans in Age of Empires), to military "police" (such as the Gestapo occupying France in Medal of Honor: Frontline), to zombies in police officer garb (as in Resident Evil II). Declaration of Ed Fries in Support of Plaintiffs' Motion for a Preliminary Injunction ("Fries Decl.") ¶¶ 26, 69. Whether such officers are "good" or "bad" is not always obvious and may change as the plot and characters in a game develop. For example, in Minority Report: Everybody Runs (based on the movie Minority Report), the player assumes the role of the head of a futuristic police squad in Washington, D.C., who is framed and thus must battle members of his own police force—who are mistakenly pursuing him—to clear his name and save the world from nefarious forces. Id. ¶¶ 26, 29-34. Some video games allow the player's character to "injure" or "kill" police officers; in other games, players can "injure" or "kill" characters who are not police officers, but who may or may not be considered "law enforcement officers"; and in other games, the player can take actions that may or may not be viewed as inflicting "injury" on an identifiable law enforcement officer—such as running a police car off the road. Id. ¶¶ 26-28.

House Bill No. 1009 restricts the distribution to minors of video games if their content includes "realistic or photographic-like depictions of aggressive conflict in which the player kills, injures, or otherwise causes physical harm to a human form in the game who is depicted, by dress or other recognizable symbols, as a public law enforcement officer." Act § 2. The Act does not define several of its key terms, including "public law enforcement officer," "human form," "realistic or photographic-like . . . depiction," or

"physical harm." Id. A violation of the Act's prohibition, which the Act places within Washington's criminal code, see Ch. 9.91 RCW (Misc. Crimes), constitutes a "civil infraction." Act § 2. A violation of the Act "shall" be punished by a "maximum penalty and default amount" of $500. Act § 3.

The Act recites two purposes the Legislature thought it was serving: "foster[ing] respect for public law enforcement officers," and "curb[ing] hostile and antisocial behavior in Washington's youth." Act § 1. The Legislature also stated, without further elaboration, that "there has been an increase in studies showing a correlation between exposure to violent video and computer games and various forms of hostile and antisocial behavior." Act § 3. But nothing in the legislative record or the record of this case indicates that the Legislature actually reviewed any studies. Nor do any studies exist that could establish the kind of compelling justification required to uphold the constitutionality of the Act.

### III.    ARGUMENT

#### A.    SUMMARY JUDGMENT STANDARD

The State has the burden of proof at trial to establish that H.B. 1009 passes First Amendment scrutiny. See, e.g., United States v. Playboy Entm't Group, 529 U.S. 803, 816-17 (2000). Thus, to survive Plaintiffs' summary judgment motion, the State must come forward with sufficient evidence to create a genuine issue of material fact on each and every "element essential to [its] case." Brother Records, Inc. v. Jardine, 318 F.3d 900, 909 (9th Cir. 2003) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); Underwager v. Channel 9 Australia, 69 F.3d 361, 365 (9th Cir. 1995). Such evidence would have to include "specific facts showing that there is genuine issue for trial." Celotex Corp., 477 U.S. at 324 (internal quotation marks omitted). The State "must demonstrate with evidence that is 'significantly probative' or more than 'merely colorable' that a genuine issue of material fact

exists for trial." FTC v. Cyberspace.com, LLC, No. C00-1806L, 2002 WL 32060289, at *1 (W.D. Wash. July 10, 2002) (Lasnik, J.) (quoting FTC v. Gill, 265 F.3d 944, 954 (9th Cir. 2001)). Bare allegations, speculation, or conclusions, or even a "scintilla" of evidence, are insufficient to meet this burden. See Nelson v. Pima Community College, 83 F.3d 1075, 1081 (9th Cir. 1996); Columbia Pictures Indus., Inc. v. Professional Real Estate Investors, Inc., 944 F.2d 1525, 1529 (9th Cir. 1991), aff'd, 508 U.S. 49 (1993); Forsberg v. Pacific Northwest Bell Tel. Co., 840 F.2d 1409, 1419 (9th Cir. 1988). The State cannot meet its burden here, as there are no genuine issues of material fact on any of the elements of its case, much less all of the elements.

B.  **H.B. 1009 IS AN UNPRECEDENTED CONTENT- AND VIEWPOINT-BASED RESTRICTION OF EXPRESSION THAT VIOLATES THE FIRST AMENDMENT.**

As already noted, this Court has held that video games merit full First Amendment protection, agreeing with all other federal courts to have reached the question in comparable cases. See, e.g., IDSA, 329 F.3d at 956-58 ("the pictures, graphic design, concept art, sounds, music, stories, and narrative present in video games" entitle such games to First Amendment protection); James v. Meow Media, Inc., 300 F.3d 683, 695-96 (6th Cir. 2002) (finding "little difficulty in holding that the First Amendment protects video games" where the games are targeted based on their "communicative aspect"), cert. denied, 123 S. Ct. 967 (2003); AAMA, 244 F.3d at 577-78. The Court has also recognized, and the State has conceded, that H.B. 1009 regulates speech based on content, because the law restricts only "violent" video games, defined by the Act as games containing depictions of violence toward "public law enforcement officers." See Defendants' Response in Opposition to Motion for Preliminary Injunction ("State PI Opp.") at 11 n.8.; Injunction Order at 4. Indeed, the Act regulates not just based on content, but also, more perniciously, on

viewpoint. As the Act expressly states, it was designed as a means of "foster[ing] respect for law enforcement officers," Act § 1, by censoring <u>only</u> those games with depictions in which the player's character may act violently toward such governmental officials.

