Opposition to Plaintiffs' Motion for a Preliminary Injunction ("Plaintiffs' PI Reply") Exh. A

(article by Christopher Ferguson discussing the "long history of human violence" predating

any violent media).  Testimony at the same federal Congressional hearing relied upon by the

State, see State PI Opp. Exh. B, refuted the State's claim of a "scientific connection between

violent video games and real world violence," State PI Opp. at 4.  See Plaintiffs' PI Reply

Exh. B (testimony of Jeffrey Goldstein explaining why the results of the studies cited by the

State do not support the conclusions those studies reach).  Indeed, Washington's own

Department of Health conducted an expansive study of "violent" video games in 2000, in

response to a legislative request, and concluded that "the research is not supportive of a

major public concern that violent video games lead to real-life violence."  See id. Exhs. C, D

(executive summary and full study, entitled Video Games and Real-Life Aggression:  A

Review of the Literature).  The Washington study's conclusion is consistent with a 2001

Surgeon General report stating that "media violence has a relatively small impact on

violence," and that no research supports the notion that violent media leads to subsequent

violent behavior.  See

http://www.surgeongeneral.gov/library/youthviolence/chapter4/appendix4bsec3.html.  It is

also consistent with the Government of Australia's conclusion that "only weak and

ambiguous evidence" exists concerning "effects of aggressive content" in video games, and

that any such effects "are unlikely to be substantial."  Kevin Durkin & Kate Aisbett,

Computer Games and Australians Today (Office of Film and Literature Classification 1999).

    More to the point, absolutely no research, cited by the State or otherwise, purports to

study the effects of the particular video games at issue here—those in which the player may

choose to act violently toward law enforcement officers.  So there is no basis for the

supposition that such games cause harm to police officers or anyone else.

Dockets.Justia.com

(b)    The "Well-Being of Youth" as a Justification

As noted above, the State now asserts a "second" compelling interest in protecting the "well-being of its youth." Injunction Order at 5. The specific harm to minors' "well-being" that the State seeks to prevent is the "development of aggressive personality." State PI Opp. at 13 (quoting the Anderson and Bushman study, State PI Opp. Exh. C). But this fear that individuals may develop "aggressive tendencies and anti-social behaviors," Injunction Order at 6, appears to be no more than a repackaging of the insufficient justification just discussed—the concern that game play will cause listeners to engage in unlawful or violent behavior. See id. (noting that the State's two justifications merged into a "public safety" rationale).

To the extent the second justification is broader, it is even more troubling and less persuasive. An asserted need to protect minors from psychological harm has been rejected as a potential justification of censorship of violent video games by every court that has reached the question. See IDSA, 329 F.3d at 958-59; AAMA, 244 F.3d at 578-59.[6] The government does not have a generalized power to limit minors' exposure to creative works that it thinks will be the most psychologically beneficial. Minors generally enjoy the same First Amendment rights as adults to be free from content-based governmental regulation of speech they utter or receive. See, e.g., Erznoznik v. City of Jacksonville, 422 U.S. 205, 212-14 (1975). The only context in which concerns about psychological harm can justify

---

[6] Indeed, it is ironic that the State now relies on such a rationale, because throughout the legislative process and this litigation, the State has attempted to distinguish H.B. 1009 from the attempted "harmful to minors" regulations of video games that were ultimately deemed unconstitutional by federal appeals courts. See, e.g., State PI Opp. at 14-15; id. at Exh. A (May 14, 2003 Letter from Rep. Dickerson, to Gov. Locke) (articulating "[d]ifferences between [H]B 1009 and laws previously found unconstitutional," and recognizing that courts have struck down "harmful to minors" regulations of "violent" video games for lack of a compelling interest).

censoring expression accessed by minors is in the context of sexually explicit speech, which becomes unprotected as to minors if it meets the description of what is "harmful to minors." See Ginsberg v. New York, 390 U.S. 629 (1968). Ginsberg is an extension of the obscenity doctrine, and the "harmful to minors" doctrine cannot be uprooted from that context and applied to violent speech or any other non-sexual speech of which the State happens to disapprove for minors. Unlike obscene speech, speech depicting violence is fully protected. See Winters v. New York, 333 U.S. 507, 510 (1948). Accordingly, the sexual "harmful to minors" cases cited by the State and referenced by the Court in its Injunction Motion, see, e.g., Injunction Order at 5 (citing Sable Communications of Cal., Inc. v. FCC, 492 U.S. 115, 126 (1989)), do not support a compelling interest in this case. See IDSA, 329 F.3d at 959.