Because H.B. 1009 is a content-based restriction of speech, it is "presumptively invalid," Injunction Order at 4 (citing <u>R.A.V.</u>, 505 U.S. at 382), and must satisfy strict scrutiny, see <u>Playboy</u>, 529 U.S. at 811-12. As the Court has explained, <u>see</u> Injunction Order at 4, the State must (1) articulate a legitimate and compelling state interest; (2) prove that H.B. 1009 actually serves that interest and is "necessary" to do so (<u>i.e.</u>, prove that the asserted harms are real and would be materially alleviated by the Act); and (3) show that H.B. 1009 is narrowly tailored to achieve that interest. <u>See, e.g.</u>, <u>R.A.V.</u>, 505 U.S at 395-96; <u>Turner Broad. Sys., Inc. v. FCC</u>, 512 U.S. 622, 664-65 (1994) (state interest must actually be served by challenged statute); <u>Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.</u>, 502 U.S. 105, 118 (1991). In addition, as the Court has made clear, "[w]here the challenged legislation restricts or limits freedom of speech, . . . courts must ensure that the legislature's judgments are based on reasonable inferences drawn from substantial evidence." Injunction Order at 6 (citing, <u>inter alia</u>, <u>Turner</u>, 512 U.S. at 666).[2]

---

[2] Indeed, in the present strict scrutiny case, <u>Turner</u>'s demand that there be an evidentiary basis for government regulation of speech applies with even more force. Conversely, <u>Turner</u>'s statement that "courts must 'accord substantial deference to the predictive judgments' of the legislature," Injunction Order at 6 (quoting <u>Turner</u>, 512 U.S. at 666), must be viewed within <u>Turner</u>'s more relaxed context of intermediate scrutiny and should not be applied in the context of strict scrutiny. This is particularly true here, where the Legislature enacting H.B. 1009 came nowhere close to "amass[ing] and evaluat[ing] . . . vast amounts of data bearing upon" a "complex and dynamic" issue—the context for deference envisioned by the Supreme Court in <u>Turner</u>. 512 U.S. at 665-66 (internal quotation marks and citation omitted).

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. C03-1245L) - 6
[41632-0001/SL032550.186]

The State does not come close to satisfying this exacting test. Nor is it conceivable that it could do so at trial. Accordingly, a grant of summary judgment for Plaintiffs is warranted.

1. **The State Does Not Have a Compelling Interest in Restricting Access to the Targeted Games.**

Probably because it only served to highlight the unconstitutionality of the Act, the State has already abandoned reliance on one of the justifications stated in the Act—"foster[ing] respect for law enforcement officers." See Injunction Order at 5 & n.3. Instead, the State now alleges compelling interests in "discouraging criminal violent behavior" and promoting "the well-being of its youth." Id. at 5. This new approach is constitutionally invalid as well.

   (a)  **"Discouraging Criminal Violent Behavior" as a Justification**

With respect to its rationale of "discouraging criminal violent behavior," the State must meet the extremely stringent compelling interest standard set forth in Brandenburg v. Ohio, 395 U.S. 444 (1969). See, e.g., James, 300 F.3d at 699 ("Federal courts, however, have generally demanded that all expression, advocacy or not, meet the Brandenburg test before its regulation for its tendency to incite violence is permitted."). Brandenburg holds that the government has a compelling interest in regulating expression, based on a concern that it will cause listeners to engage in unlawful or violent behavior, only if the government can prove that such expression is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action." Ashcroft v. Free Speech Coalition, 122 S. Ct. 1389, 1403 (2002) (quoting Brandenburg, 395 U.S. at 447) (emphasis added). This exacting standard reflects the core principle that "[t]he mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." Id.

The relevant finding by the Legislature in the Act simply ignores these constitutional principles. The Legislature found only an increase in the number of studies showing a "<u>correlation</u> between exposure to violent video and computer games and various forms of <u>hostile and antisocial</u> behavior." Act § 1 (emphasis added). The Legislature thus did not comment on any linkage to actual <u>violence</u> or make any <u>causal</u> claim at all. But even if it had done so, the finding would have been insufficient because the Legislature did not, and obviously could not, find that video games—works designed for entertainment played safely every day by millions—are directed at inciting violence and likely to do so. <u>Brandenburg</u> in this context absolutely precludes reliance on something short of that—<u>i.e.</u>, a determination that a given category of video games may motivate some small number of players to engage in an increased amount of "copycat" violent behavior. That is no more permissible than it would be to ban books advocating revolution, or pamphlets expressing hate toward particular racial or ethnic groups, both of which may increase the chance that someone, somewhere will engage in violence.