In any event, as explained above, the State has come forth with no evidence of real "harm" to minors sufficient to meet strict scrutiny. See supra, at 9-11. In fact, as Judge Posner observed in AAMA, it might well be more harmful to seek to insulate minors from violent content: "To shield children right up to the age of 18 from exposure to violent descriptions and images would not only be quixotic, but deforming." 244 F.3d at 577.

### 2. Even If the State Has Articulated a Compelling Interest in Theory, H.B. 1009 Neither Advances Any Such Interest in a Direct and Material Way Nor Is Narrowly Tailored.

Assuming that the State's justifications for H.B. 1009 were not facially illegitimate, the Act nonetheless violates the First Amendment because it does not materially advance the State's purported interests. Nor is the Act narrowly tailored, as the State has bypassed other, less restrictive means of achieving its alleged goals. For each of these reasons, H.B. 1009 fails strict scrutiny.

(a)     **H.B. 1009 Does Not Advance the State's Purported
            Interests.**

As the Court previously explained, even if the State could articulate a compelling

interest, it must show that its proposed regulation will "alleviate the supposed threat in a

direct and material way." Injunction Order at 6; see id. at 5 (citing Turner, 512 U.S. at 664-

65). That is, the Act must actually "serve" the alleged state interest. Republican Party of

Minnesota v. White, 536 U.S. 765, 776 (2002). Thus, "[i]t is not enough to show that the

Government's ends are compelling; the means must be carefully tailored to achieve those

ends." Sable, 492 U.S. at 126 (emphasis added). Under this standard, H.B. 1009 fails

scrutiny, because the Act does not serve the interests asserted, let alone in a "direct and

material way." Cf. Injunction Order at 8 ("serious questions" whether the Act will "alleviate

the perceived harm").

The State has yet to explain how the Act's regulation of video games depicting

violence toward law enforcement officers will serve the State's broad purported compelling

interests—preventing actual violence and ensuring minors' well-being. Indeed, there is

absolutely no "fit" between the Act and the harms alleged, particularly because the State has

produced no evidence or studies demonstrating any causal link between "violent" games and

real-world violence, never mind evidence specific to law enforcement officers. Thus, as the

Court has recognized, the Act is a "seemingly arbitrary" regulation, Injunction Order at 7,

one "barely tailored to serve [its asserted] interest at all," White, 536 U.S. at 776.

Moreover, as the Court has explained, the Act is both over- and under-inclusive,

Injunction Order at 7—strong evidence that the Act fails to advance the State's purported

interests, see, e.g., Florida Star v. B.J.F., 491 U.S. 524, 540 (1989) ("facial

underinclusiveness" of a regulation undermines the claim that the regulation serves its

alleged interests). On one hand, the Act "sweep[s] too broadly" by "restrict[ing] access to games which mirror mainstream movies," including games "specifically rated as appropriate for teenagers." Injunction Order at 8. On the other hand, depictions of violence—including violence against law enforcement officers—are found not only in video games, but also in movies, books, magazines, music, art, as well as on television and the Internet. See, e.g., AAMA, 244 F.3d at 579 ("violent" video games "are a tiny fraction of the media violence to which modern American children are exposed"). Indeed, much of the body of research relied upon by the State is not specific to video games, but pertains to media violence generally. See, e.g., State PI Opp. Exh. B. (statement of Craig Anderson). Yet, as this Court recognized, the countless depictions of violence (and violence toward law enforcement officers) in other media, are left unaffected by H.B. 1009. See Injunction Order at 7 ("The state has not made any attempt to regulate the total amount of violence to which minors are exposed nor has it attempted to regulate all of the graphic violence depicted in video games. . . .").

Faced with this striking disconnect between H.B. 1009's narrow prohibition and the broad compelling interests it claims to serve, the State has consistently responded as follows: "The language of the statute was intentionally narrow in order to pass constitutional muster." State PI Opp. at 15. This retort simply misses the point, because regardless of how narrow or broad a regulation may be, that regulation must have some logical relationship to the asserted state interest, and directly and materially serve that interest, in order to survive First Amendment scrutiny. See, e.g., White, 536 U.S. at 765, 776; Turner, 512 U.S. at 664-65; Injunction Order at 5-6. But, as this Court observed, the restriction here "will have no effect at all on the other channels through which violent representations are presented to children, nor will it keep minors from playing extremely

violent video games: only those involving police officers would be off-limits." Injunction

Order at 7-8. Because the State can suggest no link between the narrow class of expressive

works it has selected for regulation and the harms it seeks to prevent, the State's refrain

simply highlights the lack of "fit" between its alleged interests and the arbitrary nature of the

category of speech it seeks to censor. For this reason alone, Plaintiffs are entitled to

summary judgment.