Courts confronting comparable efforts to regulate or penalize video games based on their "violent" content have agreed that <u>Brandenburg</u>'s requirements cannot be met by alleging a correlation between game play and real life violence. For example, Judge Posner explained that, absent concrete proof by the government that particular video games have a literal effect of "incit[ing] youthful players to breaches of the peace," Supreme Court precedent dictates that such games may not be prohibited based on the mere assertion that violence may occur. <u>AAMA</u>, 244 F.3d at 575. Similarly, the Sixth Circuit has concluded that "violent" video games "fall[] well short" of the <u>Brandenburg</u> threshold, because the "glacial process of personality development" allegedly affected by "violent" video games "is far from the temporal imminence that we have required to satisfy the <u>Brandenburg</u> test."

James, 300 F.3d at 698; see Wilson v. Midway Games, Inc., 198 F. Supp. 2d 167, 182 (D. Conn. 2002) (at worst, video games "amount[] to nothing more than advocacy of illegal action at some indefinite future time," and thus do not satisfy Brandenburg (quoting Hess v. Indiana, 414 U.S. 105 (1973))); Sanders v. Acclaim Entm't, Inc., 188 F. Supp. 2d 1264, 1279 (D. Colo. 2002) (refusing to "dilute the Brandenburg test" in the context of "violent" video games).[3]

Moreover, even if Brandenburg were not the applicable test, the State has failed to offer any evidence that game play causes any violence at all. See Playboy, 529 U.S. at 822 ("The question is whether an actual problem has been proved in this case.").[4] The State has cited a handful of academic articles, which are then summarized and characterized in testimony before the United States Congress, see State PI Opp. Exhs. A-E, but none of these materials proves a link between video games and violence —as Courts of Appeals considering the very research cited by the State have recognized. See, e.g., IDSA, 329 F.3d at 958-59 (considering testimony of Anderson and concluding that his studies' claims of increased aggression do not support proscribing speech); AAMA, 244 F.3d at 578-79 (considering current studies, including some relied upon by the State here, and describing the city's "claim of harm to its citizens from these games" as "implausible, at best wildly

---

[3] In an analogous context—the attempted regulation of non-obscene pornography based on, among other things, allegations that such materials may lead to the infliction of violence on women—the Ninth Circuit has similarly concluded that such regulation falls short of what Brandenburg requires, and thus fails First Amendment scrutiny. See Dworkin v. Hustler Magazine Inc., 867 F.2d 1188, 1199-1200 & n.8 (9th Cir. 1989) (noting the "equivocal evidence" of any "causal relationship between pornographic materials and violent actions").

[4] The anecdotal, baseless hearsay of interested parties who believe that violent games have caused certain acts of violence, relied upon by the State, see, e.g., State PI Opp. at 12 n.9; id. at Exh. H, cannot be the basis for censoring speech. Playboy, 529 U.S. at 822 ("[T]he government must present more than anecdote and supposition.").

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. C03-1245L) - 9
[41632-0001/SL032550.186]

speculative"); id. (existing studies "do not find that video games have ever caused anyone to commit a violent act"). Rather, as the Court recognized, these studies, taken in their most favorable light, at most show that depictions of violence in all sorts of media may "have an immediate and measurable effect on the *level of aggression* experienced by viewers and may have an enhanced effect on youngsters." Injunction Order at 7 (emphasis added).[5] But a form of entertainment can hardly be banned, even for minors, because it stimulates people to feel aggressive. See, e.g., IDSA, 329 F.3d at 958; AAMA, 244 F.3d at 577.

In fact, many of the studies—those that study correlations between game play and other behaviors over time—do not claim causation at all, much less causation to real-life violence. For example, the Anderson & Dill paper, State PI Opp. Exh. D, reports correlations between game play and personality features and academic achievement. The authors explicitly caution that "causal" conclusions about such studies are "risky at best." Id. at 782. Similarly, the Buchanan study cited by the State, State PI Opp. Exh. E, focuses on "relational aggression"—in contrast to physical violence—and notes its own "limitations," including that the "findings reported here are correlational and do not merit casual [sic] assessment," id. at 9.

By contrast, the evidence supplied by the Plaintiffs includes a careful and thorough review of the existing literature concluding that "media violence does not cause aggression, or if it does the effects are so weak that they cannot be detected and must therefore be vanishingly small." Jonathan L. Freedman, Media Violence and Its Effect on Aggression: Assessing the Scientific Evidence, x-xi, 200-01 (2002); see Plaintiffs' Reply to State

---

[5] Although using the term "youngsters" to describe the studies' findings, the Court also recognized that one of the main studies relied upon by the State concerning the alleged effect of "violent" video games concerned college students, not "youngsters." Injunction Order at 7.