        (b)    **H.B. 1009 Is Not Narrowly Tailored.**

      The State's "narrow tailoring" argument reveals its misunderstanding of, and failure

to comply with, the Constitution's actual requirement of narrow tailoring. Although it is true

that H.B. 1009 narrowly targets one particular type of violent speech—indeed, so much so

that it regulates speech based on viewpoint—that has absolutely nothing to do with the

narrow tailoring that strict scrutiny demands. "Narrow tailoring" in the Constitutional sense

requires that regulation of speech be limited to what is necessary to achieve the legislature's

end, and that the State explain the rejection of less speech-restrictive alternatives, see, e.g.,

R.A.V., 505 U.S. at 395; Playboy, 529 U.S. at 813.

      H.B. 1009 is not narrowly tailored. As the Court recognized, the Act's prohibition is

overbroad, as "it would restrict access to games which mirror mainstream movies" and ones

that "are specifically rated as appropriate for teenagers." Injunction Order at 7-8. In

addition, as discussed in more detail below, the Act's provisions, though ostensibly

"narrowly" confined to games involving violence toward law enforcement officers, are so

vague that they could be read to cover a large subset of existing video games. See Reno v.

ACLU, 521 U.S. 844, 871-72 (1997) (vagueness "undermines the likelihood that the [Act]

has been carefully tailored to the . . . goal of protecting minors"). And, regardless of

vagueness, the narrow tailoring requirement requires the State to prove that a "plausible, less

restrictive alternative . . . will be ineffective to achieve its goals." Playboy, 529 U.S. at 816. The State cannot make such a showing here, where such an alternative exists:  awareness-raising measures concerning the video game rating system, which provides guidance to parents and others about the content of video games.  See id. at 824 ("A court should not . . . presume parents, given full information, will fail to act."); 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 507-08 (1996) (plurality op.) (striking down advertising ban because of less restrictive alternatives such as an "educational campaign" or "counterspeech").  In any event, the State was required at least to have considered the efficacy of less restrictive alternatives, see Sable, 492 U.S. at 129-30, but never did so.  Rather, the State refused to entertain Plaintiffs' offer to work with the State to help educate consumers about the video game rating system.

In sum, the State cannot show that the Act serves any compelling government interest in a narrowly tailored manner.  Rather, the Act is a "seemingly arbitrary" regulation of expression, Injunction Order at 7—one impermissibly designed "to protect the young from ideas or images that a legislative body thinks unsuitable for them." Erznoznik, 422 U.S. at 213-14.  Further factual development will do nothing to remedy these constitutional flaws.  Accordingly, H.B. 1009 fails strict scrutiny, and summary judgment should be entered for Plaintiffs.

## C.    H.B. 1009 IS UNCONSTITUTIONALLY VAGUE.

The Act is unconstitutional on another, independent ground:  vagueness.  Because several of the Act's terms are impermissibly vague and place the burden of compliance on game retailers, the Act will restrict a far broader range of video games than even the State claims it is seeking to regulate.  The Constitution demands that statutes be set forth with "sufficient definiteness that ordinary people can understand what conduct is prohibited."

Kolender v. Lawson, 461 U.S. 352, 357 (1983).  Such precision is essential to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly."  Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).  Exacting precision is demanded of legislation imposing penalties where free speech rights are at issue.  See NAACP v. Button, 371 U.S. 415, 433 (1963) (noting dangers, "in the area of First Amendment freedoms," of "the existence of a penal statute susceptible of sweeping and improper application").

Several key terms in the Act either are inherently vague or are defined in such a way as to fail to provide fair notice.  For example, the core of the Act's prohibition concerns depictions of "public law enforcement officer[s]," but that term has no easily understood meaning in the context of a medium where the action takes place in a wide variety of fictional and historical settings.  For example, in a James Bond game, do secret agents meet that definition?  What about military officers?  Military officers serving as civilian law enforcement?  Do "enemy" officers or security guards qualify?  What if a villain in the game disguises himself as a police officer?  What if the player's role in the game is that of a police officer, and the player may accidentally "harm" his partner?

The same sorts of interpretive problems plague the term "human form"—which is ill suited to a medium that relies extensively on extra-terrestrial or make-believe life forms and characters—and the term "realistic or photographic-like . . . depictions" of violence—which has no clear meaning in a medium in which all depictions are obviously computer-generated and thus inherently unrealistic.

Rather than attempt to rebut these charges of vagueness, the State has effectively conceded that H.B. 1009 is vague.  Upon Plaintiffs' request for clarification in their injunction motion, the State responded:  "If the statute contained precise language . . . ,

designers and makers of a video game could certainly design around such a precise definition, eviscerating the intent of the statute." State PI Opp. at 16. This response can only be interpreted as an admission that the State has crafted H.B. 1009 vaguely in order to create a chilling effect on expression. If the legislature's true intent in passing H.B. 1009 were merely to restrict games depicting violence toward "law enforcement officers," it would not matter that game designers could "design around such a precise definition," as long as the games did not offend the precise terms of a properly defined statute.

This interpretation of the State's response is confirmed by the legislative record, which, far from shedding light on how to interpret these terms, actually indicates the hope of the Act's proponents that the Act's terms will be confusing to the average person, will be interpreted more broadly than as provided, and will, accordingly, chill speech. See Hearing Before the Senate Committee on Children and Family Services and Corrections (Apr. 1, 2003) (statement of Rep. Dickerson) ("The practical effect of passing this legislation, although written very narrowly, I believe, will be much greater and will take in violence toward women."); Hearing Before the House Juvenile Justice and Family Law Committee (Jan. 22, 2003) (statement of Rep. Dickerson) (the Act's effect will be that "retailers will have to do what they say they're doing already and that is not allow any M-rated games to be sold to underage children," not just those games involving violence to law enforcement officers). Thus, not only will the Act's vagueness impermissibly cause Plaintiffs and others to "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked," Grayned, 408 U.S. at 109 (quotation marks omitted; alteration in original), but the Act's framers actually intended this forbidden effect.

Accordingly, as this Court noted, "it is not at all clear how defendants will interpret and enforce the statute." Injunction Order at 2. Moreover, stores and store clerks will be

subject to steep liability if they wrongly guess about what games the Act covers. Game creators, distributors, and retailers will respond to the uncertainty in the Act, and the penalties the Act imposes, by either self-censoring or otherwise restricting access to any potentially offending video game title. See Fries Decl. ¶¶ 8-9. Some range of games will not be made (or will be made differently) and some games will not be stocked at all. See id. ¶ 9. Such understandable, self-protective behavior will prevent access to such expression not only by children, but also by adult customers as well—whose right to enjoy "violent" video games is undisputed by the State. Taken together, the vague terms used in the Act itself and the Act's legislative history create an unwarranted chilling effect on protected speech and render the Act unconstitutionally vague.

## D. THE ACT IS AN UNLAWFUL PRIOR RESTRAINT.

The challenged provisions of the Act also constitute an unconstitutional prior restraint. It is blackletter law that prior restraints on expression are "the most serious and the least tolerable infringement on First Amendment rights," Nebraska Press Ass'n v. Stewart, 427 U.S. 539, 559 (1976), and thus are presumptively unconstitutional, see, e.g., Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 558-59 (1975). In determining whether a regulation is a prior restraint, courts look to "substance and not to mere matters of form, and . . . in accordance with familiar principles . . . [statutes] must be tested by [their] operation and effect." Near v. Minnesota ex rel. Olson, 283 U.S. 697, 708 (1931). The "operation and effect" of the Act render it a prior restraint on speech. The Act imposes stiff penalties for those who engage in covered expression. The Act is also vague, making it likely that authorities will enforce the Act on an ad hoc basis. In effect, video game retailers will be restrained from selling a great number of video games—some ultimately covered by the statute, and some not—and the only way a retailer can be confident of avoiding

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. C03-1245L) - 20
[41632-0001/SL032550.186]

prosecution for selling or renting a game is to consult with local authorities before doing so. Because a Ninth Circuit decision departs from these principles, see Free Speech Coalition v. Reno, 198 F.3d 1083, 1096-97 (9th Cir.), aff'd on other grounds, 535 U.S. 234 (2002), Plaintiffs seek to preserve this claim and argument but rely primarily on the constitutional deficiencies identified above.

## IV.   CONCLUSION

For the foregoing reasons, the Court should enter summary judgment for Plaintiffs.

DATED:  September 15, 2003.

**JENNER & BLOCK, LLC**
Paul M. Smith (Pro Hac Vice)
Deanne E. Maynard (Pro Hac Vice)
Kathleen R. Hartnett (Pro Hac Vice)
601 Thirteenth Street, N.W., Suite 1200
Washington, D.C.  20005
Phone:  (202) 639-6000
Fax:  (202) 639-6066

and

**PERKINS COIE LLP**


By:  s/Signe Brunstad
     David J. Burman, WSBA #10611
     Signe H. Brunstad, WSBA #30944
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Telephone:  206-359-3990
Facsimile:  206-359-4990
E-mail:  bruns@perkinscoie.com
Attorneys for Plaintiffs